# UNITED STATES DISTRICT COURT DISTRICT
# WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| Margaret Kennedy, Ron Tussey, and Charles Fisher, as representatives of a class of similarly situated persons, and and **on behalf of the PRISM Plan for Represented Employees of ABB, Inc.** and Timothy Herndron and Timothy Pinnell as representatives of a class of similarly situated persons, and **on behalf of the PRISM Plan for Employees of ABB, Inc.,** <br><br> Plaintiffs; <br><br> v. <br><br> ABB, Inc., John W. Cutler, Jr., Pension Review Committee of ABB, Inc., Pension & Thrift Management Group of ABB, Inc. Employee Benefits Committee of ABB, Inc., Fidelity Management Trust Company, and Fidelity Management & Research  Co. <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Cause No:  2:06-cv-04305  NKL |

## PLAINTIFFS' OPPOSITION TO FIDELITY DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

SCHLICHTER, BOGARD & DENTON
Jerome J. Schlichter, 02488116
Daniel V. Conlisk
Heather Lea, 6276614
100 S. Fourth Street., Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (Fax)
jschlichter@uselaws.com
dconlisk@uselaws.com
hlea@uselaws.com

ATTORNEYS FOR PLAINTIFFS/
CLASS REPRESENTATIVES

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 2

ARGUMENT ........................................................................................................ 5

   I.     The Fidelity Defendants Seek Summary Judgment. ................................ 5

   II.    The Fidelity Defendants' Fiduciary Status Is Based Upon A Fact-Intensive
        Inquiry That Cannot Be Decided At The Pleadings Stage. .................................. 6

   III.   The Complaint Sufficiently Alleges FMRCo Is An ERISA Fiduciary.................. 8

        A. Plaintiffs Do Not Contend FMRCo is a Fiduciary Simply Because It Is A
           Mutual Fund Investment Advisor. .................................................... 8

        B. FMRCo Exercises Fiduciary Authority Over Funds TO Be Included As Plan
           Investment Options. ........................................................................... 9

        C. FMRCo Exercised Control Over The Plans' Assets By Deciding How Much
           The Plans Would Pay For Administration ....................................... 10

   IV.   The Complaint Sufficiently Alleges FMTC's Status As A Fiduciary. ................. 16

   V.    Count II States A Claim. ...................................................................................... 18

        A. Count II States A Claim Even If The Fidelity Defendants Are Not Fiduciaries.
           ................................................................................................................. 18
        B. Count II It Seeks Appropriate Equitable Relief. .............................. 19

   VI.   Count III States A Claim. .................................................................................... 25

CONCLUSION ..................................................................................................... 25

Case 2:06-cv-04305-NKL   Document 58   Filed 05/01/07   Page 2 of 33

# TABLE OF AUTHORITIES

## Cases

*A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Secs., Inc.*, 964 F. Supp. 147, (S.D.N.Y. 1997) ........................................................................................................... 9

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, (1972) ............................ 24

*Am. Med. Assoc. v. United Healthcare Corp.*, 2002 WL 31413668, at *7 (S.D.N.Y. Oct. 23, 2002) ............................................................................................................................. 20

*American Federation of Unions v. Equitable Life Assurance Soc'y,* 841 F.2d 658 (5th Cir.1988). ........................................................................................................................... 7

*BJC Health System v. Columbia Gas Co.*, 348 F.3d 685 (8th Cir. 2003) ........................... 5

*Blatt v. Marshall and Lassman,* 812 F.2d 810 (2d Cir. 1986) ........................................... 6

*Blatt*, 812 F.2d at 813 .................................................................................................. 7, 10

*Bostic v. Goodnight*, 443 F.3d 1044, 1048 (8th Cir. 2006) .............................................. 20

*Brock v. Hendershott,* 840 F.2d 339 (6th Cir.1988) ......................................................... 7

*Cardinal Health, Inc. ERISA Litigation*, 424 F. Supp. 2d 1002, 1030 (S.D. Ohio 2006) .. 8

*Century 21 Shows*, 400 F.2d at 607 ................................................................................. 19

*Chapro v. SSR Realty Advisors, Inc. Severance Plan*, 351 F.Supp. 2d 152, 156 (S.D.N.Y. 2004) ............................................................................................................................... 20

*Chicago District Council of Carpenters Welfare Fund v. Caremark,* 474 F.3d 463 (7th Cir. 2007) ...................................................................................................................... 14

*Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal. App. 3d 1 (1977) ............................................................................................... 20

*Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal. App. 3d 1, 14 (1977) .................... 20

*Communications Workers of America, AFL-CIO v. Nynex Corp.*, 1998 WL 85323, at *1 (S.D.N.Y. Feb. 26, 1998) ............................................................................................... 20

*Corbett v. Marsh & McLennan Cos.*, No. MDL 15863, 2006 WL 734560 (D. Md. Feb. 27, 2006) ......................................................................................................................... 9

*DeGuiseppe v. Vertis, Inc.,*2005 WL 2271865, at *4 (E.D. Pa. Sept. 15, 2005) .............. 20

*Del Rio v. Toledo Edison Co.*, 2005 WL 1001430 at *3 (6th Cir 2005)........................... 22

*Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C.Cir.1990) ...................... 22

*Eslava v. Gulf Telephone Co.*, 418 F. Supp. 2d 1314 (S.D. Ala. 2006) ........................... 8

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987) .............. 14

*Galgay v. Gangloff,* 677 F. Supp. 295 (M.D.Pa.1987) ........................................ 7

*Garman v. Griffin*, 666 F.2d 1156, 1158-59 (8th Cir. 1981) ............................. 19

*Gee v. UnumProvident Corp.*, 2005 WL 534873 at *14 (E.D.Tenn. 2005) ................... 22

*Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 192-94 (2d Cir. 1998) ........................ 24

*Griggs v. E.I. DuPont de Nemours,* 237 F.3d 371, 381-84 (4th Cir.2001) ..................... 22

*Guardian Music Corp. v. James W. Guerico Enterprises, Inc.*,
    2006 WL 1880381 at *2 (S.D.N.Y. 2006) .................................................... 20

*Haddock v. Nationwide Insurance Co.*, 419 F. Supp. 2d 156 (D. Conn. 2006) .......... 10, 12

*Howe v. Varity Corp,* 36 F.3d. 746, 754 (8th Cir. 1994) ..................................... 22

*In re AEP ERISA Litig.,* 327 F. Supp. 2d 812, 824 (S.D. Ohio 2004) ........................... 23

*In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898 (E.D. Mich. 2004) ..................... 8

*In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658 (E.D. Tex. 2004) ........ 8

*In re Electronic Data Sys. Corp. "ERISA" Litig.,* 305 F. Supp. 2d 658, 673 (E.D. Tex.
    2004) ...................................................................................... 23

*In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207 (D. Kan. 2004) .......................... 8

*In re Xcel Energy, Inc.*, 312 F. Supp. 2d 1165 (D. Minn. 2004) ....................................... 8

*Independent Business Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698, 701-02 (8th Cir.
    1997) ...................................................................................... 19

*Kalda v. Sioux Valley Physician Partners*, 2007 WL 925245 at * 3 ............................... 21

*Keach v. U.S. Trust Co.*, 256 F. Supp. 2d 828 (C.D. Ill. 2003) ........................................ 6

*Kling v. Fidelity Mgmt. Trust Co.,* 323 F. Supp. 2d 132, 143 n.10 (D. Mass. 2004) ........ 23

*Mertens v Hewitt Assoc.*, 508 U.S. 248 (1993) ....................................................... 6

**Morrell & Co. v. John Hancock Mut. Life Ins. Co.,** No. 85 C 9166, 1988 WL 58619
    (N.D. Ill. May 31, 1988) ................................................................... 14

*Olson v. E.F. Hutton & Co., Inc.*, 972 F.2d 622 (8th Cir. 1992) ....................................... 6

*Pegram v. Herdrich,* 530 U.S. 211 (2000) .............................................................. 9

*Peralta v. Hispanic Business, Inc.*, 419 F.3d 1064, 1071-72 (9th Cir. 2005) ................... 22

iv

*Rankin v. Rots,* 278 F. Supp. 2d 853 (E.D. Mich. 2003) .................................................. 8

*Rankin,* 278 F. Supp. 2d at 876 ........................................................................................ 23

*Rankin,,* 278 F. Supp. 2d at 876 ....................................................................................... 23

*Reed*, 460 F.2d at 826 ........................................................................................................ 19

*Rivoli Drug Co. v. Lynch*, 50 F.2d 536 (9th Cir. 1931) .................................................. 20

*S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 751 (9th Cir. 2005) ......................... 22

*Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983) ....................................... 17

*Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir.1997) ........................................................ 21

*Siemers v. Wells Fargo & Co.; 2007 WL 760750 (N.D. Cal. March 9, 2007)* ............... 13

*Siemers v. Wells Fargo & Co.*, 2007 WL 760750, *12-15 (N.D.Ca. March 9, 2007) ...... 23

*Sixty-Five Security Plan v. Blue Cross & Blue Shield,* 583 F. Supp. 380 (S.D.N.Y. 1984) ........................................................................................................................................... 14

*Stanton v. Shearson/Lehman American Express, Inc.,* 631 F.Supp. 100 (N.D.Ga.1986)... 7

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ........................................................... 5

*Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002) ................................................................. 5

*Towers v. Titus*, 5 B.R. 786 (N.D. Cal. 1979) .................................................................. 20

*Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 247-48 (2000) ................... 18

*U.S. v. Glick*, 142 F.3d 520 (2d Cir. 1997) ...................................................................... 11

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ..................................................................... 19

*Varity v. Howe*, 516 U.S. 489, (1996) ................................................................................ 6

*Worldcom, Inc. ERISA Litig.,* 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003) ...................... 22

## Statutes

29 U.S.C. § 1002(21)(A) ...................................................................................................... 6

29 U.S.C. § 1002(21)(B) ...................................................................................................... 8

29 U.S.C. § 1101(b) ........................................................................................................... 11

## Rules

Fed R. Civ. P. 8(a)(2) ........................................................................................................... 5

Fed. R. Civ. P. 12(b) ........................................................................................................ 5

Fed. R. Civ. P. 56(f) ........................................................................................................ 5

## Regulations

29 C.F.R. § 2509.75-3 ...................................................................................................... 8

29 C.F.R. 2510.3-101 ...................................................................................................... 11

Case 2:06-cv-04305-NKL   Document 58   Filed 05/01/07   Page 6 of 33

## INTRODUCTION

Plaintiffs are participants in two 401(k) Plans, the PRISM Plan for Represented Employees of ABB, Inc. and the PRISM Plan for Employees of ABB, Inc. (herein the "Plan" or "Plans"). (Compl. ¶ 10, 12-16.). The terms of the Plans are identical. In their Complaint, Plaintiffs explain that Defendants ABB, Fidelity Management & Research Company ("FMRCo") and Fidelity Management Trust Company ("FMTC") (collectively, "the Fidelity Defendants") breached their fiduciary duties in, essentially, two ways.

First, Defendants breached their core fiduciary under ERISA duties by causing the Plan, and thus all Plan participants, to pay excess and unreasonable fees and expenses to the Fidelity Defendants and related fidelity entities. (Compl. ¶¶ 11, 58-82, 99.a-f, k) The Plan paid these fees and expenses via a combination of: (1) "Hard Dollar" payments to the Fidelity Defendants (from the Plan and the Master Trust for Employee Benefit Plans of ABB Inc. (the "Master Trust")); and (2) "Revenue Sharing" charges (fee assessments hidden in the expense ratios of Plan investment options and secretly distributed among Fidelity entities). (COMPL., ¶¶ 34-37, 40, 58-96). These excessive fees were assessed against all participants' 401(k) accounts and impaired their retirement savings. (COMPL. ¶¶ 10-11, 39, 58-61, 78-82, 99-102).

Second, Defendants violated their fiduciary duties – while subjecting the Plan to these excessive fees against on a Plan-wide basis – by failing to disclose or outright concealing: (1) that such excessive fees were being charged to all Plan participants; (2) that the expense ratios of the Plans' various investment options were inflated and overstated to provide funds with which to make these excessive fee payments, via hidden

revenue sharing arrangements, to various Fidelity entities; (3) the true and accurate cost of the services participants were purchasing from Fidelity for the Plan's investment options – *i.e*, the actual price of the ostensible services (investment management) covered by such expense ratios *as opposed to* the amount charged to support undisclosed revenue sharing among Fidelity entities; (4) the true and necessary cost of operating the Plan, and thus the true and accurate expenses that properly could be charged to participants for their participation in the Plan; and (5) the ongoing self-dealing and conflicts of interest inherent in these hidden fee arrangements by which Fidelity collected excess compensation for distribution among related entities. (Compl. ¶ 79-96; 99.g.- i.; 106-114) As a result, Plaintiffs and all participants lacked the information necessary to understand and protect their interests in the Plan, were rendered incapable of making informed decisions regarding their investments in the Plan, and were unaware of Defendants' fiduciary breaches. (Compl. ¶¶ 86-96).

The Fidelity Defendants seek dismissal because, they contend, they are not ERISA fiduciaries. Whether an entity is a fiduciary in an ERISA 401(k) Plan turns upon a functional test which focuses *not* on the terms of Plan documents, but rather upon the role it fulfills and the discretion it exercises. Accordingly, as set forth below, the Complaint alleges that the Fidelity Defendants exercised extensive discretion in various areas, and, in doing so, established their fiduciary status.

## FACTUAL BACKGROUND

Since at least 1995, FMTC has exercised extensive authority over the Plans' investment options, the operation and administration of the Plans through various Fidelity-related service providers, and the amount the Plans pays to such Fidelity-related

service providers. (Compl. ¶¶ 20-25, 39-42, 79-82, 119-121.)  ABB and FMTC agreed

that the Plans would offer as investment options *only*[1]: (1) mutual funds which Defendant

Fidelity Management & Research Company ("FMRCo", a registered investment adviser

that operates mutual funds) advised or managed; and (2) non-Fidelity funds *only to the*

*extent that  FMTC agreed* with the inclusion of such funds.  (Compl. ¶¶ 22-25.)  ABB

and FMTC agreed that ABB would hire FMTC as Plan trustee and Plan record keeper.

They also agreed that Fidelity would provide other Plan administrative services.  (Compl.

¶ 29.)

      To make matters worse, ABB and Fidelity did not negotiate the fees that would be

assessed against the Plans' assets for these recordkeeping and administrative services.

Instead, FMTC and/or FMRCo determined the amount of those fees, which are charged

as a percentage of the Plans' assets, and hidden within investment options' expense

ratios.  (Compl. ¶¶ 70-85.)  As the Plans assets grew to a combined value in 2004 of more

than $1.5 billion, FMTC and FMRCo's pay – unilaterally set as a percentage of the

Plan's assets – grew commensurately.  The Fidelity Defendants unilaterally decided how

to divide this ever-increasing compensation among themselves; how much to allot for

Plan record keeping and administrative tasks performed by FMTC; and how much to pay

other Fidelity entities for purported services to the Plan (if any).  (Compl. ¶¶ 81-85.)  The

Fidelity Defendants had sole discretion over the amount of these fees without Defendant

ABB's knowledge, much less its oversight.  (Compl. ¶¶ 81-85.)

      Fidelity's control over Plans' investment options was a critical part of this

scheme.   Fidelity's compensation for recordkeeping, administrative and other services to

operate the Plan was not exclusively in the form of disclosed, hard-dollar payments.

---

[1]  With an exception for certain pre-existing investments and the ABB Company Stock Fund.

(Compl. ¶¶ 60-85.) Rather, it was derived from revenue sharing amounts built into the expense ratios of the various mutual funds included as Plan investment options. Thus, Fidelity's pay for its recordkeeping, administrative and other services depended entirely upon the Plans' investment options including *only* funds which had inflated their expense ratios with sufficient "revenue sharing" allotments provide the Fidelity Defendants with a hefty profit. Further, Fidelity's status as exclusive service provider ensured that it would not have to share any of these revenue sharing monies with others.

Thus, by agreeing that ABB could include as investment options *only* Fidelity mutual funds, or non-fidelity funds *that Fidelity had approved*, Fidelity guaranteed that it would receive excessive compensation that would increase as Plan assets increased.[2] For example, FMRCo serves as investment advisor for over a dozen *retail* fidelity mutual funds offered as Plan investment options, even though the Plans' $1.5 billion in assets should qualify it for lower priced *institutional* funds. Such retail funds charge higher expense ratios which secretly contain greater amounts of revenue sharing for Fidelity and its related entities.

None of this was, or is, disclosed to Plan participants. Participants' returns from the Plans' Fidelity-managed or Fidelity-approved funds are reported *net* of these charges; they never appear on participants' statements. Neither the Plans' participants nor ABB saw the amount or allocation of fees paid to FMTC and its related entities for Plan recordkeeping and administrative services. (Compl. ¶¶ 62-85.) While wholly invisible, the Fidelity Defendants' fees were excessive and unreasonable for the services provided.

---

[2] This too was a virtually certainty, as participants would be making ongoing contributions from each paycheck to the funds which Fidelity had selected.

## ARGUMENT

The Federal Rules of Civil Procedure require only that the complaint contain a short and plain statement that provides the defendant with fair notice of the claim. *See* Fed. R. Civ. P. 8(a)(2); *BJC Health System v. Columbia Gas Co.*, 348 F.3d 685 (8th Cir. 2003). Dismissal is appropriate only if there exists *no* possible set of facts consistent with the allegations in the complaint under which the plaintiff could recover. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

### I. The Fidelity Defendants Seek Summary Judgment.

The Fidelity Defendants' motion improperly relies on a deluge of documents that are not attached to, or incorporated into, the Complaint, and that are not central to Plaintiffs' causes of action. Their motion is, in short, a defective motion for summary judgment. *See* Fed. R. Civ. P. 12(b); *BJC Health System v. Columbia Gas Co.*, 348 F.3d 685 (8th Cir. 2003). Plaintiffs have not completed discovery. Consideration of summary judgment issues is unwarranted, and the motion should be denied. See Fed. R. Civ. P. 56(f). Seeking to escape this, the Fidelity Defendants urge that the Court may consider their deluge of documents because the Complaint mentions one of them. But the exception to Rule 12(b)(6), on which the Fidelity Defendants rely, if far too narrow to accommodate the documents submitted. *See, e.g., Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002). It allows the submission of, for example, a written contract on which a breach of contract claim is based. *Id*. In such a case, the contract defines the parties' obligations. Here, the Defendants' Trust Agreements do not define their obligations

5

under ERISA.[3]  Defendants' fiduciary duties arise out of ERISA, the case law

interpreting it, and the trust and fiduciary law out of which it grows.

## II. The Fidelity Defendants' Fiduciary Status Is Based Upon A Fact-Intensive Inquiry That Cannot Be Decided At The Pleadings Stage.

Plaintiffs have alleged that both FRMCo and FMTC are Plan fiduciaries.  Section

3(21) of ERISA provides, in pertinent part, that a fiduciary is any individual or entity that

performs the following functions in connection with an ERISA plan:

> (i) ... exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) ... renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) ... has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

Thus, ERISA  "defines 'fiduciary' not in terms of formal trusteeship, but in

functional terms of control and authority over the plan." *Mertens v Hewitt Assoc.*, 508

U.S. 248 (1993).  The Eighth Circuit has consistently read this definition of fiduciary in

the broadest of ways.  *Olson v. E.F. Hutton & Co., Inc.*, 972 F.2d 622 (8th Cir. 1992).

When making a determination of whether a party associated with an ERISA plan owes

the plan a fiduciary duty, "[ERISA] imposes fiduciary status upon those who act like

fiduciaries as well as those who" are designated as fiduciaries.  *Id.  See also  Blatt v.

Marshall and Lassman,* 812 F.2d 810 (2d Cir. 1986); *Galgay v. Gangloff,* 677 F. Supp.

295 (M.D.Pa.1987) (noting legislative history reveals Congress sought "to codify the

---

[3] *See Varity v. Howe*, 516 U.S. 489 (1996).  *See also Keach v. U.S. Trust Co.*, 256 F. Supp. 2d 828 (C.D. Ill. 2003) (looking solely at the powers that a defendant is given on paper would "render the protections of ERISA meaningless, as ERISA's fiduciary liability provisions would have no meaning in the real world unless they are flexible enough to take cognizance of the different dynamics in which these transactions can occur").

traditional principles of fiduciary responsibility from the law of trusts" and "adopted a broad, functional definition of the term" in order to further this purpose).

Contrary to Fidelity's contentions, it need not have "absolute discretion with respect to a benefit plan to be considered a fiduciary." *Blatt,* 812 F.2d at 812; *see also American Federation of Unions v. Equitable Life Assurance Soc'y,* 841 F.2d 658 (5th Cir.1988). Indirect or attenuated actions are adequate to show "control over plan assets" so as to classify one as an ERISA. *See Blatt,* 812 F.2d at 813 (accounting firm was an ERISA fiduciary because its refusal to sign and deliver to a former employee a form required for him to receive a distribution from the plan was an exercise of actual control over the disposition of plan assets); *Brock v. Hendershott,* 840 F.2d 339 (6th Cir.1988) (a high-ranking union representative who used his "considerable influence" over local unions to direct them to choose a particular dental plan was an ERISA fiduciary because of his exercise of authority or control over the disposition of plan assets); *Stanton v. Shearson/Lehman American Express, Inc.,* 631 F.Supp. 100 (N.D.Ga.1986) (a brokerage firm acts as an ERISA fiduciary "when it exercises authority or control over the broker assigned to the ERISA account; since the broker's employment respects the disposition of ERISA assets, control over the broker is control respecting the disposition of those assets").

Against this background, courts consistently hold that making that fact-intensive assessment of whether a defendant meets this standard is *not* appropriate when the plaintiff has not yet had the benefit of full discovery.[4] Put succinctly, "the manner in

---

[4] *In re Cardinal Health, Inc. ERISA Litigation*, 424 F. Supp. 2d 1002, 1030 (S.D. Ohio 2006) ("fiduciary status is a 'fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss.'"); *Eslava v. Gulf Telephone Co.*, 418 F. Supp. 2d 1314 (S.D. Ala. 2006) (declining to dismiss plaintiffs' ERISA claims based on defendant's "alleged fiduciary status or the parameters of her fiduciary

which each defendant . . . operated" remains "something of a black box" prior to

discovery. *Rankin v. Rots,* 278 F. Supp. 2d 853 (E.D. Mich. 2003). "To expect a plaintiff

to be able to turn on the light and point to the particular individuals who exercised

decision making authority is simply too much to require at" at the pleading stage. *Id.*

### III.      The Complaint Sufficiently Alleges FMRCo Is An ERISA Fiduciary.

#### A.      Plaintiffs Do Not Contend FMRCo is a Fiduciary Simply Because It Is A Mutual Fund Investment Advisor.

ERISA § 3(21)(B), 29 U.S.C. § 1002(21)(B)  , provides that a mutual fund

investment adviser does not become a fiduciary *solely* because of its role as mutual fund

investment adviser.  29 U.S.C. § 1002(21)(B).   Based on this, FMRCo argues that it is

not a fiduciary as a matter of law.  (Fidelity MTD p. 7.)   But this misreads the statute.

FMRCo is not *automatically* deemed a fiduciary simply because advises the Plan's

Fidelity mutual fund's investments.  But FMRCo can be, and is, a fiduciary under ERISA

§ 3(21)(A)'s other provisions.  *See* 29 C.F.R. § 2509.75-3 (if an investment adviser to a

mutual fund is a fiduciary or party in interest for reasons other than the investment in the

mutual fund, the adviser remains fiduciary). [5]   The Supreme Court has expressly

recognized that a party  can be a fiduciary for some purposes but not others, depending

capacities at this stage of the case"); *In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207 (D. Kan. 2004) (finding it premature to determine scope of fiduciary duties and whether particular defendant acted in fiduciary capacity on motion to dismiss); *In re Xcel Energy, Inc.*, 312 F. Supp. 2d 1165 (D. Minn. 2004) (questions of fiduciary status are ill-suited to resolution on Rule 12(b)(6) motion); *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898  (E.D. Mich. 2004) (holding fiduciary status could not be determined on a motion to dismiss); *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658 (E.D. Tex. 2004) ("It is typically premature to determine a defendant's fiduciary status at the motion to dismiss stage of the proceedings.").

[5]  *See* FMRCo's authority acknowledges this.  (Fidelity MTD p. 7.)  Although recognizing that a mutual fund investment advisor is not automatically deemed a fiduciary, both cases explain that such advisers may be fiduciaries for other reasons.  *A. Ronald  Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Secs., Inc.*, 964 F. Supp. 147,  (S.D.N.Y. 1997) (the investment of plan assets in "securities issued by a registered investment company d*oes not of itself* cause the investment company [or] its adviser" to become an ERISA fiduciary) (emphasis added);  *Corbett v. Marsh & McLennan Cos.*, No. MDL 15863, 2006 WL 734560 (D. Md. Feb. 27, 2006) (mutual fund investment adviser can be considered provider of "investment advice" and thus a fiduciary, depending on facts).

upon which functions it performs on behalf of the Plan. *Pegram v. Herdrich,* 530 U.S. 211 (2000).

Here, in addition to advising Fidelity-branded mutual funds, FMRCo performs two fiduciary functions. First, in conjunction with FMTC and possibly other Fidelity entities, FMRCo: (1) decides which FMRCo-managed mutual funds will be made available to ABB for inclusion as Plan investment options, and (2) grants or denies the requisite approval of any non-Fidelity funds that, subject to FMRCo's decision, may be offered as investment options in the Plans. Second, FMRCo, either alone or in conjunction with FMTC, decides how much the Plans will pay for *Plan* record keeping and other *Plan* related administrative services. (Compl. ¶¶ 23-25.)

> **B.** **FMRCo Exercises Fiduciary Authority Over Funds TO Be Included As Plan Investment Options.**

A party need not exert final or formal control to be deemed an ERISA fiduciary. Here, exerting influence and/or indirect control over the Plans' selection of funds to be included as investment options makes FMRCo an ERISA fiduciary. *See* ERISA § 3(21)(A)(i); *Blatt*, 812 F.2d at 813; *Brock v. Hendershott*, 840 F.2d at 342; *Stanton v. Shearson/Lehman American Express, Inc.*, 631 F.Supp. at 105; *Olson*, 957 F.2d at 625. FMRCo and other Fidelity Defendants and entities performed the primary screening of plan investment options, reducing the thousands of investment vehicles available to *only* Fidelity funds or non-Fidelity funds of which FMRCo approved. By doing so, FMRCo and FMTC were able to ensure that only funds with expense ratios that included substantial revenue sharing would be considered for inclusion in the Plan.

Despite this, FMRCo insists that it cannot be a fiduciary because, according to the Trust Agreement, ABB had "final authority" over the inclusion of funds in the Plans.

9

But such formal authority is largely irrelevant to ERISA's functional fiduciary test.  *See* ERISA § 3(21)(A)(i); *Blatt*, 812 F.2d at 813; *Brock v. Hendershott*, 840 F.2d at 342; *Stanton v. Shearson/Lehman American Express, Inc*., 631 F.Supp. at 105; *Olson*, 957 F.2d at 625. The Complaint explains that *in practice* FMRCo "played a role" in the selection of Plan investment options.  (Compl. ¶¶ 23-25.)   The Complaint indicates that Fidelity was extensively involved in the operation of the Plan and the screening of investment options.  If these allegations alone are not sufficient, they certainly give rise to inferences that FMRCo and other Fidelity entities played substantial functional roles.

In *Haddock v. Nationwide Insurance Co.*, 419 F. Supp. 2d 156 (D. Conn. 2006)*,* the court held that Nationwide was an ERISA fiduciary because it exercised "*some* control over the selection of mutual funds that are available for the Plans' and participants' investments,"  even though Nationwide did not make the final decision. *Haddock*, 419 F. Supp. 2d at 166 (emphasis added).  There, as here, such control enabled the Nationwide to recommend only mutual funds which paid sufficient revenue-sharing to Nationwide.  As a result, the court held that Nationwide was a fiduciary with regard to the selection of mutual funds.  *See id.* & n.6.

## C. FMRCo Exercised Control Over The Plans' Assets By Deciding How Much The Plans Would Pay For Administration.

FMRCo was both the ultimate arbiter of the Plan's recordkeeping and administrative fees and the paymaster collecting such fees from Participants' accounts. The Complaint explains that these fees were unreasonable and excessive.  Fidelity does not, and cannot, dispute that it controlled these monies and determined how much the Plan paid for Plan recordkeeping and administration.  Instead, Fidelity contends that it is not a fiduciary because these excessive fees were, once removed from participants'

accounts, were not "plan assets." (Fidelity MTD p. 8.)[6] Ignoring that it filed a motion to dismiss, FMRCo's argument turns on factual contentions that the money paid to Fidelity is routed through Fidelity-related or approved mutual funds before it is tendered to FMTC. There is no basis for these contentions in the Complaint. The Fidelity Defendants, and/or related Fidelity entities, served, at a minimum, as the Plans' trustee, record-keeper, and broker. As such, they had possession and control of the Plans' assets. Plaintiffs need discovery to determine the exact mechanism that the Fidelity Defendants used to collect and distribute the excess fees they removed from Plan participants' accounts and distributed among Plan service providers.

Even if the Court were to analyze FMRCo's fiduciary-status under hypothetical that Defendants posit, the excess fee money that Fidelity removed from Plan participants' accounts does not loose its protection as a "plan asset" simply because Fidelity entities successfully have secured possession of it. In *U.S. v. Glick*, 142 F.3d 520 (2d Cir. 1997), the court rejected this argument. Glick was an insurance broker who enrolled plan participants in a health insurance plan in exchange for a commission. Glick himself determined the amount of his commission. In order to continue to serve as broker for the plan, Glick agreed to make a payment to the plan's sponsor for every participant he brought into the plan. After being convicted of bribery for paying these kickbacks to the plan sponsors, Glick challenged his sentence. He argued, as the Fidelity Defendants argue here, that he was not an ERISA fiduciary because his commissions were not "plan

---

[6]  ERISA itself does not define "plan assets" in this context. As discussed above, section 401(b) provides only that the assets of a mutual fund company do not become "plan assets" merely by the plan's investment in a mutual fund company, but does not offer any guidance as to what plan assets are. *See* 29 U.S.C. § 1101(b). The attendant regulations promulgated by the Department of Labor do not contain any further clarification on this point. *See* 29 C.F.R. 2510.3-101 (plan assets – investments).

assets" over which he exercised control. *Glick*, 142 F. 3d at 527. The Second Circuit rejected this contention. In holding that Glick exercised control over plan assets and was thus a fiduciary, the Second Circuit reasoned that just as "the monies an employer actually pays over to the welfare plan, directly or indirectly and regardless of whose control such monies passes, constitutes welfare plan assets from the time the employer parts with the monies," it is "reasonable to conclude that the monies retain their character as fund assets as they pass downstream …" *Id.*.

The only court to consider the issue in the ERISA revenue sharing context reached the same conclusion. In *Haddock v. Nationwide Insurance Co.*, 419 F. Supp. 2d 156 (D. Conn. 2006), Nationwide provided group annuities– essentially insurance company mutual funds – to retirement plans and their participants. There, as here, Nationwide prescreened such funds and the plan sponsor chose plan investment options from the list Nationwide approved. *Id.* at 161. When such a mutual fund was included in the plan, Nationwide received revenue-sharing payments from the fund.

Another plan fiduciary learned of this and sued to force Nationwide to restore these revenue sharing payments to the plan. Nationwide argued that revenue sharing monies were not plan assets. The court disagreed and found that the revenue sharing transfers were "plan assets" even though they were *paid by mutual funds out of mutual fund fees. Id.* at 162-63. *Haddock* employed a "functional" test under which revenue sharing fee transfer would constitute plan assets when the defendant holds or receives them: (1) as a result of its status as a fiduciary or its exercise of fiduciary discretion or authority; and (2) at the expense of plan participants or beneficiaries. *Haddock*, 419 F. Supp. 2d at 169-70 (citing cases from which the standard was drawn). *Haddock* first

concluded that Nationwide came to hold the assets as a result of its status as a fiduciary: there, as here, the prescreening of mutual funds for inclusion in the Plan was *both* an exercise of control *and* the reason that Nationwide was in the position to secretly receive the revenue-sharing payments. *Id.* at 170.[7] Nationwide was able, as is FMRCo here, to ensure that the plan only chose among funds that would pay sufficient revenue sharing. *Id.* at 166-67.

Second, the Court held that Nationwide collected and retained these excess fees and expenses directly at the expense of plan participants. *See Haddock*, 419 F. Supp. 2d at 170. Here, FMRCo used its control over the plan assets to collect excessive administrative fees – fees which did not reflect the actual expense of administrative services supplied to the Plans – from participants' retirement directly to their detriment. *Id.* (second prong). Had Fidelity not removed these excess fees from the Plan, these monies would have been available to earn investment gains and provide additional income to participants when they retire. *See Siemers v. Wells Fargo & Co.; 2007 WL 760750 (N.D. Cal. March 9, 2007)*; Private pension changes needed to provide 401(k) participants and the Department of Labor better information on fees (Nov. 2006) by the Government Accountability Office.

Thus, neither the law, nor common sense, support Fidelity's hyper-technical contentions that – by secretly collecting excess fees from participants' retirement savings *exactly because* of its possession of, and control over, Plan assets – it can reclassify such assets so as to impair their status and protection under ERISA. In *Sirna*, on which FMRCo relies, the court acknowledged that when a plan service provider ended up with

---

[7] The court also found that the mutual funds -- although charging no more than the expense ratios disclosed in their prospectuses – ensured that those expense ratios were sufficiently overstated so as to provide money for revenue-sharing payments to Nationwide. *Id.* at 170.

"so much control over factors determinative of its own compensation" that the provider was able to "manipulate the plan or its assets to [the provider's] own benefit," the service provider could be deemed a fiduciary with respect to its compensation. *Sirna*, 964 F.2d at 149 (*quoting F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987)).[8] Here, FMRCo had this exact sort of control over its compensation and that of other Fidelity entities.

FMRCo also relies on *Chicago District Council of Carpenters Welfare Fund v. Caremark,* 474 F.3d 463 (7th Cir. 2007). In *Caremark*, a health insurance plan sponsor (Carpenters) contracted with a "pharmacy benefits manager" (Caremark) to pay set prices for prescription drugs. *Id.* at 466. Those prices were based on factors entirely beyond the control of Caremark (or Carpenters, for that matter). Caremark also agreed to pay Carpenters a rebate of $1.50 or $.75 per prescription filled, regardless of the price of the prescription or the percentage of the rebate Caremark itself received from the drug makers. *Id.* at 467-69. The Seventh Circuit found that under these circumstances, and based on the specific contractual terms, where the parties specifically negotiated a set amount of rebates that Caremark (not the drug maker) was obligated to pay the plan and where it provided that Caremark would hold the rebate contract with the drug manufacturers, Caremark did not exercise fiduciary control of "plan assets" when it retained rebates that it negotiated on its own behalf with drug makers. *Id.* at 476.

The *Caremark* decision makes reference to "plan assets" only in footnote six. In fact, as the *Caremark* court observed, if Caremark *had* been collecting rebates and

---

[8] *See also  Morrell & Co. v. John Hancock Mut. Life Ins. Co.*, No. 85 C 9166, 1988 WL 58619 (N.D. Ill. May 31, 1988) (Holding that claims administrator who had control over which claims would be paid was compensated based upon a percentage of paid claims was a fiduciary precisely because it had control over the amount of its payment.); *Morrell & Co. v. John Hancock Mut. Life Ins. Co.*, No. 85 C 9166, 1988 WL 58619, at *1-2 (N.D. Ill. May 31, 1988). *See also Sixty-Five Security Plan v. Blue Cross & Blue Shield,* 583 F. Supp. 380 (S.D.N.Y. 1984) (same).

passing through a percentage to Carpenters, instead of paying a flat, contractually pre-determined rate, the rebates would have been considered "plan assets." *Caremark*, 474 F.3d at 476 & n.6  If the amount of the rebate was not the subject of negotiation but was unilaterally determined by Caremark, then Caremark would have clearly been exercising discretionary control over those assets.

This case presents just that latter situation.  The Agreements between FMTC and ABB make no mention of such "rebates" or internal to Fidelity revenue-sharing payments.  To the contrary, the Complaint explains that Fidelity's revenue sharing practices were hidden and undisclosed.  Moreover, here Fidelity chose which of its many mutual funds to allow ABB to include in the Plan, and thus was able to ensure the Plan contained only funds that with revenue sharing to pay Fidelity's excess fee charges.  In fact, Fidelity selected retail mutual funds for a $1.5 billion plan exactly because such funds included more revenue sharing within their retail expense ratios.  None of this was the subject of negotiations.  Instead, FMRCo used its inflated expense ratios fees as a "conduit" secretly to pass money to FMTC, and exercised complete control over the amount of money that would eventually be used for administrative fees.

Finally, FMRCo appeals to policy, arguing that the supposed "clear boundary" for investment fund advisers to mutual funds would be erased if they could become fiduciaries by accepting payment for services.  (Fidelity MTD p. 11.)  But ERISA has not created such a boundary.  The statute contemplates that investment advisers to mutual funds may also be ERISA fiduciaries.  Plaintiffs do not contend that FMRCo and the Fidelity Defendants are fiduciaries simply because they accept payment.  Nor does any policy argument favor Fidelity's conduct as it alleged.  The Complaint challenges the

Fidelity Defendants' business practice of collecting excess and unreasonable fees that impair Plan participants' retirement savings via an undisclosed scheme of hiding Plan service providers' excess and unreasonable compensation – and thus the true cost of participating in the 401(k) plan – in expense ratios of investment options that Fidelity ensures are part of the Plan

## IV.    The Complaint Sufficiently Alleges FMTC's Status As A Fiduciary.

The foregoing argument regarding FMRCo also applies to FMTC.  Although its exact role is clouded, being within the "black box" of Plaintiffs' pre-discovery knowledge, *Rankin*, 278 F. Supp. 2d at 879, FMTC is a fiduciary because it exercises discretion over the amount of revenue sharing payments it receives for the two funds it manages and possibly for the funds managed by FMRCo as well.  It thus effectively sets its own compensation, free from interference by ABB or any of the participants.  FMTC is also a fiduciary because it "plays a role" in determining which investment options ABB will include in the Plans.

First, as discussed above, FMTC is involved in the transfer of revenue sharing payments which consist of plan assets. *See Haddock*, 419 F. Supp. 2d at 162-63, 169-70. It is in the same position as was Nationwide in *Haddock* with respect to these revenue-sharing payments: it ensures that ABB will include in the Plans funds managed by FMTC (as to which it does not dispute its fiduciary status) or managed by FMRCo; and it receives payments attributable to the inclusion of those funds in those Plans.  *See id.* at 169-70.  Those payments are unreasonable, and, especially when considered in conjunction with all of the payments it receives, do not bear any relation to the services it actually performs.  If FMTC determines the amount of revenue sharing, which is

consistent with the allegations of the Complaint, then FMTC exercises discretion over the Plans' assets and can be considered a fiduciary.

Likewise, Plaintiffs have alleged that FMTC, like FMRCo, plays a role in the selection of investments for the Plans. (Compl. ¶¶ 22, 41-42.) Although Plaintiffs identified FMRCo as the entity that culls mutual funds to form the short list it presents to ABB for approval, it is equally possible that FMTC is the one performing the pre-selection and would thus be fiduciary. *See Supra* at 16-21.

FMTC relies on *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983) in arguing that it did not become a fiduciary by entering agreements with ABB regarding the Plan. (Fidelity MTD p. 11.) However, *Schulist* does not foreclose the possibility that an entity that started out as a non-fiduciary, bargaining at arm's length for favorable terms, could end up a fiduciary. *Schulist*, 717 F.2d at 1131-32.[9] As discussed previously in connection with FMRCo, when a plan service provider has complete control over the factors that determine the amount of its fees, so that it essentially sets the terms of its own compensation, that party will be deemed a fiduciary, even if that control was a term of the contract in the first place. FMTC required ABB to agree that only FMRCo managed funds or other agreed to funds would be made available to the Plans. In so doing it gave itself (or FMRCo) complete discretion over the amount of the revenue-sharing payments it would receive, and thus how much it would be paid for its services to the Plans. This made it a fiduciary.

---

[9]     Nor is this case like *Caremark*, where the prices paid by the plan sponsor for services to the plan were set according to benchmarks beyond the control of either party and where the plan sponsor knew exactly how much it was paying, what it was paying for, and to whom it was going. *See Caremark*, 474 F.3d at 472-73.

Moreover, even assuming, FMTC was not a fiduciary in 1995, when it first entered into the trust agreements with ABB, that assumption does not answer the question to whether it thereafter became a functional fiduciary during their 12-year relationship. The numerous amendments—adding Fidelity fund after Fidelity fund—support such an inference, suggesting that FMTC lost its status as an arms-length stranger to ABB, and that ABB instead began unquestioningly rubberstamping the individual funds that Fidelity offered for inclusion in the ABB Plans. The question of FMTC's fiduciary status simply cannot be resolved on a motion to dismiss.

## V. Count II States A Claim.

### A. Count II States A Claim Even If The Fidelity Defendants Are Not Fiduciaries.

In seeking to dismiss Count II, the Fidelity Defendants again contend that the are not fiduciaries. As set forth above, this cannot be determined at the pleading stage. Nor does it need to be. The Fidelity Defendants' liability under § 502(a)(3) does not turn on their fiduciary status. If they participated in prohibited transactions with a fiduciary, the Fidelity Defendants can be liable under § 502(a)(3) even if they are not fiduciaries. *See Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 247-48 (2000).

The Fidelity Defendants do not dispute this. Instead, they claim that Plaintiffs have made the Fidelity Defendants' fiduciary status a predicate to their claims in Count II. While this is not true, it would not matter at this stage of the case even if it were. Plaintiffs are not constrained by the legal theories in their complaints. *See Independent Business Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698, 701-02 (8th Cir. 1997)(complaint need not identify a legal theory and can even identify an incorrect theory). Moreover, a complaint can "plead in the alternative, even if the pleadings are

inconsistent." *Garman v. Griffin*, 666 F.2d 1156, 1158-59 (8th Cir. 1981). Such alternative pleading is particularly appropriate in this case precisely because the Fidelity Defendants have sought to hide the details of their involvement with the Plan and how they are paid for their services.

**B.    Count II It Seeks Appropriate Equitable Relief.**

**i.    The Equitable Relief Sought In Count II Is Appropriate.**

The Fidelity Defendants argue that to the extent that Count II seeks equitable relief, the relief is nevertheless not "appropriate." In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court considered § 502(a)(3)'s requirement that the equitable relief be "appropriate." It explained that § 502(a)(3) is a "catchall" provision, designed to "act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Id.* at 512. The Court concluded "that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id.* at 515. But *Varity* did not create a pleading rule mandating plaintiffs prove the inadequacy of other remedies in their Complaint. *See Reed*, 460 F.2d at 826; *Century 21 Shows*, 400 F.2d at 607. [10]

Nor can it be determined as a matter of law at this stage that the relief sought in

---

[10] In *Varity Corp v. Howe*, the Court merely stated that duplicative relief under § 502(a)(3) would "likely" and "normally" not be appropriate. *Id.* at 515. What circumstances would be "unlikely" and/or "abnormal" so as to make relief under both sections appropriate is an inherently factual question. Determination of whether Plaintiffs seek appropriate relief under §502(a)(3) must await discovery. *See, e.g., Chapro v. SSR Realty Advisors, Inc. Severance Plan*, 351 F.Supp. 2d 152, 156 (S.D.N.Y. 2004) (refusing to dismiss § 502(a)(3) claim duplicative of § 502(a)(1) claim "at [motion to dismiss] stage of the case"); *Communications Workers of America, AFL-CIO v. Nynex Corp.*, 1998 WL 85323, at *1 (S.D.N.Y. Feb. 26, 1998) ("[e]ven if the claims are duplicative, no binding authority has held that a plaintiff cannot *plead* both claims.") (emphasis added); *Am. Med. Assoc. v. United Healthcare Corp.*, 2002 WL 31413668, at *7 (S.D.N.Y. Oct. 23, 2002) ("It is not clear that by asserting the ERISA claims under §§ 502(a)(3) and 502(a)(1)(B) that plaintiffs are seeking the same relief."); *see also DeGuiseppe v. Vertis, Inc.,*2005 WL 2271865, at *4 (E.D. Pa. Sept. 15, 2005) (refusing to grant dismissal because it is not clear yet at this stage of the proceedings whether § 502(a)(1)(B) will in fact give plaintiff adequate relief).

19

Count II duplicates relief available under other parts of § 502. Section 502(a)(3) provides Plaintiffs' only avenue for relief under ERISA if the Fidelity Defendants ultimately prove they are *not* fiduciaries. Section § 502(a)(2) does not provide for recovery from non-fiduciaries. As discussed above, Defendants' fiduciary status cannot be resolved at the pleading stage. Thus, deciding whether relief under § 502(a)(3) may replicate the relief available under § 502(a)(2) is also premature.

The Fidelity Defendants also suggest that the remedies Plaintiffs seek in their §502(a)(3) claim are not equitable. Plaintiffs request an accounting, surcharge, restitution, and injunctive relief. All are undeniably equitable. For example, there can be no serious dispute that "[a]n accounting is an equitable remedy designed to provide a means for compelling one, who because of a confidential or trust relationship has been entrusted with property of another, to render an account of his actions and for the recovery of any balance found to be due." *Bostic v. Goodnight*, 443 F.3d 1044, 1048 (8th Cir. 2006).[11]

### ii.. **Defendants' Contentions That Count II Could Lead to Immaterial Disclosures Are Speculative and Premature.**

The Fidelity Defendants urge that the Court should dismiss Count II because, if the court ordered certain equitable relief, it might require that the Defendants disclose information beyond that which ERISA expressly requires, or beyond that which potential new rules may require. Plaintiffs respectfully submit that it is wholly impractical and utterly speculative to suggest that the Court must dismiss a cause of action at the pleadings stage of a complex class action because a potential remedy – likely several

---

[11] *See* also *Rivoli Drug Co. v. Lynch*, 50 F.2d 536, 537-38 (9th Cir. 1931); *Towers v. Titus*, 5 B.R. 786, 793-94 (N.D. Cal. 1979); *Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal. App. 3d 1, 14 (1977). *See also Guardian Music Corp. v. James W. Guerico Enterprises, Inc.*, 2006 WL 1880381 at *2 (S.D.N.Y. 2006).

months in the future – theoretically *might* conflict with congressional or agency actions yet in their infancy. It is equally premature and impractical to dismiss a cause of action because eventual injunctive relief *could* require Plan fiduciaries to be forthcoming and candid regarding the fees they remove from Plan participants' accounts.

But beyond such quaint notions of practicality, Defendants' arguments ignore the law governing ERISA fiduciaries. In *Kalda v. Sioux Valley Physician Partners*, 2007 WL 925245 at * 3, the Eighth Circuit rejected Defendants' limited view of ERISA fiduciaries' obligations. As part of a fiduciaries' core obligation to "discharge its duties to a plan solely in the interest of the participants and beneficiaries" the court noted fiduciaries "must comply with the common-law duty of loyalty including the 'obligation to deal fairly and honestly with all plan members.'" *Id* at *3, *quoting Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir.1997). Accordingly, the Eighth Circuit held that "a fiduciary may 'not affirmatively miscommunicate or mislead plan participants about material matters regarding their ERISA plan.'" *Id.* But beyond mere miscommunication, the Court held that the core fiduciary duty of loyalty includes the obligation to affirmatively explain material matters to participants:

> Additionally, a fiduciary has a duty to inform when it knows that silence may be harmful, and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits. The duty of loyalty requires a fiduciary to disclose any material information that could adversely affect a participant's interests.

*Id.* (internal quotations and citations omitted); *see Howe v. Varity Corp,* 36 F.3d. 746, 754 (8th Cir. 1994), *aff'd* 516 U.S. 489 (1996)(A fiduciary can also have a duty to disclose, "a duty ... to advise [a beneficiary] of circumstances that threaten interests

relevant to the relationship.") [12]

Further, the Fidelity Defendants contend that a variety of securities laws also render the equitable relief that Plaintiffs seek under § 502(a)(3) inappropriate. But they do not cite any authority that suggesting that the Court should look outside ERISA to assess the appropriateness of relief under ERISA § 502(a)(3). In contrast, *Varity Corp.*, and the three earlier Supreme Court cases that it cites focus exclusively on the impact of other *ERISA* provision to determine the appropriateness of equitable relief under § 502(a)(3).

Numerous courts have concluded in ERISA cases that "the existence of duties under one federal statute does not, absent express congressional intent to the contrary, preclude the imposition of overlapping duties under another federal statutory regime." *In re Worldcom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003); *see also Rankin,*, 278 F. Supp. 2d at 876. Based on this principle, courts have routinely held that compliance with various securities laws cannot be invoked to immunize ERISA fiduciaries from liability for failing to disclose material information to participants. *Kling*

---

[12] *See also Peralta v. Hispanic Business, Inc.*, 419 F.3d 1064, 1071-72 (9th Cir. 2005)("[I]n order to give meaning and effect to ERISA's fiduciary purpose, more must be required of an administrator than mere compliance with ERISA's express reporting and disclosure provisions. In other words, "[i]f the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose."(quoting *Varity*, 516 U.S. at 504); *S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 751 (9th Cir. 2005) ("ERISA fiduciary duties are 'the highest known to the law.'"); *Griggs v. E.I. DuPont de Nemours*, 237 F.3d 371, 381-84 (4th Cir.2001) (When a fiduciary is aware that a participant is laboring under a material misunderstanding fostered by the fiduciary's own communications, it has a §404(a) duty to provide disclosures beyond what §§101-111 require for the purpose of correcting the misinformation.); *Del Rio v. Toledo Edison Co.*, 2005 WL 1001430 at *3 (6th Cir 2005)("[a] fiduciary breaches his duty by providing plan participants with materially misleading information, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally."); *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C.Cir.1990) ("The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA."); *Gee v. UnumProvident Corp.*, 2005 WL 534873 at *14 (E.D.Tenn. 2005) (The purposes of ERISA (i.e., encouraging employers to offer ERISA benefits and protecting participants and beneficiaries) require that "plan fiduciaries who possess actual knowledge of information that calls into question the prudence of a significant plan investment and would be of immense benefit to participants and beneficiaries" must disclose such information so that participants can avoid losses.).

*v. Fidelity Mgmt. Trust Co.,* 323 F. Supp. 2d 132, 143 n.10 (D. Mass. 2004) (citing

cases); *see also In re Electronic Data Sys. Corp. "ERISA" Litig.,* 305 F. Supp. 2d 658,

673 (E.D. Tex. 2004) ("Defendants cannot use the securities laws to shield themselves

from their fiduciary duty to protect Plan beneficiaries.").  Courts have routinely refused

to dismiss complaints on that basis.  *See, e.g., In re AEP ERISA Litig.,* 327 F. Supp. 2d

812, 824 (S.D. Ohio 2004); *Rankin,* 278 F. Supp. 2d at 876.

Lastly, the Fidelity Defendants challenge the materiality of information regarding

their undisclosed revenue sharing practices that the Court *might* require them to disclose

if it ultimately granted such of injunctive relief.  This argument is *wildly* speculative and

premature.  It assumes that, based solely on the allegations of the Complaint, the Court

will ultimately enter *mandatory injunctive relief* requiring the Fidelity Defendants to

make disclosures of what they contend is *immaterial* information to Plan participants.

Were our complaints only so powerful.

Nor are the details of undisclosed revenue sharing immaterial as a matter of law.

To the contrary, *Siemers v. Wells Fargo & Co.*, 2007 WL 760750, *12-15 (N.D.Ca.

March 9, 2007), recently held that undisclosed revenue sharing arrangements in

investment funds – the exact practice Plaintiffs challenge in this case – are materially

misleading and deceptive; intentionally suppress the fact that the common fund is being

diverted for secret compensation arrangements; and hide conflicts of interest among the

parties receiving such secret compensation.  In rejecting the defendants' arguments in

*Siemers*, the exact arguments that Defendants make here, the court held:

> It seems true, as defendants state, that all fees were disclosed and no fees--sham
> or otherwise--were removed from the common fund beyond the total disclosed.
> **But investors were not warned of the size and scope of the established**
> **revenue-sharing arrangements and the fact, as alleged, that excessive fees**
> **were being authorized in the first place to pay for the revenue-sharing**

23

> **program rather than for the ostensible reasons. Based on the ostensible
> reasons, investors would have expected some benefit from the fees whereas,
> as alleged, to the extent of the excess, there was no benefit**. Nor were they
> warned of the adviser's conflict of interest. Instead, the sponsors left in place
> understated disclosures of the type the Commission has held were inadequate.

*Id.* at \*13 (emphasis added).  The same is true in this case.

Further, in *Siemers*, the court held that reliance on the deception inherent in

undisclosed revenue sharing arrangements must be presumed:

> Finally, with respect to the issue of reliance, we are concerned here with half-
> truths. The sale of mutual fund shares carries with it an implied representation that
> all fees, even high fees, are used only for the authorized purposes and that there
> are no material conflicts of interest beyond those disclosed. Prospective investors
> ordinarily so presume. **They ordinarily presume that mutual fund fees, even if
> high, will be used for authorized purposes and will not be charades. When
> the implied representations are false, as here alleged, then reliance is
> presumed**. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 192-94 (2d Cir.
> 1998); see *also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128,
> (1972).

*Id.* at \*14 (emphasis added).[13]  Again, this reasoning applies directly here.

Finally, the Chairman of the Independent Trustees of The Fidelity Funds, Marvin

Mann, testified in 2004 that a fund should provide an investor with "a statement setting

forth the expenses that the investor will incur. … The statement would *detail* all sales

charges and *itemize* all of the fees and expenses that will be paid by the investor *either*

*directly or indirectly*. . ..  The goal would be to allow investors who are interested in

expense information to receive it in a manner that is readily accessible, easy to

understand and, more importantly, in the context of a report that shows what they really

earned on their investment."[14]  Any eventual injunctive relief about which the Fidelity

Defendants now claim concern would certainly be no more extensive than the disclosures

---

[13] *See also Siemers.*, 2007 WL 760750 at 13 ("The loss, however, was the alleged pilfering of the common
fund. Had there been no misuse, the common fund would have been all the greater with all the more for
investment.").

[14]     Statement of Marvin Mann, Chairman of the Independent Trustees of The Fidelity Funds, Before
the Senate Committee on Banking, Housing and Urban Affairs on "Review of Current Investigations and
Regulatory Actions Regarding the Mutual Fund Industry:  Fund Operations and Governance" (March 2,
2004), *available at* http://banking.senate.gov/_files/mann.pdf (emphasis added).

which Fidelity's own chairman/trustee encouraged.

**VI.        Count III States A Claim.**

In seeking that Count III be dismissed, the Fidelity Defendants principally argue that "any fees received by Fidelity entities have become part of Fidelity's general revenues and thus cannot be considered traceable." (Fidelity MTD p. 19-20.) But they provide no support for this factual assertion, it has no basis in the Complaint, and it cannot be inferred from the Complaint in Fidelity's favor. Simply stated, whether any the excess and unreasonable fees which the Fidelity Defendants collect though their revenue sharing practices are traceable is a disputed factual issue that is wholly improper as an argument in a motion to dismiss. Defendants' attempts to contort the allegations of the Complaint to support their other contentions in this argument are equally baseless and ill-advised. The Complaint has very clearly provided the Fidelity Defendants with notice of the claims against which they must defend. They can present their numerous imaginative and speculative arguments, as Plaintiffs are certain they will, on summary judgment.

**CONCLUSION**

For all of the foregoing reason, Plaintiffs respectfully request that this Court deny the Fidelity Defendants' Motion to Dismiss Plaintiffs' Complaint and grant whatever additional relief it deems appropriate.

Respectfully Submitted,

SCHLICHTER, BOGARD &
DENTON

By:  s/Daniel V. Conlisk
Jerome J. Schlichter, 02488116
Daniel V. Conlisk
Heather Lea, 6276614
100 S. Fourth Street., Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (Fax)
jschlichter@uselaws.com
dconlisk@uselaws.com
hlea@uselaws.com

ATTORNEYS FOR PLAINTIFFS/
CLASS REPRESENTATIVES
*Margaret Kennedy, Ron Tussey,
Charles Fisher, Timothy Hendron
and
Timothy Pinnell*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 30, 2007, I electronically filed the foregoing with the Clerk of the Court using the EM/ECF system which sent notification of such filing to the following:

Thomas E. Wack
Lisa Demet Martin
Jeffrey S. Russell
Bryan Cave, LLP
211 North Broadway, Ste. 3600
St. Louis, MO 63102

Brian T. Ortelere
William J. Delaney
Catherine A. Cugell
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA  19103

Richard N. Bien
Adam B. Walker
Lathrop & Gage, L.C.
2345 Grand Boulevard, Suite 2800
Kansas City, Missouri 64108

Bob Eccles
O'Melveny & Myers, LLP
1625 I Street, NW
Washington, DC  20006

                                                    <u>/s Daniel V. Conlisk</u>