| | | |
|---|---|---|
| Charles Fisher, as representative | ) | |
| of a class of similarly situated persons, | ) | |
| and **on behalf of the PRISM Plan for** | ) | |
| **Represented Employees of ABB, Inc.** and | ) | |
| Ron Tuseey, Timothy Herndon and | ) | |
| Timothy Pinnell as representatives | ) | |
| of a class of similarly situated persons, | ) | |
| and **on behalf of the PRISM Plan for** | ) | |
| **Employees of ABB, Inc.,** | ) | |
| | ) | |
| Plaintiffs; | ) | |
| | ) | |
| v. | ) | Cause No: 2:06-cv-04305 NKL |
| | ) | |
| ABB, Inc., John W. Cutler, Jr., Pension | ) | |
| Review Committee of ABB, Inc., Pension | ) | |
| & Thrift Management Group of ABB, Inc. | ) | JURY TRIAL DEMANDED ON ALL |
| Employee Benefits Committee of ABB, | ) | COUNTS TRIABLE |
| Inc., Fidelity Management Trust Company, | ) | |
| and Fidelity Management & Research | ) | |
| Company, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY

1.     In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and

Class Representatives Charles Fisher, Ron Tussey, Timothy Hendron, and Timothy Pinnell, on

behalf of all similarly situated participants and beneficiaries of both the Personal Retirement

Investment and Savings Management Plan for Employees of ABB, Inc. and the Personal

Retirement Investment and Savings management Plan for Represented Employees of ABB, Inc.

(Collectively and individually, the "Plan" or "Plans") seek to recover the financial losses

suffered by the Plan and to obtain injunctive and other equitable relief for the Plan from ABB,

Inc. (the Plan Sponsor), the Pension Review Committee of ABB, Inc., the Plan Administrator,

and other defendants identified below, based upon breaches of their fiduciary duties (collectively "Defendants").

2.      As set forth in detail below, Defendants caused the Plan to include investment options with fees and expenses – paid by the Plan, and thus borne by Plan participants – that were and are unreasonable and excessive; not incurred solely for the benefit of the Plan and its participants; and undisclosed to participants.  Further, as set forth below, Defendants' selection of investment options for the Plan was imprudent and improper in light of the Plan's size and enormous negotiating leverage in the investing marketplace.  By subjecting the Plan and its participants to these investment options and the accompanying excessive fees and expenses, and by other conduct set forth below, Defendants violated their fiduciary obligations under ERISA and caused damages to the Plan.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs:

3.      Plaintiff and Class Representative Ron Tussey lives in Lake Ozark, Missouri, within the Western District of Missouri.  He is a participant in the Represented Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

4.      Plaintiff and Class Representative Charles Fisher lives in Argyle, Missouri, within the Western District of Missouri.  He is a participant in the Represented Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

5.      Plaintiff and Class Representative Timothy Herndron lives in Webster Groves, Missouri.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7).

6.     Plaintiff and Class Representative Timothy Pinnell lives in Jefferson City, Missouri within the Western District of Missouri.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

## Defendants:

7.     Defendant ABB, Inc. ("ABB") is one of over 350 different subsidiaries of ABB Ltd., which is located in Zurich, Switzerland.  ABB is traded on the Swiss Exchange, the Stockholm Exchange, and the New York Stock Exchange.  ABB has a presence in more than 100 countries and employs over 100,000 people.  Within the United States, ABB has operations in over 40 states, including Jefferson City and St Louis with over 500 employees in Missouri. ABB is the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

8.     Defendant John W. Cutler, Jr. is ABB's Director of Pension & Thrift Management.  The Pension & Thrift Management Group of ABB is responsible for aspects of Plan administration and is thus a fiduciary.

9.     Defendant The Employee Benefits Committee of ABB (the "Benefits Committee") is also a named fiduciary and the Administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1102(16)(A), and has the authority to control and to manage the operation and administration of both Plans.  Each Member of the Committee is also a named fiduciary of the Plan.

10.     Defendant the Pension Review Committee of ABB (the "Pension Review Committee") is the named fiduciary for the investment of Plan assets.

11.     The Pension & Thrift Management Group, John W. Cutler, Jr., the Benefits Committee, Pension Review Committee, and ABB may collectively be referred to herein as ABB.

Case 2:06-cv-04305-NKL   Document 89   Filed 07/05/07   Page 3 of 35

12.     Defendant Fidelity Management Trust Company ("FMTC") is a Massachusetts corporation with its headquarters in Boston. FMTC is a trust company and manages assets for approximately 550 institutional clients worldwide with $113 billion in assets under management as of March 2006. FMTC is a subsidiary of Fidelity Investments, one of the world's largest money managers.

13.     Defendant ABB designated FMTC as trustee of "The Personal Retirement Investment and Savings Management Plan for Employees of ABB, Inc. and the Personal Retirement Investment and Savings Management Plan for Certain Represented Employees of ABB, Inc.," which holds the assets of both Plans. FMTC is a fiduciary in this role.

14.     FMTC is the Plan's record keeper and performs a variety of administrative tasks for the Plan. FMTC is, at the very least, a party-in-interest in this role.

15.     FMTC directly manages at least thirteen of the investment options available to Plan participants, almost half of the Plan assets. It is a fiduciary to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

16.     FMTC played, and plays, a central role in the selection of the investment options the Plan makes available to participants. FMTC does the first-cut screening of investment options, and has veto authority over the inclusion of investment options available in the Plan. In fact, ABB and FMTC agreed that ABB would limit its selection to (1) securities issued by investment companies for which FMTC's affiliate company, Fidelity Management & Research Company, serves as investment advisor or (2) non-Fidelity funds to which FMTC agrees, subject to an exception for certain pre-existing guaranteed investment contracts (GICs). Accordingly, FMTC is a fiduciary pursuant to ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A).

4

17.     Defendant Fidelity Management & Research Company ("FMRCo") is a subsidiary of Fidelity Investments and an affiliate of FMTC.  FMRCo is a registered investment company that acts as the leading manager and investment advisor to the Fidelity family of mutual funds and other fiduciary accounts.  The Fidelity funds are marketed throughout the United States through a variety of distribution channels, including Fidelity investment centers and over the internet at Fidelity.com.

18.     FMRCo exercises discretion in the selection of the investment options that the Plan makes available to participants.  Accordingly, FMRCo has an obligation to obtain and analyze all material information in selecting these options.

19.     FMRCo exercises discretion over Plan assets when it determines how much the Plan will pay to Fidelity affiliates, like FTMC, for administrative and other services with soft dollars collected as part of Fidelity's undisclosed revenue sharing program.

20.     FMRCo is the investment advisor for approximately half of the investment options available to Plan participants.  The Plan (and thus by the participants and beneficiaries) pays for its services.  FMRCo maintains an active Revenue Sharing program.  It charges participants for the ostensible purpose of operating each investment Fund and managing its assets, but in actuality also assesses fees against participants' accounts to provide "soft dollars" to support Fidelity's Revenue Sharing program.

21.     In its Revenue Sharing program, Fidelity transfers soft dollars taken from participants' accounts to other Fidelity entities and/or business partners for the purposes which may involve the Plan or which may offer no benefit to, or have no connection whatsoever with, the Plan.  Similarly, Fidelity receives soft dollar Revenue Sharing transfers from any non-Fidelity funds it allows to be included as Plan investment options.  Plaintiffs are informed and

5

believe that the level of soft dollar Revenue Sharing transfers that Fidelity will receive is an important factor in its decision of whether to allow a non-Fidelity fund to be included among Plan investment options.

22.     Accordingly, FMRCo exercises discretion over Plan assets by removing soft dollars from Plan participants' accounts; determining how such soft dollars are used and whether they will be applied to reduce expenses otherwise payable by the Plan or ABB; deciding how such soft dollars will be shared with FMTC and/or other Fidelity entities (or other service providers); and considering the soft dollars it will receive from non-Fidelity funds it allows to be included as investment options.  For these reasons, FMRCo is a fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

23.     In this Complaint, FMTC and FMRCo may be collectively referred to as "Fidelity."

24.     Fidelity utilized the services of Fidelity Brokerage Services, Inc. ("FBSI") to execute trades.  FBSI charges the Plan excessive commissions for its trading services and transfers a portion of these commissions to FMTC, FMRCo, or other Fidelity entities.  These rebates are another form of "soft dollar" Revenue Sharing and do not benefit Plan participants.

25.     As in other Revenue Sharing programs, FBSI collected monies for these transfers by ostensibly charging for trading services that benefited the Plans, while in actuality removing far more Plan assets from participants' accounts than was required to pay for those services so as to provide soft dollars in support of Fidelity's Revenue Sharing goals.

## Jurisdiction and Venue:

26.    Plaintiffs seek relief on behalf of their respective Plans through the private causes of action conferred by ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

27.    The Defendants are subject to nationwide service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1)(2).

28.    Venue of this action is proper pursuant to ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), because the injury occurred directly to Plaintiffs in this district, where they live and work; because the breaches of fiduciary duty occurred in this district; and because the Defendants may be found in this district.

## Rule 23 Requires Class Certification:

29.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Plan, themselves and all similarly situated Plan participants and beneficiaries.  The Plan is comprised of a unitary trust corpus in which each Plaintiff, and each Plan participant, has an interest.  Plaintiffs seek to represent the following (the "Class"):

> All persons, *excluding the Defendants, and/or other individuals who are or may be liable for the conduct described in this Complaint,* who were or are participants or beneficiaries of the Plan and who were, are, or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

30.    Certification of this Class is proper under Rule 23(a) in that:

A. **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the Plan's public documents

state that, at the end of the 2004 Plan year, there were 12,814 participants with account balances in the Plan.

B. **Commonality.** Common issues of fact and law predominate over any issues unique to individual Class members. Issues that are common to all Class Members include, but are not limited to, whether the Defendants:

    i.   Included investment options in the Plan which were imprudent and improper in light of the Plan's size and negotiating leverage;

    ii.   Included investment options that caused participants' retirement savings to consistently under-perform the market in long-term retirement savings;

    iii.   Failed to consider investment options with low costs that are available to large plans;

    iv.   Failed to capture profits available to the Plan because of its size from such activities as securities lending and use interest on float;

    v.   Subjected the Plan to fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

    vi.   Caused the Plan to enter into agreements with third-parties which caused the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

    vii.   Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused the Plan to pay fees and expenses that were, or

are, unreasonable and/or not incurred solely for the benefit of Plan participants;

viii.  Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial and retirement industry collect payments and other revenues from 401(k) plans;

ix.   Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

x.   Failed properly to inform, and/or disclose to, Plan participants the fees and expenses that are, or have been, paid by the Plan;

xi.   Failed to inform, and/or disclose to Plan participants in proper detail and clarity the transaction fees and expenses which affect participants' account balances in connection with the purchase or sale of interests in investment alternatives;

xii.  Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against Plan assets, and by failing to stop such hidden excessive fees;

xiii.  In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plan, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

xiv. Caused and/or allowed fees and expenses to be paid by the Plan for purposes other than those allowed by ERISA;

xv. By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery, and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

xvi. Are liable to the Plan and the Class for losses suffered as a result of the breaches of their fiduciary duties and other ERISA-imposed obligations; and

xvii. Are responsible to account for the assets and transactions of the Plan and should be charged/surcharged for any transactions and payments for which they cannot account or which were not proper uses of Plan assets.

C. **Typicality.** The Plan is comprised of a unitary trust corpus in which each Plaintiff, and each Plan participant, has an interest. The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

i. The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and beneficiary, and each member of the Class;

ii. The Defendants' breach of those obligations constitutes a breach to each participant and beneficiary, and each member of the Class;

iii. To the extent that there are any differences in Class members' damages, such differences would not arise until after an award is

made to the Plan and would be resolved through simple mathematics. Such minimal and formulaic differences are no impediment to class certification.

D. **Adequacy of Representation.** The Plaintiffs are adequate representatives of the absent Class members and will protect such absent Class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the Class' claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

31. Class certification is also appropriate under Rule 23(b) and each subpart in that:

A. Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B. Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

C. Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS

### The Plan

32. Each Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contains or is part of an "eligible individual account plan" under ERISA §

407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A) .  It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

33.     ABB has designed the Plans to be administered through the Master Trust for Employee Benefit Plans of ABB Inc (hereinafter the "Master Trust").

34.     Up until 2004, ABB and FMTC agreed that the Pension Review Committee's selection of investment options would be limited to funds managed, operated, or advised by FMRCo, or which FMTC could be included in the Plan.

35.     Thus, while participants could invest Plan contributions in over 20 investment options purportedly selected by ABB; FMTC had the authority to control ABB's selection process in that FMTC's agreement was required before ABB could choose any non-Fidelity funds.

36.     As a result, half of the investment options that ABB and FMTC included in the Plan were and are *retail* mutual funds operated, managed, or advised by FMRCo – the same mutual funds that FMRCo and its parent Fidelity Investments sells to small investors at store-front brokerages. These retail mutual funds assess markedly higher fees against participants' accounts than do private pooled investment vehicles, like separate accounts, available for the asking to enormous institutional investors like the Plans.

**Defendants' Fiduciary Duties**

37.     Defendants are bound by ERISA's imposition of a fiduciary duty that has been characterized as "the highest known to law."  Defendants' fiduciary obligations require that, at all times, they conduct themselves with the utmost good faith, loyalty and fidelity; act with the sole purpose of advancing the interests of the Plan, its participants, and beneficiaries;

Case 2:06-cv-04305-NKL   Document 89   Filed 07/05/07   Page 12 of 35

scrupulously avoid all self-interest, duplicity, and deceit; and fully disclose to and inform participants and beneficiaries of all material information.

38.     Defendants' fiduciary obligations under ERISA require that they exercise the care, skill, and diligence which a prudent expert would in the operation of a Plan with like character and aims.

39.     Defendants' fiduciary obligations under ERISA require that they discharge their duties with the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying the reasonable cost of administering the Plan.

40.     Defendants' fiduciary obligations under ERISA require that they ensure, at all times, that Plan assets are *never* used for the benefit of the employer; here, ABB.

41.     Defendants' fiduciary obligations under ERISA require them to scrupulously avoid any transaction in which Plan assets would be used by, or inure to the benefit of, a party-in-interest in connection with the Plan.

## DEFENDANTS' MULTIPLE BREACHES OF FIDUCIARY DUTY

### Unreasonable and Excessive Plan Fees and Expenses

42.     Defendants have breached their fiduciary obligations by causing the Plan, and thus its participants and beneficiaries, to pay excessive and unreasonable fees and expenses to Plan service providers – primarily Fidelity entities.

43.     These excess payments took the form of both "Hard Dollar" payments (direct payments from the Plan to a service provider) and hidden Revenue Sharing transfers.

44.     In Revenue Sharing arrangements, Plan fiduciaries, like the Defendants here, select Funds which assess asset-based charges ("expense ratios") against Plan participants' retirement savings for the ostensible purpose of operating the Fund and managing Fund

investments. But in truth, such expense ratios include *both* fees collected for these ostensible purposes *and* excessive fees assessments collected for the purpose of providing "soft dollars" for the Fund's Revenue Sharing program.

45.     Based upon the ostensible reasons for which Fund expense ratios are imposed, Plan participants investing in the Fund are led to expect and believe that the fees collected from their savings will benefit them by paying proper costs of operating the Fund and managing its investments.

46.     This, however, is false. The Funds transfer the soft dollars collected via Revenue Sharing arrangements to other Plan service providers – primarily Fidelity entities – and/or others with some connection with the Fund, the Plan, or Fidelity.

47.     As a result of Revenue Sharing arrangements, Plan service providers or others who do business with the Plan or the Fund received either or *both* Hard Dollar payments from the Plan *and* additional revenue that the Fund "shares" with them.

48.     The resulting fees and expenses borne by the Plan were unreasonable and excessive. By subjecting the Plan to such excessive fees and expenses, and by selecting investment options that assessed excessive fees against participants' accounts to provide soft dollars for Revenue Sharing programs, Defendants breached their fiduciary duties.

49.     Further, because the Fidelity entities keep the Revenue Sharing allocations from Funds within the Fidelity organization, the total amounts that Fidelity realizes for itself are in excess of the fees that Fidelity would retain if the Plan included service providers that were not affiliated with Fidelity. Fidelity is able to retain these additional payments because ABB: (A) employs FMTC as both the Plan's record keeper and trustee; and (B) FMTC permits ABB to select only investment options that are operated, managed, or advised by FMRCo and other

Fidelity affiliates – as well as recently added non-Fidelity Funds which maintain Revenue Sharing programs that collect and transfer soft dollars to Fidelity.

50.     These Revenue Sharing payments – consisting of millions of dollars – were *both* far in excess of reasonable fees for the administrative or investment services provided to the Plan by Fidelity *and* far in excess of what a plan of this type should pay for similar services or investment options.

**Failure to Capture Additional Compensation Streams For the Benefit of the Plan**

51.     Beyond collecting fees from the Plan through Hard Dollar and Revenue Sharing payments, Plan service providers receive additional, undisclosed compensation from their dealings with the Plan and Plan assets ("Additional Compensation Streams").  For example:

- consultants receive finders' fees from investment managers for the consultants' placement of Plan assets with the investment manager or mutual fund company;

- trustees or custodial banks perform cash sweeps of Plan accounts to capture cash before it is transferred to investment options, and earn interest on those cash holdings;

- investment managers, custodial banks, prime bankers, and/or mutual funds receive payments for lending securities, owned by the Plan, to third parties; and

- in connection with foreign investments, investment managers and mutual funds reap additional compensation from profiting on foreign currency exchange.

52.     In a multi-billion dollar plan, like the Plan here, such Additional Compensation Streams can result in millions of dollars of funds available to the Plan and to defray or eliminate Plan expenses.

53.     Accordingly, Plan fiduciaries must also understand and consider these Additional Compensation Streams in fulfilling their fiduciary obligations to ensure that the full amount of available sums are captured for the Plan and applied solely for the benefit of the Plan and its participants and beneficiaries.

54.     Here, Defendants have failed to do so.

### Defendants' Inclusion of Retail Mutual Funds Among The Plan's Investment Options

55.     The prudent and proper selection of investment options for the Plan is one of Defendants' core fiduciary obligations.

56.     Defendants included approximately sixteen (16) retail mutual funds as Plan investment options in 2005 as well as ABB stock and five (5) custom blended funds charging above average fees (in 2004, the Plan included nineteen (19) retail mutual funds, and nineteen (19) in 2003).

57.     In 2005, the Master Trust held approximately $1.54 billion in assets.  In 2004, it held approximately $1.51 billion, and in 2003, $1.47 billion.  In 2005, the Personal Retirement Investment and Savings Management Plan for employees of ABB, Inc. held approximately $1.48 billion.  In 2004, it held approximately $1.45 billion, and in 2003, $1.41 billion.

58.     In the financial and investments industry, a large institutional investor with billions of dollars, like the Plan, routinely can obtain lower prices for investment management and other services than can a retail investor with only thousands, or even a few million, dollars.

59.     Defendants – as fiduciaries of a multi-billion dollar retirement savings plan – had enormous bargaining leverage in the investment marketplace.  They squandered this leverage by subjecting the Plan and its participants to the high costs of retail/publicly-traded mutual funds and failing to provide investment options with significantly lower costs.

60.     As fiduciaries, Defendants were obligated to use the Plans' bargaining power to require that investment managers provide separate low cost investment accounts, collective investment trusts, or common collective funds ("Separate Accounts") as Plan investment options.

61.     Separate Accounts are investment vehicles in which investment managers pool the assets of a large investor, like the Plan, into a private trust and manage them according to a stated investment objective.  Like mutual funds, Separate Accounts offer various investment styles (large cap, value, growth, balanced growth, small cap, international equity, etc.).

62.     However, Separate Accounts' operating expenses are substantially lower than those of mutual funds because they do not have to pay for advertising, marketing and distribution, nor do they have to maintain the liquidity required for trading in publicly-traded mutual funds.

63.     Separate accounts also avoid subjecting Plan participants to conflicts of interest inherent in large mutual fund organizations.  Mutual fund managers' own profit motive – driven by the assessment of fees against the fund's investments – conflict with investors' interest in reducing fees to maximize their returns.

### Defendants' Payments for Active Investment Management

64.     At least eighteen (18) of the Plan's funds are actively managed, and this has been true for years.  In actively-managed funds, the investment managers seek to outperform the Fund's benchmark, to "beat the market."  Active management is more expensive than passive management, in which Fund managers conform their holdings to those of a particular benchmark. Passive managers provide market returns for low fees.

65.     The inclusion of actively-managed mutual funds is detrimental to the interests of the Plan and its participants and beneficiaries.  It repeatedly has been established that actively

managed mutual funds rarely outperform market indexes on a risk-adjusted basis when held as long-term investments.

66.    Defendants' inclusion in the Plan of actively-managed funds provided (and provides) no added value to participants while forcing them to bear substantial and unnecessary fees.  Over time and on a risk-adjusted basis, the Plan's actively managed Funds have under-performed, and are known to under-perform, comparable market indexes by at least as the level of such fees.

67.    Including actively managed mutual funds as investment options in the Plan virtually guaranteed that participants and beneficiaries would receive less than a market return on their long-term retirement savings, when they could have received market returns.  In doing so, Defendants breached their core fiduciary duties to the Plan.

**Defendants' Campaign of Misrepresentation and Non-Disclosure**

68.    As set forth above, Defendants have concealed from Participants the amount of the recordkeeping and administrative costs of the Plan, when, in truth, Defendants have ensured that such recordkeeping and administrative costs are borne by the Plan with soft dollars collected through undisclosed Revenue Sharing programs.

69.    As set forth above, Defendants have not disclosed, and/or have affirmatively concealed, a litany of material information including:

      A.    That the Plan's size and asset value enabled Defendants to provide lower-priced investment options;

      B.    That the fees charged, including fees for active investment management, assessed against participants' retirement savings were depriving them of the opportunity to receive market returns;

C.      That the excessive fees and expenses assessed against their accounts substantially would undermine the value of participants' retirement savings over time;

D.      That by including retail/publicly-traded mutual funds as Plan investment options, Defendants had squandered the Plan's enormous bargaining power and left participants of a $2.4 billion plan in the same circumstances as small, retail investors;

E.      That Plan service providers maintained undisclosed Revenue Sharing programs to collect soft dollars, and the amount they were receiving from transfers of those soft dollars;

F.      That Revenue Sharing was, and is, available for the benefit of the Plan and its participants;

G.      That Plan service providers were and/or are receiving excessive payments via Additional Compensation Streams, and that such monies were available for the benefit of the Plan but not captured;

H.      That the expense ratios charged in Plan investment options were and are inflated to collect soft dollars for the purpose of supporting Revenue Sharing programs and, as a result, are *not* used for the investment management and operation of the investment option/Fund *(i.e.* the ostensible purpose for the imposition of such fees);

I.      That the expense ratios of Plan investment options/Funds are inflated to collect soft dollars used to support Revenue Sharing programs and soft dollar

transfers so that the *stated expense ratio is not the true and accurate cost of investing* in the investment option/Fund;

J.     Who is receiving Plan assets, derived from participants' accounts, and collected as part of Revenue Sharing programs and/or Additional Compensation Streams;

K.     How much each service provider is paid with Plan assets, derived from participants' accounts, when Hard Dollar fees *and* Revenue Sharing transfers *and* Additional Compensation Streams are considered;

L.     Whether the total amount paid to services providers (*i.e.* disclosed, Hard Dollar fees *combined with* Revenue Sharing payments *and* Additional Compensation Streams) is reasonable in light of the services provided and incurred solely for participants' benefit;

M.     Whether plan fiduciaries have forgone available Revenue Sharing transfers and/or Additional Compensation Streams available in connection with Plan investment options, and thereby unnecessarily increased the expenses which Plan participants otherwise must bear;

N.     The true and accurate amount of recordkeeping and administrative fees that is assessed against participants' accounts in the Plan; in that Plan record keepers and administrators receive *both* the fees disclosed as Hard Dollar payments to them and *undisclosed* payments derived from Revenue Sharing programs;

O.     The true and accurate price of Plan investment options/Funds, in that the stated expense ratios of Plan investment options/Funds are overstated so as to

collect extra, hidden soft dollars to be used to support Revenue Sharing programs to other Plan service providers;

P.      The true and accurate amount of fees paid to investment managers *for actual investment management services* (*i.e.* the actual amount of investment management being purchased) in any Plan investment option/Fund; in that the investment management prices represented in the expense ratios of Plan investment options/Funds are overstated so as to collect soft dollars to be used for Revenue Sharing programs;

Q.      In actively-managed investment options/Funds, the actual amount of active management services that Plan participants are purchasing, in that the undisclosed collection of soft dollars via inflated expense rations to support Revenue Sharing programs renders participants incapable of knowing whether the fees charged by actively-managed Funds actually are used for active investment management rather for Revenue Sharing programs that provide no benefit to fund investors; and

R.      Whether hidden payments of Plan assets, derived from participants' accounts to support Revenue Sharing programs, are masking prohibited transactions and/or conflicts of interests between or among Plan fiduciaries and service providers;

70.      Because the Defendants failed and refused to provide them with this information, and concealed this information from them, Plan participants have lacked the information necessary for them: (a) to understand and protect their interests in the Plan; (b) to have

knowledge regarding the Defendants' breaches of fiduciary duty; and (3) to have reason to believe they should make inquiry about those breaches and the facts underlying them.

71.     Defendants know that Plan participants lack such information and knowledge.

72.     In their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.  ERISA fiduciaries, such as Defendants here, have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

73.     As a result of all of the foregoing, including Defendants' campaign of non-disclosure, concealment and misrepresentation, Plaintiffs and all Plan participants and beneficiaries have been forced to pay excessive fees and expenses from their 401(k) accounts, have suffered financial losses and damages, and have been deprived of the opportunity to receive market returns.

**COUNT I:**
**Breach of Fiduciary Duty Against all Defendants**
**ERISA §502(a)(2)**

74.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 73 as though fully set forth here.

75.     As set forth in detail above, Defendants owe to the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

    A.  To conduct itself as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

B.  To perform its duties as Plan Sponsor and Administrator with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

C.  To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

D.  To properly and prudently select investment alternatives for the Plan;

E.  To ensure, at all times, that the Plan avoids prohibited transactions;

F.  To know and understand the fees and expenses charged to the Plan, and whether they were or are unreasonable or excessive;

G.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

H.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

I.  To ensure that the fees and expenses incurred by the Plan are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

J.   In entering into agreements with service providers to the Plan, to ensure that the payments from the Plan – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

K.   In operating and administering the Plan, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

L.   In operating and administering the Plan, on an ongoing basis to monitor that the payments made by the Plan to service providers – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

M.   To inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

N.   To inform itself of trends, developments, practices, and policies in the retirement, financial investment, and securities industry which affect the Plan; and to remain aware and knowledgeable of such trends, practices, and policies on an ongoing basis;

O.   To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, and accurately;

P.   To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plan; the management, risk, potential

returns of such investments; and the fees and expenses incurred in connection with those investments; and

Q. To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions.

76.     As set forth in detail above, Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

A. Squandering the Plan's enormous bargaining power to obtain low-cost investments, and instead subjecting the Plan and its participants and beneficiaries to high-priced retail/publicly traded mutual funds;

B. Failing to employ the Plan's enormous bargaining power to obtain separate accounts and/or other low-cost investment options appropriate for a multi-billion dollar 401(k) plan;

C. Failing to use the Plan's enormous bargaining power to obtain low-cost funds which provide a market return;

D. Failing to properly and prudently select plan investment options, making selections for self-interested reasons, and/or abdicating their responsibilities in this regard;

E. Causing or allowing the Plan to enter into agreements with service providers under which the Plan and continues to pay – directly or indirectly – fees and expenses that were, and continue to be unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

F.   Allowing the Plan to pay – directly on indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

G.   Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing and/or allowing the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

H.   By engaging in, and causing the Plan to engage in, prohibited transactions;

I.   By failing to know and understand the fees and expenses charged to the Plan, and whether they were or are unreasonable or excessive;

J.   Failing to inform itself of trends, developments, practices, and policies in the retirement, financial investment, and securities industry which affect the Plan; and failing to  remain aware and knowledgeable of such trends, practices, and policies on an ongoing basis;

K.   Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

L.   Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

M.   Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, and accurately;

N.  Causing numerous retail mutual funds to be included as Plan investment options, and thereby breaching their fiduciary duty to select reasonable and prudent investment choices for the Plan and diluting the Plan's bargaining power, based upon its asset size, to secure lower cost investment options;

O.  Allowing Plan service providers, at the Plan's expense, to receive Revenue Sharing transfers, and failing to capture Revenue Sharing for the benefit of the Plan and its participants;

P.  Allowing Plan service providers, at the Plan's expense, to receive Additional Compensation Streams; and failing to capture Additional Compensation Streams for the benefit of the Plan and its participants;

Q.  Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

R.  Failing to inform and/or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

S.  Failing to discover, disclose, and stop the charging of  hidden and excessive fees to the Plan;

T.  Failing to disclose to Plan participants and beneficiaries that the Plan's investment options subjected their retirement savings to excessive and unreasonable fees in light of the Plan's size and bargaining power in the investment marketplace;

U.  Failing to disclose to Plan participants and beneficiaries that Defendants had chosen plan investment options without considering appropriate information and investment alternatives in light of the Plan' size and asset value; and

V.  By the foregoing conduct, failing to exercise the loyalty, care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters.

77.     As set forth in detail above, as a result of these breaches, the Plan, Plaintiffs, the Class, and the Plan's participants and beneficiaries have suffered financial losses and damages.

78.     At all times, the Fidelity Defendants and the ABB Defendants were co-fiduciaries, and each knowingly participated in the fiduciary breaches of the other.

79.     Alternatively, at all times the Fidelity Defendants were parties-in-interest and knowingly participated in ABB's Fiduciary breaches.

80.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are personally liable to make good to the Plan for the losses it experienced as a result of Defendants' breaches of fiduciary duty.

81.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are personally liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

<u>**COUNT II:**</u>
**Other Remedies for Breach of Fiduciary Duty Against all Defendants**
**– ERISA §502(a)(3)**

82.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 81 as though fully set forth here.

83.     In addition to, and as an alternative to, the causes of action stated in Count I, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

84.     Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

85.     Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

86.     Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

87.     By accepting possession and control over Plan participants' assets, Defendants necessarily have also accepted the obligation to explain and account for every transaction, expenditure, application and distribution of such assets.

88.     Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

89.     Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

90.     As set forth in detail above, Defendants have caused and/or allowed the Plan to pay – directly and via hidden Revenue Sharing transfers and hidden Additional Compensation

Streams – excess fees and expenses to Plan service providers.   Litigating and resolving these issues will involve identifying and reconciling multiple transfers, payments, and flows of Plan assets that occurred while such Plan assets were within Defendants' possession and control.

91.     Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

92.      An accounting is a particularly appropriate equitable remedy in circumstances where, as here, the underlying action and accounts are so complicated that a normal action for a fixed sum may not be practical.

93.     In such an accounting, in light of their possession and control of Plan assets and information about how Plan assets have been applied and distributed, Defendants must bear the burden of proving all Plan transactions and their propriety.

94.     Accordingly, the Court should order that Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of, the Plan and its assets.

95.     Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan and/or paid to third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

96.     Plaintiffs respectfully request that the Court charge/surcharge against the Defendants and in favor of the Plan all amounts involved in transactions which such accounting reveals were or are improper, excessive and/or in violation of ERISA.

97.     Plaintiffs respectfully request that the Court order Defendants to disgorge all amounts credited to ABB for administrative costs which ABB was obligated to pay and which Defendants assured Plan participants it did pay.

98.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease so that the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future.

## COUNT III:
### Other Remedies for Breach of Fiduciary Duty Against FMTC and FMRCo
### ERISA §502(a)(3)

99.     Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 98 as though fully set forth here.

100.     As a further alternative to the causes of action stated in Count I, Plaintiffs seek further relief against Defendants FMTC and FMRCo pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

101.     One form of equitable relief available under section 503(a)(3) is equitable restitution.

102.     By secretly collecting soft dollars from the Plan to support its Revenue Sharing program and retaining the Revenue Sharing monies as described above, Defendants FMTC and FMRCo obtained funds that should have been used solely for the benefit of Plan participants and beneficiaries for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

103.     FMTC and FMRCo knew that the monies removed from participants' accounts to support Fidelities' Revenue Sharing program were the Plan assets, and, if not so removed, would continue to be Plan assets, and were to be used solely for the benefit of Plan

participants and beneficiaries and for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

104.     Because they were not used for purposes not permitted by ERISA, these monies rightfully and in good conscience belong to the Plan and its participants and beneficiaries.

105.     The Revenue Sharing monies are specifically identifiable funds.

106.     The Revenue Sharing monies are in the possession and custody of FMTC or FMRCo.

107.     Plaintiffs, on behalf of the Plans, seek equitable restitution of the Revenue Sharing payments, along with any profit, from FMTC and/or FMRCo.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and  declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- award actual damages to the Plan in the amount of its monetary losses;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA § 502(g);

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS AND ISSUES SO TRIABLE.**

Respectfully Submitted,


SCHLICHTER, BOGARD & DENTON


By:  _/s/ Daniel V. Conlisk_____
     Jerome J. Schlichter, 32225
     Daniel V. Conlisk, 36544
     Heather Lea, 49872
      Mark G. Boyko, 57318
     100 S. Fourth St., Suite 900
     St. Louis, Missouri 63102
     (314) 621-6115
     (314) 621-7151 (Fax)
     dconlisk@uselaws.com
     hlea@uselaws.com

     ATTORNEYS FOR PLAINTIFFS/
      CLASS REPRESENTATIVES Margaret Kennedy,
      Ron Tussey, Charles Fisher, Timothy Herndron, and
      Timothy Pinnell

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed on this 5th day of July, 2007 and will be delivered electronically by the CM/ECF system to the following:

Thomas Wack
Lisa Demet Martin
Jeffrey S. Russell
Bryan Cave, LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102

Brian T. Ortelere
William J. Delaney
Catherine A. Cugell
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

Richard N. Bien
Adam B. Walker
Lathrop & Gage, L.C.
2345 Grand Boulevard, Ste. 2800
Kansas City, MO 64108

Bob Eccles
Stephen D. Brody
Shannon Barrett
Brian Boyle
O'Melveny & Myers, LLP
1625 I Street, NW
Washington, DC 20006

James S. Dittmar
James O. Fleckner
Goodwin Procter
53 State Street
Exchange Place
Boston, MA 02109

/s/ Daniel V. Conlisk

35