**UNITED STATES DISTRICT COURT DISTRICT
WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| Margaret Kennedy, Ron Tussey, and Charles Fisher, as representatives of a class of similarly situated persons, and and **on behalf of the PRISM Plan for Represented Employees of ABB, Inc.** and Timothy Herndron and Timothy Pinnell as representatives of a class of **similarly situated persons, and on behalf of the PRISM Plan for Employees of ABB, Inc.,** | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs; | ) ) |
| v. | ) ) Cause No: 2:06-CV-04305 NKL |
| ABB, Inc., John W. Cutler, Jr., Pension Review Committee of ABB, Inc., Pension & Thrift Management Group of ABB, Inc. Employee Benefits Committee of ABB, Inc., Fidelity Man agement Trust Company, and Fidelity Management & Research Co. | ) ) ) ) ) ) ) |
| Defendants. | ) |

**PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO
THE FIDELITY DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTS ......................................................................................................................... 3

I.      Fidelity Defendants' Breached Their Fiduciary Duty and Otherwise Engaged In

Misconduct.................................................................................................................. 3

II.     The Fidelity Defendants Are Plan Fiduciaries.................................................... 4

ARGUMENT ............................................................................................................... 6

I.      The Fidelity Defendants Improperly Seek Summary Judgment........................ 6

II.     The Amended Complaint More Than Adequately Alleges That the Fidelity Defendants Caused The Plan To Bear Unreasonable and Excessive Expenses................................ 7

A.     The Amended Complaint Fulfills Federal Notice Pleading Standards............................ 7

B.     The Amended Complaint Provides Both Notice And The Basis Of Plaintiffs' Claims. .... 8

III.    The Fidelity Defendants' Fiduciary Status Is Based Upon A Fact-Intensive Inquiry That Cannot Be Decided At The Pleadings Stage................................................... 12

A.     The Complaint Sufficiently Alleges That The Fidelity Defendants Exercised Control Over Plan Assets Or Plan Administration. ................................................... 14

B.     Fidelity Defendants Contracted With Several Other Fidelity Affiliates and/or Business Units To Provide The Services To The Plan. ........................................... 15

C.     The Fidelity Defendants Unilaterally Decided How Much Of The Expense Ratios Charged To Participants Will Be Used To Support Fidelity's Undisclosed Revenue Sharing Program.................................................................................. 16

D.     The Fidelity Defendants Further Exercised Discretion Over The Choice Of The Plan's Investment Options. .................................................................... 21

IV.    Plaintiffs' Claim under ERISA §502(a)(3) in Count II, States a Claim. ......................... 23

A.     Count II States A Claim Even If The Fidelity Defendants Are Not Fiduciaries. ............. 23

B.     Count II It Seeks Appropriate Equitable Relief.................................................... 23

V.     Count III States A Claim. .......................................................................... 28

CONCLUSION............................................................................................................. 28

Case 2:06-cv-04305-NKL   Document 110   Filed 08/20/07   Page 2 of 36

# TABLE OF AUTHORITIES

## Cases

*A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Secs., Inc.*, 964 F. Supp. 147, (S.D.N.Y. 1997) .................................................................................................................. 15

*Abbott, et al. v Lockheed Martin Corp., et al.,* 2007 WL 2316485 (SD Ill. August 13, 2007) ...... 1

*Am. Med. Assoc. v. United Healthcare Corp.*, 2002 WL 31413668, at *7 (S.D.N.Y. Oct. 23, 2002) ....................................................................................................................................... 25

*American Federation of Unions v. Equitable Life Assurance Soc'y,* 841 F.2d 658 (5th Cir.1988). ............................................................................................................................................. 13

*Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ...................................................................... 1

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (May 21, 2007).................................................. 7

*Bell Atlantic,* 127 S.Ct. at 1966.................................................................................................... 8

*Blatt v. Marshall and Lassman,* 812 F.2d 810 (2d Cir. 1986) ..................................................... 13

*Blatt,* 812 F.2d at 812 .................................................................................................................. 13

*Blatt*, 812 F.2d at 813 ....................................................................................................... 13, 21, 22

*Bostic v. Goodnight*, 443 F.3d 1044, 1048 (8th Cir. 2006)........................................................... 24

*Brock v. Hendershott,* 840 F.2d 339 (6th Cir.1988) .................................................................... 13

*Cardinal Health, Inc. ERISA Litigation*, 424 F. Supp. 2d 1002, 1030 (S.D. Ohio 2006) ........... 13

*Caremark*, 474 F.3d at 472-73 .................................................................................................... 23

*Caremark*, 474 F.3d at 476 ......................................................................................................... 20

*Century 21 Shows*, 400 F.2d at 607 ............................................................................................ 25

*Chapro v. SSR Realty Advisors, Inc. Severance Plan*, 351 F.Supp. 2d 152, 156 (S.D.N.Y. 2004) ............................................................................................................................................. 25

*Chicago District Council of Carpenters Welfare Fund v. Caremark,* 474 F.3d 463 (7th Cir. 2007) ............................................................................................................................................. 19

*Civic Western Corp. v. Zila Industries, Inc.,*66 Cal. App. 3d 1 (1977) ......................................... 24

*Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal. App. 3d 1, 14 (1977) ................................. 24

*Communications Workers of America, AFL-CIO v. Nynex Corp.*, 1998 WL 85323, at *1 (S.D.N.Y. Feb. 26, 1998)................................................................................................................. 25

*Concha v. London*, 62 F.3d 1493 (9th Cir 1995) .......................................................................... 8

*Corbett v. Marsh & McLennan Cos.*, No. MDL 15863, 2006 WL 734560 (D. Md. Feb. 27, 2006) ........................................................................................................................... 15

*DeGuiseppe v. Vertis, Inc.,*2005 WL 2271865, at *4 (E.D. Pa. Sept. 15, 2005) ......................... 25

*Del Rio v. Toledo Edison Co.*, 2005 WL 1001430 at *3 (6th Cir 2005)....................................... 26

*DiFelice v. United Airways, Inc.*, 2007 WL 219296 at * 6 n. 4 (4th Cir Aug. 1, 2007)................. 2

*Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C.Cir.1990)................................... 26

*Ellis v. Rycenga Homes, Inc.*, 484 F.Supp. 2d 694, 712 (W.D. Mich. 2007) .............................. 15

*Erickson v. Pardus*, 127 S.Ct. 2197 (June 4, 2007)....................................................................... 2

*Erickson v. Pardus*, 127 S.Ct. 2197, 220 (2007) ......................................................................... 7

*Eslava v. Gulf Telephone Co.*, 418 F. Supp. 2d 1314 (S.D. Ala. 2006) ...................................... 13

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987) .......................... 19

*Galgay v. Gangloff,* 677 F. Supp. 295 (M.D.Pa.1987) ................................................................ 13

*Garman v. Griffin*, 666 F.2d 1156, 1158-59 (8th Cir. 1981) ....................................................... 23

*Gee v. UnumProvident Corp.*, 2005 WL 534873 at *14 (E.D.Tenn. 2005) ................................. 26

*George, et. al v. Kraft Foods Global, Inc., et. al,* 2007 WL 853998 (S.D. Ill., 2007).................. 2

*Glick*, 142 F. 3d at 527................................................................................................................ 17

*Griggs v. E.I. DuPont de Nemours,* 237 F.3d 371, 381-84 (4th Cir.2001).................................. 26

*Guardian Music Corp. v. James W. Guerico Enterprises, Inc.*, 2006 WL 1880381 at *2
  (S.D.N.Y. 2006).......................................................................................................................... 24

*Haddock v. Nationwide Insurance Co.*, 419 F. Supp. 2d 156 (D. Conn. 2006).......................... 22

*Haddock*, 419 F. Supp. 2d at 166................................................................................................ 22

*Haddock*, 419 F. Supp. 2d at 169-70 .......................................................................................... 18

*Haddock*, 419 F. Supp. 2d at 170................................................................................................ 18

*Hecker v. Deere & Co.*, 2007 WL 1874367 (W.D. Wis. Jun. 21, 2007) ........................................ 2

*Herman v. Mercantile Bank*, 143 F.3d 419 (8th Cir. 1998)........................................................ 10

*Howe v. Varity Corp,* 36 F.3d. 746, 754 (8th Cir. 1994) ............................................................ 26

*In re AEP ERISA Litig.,* 327 F. Supp. 2d 812, 824 (S.D. Ohio 2004) ......................................... 27

*In re AEP ERISA Litigation*, 327 F.Supp.2d 812, 821 (S.D. Ohio 2004)....................................... 8

Case 2:06-cv-04305-NKL   Document 110   Filed 08/20/07   Page 4 of 36

*In re AIG Advisor Group Securities Litigation*, 2007 WL 1213395 at ** 8-10 (E.D.N.Y. April 25, 2007) ........................................................................................................................ 27

*In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898 (E.D. Mich. 2004) ................................... 14

*In re Dreyfus Mutual Fund Fee Litigation*, 428 F.Supp.2d 342, 350 (W.D.Pa. 2005)................. 9

*In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658 (E.D. Tex. 2004) .................. 14

*In re Electronic Data Sys. Corp. "ERISA" Litig.,* 305 F. Supp. 2d 658, 673 (E.D. Tex. 2004) .. 27

*In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207 (D. Kan. 2004) ...................................... 14

*In re Xcel Energy, Inc.*, 312 F. Supp. 2d 1165 (D. Minn. 2004) ................................................. 14

*Independent Business Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698, 701-02 (8th Cir. 1997) 23

*Kalda v. Sioux Valley Physician Partners*, 2007 WL 925245 at * 3 ........................................... 25

*Kawani, et al. v. Bechtel*, No. 06-cv-5566 (N.D. Cal. May 15, 2007).......................................... 1

*Keach v. U.S. Trust Co.*, 256 F. Supp. 2d 828 (C.D. Ill. 2003) .................................................... 7

*Kling v. Fidelity Mgmt. Trust Co.,* 323 F. Supp. 2d 132, 143 n.10 (D. Mass. 2004)................... 26

*Larue v. DeWolff,* 06-856 (Aug 7, 2007) ................................................................................... 24

*Loomis, et al. v. Exelon Corp., et al.,* Case No. 06-cv-4900 (N.D. Ill. Feb. 21, 2007).................. 2

*Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 n.4 (8th Cir. 2003) ............................................ 7

*Mertens v Hewitt Assoc.*, 508 U.S. 248 (1993)......................................................................... 12

*Morrell & Co. v. John Hancock Mut. Life Ins. Co.*, No. 85 C 9166, 1988 WL 58619 (N.D. Ill. May 31, 1988).......................................................................................................................... 19

*Olsen v. E.F. Hutton & Co., Inc.,* 972 F.2d 622 (8th Cir. 1992) ..................................................... 3

*Olson v. E.F. Hutton & Co., Inc.*, 972 F.2d 622 (8th Cir. 1992) .................................................. 12

*Olson*, 957 F.2d at 625 ......................................................................................................... 21, 22

*Pegram v. Herdrich,* 530 U.S. 211 (2000)................................................................................. 15

*Peralta v. Hispanic Business, Inc.*, 419 F.3d 1064, 1071-72 (9th Cir. 2005).............................. 26

*Rankin v. Rots,* 278 F. Supp. 2d 853 (E.D. Mich. 2003) .............................................................. 14

*Rankin*, 278 F. Supp. 2d at 876 ................................................................................................ 27

*Rankin*, 278 F. Supp. 2d at  876 ............................................................................................... 26

*Reed*, 460 F.2d at 826 .............................................................................................................. 25

v

*Rivoli Drug Co. v. Lynch,*
  50 F.2d 536 (9th Cir. 1931) .................................................................................. 24

*S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 751 (9th Cir. 2005) ...................................... 26

*Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983) .................................................... 22

*Schulist*, 717 F.2d at 1131-32 .......................................................................................... 23

*Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir.1997) ................................................................ 26

*Siemers v. Wells Fargo & Co.*, 2007 WL 1140660 (N.D.Ca. April 17, 2007) .............................. 9

*Siemers v. Wells Fargo & Co.*, 2007 WL 1140660, *6,  see also discussion at 7-10 (N.D.Ca.
  April 17, 2007) ....................................................................................................... 27

*Siemers v. Wells Fargo & Co.*, 2007 WL 760750, *12, see also discussion at 13-15 (N.D.Ca.
  March 9, 2007) ....................................................................................................... 27

Siemers v. Wells Fargo & Co.; 2007 WL 760750 (N.D. Cal. March 9, 2007) ........................... 19

*Sirna*, 964 F.2d at 149 .................................................................................................. 19

*Sixty-Five Security Plan v. Blue Cross & Blue Shield,* 583 F. Supp. 380 (S.D.N.Y. 1984)......... 19

*Spano, et. al, v. The Boeing Company, et. al,* 2007 WL 1149192 (SD Ill. April 18, 2007) ........... 1

*Stanton v. Shearson/Lehman American Express, Inc.,* 631 F.Supp. 100 (N.D.Ga.1986)............. 13

*Stanton v. Shearson/Lehman American Express, Inc.*, 631 F.Supp. at 105 ............................ 21, 22

*Taylor v. United Technologies Corp.*, #3:06cv1494 (WWE) (D.Conn. Aug. 9, 2007) ............ 2, 10

*Taylor, et al. v. United Technologies Corp., et al.,* 2007 WL 2302284 (D. Conn. August 9, 2007)
  .............................................................................................................................. 2

*Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002) .................................................................. 7

*Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir. 2002) .................................................................. 7

*Towers v. Titus*, 5 B.R. 786 (N.D. Cal. 1979)................................................................... 24

*Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 247-48 (2000) ............................ 23

*U.S. v. Glick*, 142 F.3d 520 (2d Cir. 1997) ....................................................................... 17

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ..................................................................... 24

*Varity v. Howe*, 516 U.S. 489, (1996).............................................................................. 7

*Varity*, 516 U.S. at 504................................................................................................. 26

*Woods v. Southern Co.,* 396 F.Supp.2d 1351, 1359-60 (N.D.Ga. 2005)....................................... 8

Case 2:06-cv-04305-NKL   Document 110   Filed 08/20/07   Page 6 of 36

*Woods v. Southern Co.,* 396 F.Supp.2d 1351, 1365 (N.D.Ga. 2005) ............................................... 1

*Worldcom, Inc. ERISA Litig.,* 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003).................................. 26

## Statutes

29 U.S.C. § 1002(21)(A)........................................................................................................ 12

29 U.S.C. § 1002(21)(B)........................................................................................................ 14

29 U.S.C. § 1101(b) .............................................................................................................. 16

## Rules

Fed. R. Civ. P. (8) ................................................................................................................... 7

Fed. R. Civ. P. 12(b) ............................................................................................................... 6

## Regulations

29 C.F.R. § 2509.75-3............................................................................................................ 14

29 C.F.R. 2510.3-101............................................................................................................. 16

Case 2:06-cv-04305-NKL   Document 110   Filed 08/20/07   Page 7 of 36

## INTRODUCTION

Plaintiffs are participants in two 401(k) Plans, the PRISM Plan for Represented

Employees of ABB, Inc. and the PRISM Plan for Employees of ABB, Inc. (herein the "Plan" or

"Plans"). (Amended Complaint, ¶¶ 3-6 (hereinafter "A.C. ¶¶ 3-6")). The terms of the Plans are

identical. In their Amended Complaint, Plaintiffs explain that Fidelity Management & Research

Company ("FMRCo") and Fidelity Management Trust Company ("FMTC") (collectively, "the

Fidelity Defendants") are functional fiduciaries of the Plan under ERISA. (A.C. ¶¶ 14-25; 49-

50.) They owe fiduciary duties to the Plan and its participants and beneficiaries. The Amended

Complaint explains the many breaches of these fiduciary duties that underlie this action. (A.C. ¶¶

42-73.)

Determining functional fiduciary status is not appropriate at the pleadings stage because

doing so requires a fact-intensive inquiry into the underlying circumstances, and is not restricted

by formal designations in plan documents.[1] Nonetheless, in their Motion to Dismiss, the Fidelity

Defendants contend that they are not ERISA functional fiduciaries based on the formal

designations in the trust agreement that they attach to their Motion.

Similarly, six (6) District Courts have refused to dismiss plaintiffs' complaints in similar

cases, both before and after the Supreme Court's May 21, 2007 decision in *Bell Atl. Corp. v.*

*Twombly*, 127 S.Ct. 1955 (2007). *See Abbott, et al. v Lockheed Martin Corp., et al.,* 2007 WL

2316485 (SD Ill. August 13, 2007), attached as Ex. A; *Kawani, et al. v. Bechtel*, No. 06-cv-5566

(N.D. Cal. May 15, 2007), attached as Ex. B; *Spano, et. al, v. The Boeing Company, et. al,* 2007

WL 1149192 (SD Ill. April 18, 2007), attached as Ex. C*; Loomis, et al. v. Exelon Corp., et al.,*

---

[1] *See, e.g, Woods v. Southern Co.,* 396 F.Supp.2d 1351, 1365 (N.D.Ga. 2005)("[I]n light of the flexible and fact-intensive concept of a 'functional fiduciary' under ERISA, the Federal Rules' adoption of liberal 'notice pleading,' and the infant stage of this litigation, the Court is reluctant to dispose of Plaintiff's ERISA claims based on the absence of exacting factual averments respecting the existence of Defendants' fiduciary status or the outer contours of their fiduciary capacities.").

1

Case No. 06-cv-4900 (N.D. Ill. Feb. 21, 2007), attached as Ex. D; *George, et. al v. Kraft Foods Global, Inc., et. al,* 2007 WL 853998 (S.D. Ill., 2007), attached as Ex. E; and *Taylor, et al. v. United Technologies Corp., et al.,* 2007 WL 2302284 (D. Conn. August 9, 2007), attached as Ex. F. The reasoning of that one court – Judge Shabaz of the Western District of Wisconsin – recently has been rejected by the United States Court of Appeals for the Fourth Circuit,[2] and had previously had been rejected by the Department of Labor and the vast majority of other courts and commentators considering the issue. Nonetheless, the Fidelity Defendants urge that, under *Twombly*, liberal federal notice pleading standards no longer apply. They contend that Plaintiffs' Amended Complaint must specifically allege evidence, for example, to *establish* that Plan fees and expenses are unreasonable *at the pleadings stage*. (Fidelity's Suggestions in Support of Fidelity Defendants' Motion to Dismiss (hereinafter Fidelity's Sugg.), ¶¶ 5-7.) *Twombly* did not so alter federal pleading standards, *see Erickson v. Pardus*, 127 S.Ct. 2197 (2007), and, in a case similar to this one, the U.S. District Court for the District of Connecticut rejected essentially the same argument. *See Taylor v. United Technologies Corp.*, 2007 WL 2302284 (D. Conn. August 9, 2007) attached as Ex. F.

Fidelity relies extensively on *Hecker v. Deere & Co.*, 2007 WL 1874367 (W.D. Wis. Jun. 21, 2007), in contending that this Court should hold as a matter of law at the pleading stage that it is not a fiduciary. In *Deere*, Judge Shabaz based this finding on *both* (1) his erroneous conclusion that ERISA §404(c) provides an impregnable defense to fiduciary misconduct and the selection of investment options and the monitoring of their performance and cost (*see* Plaintiffs' Opposition To ABB Defendants Motion To Dismiss, pp. 20-22) *and* (2) his application of an improper standard for making the functional fiduciary determination. *Id.* at *7-8. While courts

---

[2] *See DiFelice v. United Airways, Inc.*, 2007 WL 219296 at * 6 n. 4 (4th Cir Aug. 1, 2007), a case on which Morgan Lewis & Bockius, the ABB Defendants' attorneys here, served as counsel.

2

consistently have held that the characterizations contained in plan documents are not determinative – or even particularly instructive – in determining functional fiduciary status, Judge Shabaz found the terms of the trust agreement to be controlling. *Id.* at *8. *See, e.g, Olsen v. E.F. Hutton & Co., Inc.,* 972 F.2d 622 (8th Cir. 1992)(rejecting premise that contractual terms govern fiduciary status.)  Plaintiffs respectfully submit that these holdings are flatly wrong and should be accorded no weight here.

## FACTS

I.     **Fidelity Defendants' Breached Their Fiduciary Duty and Otherwise Engaged In Misconduct.**

In their Amended Complaint, Plaintiffs explain that Defendants breached their fiduciary duties by including investment options in the Plan which caused the Plan to pay excess and unreasonable fees to the Fidelity Defendants, Fidelity-related entities, and others. (A.C. ¶¶ 42-50.)  Defendants caused the Plan to pay these excessive fees by including, as Plan investment options: (1) Fidelity mutual funds, and other Fidelity-approved funds that assessed secretly inflated asset-based charges to provide monies for Fidelity's revenue sharing program (A.C. ¶¶ 20-25, 49-50); (2) Retail Fidelity mutual funds and other retail mutual funds that charge far more for investment management and other services than a multi-billion dollar Plan should pay (A.C. ¶¶ 2, 55-63); and (3) Fidelity mutual funds and other funds that charge high fees for active investment management, even though the excess costs of such actively-managed funds impair participants long-term retirement savings. (A.C. ¶¶ 64-67.)  Further, the Plan paid excessive and unreasonable fees because the Defendants failed to capture for the benefit of the Plan – and allowed the Fidelity Defendants to retain – the proceeds from securities lending activities involving the Plan's assets, "float" interest on the Plan's short-term cash holdings, and other

streams of revenue generated by the custody and administration of the Plan's more than $1.5 billion in assets. (A.C. ¶¶ 51-54, 57.)

The Amended Complaint explains that, in connection with this fiduciary misconduct, Defendants failed: (1) to conduct themselves prudently; (2) to establish and follow proper fiduciary procedures; (3) to investigate, monitor, understand the fees and expenses assessed against the Plan; (4) to properly and prudently use the Plan's enormous bargaining power, based on its multi-billion dollar asset value, to obtain appropriate plan investment options that; and (5) to ensure that the Plan's assets inure exclusively to the benefit of the Plan and its participants. (A.C. ¶¶ 75 & 76.) Finally, the Amended Complaint details that Defendants concealed, misrepresented and/or failed to disclose a litany of material information regarding the Plan's fees, expenses, and the foregoing. (A.C. ¶¶ 68-73.)

## II.     The Fidelity Defendants Are Plan Fiduciaries.

Since at least 1995, FMTC has exercised extensive authority over the Plans' investment options, the operation and administration of the Plans through various Fidelity-related service providers, and the amount the Plans pays to such Fidelity-related service providers. (A.C. ¶¶ 34-36.) First, Defendant Fidelity Management Trust Company ("FMTC") is the Trustee of the Plan, and thus – without dispute – is a Plan fiduciary. (A.C. ¶¶ 12-16.) Thus, at all times, the ABB Defendants and FMTC were co-fiduciaries, "and each knowingly participated in the breaches of the other." (A.C. ¶ 78.) This alone is a sufficient basis to deny the motion to dismiss. 29 U.S.C §1105.

Second, both Fidelity Defendants played, and play, a central role in the selection of the Plan investment options. FMTC does the first-cut screening of investment options, and has veto authority over the inclusion of investment options in the Plan. (A.C. ¶16.) ABB and FMTC

4

agreed that the Plans would offer as investment options *only*:[3] (1) mutual funds that Defendant Fidelity Management & Research Company ("FMRCo," a registered investment adviser that operates Fidelity mutual funds) advised or managed; and (2) non-Fidelity funds *only to the extent that FMTC agreed* with the inclusion of such funds. (A.C. ¶ 16.)  ABB contracted with FMTC to be the trustee and record keeper for the Plan.  However, FMTC retained other Fidelity affiliates or business units to provide some, if not most, of these responsibilities. (A.C. ¶¶ 12-16.)

 To make matters worse, ABB and Fidelity did not negotiate the fees that would be assessed against the Plans' assets for these recordkeeping and administrative services.  Instead, FMTC and/or FMRCo unilaterally determined the amount of those fees and collected them as soft dollars via Fidelity's undisclosed revenue sharing program. (A.C.¶¶ 20-25, 49, 50.)  As the Plans assets grew to a combined value in 2004 of more than $1.5 billion, FMTC and FMRCo's pay –set as a percentage of the Plan's assets – grew commensurately.  The Fidelity Defendants decided how to divide this ever-increasing compensation among themselves; how much to allot for Plan record keeping and administrative tasks performed by various Fidelity entities. (A.C. ¶¶ 12-25, 86.)  The Fidelity Defendants had sole discretion over the amount of these fees and the allocation of revenue generated by the Plan fees without Defendant ABB's knowledge, much less its oversight. (A.C. ¶¶ 12-25.)

 Fidelity's control over Plans' investment options was a critical part of this scheme.  Fidelity's compensation for recordkeeping, administrative, and other services to operate the Plan was not in the form of disclosed, hard-dollar payments. (A.C. ¶¶ 44-50.)  Rather, Fidelity's compensation was derived from soft dollars collected via undisclosed allotments in Fund expense ratios used to support Fidelity's revenue sharing program. (A.C. ¶¶ 43-50.)  Thus, Fidelity's compensation for its recordkeeping, administrative, and other services depended

---

[3]  With an exception for certain pre-existing investments and the Westinghouse Company Stock.

entirely upon the Defendants' inclusion, as Plan investment options, funds that had inflated their expense ratios with sufficient undisclosed "revenue sharing" allotments in order to provide the Fidelity Defendants with a hefty profit via their revenue sharing program. (A.C. ¶¶ 42-50.) Further, Fidelity's status as exclusive service provider ensured that it would not have to share any of these revenue sharing monies with others. (A.C. ¶¶ 12-25, 49.)

Thus, by agreeing that ABB could include as investment options *only* Fidelity mutual funds, or non-fidelity funds *that Fidelity had approved*, Fidelity ensured that it would receive compensation that would continually increase as Plan assets grew.

Beyond control over the Plan's payments to administrative and other service providers, the Fidelity Defendants also controlled and retained Plan assets in the form of income earned from float interest, securities lending activities, and other additional compensation streams generated from fidelity's custody of the Plan's $ 1.5 billion. (A.C. ¶¶ 51-57.)

None of this was, or is, disclosed to Plan participants. While wholly invisible, the Fidelity Defendants' fees were excessive and unreasonable for the services provided.

## ARGUMENT

### I.     The Fidelity Defendants Improperly Seek Summary Judgment.

The Fidelity Defendants' motion improperly relies on a deluge of documents that are not attached to, or referenced in, the Complaint and that are not central to Plaintiffs' causes of action. Their motion is, in short, a defective motion for summary judgment. *See* Fed. R. Civ. P. 12(b); *BJC Health System v. Columbia Gas Co.*, 348 F.3d 685 (8th Cir. 2003).[4]  Seeking to circumvent this, the Fidelity Defendants invoke an exception to Rule 12(b)(6) that allows the consideration of matters outside the pleadings that are referred to in the complaint and *central* to plaintiffs'

---

[4] *See* Plaintiffs' Motion to Strike Defendants' Extraneous Materials Beyond the Pleadings filed on the same date as this Memorandum.

claims. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 n.4 (8th Cir. 2003); *Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir. 2002). That exception is far too narrow to accommodate deluge of materials that the Fidelity Defendants submit. *See, e.g., Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002). It allows, for example, the filing of a written contract *on which a breach of contract claim is based. Id.* In such a case, the contract defines the parties' obligations. Here, the Defendants' Trust Agreements do not define their obligations under ERISA.[5] Defendants' fiduciary duties arise out of ERISA, the case law interpreting it, and the trust and fiduciary law out of which it grows. Moreover, as discussed below, the Fidelity Defendants' functional fiduciary status is based upon a fact-intensive inquiry into their conduct and is not limited by formal plan documents.

## II. The Amended Complaint More Than Adequately Alleges That the Fidelity Defendants Caused The Plan To Bear Unreasonable and Excessive Expenses.

### A. The Amended Complaint Fulfills Federal Notice Pleading Standards.

In *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (May 21, 2007), the Supreme Court did not discard liberal federal notice pleading standards. Two weeks after *Twombly*, in *Erickson v. Pardus*, 127 S.Ct. 2197, 220 (2007), the Court reiterated that a claim under Fed. R. Civ. P. (8) requires only that Plaintiffs provide "a short and plain statement of the claim showing that [they] are] entitled to relief." Plaintiffs are not required to allege specific facts, and their statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Id.*, quoting *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007). When considering such a motion, the court must accept as true all Plaintiffs' factual allegations, and give plaintiffs the benefit of all reasonable inferences. *In re H&R Block, Inc.,* 2007 U.S. Dist.

---

[5] *See Varity v. Howe*, 516 U.S. 489 (1996). *See also Keach v. U.S. Trust Co.*, 256 F. Supp. 2d 828 (C.D. Ill. 2003) (looking solely at the powers that a defendant is given on paper would "render the protections of ERISA meaningless, as ERISA's fiduciary liability provisions would have no meaning in the real world unless they are flexible enough to take cognizance of the different dynamics in which these transactions can occur").

Lexis 58424 at *9, (W.D.Mo. Aug. 1, 2007). Moreover, in meeting this threshold, "'prior rulings and considered views of leading commentators' can assist in assessing the plausibility of the plaintiffs' allegations." *Schoemehl v. Renaissance Elec. Co., Inc.*, 2007 WL 2048669 at * 2-3 (E.D.Mo. July 12, 2007)*, quoting Bell Atlantic,* 127 S.Ct. at 1966.

In the context of an ERISA breach of fiduciary duty action claims, the suggestion of a heightened pleading standard is particularly inappropriate. In *Concha v. London*, 62 F.3d 1493 (9th Cir 1995), the Ninth Circuit explained that plaintiffs frequently cannot plead the facts underlying fiduciary misconduct with particularity at the pleadings stage because, "[w]here a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that this control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a position to describe with particularity the events constituting the alleged misconduct." *Id.* at 1504. Instead, such details and "facts will frequently be in the exclusive possession of the breaching fiduciary." *Id.* Thus, "[e]ven in cases where fraud is alleged, we relax pleading requirements where the relevant facts are known only to the defendant." *Id.* [6]

### B. The Amended Complaint Provides Both Notice And The Basis Of Plaintiffs' Claims.

The Amended Complaint alleges that fees and expenses assessed against the Plan were, and are, excessive and unreasonable because Plan service providers (i.e. the Fidelity Defendants and related entities) receive: (1) hard dollar payments(A.C. ¶¶ 42-43.); *and* (2) soft dollars collected through Fidelity's revenue sharing program, the amount of which grow as Plan assets

---

[6] See also *Woods v. Southern Co.,* 396 F.Supp.2d 1351, 1359-60 (N.D.Ga. 2005) ("[A] plaintiff need not meet some heightened pleading requirement when bringing an ERISA claim. Rather, he need only meet the low pleading threshold of Rule 8(a), which requires "a short plain statement of the claim showing that he is entitled to relief.")(citations omitted); *In re AEP ERISA Litigation*, 327 F.Supp.2d 812, 821 (S.D. Ohio 2004) (same).

grow regardless of the level of services provided[7] (A.C. ¶¶ 44-50); *and* (3) payments collected via retail mutual fund expense ratios, even though the Plan's multi-billion dollar asset value can secure for it much less expensive investments (A.C. ¶¶ 55-67, 76); *and* (4) payments imposed for active investment management, even though such active investment management impairs participants' long-term retirement (A.C. ¶¶ 42-50, 64-67); *and* (5) the proceeds from "float" interest, securities lending activities, and other compensation streams that arise out of their custody of plan assets. (A.C. ¶¶ 51-54.) The Amended Complaint explains that the Defendants breached their fiduciary duties in disguising, obscuring, concealing, and/or failing to disclose material information about these practices, the existence and extent of the Fidelity Defendants' revenue sharing program, and the amount and nature of the excess fees participants were forced to bear. (A.C. ¶¶ 68-81.)

The Fidelity Defendants argue that these allegations are "mere conclusions and labels." (Fidelity Sugg. pp. 5, 6, 18.) In *Siemers v. Wells Fargo & Co.*, 2007 WL 1140660 (N.D.Ca. April 17, 2007), the court rejected a similar argument. There, as here, plaintiffs alleged that defendants had secretly inflated the expense ratios of mutual funds to support the funds' revenue sharing programs. *Id.* at *1 - *3. There, as here, plaintiffs did not allege the extent to which each expense ratio had been inflated. *Id.* at *7 - *8. In rejecting the defendants argument that plaintiffs had insufficiently pled the excessiveness of the expense ratios, the court reasoned that, "[a]t the pleading stage, however, it would be most unfair to insist that the complaint establish the extent of any excess. No counsel could ethically pin this down at the pleading stage. It should suffice if the complaint sets forth the facts from which the charge of excessiveness is

---

[7] This, without more, is problematic, especially in the fiduciary context. *See In re Dreyfus Mutual Fund Fee Litigation*, 428 F.Supp.2d 342, 350 (W.D.Pa. 2005)(In enacting statutes to regulate mutual funds, "Congress recognized that as mutual funds grew larger, it became less expensive for investment advisors to provide additional services. Congress wanted to ensure that investment advisors passed on to fund investors the savings that they realized from these economies of scale.").

specific and plausible." *Id.* at *7.

The Fidelity Defendants request dismissal because the Amended Complaint does not establish that the Plan's fees were unreasonable and that the Defendants' conduct was imprudent. This is just plain wrong. First, Rule 8(a) and federal notice pleading do not require that plaintiffs establish such matters at the pleading stage. Indeed, in *Bell Atlantic Co. v. Twombly,* the Supreme Court expressly approved the generalized pleading of negligence that failed to allege how the defendant had been negligent. 127 S.Ct. at 1970 n. 10. Not surprisingly, the case on which the Fidelity Defendants rely, *Herman v. Mercantile Bank*, 143 F.3d 419 (8th Cir. 1998), was an appeal from a full trial on the merits. Nowhere does it suggest that plaintiffs must show the conduct of a "hypothetical prudent fiduciary" as a matter of pleading.

Second, in *Taylor v. United Technologies Corp.*, 2007 WL 2302284 (D.Conn. Aug. 9, 2007), attached as Ex. F, the court specifically rejected defendants' contention that the "unreasonableness of fees" assessed against the 401(k) plan at issue there must be shown as a matter of pleading. In *Taylor*, defendants argued that, because revenue sharing is a "ubiquitous industry practice," plaintiffs' allegations that revenue sharing results in unreasonable fees must fail as a matter of law. *Id.* After reviewing the allegations and plaintiffs' complaint, which are very similar to the allegations here, the court held that "[t]he fact that plaintiffs allege that revenue sharing is a common industry practice does not curtail their ability to prove that, in this instance, it is resulted in unreasonable fees. The Court will not grant a motion to dismiss on the ground." *Id.*

Here, the Fidelity Defendants' argument is similar: because 401(k) plans have not "systematically avoided retail mutual funds and actively managed investment products," Plaintiffs' claim that such is a fiduciary breach to include these funds in a *multi-billion dollar*

10

401(k) plan must be dismissed.  As in *Taylor*, this argument must fail.  The fact that some 401(k) plans – notably small plans – select retail mutual funds and actively managed investment products as investment options "does not curtail [Plaintiffs] ability to prove that, in this instance, it has resulted in unreasonable fees." *Id.*

Third, the Fidelity Defendants seek the benefit of impermissible inferences in their favor. They claim that "retail mutual funds represent the predominant investment options in 401(k) plans today," and urge the Court to infer that retail mutual funds are a prudent and proper investment for *multi-billion dollar* 401(k) plans. (Fidelity Sugg. pp. 6-7.)  But it is well recognized that multi-billion 401(k) plans have investment opportunities that small plans do not.

In 1998, the Pension And Welfare Benefits Administration's (the "PWBA's") report, "Study Of 401(K) Plan Fees And Expenses," noted that large investors, including 401(k) plans, can save on their investment management expenses by taking advantage of "commingled accounts" that are similar to retail mutual funds but impose lower fees. PWBA, "Study of 401(K) Plan Fees and Expenses" §2.4.1.3., attached as Ex. G.  More importantly, the PWBA explained that "[v]ery large plans can achieve even greater investment management savings by establishing separate accounts for their 401(k) assets.  In such an arrangement, the sponsor can define its own investment objectives and targets portfolios." *Id.*

Further, the PWBA explained that "[s]eparate accounts require substantial minimum investments of $15 million to $25 million per account.  However, large plans typically, with total assets of over $500 million, can realize substantial savings through such instruments.  **Total investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds.**" *Id.* (emphasis added).  Finally, the PWBA explained that "[i]n general, direct use of retail mutual funds or the providers institutional funds is the most

common investment management among smaller plans, those with assets of $50 million or under. . . ." *Id.*[8]

Simply stated, the unfortunate fact that many 401(k) participants must save for retirement in plans that are too small to avoid the excessive and unreasonable costs of retail mutual funds does not render it prudent, *as a matter of law*, to subject participants of multi-billion dollar 401(k) plans to the same disadvantages. Rather, it should be exactly the opposite.

### III. The Fidelity Defendants' Fiduciary Status Is Based Upon A Fact-Intensive Inquiry That Cannot Be Decided At The Pleadings Stage.

Plaintiffs have alleged that both FRMCo and FMTC are Plan fiduciaries. Section 3(21) of ERISA provides, in pertinent part, that a fiduciary is any individual or entity that performs the following functions in connection with an ERISA plan:

> (i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) ... renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) ... has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

Thus, ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan." *Mertens v Hewitt Assoc.*, 508 U.S. 248 (1993). The Eighth Circuit has consistently read this definition of fiduciary in the broadest of ways. *Olson v. E.F. Hutton & Co., Inc.*, 972 F.2d 622 (8th Cir. 1992). The focus of a fiduciary determination is primarily on what a party does, not just what they are called. *Id. See also Blatt*

---

[8] *See also* Kristen Polich, *"Hewitt Study Highlights Squeeze on Retirement Savings,"* Hewitt Associates, November 28, 2005 at p. 2 ("Strategies To Strengthen Savings" include "**Avoid high fees, when possible**. Retail mutual funds charge, on average, more than two and a half times the expenses of privately managed, commingled funds. . . ")(Emphasis in original), attached as Ex. H; Janet Kidd Stewart, "Retail Funds Falling Out of Favor in Some 401(k)'s," Chicago Tribune, June 10, 2007, attached as Ex. I.

*v. Marshall and Lassman,* 812 F.2d 810 (2d Cir. 1986); *Galgay v. Gangloff,* 677 F. Supp. 295 (M.D.Pa.1987) (noting legislative history reveals Congress sought "to codify the traditional principles of fiduciary responsibility from the law of trusts" and "adopted a broad, functional definition of the term" in order to further this purpose).

Contrary to its contentions otherwise, Fidelity need not have "absolute discretion with respect to a benefit plan to be considered a fiduciary." *Blatt,* 812 F.2d at 812; *see also American Federation of Unions v. Equitable Life Assurance Soc'y,* 841 F.2d 658 (5th Cir.1988). Indirect or attenuated actions are adequate to show "control over plan assets" so as to classify one as a fiduciary. *See Blatt,* 812 F.2d at 813 (accounting firm was an ERISA fiduciary because its refusal to sign and deliver to a former employee a form required for him to receive a distribution from the plan was an exercise of actual control over the disposition of plan assets); *Brock v. Hendershott,* 840 F.2d 339 (6th Cir.1988) (a high-ranking union representative who used his "considerable influence" over local unions to direct them to choose a particular dental plan was an ERISA fiduciary because of his exercise of authority or control over the disposition of plan assets); *Stanton v. Shearson/Lehman American Express, Inc.,* 631 F.Supp. 100 (N.D.Ga.1986) (a brokerage firm acts as an ERISA fiduciary "when it exercises authority or control over the broker assigned to the ERISA account; since the broker's employment respects the disposition of ERISA assets, control over the broker is control respecting the disposition of those assets").

Against this background, courts consistently hold that making that fact-intensive assessment of whether a defendant meets this standard is *not* appropriate when the plaintiff has not yet had the benefit of full discovery.[9] Put succinctly, "the manner in which each defendant...

---

[9] *In re Cardinal Health, Inc. ERISA Litigation*, 424 F. Supp. 2d 1002, 1030 (S.D. Ohio 2006) ("Fiduciary status is a 'fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss.'"); *Eslava v. Gulf Telephone Co.*, 418 F. Supp. 2d 1314 (S.D. Ala. 2006) (declining to dismiss plaintiffs' ERISA claims based on defendant's "alleged fiduciary status or the parameters of her fiduciary capacities at this stage of the case"); *In re*

operated" remains "something of a black box" prior to discovery. *Rankin v. Rots,* 278 F. Supp. 2d 853 (E.D. Mich. 2003). "To expect a plaintiff to be able to turn on the light and point to the particular individuals who exercised decision making authority is simply too much to require" at the pleading stage. *Id.*

This is particularly the case where, as here, Fidelity Defendants contracted with other Fidelity affiliates and business units to provide services to the Plan. The Fidelity Defendants unilaterally determined how much to compensate each Fidelity service provider for their services to the Plan. These facts, alone, are sufficient to deny Fidelity's Motion to Dismiss.

### A. The Complaint Sufficiently Alleges That The Fidelity Defendants Exercised Control Over Plan Assets Or Plan Administration.

ERISA § 3(21)(B), 29 U.S.C. § 1002(21)(B), provides that a mutual fund investment adviser does not become a fiduciary *solely* because of its role as mutual fund investment adviser. 29 U.S.C. § 1002(21)(B). Based on this, Fidelity argues that it is not a fiduciary as a matter of law. (Fidelity Sugg. ¶¶ 8-11.) But this misleads the statute. While Fidelity is not *automatically* deemed a fiduciary simply because it advises some of the Plan's mutual fund's investments, ERISA contemplates that an entity may perform more than just a single function with respect to a plan. The Fidelity Defendants can be, and are, fiduciaries under ERISA §3(21)(A)'s other provisions. *See* 29 C.F.R. § 2509.75-3 (if an investment adviser to a mutual fund is a fiduciary or party in interest for reasons other than the investment in the mutual fund, the adviser remains fiduciary).[10] The Supreme Court has expressly recognized that a party can be a fiduciary for

---

*Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207 (D. Kan. 2004) (finding it premature to determine scope of fiduciary duties and whether particular defendant acted in fiduciary capacity on motion to dismiss); *In re Xcel Energy, Inc.*, 312 F. Supp. 2d 1165 (D. Minn. 2004) (questions of fiduciary status are ill-suited to resolution on Rule 12(b)(6) motion); *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898 (E.D. Mich. 2004) (holding fiduciary status could not be determined on a motion to dismiss); *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658 (E.D. Tex. 2004) ("It is typically premature to determine a defendant's fiduciary status at the motion to dismiss stage of the proceedings.").

[10] *See* Fidelity's authority acknowledges this. (Fidelity Sugg. p.9.) Although recognizing that a mutual fund

some purposes but not others, depending upon which functions it performs on behalf of the Plan. *Pegram v. Herdrich,* 530 U.S. 211 (2000).

At a minimum, Plaintiffs have pled that FMTC as a trustee to the Plan is a fiduciary by law. (A.C. ¶¶ 12-16.) Therefore, FMTC is also responsible, as a co-fiduciary, for all breaches of fiduciary duty by other fiduciaries — to the extent that FMTC participated knowingly, by its own failure to fulfill its fiduciary duties it enables another breach, or if FMTC knows of another fiduciary's breach and does nothing to remedy it. 29 U.S.C. § 1105. *See also Ellis v. Rycenga Homes, Inc.*, 484 F.Supp. 2d 694, 712 (W.D. Mich. 2007).

Here, in addition to advising Fidelity-branded mutual funds, Fidelity Defendants perform at least two fiduciary functions. First, in conjunction with each other and possibly other Fidelity entities, FMRCo and FMTC: (1) contracts with other Fidelity affiliates and/or business units to provide the services necessary to administer the Plan; (2) decides the Funds that will be made available to ABB for inclusion as Plan investment options, and (3) decides how much the Plans will pay for *Plan* record keeping and other *Plan* related administrative services. (A.C. ¶¶ 12-25.)

### B. Fidelity Defendants Contracted With Several Other Fidelity Affiliates and/or Business Units To Provide The Services To The Plan.

FMTC is not the entity who provides recordkeeping services, despite the fact that its contract with ABB states otherwise. Further, FMRCo also contracted with a different Fidelity entity to provide investment advisory services to the investment options within the Plan. Instead of fulfilling the roles that Fidelity describes as so ministerial, it retained other Fidelity entities to provide certain services related to the administration of the Plan and determined the

---

investment advisor is not automatically deemed a fiduciary, both cases explain that such advisers may be fiduciaries for other reasons. *A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Secs., Inc.*, 964 F. Supp. 147, (S.D.N.Y. 1997) (the investment of plan assets in "securities issued by a registered investment company d*oes not of itself* cause the investment company [or] its adviser" to become an ERISA fiduciary) (emphasis added); *Corbett v. Marsh & McLennan Cos.*, No. MDL 15863, 2006 WL 734560 (D. Md. Feb. 27, 2006) (mutual fund investment adviser can be considered provider of "investment advice" and thus a fiduciary, depending on facts).

compensation that each entity would receive.  (A.C. ¶¶ 12-25.)

It would be improper at the Motion to Dismiss stage to delve into the particular details of these relationships.  Rather, the important point is that things are not as they seem and Fidelity's representations as to its role in the administration of the Plan or control of its assets are incomplete — at best.

### C. The Fidelity Defendants Unilaterally Decided How Much Of The Expense Ratios Charged To Participants Will Be Used To Support Fidelity's Undisclosed Revenue Sharing Program.

The Fidelity Defendants are both the ultimate arbiter of the Plan's revenue sharing payments, recordkeeping, and administrative fees, and the paymaster collecting such fees from Participants' accounts.  The Amended Complaint explains that these fees are unreasonable and excessive.  Fidelity does not, and cannot, dispute that it controlled these monies and determined how much the Plan paid for Revenue Sharing that went to offset recordkeeping and administration charges.  Instead, Fidelity contends that it is not a fiduciary because these excessive fees were, once removed from participants' accounts, were not "plan assets."  (Fidelity Sugg. ¶¶ 10-11.)[11]  Ignoring that it filed a motion to dismiss, Fidelity's argument turns on factual contentions that the money paid to Fidelity is routed through Fidelity-related or approved mutual funds before it is tendered to the responsible entity, and that Plan fiduciaries have no control over it or expectation to receive any portion of it back.

There is, however, no basis for these contentions in the Complaint.  The Fidelity Defendants, and/or related Fidelity entities, served, at a minimum, as the Plans' trustee, recordkeeper, and broker.  As such, they had possession and control of the Plans' assets.

---

[11]    Section 401(b) provides only that the assets of a mutual fund company do not become "plan assets" merely by the plan's investment in a mutual fund company, but does not offer any guidance as to what plan assets are.  *See* 29 U.S.C. § 1101(b).  The attendant regulations promulgated by the Department of Labor do not contain any further clarification on this point.  *See* 29 C.F.R. 2510.3-101 (plan assets – investments).

Plaintiffs need discovery to determine the exact mechanism that the Fidelity Defendants used to collect and distribute the excess fees they removed from Plan participants' accounts and distributed among Plan service providers and whether Plan fiduciaries had established proper procedures to secure the return to the Plan of any excess.

Even if the Court were to analyze the Fidelity Defendants' fiduciary-status under hypothetical that Defendants posit, the excess fee money that Fidelity removed from Plan participants' accounts does not loose its protection as a "plan asset" simply because Fidelity entities successfully have secured possession of it. In *U.S. v. Glick*, 142 F.3d 520 (2d Cir. 1997), the court rejected this argument. Glick was an insurance broker who enrolled plan participants in a health insurance plan in exchange for a commission. Glick himself determined the amount of his commission. In order to continue to serve as broker for the plan, Glick agreed to make a payment to the plan's sponsor for every participant he brought into the plan. After being convicted of bribery for paying these kickbacks to the plan sponsors, Glick challenged his sentence. He argued, as the Fidelity Defendants argue here, that he was not an ERISA fiduciary because his commissions were not "plan assets" over which he exercised control. *Glick*, 142 F. 3d at 527. The Second Circuit rejected this contention. In holding that Glick exercised control over plan assets and was thus a fiduciary, the Second Circuit reasoned that just as "the monies an employer actually pays over to the welfare plan, directly or indirectly and regardless of whose control such monies passes, constitutes welfare plan assets from the time the employer parts with the monies," it is "reasonable to conclude that the monies retain their character as fund assets as they pass downstream …" *Id.*

The only court to consider the issue in the ERISA revenue sharing context reached the same conclusion. In *Haddock v. Nationwide Insurance Co.*, 419 F. Supp. 2d 156 (D. Conn.

2006), Nationwide provided group annuities – essentially insurance company mutual funds – to retirement plans and their participants. There, as here, Nationwide prescreened such funds and the plan sponsor chose plan investment options from the list Nationwide approved. *Id.* at 161. When such a mutual fund was included in the plan, Nationwide received revenue-sharing payments from the fund.

Another plan fiduciary learned of this and sued to force Nationwide to restore these revenue sharing payments to the plan. Rejecting Nationwide's contention that revenue sharing monies were not plan assets, the Court found that the revenue sharing transfers were "plan assets" even though they were *paid by mutual funds out of mutual fund fees. Id.* at 162-63. *Haddock* employed a "functional" test under which revenue sharing fee transfer would constitute plan assets when the defendant holds or receives them: (1) as a result of its status as a fiduciary or its exercise of fiduciary discretion or authority; and (2) at the expense of plan participants or beneficiaries. *Haddock*, 419 F. Supp. 2d at 169-70 (citing cases from which the standard was drawn). *Haddock* first concluded that Nationwide came to hold the assets as a result of its status as a fiduciary: there, as here, the prescreening of mutual funds for inclusion in the Plan was *both* an exercise of control *and* the reason that Nationwide was in the position to secretly receive the revenue-sharing payments. *Id.* at 170.[12] Nationwide was able, as is the Fidelity Defendants here, to ensure that the plan only chose among funds that would pay sufficient revenue sharing. *Id.* at 166-67.

Second, the Court held that Nationwide collected and retained these excess fees and expenses directly at the expense of plan participants. *See Haddock*, 419 F. Supp. 2d at 170. Here, the Fidelity Defendants used their control over the Plan assets to collect excessive

_____

[12] The court also found that the mutual funds, although charging no more than the expense ratios disclosed in their prospectuses, ensured that those expense ratios were sufficiently overstated so as to provide money for revenue-sharing payments to Nationwide. *Id.* at 170.

administrative fees – fees which did not reflect the actual expense of administrative services supplied to the Plans – from participants' retirement directly to their detriment. *Id.* (second prong). Had Fidelity not removed these excess fees from the Plan, these monies would have been available to earn investment gains and provide additional income to participants when they retire. *See Siemers v. Wells Fargo & Co.;* 2007 WL 760750 (N.D. Cal. March 9, 2007); Government Accountability Office, Private Pension Changes Needed To Provide 401(k) Participants and the Department of Labor Better Information On Fees (Nov. 2006).

Thus, neither the law, nor common sense, support Fidelity's hyper-technical contentions that – by secretly collecting excess fees from participants' retirement savings *exactly because* of its possession of, and control over, Plan assets – it can reclassify such assets so as to impair their status and protection under ERISA. In *Sirna*, on which Fidelity relies, the court acknowledged that when a plan service provider ended up with "so much control over factors determinative of its own compensation" that the provider was able to "manipulate the plan or its assets to [the provider's] own benefit," the service provider could be deemed a fiduciary with respect to its compensation. *Sirna*, 964 F.2d at 149 (*quoting F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987)).[13] Here, the Fidelity Defendants had this exact sort of control over their compensation and that of other Fidelity entities.

Fidelity also relies on *Chicago District Council of Carpenters Welfare Fund v. Caremark,* 474 F.3d 463 (7th Cir. 2007). In *Caremark*, a health insurance plan sponsor (Carpenters) contracted with a "pharmacy benefits manager" (Caremark) to pay set prices for prescription drugs. *Id.* at 466. Those prices were based on factors entirely beyond the control of

---

[13] *See also Morrell & Co. v. John Hancock Mut. Life Ins. Co.*, No. 85 C 9166, 1988 WL 58619 (N.D. Ill. May 31, 1988) (Holding that claims administrator who had control over which claims would be paid was compensated based upon a percentage of paid claims was a fiduciary precisely because it had control over the amount of its payment.); *Morrell & Co. v. John Hancock Mut. Life Ins. Co.*, No. 85 C 9166, 1988 WL 58619, at *1-2 (N.D. Ill. May 31, 1988). *See also Sixty-Five Security Plan v. Blue Cross & Blue Shield,* 583 F. Supp. 380 (S.D.N.Y. 1984) (same).

19

Caremark (or Carpenters, for that matter). Caremark also agreed to pay Carpenters a rebate of $1.50 or $.75 per prescription filled, regardless of the price of the prescription or the percentage of the rebate Caremark itself received from the drug makers. *Id.* at 467-69. The Seventh Circuit found that under these circumstances, and based on the specific contractual terms, where the parties specifically negotiated a set amount of rebates that Caremark (not the drug maker) was obligated to pay the plan and where it provided that Caremark would hold the rebate contract with the drug manufacturers, Caremark did not exercise fiduciary control of "plan assets" when it retained rebates that it negotiated on its own behalf with drug makers. *Id.* at 476.

The *Caremark* decision makes reference to "plan assets" only in footnote six. In fact, as the *Caremark* court observed, if Caremark *had* been collecting rebates and passing through a percentage to Carpenters, instead of paying a flat, contractually pre-determined rate, the rebates would have been considered "plan assets." *Caremark*, 474 F.3d at 476 & n.6. If the amount of the rebate was not the subject of negotiation but was unilaterally determined by Caremark, then Caremark would have clearly been exercising discretionary control over those assets.

This case presents just that latter situation. The Agreements between FMTC and ABB make no mention of such "rebates" or internal to Fidelity revenue-sharing payments. To the contrary, the Amended Complaint explains that Fidelity's revenue sharing practices were hidden and undisclosed. Moreover, here Fidelity chose which of its many mutual funds to allow ABB to include in the Plan, and thus was able to ensure the Plan contained only funds that with revenue sharing to pay Fidelity's excess fee charges. In fact, Fidelity selected retail mutual funds for a $1.5 billion Plan exactly because such funds included more revenue sharing within their retail expense ratios. None of this was the subject of negotiations. Instead, Fidelity used its inflated expense ratios fees as a "conduit" secretly to pass money to other Fidelity entities, and further

exercised complete control over the amount of money that would eventually be used for administrative fees.

Finally, FMRCo appeals to policy, arguing that the supposed "clear boundary" for investment fund advisers to mutual funds would be erased if they could become fiduciaries by accepting payment for services. (Fidelity Sugg. ¶ 11.) But ERISA has not created such a boundary. The statute contemplates that investment advisers to mutual funds may also be ERISA fiduciaries. Plaintiffs do not contend that the Fidelity Defendants are fiduciaries simply because they accept payment. Nor does any policy argument favor Fidelity's conduct as it alleged. The Amended Complaint challenges the Fidelity Defendants' business practice of collecting excess and unreasonable fees that impair Plan participants' retirement savings via an undisclosed scheme of hiding Plan service providers' excess and unreasonable compensation – and thus the true cost of participating in the 401(k) plan.

### D. The Fidelity Defendants Further Exercised Discretion Over The Choice Of The Plan's Investment Options.

A party need not exert final or formal control to be deemed an ERISA fiduciary. Here, exerting influence and/or indirect control over the Plans' selection of funds to be included as investment options makes the Fidelity Defendants ERISA fiduciaries. *See* ERISA §3(21)(A)(i); *Blatt*, 812 F.2d at 813; *Brock v. Hendershott*, 840 F.2d at 342; *Stanton v. Shearson/Lehman American Express, Inc*., 631 F.Supp. at 105; *Olson*, 957 F.2d at 625. The Fidelity Defendants and other Fidelity entities performed the primary screening of Plan investment options, reducing the thousands of investment vehicles available to *only* Fidelity funds or non-Fidelity funds of which FMRCo approved. By doing so, FMRCo and FMTC were able to ensure that only funds with expense ratios that included substantial revenue sharing would be considered for inclusion in the Plan.

Despite this, FMRCo and FMTC insist that they cannot be a fiduciary because, according to the Trust Agreement, ABB had "final authority" over the inclusion of funds in the Plans. But such formal authority is largely irrelevant to ERISA's functional fiduciary test. *See* ERISA §3(21)(A)(i); *Blatt*, 812 F.2d at 813; *Brock v. Hendershott*, 840 F.2d at 342; *Stanton v. Shearson/Lehman American Express, Inc*., 631 F.Supp. at 105; *Olson*, 957 F.2d at 625. The Amended Complaint explains that *in practice* both Fidelity Defendants "played a role" in the selection of Plan investment options. (A.C. ¶¶ 12-25.) The Amended Complaint indicates that Fidelity was extensively involved in the operation of the Plan and the screening of investment options. If these allegations alone are not sufficient, they certainly give rise to inferences that the Fidelity Defendants along with other Fidelity entities played substantial functional roles.

In *Haddock v. Nationwide Insurance Co.*, 419 F. Supp. 2d 156 (D. Conn. 2006)*,* the court held that Nationwide was an ERISA fiduciary because it exercised "*some* control over the selection of mutual funds that are available for the Plans' and participants' investments," even though Nationwide did not make the final decision. *Haddock*, 419 F. Supp. 2d at 166 (emphasis added). There, as here, such control enabled the Nationwide to recommend only mutual funds which paid sufficient revenue-sharing to Nationwide. As a result, the court held that Nationwide was a fiduciary with regard to the selection of mutual funds. *See id.* & n.6.

FMTC relies on *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983) in arguing that it did not become a fiduciary by entering agreements with ABB regarding the Plan. (Fidelity Sugg. ¶¶ 12-13.) However, *Schulist* does not foreclose the possibility that an entity that started

out as a non-fiduciary, bargaining at arm's length for favorable terms, could end up a fiduciary. *Schulist*, 717 F.2d at 1131-32.[14]

## IV. Plaintiffs' Claim under ERISA §502(a)(3) in Count II, States a Claim.

### A. Count II States A Claim Even If The Fidelity Defendants Are Not Fiduciaries.

In seeking to dismiss Count II, the Fidelity Defendants again contend that they are not fiduciaries. As set forth above, this cannot be determined at the pleading stage. Nor does it need to be. The Fidelity Defendants' liability under § 502(a)(3) does not turn on their fiduciary status. Their conduct also would constitute in prohibited transactions with a fiduciary, and thus the Fidelity Defendants may be liable under § 502(a)(3) even if they are not fiduciaries. *See Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 247-48 (2000).

The Fidelity Defendants do not dispute this. Instead, they claim that Plaintiffs have made the Fidelity Defendants' fiduciary status a predicate to their claims in Count II. While this is not true, it is also irrelevant at this stage of the case. *See Independent Business Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698, 701-02 (8th Cir. 1997)(A complaint need not identify a legal theory and can even identify an incorrect theory.); *Garman v. Griffin*, 666 F.2d 1156, 1158-59 (8th Cir. 1981) (A complaint can "plead in the alternative, even if the pleadings are inconsistent.").

### B. Count II It Seeks Appropriate Equitable Relief.

#### i. The Relief Sought in Count II is Unquestionably Equitable.

Plaintiffs request an accounting, surcharge, restitution, and injunctive relief. All are undeniably equitable. For example, there can be no serious dispute that "[a]n accounting is an

---

[14]     Nor is this case like *Caremark*, where the prices paid by the plan sponsor for services to the plan were set according to benchmarks beyond the control of either party and where the plan sponsor knew exactly how much it was paying, what it was paying for, and to whom it was going. *See Caremark*, 474 F.3d at 472-73.

equitable remedy designed to provide a means for compelling one, who because of a confidential

or trust relationship has been entrusted with property of another, to render an account of his

actions and for the recovery of any balance found to be due." *Bostic v. Goodnight*, 443 F.3d

1044, 1048 (8th Cir. 2006).[15]  In *Spano v. the Boeing Company* the court expressly rejected

Defendants' exact argument in a similar case, holding the defendants' attempt to render an

accounting remedy unavailable under ERISA §502(a)(3) "finds no support in the statutory

language or in settled judicial construction of the statute." 2007 WL 1149192 (S.D. Ill, April 18,

2007)(Ex. C).  Similarly, a surcharge is an unquestionably equitable remedy.  Restatement

(Third) of Trusts §205 & cmt. a, at 223 (1993); 3 Austin W. Scott & William F. Fratcher, *The

Law of Trusts*, §205 at 238-240  (4th ed. 1988). [16]

### ii.  The Relief Sought In Count II Is Appropriate.

The Fidelity Defendants argue that to the extent that Count II seeks equitable relief, the

relief is nevertheless not "appropriate."  In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the

Supreme Court explained that § 502(a)(3) is a "catchall" provision, designed to "act as a safety

net, offering appropriate equitable relief for injuries caused by violations that § 502 does not

elsewhere adequately remedy." *Id.* at 512.  The Court concluded "that where Congress

elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for

further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id.* at

515.  But *Varity* did not create a pleading rule mandating plaintiffs prove the inadequacy of other

---

[15] *See* also *Rivoli Drug Co. v. Lynch*, 50 F.2d 536, 537-38 (9th Cir. 1931); *Towers v. Titus*, 5 B.R. 786, 793-94 (N.D. Cal. 1979); *Civic Western Corp. v. Zila Industries, Inc*., 66 Cal. App. 3d 1, 14 (1977).  *See also Guardian Music Corp. v. James W. Guerico Enterprises, Inc.*, 2006 WL 1880381 at *2 (S.D.N.Y. 2006).

[16] *See also* Brief Of Eleven Law Professors As Amici Curiae In Support Of Petitioner, *Larue v. DeWolff*, 2007 WL 2287653 (Aug 7, 2007), p. 1 n. 6, On Writ Of Certiorari To The United States Supreme Court, attached as Ex. J; Brief Amicus Curiae Of AARP In Support Of Petitioner, *Larue v. DeWolff*, 2007 WL 2274796 (Aug 7, 2007) On Writ Of Certiorari To The United States Supreme Court, p. 17-19, attached as Ex. K;  Brief For United States As Amicus Curiae Supporting Petitioner, *Larue v. DeWolff*, 2007 WL 2274791 (Aug 7, 2007) On Writ Of Certiorari To The United States Supreme Court, pp. 17-19, attached as Ex. L.

remedies at the pleading stage.  *See Reed*, 460 F.2d at 826; *Century 21 Shows*, 400 F.2d at 607.[17]

Nor can it be determined at this stage that the relief sought in Count II duplicates relief available under other parts of § 502.  Section 502(a)(3) provides Plaintiffs an avenue for relief against the Fidelity Defendants if they ultimately prove they are *not* fiduciaries.  Defendants' fiduciary status cannot be resolved at the pleading stage.

### iii. Defendants' Contentions That Injunctive Relief Sought In Count II Could Lead to Immaterial Disclosures Are Speculative and Premature.

The Fidelity Defendants argue Count II should be dismissed because, if the Court ordered disclosure of certain material information, such disclosures might be more extensive than those required by the ERISA statute and regulations.  Plaintiffs respectfully submit that it is wholly impractical and utterly speculative to dismiss plaintiffs' claims at the pleadings stage because: (1) a potential remedy theoretically *might* conflict with statutes, regulations or agency actions yet in their infancy or (2) eventual injunctive relief *might* require Plan fiduciaries to be candid regarding the fees they remove from Plan participants' accounts.

Beyond such quaint notions of practicality, Defendants' arguments ignore ERISA law.  In *Kalda v. Sioux Valley Physician Partners*, 2007 WL 925245 at * 3, the Eighth Circuit rejected Defendants' limited view of ERISA fiduciaries' obligations.  As part of a fiduciaries' core obligation to "discharge its duties to a plan solely in the interest of the participants and

---

[17] In *Varity Corp v. Howe*, the Court merely stated that duplicative relief under § 502(a)(3) would "likely" and "normally" not be appropriate. *Id. at* 515. What circumstances would be "unlikely" and/or "abnormal" so as to make relief under both sections appropriate is an inherently factual question.  Determination of whether Plaintiffs seek appropriate relief under §502(a)(3) must await discovery.  *See, e.g., Chapro v. SSR Realty Advisors, Inc. Severance Plan*, 351  F.Supp. 2d 152, 156 (S.D.N.Y. 2004) (refusing to dismiss § 502(a)(3) claim duplicative of § 502(a)(1) claim "at [motion to dismiss] stage of the case"); *Communications Workers of America, AFL-CIO v. Nynex Corp.*, 1998 WL 85323, at *1 (S.D.N.Y. Feb. 26, 1998) ("[e]ven if the claims are duplicative, no binding authority has held that a plaintiff cannot *plead* both claims.") (emphasis added); *Am. Med. Assoc. v. United Healthcare Corp.*,  2002 WL 31413668, at *7 (S.D.N.Y. Oct. 23, 2002) ("It is not clear that by asserting the ERISA claims under §§ 502(a)(3) and 502(a)(1)(B) that plaintiffs are seeking the same relief."); *see also DeGuiseppe v. Vertis, Inc.,*2005 WL 2271865, at *4 (E.D. Pa. Sept. 15, 2005) (refusing to grant dismissal because it is not clear yet at this stage of the proceedings whether § 502(a)(1)(B) will in fact give plaintiff adequate relief).

25

beneficiaries" the court held fiduciaries "must comply with the common-law duty of loyalty including the 'obligation to deal fairly and honestly with all plan members.'" *Id* at *3, *quoting Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir.1997). "A fiduciary may 'not affirmatively miscommunicate or mislead plan participants about material matters regarding their ERISA plan.'" *Id.* But beyond mere miscommunication, the court held that the core fiduciary duty of loyalty includes the obligation to affirmatively explain material matters to participants:

> Additionally, a fiduciary has a duty to inform when it knows that silence may be harmful, and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits. The duty of loyalty requires a fiduciary to disclose any material information that could adversely affect a participant's interests.

*Id.* (internal quotations and citations omitted); *see Howe v. Varity Corp,* 36 F.3d. 746, 754 (8th Cir. 1994), *aff'd* 516 U.S. 489 (1996)(A fiduciary can also have a duty to disclose, "a duty ... to advise [a beneficiary] of circumstances that threaten interests relevant to the relationship.") [18]

Further, courts routinely have rejected ERISA defendants' attempts, like Defendants' contentions here, to use securities laws to limit their fiduciary disclosure obligations. *See In re Worldcom, Inc. ERISA Litig.,* 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003); *Rankin,* 278 F. Supp. 2d at 876; *Kling v. Fidelity Mgmt. Trust Co.,* 323 F. Supp. 2d 132, 143 n.10 (D. Mass. 2004)

_____

[18] *See also Peralta v. Hispanic Business, Inc.*, 419 F.3d 1064, 1071-72 (9th Cir. 2005)("[I]n order to give meaning and effect to ERISA's fiduciary purpose, more must be required of an administrator than mere compliance with ERISA's express reporting and disclosure provisions. In other words, "[i]f the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose."(quoting *Varity*, 516 U.S. at 504); *S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 751 (9th Cir. 2005) ("ERISA fiduciary duties are 'the highest known to the law.'"); *Griggs v. E.I. DuPont de Nemours,* 237 F.3d 371, 381-84 (4th Cir.2001) (When a fiduciary is aware that a participant is laboring under a material misunderstanding fostered by the fiduciary's own communications, it has a §404(a) duty to provide disclosures beyond what §§101-111 require for the purpose of correcting the misinformation.); *Del Rio v. Toledo Edison Co.*, 2005 WL 1001430 at *3 (6th Cir 2005)("[a] fiduciary breaches his duty by providing plan participants with materially misleading information, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally."); *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C.Cir.1990) ("The duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA."); *Gee v. UnumProvident Corp.*, 2005 WL 534873 at *14 (E.D. Tenn. 2005) (The purposes of ERISA (i.e., encouraging employers to offer ERISA benefits and protecting participants and beneficiaries) require that "plan fiduciaries who possess actual knowledge of information that calls into question the prudence of a significant plan investment and would be of immense benefit to participants and beneficiaries" must disclose such information so that participants can avoid losses.).

26

(citing cases); *see also In re Electronic Data Sys. Corp. "ERISA" Litig.,* 305 F. Supp. 2d 658, 673 (E.D. Tex. 2004) ("Defendants cannot use the securities laws to shield themselves from their fiduciary duty to protect Plan beneficiaries.").  Courts have routinely refused to dismiss complaints on that basis.  *See, e.g., In re AEP ERISA Litig.,* 327 F. Supp. 2d 812, 824 (S.D. Ohio 2004); *Rankin,* 278 F. Supp. 2d at 876.

Lastly, the Fidelity Defendants challenge the materiality of information regarding their undisclosed revenue sharing practices that the Court *might* require them to disclose if it ultimately granted such of injunctive relief.  This argument is *wildly* speculative and premature.  It assumes that the Court will ultimately enter mandatory injunctive relief requiring the Fidelity Defendants to make disclosures of *immaterial* information to Plan participants.  Nor are the details of undisclosed revenue sharing immaterial as a matter of law.  *See, e.g., Siemers v. Wells Fargo & Co.*, 2007 WL 1140660, *6,  see also discussion at 7-10 (N.D.Ca. April 17, 2007)("The full extent – as well is the existence – of the Wells Fargo revenue-sharing regime or material facts.  They would have been significant and the total mix of information for making an investment decision."); *Siemers v. Wells Fargo & Co.*, 2007 WL 760750, *12, see also discussion at 13-15 (N.D.Ca. March 9, 2007) ("Given the competitiveness among funds for investor dollars, the sponsors had a strong incentive to hide the subject of revenue sharing, a subject that would logically reveal to potential customers that they would ultimately have to bear its burden"); *see also In re AIG Advisor Group Securities Litigation*, 2007 WL 1213395 at ** 8- 10 (E.D.N.Y. April 25, 2007) (Conflicts, and potential conflicts, of interest inherent in undisclosed revenue sharing payment systems make their nondisclosure material). [19]

---

[19] *See also* Statement of Marvin Mann, Chairman of the Independent Trustees of The Fidelity Funds, Before the Senate Committee on Banking, Housing and Urban Affairs on "Review of Current Investigations and Regulatory Actions Regarding the Mutual Fund Industry:  Fund Operations and Governance" (March 2, 2004), *available at*

## V. Count III States A Claim.

In seeking that Count III be dismissed, the Fidelity Defendants principally argue that "any fees received by Fidelity entities have become part of Fidelity's general revenues and thus cannot be considered traceable." (Fidelity Sugg. ¶ 24.) There is no basis for this assertion in the Complaint; nor any to infer it in Fidelity's favor. Whether the excess and unreasonable fees that the Fidelity Defendants collect though their revenue sharing program are traceable is a disputed factual issue. It is wholly improper in a motion to dismiss.

## CONCLUSION

For all of the foregoing reason, Plaintiffs respectfully request that this Court deny the Fidelity Defendants' Motion to Dismiss Plaintiffs' Complaint and grant whatever additional relief it deems appropriate.

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON

By: s/Daniel V. Conlisk
Jerome J. Schlichter, 02488116
Daniel V. Conlisk
Heather Lea, 6276614
100 S. Fourth Street., Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (Fax)
jschlichter@uselaws.com
dconlisk@uselaws.com
hlea@uselaws.com

ATTORNEYS FOR PLAINTIFFS/
CLASS REPRESENTATIVES
*Ron Tussey, Charles Fisher, Timothy Hendron and Timothy Pinnell*

---

http://banking.senate.gov/_files/mann.pdf (emphasis added). (Marvin Mann, testified in 2004 that a fund should provide an investor with "a statement setting forth the expenses that the investor will incur. … The statement would *detail* all sales charges and *itemize* all of the fees and expenses that will be paid by the investor *either directly or indirectly*.... The goal would be to allow investors who are interested in expense information to receive it in a manner that is readily accessible, easy to understand and, more importantly, in the context of a report that shows what they really earned on their investment.") Any eventual injunctive relief about which the Fidelity Defendants now claim concern would certainly be no more extensive than the disclosures which Fidelity's own chairman/trustee encouraged.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed on this 20th day of August, 2007 and will be delivered electronically by the CM/ECF system to the following:

Thomas Wack
Lisa Demet Martin
Jeffrey S. Russell
Bryan Cave, LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102

Brian T. Ortelere
William J. Delaney
Catherine A. Cugell
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

Richard N. Bien
Adam B. Walker
Lathrop & Gage, L.C.
2345 Grand Boulevard, Ste. 2800
Kansas City, MO 64108

Bob Eccles
Stephen D. Brody
Shannon Barrett
Brian Boyle
O'Melveny & Myers, LLP
1625 I Street, NW
Washington, DC 20006

James S. Dittmar
James O. Fleckner
Goodwin Procter
53 State Street
Exchange Place
Boston, MA 02109

_____ /s/Daniel V. Conlisk _____