UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| Charles Fisher as representative of a class of similarly situated persons, and and **on behalf of the PRISM Plan for Represented Employees of ABB, Inc.** and Ronald Tussey, Timothy Hendron and Timothy Pinnell as representatives of a class of similarly situated persons, and **on behalf of the PRISM Plan for Employees of ABB, Inc.**, <br><br>       Plaintiffs; <br><br>v. <br><br>ABB, Inc., John W. Cutler, Jr., Pension Review Committee of ABB, Inc., Pension & Thrift Management Group of ABB, Inc. Employee Benefits Committee of ABB, Inc., Fidelity Management Trust Company, and Fidelity Management & Research Co. <br><br>       Defendants. | Cause No: 2:06-CV-04305 NKL |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
PLAINTIFFS' EXPERT STEVEN POMERANTZ**

**Table of Contents**

I. INTRODUCTION ................................................................................................... 1

II. The Opinions and Testimony of Plaintiffs' Experts Fall Well Within Rule 702. .. 2

    A.     Defendants' Motions are a Waste of Time and Resources. ........................ 2

    B.     Defendants' Motions Ignore *Daubert*'s Basic Principles and Seek To Apply Them in a In Circumstances They Are Not Designed to Address... 3

III. THE MOTION IS WITHOUT MERIT................................................................... 4

    A.     Dr. Pomerantz Is A Qualified Expert. ........................................................ 6

    B.     Dr. Pomerantz's Opinions Are Well-Founded. ........................................... 8

         1.     Defendants' Mismanagement Caused The Plans To Vastly Underperform ABB's Pension Plan. .............................................. 8

         2.     Excessive Fees Caused Damages to the Plan. ............................... 9

         3.     Defendants' Arguments Are Not Well-Founded. ......................... 11

    C.     Dr. Pomerantz's Opinions Are Admissible Under *Daubert*. ................... 12

IV. CONCLUSION....................................................................................................... 15

# Table of Authorities

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir.2002) .......................... 4

*Bennett v. Fidelity Mgmt. & Research Co.,* 04-CV-11651-MLW (D. Mass. 2007) ..12, 13, 14, 15

*Bublitz v. E.I. duPont de Nemours and Co.*, 2002 WL 34371191 (S.D.Iowa March 8, 2002) ................................................................................................................................ 3

*Cramer v. Sabine Transp. Co.*, 141 F. Supp.2d 727 (S.D.Tex. 2001) ............................... 2

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993) ............................... 2, 3, 4, 12

*First Nat'l State Bank of New Jersey v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir.1981) ............................................................................................................................. 6

*Havrum v. U.S.*, 1998 WL 35223750 (W.D.Mo. 1998) (J. Laughrey) .............................. 2

*Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252 (8th Cir. 2006) ....................... 3

*Jones v. Harris Assoc. L.P.,* 2009 WL 578699 (March 9, 2009) .................................... 15

*Jones v. Harris Assoc., L.P.,* 537 F.3d 728 (7th Cir. Aug. 8, 2008) ................................ 14

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...................................................... 3

*Marvin Lumber And Cedar Co. v. PPG Indus. Inc.*, 401 F.3d 901 (8th Cir. 2005) .......... 1

*Monsanto Co. v. David*, 448 F.Supp.2d 1088 (E.D.Mo. 2006) ......................................... 3

*Pioneer Hi-Bred Intern v. Holden Found. Seeds, Inc.*, 35 F.3d 1226 (8th Cir. 1994) ..... 12

*Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096 (8th Cir. 2006) ........................... 3, 4, 7

*Tuf Racing Prods. Inc. v. Am. Suzuki Motor Corp.,* 223 F.3d 585 (7th Cir. 2000) ............ 4

*U.S. v. Bolden*, 2003 WL 25772792 (E.D.Mo. Sept. 4, 2003) .......................................... 3

*U.S. v. Geiger*, 2008 WL 5272481 (6th Cir.2008) ............................................................ 5

*U.S. v. Leo*, 941 F.2d 181 (3d Cir.1991) ........................................................................... 5

*U.S. v. Wingfelder*, 790 F.2d 576 (7th Cir. 1986) ............................................................. 6

*Williams v. Sec. Nat. Bank of Sioux City, Iowa*, 358 F.Supp.2d 782 (N.D.Iowa 2005) ..... 7

**Statutes**

29 U.S.C. §1104(a)(1)(B) .................................................................................................. 5

**Rules**

FED.R.EVID. 702 ........................................................................................................ 3, 4, 5

FED.R.EVID. 704(a) ....................................................................................................... 3, 5

I.  **INTRODUCTION**

Dr. Pomerantz is a highly regarded expert in the field of investing and investment management who mathematically demonstrated what Defendants' own documents state, that Fidelity was pricing its non-401k services to ABB at below market rates in order to reap a windfall profit on the backs of the 401k Plans and its participants.  Dr. Pomerantz opines that the loss to the 401(k) Plans from Defendants' failure to prudently manage the Plans were $676.1 million, which would be reduced to $357.6 million only if this Court holds that Plaintiffs' claims are limited to a 6-year statute of limitations.  As his report indicates, that calculation was scientifically supportable and analytically sound.

As is clear in Defendants' Motion, their intent is merely to attack the credibility of Dr. Pomerantz's opinions and calculations and nit-pick the facts on which they are based.  In short, Defendants seek to dress up the points they hope to make in cross examination as a challenge the "'methodology' and the 'reliability' of the studies' results, invoking these catchwords relating to the admissibility of expert opinion testimony," when their criticism is of Dr. O'Neal's collection and applications of the facts in a solid and well-accepted analytical approach.  The Eighth Circuit rejects this as the basis for a *Daubert* challenge.  *Marvin Lumber And Cedar Co.  v. PPG Indus. Inc.*, 401 F.3d  901, 916 (8th Cir. 2005).  There, the Eighth Circuit emphasized that "even post-*Daubert*, 'the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility.'" *Id.*  "To the extent [defendants'] complaints about [plaintiff's expert's] studies are well-founded, they go to the weight to be accorded his opinions by the jury. It was [defendants'] responsibility at trial, through careful cross-examination of [plaintiff's expert] and direct examination of its own experts, to alert the jury to the weaknesses in the factual basis of [plaintiff's expert's] opinion. *Id.; see Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596

1

(1993)("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Defendants' Motion is a particularly pointless exercise here because this will be a bench trial. This Court, like so many others, has noted that in bench-tried cases, "addressing admissibility issues at the time of trial, rather than in a pre-trial hearing, would be the most efficient use of all of the resources involved." *Havrum v. U.S.*, 1998 WL 35223750 (W.D.Mo. 1998) (J. Laughrey). This is even more true here, where Defendants have not challenged the admissibility of Dr. Pomerantz's calculations of damages for the use of mutual funds instead of separately managed accounts, the imprudent decision to remove Vanguard's Wellington Fund or the imprudent selection of the domestic and international equity plan options. Rather, Defendants' quarrel is limited to an assessment that Dr. Pomerantz should not have compared the performance of the 401(k) Plans with that of the Plan prudently managed by Defendants, the Defined Benefit ("Pension") Plan, and that Dr. Pomerantz should not have expressed a conclusion that Defendants violated ERISA.

II.     **The Opinions and Testimony of Plaintiffs' Experts Fall Well Within Rule 702.**

    A.     **Defendants' Motions are a Waste of Time and Resources.**

As explained below, Defendants' multiple Motions to Strike Plaintiffs' Experts are baseless. They are equally unnecessary and wasteful in a bench-tried case. This Court has previously held that *Daubert* motions in a bench tried case are inefficient. *Havrum*, 1998 WL 35223750 at *9. Echoing this view more strongly, in *Cramer v. Sabine Transp. Co.*, 141 F. Supp.2d 727 (S.D.TExh. 2001), the court admonished:

> First, this is a bench trial, making any motion in limine asinine on its face. Motions in limine are intended to prevent allegedly prejudicial evidence from being so much as

2

whispered before a jury prior to obtaining the Court's permission to broach the topic. In a bench trial, such procedures are unnecessary, as the Court can and does readily exclude from its consideration inappropriate evidence of whatever ilk.

*Id.* at 733. Sister courts echo this distain. *Monsanto Co. v. David*, 448 F.Supp.2d 1088, 1093 n.3 (E.D.Mo. 2006)("In light of the fact that this matter was before the Court and not a jury, the Court's gatekeeper function under Rule 702 of the Federal Rules of Civil Procedure and *Daubert* [citation omitted] was not required with respect to these experts."); *U.S. v. Bolden*, 2003 WL 25772792, *1 (E.D.Mo. Sept. 4, 2003)("it makes little sense with regard to matters determined by a judge, as opposed to a jury, to have one hearing related to *Daubert*, and then a second hearing before the same judge to receive any testimony deemed relevant and admissible."); *Bublitz v. E.I. duPont de Nemours and Co.*, 2002 WL 34371191, *5 (S.D.Iowa March 8, 2002)("the *Daubert* gatekeeping function is lessened in the context of a bench trial.").

      B.      **Defendants' Motions Ignore *Daubert*'s Basic Principles and Seek To Apply Them in a In Circumstances They Are Not Designed to Address.**

An individual who is qualified by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise as to the evidence or a fact in issue if scientific, technical, or other specialized knowledge will assist the Court in understanding the evidence or determining the facts. FED.R.EVID. 702. Such expert testimony is allowed even if it embraces an ultimate issue to be tried by the Court. FED.R.EVID. 704(a). Rule 702 codifies the *Daubert* standard for admission of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-149 (1999); *Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1258 n.3 (8th Cir. 2006).

In *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006), the Eighth Circuit advised that "*Daubert* provides a district court with the discretion necessary to close the courtroom door to 'junk science' and to admit reliable expert testimony that will aid the trier of

3

fact." *(quoting Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir.2002)). The Court emphasized that "[a] review of the caselaw after *Daubert* shows that *the rejection of expert testimony is the exception rather than the rule.*" *Id.* (emphasis added), *citing* Fed.R.Evid. 702 advisory committee's note. Rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.*, quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).

. In light of this, Defendants contentions that *Daubert* requires the exclusion of Plaintiffs' experts pushes *Daubert*'s principals well beyond the circumstances they were designed to address. In *Tuf Racing Prods. Inc. v. Am. Suzuki Motor Corp.,* 223 F.3d 585 (7th Cir. 2000) (citations omitted), Judge Posner explained:

> The notion that [*Daubert*] requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which *Daubert* interprets rather than overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be "scientific" (natural scientific or social scientific) in character. Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness. *The principle of Daubert is merely that if an expert witness is to offer an opinion based on science, it must be real science, not junk science.*

*Id.* at 591 (emphasis added); *see Robinson*, 447 F.3d at 1100. Here, the opinions of Plaintiffs' experts explain the customs and practices under which ERISA fiduciaries operate and administer retirement plans, and such fiduciaries' standard of care and competence in light of the complex environment created by ERISA and its regulations. This analysis and these opinions have nothing in common with the junk science that *Daubert* seeks to eliminate.

III. **THE MOTION IS WITHOUT MERIT**

Defendants' objections to the opinion testimony of Dr. Pomerantz are baseless. Any individual who is qualified by knowledge, skill, experience, training, or education may testify in

the form of an opinion or otherwise as to the evidence or a fact in issue if scientific, technical, or other specialized knowledge will assist the Court in understanding the evidence or determining the facts. FED.R.EVID. 702. Such expert testimony is allowed even if it embraces an ultimate issue to be tried by the Court. FED.R.EVID. 704(a). The testimony must be based on sufficient facts or data, reliable principles and methods, and the reliable application of those principles and methods to the facts of the case. *Id.*

Dr. Pomerantz provided his opinions regarding the minimum standard of professional competence – the standard of care – which fiduciaries must meet in seeking to fulfill their duties of prudence with respect to plan investments. In investment decisions regarding 401(k) plans, fiduciaries must act with the care, skill, prudence, and diligence under the circumstances then prevailing that a *prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.* 29 U.S.C. §1104(a)(1)(B)(emphasis added). The statute does not elaborate on what a prudent man "acting" in a like capacity and familiar with such matters "would actually do" in the conduct of an enterprise of a like kind or character." *Id.* As in any profession, such broad governing principles must be translated into the operational, nuts-and-bolts, standards that define a minimal level of competence for the profession involved. Dr. Pomerantz explained that standard of care. His testimony, particularly the specialized knowledge of individuals in the fields of investment management, will assist the Court in determining whether Defendants breached those fiduciary duties. *See, e.g. U.S. v. Geiger*, 2008 WL 5272481 at *3 (6th Cir.2008)( Expert opinion admissible regarding the "discrete fields of legal ethics and legal malpractice"); *U.S. v. Leo*, 941 F.2d 181, 196-97 (3d Cir.1991)(Court admitted testimony regarding the "custom and practice" in the defense industry under the Armed Services Procurement Act of 1947 and applicable

5

regulations.); *U.S. v. Wingfelder*, 790 F.2d 576, 580-81 (7th Cir. 1986)("Expert testimony by an IRS agent which expresses an opinion as to the proper tax consequences of a transaction is admissible evidence". (citation omitted)); *First Nat'l State Bank of New Jersey v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir.1981) (per curiam) (allowing admission of evidence of customs and practices in the banking industry).

A. **Dr. Pomerantz Is A Qualified Expert.**

Steve Pomerantz clearly is qualified to provide his opinions in this regard because of his knowledge, skill, experience, training, and education. Dr. Pomerantz received a Ph.D. in Mathematics from the University of California at Berkeley in 1986. App. 00025.[1] He has taught courses in statistics, probability, operations research, and finance at the undergraduate and graduate level and has made presentations at investment seminars on portfolio management, risk management, asset allocation, hedge funds, and securities pricing. App. 00025-26. Dr. Pomerantz has over 20 years of experience in investment research, financial modeling, derivative structuring, and portfolio and risk management. *Id.* He has held positions in research and management of fixed income, equities, derivatives, and alternative investments at several major financial firms, including New York Life Investment Management, Citibank, and Morgan Stanley. *Id.* He is a consultant to several investment management firms in the areas of risk management and portfolio strategy and has served as a portfolio manager at several firms. *Id.* Dr. Pomerantz has published numerous articles, including "Designing a 401(k) Plan" for the New York State Bar Association newsletter in 2005. App. 00026. Dr. Pomerantz has also provided expert testimony in over 30 cases. App. 00026-27.

This extensive education and experience clearly qualifies Dr. Pomerantz to testify

---

[1] Citations to the record are identified as "App. __," which refers to Plaintiffs' Appendix filed April 8, 2009

regarding the care, skill, prudence, and diligence that an experienced investment advisor would have applied in managing investment options for plan participants and how Defendants' management was imprudent by those standards. Dr. Pomerantz's testimony from that experience and education will assist the Court in understanding why Defendants failed to meet those standards and thus why Defendants breached their fiduciary duties.[2]

Defendants contend Dr. Pomerantz cannot testify regarding the imprudence of their management because he personally never acted as a "named fiduciary" of an ERISA plan. Ct. Doc. 271, pp. 1, 4-5. No court has limited the scope of permissible expert testimony on §1104(a)(1)(B) prudence to those individuals who have actually served as "named fiduciaries" to an ERISA plan. Eighth Circuit precedent as to the scope of expert testimony is to the contrary. An expert whose general knowledge applies to a particular factual issue is qualified even if he lacks actual experience regarding the particular factual issue before the Court. *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096 (8th Cir. 2006); *Williams v. Sec. Nat. Bank of Sioux City, Iowa*, 358 F.Supp.2d 782, 807-808 (N.D.Iowa 2005). Defining the standards of prudent financial advisors and managers and applying those standards to Defendants' actions is no more "doing science" than is an accountant calculating business damages.

Defendants also incorrectly contend that the standard of prudence in investment management under §1104(a)(1)(B) is merely a matter of determining what is the custom and practice of "like-situated ERISA fiduciaries" – in other words, what everyone else does. Ct. Doc. 271, pp. 1, 5. The statute does not limit the standard of prudence to a mere survey of the

---

[2] From this it is evident that an expert testifying as to what he considers prudent under the circumstances is not stating legal conclusions, even though "prudence" is incorporated as a fiduciary duty in §1104(a)(1)(B). Cf. Motion at 9-13. As discussed below, Dr. Pomerantz provides detailed evidence and reasoning for his opinion and not just "*ipse dixit*" claims of violation of ERISA statutes. Dr. Pomerantz specifically disavowed any attempt to offer a legal opinion. App. 03527-38 at 30:11-20; 32:19-24.

7

investment decisions of other plans and Defendants, again, cite no case that has so restrictively construed this fiduciary duty. (Plaintiffs are aware of no such case.) As Dr. Pomerantz stated, prudence in the investment management field is not just a matter of doing what everyone else does, but instead is acting in the best interest of the participants, determining what goals one is trying to achieve and whether one's actions are consistent with those goals. App. 03528-29 at 59:15-21, 202:11-203:8. Properly applying the standards of investment professionals in consideration of the needs of plan participants for secure retirement income, Dr. Pomerantz provided detailed explanations for why Defendants failed to meet those standards.

### B. Dr. Pomerantz's Opinions Are Well-Founded.

Dr. Pomerantz provided a detailed and thoroughly annotated discussion of how Defendants provided participants misleading and improper benchmarks of the performance of Plans' investment options and performance histories, how the Plaintiffs' 401(k) Plans vastly underperformed ABB's own pension plan (despite having the same managers) far beyond what would be expected in a properly managed plan. In his report, Dr. Pomerantz outlined the various scholarly and industry surveys and documents which support his findings. That Defendants nevertheless assert some failure worthy of striking his testimony is evidence that Defendants are not using this motion, or any of their other motions against Plaintiffs' expert witnesses, for a legitimate purpose. The following are evidence of the validity and support of Dr. Pomerantz's opinions.

      1.     **Defendants' Mismanagement Caused The Plans To Vastly Underperform ABB's Pension Plan.**

Dr. Pomerantz cited a study by the Center For Retirement Research at Boston College that indicates a defined contribution plan (such as the subject 401(k) plans) should perform within .1% (10 basis points, or "bps") of the performance of the employer's defined benefit plan.

8

App. 00022 at ¶¶56-57, n. 58. ABB's defined contribution plan here, the PRISM Plans, however, underperformed its defined benefit (pension) plan by more than 2.5% (250 bps). App. 00022 at ¶¶ 56-57. Such a vast disparity over the expected relative performance indicates Defendants' neglect of the 401(k) Plans, which is confirmed by Defendants' own documents that showed they focused their efforts on the pension plan and neglected the 401(k) Plans. *Id.* at 6-18.[3] Dr. Pomerantz also demonstrated, based on the Center For Retirement Research study, that this difference in performance far exceeded that which could have been the result of different asset allocation (i.e. Stock vs. Bond investing) decisions. App. 00022 at ¶57

### 2. Excessive Fees Caused Damages to the Plan.

Dr. Pomerantz noted that the investment options charged fees to the Plans and its participants that were higher than comparable prudent investment options. App. 00010-15 at ¶¶19-34. Dr. Pomerantz demonstrated that separate accounts were available and massively less expensive than the mutual funds included in the Plans. For example, Dr. Pomerantz provided this graphical representation of the fee savings available to large plans through the use of separate account investment vehicles:

---

[3] This difference cannot be attributed to individual participant asset allocation decisions, because the large number of participants cancels out any particular allocation by an individual investor. As Pomerantz explained, Defined Benefit Plans perform only marginally better than DC plans over time. App. 00022 at ¶56. Here, in contrast, the mismanagement of the DC Plan caused it to massively underperform the DB Plan which is by no means the norm. App. 00021 at ¶54. The pension and 401(k) Plans had similar asset allocations, *id.*, but the pension plan had superior performance because it received greater attention from Defendants and thus had better investments.

9



App. 00033.

Dr. Pomerantz also pointed out that, scientifically, the inclusion of mutual funds instead of separate accounts caused the Plans to incur higher overall fees. This is graphically represented by the chart below, which was included in Dr. Pomerantz's Expert Report.



App. 00035.

These opinions are based directly on Dr. Pomerantz's decades of experience in asset management and investing, and buttressed by studies by Callan Associates, the Department of Labor and others. This information is relied upon by practitioners in the field and distilled for the Court by Dr. Pomerantz.

### 3. Defendants' Arguments Are Not Well-Founded.

This concise summary of Dr. Pomerantz's reports shows that he very thoroughly described his analysis and support for his conclusions, all of which are annotated with record citations. Defendants' primary assertion is that because Dr. Pomerantz could not recite ERISA's definition of imprudence, his opinions that ABB should have used far cheaper separately managed account instead of mutual funds is somehow merely *ipse dixit*. Ct. Doc. 281, p. 1-2, 8. Meanwhile, the Fidelity Defendants mistakenly attribute Dr. Pomerantz's calculations of damages, which necessarily require an assessment of the damages caused as a result of (and therefore, AFTER) a Defendants' breach, to nothing more than hindsight. Fidelity Memo. p. 1. Simply stated, Dr. Pomerantz established, through his experience and with support from the Department of Labor and several other industry sources, that Defendants should have included separately managed accounts instead of mutual funds. He then calculated the difference in the Plans assets had they been invested in separate accounts instead of mutual funds. Defendants cannot directly attack this logic, preferring instead to argue the merits of whether it was imprudent for the Plans to include mutual funds. This is exactly the sort of argument that should be made at trial.

11

Case 2:06-cv-04305-NKL   Document 300   Filed 04/08/09   Page 14 of 19

C. **Dr. Pomerantz's Opinions Are Admissible Under *Daubert*.**

A fundamental principle of Rule 702 is one of inclusion rather than exclusion. "Vigorous cross-examination [and the] presentation of contrary evidence… are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "*Daubert* requires only scientific validity for admissibility, not scientific precision." *Pioneer Hi-Bred Intern v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1230 (8th Cir. 1994). Defendants' arguments boil down to an assertion that Dr. Pomerantz chose misleading benchmarks for Plan investment options. Here too, these are exactly the sorts of issues that should be presented at trial.

In opposing Dr. Pomerantz's well-supported opinion that the use of retail mutual funds caused the Plan to pay excessive fees, Defendants' experts, including R. Glenn Hubbard rely on Mr. Hubbard's opinion that the "mutual fund industry is competitive, and the fees charged by mutual funds are constrained by those forces to economically reasonable rangers." Hubbard Report, ¶88 (attached as Exh. 5) citing John C. Coates IV and R. Glenn Hubbard, "Competition in the Mutual Fund Industry: Evidence and Implications for Policy," Journal of Corporation Law, 33 (2007), 160-3. **At the time of this article, Hubbard was already on Fidelity's payroll, making $1,000 per hour to render the opinions he expressed in this case.**[4] Exh. 3 at 6:18-8:16. In his October 2, 2007 declaration for *Bennett v. Fidelity Mgmt. & Research Co.,* 04-CV-11651-MLW (D. Mass. 2007), Hubbard says he was retained as a consulting expert by Fidelity, with respect to, *inter alia*, "the economies of scale that may exist at Fidelity in connection with Fidelity's provision of mutual fund services to retail investors and…whether and to what extent any economies of scale that do exist have been shared with the funds at issue in

---

[4] Hubbard also receives 7.5 percent of the billings of the Analysis Group, who helped him with preparing his report. Ex. 3 at p. 6:22-9:16.

12

Case 2:06-cv-04305-NKL   Document 300   Filed 04/08/09   Page 15 of 19

this case and their shareholders." Hubbard Declaration attached as Exh. 4. at ¶ 2. Hubbard declared that, "[t]heoretically, economies of scale exist in firms when, at a given level of production, the average <u>total</u> cost of production declines as the quantity produced increases." *Id.* at ¶ 5 (emphasis in original).

The entire Coates-Hubbard study, including its economies of scale argument is soundly denounced by John Freeman in his letter to the Securities and Exchange Commission (SEC).[5] "Coates-Hubbard [study] is a superficial and deeply flawed piece of advocacy espousing the views of fund sponsors and their mouthpiece, the Investment Company Institute."[6] He asserts that the argument that advisory prices in the fund industry are competitive based on sub-advisory costs is a sham argument. *Id.* at ¶7.

Even when the article was being researched and drafted, Mr. Hubbard was making hundreds of thousands of dollars expressing expert opinions on behalf of Fidelity in other litigation. The impartiality of Hubbard's study is highly suspect because he was researching and writing the content while simultaneously accepting huge sums of money from Fidelity to defend them against a suit challenging the mutual fund management fees it receives for managing five of the largest mutual funds in the country. In fact, Hubbard's testimony in his January 23, 2009 deposition shows the profound conflict of interest from which his "study" suffers:

> Q. All right. So let's talk about the year 2006. In the year 2006 you are working on this article, I believe you are sure of that?
>
> A. Yes.
>
> Q. All right. In the year 2006 you are a retained expert for Fidelity in the Bennett case, right?

---

[5] John Freeman is a Distinguished Professor Emeritus and John T. Campbell Chair in Business and Professional Ethics Emeritus at the University of South Carolina School of Law. See CV, attached as Exh.1.

[6] March 13, 2007 letter to Nancy M. Morris, Secretary of the SEC, attached as Exh. 2, p 1.

> A. Yes.
>
> Q. All right. In your report and in your testimony in the Bennett case you opine, among other things, on the reasonableness of mutual fund fees and compensation, do you not?
>
> A. Yes, of course.
>
> Q. It's a central issue for your report in that case, right?
>
> A. Of course.
>
> Q. And it's a central issue in your article, right?
>
> A. It's the subject of the article.
>
> Q. It's the subject of your article and the subject of your expert testimony?
>
> A. Yes.
>
> And:
>
> Q. Now, is the article and the conclusions of the article essentially the base for your expert report in the Bennett case?
>
> A. I would say it certainly figures in that report, yes.

Exh. 3 at pp. 45:6-51:16. Indeed, a Fidelity attorney gave Coates and Hubbard comments on earlier drafts of the article. Exh. 3 at 47:10-22.

Given that this article is singularly relied upon by Defendants and the mutual fund industry to support their excessive pricing and lack of competition, is it any wonder Judge Posner and four other judges on the Seventh Circuit have found that "mutual funds are a component of the financial services industry, where abuses have been rampant, as is more evident now than it was when Coates and Hubbard wrote their article"? *Jones v. Harris Assoc., L.P.,* 537 F.3d 728, 730 (7th Cir. Aug. 8, 2008)(denial of motion for rehearing, J. Posner dissenting). These judges are convinced that "evidence that connections among agents in the mutual fund industry foster

favoritism, to the detriment of investors," *Id.* at 731, and that, contrary to the article Fidelity bought, "competition in product and capital markets can't be counted on to solve the problem" of mutual fund fees. *Id.* at 730. Indeed, with Prof. Hubbard writing an article to state the same dubious conclusion Fidelity was simultaneously paying him handsomely to reach, the Coates and Hubbard article is itself evidence of these abuses. Further, Coates and Hubbard were directly paid over $100,000 by representative organization of the mutual fund industry itself to write their article. Hubbard Depo. pp. 33:20-40:17. Indeed, since the *Bennett* case is currently ongoing, Hubbard continues to receive large sums of money from Fidelity as a paid expert witness. It is difficult, if not impossible to conceive of means by which Hubbard's study could be deemed an academic product. Even without noting the tainted nature of this supposedly scholarly article, the Supreme Court has chosen to weigh in on this very issue. *Jones v. Harris Assoc. L.P.,* 2009 WL 578699 (March 9, 2009)(granting cert.).

IV. **CONCLUSION**

Defendants fail to provide any basis under Rule 702 for excluding Dr. Pomerantz from testifying at trial. Defendants' Motions, therefore, must be denied.

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON

By: /s/Troy A. Doles
Jerome J. Schlichter,
Daniel V. Conlisk
Heather Lea,
Troy A. Doles
100 S. Fourth Street, Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (Fax)
jschlichter@uselaws.com
dconlisk@uselaws.com
hlea@uselaws.com

ATTORNEYS FOR PLAINTIFFS/
CLASS REPRESENTATIVES
*Ron Tussey, Charles Fisher, Timothy Hendron and Timothy Pinnell*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed on this 8th day of April, 2009 and will be delivered electronically by the CM/ECF system and via e-mail and U.S. Mail to the following:

Thomas Wack
Lisa Demet Martin
Jeffrey S. Russell
Bryan Cave, LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102

Brian T. Ortelere
William J. Delaney
Catherine A. Cugell
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

Adam B. Walker
Lathrop & Gage, L.C.
2345 Grand Boulevard, Ste. 2800
Kansas City, MO 64108

Bob Eccles
Stephen D. Brody
Shannon Barrett
Brian Boyle
O'Melveny & Myers, LLP
1625 I Street, NW
Washington, DC 20006

James S. Dittmar
James O. Fleckner
Goodwin Procter
53 State Street
Exchange Place
Boston, MA 02109

/s/ Troy A. Doles