# EXHIBIT 2

JOHN P. FREEMAN
2329 Wilmot Avenue
Columbia, South Carolina 29205-3164

803-777-7224 Office Voice and Fax
777-8925 Office Fax
254-4667 Home Voice
JohnF@law.law.sc.edu

March 13, 2007

Ms. Nancy M. Morris
Secretary
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

        Re:    *File No. S 7-03-04, Investment Company Governance,*
                 *Release No. IC-27600 (December 15, 2006)*

Dear Ms. Morris:

I am writing to address issues raised in a lengthy study included as an attachment to a submission made in File S703-04 on behalf of Fidelity Investments on March 2, 2007. The same study is relied upon as evidence by the Chamber of Commerce in its submission filed the same date. I did not learn of these filings until yesterday.

The attachment to the Fidelity submission is a study authored by John C. Coates, IV, and R. Glenn Hubbard. The study is entitled, *Competition and Shareholder Fees in the Mutual Fund Industry: Evidence and Implications for Policy.* I will refer to it henceforth as "Coates-Hubbard." It evidently was prepared last June under the aegis of the American Enterprise Institute. Coates-Hubbard is a superficial and deeply flawed piece of advocacy espousing the views of fund sponsors and their mouthpiece, the Investment Company Institute. Until very recently, I did not know it existed. Now that it has been put in the public domain, in this file, I must speak up.

Coates-Hubbard contends, in essence, that the mutual fund industry is a paragon of competitiveness. The authors imply that its alleged competitiveness makes such things as fiduciary duty breaches or fee gouging impossible. The study rejects as unscholarly and wrong three separate investigations into mutual fund governance, each of which concluded that advisory fees charged by mutual fund advisors were far higher than fee levels charged for comparable advisory services rendered to other institutional clients. The analyses attacked were (1) the *Wharton Report*,[1] a detailed scholarly report to the Commission written in 1962, (2) the SEC's own study published in 1966, *Public Policy Implications of Investment Company*

---

[1] WHARTON SCHOOL OF FINANCE & COMMERCE, 87TH CONG., A STUDY OF MUTUAL FUNDS (Comm. Print 1962) [hereinafter WHARTON REPORT].

*Growth*,[2] and (3) an article I co-authored with Stewart Brown of Florida State University, entitled *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. CORP. L. 610 (2001) [hereinafter Freeman-Brown]. This comment letter responds to Coates-Hubbard's attack on the three fee/governance analyses.

The *Wharton Report*, the PPI study and Freeman-Brown each found evidence of fee gouging in the mutual fund industry for advisory services. Each found that mutual fund advisers charge funds significantly higher fees than are charged by the adviser when selling services in the free market.

The authors of the *Wharton Report* found that where fund advisers had outside advisory clients, there was a "tendency for systematically higher advisory fee rates to be charged open-end [mutual fund] clients."[3] The *Wharton Report*'s authors ascribed the disparity in fee structures to fund advisers' ability to capitalize on the conflict of interest inherent in most funds' management structures and convert it into the power to set extra-competitive prices.[4] The *Wharton Report* identified 54 investment advisers with both mutual fund clients and other clients.[5] Of this sample, fee rates charged the mutual fund clients were at least 50% higher in 39 out of the 54 cases, 200% higher in 24 of the cases, and 500% or more higher in 9 of the cases.[6]

In its PPI study, the SEC revisited the Wharton School's findings and determined that, "[t]he Wharton Report's conclusions correspond to those reached by the more intensive examination of selected mutual funds and mutual fund complexes made by the Commission's staff."[7] The Commission noted that advisory fee rates for pension and profit sharing plans were less than "one-eighth of the 0.50 percent rate commonly charged to mutual funds of that size."[8]

Following the PPI study, a good deal of time passed without fee levels in the fund industry receiving much scrutiny. From time to time, articles uncomplimentary toward mutual fund governance appeared in the financial press.[9] One of those articles noted the disparity between

---

[2] SEC, PUBLIC POLICY IMPLICATIONS OF INVESTMENT COMPANY GROWTH, H.R. REP. No. 89-2337 (1966), *available at* http://sechistorical.org/collection/papers/1960/1966_InvestCoGrowth/ [hereinafter PPI study].
[3] WHARTON REPORT at 493.
[4] The price disparity was explained as follows:
> The principal reason for the differences in rates charged open-end companies and other clients appears to be that with the latter group "a normal procedure in negotiating a fee is to arrive at a fixed fee which is mutually acceptable." In the case of the fees charged open-end companies, they are typically fixed by essentially the same persons who receive the fees, although in theory the fees are established by negotiations between independent representatives of separate legal entities, and approved by democratic vote of the shareholders. This suggests that competitive factors which tend to influence rates charged other clients have not been substantially operative in fixing the advisory fee rates paid by mutual funds.

[5] *Id.* at 489.
[6] *Id.*
[7] H.R. REP. No. 89-2337 120 (1966), *available at* http://sechistorical.org/collection/papers/1960/1966_InvestCoGrowth/.
[8] *Id.* at 115.
[9] *See, e.g.*, Tracey Longo, *Days of Reckoning: Congress is Finally Starting to Look Into Why Mutual Fund Fees Keep Rising*, FIN. PLAN., Nov. 1, 1998, at 1 ("Several leading mutual fund analysts and critics are also

2

Case 2:06-cv-04305-NKL   Document 300-2   Filed 04/08/09   Page 3 of 14

what fund investors pay for advice and what institutions pay, noting that fund shareholders "pay nearly twice as much as institutional investors for money management.[10] That observation dovetails with the findings of Freeman-Brown, published in 2001.

According to Yale's Endowment manager, David Swenson, Freeman-Brown used "a variety of cleverly constructed tests" in order "to demonstrate that mutual funds charge excessive advisory fees."[11] Mr. Swensen summarizes some of Freeman-Brown's key findings thus:

> [T]he authors show that . . . Vanguard, operating in its investor-oriented fiduciary capacity, manages to negotiate extremely competitive rates for external management of its internally managed funds. In 1999, Vanguard's fee arrangements . . . amounted to approximately 25 percent of the "prevailing fund industry rate." Freeman and Brown cite evidence that mutual funds extract fees amounting to roughly twice the level of fees for comparable services provided to public pension funds. Presenting evidence in a variety of ways, including a particularly damning chart that shows specific money managers charging mutual funds substantially more than pension fund clients, the authors conclude that "the chief reason for substantial advisory fee level differences between equity pension

---

making the case that not only do higher fees not mean better performance, often the opposite is true."); Robert Barker, *High Fund Fees Have Got to Go*, BUS. WK., Aug. 16, 1999, at 122 ("Since 1984, Morningstar reports, the average cost of actively run no-load U.S. stock funds fell less than 10%, even as their assets multiplied 32 times. Vast economies of scale benefited mutual-fund companies, not investors."); Robert Barker, *Fund Fees Are Rising. Who's to Blame?*, BUS. WK., Oct. 26, 1998, at 162 ("If expenses are too high, it's the independent directors who have failed."); Thomas Easton, *The Fund Industry's Dirty Secret: Big is Not Beautiful*, FORBES, Aug. 24, 1998, at 116, 117 ("The dirty secret of the business is that the more money you manage, the more profit you make—but the less able you are to serve your shareholders. . . . In most businesses size is an advantage. In mutual funds it is an advantage only to the sponsor, not to the customer."); Charles Gasparino, *Some Say More Could be Done to Clarify Fees*, WALL ST. J., May 20, 1998, at C1 ("[I]s the industry rising to the challenge? Is it doing all it can to clearly and simply explain how much investors are paying in fees and expenses?"); Linda Stern, *Watch Those Fees*, NEWSWEEK, Mar. 23, 1998, at 73 ("Today's financial marketplace is a bizarre bazaar: in the flourishing fund industry, the law of supply and demand sometimes works backward, and heightened competition can mean higher prices."); Steven T. Goldberg, *Where Are Fund Directors When We Need Them?*, KIPLINGER'S PERS. FIN. MAG., Apr. 1997, at 111 ("It isn't hard to find examples of fund directors who are tolerant of high fees, bad performance or both."); Jeffrey M. Laderman, *Are Fund Managers Carving Themselves Too Fat a Slice?*, BUS. WK., Mar. 23, 1992, at 78 (discussing the fact that mutual fund advisory "fees are not coming down as they are in the pension-fund business. 'Perhaps that's because pension-plan sponsors pay attention to fees,' notes Charles Trzcinka, a finance professor at the State University of New York at Buffalo."); Anne Kates Smith, *Why Those Fund Fees Matter*, U.S. NEWS & WORLD REP., July 8, 1996, at 73 ("[I]magine customers cheerfully swallowing price hikes each year—even though competing products keep flooding the market. Sound ridiculous? That's how the mutual-fund business works."); Geoffrey Smith, *Why Fund Fees Are So High*, BUS. WK., Nov. 30, 1998, at 126 (noting allegations that the amount of assets under management in the Fidelity fund complex jumped from $36 billion to $373 billion from 1985 to 1995 without economies of size being shared with investors; management fees were increased from 1.085% of assets under management to 1.146% of assets, yielding the management company an extra $288 million in revenue).
[10] See Ruth Simon, *How Funds Get Rich at Your Expense*, MONEY, Feb. 1995, at 130. Ms. Simon added, "that calculation doesn't even include any front- or back-end sales charges you may also pony up." *Id.*
[11] DAVID F. SWENSEN, UNCONVENTIONAL SUCCESS – A FUNDAMENTAL APPROACH TO PERSONAL INVESTMENT 241 (2005).

3

fund portfolio managers and equity mutual fund managers is that advisory fees in the pension fund area are subject to a marketplace where arm's length bargaining occurs."[12]

Coates-Hubbard dismissed the *Wharton Report*'s comparative fee analysis as superficial, which it was not, and dismissed the PPI study as simply "accepting without question" the *Wharton Report*'s findings, which is a false characterization.[13] The *PPI* went well beyond the *Wharton Report*'s scope with fresh analysis supporting the same conclusion; namely, that mutual funds pay more for advisory services than pension and profit-sharing plans.

For comparative fee analysis Freeman-Brown relied on two main sources of information. The first was data collected from questionnaire responses received from public pension funds[14] reporting on fees levels charged by the pension funds' external equity fund managers. The other main source was Morningstar's Principia Pro database. Fee breakdowns in that database are drawn from fund registration statements. Within the Morningstar data, the focus was on advisory fees; costs designated by the funds as administrative (legal, transfer agency services, etc.) were excluded from the comparisons.

Among other things, the study showed that the equity pension fund portfolio featured a weighted average size of $443 million, and a weighted average advisory fee of 28 bps. The average equity mutual fund in the survey had a weighted average asset size of $1.3 billion, and the weighted average advisory fee level was 56 bps. In dollar terms, the fee average for equity pension funds was $1.2 million; for the equity mutual funds, it was roughly 6 times as much, around $7.28 million. Other aspects of Freeman-Brown methodology and findings are dealt with in the next section where various Coates-Hubbard criticisms are considered.

## COMMENTS ON VARIOUS COATES-HUBBARD FINDINGS

1. **Coates-Hubbard Wrongly in Contends It's Always Apples to Oranges; To the Contrary, Pension Advisory Costs Can Be Compared to Fund Advisory Costs.**

We know that costs for pension and fund advisory services are measurable and comparable because the *Wharton Report* and the *PPI* study made the comparisons. Over many decades, the findings of those scholarly reports about comparable fees were never challenged by anyone. Those reports are now dismissed by Coates-Hubbard as irrelevant, old-school, meaningless 1960s research. The problem with Coates-Hubbard's dismissive approach is that facts are facts.

The principal support for Coates-Hubbard's contention that pension advisory costs cannot be compared with mutual funds is that "[m]utual funds report different costs in the same categories of expenses. Management fees sometimes include administrative costs other than pure portfolio

---

[12] DAVID F. SWENSEN, UNCONVENTIONAL SUCCESS – A FUNDAMENTAL APPROACH TO PERSONAL INVESTMENT 241-42 (2005)
[13] Coates-Hubbard at 6.
[14] The hundred largest public pension funds were surveyed. The cover letter asked for cooperation, mentioning that the request should be viewed as a FOIA request by those disinclined to cooperate without compulsion.

4

management."[15] This data problem does exist, but it is minor, and it could easily be eliminated if the Commission insisted that funds follow uniform, clearly-defined system of expense reporting, which is an improvement called for by Freeman-Brown.[16] To adjust as well as possible for this minor overlap problem, data for funds that clearly mingled administrative and advisory costs were excluded from the Freeman Brown study.[17] The Freeman-Brown methodology was accurate and correct. Don Phillips, president of Morningstar, was quoted in *The Wall Street Journal* as saying "... the [Freeman and Brown] study is dead-on in its methodology and findings." He continued: "This study is very damning .... It shows that retail mutual funds are not competitively priced."

Although Coates-Hubbard faults Freeman-Brown for failing to isolate the pure costs of portfolio management,[18] they also admit "[d]ata are not readily available to accurately isolate the pure costs of portfolio management, and even if they were, differences in liquidity requirements prevent a one-on-one comparison of portfolio management costs."[19] This observation merits several comments. First, if the "data are not readily available" showing pricing, then it is hard to prove that the pricing is competitive. Besides that, there are some data available.

For one things, Eliot Spitzer testified before a Senate Subcommittee that a major fund manager was grossly overcharging its shareholders for precisely the same services it was selling on the free market to others:

> MR. SPITZER: Here are the numbers. Putnam's mutual fund investors were charged 40 percent more for advisory services than Putnam's institutional investors. In dollar terms, what this fee disparity means is that in 2002 Putnam mutual fund investors paid $290 million more in advisory fees than they would have paid had they been charged the rate given to Putnam's institutional clients, and these are for identical services. . . .

---

[15] Coates-Hubbard at 23.
[16] Freeman-Brown at 669:
> [T]o facilitate comparative cost disclosures, the SEC needs to require financial reporting on a standardized basis so that categories of expense are comparable on an industry-wide basis. Currently, some funds blend administrative costs into the advisory fee. This bundling frustrates cost comparisons and detailed analysis (most prominently by the SEC staff itself), and it needs to be stopped.

[17] Specifically, in framing the Freeman-Brown study, we determined that, on average, domestic equity mutual funds paid 21 basis points (.21 percent) for administrative services such as transfer agency, custodial and legal fees. Our operating expense (advisory and administrative fees) ratios were comparable to those found in the ICI's own cost study. To hone our fund expense data down to advisory fee payments, we eliminated explicitly disclosed administrative fees together with the large amount of hidden administrative costs embedded in funds' 12b-1 expenses. At this point, after further investigation, we concluded that any residual administrative expenses embedded in fund advisory fees were de minimis. We then calibrated the mutual fund sample to closely resemble our pension fund sample. We found that the cost of advisory (stock picking) services for a large sample of domestic equity funds averaged 56 basis points (.56 percent). We found that public pension funds pay an average of 28 basis points (.28 percent) for the same services. This comparison led us to conclude that mutual funds pay around double what pension funds pay solely for stock picking services.
[18] *Id.*
[19] *Id.*

Case 2:06-cv-04305-NKL   Document 300-2   Filed 04/08/09   Page 6 of 14

> This is an apples-to-apples comparison, and, *when we generated these numbers, we went to Putnam and we said give us your best apples- to-apples comparison for identical services.*
>
> SENATOR COLLINS: That's . . .
>
> MR. SPITZER: *The numbers were <u>from them</u> for that <u>identical set of services</u>.*
>
> SENATOR COLLINS: That's a very important clarification, and I appreciate your adding that to your testimony.[20]

Plainly, Mr. Spitzer did not have trouble getting apples-to-apples evidence, and that evidence is consistent with Freeman-Brown and damning. There is more. As mentioned above Freeman-Brown reported on Vanguard's use of sub-advisors to manage several of its mutual fund portfolios. Vanguard is a complex where there is no conflict of interest between the fund and the adviser because of Vanguard's internal management structure. When external managers are hired, it is not "fund market" competition, i.e., the external adviser vs. the captive fund, it is "free market" competition, i.e., Vanguard's boards shopping in the free market for the best advisory service provider at the best price. The weighted average advisory fee paid by Vanguard to these external advisors was 13.2 bps, far less than other mutual fund advisors charge their own funds for active management. The Vanguard example shows that unswerving adherence to fiduciary principles and the free market shopping can yield superior value for fund shareholders.

Another example showing price disparities, and suggesting a lack of price competition at the fund level for advisory services, comes in the form of Alliance Capital's[21] behavior a few years ago. The following facts are taken from a statement I submitted to the United States Senate on January 27, 2004:[22]

> Recently, Alliance Capital was charging 93 basis points (.93 percent) for managing the [then] $17.5 billion Alliance Premier Growth Fund. This is a fee paid by shareholders of $162.7 million per year. At the same time as it was charging 93 basis points to its *own shareholders*, Alliance was managing the Vanguard U.S. Growth Fund for 11 basis points (.11 percent)—less than 1/8 of what it was charging Alliance shareholders. Alliance was also managing a $672 million portfolio for the Kentucky Retirement System for 24 basis points, a $1.7 billion portfolio for the Minnesota State Board of Investment for 20 basis points, a $730 million equities portfolio for the Missouri Retirement System for 18.5 basis points, and a $975 million equity portfolio for the Wyoming Retirement System for 10 basis points.

---

[20] Oversight Hearing On Mutual Funds: Hidden Fees, Misgovernance and Other Practices that Harm Investors, Before the Senate Governmental Affairs Committee's Subcommittee on Financial Management, The Budget And International Security, Jan. 27, 2004, *available on* Lexis Allnws File, (testimony of Eliot Spitzer) (emphasis added).
[21] Now known as AllianceBernstein.
[22] *Available at* http://www.senate.gov/~govt-aff/_files/012704freeman.pdf.

6

Case 2:06-cv-04305-NKL   Document 300-2   Filed 04/08/09   Page 7 of 14

> These price discrepancies cannot be justified on the basis of differences in service. According to the prospectus for the Alliance Stock Fund, the management company's institutional accounts shared "substantially the same investment objectives and policies" and were managed with "essentially the same investment strategies and techniques" as the Alliance Premier Growth Fund. Moreover the different clients "shared a nearly identical composition of investment holdings and related percentage weightings."[23]

According to Coates-Hubbard, "differences in liquidity" will always "prevent a one-on-one comparison of portfolio management costs."[24] The supposed liquidity difference is a variable arising due to a need to account for redemptions within the mutual fund. Anecdotal evidence suggests that this supposed liquidity difference is minor, if it exists at all. I am unaware of anyone who has every attempted to isolate and quantify the cost of the "liquidity difference." It cannot be high. The ICI has claimed, and Coates-Hubbard's authors evidently agree, that the true cost of managing a mutual fund portfolio is around 31bps, leading to the conclusion that there is "little difference in portfolio management fees" charged to pension funds and rates charged to mutual funds. Obviously, if the pension and mutual fund advisory rates are comparable, and if there is very little difference in rates, then the supposed liquidity difference that allegedly serves to "prevent one-on-one" comparisons is something of a financial Loch Ness monster – a phenomenon talked about but never seen in real life.

The ICI's contention, adopted by Coates-Hubbard, that advisory prices in the fund industry are competitive based on sub-advisory costs is simply a sham argument. The dollar price ultimately paid by the consumer is what counts when it comes to expenses. The ICI report, accepted by Coates-Hubbard, focuses only on a portion of the overall advisory cost borne by sub-advised funds. The focus is on sub-advisory fees paid by the mutual fund managers, diverting attention away from the full advisory fee actually charged to and paid by the fund to its adviser. This makes the analysis deceptive, for funds managers (save Vanguard) add a hefty "premium" or "monitoring fee" to the sub-advisors' charge. In other words, the sub-advisor may charge the manager 30 bps for its investment advice, but the manager adds a 25 or 30 bps "premium" before passing along the advisory fee charge to fund shareholders. This double-charging feature of sub-advisory contracts was completely ignored by the ICI, and the error is huge; many millions of dollars in added costs yearly are simply ignored. This bill-padding system takes the cost of advisory services for sub-advised funds into the stratosphere. Cost savings that could be realized by subcontracting out the work are skimmed off by the adviser. Thus, there can be few, if any, cost savings arising from sub-advisory relationships that flow through to fund shareholders.

A further fallacy with both the ICI study and Coates-Hubbard rests in the seductive ease of basis point comparisons. We sometimes tend to forget that fund advisers are not compensated with basis points, they are compensated with dollars. Thus, at p. 24, Coates-Hubbard faults the Freeman-Brown study for not explaining why Vanguard pays sub-advisors 13 bps, whereas the price paid by public pension plans is more, 20 bps. The answer is simple and apparent from the

---

[23] *Id.* at 6.
[24] Coates-Hubbard 24.

7

Case 2:06-cv-04305-NKL    Document 300-2    Filed 04/08/09    Page 8 of 14

text of Freeman-Brown. The weighted average size of the Vanguard externally managed funds was $11.6 billion.[25] The weighted average asset size for the largest pension fund decile in our sample was $1.55 billion in assets, less than 1/7 the size of the average Vanguard portfolio. The Vanguard fee rate is lower due to economies of scale being captured for the benefit of fund shareholders.

Note that working for Vanguard is nonetheless lucrative. Applying the average fee rate to the average asset size yields an advisory fee to the sub-advisor of $15.1 million in fees. The average numbers for pension managers yields less, $3.10 million. A comparison made in Freeman-Brown that is telling and never mentioned by Coates-Hubbard is that the top 10 percent largest pension funds have, as noted, $1.55 billion in assets and a 20 bps management fee ratio. For mutual funds, the top 10% in size have assets of $9.7 billion and a 50 bps fee level. Fund managers are thus paid roughly 15 times as much for managing the largest mutual funds compared to managers of the largest public equity pension fund portfolios. That a 15-times higher fee is collected in the fund industry is not indicative of the robust price competition among funds for advisory services.

Accepting the Coates-Hubbard study's embrace of the ICI sub-advisory fee concept as the true cost of fund advisory services gives a fee of around 30 bps (never mind economies of scale) for the investment management function. There is a way to estimate the cost of all the rest of fund operations. According to one academic study, the weighted average expense ratio for the mutual fund industry's index funds is around 25 basis points, that is, .25%.[26] This is a telling figure, for it represents the true cost, on a weighted average basis, of running a mutual fund. Index funds, after all, actually are mutual funds. Index funds are not actively managed, and hence lack advisory fees, but that is all they lack. They have shares, daily pricing, boards of directors, SEC regulatory requirements, prospectuses, 800 numbers, shareholder reports, etc. Fund sponsors set them up to make a profit for themselves, so profit to the sponsor is included, too, in the all-in cost of 25 basis points. If, as the ICI contends, and Coates-Hubbard accepts, the average cost of advisory services approximates 30 bps, then by their own math, the weighted average cost of the typical equity mutual fund ought to be around 55 bps. Instead it is far higher. It is far higher principally because there is virtually no price competition when it comes to fund advisory services. Instead, there is a great deal of price gouging and breaches of fiduciary duty.

One sign of fee gouging in the fund industry relates to how reluctantly economies of scale are shared by mutual fund advisers with investors as the mutual fund grows. Freeman-Brown found that advisory fees dropped sharply in the public pension marketplace as the fund asset size increased. The data for pension funds showed that fees declined from 60 basis points for the smallest portfolios ($36 million on average) to 20 basis points for the largest ($1.55 billion on

---

[25] See Freeman-Brown p. 638, Table 6.
[26] See Jason Karceski et al., *Portfolio Transactions Costs at U.S. Equity Mutual Funds*, at 16, Table Z (Nov. 2004), *available at* http://www.zeroalphagroup.com/news/Execution_CostsPaper_Nov_15_2004.pdf. Confirming that a mutual fund can be organized and run on a total expense budget of less than 25 basis points per year is data from another source showing the weighted average annual expense ratio for no-load equity and bond mutual funds during 1995-2005 to be a mere .19%. Todd Houge & Jay Wellman, *The Use and Abuse of Mutual fund Expenses*, 70 J. BUS. ETHICS 23, 28 (2006).

8

average).[27] The competitive nature of the market for investment advisory services to public pension funds forced fees to decline as asset size increased, essentially reflecting economies of scale in the money management business. The pattern was very different for mutual funds. The average fee charged was essentially flat through the first seven deciles, and the fee charged was consistently greater than 70 basis points. Fees declined when fund size increased above about $750 million, but the decline was not as steep as for pension portfolios. The top decile for funds had an average fund size of almost $10 billion, but weighted average advisory fees declined to only 50 basis points.[28] These findings reflect a lack of price competition in the market for fund advisory services.

In 2004, the fund industry got this scathing assessment from Senator Peter Fitzgerald: "The mutual fund industry is, indeed, the world's largest skimming operation, a $7-trillion trough from which fund managers, brokers, and other insiders are steadily siphoning off an excessive slice of the nation's household, college, and retirement savings."[29] An industry featuring a very large "skimming operation" is not a paragon of competitiveness.

2.  **Serious Fiduciary Duty Breaches Can and Do Occur in the Fund Industry However Competitive It May Be.**

For competition to flourish, you need rigorous disclosure requirements which are sadly lacking in the fund industry. Managerial integrity also has sometimes been lacking. The late trading and market timing frauds show what faithless managers are capable of when they are left to operate in the shadows. The same is true for the directed brokerage kick-back scheme some funds were running before the Commission amended Rule 12b-1 to put a stop to the practice.

More evidence of the need for managerial vigilance comes in the form of *Matter of BISYS*.[30] In that case advisers for 27 fund families were found to have delegated to BISYS Fund Services, Inc. the task of performing administrative services for the funds. The cost for the work evidently was set around 20 basis points of net assets. The order suggests that BISYS actually did the work for a lot less, around 5.5 basis points, secretly kicking back six basis points to the funds' advisers. Another 8.5 basis points given up by BISYS was secretly being used for "marketing," *i.e.*, to pay for distribution, not for administrative services. Over a five year period, BISYS kicked back $230 million in administrative fees "to use in marketing budgets."[31] Meanwhile, the funds' boards and the funds' shareholders were duped, with fund assets being diverted for marketing costs via the back door as administrative costs, rather than as charges under a proper 12b-1 plan.

Another shocking example of fund boards being duped is presented by Citigroup's scheme to grossly over-bill shareholders in its Smith Barney mutual fund group for transfer agent fees. In

---

[27] Freeman-Brown at 632.
[28] *Id.*
[29] *Hearings Before the Senate Governmental Affairs Comm.*, 108th Cong., 2d Sess. (2004) *available on Lexis, Arcnws Library* (remarks of Sen. Peter G. Fitzgerald).
[30] Matter of BISYS Fund Serv., Inc., Inv. Company Act Rel. No. 2554 (Sept. 26, 2006).
[31] *Id.* at 3, ¶ 4.

Case 2:06-cv-04305-NKL   Document 300-2   Filed 04/08/09   Page 10 of 14

that case, the fund boards were led to believe transfer agency business was being moved from a third-party provider to a Citigroup affiliate. In reality, most of the work continued to be done by the third party transfer agent, but at a steeply reduced cost. The fee discount amounting to tens of millions per year of shareholders' money secretly was diverted to two Citigroup subsidiaries.[32]

I mention the *BISYS* and *Citigroup* cases to make a simple point ignored by Coates-Hubbard: the root issues are integrity and fiduciary duty. Putting aside the fact that existence of competition for customers says next to nothing about competition for advisory services, the simple fact is that serious wrongdoing can well occur in the most competitive of marketplaces. The used car segment of the auto industry is competitive. This does not mean customers cannot be cheated out of money by dealers who set back odometers. The fund industry is a unique animal. Congress investigated the industry's behavior in and around the crash and concluded that egregious misconduct by fund manager-fiduciaries necessitated an entirely new securities statute, the Investment Company Act, to address the unique problems posed by investment companies.

### 3. Some Other Coates-Hubbard Failings.

This letter is already long, so I will close shortly after making a few additional points. First, there is really no basis to dispute the General Accounting Office's conclusion, stated in 2000, that the mutual fund industry generally does not attempt to compete on the basis of operating expense fees that investors pay.[33] In truth, throughout the fund industry, there is virtually no competition for advisory services. In that area, prices are set based on no-bid contracts. Worse, when prices are evaluated in fund board rooms and the courts, the tendency is to compare costs and services with other funds, i.e., other no-bid contract arrangements, not those with prices set in the free market which indisputably exists for investment advisory services.

Evidence of the lack of price competition in the fund marketplace comes in the form of recent studies showing that the fund shares that are most expensive to buy, i.e., those carrying the highest loads, are also the worst to own, due in part to their carrying higher expense ratios.[34] Perhaps this is in part attributable to deception practiced on investors misled into thinking the Class B shares they are buying carry no sales loads.[35] A marketplace where the worst products

---

[32] *See* SEC News Release, Citigroup To Pay $208 Million to Settle Charges Arising From Creation of Affiliated Transfer Agent to Serve Its Proprietary Mutual Funds, 2005 WL 1274240 (S.E.C.). Details concerning the scheme are provided in *SEC v. Jones*, 2006 WL 1084276 (S.D.N.Y. 2006).

[33] GENERAL ACCOUNTING OFFICE, MUTUAL FUND FEES ADDITIONAL DISCLOSURE COULD ENCOURAGE PRICE COMPETITION 62, *et seq.* (2000). This analysis is available at http://www.gao.gov/archive/2000/gg00126.pdf.

[34] *See* Mercer Bullard & Edward S. O'Neal, *The Costs of Using a Broker to Select Mutual Funds,* Nov. 2006, *available at* http://www.zeroalphagroup.com/studies/113006_Zero_Alpha_Group_Fund_Democracy_Index_Funds_Rep ort.pdf (finding that via the broker-dealer channel load fund shareholders are induced to pay the highest commission costs in order to buy the worst index mutual fund products); Houge & Wellman, *supra* note 26; Daniel Bergstresser, et al., Assessing the Costs and Benefits of Brokers in the Mutual Fund Industry Table 5 (Draft Jan. 16, 2006), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=616981.

[35] Morningstar's Managing Director, Don Phillips, offers this telling anecdote:

10

carry the highest prices does not strike me as very competitive. For example, all other things being equal, in a competitive marketplace one would not expect flawed diamonds to sell for higher prices than flawless ones.

In the discussion starting on p. 24 and in fn.123, the Coates-Hubbard study contends fund shareholders get abundant fall-out benefits from fund sponsors. Missing from their report is any data backing up these claims.

Among other things, Coates-Hubbard contends shareholders profit when new investors are brought into the fund through economies of scale. This economies argument was, of course, one of the major selling points when Rule 12b-1 was adopted. The idea that sales to new investors financed out of fund assets are beneficial to existing fund shareholders is dubious and not supported by the literature.[36] No credible evidence exists demonstrating shareholders benefit receive a pecuniary benefit from 12b-1 fees. .

Another supposed fall-out benefit accruing to fund shareholders, according to fn. 123 of Coates-Hubbard, is: "Alleged rebates and soft dollar payments." I wonder how an "alleged" rebate helps anyone. Rebates from service providers returning costs borne by the fund clearly are bad unless they are 100% paid into the fund, and in *BISYS* and *Citigroup* they were not. As for soft dollars, they undercut price competition if undisclosed, and the American Enterprise Institute has taken the position that section 28(e) of the 1934 act should be repealed to prohibit mutual funds from paying soft dollars.[37] The practice of padding brokerage costs (which, of course, are not reflected in funds' expense ratios) to generate money to pay for advisory services raises major policy issues. If the expenditures do not go to reduce the fund's advisory fees, the true amount of fees is distorted and fiduciary duty issues may be implicated. The practice of mislabeling expense items is common in the fund industry and brings to mind an observation made by Gary Gensler, author of *The Great Mutual Fund Trap*. Gensler observed, "mutual funds have constructed a system where costs are practically invisible."[38] A system where costs are invisible is a system where price competition is disadvantaged. For evidence of invisibility, consider this: revenue sharing, the fund industry's "dirty little secret." These distribution payments aggregate more than $2 billion yearly, often based on oral contracts. They have become so important that

---

> What I think is right with the negative opinion about 12b-1 fees is this hugely complicated selection process of a mutual fund. And it allowed the fund industry to create or to carry out something that frankly was unfair. The notion that "B" shares were no-load funds. I've talked to thousands of investors literally who came to me and said, "I bought a no-load fund." And then you ask them what they bought, and they bought the "B" shares of a load fund organization. They thought they were getting something for free.

Mercer Bullard, *The Mutual Fund Summit Transcript*, 73 MISS. L.J. 1153, 1187 (2004) (remarks of Don Phillips, Managing Director of Morningstar, Inc.).

[36] *See, e.g.*, Lori Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns*, Apr. 26, 2005, at 2, *available at* 2004 WL 3386675.

[37] *Mutual Fund Expenses and Soft Dollars*, Statement No. 200 of the Shadow Financial Regulatory Committee, Dec. 8, 2003, *available at* http://fic.wharton.upenn.edu/fic/Policy%20page/20051114_ShadowStatement200%5B1%5D.pdf

[38] Letter from Richard H. Baker, Chairman, Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, U.S. House of Representatives, to William H. Donaldson, Chairman, Securities and Exchange Commission, (Mar. 26 2003), at 1.

11

Case 2:06-cv-04305-NKL   Document 300-2   Filed 04/08/09   Page 12 of 14

in 2005 revenue sharing *alone* accounted for more than one-half of one national brokerage firm's net income.[39] The fund industry's murky revenue sharing practices illustrate where there truly is fierce competition in the fund industry today, namely, for broker-dealers' favor. The effect of this competition is to run up costs, not to lower them.

Another supposed "fall-out" benefit singled out by Coates-Hubbard as beneficial to fund shareholders is particularly puzzling. It is called: "Reusing research and portfolio management." Here is what Coates-Hubbard says in explaining how the fund benefits when the adviser resells the research know-how it developed at fund shareholders' expense:

> Using the research for additional portfolio management business, such as contracting to become a sub-advisor for another fund or an external portfolio manager for an institutional client, allows the fund to gain further incremental revenues toward covering total costs, benefiting all fund investors.

This is a peculiar statement. It assumes that when, for example, Alliance Capital sold its services to the Wyoming Plan for 10 bps, this transaction financially benefited Alliance Capital's Premier Growth Fund shareholders. But I am unaware of a tradition of fee sharing between advisers and funds in such cases. What instead seems to be the case is that advisers take research paid for by the fund and convert the asset to their personal benefit. The advisers are thus seen using the funds' property – the information gleaned -- to sub-advise other entities, keeping the profits for themselves, and raising fiduciary duty/corporate opportunity problems in the process. What is particularly odd is that the sub-adviser work tends to be done for others at a much lower price than was charged for the work performed for the originating fund. Coates-Hubbard seems to imply that in the supposedly highly competitive mutual fund industry, it is proper, in fact a good thing, for the adviser to take sensitive, proprietary information paid for by the mutual fund, and sell it for personal gain to a competitor, who the product at a bargain price. I beg to differ.

According to Coates-Hubbard, the only recommendations made in Freeman-Brown were that courts called on to evaluate fiduciary duty breaches over fees should consider comparable fees (which Coates-Hubbard's authors call, "a proposal we endorse"), and that there be "additional disclosure from advisers on their costs and profits."[40] Missing from the list is our key proposal, described in *Forbes* magazine as the fund industry's worst nightmare, "most favored nations" treatment for fund shareholders. This most important recommendation ties into the information/asset diversion behavior mentioned above: We urged, and I urge again,

---

[39] In 2005, brokerage firm Edward Jones had a total net income of $330 million. More than half of that sum, $172 million, was attributable *purely* to revenue sharing payments, that is receipts over and above sales load or 12b-1 fee revenue, from the firm's eight "preferred fund families" and Federated Investors. *See* Edward Jones, Mutual Fund Families, Including Information about Our Preferred Fund Families and Revenue Sharing, *available at* http://www.edwardjones.com/cgi/getHTML.cgi?page=/USA/products/mutualfunds_revenue_sharing.html (last visited Mar. 6, 2007).

[40] Coates-Hubbard at 59, n.136.

12

that the Commission should use its rule-making authority to declare that a presumption exists that fund shareholders deserve "most favored nation" treatment over advisory fees charged by their advisors. The "most favored nation" concept is both simple and powerful. Fund shareholders should pay a price for investment advice that is no higher than that charged by the fund's advisor and its affiliated entities when billing for like services rendered to other customers, such as pension funds, endowment funds, "private counsel accounts," or other advisory service users.[41]

In summary, the Coates-Hubbard paper offers limited if any helpful guidance to the Commission in its current rulemaking effort.

Sincerely yours,

*John Freeman*

John P. Freeman

cc: Chairman Christopher Cox
Commissioner Paul S. Atkins
Commissioner Roel C. Campos
Commissioner Kathleen L. Casey
Commissioner Annette L. Nazareth

---

[41] Freeman-Brown at 661.