# EXHIBIT 3

Case 2:06-cv-04305-NKL   Document 300-3   Filed 04/08/09   Page 1 of 7

```
 1      CONFIDENTIAL
 2      IN THE UNITED STATES DISTRICT COURT
 3         WESTERN DISTRICT OF MISSOURI
 4      Case No. 2:06 CV 04305(NKL)
        -----------------------------------)
 5  RONALD TUSSEY, et al.,
 6          Plaintiffs,
 7      vs.
 8
    ABB, INC., et al.,
 9
            Defendants.
10  -----------------------------------)
11
12
13
         VIDEOTAPED DEPOSITION OF
14
            R. GLENN HUBBARD
15
           New York, New York
16
        Friday, January 23, 2009
17
18
19
20
21
22
23  Reported by:
    Toni Allegrucci
24  JOB NO. 55285
25
```

Page 5

```
 1      CONFIDENTIAL - R. G. Hubbard
 2          MR. VIDEOGRAPHER:  Good morning.
 3  This is tape No. 1 of the videotaped
 4  deposition of Glenn Hubbard, in the
 5  matter Tussey versus ABB, Incorporated,
 6  et al.  This deposition is being held at
 7  620 Eighth Avenue, New York, New York,
 8  on January 23, 2009, at approximately
 9  8:10 a.m.
10          My name is Pedro Placido from the
11  firm of Esquire Deposition Services and
12  I'm the legal video specialist.  The
13  court reporter is Toni Allegrucci in
14  association with Esquire Deposition
15  Services.  Will counsel please introduce
16  themselves for the record.
17          MR. SCHLICHTER:  Jerome Schlichter,
18  Heather Lea and Troy Doles, for the
19  plaintiffs, and Mr. Steve Pomerantz is
20  sitting here at the table.
21          MS. KORDELESKI:  Kathy Kordeleski,
22  ABB.
23          MR. ORTELERE:  Brian Ortelere for
24  the ABB defendants.
25          MS. RAYMOND:  Margaret Raymond,
```

Page 6

```
 1      CONFIDENTIAL - R. G. Hubbard
 2  Fidelity.
 3          MR. DITTMAR:  James S. Dittmar,
 4  Fidelity.
 5          MR. EGLAND:  And Mark Egland,
 6  Analysis Group.
 7          MR. VIDEOGRAPHER:  Will the
 8  Court Reporter please swear in the
 9  witness.
10  R  G L E N N  H U B B A R D, called as a
11  witness, having been duly sworn by a Notary
12  Public, was examined and testified as
13  follows:
14  EXAMINATION BY
15  MR. SCHLICHTER:
16      Q.  State your name, please.
17      A.  Robert Glenn Hubbard.
18      Q.  Mr. Hubbard, when did you first
19  become involved in this case?
20      A.  I believe July of 2007 was the
21  retention.
22      Q.  Were you brought in by the
23  Analysis Group?
24      A.  I've certainly worked with
25  Analysis Group.  I was brought in by the
```

Page 7

```
 1      CONFIDENTIAL - R. G. Hubbard
 2  client.
 3      Q.  Was the Analysis Group already
 4  involved at that point?
 5      A.  I believe they may have been, yes.
 6      Q.  Did they talk to you first rather
 7  than the lawyers?
 8      A.  I'm sorry, who is "they" in the
 9  question?
10      Q.  The Analysis Group?
11      A.  I really don't recall, sorry.
12      Q.  Now, you have an arrangement, what
13  are you being compensated in this case?
14      A.  $1,000 per hour for my services.  I
15  also receive what's called an "attribution"
16  based on the gross billings of
17  Analysis Group.
18      Q.  An "attribution," and what is
19  the -- is that a percentage?
20      A.  Yes.
21      Q.  So you have $1,000 an hour, plus a
22  percentage of the income that the
23  Analysis Group gets in this case?
24      A.  No, that's not correct.  I have
25  $1,000 an hour for my own time and a
```

Page 8
1  CONFIDENTIAL - R. G. Hubbard
2  percentage of their gross billings. Their
3  income is a number I wouldn't know.
4    Q.  So their gross billings, what
5  percentage is that?
6    A.  It would be 7.5 percent.
7    Q.  And what have those billings have
8  to this point approximately?
9    A.  I'm sorry, by "those billings,"
10 mine, Analysis Group?
11   Q.  Those billings for which you have a
12 percentage?
13   A.  The payments that I've received are
14 about $100,000. Whether that fully catches
15 up Analysis Group and Fidelity, that would be
16 only information that I would have.
17   Q.  Well, what has your billing been
18 separate from what the percentage you've
19 received from the Analysis Group in this
20 case?
21   A.  I'd say since the case began it's
22 approximately 60 hours.
23   Q.  Sixty hours?
24   A.  Yes.
25   Q.  So that's $60,000 in flat fee?

Page 9
1  CONFIDENTIAL - R. G. Hubbard
2    A.  Right. I haven't received all of
3  that but, yes, that would be the time
4  accrued.
5    Q.  And do you have any estimate of
6  what the Analysis Group has received?
7    A.  I don't. All I would know is based
8  on my attribution, which has been about
9  $100,000. I don't know the accrual number,
10 that's simply what I've received.
11   Q.  Your attribution is $40,000 or
12 $100,000, the portion that's the 7.5 percent?
13   A.  No. 100 -- let's step back.
14 Direct billing would be number of hours times
15 1,000, so that's the 60,000 that's accrued.
16   Q.  Right.
17   A.  The 100,000 is roughly what I've
18 received in attribution.
19   Q.  On top of the 60?
20   A.  On top.
21   Q.  Okay. So if you've received
22 everything that Analysis Group has billed to
23 this point, and in trying to assess what it
24 is that Analysis Group has received, $100,000
25 is 7.5 percent --

Page 33
1  CONFIDENTIAL - R. G. Hubbard
2  opinion, I'm asking you economic opinion,
3  does a fiduciary in a 401(k) plan have the
4  right to fully rely on the board of directors
5  of the mutual fund whose, of the mutual fund
6  in the 401(k) plan, so that the fiduciary can
7  simply conclude the fees are reasonable
8  because the fiduciary concludes the board of
9  directors have done their job?
10   A.  Well, since you've asked for
11 reliance you've asked me, again, for legal
12 opinion, so I can't do it. But what I can
13 say is that it would be reasonable for
14 fiduciary to assume that forces of
15 competition and board action would generate
16 certainly in general competitive prices,
17 whether that's sufficient is legal opinion
18 and, I'm sorry, I just can't offer it for
19 you.
20   Q.  Now, in your article with
21 John Coates, Competition Shareholders Fees in
22 the Mutual Fund Industry, Evidence and
23 Implications for Policy, that was published
24 in 2006, right?
25   A.  2007, I believe, but...

Page 34
1  CONFIDENTIAL - R. G. Hubbard
2    Q.  All right.
3    A.  Maybe I mis --
4    Q.  When did you start work on that
5  case, that article?
6    A.  Oh, I'm guessing probably a year
7  prior to publication, probably late 2005,
8  early 2006, but I don't know.
9    Q.  The date on it is 8/2007, so does
10 that refresh your memory about when you would
11 have started work on that?
12   A.  Yeah, again, I just said I don't
13 know, it would probably be over a year, but I
14 don't know.
15   Q.  Who funded that?
16   A.  Well, most -- I'm not sure what you
17 mean by "funding." We certainly received
18 financial support for research from the
19 Investment Company Institute. In terms of
20 our own time, you know, it's John's and my
21 time.
22   Q.  How much support from the
23 Investment Company Institute did you receive
24 for that?
25   A.  I really don't recall, sorry.

CONFIDENTIAL - R. G. Hubbard

Q. Give me an approximation, was it hundreds of thousands of dollars?
A. Oh, I doubt it, or I would recall something like that. It was a substantial support, I mean --
Q. Hundreds of thousands or less than hundred thousand?
A. Again, if I don't recall I can't recall.
Q. Well, you might not recall a specific number but you might recall a range, that's what I'm asking about. Do you have any range at all? Do you have any idea?
A. You know, I'm sorry, I don't.
Q. Could it be $100, $500?
A. No. I think $100,000 would be the lower end of the range.
Q. What would be the upper end?
A. I don't recall.
Q. Who was the money paid to, you and Mr. Coates or to Harvard or whom?
A. Well, some of it would go to Mr. Coates and me, yes.
Q. How much did you get?

CONFIDENTIAL - R. G. Hubbard

A. Again, I just I don't recall, sorry.
Q. What percent?
A. Well, I would have gotten it based on whatever I billed them, but I don't recall what that is.
Q. I understand what you billed them. What I'm saying is, in the division of the money between what you got and what Mr. Coates got, what was your arrangement?
A. I don't know about Mr. Coates, I only know about myself.
Q. Oh, so the money that you are talking about, which was at least $100,000 and you don't know the upside, went to you for that?
A. Well, no. I mean I'm guessing that's for the entire project because there were other payments besides myself, but I really don't recall.
Q. Well, I don't understand what you are saying. You are saying you don't know what Mr. Coates got, you only know what you got, and then you quoted those figures.

CONFIDENTIAL - R. G. Hubbard

So was the 100,000 minimum that you are talking about and the unknown maximum what you got or what you and Mr. Coates got together?
A. It's my guess about the total, but I really don't know, I mean there were payments to Analysis Group, as well, for support. Whatever Mr. Coates got, plus whatever I got, I don't know the number.
Q. All right. Well, the number you are talking about is separate from what Analysis Group got, right?
A. I have no idea what Analysis Group got.
Q. I didn't ask that. I asked whether the number that you got, that you mentioned minimum of $100,000 and unknown maximum, was separate from whatever it was that Analysis Group got?
A. I believe I mentioned just a couple moments ago that that would be a guess for the project as a whole, I also said it would be an uninformed guess because I don't recall.

CONFIDENTIAL - R. G. Hubbard

Q. And you don't recall what you received, any estimate whatsoever?
A. I really don't, no.
Q. The Investment Company Institute has a self-interest in the conclusions that you reached, does it not?
A. The Investment Company Institute certainly has its own point of view. This is research that's reviewed and published in an academic setting. The ultimate judges aren't the investment company.
Q. That wasn't my question. That wasn't my question, Mr. Hubbard. My question was about self-interest, and we're entitled to know about it.
A. It's disclosed, sir, right on the cover of the article.
Q. Well, I'm asking you this question, the Investment Company Institute, I'm not talking about the fact that it's funded by them, I'm talking about the fact that they have a self-interest in the result, don't they?
A. The Investment Company Institute

Page 39

1  CONFIDENTIAL - R. G. Hubbard
2  certainly has a point of view, yes.
3      Q.  That's not my question whether they
4  have a point of view, everybody has a point
5  of view.
6          My question is whether they have a
7  self-interest in the result?
8      A.  I don't know what a "self-interest"
9  means for an organization, but I would assume
10 that they have their own views about
11 competition in the mutual fund industry, if
12 that's your question.
13     Q.  The Investment Company Institute
14 you know, Mr. Hubbard, promotes the mutual
15 fund industry, don't you?
16     A.  They certainly are an association
17 for the mutual fund industry, sure.
18     Q.  They are not-for-profit arm of the
19 mutual fund industry, set up to promote it,
20 right?
21     A.  I don't know if "promote" is the
22 right word but they are certainly
23 representing that industry, yes.
24     Q.  It's the representative
25 organization of the mutual fund industry,

Page 40

1  CONFIDENTIAL - R. G. Hubbard
2  isn't it?
3      A.  I would say sure.
4      Q.  Okay.  So it's the mutual fund
5  industry then which financed this report,
6  right?
7      A.  They certainly provided support
8  toward the report.
9      Q.  And it is possible that the
10 Analysis Group then got hundreds of thousands
11 of dollars for their work on this project,
12 isn't it?
13     A.  I really don't know.
14     Q.  Who asked you to do that study?
15     A.  You know, I really don't recall.  I
16 believe it was somebody from ICI, but I don't
17 really remember the person's name.
18     Q.  Who was the then head of the ICI?
19     A.  I don't know.
20     Q.  All right.  You believe it was
21 somebody from ICI and this wasn't something
22 that you came up with on your own then, it
23 was somebody from ICI requesting it as best
24 you recall?
25     A.  No, that's not what I said.  John

Page 45

1  CONFIDENTIAL - R. G. Hubbard
2  Fidelity's?
3      Q.  Fidelity's?
4      A.  Not that I recall, no.  I wasn't
5  doing Fidelity work when I did this paper.
6      Q.  Now, you said that you started your
7  involvement in this sometime I believe you
8  said you weren't sure, I know that, would the
9  best timeframe be, in your mind, sometime in
10 the year 2006?
11     A.  I've said I don't recall, so it
12 could be 2005, 2006, I really don't recall.
13     Q.  Now, the Bennett versus FMR Co.
14 case is a case involving, among other issues,
15 mutual fund fees of Fidelity's mutual funds,
16 right?
17     A.  Yes, it is.
18     Q.  You are involved in that case and
19 have been involved for how many years?
20     A.  I really don't recall, sorry.
21     Q.  Give me an approximation?
22     A.  It could be from 2006, I don't
23 really remember.
24     Q.  Okay.  And if it was 2006 then you
25 were involved as an expert witness -- well,

Page 46

1  CONFIDENTIAL - R. G. Hubbard
2  first of all, who got you involved in that
3  case?
4      A.  I'm sorry, which case are we now
5  on?
6      Q.  Bennett?
7      A.  I don't remember with whom my first
8  conversation was.  I believe it was probably
9  Analysis Group, but I don't recall.
10     Q.  All right.  And do you have the
11 same arrangement with Analysis Group in that
12 case that you do in this case, that you get
13 paid your flat rate, plus a percentage of
14 Analysis Group's billings?
15     A.  I do.
16     Q.  Seven and a half percent in that
17 case, too?
18     A.  Yes.
19     Q.  How much have you received in that
20 case?
21     A.  I really don't know.
22     Q.  Give me an approximation?
23     A.  I couldn't even do that.  The only
24 reason I knew the other was I knew it was a
25 question you would ask for this proceeding.

Page 47

1   CONFIDENTIAL - R. G. Hubbard
2   I don't know it for everything I work on.
3       Q.   More than a half a million dollars?
4       A.   Oh, no.
5       Q.   More than 300,000?
6       A.   You could ask me to speculate all
7   morning, Mr. Schlichter, I don't know.
8       Q.   At least 100,000?
9       A.   I really don't know.
10      Q.   Now, did you discuss, when you were
11  ready to publish the article, did you discuss
12  at any time with Fidelity or discuss with
13  them or inform them of the fact that you were
14  about to publish an article on mutual funds?
15      A.   I don't recall any discussions with
16  Fidelity.  Remember, this was started
17  considerably before the Bennett matter.  I
18  certainly did receive comments from an
19  attorney who has done work for Fidelity,
20  Mr. Murphy, who's cited as a commenter.
21  That's as close as I can think in answering
22  your question.
23      Q.   You just said, remember, this was
24  started before Bennett, you just said you
25  didn't know when you started the work, you

Page 48

1   CONFIDENTIAL - R. G. Hubbard
2   said that just a minute ago, Mr. Hubbard?
3       A.   Again, my recollection is this is
4   late 2005, early 2006.  The factual answer is
5   I didn't discuss this with Fidelity
6   representatives.  The only person that I can
7   remember is Mr. Murphy, who is not a Fidelity
8   employee but who has represented Fidelity on
9   some matters.
10      Q.   Well, let me understand then, since
11  you've said that, if you don't remember when
12  you started the work on this paper, do you
13  remember when you started the work on this
14  paper in relation to when you started to work
15  on the Fidelity case, the Bennett case?
16      A.   You know, I really don't.  The
17  paper, the ideas behind the paper are things
18  that John and I have been talking about a
19  long time, so I don't remember when an actual
20  start date might be.
21      Q.   Had you given your opinions in a
22  report or on the record in the Bennett case
23  prior to the time you published this article?
24      A.   I don't -- no.  Because -- this is
25  all blending together -- the Bennett case

Page 49

1   CONFIDENTIAL - R. G. Hubbard
2   deposition is this year, so far as I recall,
3   so no would be the answer.
4       Q.   Well, what about the report, did
5   you, did you issue the report before you or
6   after you completed the article?
7       A.   I believe after the completion of
8   the article, the article may have been
9   published in late '07, but the Bennett report
10  I believe is completed at a different time.
11  I'm sorry, I don't remember all these dates.
12      Q.   All right.  So let's talk about the
13  year 2006.  In the year 2006 you are working
14  on this article, I believe you are sure of
15  that?
16      A.   Yes.
17      Q.   All right.  In the year 2006 you
18  are a retained expert for Fidelity in the
19  Bennett case, right?
20      A.   Yes.
21      Q.   All right.  In your report and in
22  your testimony in the Bennett case you opine,
23  among other things, on the reasonableness of
24  mutual fund fees and compensation, do you
25  not?

Page 50

1   CONFIDENTIAL - R. G. Hubbard
2       A.   Yes, of course.
3       Q.   It's a central issue for your
4   report in that case, right?
5       A.   Of course.
6       Q.   And it's a central issue in your
7   article, right?
8       A.   It's the subject of the article.
9       Q.   It's the subject of your article
10  and the subject of your expert testimony?
11      A.   Yes.
12      Q.   So you happen to have two ongoing
13  matters on the same central subject of fees
14  and mutual funds, one in an article you are
15  doing, working on, and one in a report for
16  Fidelity you are working on, at the same
17  time, right?
18      A.   I'm not sure what you mean by it
19  but, yes, the work is going on at the same
20  time, if that's your question.
21      Q.   All right.  And of course you know
22  that the findings that you reach would
23  obviously be something that could be used by
24  anyone in questioning you in the Fidelity, in
25  the Bennett versus Fidelity case?

1  CONFIDENTIAL - R. G. Hubbard
2      A.  That would be perfectly reasonable,
3  yes.
4      Q.  "Would be perfectly reasonable."
5  So that if you conclude fees are reasonable
6  throughout the entire mutual fund industry,
7  you would expect that would be asked about in
8  your testimony in the Bennett versus Fidelity
9  case, right?
10     A.  Yes.  That wasn't the conclusion
11 but, yes, that would be --
12     Q.  If you conclude many mutual funds
13 have excessive fees, you could expect that
14 would be asked about in the Bennett versus
15 Fidelity case, right?
16     A.  Yes, of course.
17     Q.  Yet the testimony here is that you
18 never even spoke to Fidelity about writing
19 this article?
20     A.  You asked me had I spoken with
21 Fidelity when I began this project, I have no
22 recollection of that.  The only recollection
23 I have is a conversation with Mr. Murphy, but
24 that was offering comments on the already
25 finished article.