UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| RONALD TUSSEY, *et al.*, ) | |
| ) | |
| Plaintiffs; ) | |
| ) | |
| v. ) | Case No. 06-04305-CV-C-NKL |
| ) | |
| ABB, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' EMERGENCY RESPONSE TO ABB AND FIDELITY DEFENDANTS' "NOTICE OF CORRECTION" IN ADVANCE OF THE COURT'S RULING ON SUMMARY JUDGMENT**

**Introduction**

Without seeking leave of Court, Defendants seek to purportedly "correct" errors in their opposition to Plaintiffs' Motion for Summary Judgment and in support of their own Motions, but in fact what they are doing is correcting their prohibited conduct in hopes that will deem their false statements to this Court as true. They now admit to using participants' money to cover expenses for the non-qualified, deferred compensation plans. Instead, in violation of DOL and IRS regulations and in an attempt to create new "facts," Defendants say they will return the prohibited payments back to the PRISM Plans and that this will somehow "correct" what they previously and repeatedly denied occurred. Unlike a correction of typographical or citation errors, Defendants' filings are an attempt to revise history and thereby avoid summary judgment. Defendants cite no authority for such a remarkable proposition. By their own admission, the PRISM Plans' participants paid for the non-qualified, deferred compensation plans, which benefited ABB's highly compensated executives. For this reason, Plaintiffs' motion for partial

1

summary judgment ("Plaintiffs' Motion")(Ct. Docs. 257, 258) should be granted and Defendants' motions (Ct. Docs. 282, 284), now under a cloud of suspicion, should be denied.

It is critically important to recognize that this now admitted impropriety is not outlier behavior. Instead, it is another example of what Plaintiffs have stated throughout this case – that ABB and Fidelity consistently used Plan participants' retirement money to benefit themselves and their executives, in explicit violation of ERISA's duty of absolute loyalty to Plan participants. This admitted conduct now entitles Plaintiffs to summary judgment and the denial of Defendants' Motions. Yet, instead of admitting that their statements to this Court were false, Defendants have acted as if their eleventh hour offer to reimburse participants before this Court rules on summary judgment somehow means this Court: (1) should allow new facts to be retroactively created years after the wrongdoing; (2) should then deem Defendants' false statements to this Court to be treated as true; (3) should deny Plaintiffs' summary judgment motion, as if Defendants did not use ABB employees' money for ABB and Fidelity's benefit; and (4) should grant summary judgment in favor of ABB and Fidelity as if these prohibited payments had never occurred.[1]

## I. Defendants' Supposed "Notices of Correction" are an Attempt to Circumvent This Court's Authority.

The determination of breaches, resulting damages, and procedures for remedying such breaches are squarely before this Court. Defendants' attempt to characterize their self-dealing as a mistake or omission is a direct affront to this Court's authority. The law is absolutely clear – whether mistake, omission, violation of policy, or otherwise – the PRISM Plans' payment of non-plan related expenses were prohibited transactions under ERISA § 406 and breaches of

---

[1] Even Defendants' labeling of their filings as a "Notice of Correction" is disingenuous in its attempt to avoid stating that Defendants misrepresented the facts to the Court and that Plaintiffs' contentions regarding self-dealing are correct.

Defendants' fiduciary duties. Neither intent nor bad faith is required when fiduciaries benefit themselves at the expense of participants, actions that Defendants now admit.

**II.    Defendants' Prohibited Acts Are No Longer Disputed; Thus, Plaintiffs' Motion for Summary Judgment Should be Granted and Defendants' Motions Denied**

Plaintiffs moved for summary judgment with respect to the uncontroverted, and now admitted, prohibited transactions committed by Defendants involving the use of Plan assets. Doc. 258. Contrary to Defendants' assertions, Plaintiffs' Motion plainly included undisputed facts which establish that these "free" plans to ABB's highly compensated officers were prohibited transactions. *See Id.* at p. 18. These free plans were examples of the "win-win" relationship between ABB and Fidelity, with the Plan participants being the lone losers. App. 1158-59[2] (" Redacted ").

Contrary to Defendants suggestions that a mistake or oversight occurred, these prohibited actions are quite consistent with discussions ABB and Fidelity had regarding using Plan participants' assets to benefit themselves and their executives.[3] Indeed, as Plaintiffs stated, Fidelity and ABB discussed the very issue of the Plans "covering" the cost of the non-qualified plans yet they did nothing to stop this.[4] Doc. 337, Exs. Z, AA. Only after Mercer (an outside consultant) specifically informed ABB, in writing, that these free plans should be stand alone plans and not "covered" by the PRISM Plans, did Fidelity even bother to invoice ABB for the

---

[2] App. refers to Plaintiffs' Appendix filed with their opposition to Defendants' Motions for Summary Judgment and may be found at Ct. Docs. 309-313.
[3] Rather than being a "mistake," this prohibited conduct began in 1997. Doc. 258 ¶¶ 32-47.
[4] In this same communication, ABB and Fidelity also discussed the Plans covering a portion of ABB's Health & Welfare and Payroll expenses, which is equally a prohibited transaction and a breach of the duty of exclusive loyalty to participants. As with the non-qualified plans, Defendants have done nothing to correct these prohibited transactions. Doc.337, Exs. Z, AA.

3

administration of these free plans.[5] App. 376. However, as now admitted, even with explicit invoices, the Plan still paid for the "free plans."

Defendants should be well aware that the presence of policies and ethical guidelines to the contrary does not stop prohibited conduct or necessarily mean the prohibited conduct, when it does occur, was a mistake. In 2006, the Honorable John S. Martin, Jr. issued a report regarding the impact of the recently disclosed improper and prohibited conduct on the part of Fidelity traders. http://www.sec.gov/litigation/admin/2008/ia-2713-attorney_report.pdf (last visited October 29, 2009). He specifically looked at the traders' receipt of free travel, gifts, and other gratuities from brokers, analyzing the impact and resulting damages of these gratuities on the Fidelity Mutual Funds at issue. *Id.* at p.1. For example, in one tainted trade alone, Judge Martin found $18 million of damages that resulted from a free flight to the Super Bowl, which was hardly worth a fraction of the cost paid by shareholders. *Id.* at p. 4-5. This readily shows that decision makers are influenced by relatively small "gifts" and that such influence can cost shareholders (in this case Plan participants) millions of dollars. This is precisely why Congress enacted ERISA § 406, which bars the very conduct that would call into question the decisions of Plan fiduciaries. "Where, as here, a fiduciary has breached its duty to act solely in the interest of the funds, the inescapable uncertainty in measuring the harmful effects of taint arising from [receiving the prohibited gifts] should not result in a finding that there is no remedy." *Id.* at p. 9. Thus, Defendants belief that they can simply reimburse the $80,000 improperly paid by the Plans (the equivalent to the price of a plane ticket, to use the above analogy) and undo the harm that they have caused the PRISM Plans, is absurd.

---

[5] Mercer advised ABB that the non-qualified plans should be separated from the PRISM Plans in November, 2005. Not coincidentally, the first invoice after Mercer's warning, reflects explicit charges for the non-qualified plans, which were authorized by ABB and paid by the PRISM Plans. Doc. 437, Ex. 1 Lockhart Decl.

As already explained, by their nature, prohibited transactions are clear violations of a plan fiduciary's duties of loyalty and prudence under ERISA § 404(a). Doc. 258 p. 16, citing *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.,* U.S., 530 U.S. 238, 241-42 (U.S. June 12, 2000) (section 1106(a)(1) "supplements the fiduciary's general duty of loyalty"); *Felber v. Estate of Regan,* 117 F.3d 1084, 1087 (8th Cir. 1997) (fiduciary "must avoid engaging in prohibited transactions;" self-dealing breached both § 404(a) fiduciary duties and § 406 prohibited transaction rules); *FirsTier Bank N.A. v. Zeller,* 16 F.3d 907, 911 (8th Cir. 1994) (fiduciary has duty "to avoid prohibited transactions"); *Leigh,* 727 F.2d at 126 (Section 1106 is a "gloss" on duty of loyalty under Section 404). Accordingly, with the admission by all Defendants that they caused the Plan to pay for services that were solely for the benefit of corporate executives and ABB, Plaintiffs' motion under ERISA § 406 should be granted and Defendants' motions for summary judgment (under ERISA §§ 404 and 406) should be denied.

Defendants attempt to discount the gravity of their acts by characterizing their attempted, retroactive efforts as a "correction," which they still have not made but once made **still will not** make their prior representations to the Court true.[6] Interestingly, they gloss over the inescapable fact that their representations to the Court were and will always be false. Even if Defendants make a remedial payment in the future, despite this Court's authority over this case and Plaintiffs' claims, such does not change the fact that the prohibited payments were made in the first place. Indeed, rather than fix their misstatements to the Court, much less meet their fiduciary obligations and take responsibility for their actions, Defendants are attempting to circumvent this Court's authority on the eve of trial and limit their admitted damage to the Plans.

---

[6] The fact that the Plans paid for the services cannot be undone. The attempted creation of a new fact that ABB **may** make a payment to the Plans in an attempt to undo the prohibited payments does not change the record of what has occurred, which provides the facts for the Court to decide summary judgment.

5

At best, a payment to the Plans on the eve of a summary judgment ruling might arguably reduce the damages, but it cannot undo the violation of law that unquestionably occurred.

Fidelity Defendants' assertion that it innocently allowed the Plans to pay for these non-qualified plans is flatly contradicted by their own admissions that the Plans covered the non-qualified plans' administrative expenses of "receive[ing] contributions, process[ing] distributions, train phone reps, issue statements." Doc. 337, Ex. AA. Indeed, Fidelity's knowledge that the non-qualified plans were covered by the Plan was calculated and purposeful.[7] In any event, even if the Court accepts Fidelity's argument that it is merely a directed trustee, which it is not, when they, upon ABB's directions, removed assets of the Plan, for themselves, knowing that such action violated ERISA, Fidelity committed a prohibited transaction. *See Koch v. Dwyer*, 199 WL 528181, *10 (S.D.N.Y. July 22, 1999) (court denied defendant's motion to dismiss after finding that the directed trustee may have violated ERISA if it was aware that the direction from the plan fiduciary was in violation of ERISA); *Kling v. Fidelity Management Trust Co.,* 270 F.Supp.2d 121, 131-32 (D.Mass. 2003) (same).

### III. Defendants' Purported "Notice of Correction" Also Attempts to Circumvent the Authority and Direction of the Department of Labor, and the Internal Revenue Service.

The Department of Labor has set forth guidelines and standards with which fiduciaries must comply in order to voluntarily rectify a fiduciary breach. These standards are exacting and thorough, requiring fiduciaries to, among other things: (1) submit complete documentation of the improper charges; (2) submit documentation regarding lost earnings; (3) submit proof of payment; (4) pay all expenses related to repayment of improper charges and lost earnings; and

---

[7] App. 1176.     `Redacted`     *Id.*

6

(5) notify participants.[8] All of these things must be done under the penalty of perjury.[9] The breaches Defendants' admit to are multiple prohibited transactions and subject to a 15% excise tax under the Internal Revenue Code.[10] Defendants cannot escape liability or the responsibility to ensure that the Plans are properly made whole based on their characterization of what are indisputable prohibited transactions and breaches merely by describing them as a "mistake."[11] Even if Defendants were to comply with the directions of the DOL and the IRS (and they fail to state that they will do so), they cannot escape liability in this case. Defendants simply cannot recreate history or "put the toothpaste back in the tube" and have this Court make its summary judgment rulings on recreated "facts." What Defendants seek to do would be analogous to a defendant who breaks down a homeowner's door and ransacks her home, then denies his actions but later offers to replace the front door on the eve of summary judgment, arguing that doing so now makes his denials true. There simply is no authority for such a position and none is cited.

### IV. Defendants' Admissions Raise Serious Doubts Regarding the Accuracy and Validity of Defendants' Representations Regarding the Non-Qualified Plans

Despite Defendants' disingenuous attempts to describe their representations to the Court as somehow retroactively correct (once they make some unknown and secretly calculated payment to the Plans), the truth is Defendants blatantly misrepresented material facts to the Court worthy of Rule 11 review. These falsehoods permeate their responses to Plaintiffs' Statement of Undisputed Facts, Defendants' Counterstatements of Undisputed Facts, Defendants' Statement of Undisputed Facts, and arguments made opposing Plaintiffs' summary

---

[8] *See* http://www.dol.gov/ebsa/newsroom/fs2006vfcp.html (last visited October 28, 2009); attached as Exhibit A.
[9] *Id.*
[10] *Id.*
[11] Aside from skirting the Court's authority and that of the regulatory agency governing this area, Defendants completely fail to identify the specific items that were prohibited and to describe in detail their proposed method of "remedying" this problem and complying with DOL and IRS requirements.

7

judgment and supporting their own motions for summary judgment.[12] Defendants cannot "fix" these misrepresentations by taking insufficient action that even afterwards will not make their misstatements true.

Even if mistake were a defense to a prohibited transaction, which it absolutely is not, Defendants' actions belie any claim of good faith. First, someone with Fidelity and ABB had to consciously set up this arrangement for the invoices to be created and handled this way. Second, each time these invoices were submitted between January 2006 and the last one produced by Defendants for the second quarter of 2009, Fidelity would have had to make a mistake in doing so. Third, each time they were explicitly approved, ABB would have had to make a mistake in its supposedly multi-layered approval process. Fourth, each time Fidelity took the money for itself from Plan participants following ABB's sign off, Fidelity would have had to do so mistakenly.[13] Fifth, this pattern of "mistakes" would have to have been mistakenly repeated over more than 3.5 years to the date of the last invoice produced in this litigation. It defies credibility for Defendants to suggest that such a litany of improprieties was done inadvertently. Further, Defendants say nothing about annual audits of these accounts or payments. Either they failed to have annual audits performed, which itself would be a violation of the duty of prudence, or the auditors would have had to also make mistakes each year after this practice began.[14]

Further, apart from the fact that these admitted actions are further examples of a pattern of Defendants' use of the PRISM Plans for their own benefit, Defendants' characterization of the

---

[12] *See e.g* Doc. 285 at pp. 76, 77 ("Plaintiffs' cross-subsidization theory suffers from another, perhaps more fundamental, defect: The supposed subsidization did not involve plan assets."); Doc. 314 at pp. 2, 3, 11, 16, 17, 18, 21, 22, 28, 29, 32, 33, 37, 52, 53, 54, 55, 62, 63, 64, 65, 66, 67, 68; Doc. 321 at pp. 23, 24, 30, 40, 41, 42.

[13] As trustee, Fidelity has a duty, under ERISA, to avoid allowing illegal payments to be made from plan assets. *Koch v. Dwyer*, 199 WL 528181, *10 (S.D.N.Y. July 22, 1999) (court denied defendant's motion to dismiss after finding that the directed trustee may have violated ERISA if it was aware that the direction from the plan fiduciary was in violation of ERISA); *Kling v. Fidelity Management Trust Co.,* 270 F.Supp.2d 121, 131-32 (D.Mass. 2003) (same).

[14] It is noteworthy that this prohibited conduct occurred as late as August 2009. Since Defendants have not produced documents thereafter, neither Plaintiffs nor the Court can know whether these prohibited acts continue.

prohibited payments as an oversight and mistake is not supported by the very face of the documents. Each invoice contains indicia that ABB was very much aware of what it was approving before payment amounts were approved. For instance, the January 24, 2006, invoice contains a mark next to each dollar amount billed, a check mark next to each sub-total, and written approval to pay the total amount due from the H Account. Doc. 437, Ex. 1 Lockhart Decl. Another example involves an invoice dated March 1, 2007. Doc. 439, Tab A of Boyle Declaration. This invoice included a $2,000 charge for "ABB-Auto Enrollment." Apparently, upon ABB's review they felt for some reason this was an improper charge, contacted Fidelity, and the invoice was revised on March 16, 2007 with this charge removed. Doc. 437, Ex. 3 Lockhart Decl. Yet, having reviewed this invoice, ABB authorized prohibited charges on this same invoice to be paid by the Plan participants for the benefit of ABB's executives.[15] These charges were not removed. Finally, even the tortured explanations offered by Defendants for their false statements to this Court and for their illegal conduct, do not account for the full amount of improper charges. The descriptions vary widely but raise additional questions about the extent and the amounts of their prohibited charges.[16] These matters will have to be determined at trial.

**Conclusion**

Defendants' unprecedented attempt to undo what are now undisputed, prohibited transactions in violation of ERISA is not supported by any authority. Defendants have no ability

---

[15] Not surprisingly, the ABB executive, Michael Scarpa, who approved most invoices was a member of one of the non-qualified plan whose expenses were being covered by the PRISM Plans. App. 2026.

[16] The example described in Mr. Lockhart's declaration is typical: "Exhibit 5 contains an $8,000 charge for 'RSOCOMDCFAABB INCDCP Plan Fund Add.' Although I now understand that this charge related to services provided to the ABB, Inc. 2006 Deferred Compensation Plan. . .." Interestingly, Mr. Lockhart does not mention another charge on the same invoice that specifically says it is for the ABB Restoration Plan, which is another "free" plan for corporate executives. Plaintiffs' counsel attempted to replicate Defendants' calculations of prohibited charges, but without a full explanation of which specific charges are involved and what, if any, other amounts were added, it was not possible to verify Defendants' representations of the amounts involved. Doc. 437.

to rewrite history. Even if somehow done by mistake, prohibited transactions repeatedly occurred. Rather than being isolated mistakes, these actions now undisputed are consistent with a long history of Defendants using Plaintiffs' retirement savings for the benefit of themselves and ABB executives. Regardless of whether Defendants reimburse the Plans, as they say they will in the future, these admissions demonstrate that Defendants' statements in their summary judgment memoranda were false and destroy the foundation for Defendants' denial of prohibited transactions and violation of the duties of loyalty and prudence. Further, these admissions demonstrate that Plaintiffs' Motion should be granted and Defendants' Motions should be denied. Any further relief that the Court deems appropriate may be addressed at trial.

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON

By: /s/Jerome J. Schlichter
Jerome J. Schlichter
Daniel V. Conlisk
Troy A. Doles
Heather Lea
100 S. Fourth Street, Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (Fax)

ATTORNEYS FOR PLAINTIFFS/
CLASS REPRESENTATIVES

10

Case 2:06-cv-04305-NKL   Document 441-2   Filed 10/29/09   Page 10 of 11

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed on this 29th day of October, 2009 and will be delivered electronically by the CM/ECF system:

Thomas Wack
Lisa Demet Martin
Jeffrey S. Russell
Bryan Cave, LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102

Brian T. Ortelere
William J. Delaney
Catherine A. Cugell
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

Richard Bien
Adam B. Walker
Lathrop & Gage, L.C.
2345 Grand Boulevard, Ste. 2800
Kansas City, MO 64108

Bob Eccles
Stephen D. Brody
Shannon Barrett
Brian Boyle
O'Melveny & Myers, LLP
1625 I Street, NW
Washington, DC 20006

James S. Dittmar
James O. Fleckner
Goodwin Procter
53 State Street
Exchange Place
Boston, MA 02109

      /s/ Jerome J. Schlichter