UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

RONALD TUSSEY, et al.,

              Plaintiffs,

v.

ABB, INC., et al.,

              Defendants.

CIVIL ACTION
No. 06-CV-04305

(Judge Nanette K. Laughrey)

## FIDELITY DEFENDANTS' TRIAL BRIEF

M. Randall Oppenheimer
Robert N. Eccles
Brian D. Boyle
Shannon Barrett
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
*Admitted pro hac vice*

Richard N. Bien
Lathrop & Gage, L.C.
2345 Grand Boulevard, Suite 2800
Kansas City, MO 64108

James S. Dittmar
James O. Fleckner
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
*Admitted pro hac vice*

*Attorneys for Defendants Fidelity Management Trust Company
and Fidelity Management & Research Company*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION AND SUMMARY ......................................................................... 1

NATURE OF PLAINTIFFS' CLAIMS ....................................................................... 7

BACKGROUND ON 401(k) PLANS, MUTUAL FUNDS, AND REVENUE-SHARING ......... 8

DISCUSSION ....................................................................................................... 14

I.   THE FIDELITY DEFENDANTS HAD NO FIDUCIARY RESPONSIBILITY
     WITH RESPECT TO THE CONDUCT AT ISSUE ..................................................... 14

     A.   FMTC Did Not Have Or Exercise Fiduciary Control Over ABB's
          Investment Selections ...................................................................... 14

     B.   FMTC Cannot Be Held Liable As A Co-Fiduciary For ABB's Investment
          Selections ....................................................................................... 19

     C.   FMRCo. Is Not A Fiduciary Or Co-Fiduciary To The Plan In Any Respect ...... 21

II.  ABB'S INVESTMENT SELECTIONS WERE NOT IMPRUDENT OR
     DISLOYAL ........................................................................................................ 22

     A.   The IPS Was Neither Legally Binding Nor Violated .......................... 22

     B.   ABB's Investment Selections Did Not Impose Excessive Costs On The
          Plans ............................................................................................... 25

     1.   The ABB Plans' Lineup Did Not Cause The Plans To Incur Excessive
          Costs ............................................................................................... 25

     2.   The Plans Did Not Incur Excessive Costs From Investments With
          Revenue Sharing .............................................................................. 29

III. FIDELITY AND ABB DID NOT ENGAGE IN PROHIBITED
     TRANSACTIONS WITH THE PLAN OR PLAN ASSETS ........................................... 32

     A.   Plaintiffs' Prohibited Transaction Claims Fail Categorically Because
          Reasonableness Is A Complete Defense ........................................... 33

     B.   FMTC's Provision Of "TBO" Services To ABB Was Not "In Connection
          With" Its Compensation For 401(k) Services ..................................... 33

     C.   FMTC Did Not Provide Free Services To Non-Qualified Plans "In
          Connection With" Its Compensation For 401(k) Services .................. 35

     D.   "Revenue Sharing" Is Not A Prohibited Indirect Transfer Of Plan Assets
          To A Party In Interest ...................................................................... 36

IV.  ERISA'S STATUTE OF LIMITATIONS BARS ALL OR MANY CLASS
     MEMBERS' CLAIMS ENTIRELY AND LIMITS ALL DAMAGES ......................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Health Inc. v. Davila*,
    542 U.S. 200 (2004) ................................................................................................ 16

*Angell v. John Hancock Life Ins. Co.*,
    421 F. Supp. 2d 1168 (E.D. Mo. 2006) ................................................................. 40

*Braden v. Wal-Mart Stores, Inc.*,
    2009 WL 4062105 (8th Cir. 2009) ........................................................................ 26

*Brock v. Robbins*,
    830 F.2d 640 (7th Cir. 1987) ................................................................................. 28

*Brown v. Am. Life Holdings, Inc.*,
    190 F.3d 856 (8th Cir. 1999) ................................................................................. 38

*Brown v. Owens Corning Inv. Review Comm.*,
    2008 U.S. Dist. LEXIS 104153 (N.D. Ohio 2008) ............................................... 39

*Chaganti v. Ceridian Benefits Servs. Inc.*,
    208 F. App'x 541 (9th Cir. 2006) .......................................................................... 16

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
    474 F.3d 463 (7th Cir. 2007) ........................................................................... 15, 16

*Coleman v. Nationwide Life Ins. Co.*,
    969 F.2d 54 (4th Cir. 1992) ................................................................................... 15

*Curtiss-Wright Corp. v. Schoonejongen*,
    514 U.S. 73 (1995) ................................................................................................. 22

*Dame v. First Nat'l Bank of Omaha*,
    217 F.3d 1018 (8th Cir. 2000) ............................................................................... 24

*Difelice v. U.S. Airways, Inc.*,
    397 F. Supp. 2d 735 (E.D. Va. 2005) .................................................................... 20

*Donovan v. Cunningham*,
    716 F.2d 1455 (5th Cir. 1983) ............................................................................... 21

*Dupree v. Prudential Ins. Co. of Am.*,
    2007 WL 2263892 (S.D. Fla. 2007) ...................................................................... 28

*Eckelkamp v. Beste*,
    201 F. Supp. 2d 1012 (E.D. Mo. 2002) ................................................................. 15

*Edwards v. U.S. Dep't of Energy*,
    371 F. Supp. 2d 859 (W.D. Ky. 2005) ................................................................... 40

*F.H. Krear & Co. v. Nineteen Named Trs.*,
    810 F.2d 1250 (2d Cir. 1987) ................................................................................ 15

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Finkel v. Romanowicz*,
    577 F.3d 79 (2d Cir. 2009) ................................................... 15

*Firestone Tire & Rubber Co. v. Bruch*,
    489 U.S. 101 (1989) .............................................................. 18

*Frommert v. Conkright*,
    433 F.3d 254 (2d Cir. 2006) ................................................. 39

*Halbach v. Great-West Life & Annuity Ins. Co.*,
    561 F.3d 872 (8th Cir. 2009) ................................................ 18

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ................................... 16, 21, 26

*Heinglein v. Colt Indus. Operating Corp.*,
    260 F.3d 201 (3d Cir. 2001) ................................................. 40

*In re Honda of Am. Mfg. ERISA Fees Litig.*,
    2009 U.S. Dist. LEXIS 95087 (S.D. Ohio 2009).................... 26

*In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*,
    434 F. Supp. 2d 233 (S.D.N.Y. 2006) ................................... 29

*In re Morgan Stanley & Van Kampen Mutual Fund Sec. Litig.*,
    2006 U.S. Dist. LEXIS 20758 (S.D.N.Y. 2006)..................... 29

*Johnson v. Georgia-Pacific Corp.*,
    19 F.3d 1184 (7th Cir. 1994) ................................................ 16

*Kanawi v. Bechtel Corp.*,
    590 F. Supp. 2d 1213 (C.D. Cal. 2008) ................................ 40

*Keach v. U.S. Trust Co.*,
    240 F. Supp. 2d 840 (C.D. Ill. 2002) .................................... 20

*Landro v. Glendenning Motorways, Inc.*,
    625 F.2d 1344 (8th Cir. 1980) .............................................. 18

*Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*,
    982 F.2d 1031 (6th Cir. 1993) .............................................. 16

*Loomis v. Exelon Corp.*,
    2009 WL 4667092 (N.D. Ill. 2009) ...................................... 26

*Marks v. Independence Blue Cross*,
    71 F. Supp. 2d 432 (E.D. Pa. 1999) ...................................... 17

*Martin v. Ark. Blue Cross & Blue Shield*,
    299 F.3d 966 (8th Cir. 2002) ................................................ 18

*Martin v. Consultants & Adm'rs, Inc.*,
    966 F.2d 1078 (7th Cir. 1992) .............................................. 39

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Martin v. Feilen*,
965 F.2d 660 (8th Cir. 1992) ..................................................................... 20

*Pegram v. Herdrich*,
530 U.S. 211 (2000)..................................................................................... 14

*Phillips v. Alaska Hotel & Rest. Employees Pension Fund*,
944 F.2d 509 (9th Cir. 1991) ..................................................................... 40

*Roberts v. Source for Public Data*,
2009 U.S. Dist. LEXIS 107057 (W.D. Mo. 2009) ..................................... 38

*Roth v. Sawyer-Cleator Lumber Co.*,
16 F.3d 915 (8th Cir. 1994) ....................................................................... 28

*Seaway Food Town, Inc. v. Med. Mut. of Ohio*,
347 F.3d 610 (6th Cir. 2003) ..................................................................... 16

*Shirk v. Fifth Third Bancorp.*,
2009 U.S. Dist. LEXIS 90775 (S.D. Ohio 2009)................................... 38, 39

*Taylor v. United Techs. Corp.*,
2009 WL 535779 (D. Conn. 2009) ............................................................. 29

*Taylor v. United Techs. Corp.*,
2009 WL 4255159 (2d Cir. 2009) .............................................................. 30

*Tibble v. Edison Int'l*,
639 F. Supp. 2d 1074 (C.D. Cal. 2009) ..................................................... 40

*Van Vels v. Betten*,
2007 U.S. Dist. LEXIS 7003 (W.D. Mich. 2007)........................................ 28

*Varity Corp. v. Howe*,
516 U.S. 489 (1996)..................................................................................... 16

*Vega v. Nat'l Life Ins. Servs. Inc.*,
145 F.3d 673 (5th Cir. 1998) ..................................................................... 16

*Vega v. Nat'l Life Ins. Servs. Inc.*,
188 F.3d 287 (5th Cir. 1999) (en banc) ..................................................... 16

*Wright v. Heyne*,
349 F.3d 321 (6th Cir. 2003) ..................................................................... 39

*Wsol v. Fiduciary Mgmt. Assocs., Inc.*,
266 F.3d 654 (7th Cir. 2001) ..................................................................... 28

*Young v. G.M. Inv. Mgmt. Corp.*,
550 F. Supp. 2d 416 (S.D.N.Y. 2008) ................................................... 38, 39

*Young v. G.M. Inv. Mgmt. Corp.*,
325 F. App'x 31 (2d Cir. 2009) ............................................................. 26, 39

# TABLE OF AUTHORITIES
(continued)

**Statutes and Regulations**

15 U.S.C. § 80a-7 ........................................................................................ 27

15 U.S.C. § 80a-8 ........................................................................................ 27

15 U.S.C. § 80a-9 ........................................................................................ 27

15 U.S.C. § 80a-14 ...................................................................................... 27

15 U.S.C. § 80a-15(c) .................................................................................. 11

15 U.S.C. § 80a-18(f) .................................................................................. 12

15 U.S.C. § 80a-22 ...................................................................................... 12

15 U.S.C. § 80a-30 ...................................................................................... 27

26 U.S.C. § 401(k) ........................................................................................ 8

29 U.S.C. § 1002(21)(A) ........................................................................ 15, 16

29 U.S.C. § 1101(b)(1) ................................................................................ 21

29 U.S.C. § 1102(b)(3) ................................................................................ 23

29 U.S.C. § 1103(a) ...................................................................................... 20

29 U.S.C. § 1104 .......................................................................................... 14

29 U.S.C. § 1105 ................................................................................ 8, 19, 20

29 U.S.C. § 1106 .......................................................................................... 33

29 U.S.C. § 1108 .......................................................................................... 33

29 U.S.C. § 1113 .................................................................................... 38, 40

17 C.F.R. § 270.0-1(a)(7) ............................................................................ 11

17 C.F.R. § 270.2a-4(a)(4) .......................................................................... 12

17 C.F.R. § 270.18f-3 .................................................................................. 12

17 C.F.R. § 270.22c-1(b)(1) ........................................................................ 27

17 C.F.R. § 270.30a-2 .................................................................................. 27

17 C.F.R. § 270.38a-1(a) ............................................................................. 27

26 C.F.R. § 1.162-7(b)(3) ............................................................................ 28

29 C.F.R. § 2509.08-2 .................................................................................. 23

**Other Authorities**

DOL Advisory Opinion 97-16A (May 22, 1997) ........................................ 17

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

DOL Advisory Opinion 2009-4a (Dec. 4, 2009) .......................................................... 22

DOL, 401(k) Fiduciary Education Campaign .......................................................... 26

H.R. Rep. No. 1280, 93rd Cong., 2d Sess. 308 (1974) ........................................ 20, 22

SEC No Action Letter, Investment Company Institute, Oct. 30, 1998 ........................................ 13

Defendants Fidelity Management Trust Company ("FMTC") and Fidelity Management

Research Company ("FMRCo.") (collectively "the Fidelity Defendants") respectfully submit this

trial brief in anticipation of the bench trial commencing January 5, 2010.

## INTRODUCTION AND SUMMARY

FMTC, with certain affiliates (collectively "Fidelity"), is one of the nation's leading

providers of 401(k) plan services to plans sponsored by large employers. FMTC provides a huge

array of 401(k) services, which requires a massive investment in infrastructure: computer data

systems; customized participant websites; phone services; an investment platform that supports

literally thousands of Fidelity and non-Fidelity investment options; and, most importantly, a

large, highly trained and experienced staff. The large plan market poses very significant

challenges, both in terms of sheer capacity demands and in terms of the greater complexity of

large plans. FMTC has a number of strong, well-known competitors in this market, and must

compete on service offerings, quality, and price.

Plaintiffs are a class of plan participants in 401(k) plans sponsored by FMTC's co-

defendant ABB. Plaintiffs' claims at their core challenge the selection of investment options in

the ABB Plans' lineup. Plaintiffs allege that ABB acted imprudently and disloyally in selecting

its investment lineup, because it included not only low-cost investment options, but also higher-

cost mutual funds, which caused the plans to incur unlawfully excessive costs.

Plaintiffs assert these claims both against the fiduciaries appointed by ABB to exercise

responsibility over the selection of investment options for the ABB Plans, and against FMTC, the

plans' directed trustee and recordkeeping service provider. Even though FMTC had no authority

over investment selections, plaintiffs contend that FMTC nevertheless controlled ABB's

selection of options, and effectively forced ABB to include in the plan lineup unlawfully costly

mutual funds, because of the "asset based" compensation they provided for Fidelity. (Plaintiffs also assert claims against FMRCo., but they have yet to explain what fiduciary role FMRCo. played in the conduct they challenge.)

Asset-based compensation is very common; ABB and FMTC here agreed that most of FMTC's compensation for providing services to the ABB Plans would be asset-based. In an asset-based compensation model, the plan recordkeeper charges the plan very low (or zero) fixed per-participant fees, and is paid instead through service contracts with the entities that manage or service the funds offered by the plan. Outside funds' managers are willing to "share" revenue they have earned from providing services to the mutual funds, because plan recordkeepers provide recordkeeping and other services to the plan participants who invest in the funds, and thereby relieve the fund managers of the obligation to provide services to those same investors. For mutual funds affiliated with the recordkeeper, the concept is the same—the fund manager (or its affiliates) need not collect extra for services provided to participants who invest in the fund.

Nearly all investment management services to 401(k) plans in the U.S. are paid for by asset-based fees. Recordkeeping services are paid for in a variety of ways, of which asset-based mechanisms have been the most common during the time period at issue in this case. When the services to a 401(k) plan are largely paid for by asset-based fees, the investment selection decision *is*, in effect, the cost and pricing decision, because under this type of structure, the amount paid for services to the plans is a function of the fees assessed by the investment managers of each of the investments in the plan. Because different investment options charge different fees, a choice of investment option is necessarily a cost decision as well as a decision about the merits of the investment. Plaintiffs' primary contention is that ABB's investment

selections were unlawful because they included mutual funds, the cost of which is higher than plaintiffs deem appropriate.

To hold ABB or FMTC liable for the widely accepted 401(k) structure that plaintiffs attack here would diminish participant choices nationwide and involve the courts in 401(k) plan rate-making to an extent unimagined by the Congress that enacted ERISA.

The first specific flaw in plaintiffs' theory, from the perspective of Fidelity in particular, is that Fidelity neither had nor exercised any authority over ABB's selection of investment options. The parties' Trust Agreement, which defines the terms under which FMTC provides recordkeeping and trustee services, limits FMTC to ministerial duties and expressly prohibits FMTC from exercising any authority over investment selections. To be sure, ABB's authority to select the options to be serviced by FMTC is not unlimited—the Agreement itself defines the options. But that contractual limitation reflects no fiduciary responsibility on FMTC's part. Under settled law, a plan service provider does not act in a fiduciary capacity when negotiating (and amending) the terms of the trust agreement pursuant to which it will provide services to the plan. FMTC thus engages in no fiduciary activity when it negotiates for adjustments to its compensation based on changes in the investment lineup it is required to service.

The Court's summary judgment ruling, however, finds that a triable issue existed as to Fidelity's fiduciary status, on the basis of plaintiffs' theory that § 4(b) of the Trust Agreement gave FMTC a discretionary "veto" over ABB's power to select investment options. Plaintiffs' theory is incorrect, as the evidence will show. As an initial matter, plaintiffs' reading is directly at odds with the many provisions prohibiting FMTC from exercising any authority over investment selections. And on its face § 4(b) does not operate as a "veto." It simply provides that ABB may "add additional investment options" to the lineup initially prescribed in the

3

Agreement "with the consent of [FMTC] and upon mutual amendment of this Trust Agreement and the Schedules thereto."  While that language refers to FMTC's "consent" to *additions*, it does not permit FMTC to reject ABB's *deletion* of options—the power that would matter most if FMTC wanted to control ABB's power to reduce its compensation.  Nor does the provision even authorize FMTC to prevent ABB from *adding* options to the lineup offered to plan participants— it relates only to the options that FMTC *agrees to service*.  ABB remains entirely free to provide other options not serviced by Fidelity.  And uncontradicted evidence will show that the parties to the Agreement understood the meaning of this provision to be exclusively operational:  FMTC could withhold consent to a new option under this provision only if the option was not operationally compatible with Fidelity's recordkeeping platform.

 The parties' course of performance confirms ABB's exclusive authority over investment selections in numerous other ways.  During the past decade Fidelity identified 40 different funds to ABB's staff for possible inclusion in the lineup, yet ABB chose just *one* of them—and ABB chose 27 other funds, *none* of which Fidelity suggested.  And over time, ABB chose almost exclusively non-Fidelity funds (24 of the 27 added), consistently *reducing* the asset-based compensation Fidelity received—underscoring Fidelity's lack of control over ABB's decisions.

That process resulted in what was very much a model plan, with virtually no fixed per-participant fees, and a broad and diverse range of investment options to choose from, including a number of exactly the type of low-cost options—such as non-mutual-fund commingled pools and index or "passive" options—that plaintiffs are demanding here.  Hence the second problem with plaintiffs' theory:  ABB's plan lineup was wholly reasonable—well within the range of what other prudent fiduciaries in similar situations offered throughout the period of this case.  The ABB Plans offered participants a wide variety of different "asset class" options, some more

4

costly than others. For instance, international funds generally are more expensive than domestic funds; stock funds generally are more expensive than bond funds; small company funds generally are more expensive than larger company funds; and so on. Individual participants place different values on these options: some participants, for example, prefer to diversify internationally rather than remain limited to domestic investments. When ABB was considering adding an investment option in a given asset class, it did not consider cost to be the sole criterion, but cost played an important role in the selection process. ABB generally chose only options at or below the median cost for their asset classes.

The ABB Plans also offered different types of investment vehicles, which are also valued differently by different investors. Mutual funds, for example, offer a familiar investment structure, transparency, and substantial regulatory protections, making them preferable to many investors over less familiar, less transparent, and less regulated non-mutual-fund investments, such as commingled pools and separate accounts. Similarly, some investors want their investments (or a portion of their investments) to be actively managed; others are satisfied with less costly index-tracking management alone.

Whether various investment options are "worth" the benefits and associated costs are fundamentally judgment calls—ones made by plan fiduciaries throughout the country. What they all recognize—and what the Department of Labor and the courts also recognize—is that price alone cannot be the sole metric for determining whether a given investment option should be offered to participants. Plaintiffs offer no criteria that this Court—or any other—could apply in making judgment calls about the relative costs and merits of the investment options in dispute. (The opinion proffered by plaintiffs' expert, for example, that SEC regulation of mutual funds is worth nothing to investors, is not a criterion a court can take seriously.) ABB's investment

lineup includes all the types of options plaintiffs themselves say should be included in a prudent plan, as well as others which plaintiffs' experts may disdain but the ABB Plans' participants themselves wished to have, and which were widely chosen by fiduciaries to other large plans.

Another judgment call made by the Plans' fiduciaries that plaintiffs want the Court to second-guess is the judgment about where on the spectrum of service quality the plan should fall—should the participants receive (and pay for) barebones, minimal service, or the highest quality service available, or something in between?  The DOL and the courts have acknowledged that cost is only one factor, and that the level and quality of service must be evaluated along with the costs.  Such decisions are clearly the province of each plan's fiduciaries—they are in the best position to evaluate the balance between cost and service they and their plan participants desire.

The critical and insurmountable hurdle faced by plaintiffs is that the ABB Plans did not incur excessive costs for the services they received.  Because of the asset-based compensation mechanism, the ABB Plans' total costs were driven by two factors:  the options ABB selected for inclusion in the Plans, and participants' own choices from among those options.  As noted above, ABB by and large chose only investment options that were priced at or below median for their asset class and type.  Under asset-based compensation, the greater the number of participants who choose to invest in funds of a more expensive asset class and type, the higher the total plan cost will be, even though participants who chose lower cost investments would not be paying a *single cent* more for their services.  To be sure, if a plan selected a menu of only high-cost options, it would experience significant total plan costs, but because ABB did *not* limit participants to high-cost options, and participants chose a variety of options, its total plan cost was always at or near the median compared to other comparably-sized plans.  ABB, in short, offered participants Plans with high-quality recordkeeping and other services provided by a

market leader, investment options squarely within the mainstream of similar plans, at total costs equally within the mainstream.

That record defeats what has come to be plaintiffs' final theory of the case, *viz.*, that FMTC somehow managed to corrupt ABB's investment fiduciaries into selecting investment options not because they would benefit participants, but because they would increase FMTC's asset-based compensation. That theory, implausible enough on its face, becomes wholly untenable when one considers the overwhelming, undisputed record of ABB's independence, professionalism and diligence in researching, selecting and reviewing investment options. If FMTC corrupted and thus controlled ABB in order to increase Fidelity's compensation, ABB would not have consistently refused to accept funds suggested by FMTC, it would not have consistently added non-Fidelity funds that reduced FMTC's compensation, and it would not have offered participants precisely the type of low-cost options that plaintiffs here demand. Plaintiffs relatedly argue that FMTC corrupted ABB into retaining FMTC as the 401(k) Plans' service provider by offering separate corporate recordkeeping services to ABB at a discount, but there is no evidence that ABB made any decisions concerning FMTC's plan-related services on the basis of other, normal business relationships between the parties.

The sum of the matter is this: FMTC did not control ABB's investment selections, and there is no basis for inferring that the selections were imprudently costly or disloyally driven by an interest in increasing FMTC's compensation, rather than by an interest in securing a diverse range of reasonable investment options for participants to choose from.

## NATURE OF PLAINTIFFS' CLAIMS

As the Court's summary judgment ruling recognizes, the gravamen of plaintiffs' allegations is that ABB entered into an "imprudent or disloyal contract with [FMTC] to provide

record keeping and other administrative services to the plan." SJ Ruling 6. Plaintiffs allege three distinct but related theories of fiduciary breach. *First*, plaintiffs assert a "procedural prudence" claim—ABB did not follow the Investment Policy Statement ("IPS") and failed to monitor the costs the Plans incurred for recordkeeping and investment management services. *Id.* at 7. *Second*, plaintiffs assert a "substantive prudence" claim—the Plans' costs were excessive. *Id. Third*, plaintiffs assert a "prohibited transactions" claim—ABB and Fidelity caused the Plans "to engage in a transaction they knew or should have known constituted a direct or indirect transfer of fund assets to [FMTC] and/or ABB." *Id.*

The Court's ruling also recognizes that there is an issue antecedent to the question whether the Fidelity Defendants breached fiduciary duties: whether the Fidelity Defendants can be held liable as fiduciaries for ABB's allegedly unlawful selection of plan investment options, either because the Fidelity Defendants themselves possessed discretionary control over those selections, or because they can be held liable for ABB's conduct under ERISA's "co-fiduciary liability" provision, ERISA § 405(a)(3).

## BACKGROUND ON 401(k) PLANS, MUTUAL FUNDS, AND REVENUE-SHARING

To help address the disputed issues at trial, this section provides background on 401(k) plans and the investment options, including mutual funds, commonly offered in such plans.

### *401(k) Plans*

The ABB Plans are typical of "defined contribution" plans established under Section 401(k) of the Internal Revenue Code, 26 U.S.C. § 401(k). Employees who choose to participate in the 401(k) plan and former employees who choose to remain in the plan (commonly referred to as the plan's "participants") make pre-tax contributions from their salary or wages, and their contributions are matched (up to a certain amount) by additional contributions from ABB. These

contributions are allocated to individual participant accounts maintained by the Plans. ABB's

Pension Review Committee (the "PRC"), as "Named Fiduciary," selects the investment options

(or investment "lineup") that are made available under the Plans. Participants then select from

that lineup the investments into which their accounts are invested, and have the right to make

exchanges between investment options. The value of the account is permitted to grow tax-free

until the employee retires or makes withdrawals. Participants are also allowed to engage in other

transactions, such as tax-free loans and rollovers to certain other retirement accounts.

*401(k) Plan Services*

Generally speaking, providing employees a 401(k) plan requires the provision of—and

compensation for—two distinct types of services: administrative services (including but not

limited to recordkeeping) and investment management services. Both types of services are paid for

by the fees that are at issue in this case.

*Administrative services.* Operation of a 401(k) plan requires a variety of administrative

services, including tracking the account balances of the individual participants, managing the

payroll deductions associated with employee contributions, processing participants' elections,

moving their accounts into and out of the Plans' various investment options, communicating plan

and investment information to participants, preparing participant account statements, providing

educational services on investing and preparing for retirement, performing the complex tests

necessary to ensure compliance with tax qualification requirements, providing directed trustee

duties or maintaining custody of the plans' assets, issuing disbursements, and providing tax

reporting. These services are sometimes referred to simply as "recordkeeping," although they

are often far more extensive than mere recordkeeping. Plan sponsors often retain a single entity

to provide all these services to the plan and its participants, and that entity of course must be

compensated for providing such services. Plan sponsors often seek to increase employee participation rates and contribution amounts, so as to increase employee satisfaction and to get the most out of their sponsorship of the program; they care about service quality for the same reasons. To that end, the quality of the recordkeeper's communications program and other participant services, including telephone service and web-based communications and transactions, may be quite important to both sponsors and participants.

*Investment management services.* The investment options offered in the 401(k) plan require investment management. Investment management may include such tasks as the investment advisor's research and selection of stocks or bonds and the trading of those investments. For mutual funds, investment management fees may also cover costs of regulatory compliance, reporting, and certain shareholder services.

Like all 401(k) plan sponsors, ABB could choose from many thousands of different investment options to offer participants as choices in the Plan's investment lineup. The ABB Plans offered both mutual funds and non-mutual-fund options (including commingled pools and separately managed accounts), and they offered both actively and passively managed funds in many different asset classes.

Mutual funds, commingled pools and separately managed accounts are vehicles for pooling the contributions of many investors and for paying an investment manager to invest the money in a diversified basket of underlying investments, usually stocks or bonds. They fall into a number of categories relevant to this case:

> 1. *Actively or passively managed*. Some investment options are described as "actively managed," meaning that an investment manager attempts to use asset-management skills with the objective of seeking capital appreciation and/or current income. Active management also provides the opportunity to exceed the performance of a relevant market index, and/or to moderate risk associated with following a single index. Other options are "passively managed," and seek

merely to mimic an established market index (up or down). Because actively managed funds must invest in research and stock selection in an effort to achieve their objectives, they are typically more costly to manage and more expensive than passively managed investments.

2.  *Asset category*. Each investment option generally focuses on a particular category of investment. Common categories include stocks or bonds, international or domestic, large or small companies.

3.  *Registered (i.e., mutual funds) or unregistered*. Mutual funds are registered with the Securities and Exchange Commission under the Investment Company Act, and subject to extensive regulatory requirements discussed below. Unregistered products in the 401(k) market are simply securities accounts, such as an account at a bank, broker or trust company, that are managed for a single plan sponsor or institutional investor ("separate accounts") or for many ("commingled pools").

Mutual funds and unregistered products have a number of functional similarities, but mutual funds are subject to many additional oversight and reporting requirements. Every investor in a mutual fund thus receives a variety of services required to manage and administer the fund. Each mutual fund typically is a distinct corporate entity, organized under state law as either a corporation or a business trust. Like a traditional operating company, mutual funds have officers and are overseen by a board of directors or board of trustees, a majority of whom SEC regulations require to be independent. *See* 17 C.F.R. § 270.0-1(a)(7). Unlike traditional operating companies, however, mutual funds generally do not have employees or facilities of their own. Rather, mutual funds typically contract with service providers to manage the fund, i.e., to invest fund assets and carry out other business and operational activities. The fund's principal contracts with its service providers must be reviewed and approved annually by the fund's board of directors. *See* 15 U.S.C. § 80a-15(c).

The mutual fund's key service provider is the fund's investment adviser, which provides the fund with investment advisory services, such as researching potential investments, choosing which stocks and other investments to buy and sell, and executing trades on behalf of the fund,

as well as a broad range of compliance and operational support. A mutual fund also requires various recordkeeping or "transfer agent" services related to shareholder transactions, and an array of other services relating to pricing and bookkeeping. (For simplicity, we will refer to the mutual fund's service providers as the "investment adviser," although some services may be provided by the adviser's affiliates or even by third-party independent contractors.)

Mutual funds, of course, must pay for the foregoing management and administrative services. The fees for such services are paid out of assets in the fund. The total fees are reported as a percentage of the assets under management; that percentage is referred to as the fund's "expense ratio." Thus, a fund with an "expense ratio" of .50% is paying .50% of the total value of its assets per year as fees for these services. (Because mutual fund fees are often less than one percent, they are typically quoted in "basis points"—.50% equals 50 basis points.) As required by detailed SEC regulations, every fund's expense ratio is disclosed to investors in plain English, in accordance with a prescribed format, in the fund's prospectuses and other public filings.

It is common for investors in a mutual fund to receive administrative services from an entity other than the fund's own investment adviser—such as when plan participants receive statements and investor communications from the plan's recordkeeper rather than from the mutual fund's adviser. In such cases, even though the mutual fund's investment adviser no longer has to bear the costs of performing those services (because the services are being performed by the plan's recordkeeper), the investment adviser nevertheless *cannot* waive or discount its fees to the plan participants, because federal law requires mutual funds to charge the same fees to every investor in the same share class. *See* 15 U.S.C. §§ 80a-18(f), 80a-22; 17 C.F.R. §§ 270.2a-4(a)(4), 270.18f-3. The investment adviser instead compensates the plan recordkeeper for providing services to plan participants by entering into an asset-based service

contract, in effect "sharing" part of the revenue the adviser receives from the funds. This practice, called "revenue sharing," has been acknowledged by the SEC as a legitimate adviser expense. *See* SEC No Action Letter, Investment Company Institute, Oct. 30, 1998.[1]

<u>Compensation for 401(k) Plan Services</u>

There are essentially two basic models for paying for administrative services to the plan and its participants: fixed fees and asset-based fees.

Fixed fees are typically set as a particular dollar amount charged for each participant or for each transaction. Fixed fees are sometimes used when the plan sponsor uses one provider exclusively for recordkeeping and different providers for investment management. In such "recordkeeping only" arrangements, the plan's recordkeeper typically assesses a charge on a per-participant basis. The total amount of fixed fees charged, however, may be offset dollar-for-dollar by revenue sharing received by the recordkeeper in connection with the plan's investment options. Pure recordkeeping only—unaffected by revenue sharing—is much less common.

Asset-based fees are paid as a percentage of the assets invested in the plan's investment options. This is frequently accomplished through revenue sharing: as described above, the recordkeeper is compensated for its plan administrative services by the advisers to the funds in which participants invest. Revenue-sharing occurs routinely in the 401(k) context, because the plan's recordkeeper normally provides participants recordkeeping and certain communication services (among other things) that the mutual fund's investment adviser would otherwise be required to provide (for example, distributing prospectuses, annual reports, and other SEC-required communications). Indeed, shifting these duties to the plan's recordkeeper can be

---

[1] Some mutual funds also carry a distinct, disclosed fee for distribution and related shareholder services, known as a "12b-1 fee" (after the SEC rule governing such fees). Such fees are paid directly from fund assets to those performing such services for the fund or its investors, including plan recordkeepers when appropriate.

especially advantageous for mutual funds, because it allows them essentially to deal with scores or hundreds or thousands of shareholders as a single investor—the plan—while the plan's recordkeeper handles records and communications for each participant individually.

Asset-based fees are often the basis for compensation in "bundled" service arrangements, where a single provider arranges for both recordkeeping and investment advisory services.   The provider may provide both the recordkeeping services and the investment options, or it may provide access to options managed by an unaffiliated third party.  Either way, if the service provider is providing both recordkeeping services and access to investment options, the arrangement is "bundled."  The bundle Fidelity provided to ABB included recordkeeping services and access to both Fidelity and non-Fidelity funds.  Where a single company (or family of companies) provides both types of services in a bundled arrangement, there may be no actual "revenue sharing" between the mutual fund's investment advisor and the plan's recordkeeper— that is, no actual transfer of money from the fund adviser (e.g., FMRCo.) to the recordkeeper (e.g., FMTC).  The vast majority of Fidelity's compensation for all services to the ABB Plans has been asset-based.  Fidelity receives revenue sharing from the non-Fidelity investment options in which the plans are invested.

**DISCUSSION**

**I.     THE FIDELITY DEFENDANTS HAD NO FIDUCIARY RESPONSIBILITY WITH RESPECT TO THE CONDUCT AT ISSUE**

**A.     FMTC Did Not Have Or Exercise Fiduciary Control Over ABB's Investment Selections**

Under ERISA § 404, a person may be held liable for conduct alleged to be a breach of fiduciary duty only if that person had fiduciary responsibility for *that particular conduct*, even if the person had fiduciary responsibility over some other aspect of the plan.  *Pegram v. Herdrich*,

530 U.S. 211, 225-26 (2000); *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 471-72 (7th Cir. 2007); *Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 61 (4th Cir. 1992); *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1258-59 (2d Cir. 1987). Accordingly, to hold either Fidelity Defendant liable as a fiduciary, plaintiffs must demonstrate that each was acting as a fiduciary to the ABB 401(k) Plans in undertaking the conduct challenged by plaintiffs. *Pegram*, 530 U.S. at 225-26; *Eckelkamp v. Beste*, 201 F. Supp. 2d 1012, 1022 (E.D. Mo. 2002).

The summary judgment ruling focused on plaintiffs' argument that the Trust Agreement gives FMTC discretionary veto authority over ABB's investment selections, because the Agreement provides that ABB may add to the investment options to be serviced by FMTC under the Agreement only with Fidelity's consent and by mutual amendment of the Agreement. SJ Ruling 5. Plaintiffs' theory misconstrues both the relevant ERISA fiduciary status provisions and the Agreement's "consent" provision.

1. The summary judgment ruling invokes ERISA § 3(21)(A)(iii), which requires that the entity *possess* "discretionary responsibility in the *administration* of the plan," as compared to § 3(21)(A)(i), which requires the entity to *exercise* discretionary authority over the "management or disposition of plan assets." According to the ruling, FMTC is a fiduciary under subsection (iii) because it possesses discretionary power over the plan, even if FMTC does not exercise it.

Subsection (iii), however, applies only to plan *administration*, which does *not* include the selection of plan investment options. That function is governed by subsection (i), which applies to the *management and disposition* of plan assets. *See Finkel v. Romanowicz*, 577 F.3d 79, 86 (2d Cir. 2009) (ERISA § 3(21)(A)(i) "refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on"

(quotation and alteration omitted)); *accord Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1189 (7th Cir. 1994). The plan administration functions governed by subsection (iii), by contrast, involve ongoing plan operational issues affecting participants and their benefits, such as participant communications, construction of plan documents, and claims determinations. Courts have construed administrative power under subsection (iii) only to encompass such day-to-day operational functions, *not* the investment of plan assets.[2]

It is no answer to say that, because investment selections affect Fidelity's compensation for administrative services under the asset-based compensation structure, the function of plan administration must include the function of investment selection. It does not. The investment options that Fidelity must service are not selected on a day-to-day operational basis; they are specified and mutually agreed to in the Trust Agreement. That Agreement also establishes the basis on which Fidelity is compensated for servicing those options. It is settled that a service provider does not act in a fiduciary capacity when it negotiates the contract (or amendments thereto) that establishes the terms of its retention, including compensation. *See Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009); *Caremark*, 474 F.3d at 473; *Seaway Food Town, Inc. v. Med. Mut. of Ohio,* 347 F.3d 610, 618-19 (6th Cir. 2003); *Marks v. Independence Blue Cross*,

---

[2] *See, e.g.*, *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220 (2004) (fiduciary made "a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan document" (internal quotation omitted)); *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) (employer exercised "administrative power" when it conveyed information about the likely future of plan benefits, thereby permitting beneficiaries to make informed choice about continued participation); *Chaganti v. Ceridian Benefits Servs. Inc.*, 208 F. App'x 541, 547 (9th Cir. 2006) ("[T]o qualify as a fiduciary, a plan administrator must have the discretion to interpret provisions of the plan document and to make final decisions, even in the face of dispute, as to eligibility and benefits."); *Vega v. Nat'l Life Ins. Servs. Inc.*, 145 F.3d 673, 677 n.24 (5th Cir. 1998) (insurance company was fiduciary because trust document gave it power to "determine the right of any person to a benefit in accordance with the master policy" and "complete discretion in making such determinations which includes plan coverage, claims payments or plan interpretation"), *on reh'g on other grounds*, 188 F.3d 287 (5th Cir. 1999) (en banc); *Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1035 (6th Cir. 1993) ("When an insurance company administers claims for an employee welfare benefit plan and has authority to grant or deny the claims, the company is an ERISA 'fiduciary' under 29 U.S.C. § 1002(21)(A)(iii).").

71 F. Supp. 2d 432, 436 (E.D. Pa. 1999).  Accordingly, Fidelity's negotiation over which investment options it will service, at what price, does not transform ABB's function of selecting the options it wants to provide to its plan participants into an administrative function subject to discretionary authority on Fidelity's part.

The Department of Labor's Advisory Opinion 97-16A (May 22, 1997) is instructive. That opinion addressed a plan service provider that actually had authority to *change investment options* on the menu offered by the plan, giving the plan sponsor 120 days to decide whether to reject the change and retain a different service provider.  The Department explained that the provider in those circumstances did *not* have fiduciary responsibility over the plan's investment options, because the plan sponsor always retained the sole discretion over its lineup, which the sponsor could exercise by terminating the provider's services whenever the plan sponsor objected to the provider's lineup change.  FMTC, of course, has much *less* authority than the provider in Advisory Opinion 97-16A—FMTC cannot unilaterally add options to the lineup on a take-it-or-leave it basis, much less change existing options.  Only ABB can change the lineup; FMTC at most can terminate the contractual servicing relationship (which does not have a fixed term) if changes required by ABB defeat FMTC's compensation and other objectives.  But as shown above, negotiating the contractual relationship through which FMTC provides services—including amending or terminating that relationship—is not a fiduciary act in any way.

2.  Even as a matter of basic contract interpretation, the provision plaintiffs cite is not a discretionary veto over ABB's investment selections, for numerous reasons.  Under the federal common law that governs interpretation of ERISA plan documents, the provision must be

17

interpreted in light of its context, past usage, and the parties' mutual understanding as revealed by their course of performance under the provision.[3]

First, the provision gives FMTC no authority over the *elimination* of funds from the ABB Plans' lineup. If the parties wanted to permit FMTC to control ABB's selections by vetoing its choices, they would have permitted FMTC to "veto" deletions as well. Yet FMTC has no authority to prevent the elimination of options, as was shown when ABB eliminated the Fidelity Magellan fund. Second, the provision does not even give FMTC the right to "veto" the *addition* of new options to the lineup offered to participants in the ABB Plans—the provision refers only to options for which FMTC agrees to provide recordkeeping services. ABB was free to provide different options serviced by a different recordkeeper.

Third, construing the provision as conferring discretionary control over investment selections would contradict other provisions of the Agreement. Plaintiffs' discretionary veto reading of the consent provision would override § 4(a) of the Agreement, which expressly denies FMTC any responsibility over selection of investment options; the Agreement's recitals, which states that FMTC's services are to be "purely ministerial in nature" (Trust Agmt., p. 2); and the service schedule, which states that FMTC "will provide only the recordkeeping and administrative services set forth on this Schedule 'A' and no others" (*id.* Sched. A).

---

[3] *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 112 (1989) ("The terms of trusts created by written instruments are determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible." (quotation omitted)); *Halbach v. Great-West Life & Annuity Ins. Co.,* 561 F.3d 872, 882 n.6 (8th Cir. 2009) (court construing plan document may consider "interpretive statements . . . past practices, customary usage in the trade, and other competent evidence"); *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1353 (8th Cir. 1980) (in construing ERISA plan documents, "[a]ny determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties"), *overruled on other grounds by Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966, 972 (8th Cir. 2002).

Finally, plaintiffs' theory that the provision gives Fidelity a discretionary veto is at odds with the parties' own mutual understanding of this provision. Uncontradicted evidence at trial will show that the parties understood that the consent provision did *not* give FMTC the authority to reject, at its own discretion, investment options ABB sought to add to its lineup, so long as they were *operationally compatible* with FMTC's recordkeeping platform. That is, FMTC could refuse consent to service an option under this provision only if FMTC could not technically support it. Witnesses will testify that FMTC has never "vetoed" an operationally compatible option. Indeed, when ABB deleted Magellan from its lineup and substituted a fund that provided *no* compensation to FMTC, FMTC had no choice but to comply with the investment decision, and to raise the issue of the negative revenue impact separately with ABB's executives (unsuccessfully, as it turned out). If FMTC had a unilateral veto right, it is inconceivable that FMTC would not have exercised it in that instance, or in any other, as ABB altered the lineup throughout the 2000s so as to dramatically decrease Fidelity's Plan-related compensation.

3. Although the summary judgment ruling does not focus on other potential theories of how FMTC has or exercises control over ABB's investment selections, the trial evidence will show that FMTC does not possess or exercise any control whatsoever:

- Fidelity identified a total of 40 funds for possible "consideration" by ABB as candidate funds for the ABB lineup. ABB's investment selection official Jack Cutler chose to add only one.
- ABB added 26 other funds over the years, none of which were suggested by Fidelity, and only three of which were Fidelity funds.
- ABB's lineup changes had the effect of reducing the number of Fidelity's funds and FMTC's compensation.

**B.    FMTC Cannot Be Held Liable As A Co-Fiduciary For ABB's Investment Selections**

The Court's summary judgment ruling notes that FMTC is a "directed trustee" with limited fiduciary responsibility over plan assets subject to ABB's direction, and as such is

19

"subject to the requirements" of ERISA's co-fiduciary liability provision, § 405(a), 29 U.S.C. § 1105(a). SJ Ruling 4. "It is true that because directed trustees are fiduciaries under ERISA, if limited fiduciaries, with respect to the plan, they are subject to co-fiduciary liability. Significantly, however, co-fiduciary liability, like the general fiduciary liability from which it derives, is not an all or nothing proposition. A limitation on a directed trustee's duties under ERISA § 403(a) would have little effect if the directed trustee's co-trustee liability was not similarly limited." *Difelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 735, 757 (E.D. Va. 2005) (citation omitted).

Co-fiduciary liability attaches under § 405 only where the defendant fiduciary has actual "knowledge" that the other fiduciary's conduct constitutes a breach of its fiduciary duty. 29 U.S.C. § 1105(a)(3); *see Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992) ("The ERISA fiduciary … is liable for known breaches of co-fiduciaries, § 1105."); *Keach v. U.S. Trust Co.*, 240 F. Supp. 2d 840, 844 (C.D. Ill. 2002) ("It is well established that actual knowledge by a fiduciary is required for co-fiduciary liability to attach under § 405(a)."). The standard of *actual* knowledge requires more than proof that the fiduciary *should* have known that its co-fiduciary's conduct breached its duties—the defendant must actually "know that it was a breach." H.R. Rep. No. 93-1280, at 308 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5080.

There is no evidence here that FMTC knew when ABB made its selections that they were imprudent or made for disloyal reasons—not least because ABB's choices were not imprudent or disloyal, and because the investment selections required the exercise of judgments that are distinctly the province of the plan's investment committee. But even if the court decides that ABB should have selected "better" or less expensive investments, and breached its duties for that reason, the standard for finding a breach by ABB differs from the standard for holding Fidelity

20

liable as a co-fiduciary for that same breach. A named fiduciary can be held liable for its own breach if it made no appropriate inquiry, even if it was unaware at the time it was breaching its duties—"a pure heart and empty head" is no defense to direct liability for fiduciary breach. *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983). But co-fiduciary liability for the named fiduciary's breach cannot attach unless the co-fiduciary actually knew at the time the conduct was in breach. *See supra* at 20. Accordingly, mere proof that Fidelity *should* have known that ABB's conduct breached its duties will not suffice to establish co-fiduciary liability. Because there is no evidence that Fidelity actually knew at the time that ABB was breaching its fiduciary duties (assuming it was), Fidelity cannot be held liable as a co-fiduciary.

### C. FMRCo. Is Not A Fiduciary Or Co-Fiduciary To The Plan In Any Respect

The Court's summary judgment ruling indicates some uncertainty as to the role played by FMRCo. The trial evidence will demonstrate that FMRCo.'s only role in the conduct involved here is to advise the Fidelity funds selected by ABB for inclusion in the Plans' lineup. FMRCo. is the SEC-registered investment adviser in the mutual fund structure described above, *supra* at 11-13. FMRCo. has no contractual or other legal relationship with the Plans and provides no services directly to Plan participants. FMRCo.'s management and advisory services are provided only to the Fidelity mutual funds through a Board-approved advisory agreement, for the benefit of *all* fund shareholders, whether they are plan participants or not.

ERISA expressly provides, and the DOL has recently reaffirmed, that assets within a mutual fund are not assets of the plan, and fees paid to the fund manager are not paid out of plan assets. *See Hecker*, 556 F.3d at 584 (citing 29 U.S.C. § 1101(b)(1)); Brief Of The Secretary of Labor, Elaine L. Chao, As Amicus Curiae In Support Of Plaintiffs-Appellants, *Hecker v. Deere & Co.*, No. 07-3605 (7th Cir. Apr. 2, 2008), at 22 ("The Secretary does not believe that [the

'revenue sharing' allegation], even if proven, would establish the fiduciary status of Fidelity Research, because the sums paid do not constitute plan assets."); DOL Adv. Op. 2009-4a (Dec. 4, 2009) ("the fact that a target-date or lifecycle mutual fund's assets consist of shares of affiliated mutual funds does not, on that basis alone, make the assets of the target-date or lifecycle mutual fund 'plan assets' of investing employee benefit plans or the investment advisers to such mutual funds fiduciaries to the investing plans under ERISA"). FMRCo. thus is not a fiduciary to the plans, and cannot be liable either as a fiduciary or as a co-fiduciary.

## II. ABB'S INVESTMENT SELECTIONS WERE NOT IMPRUDENT OR DISLOYAL

This section addresses the three liability theories identified in the summary judgment ruling: the alleged failure of ABB and FMTC to follow ABB's IPS and monitor plan costs; the allegedly excessive overall plan costs; and the alleged prohibited transactions between ABB and FMTC.

### A. The IPS Was Neither Legally Binding Nor Violated

The Court's summary judgment ruling identifies disputed issues of fact concerning both (1) whether the IPS was a legally binding document, and (2) whether ABB violated it in any event. SJ Ruling 8-9. The IPS creates no legal or evidentiary basis for liability because it was not binding and was not violated.

1. The IPS did not govern FMTC's conduct. ERISA requires that every plan "be established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), to enable plan participants and others to determine a plan's precise terms. *See* H.R. Rep. No. 93-1280, at 297 (1974), *reprinted in* 1974 U.S.C.C.A.N 5038, 5077-78; *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995). To that end, once a plan is created, ERISA limits the materials that may modify or supplement a plan's governing terms. For example, the statute

expressly requires that the formal plan document "provide a procedure for amending [the] plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3).

As the Court noted in its ruling on summary judgment, ERISA's rules concerning the identity of controlling plan documents do not mean that every document must be part of the formal plan document itself. They do, however, prohibit the creation of new governing plan documents absent express authorization in the plan document itself. To conclude otherwise would undermine Congress's intent to mandate an identifiable set of plan terms and would render pointless ERISA's requirement of an express amendment procedure.

Consistent with these principles, the DOL has issued regulations defining the circumstances under which a trustee must adhere to the terms of an investment policy statement. Those regulations do not suggest that a trustee must comply with *any* document that is labeled an "Investment Policy Statement." Rather, the regulations identify *only* two conditions that make such documents binding on the trustee: (1) where the plan document or trust agreement itself "expressly provide[s] a statement of investment policy to guide the trustee"; or (2) where the plan document or trust agreement "authorize[s] a named fiduciary to issue a statement of investment policy applicable to a trustee." 29 C.F.R. § 2509.08-2.

Neither condition applies to the IPS here. Neither the ABB Plan documents nor the Trust Agreement expressly set forth the IPS or incorporate it into their terms. Nor do they authorize ABB's named fiduciary to create an investment policy statement that is binding on Fidelity. Instead, the Trust Agreement sets forth its *own* requirements concerning the categories of investments that may be included in the Plans. Trust Agmt. § 4(b). As such, while ABB was certainly free to memorialize its basic investment philosophy in the IPS, it could not create an

IPS that bound or imposed additional duties on FMTC (or on ABB, for that matter), absent formal amendment of either the Plan documents or the Trust Agreement.

2.   The IPS was not violated in any event.   Plaintiffs first argue that ABB violated its general policy of leveraging the Plans' size, because ABB failed to use the Plans' size to obtain cheaper, non-mutual fund investment options, such as commingled pools and separately managed accounts.   SJ Ruling 9.   That argument fails for multiple reasons.   First, ABB *did* include such options in the lineup.   Second, in addition to the general statement about leveraging the plans' size, the IPS includes a specific term permitting the use of mutual funds as investments.   *See* IPS § 5.   "[W]hen a specific provision and a general provision in a contract potentially conflict, the specific is construed as modifying the general."   *Dame v. First Nat'l Bank of Omaha*, 217 F.3d 1018, 1019-20 (8th Cir. 2000).   Third, the Trust Agreement also expressly authorizes ABB to direct FMTC to offer mutual fund investment options.   Trust Agmt. § 4(b).   Plaintiffs' reading of the IPS thus would place FMTC in the position of being required under the IPS to disregard the very directions the Trust Agreement requires it to follow.

Plaintiffs' second IPS-related argument is that ABB violated the IPS provision requiring that "alliance rebates" be used to offset or reduce the cost of offering investment options to participants.   SJ Ruling 9.   But that very provision *specifically contemplates* revenue sharing with the Plans' recordkeeper.   *See* IPS § 7.   And the Tenth Amendment to the Trust Agreement identifies revenue sharing payments as part of FMTC's negotiated compensation for providing services to the Plans.   Because the alternative to such asset-based compensation would have been fixed fees paid out of participants' account, the use of revenue sharing served the IPS objective of offsetting the cost of recordkeeping services.

**B.      ABB's Investment Selections Did Not Impose Excessive Costs On The Plans**

The Court's summary judgment ruling focuses on essentially two issues concerning ABB's investment selections:  (1) whether ABB's investment selection resulted in excessive costs to the plans because ABB failed to use the plans' size as leverage to obtain lower-priced investment options than the retail mutual funds in the plans; and (2) whether revenue sharing served purposes other than defraying the plans' administrative costs.

1.      *The ABB Plans' Lineup Did Not Cause The Plans To Incur Excessive Costs*

The summary judgment ruling focuses on plaintiffs' contention that ABB did not "use[] the size of the plan to negotiate lower fees for plan participants."  SJ Ruling 10.  The trial evidence will expose multiple defects in plaintiffs' theory:

*First*, federal law prohibits mutual funds from offering some investors lower fees than others:  all investors in the same share class must be charged the same fee.  *See supra* at 12. ABB thus could not use the plans' size to "negotiate lower fees" for mutual funds.  It could only stay out of mutual funds entirely, or use "institutional" share classes of mutual funds when they were available and cost-effective for the Plans.  When both retail share classes and institutional share classes were available, and ABB selected the higher-cost share classes, the record will reflect good reasons for doing so, including obtaining greater revenue sharing associated with that share class, in order to defray recordkeeping costs that it anticipated would otherwise have been paid out of every individual participant's account through fixed per capita fees.

*Second*, the summary judgment ruling notes plaintiffs' claim that the ABB Plans relied "in large part" on retail mutual funds.  SJ Ruling 9.  But relative to similarly sized plans, the ABB Plans substantially favored other, lower-cost options.  Approximately 40% of the assets in the ABB Plans were invested in low-cost, non-mutual-fund options, whereas the median range

25

for similar plans is approximately 20-30% investment in such options. And many of the mutual funds selected by ABB were lower-cost share classes available only to institutional investors.

*Third*, ABB selected a lineup that was not based solely on minimizing plan costs by providing the cheapest possible options, but was based on providing participants a wide and diverse range of investment choices, including but not limited to the low-cost non-mutual-fund options plaintiffs demand. Yet costs did matter, and ABB considered the issue prudently: for every asset class (e.g., international, large company, etc.) that ABB added to its lineup, it reviewed the available funds in that class, and typically selected a fund at or below the average cost for that asset class.

It is true that ABB did not always choose the cheapest options available for either investments or service. The law does not require fiduciaries to act so narrowly. Courts and the DOL have consistently recognized that there are a wide range of features and qualities that may make a more costly option a better choice for a given plan. *See Braden v. Wal-Mart Stores, Inc.*, 2009 WL 4062105, at *8 (8th Cir. 2009) (pet. for reh'g filed Dec. 14, 2009); *Hecker*, 556 F.3d at 586; *Loomis v. Exelon Corp.*, 2009 WL 4667092, at*3-*4 (N.D. Ill. 2009); *In re Honda of Am. Mfg. ERISA Fees Litig.*, 2009 U.S. Dist. LEXIS 95087, at *13 (S.D. Ohio 2009); DOL, 401(k) Fiduciary Education Campaign, *available at* http://www.dol.gov/ebsa/pdf/401kfefm.pdf ("The service provider offering the lowest cost services is not necessarily the best choice for [a 401(k) plan."). As the Second Circuit recently explained—in an opinion joined by now-Justice Sotomayor—plaintiffs asserting excessive-fee claims under ERISA must show that fees were not just high, but "excessive relative to the services rendered." *Young v. G.M. Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009).

Plaintiffs here cannot make that showing. The higher price of mutual funds, for instance, includes the cost of compliance with multiple legal requirements imposed on mutual funds to protect investors' interests—requirements that add significant value to participants compared to other investments, as well as substantial compliance costs for fund managers. Such requirements include oversight by the SEC, *see* 15 U.S.C. §§ 80a-8, 80a-7; disclosure and public transparency of financial information concerning the fund, *see id.* § 80a-30; restrictions on internal management such as minimum capital requirements, *see id.* § 80a-14; 17 C.F.R. § 270.22c-1(b)(1); and various corporate governance mandates, *see* 15 U.S.C. § 80a-9; 17 C.F.R. §§ 270.38a-1(a), 270.30a-2. Few if any of these important regulatory protections are provided to investors in non-mutual-fund options such as commingled pools and separate accounts. And many investors prefer mutual funds' familiar investment structure. ABB reasonably took these advantages into account in deciding, contra plaintiffs, that participants should not be limited solely to non-mutual-fund options. And ABB's judgment was wholly consistent with the judgments made by almost every other large 401(k) plan fiduciary at the time—in the 2005-06 period relevant here, approximately 91% of all 401(k) plans included mutual funds as options; in 2007 approximately 55% of all 401(k) assets in the U.S. economy were invested in mutual funds.

The total costs incurred by the plans also were not excessive compared to other similar plans, as the graph at Appendix A demonstrates. Given the bundled, asset-based fee structure selected by ABB, total plan costs—the combined costs of all administrative and investment management services—were the result of ABB's choice of investment options together with individual participants' choices among those available options. In the short run, the greater the number of participants who chose to invest in a higher-cost asset class, the higher the overall costs incurred by the plan—even though ABB participants always had the option of selecting

extremely low-cost investments and did not pay a single cent more in fees as a result of the choices by other participants to select more expensive asset classes. But because ABB elected an asset-based pricing model, included very low-cost options in its lineup, and selected median or below priced investments within virtually all of the asset classes it offered, ABB's total plan cost was always at or near the middle range for similar size plans. *See* Appendix A.

The fact that the ABB Plans' total cost was consistent with costs of similar plans demonstrates the reasonableness of ABB's selections. ERISA's fiduciary standard measures reasonableness by the contemporaneous conduct of similarly situated fiduciaries. *See*, *e.g.*, *Brock v. Robbins*, 830 F.2d 640, 644-46 (7th Cir. 1987) (affirming district court's findings that service fees paid by plan were reasonable based on record evidence that fees fell within market range for similar services); *Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *41 (S.D. Fla. 2007) (holding that fiduciary did not violate ERISA in offering plan participants option of investing in investment account at fee that "unrelated plans' fiduciaries, independent of the [defendant], have determined is reasonable").[4] And the comparison must be made to other fiduciaries' conduct *at the time*. *See Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994) (ERISA fiduciary standard "is a test of how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight" (quotations and alterations omitted)). Because ABB's plans were well within the

---

[4] *Accord Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654, 657 (7th Cir. 2001) (fiduciary did not breach fiduciary duties in retaining broker where the amount paid was "as good as what could have been bought in a market free of kickbacks and undue influence"); *Van Vels v. Betten*, 2007 U.S. Dist. LEXIS 7003, at *18-*19 (W.D. Mich. 2007) (holding that amounts paid by plan for brokerage services were not unreasonable where the "only evidence of record shows that [defendant] was offered and paid market rates for investment services"); *cf.* 26 C.F.R. § 1.162-7(b)(3) ("It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances.").

mainstream of similarly situated plans in terms of costs and diversity of investment options, ABB cannot be held liable for breach of fiduciary duty.

2.  *The Plans Did Not Incur Excessive Costs From Investments With Revenue Sharing*

The Court's summary judgment ruling raises the question whether revenue sharing was used exclusively to reduce the cost of plan administration.   SJ Ruling 10-11.  It was.  In negotiating its compensation arrangements with ABB for the full package of services it provided to the Plans, Fidelity negotiated compensation that included revenue sharing from non-Fidelity investment options held in the Plans.  Through 2001, these rates of revenue sharing were set forth in the Trust Agreement itself; afterward, the parties agreed Fidelity's revenue-sharing-based compensation would be disclosed periodically to ABB via a web-based mechanism.

Moreover, such revenue sharing is simply one component of the plan's total costs.  Since the total plan costs for the ABB Plans were objectively reasonable compared to the costs of similar plans, there is nothing gained as a legal matter by an onerous effort to assess the reasonableness of one component of those overall costs.  And because a mutual fund must charge the same price to all investors in the same share class, *see supra* at 12, the fact that a given mutual fund did or did not share revenue with FMTC could not affect the cost of that fund to the ABB Plan participants.  So long as the mutual funds were reasonably priced on their own terms, the decision by their investment managers to share with FMTC the revenues that they received from the ABB Plan participants cannot alter the reasonableness of those funds' fees.  *See In re Morgan Stanley & Van Kampen Mutual Fund Sec. Litig.*, 2006 U.S. Dist. LEXIS 20758, at *37-*38 (S.D.N.Y. 2006) ("The allocation of the [mutual fund] fees is immaterial, because it could have no effect on share price."); *accord In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.*, 434 F. Supp. 2d 233, 238 (S.D.N.Y. 2006); *see also Taylor v. United Techs. Corp.*, 2009 WL 535779, at

*10 (D. Conn. 2009) (granting judgment to defendant where plaintiff failed to show that "the fees of any specific mutual fund" were "unreasonable in light of other analogous mutual fund fees"), *aff'd* 2009 WL 4255159 (2d Cir. 2009) (describing district court analysis as "thorough and well-reasoned").

Finally, for the purposes of assessing the reasonableness of plan costs under ERISA, plaintiffs' proposed effort to break down total plan costs into components is particularly unhelpful in connection with the Fidelity mutual funds in the ABB Plans. As noted above, FMRCo. does not "share" revenue with FMTC in the sense of actually transferring any money, so "revenue sharing" as to the Fidelity funds is a purely theoretical construct.

The Court's summary judgment ruling, to be sure, refers to internal Fidelity documents that hypothetically attributed a portion of Fidelity's total Plan-related revenues to the recordkeeping services component of the bundled services Fidelity was providing, comparing that per-participant computation to an estimate of what Fidelity's standard large-plan services would cost in the "unbundled" or fixed-fee market. The purpose of the documents was to assess how large 401(k) plans and plan consultants might choose to compare Fidelity's asset-based fee arrangements for bundled recordkeeping and investment management services to "unbundled" fixed-fee arrangements for recordkeeping services that certain of Fidelity's competitors had begun to market. Contrary to plaintiffs' contention, the trial evidence will show that those documents do not indicate that the ABB Plans paid excessive costs for the recordkeeping services component of the bundled services they were purchasing.

To start, the Fidelity documents provided only a snapshot of the asset-based revenues that Fidelity might derive over a year-long period, assuming asset levels and participant allocations remained the same. But asset-based fees in fact can vary significantly over time based on factors

such as market fluctuations and changes in the way participants allocate their accounts, making any point-in-time comparison of fees potentially very misleading. Moreover, the documents did not take into account all of the services that Fidelity was providing to the ABB Plans; only standard large-plan services were valued. And while some of the analyses show Fidelity's "administrative" revenues from the Plans to be above the "unbundled" benchmark, others show ABB's "administrative" revenues to be "at market" compared to estimated "unbundled" fees. And they uniformly establish that FMTC's "administrative" revenue from the ABB Plans was in the "middle of the pack" across the entire Fidelity large-plan client base.

These documents also reflected an artificial accounting estimate of the revenues attributable to the recordkeeping services component of the "bundled" services that Fidelity was providing to the ABB Plans. They do not reflect a market value for the services the plans were receiving. As an analogy, consider an ice cream store that sells both ice cream and cones, either separately or "bundled" together. The cone might have its own price when sold separately, but it does not have a price separate from the overall "ice cream cone" when it is sold as a bundle with a scoop of ice cream. The store might break its sales down internally to estimate the revenue associated with each component of its overall "ice cream cone" sales, but even if the "cone" component were high relative to the market price for an unbundled cone, it would say nothing about whether consumers who purchased the bundled "ice cream cones" were paying unreasonable overall costs for their purchases. The only way to examine that question would be to compare the store's prices for "ice cream cones" to the market price for bundled "ice cream cones" (controlling for differences in quality and other factors). The same analysis could be done for many products—a dining table bundled with chairs, phone service bundled with Internet access, a hotel room bundled with breakfast or WiFi. In each example, although each distinct

product can be sold separately, it makes no sense to consider the cost of the consumer's purchase of the *overall bundled item* in terms of the distinct revenue that might be attributed to each separate item. The total cost of the bundled product is either reasonable, or it is not.

3. The summary judgment ruling also refers to evidence that FMTC gave free or discounted services to ABB, suggesting that it could support a finding that the plans incurred excessive costs, because otherwise FMTC would not have been able to offer such services. SJ Ruling 11. The evidence concerning free or discounted services is addressed on its own terms below. Here, the dispositive point is that the plans' costs were reasonable when compared to other similar plans: as shown above, the ABB Plans paid asset-based costs roughly equivalent to what other similarly sized plans paid. What business decisions FMTC made in light of that asset-based compensation—whether to pay bonuses to employees, or pave an office parking lot, or expand its business and goodwill by offering a good client discounted services—has nothing to do with the objective reasonableness of the costs the plans incurred.

## III. FIDELITY AND ABB DID NOT ENGAGE IN PROHIBITED TRANSACTIONS WITH THE PLAN OR PLAN ASSETS

The summary judgment ruling describes three disputes concerning alleged prohibited transactions: (1) whether, in exchange for the revenues on the 401(k) plans, FMTC gave ABB discounted services for "total benefits outsourcing" services provided to ABB—defined benefit, health and welfare, and payroll administration; (2) whether, in exchange for revenues on the 401(k) plans, FMTC gave free or discounted services to ABB for certain "non-qualified" ABB plans (referred to as the "Restoration" plan, "New DCP" and "Old DCP"); and (3) whether revenue sharing constituted a prohibited "indirect transfer" of plan assets to FMTC. SJ Ruling 16-17. The trial will show that none of the transactions at issue was prohibited under ERISA.

Indeed, the claims fail categorically because reasonable compensation is a complete defense to the claims and, as discussed above, the costs charged to the ABB Plans were reasonable.

For the Court's convenience and to help clarify the nature of the alleged transactions, attached as Appendix B is a chart summarizing the various ABB-sponsored plans for which Fidelity provides administrative services.

### A. Plaintiffs' Prohibited Transaction Claims Fail Categorically Because Reasonableness Is A Complete Defense

This Court has already held that FMTC "can avoid liability for any of [the alleged] prohibited transactions by showing that … [FMTC] received only reasonable compensation for the services it provided to the plan."  SJ Ruling 18; *see* 29 U.S.C. § 1108(b)(2) (providing the "prohibitions provided in § 406" do not apply to contracting with a "party in interest"—which includes a plan service provider—for plan services "if no more than reasonable compensation is paid therefor"); 29 U.S.C. § 1108(c)(2) ("Nothing in § 406 shall be construed to prohibit any fiduciary from … receiving any reasonable compensation for services rendered …in the performance of his duties with the plan …."). Accordingly, the reasonableness of the costs that defeats the imprudence claims also defeats the prohibited transaction claims.

### B. FMTC's Provision Of "TBO" Services To ABB Was Not "In Connection With" Its Compensation For 401(k) Services

This Court has held that plaintiffs "must . . . prove that [services to other plans] were in connection with giving [FMTC] and its constellation of funds the contract for the PRISM plans." SJ Ruling 16; *see id.* at 17.  Plaintiffs will not make that showing at trial.

The trial testimony and documents will show that, in their arms-length negotiations, neither ABB nor Fidelity sought to link or condition contract prices for Fidelity's "TBO" services to the fee structure for the ABB 401(k) Plans.  Moreover, the evidence will show that

33

Fidelity has always sought market prices for its "TBO" services from all of its clients, including ABB. To be sure, in late 2005, Fidelity sought price increases from ABB for defined benefit and health and welfare administration services because it concluded that ABB's shrinking participant counts in those plans since the last three-year fee arrangement was struck in 2003 had rendered the existing fee structure below the market midpoint. ABB agreed to higher renewal prices.

Plaintiffs have cited internal Fidelity profit analyses indicating that Fidelity was making profits on its 401(k) servicing while incurring losses on the TBO service lines, which plaintiffs take to be proof that Fidelity was providing TBO services at a loss in order to maintain its "overpriced" 401(k) business. That theory will not survive the trial record. The TBO lines were newer lines of business for Fidelity than its 401(k) franchise, and its TBO profitability problems owed both to its comparative lack of scale in these newer lines as well as its higher-than-competitive cost structure, not to the pricing of its services. Fidelity also sold TBO services to non-401(k) clients, as well as 401(k) clients, and lost money on *both* sets of contracts—not simply on its TBO contracts with 401(k) clients.

Further, as the graph attached as Appendix C illustrates dramatically, during the very period in which plaintiffs assert that Fidelity was providing concessionary TBO prices in connection with an inflated 401(k) fee structure, Fidelity's revenues for 401(k) Plan services sharply declined while Fidelity's TBO services and resulting revenues expanded significantly. Plaintiffs' theory thus would require the Court to conclude that Fidelity sacrificed profitability on an expanding service relationship with ABB in order to preserve profitability on a declining one.

Finally, the very profitability reports cited by plaintiffs show Fidelity was incurring losses on TBO services that were *significantly greater* than the profits Fidelity was earning the from 401(k) Plans (which was true across Fidelity's entire business). Thus, to accept plaintiffs'

theory, the Court would have to conclude that Fidelity intentionally chose to lose money, by providing—as a reward for the purchase of its 401(k) services—a discount for TBO services so large that it more than wiped out the 401(k) profits being rewarded. That is, plaintiffs would have the Court believe that Fidelity gave up $10 of TBO revenue to earn $5 of 401(k) revenue.

### C. FMTC Did Not Provide Free Services To Non-Qualified Plans "In Connection With" Its Compensation For 401(k) Services

FMTC received payment for two of the three non-qualified plans—the Restoration plan and the "New DCP" (the latter payment being asset-based revenues from the same types of assets as are in the 401(k) plan). As to those two plans, plaintiffs argue that the fees would have been higher but for the 401(k) plan. The only non-qualified plan for which all fees were waived was the so-called "Old DCP." Both the Old DCP and the new DCP were very small, very simple plans requiring only the most modest level of services. Plaintiffs contend that FMTC discounted or waived the small fees for services provided in connection with these non-qualified plans, in exchange for profitable 401(k) business. There are multiple flaws in this argument.

1. ABB retained FMTC to recordkeep its 401(k) plan in 1995—long before these nonqualified plans were brought on line. The compensation terms for FMTC's 401(k) services thus were established prior to any waivers for non-qualified plan services. Moreover, the explicit 401(k) service fees were reduced sharply over time, and the asset-based fees have also declined sharply since 2000. Nor is there evidence that ABB adjusted its lineup to add funds to increase FMTC's compensation after non-qualified plan fee waivers—to the contrary, ABB's lineup adjustments after 2000 consistently *reduced* FMTC's compensation. If FMTC intended to waive the non-qualified plan fees to enhance its 401(k) revenues, that effort was a dismal failure.

2. FMTC and its competitors routinely waived small "nuisance" fees for servicing small, simple non-qualified plans. It was a standard client goodwill practice, not an inducement to

35

obtain 401(k) business. In the absence of a demonstrated connection to a plan transaction, ERISA does not seek to regulate the pricing or promotion of other corporate services.

3. Although internal Fidelity documents show that FMTC considered the profitability of its non-qualified plan services together with its qualified plan services, the evidence will show that ABB did not consider costs together that way.

4. There is no plausible basis for inferring that ABB's investment official, Jack Cutler, was influenced in his investment selections by the comparatively trivial waiver of non-qualified plan service fees that otherwise would have been paid by the company, not him personally. He played no role in contracting for 401(k) services. And his reputation depended on making sound investment selections for the ABB Plans. He would not have made unsound or imprudent decisions concerning hundreds of millions of dollars in retirement assets for all ABB employees—including matching funds contributed by ABB itself—merely because ABB as a corporation could save at most a few tens of thousands of dollars on non-qualified plan services. The record shows without ambiguity that his decisions consistently diminished Fidelity's compensation. There is thus no evidence that FMTC's small fee waivers influenced Cutler at all, much less corrupted him into doing Fidelity's bidding.

> **D.** **"Revenue Sharing" Is Not A Prohibited Indirect Transfer Of Plan Assets To A Party In Interest**

The summary judgment ruling states that a "reasonable fact finder could conclude . . . that the arrangement of [FMTC] receiving revenue sharing directly back from [FMRCo.] . . . was an indirect transfer of plan assets to a party in interest, particularly because of [FMTC's] ability to veto any non-Fidelity mutual fund selection." SJ Ruling 18. Such a finding would rest on the factual premise that "[e]ffectively, at the time the selection of the mutual funds is made, there is a process in place by which [FMTC] will be given money back that had just been deducted from

the plan," which is arguably "the kind of arrangement contemplated by the word indirect." *Id.* The trial will reveal multiple reasons to reject such a finding.

First, the potential finding described by the Court would depend "particularly" on a separate finding that FMTC could substantively veto any non-Fidelity funds. As shown above, the trial evidence will show that plaintiffs' veto theory must be rejected.

Second, FMTC does *not* receive any "money back" from FMRCo. There is thus no actual "revenue sharing" within Fidelity. Because it is a single complex of entities, FMTC's compensation is effectively embedded in the revenues received by its affiliate from participant investments in Fidelity funds. No money is transferred from FMRCo. to FMTC. And because FMTC is the only "party in interest" vis-à-vis the plan, the fact that it does not receive any money that could be deemed plan assets, even indirectly, disposes of this claim.

Third, the potential finding described by the Court also suggests that money received by FMTC has been "deducted from the plan," transferred to FMRCo., and then transferred to FMTC. Not only is no money transferred to FMTC, but no money is ever "deducted from the plan." A plan participant invests plan assets in a mutual fund by purchasing shares in the fund. In an asset-based fee structure, no money is deducted from that purchase—shares are purchased dollar for dollar. The *value* of the fund's shares, however, is affected by the fund's expense ratio—which applies equally to all shares of the same class. As explained above, mutual fund shares are *not* plan assets. *See supra* at 21-22. Thus, to the extent any fees are "deducted" from anything, it is from *mutual fund assets*, not plan assets.

Finally, the theory that FMTC receives money from plan assets, even if it were factually accurate, would be subject to FMTC's defense, discussed above, that the payments reflected objectively reasonable compensation.

## IV. ERISA'S STATUTE OF LIMITATIONS BARS ALL OR MANY CLASS MEMBERS' CLAIMS ENTIRELY AND LIMITS ALL DAMAGES

ERISA § 413, 29 U.S.C. § 1113, provides for two limitations periods: (1) a six-year statute of repose that runs from "the last action" or "omission" that "constituted a part of the breach or violation," regardless of when (or if) any plan member learns of the breach or violation; and (2) a three-year statute of limitations that runs from when a plaintiff *first* learns of the violation. *See Brown v. Am. Life Holdings, Inc*., 190 F.3d 856, 858-59 (8th Cir. 1999).

1. The Court has already granted defendants "summary judgment on claims outside the six-year statute of limitations" Tr., Dec. 7, 2009, at 20:1-3. That ruling bars any damages or other remedy for injuries that plaintiffs allegedly suffered prior to December 29, 2000—six years prior to the filing of the Complaint. Those injuries cannot have resulted from breaches or violations that occurred after that date: an injury obviously cannot be caused by actions that have not yet occurred. "[I]t would be improper for plaintiffs in an individual suit to recover damages for actions occurring prior to the statute of limitations." *Roberts v. Source for Public Data*, 2009 U.S. Dist. LEXIS 107057, at *20-*21 (W.D. Mo. 2009) (Laughrey, J.).[5]

2. ERISA's three-year statute also bars plaintiffs' claims, or at least those of any class member who was a plan participant as of December 29, 2003. For purposes of this limitations period, a plan participant is deemed to have "actual knowledge" "from the date that documents were provided, or made available, to [p]articipants disclosing the facts underlying the alleged breach of fiduciary duty." *Shirk v. Fifth Third Bancorp*., 2009 U.S. Dist. LEXIS 90775, at *11-*12 (S.D. Ohio 2009); *see Young v. G.M. Inv. Mgmt. Corp*., 550 F. Supp. 2d 416, 418-19 & n.3

---

[5] Similarly, the Court's prior rulings exclude from the class anyone whose status as a participant in the PRISM Plans had ended by December 29, 2000. In its order certifying the class, the Court held that "former participants may be included [in the class] only to the extent that their claims are not time barred." Dec. 3, 2007 Order at 22. The claims of any person who left the plan before December 29, 2000 were necessarily unaffected by any subsequent actions or omissions by the defendants. Those claims are therefore barred.

Case 2:06-cv-04305-NKL   Document 495   Filed 12/28/09   Page 45 of 52

(S.D.N.Y. 2008), *aff'd* 325 F. App'x 31 (2d Cir. 2009).[6]  It does not matter "whether the individual plaintiffs actually saw or read the documents."  *Id.* at 419 n.3; *see Shirk,* 2009 U.S. Dist. LEXIS 90775 at *11-*12.  Otherwise, a participant could circumvent the limitations period simply by "refusing to read or examine information disclosing relevant facts that would trigger the statute of limitations."  *Id.*

If plaintiffs were correct that including actively managed options and retail mutual funds among the investment options violated a fiduciary duty, then plaintiffs' claims—or at least those of every participant in the plans as of December 29, 2003—would be barred.  Plan participants had by then received fund descriptions disclosing the very facts that plaintiffs contend constitute an ERISA violation.  Participants were also provided statements, at least quarterly, that summarized each option's performance (net of expenses) against the comparable index.   The information was presented in a manner that facilitated comparison with other funds and investment options in the ABB Plans.  Participants thus were well aware of the cost differential between the actively managed mutual funds in the ABB Plans and the index funds and non-fund options that were available side-by-side with them.  If retail mutual funds were unreasonably costly, participants had notice of that fact by December 29, 2003.

Receipt of this information constitutes "actual knowledge" of the alleged breaches of fiduciary duty under the three-year statute.  *See Shirk*, 2009 U.S. Dist. LEXIS 90775, at *10-*25 (claims alleging that investment option advisory fees were excessive held time-barred because fees were disclosed in plan materials and prospectuses sent to plaintiffs more than three years before complaint's filing); *Young*, 550 F. Supp. 2d at 419-20 (claims alleging that plan's use of

---

[6] *Accord Frommert v. Conkright*, 433 F.3d 254, 272 (2d Cir. 2006); *Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003); *Martin v. Consultants & Adm'rs, Inc*., 966 F.2d 1078, 1086 (7th Cir. 1992); *Brown v. Owens Corning Inv. Review Comm*., 2008 U.S. Dist. LEXIS 104153 (N.D. Ohio 2008).

retail Fidelity mutual funds breached duty because funds charged excessive fees held time-barred because participants received prospectuses and quarterly performance summaries disclosing the use of the funds and their expense ratios more then three years before complaint was filed).

Plaintiffs may contend that mutual-fund-related breaches of fiduciary duty continued or recurred after December 29, 2003. Even if that were true, it is irrelevant to whether the three-year statute bars the claims. The statute expressly provides that it runs from "the *earliest* date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2) (emphasis added). Accordingly, "once a plaintiff knew of one breach, an awareness of later breaches would impart nothing materially new." *Phillips v. Alaska Hotel & Rest. Employees Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991). Application of a "continuing violation theory" to re-start the three-year period would simply "read the 'actual knowledge' requirement out of the statute." *Edwards v. U.S. Dep't of Energy*, 371 F. Supp. 2d 859, 870 (W.D. Ky. 2005); *see also Phillips*, 944 F.2d at 520. Courts therefore agree that the "earliest date on which a plaintiff became aware of any breach" is the beginning—the only beginning—of the ERISA limitations periods. *Id.*[7]

_____

[7] *Accord Heinglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 214 (3d Cir. 2001); *Angell v. John Hancock Life Ins. Co.*, 421 F. Supp. 2d 1168, 1176-77 (E.D. Mo. 2006); *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1086 (C.D. Cal. 2009); *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1225 (C.D. Cal. 2008).

Dated:  December 28, 2009                    Respectfully submitted,

/s/ Richard N. Bien

Richard N. Bien
Lathrop & Gage, L.C.
2345 Grand Boulevard, Suite 2800
Kansas City, MO 64108

M. Randall Oppenheimer
Robert N. Eccles
Brian D. Boyle
Shannon Barrett
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
*Admitted pro hac vice*

James S. Dittmar
James O. Fleckner
Goodwin Procter LLP
Exchange Place
Boston, MA 02109
*Admitted pro hac vice*

*Attorneys for Defendants Fidelity*
*Management Trust Company and Fidelity*
*Management & Research Company*

# APPENDIX A

Source: Exhibit 8 to Report of Fidelity Expert Glenn Hubbard



**Exhibit 8**
**Comparison of ABB's Total Plan Cost to Competitive Benchmark**
*Total Cost Ratio Excluding Sponsor Stock*

**Source:** Author's calculations from 11-K Sample; see Appendix B.

# ABB BENEFITS AND RETIREMENT SERVICES

| Service Type | Fidelity start date (d) | How was service paid for? | Participant count (a), (c) | | |
|---|---|---|---|---|---|
| | | | **2000** | **2002** | **2008** |
| *401 (k) Plans* | | | | | |
| **PRISM Plans**<br><br>ABB's defined contribution/ 401(k) plans | May 1, 1995 | Primarily asset-based fees | 16,582 | 16,696 | [15,544] (b) |
| *Benefits Outsourcing* | | | | | |
| **Defined Benefit**<br><br>Recordkeeping and administrative services performed for ABB's traditional pension plans | Feb. 28, 1997 | Primarily per-participant or per-service fees | 16,500 Active; 43,100 Total (estimated) | 13,745 Active; 28,426 Total | 10,245 Active; 24,641 Total |
| **Health & Welfare**<br><br>Health plan administration and recordkeeping | July 1, 1999 | Primarily per-participant or per-service fees | 30,950 (estimated) | 14,483 Active; 23,234 Total | 8,820 Active; 16,725 Total |
| **Payroll**<br><br>Payroll processing and human resources recordkeeping | Dec. 17, 2004 | Primarily per-participant or per-service fees | *For 2005, first year, 8,851* | *For 2005, first year, 8,851* | 8,768 |
| **Benefits consulting**<br><br>Communications, strategic, financial and other consulting services | 2002 | Primarily fixed per-project or hourly charges | Covers multiple plans | | |
| *Nonqualified plans* | | | | | |
| **Restoration Plan**<br><br>Nonqualified retirement savings plan | Feb. 28, 1997 | Primarily annual fees | 408 | 417 | 362 |
| **Old Deferred Compensation Plan**<br><br>Non-assetized nonqualified plan; investment options largely mirror PRISM plan options | July 1, 2002 | Not charged | Fidelity did not service plan | 101 with balances; 5 deferred income | 37 with balances; 1 deferred income |
| **New Deferred Compensation Plan**<br><br>Assetized nonqualified plan; investment options largely mirror PRISM plan options | Feb. 8, 2006 | Primarily asset-based fees | Fidelity did not service plan | Fidelity did not service plan | 40 |

*Notes and Sources:*

(a)     Data provided for 2000, where applicable, because the relevant time period for statute of limitations purposes began in 2000.

(b)     Participant count for PRISM Plans for 2000 and 2002 is total participants with balances per Form 5500s or Form 5500 reporting packages.  (FID-ABB-P 0011133-223 at 0011195; FID-ABB-P 0011224-72 at 0011247; FID-ABB-P 0012299-427 at 0012369; FID-ABB-P 0012428-519 at 0012468.)  2008 Form 5500 reporting package not in production, thus 2008 participant counts are based on June 2007 fee transparency.  (FID-ABB-P 0023808-54 at 0023811 and 0023835.)

(c)     2000 participant counts for Defined Benefits and Health & Welfare services are estimated counts in Schedule D of the 1999 Benefits Outsourcing agreement.  Other participant counts for Benefits Outsourcing services are derived from Diane Zimmerman-Decker's work detailing invoices by service line.

- Defined benefit includes participants in Cash Balance plan per year-end invoices.
- Health & Welfare includes participants per year-end invoices.
- Payroll includes participants in "Core HR/Payroll administration service" per year-end invoices.

(d)     Service start date is effective date per relevant trust agreement or amendment.

**APPENDIX C**



## Change in 401(k) & Non 401(k) TBO Revenues Over Time
2000 - 2008

OM105_043