IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| Tussey, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | No: 2:06-cv-04305 NKL |
| ABB, Inc., et al. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' TRIAL BRIEF

### I.    Introduction

Plaintiffs will not go into each of their claims and the factual support discussed in detail in their summary judgment briefing. Instead, this Trial Brief will focus on those issues where the Court indicated that it needed additional information or understanding. *See e.g.* Doc. 470. Specifically, Plaintiffs will discuss below: (1) the fiduciary status of FMTC (after 2004); (2) the role and fiduciary status of FMRCo; (3) the connection between the self-interested acts of the Defendants and the Defendants' decisions with respect to the PRISM Plans; (4) damages caused by Defendants' breaches; and (5) lingering issues surrounding Defendants' affirmative defenses.

By way of setting the stage, from 1995 to the present, ABB and Fidelity have jointly administered the 401(k) Plans, known as the PRISM Plans (hereafter "Plan(s)"), which are offered to ABB employees. ABB Defendants include ABB Inc., the Pension Review Committee ("PRC"), the Employee Benefits Committee ("EBC"), the Pension Thrift Management group ("PTM"), and John W. Cutler (who is the Director of PTM) (collectively referred to herein as "ABB" or "ABB Defendants"). ABB Defendants are fiduciaries to the Plans and responsible for all aspects of their administration. Fidelity Defendants include Fidelity Management Trust Company ("FMTC") and Fidelity Management Research Company ("FMRCo") (collectively

referred to herein as "Fidelity" or "Fidelity Defendants"). FMTC is a fiduciary to the Plans and in particular, as the Court has determined, for the selection of investment options through 2004. Doc. 470 pp. 4-5. After 2004, as discussed below, FMTC remained a fiduciary by retaining veto power over the selection of investment options with the Plans.

Defendants entered into a relationship with Fidelity to provide services to the Plan in 1995. This relationship was based on payments by the Plans to Fidelity of uncapped, asset-based fees paid through investment options that Fidelity selected or approved.[1] At no point, however, did ABB Defendants ever negotiate a fee schedule with Fidelity that identified any offsets, rebates, or reductions that the Plans "might benefit from as a result of one or more Fidelity funds being offered as investment options by these plans."[2] *See* Doc. 470 p. 11.

The egregiousness of Defendants' failure to do so is highlighted by the fact that the Plans adopted an Investment Policy Statement ("IPS") as a governing Plan document that specifically required them to negotiate such a fee schedule with offsets for the benefit of the Plans and their participants. Further, Defendants failed to leverage the asset size of the Plans to provide the lowest cost of participation and to monitor the recordkeeper and trustee to ensure that all rebates were used to benefit the Plans, which is also required by the IPS. As a result, the Plans paid fees far in excess of what was reasonable; a conclusion known to both sets of Defendants and the consultants advising them. The standards or practices of other defined contribution plans, to the extent they are relevant at all, are completely irrelevant as to whether Defendants complied with the IPS.

While the fiduciary Defendants owed a duty of loyalty to the Plan participants, the uncapped, excessive fees built into the Plan investments funded a well documented set of free

---

[1] Even Defendants' expert warns that this type of an arrangement leads to an environment where fees paid increase as plan assets increase, and any relationship between the fees and service ceases to exist, if it ever did.
[2] App. 296-97.

and reduced cost services to ABB's corporate plans. This, combined with the payments received by Fidelity from both the internally managed, Fidelity mutual funds as well as the non-Fidelity mutual funds, amounts to a web of self-interested transactions. It is Defendants' burden to justify the fairness of these self-interested transactions. *Braden v. Wal-Mart Stores, Inc*., 2009 WL 4062105 (8th Cir. Nov. 25, 2009). It is also Defendants' burden under ERISA § 406(b) to "prove by a preponderance of the evidence that the transaction in question fell within an exemption. . . or must prove by clear and convincing evidence that compensation it received was for services other than a transaction involving the assets of the plan." *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987)(including a detailed discussion of the "in connection with" language under ERISA § 406(b) and why the burden of proof on the fiduciary is justified). Defendants' reliance on an affirmative defense under ERISA § 404(c) is misplaced. Aside from its inapplicability to the fiduciaries' selection of investment options for the Plans, Defendants admittedly did not inform participants of the very information the Eighth Circuit has held to be material and integral to the choice of investment options within the Plans, i.e. self-interested transactions, revenue sharing, and other factors that would lead a reasonable participant to question whether the option was included within the Plans because of a benefit to the Defendants, not because it was a prudent investment. *See Braden*, 2009 WL 4062105.

Defendants' conduct caused tremendous losses to the Plans and the retirement assets of participants, both when compared to the returns achieved by the same ABB fiduciaries in the defined benefit plan and when compared to other benchmarks.

## II. Each Defendant Is Liable For The Fiduciary Misconduct Against the Plans

### A. The ABB Defendants (ABB, Inc., John W. Cutler, Jr., Pension, Review Committee of ABB, Inc., Pension & Thrift Management Group of ABB, Inc., Employee Benefits Committee of ABB, Inc.)

ABB Defendants "are fiduciaries with respect to the selection of the plan's investment options and the prices paid to Fidelity for the services it provided to the plan." Doc. 470 p. 4. As such, pursuant to ERISA §§405, 409 and 502, each is liable, jointly and severally, for the multiple fiduciary breaches committed against the Plans.

**B. Fidelity Management Trust Company retains its veto power over the addition, termination, and replacement of investment options to this day.**

FMTC is a fiduciary because: (1) it is the trustee of the Plans and thus, at the very least, it is a co-fiduciary under ERISA § 405; and (2) under the Trust Agreement, it had the authority to veto the inclusion of non-Fidelity mutual funds as investment options. While the Court's ruling on summary judgment determined that FMTC was a fiduciary because it had the power to veto non-Fidelity mutual fund investments through 2004, closer examination of the Plan document shows that Fidelity continues to have such control through the present time. Doc. 470 pp. 4-5. (The Plans could only "offer . . . securities issued by the investment companies not advised by Fidelity Management & Research Company ('Non-Fidelity Mutual Funds') as **agreed** to between" ABB and Fidelity. App. 703 (emphasis added).

Specifically, Plaintiffs will submit evidence that, pursuant to an additional provision in section 4(b) of the Trust Agreement, FMTC retained such veto power after 2004 and maintains that veto power to this day. Indeed, this veto power authority was and is even broader than the "agree" requirement regarding Non-Fidelity Mutual Funds that was contained in the agreement until 2004. In particular, even as of the present time, the "Named Fiduciary" to the Plan, can only "add additional investment options with the **consent** of [Fidelity] and upon mutual amendment of [the] Trust Agreement and the Schedules thereto to reflect such additions." App. 703 (emphasis added). This provision applies not only to non-Fidelity funds but even as to which Fidelity funds are selected. Under ERISA §3(21)(iii), FMTC is a fiduciary to the Plans.

4

Similarly, pursuant to §13 of the Trust Agreement, any amendment to the Trust could be accomplished "**only** by an instrument executed by both the [ABB] and [Fidelity]." App. 716. Therefore, for any investment options added to and/or deleted from the Plans, both FMTC and ABB have to execute an instrument in compliance with this provision. It is undisputed that this power was not only provided, but also was exercised. *See e.g.* App. 907. Under these provisions, FMTC was and has been a fiduciary since 1995 and remains so today. As such, pursuant to ERISA §§405, 409 and 502, Fidelity and ABB are liable, jointly and severally, for the multiple fiduciary breaches proven at trial.

FMTC is also a functional fiduciary to the Plans given its unfettered exercise of authority and responsibility over the administration of the Plans. For instance, FMTC, with admittedly no input or guidance from ABB Defendants or participants, decided how participants' contributions (a Plan asset) would be handled and administered pending investment in the selection option(s). App. 66-67, 3489. In addition, FMTC, with no input, negotiation, or direction from ABB Defendants or participants, exercised complete authority and control over the handling and use of the interest earned (float) on these contributions (and redemptions) pending investment. App. 3494-95. For these additional reasons, FMTC was and is a fiduciary to the Plans.

### C. Fidelity Management and Research Company Is Jointly and Severally Liable With the ABB Defendants and FMTC.

In its Order, the Court observed that it was unclear as to the role played by FMRCo relative to the Plans. Doc. 470 pp. 5-6. FMRCO had multiple roles.

### 1. FMRCo is a fiduciary because it exercised discretion over the assets of the Plans.

FMRCo is a Plan fiduciary because it exercised discretion over Plan assets by acting as the investment advisor of the Plans' assets pending the investment of the assets in the

participants' investment option selections. As Fidelity admitted, participant contributions waiting transfer to respective investment options ("front-end float") and distribution checks not yet cashed ("back-end float") were transferred to Fidelity's "FICASH" desk.[3] While at the FICASH desk, the Plan assets were invested overnight in order to earn short term interest. These investment decisions were made by FMRCo with no direction from FMTC or ABB Defendants. Under ERISA's functional fiduciary definition, this made it a fiduciary over the Plan's assets. As the Court held with respect to FMTC, even if this fiduciary status was limited, it nonetheless may serve as the basis for co-fiduciary liability under ERISA § 405.

> **2. FMRCo unilaterally decided to pay itself for the handling of float and determined its own compensation.**

FMRCo not only decided how to invest Plan assets overnight but decided without input from ABB to pay itself for doing so as investment manager. Such actions were taken with unfettered discretion, making FMRCo a fiduciary as well as one involved in self-dealing. Further, FMRCo decided how much to pay itself for this investment management of the Plans' assets, another exercise of discretion. In performing these acts, FMRCo is a fiduciary to the Plans.

> **3. FMRCo knowingly participated in Defendants' fiduciary breaches.**

The fiduciary status of FMRCo would, in any case, be "irrelevant in light of the principle that parties who knowingly participate in fiduciary breaches may be liable under ERISA to the same extent as the fiduciaries." *Lowen*, 829 F.2d at 1220. In its role as investment advisor to Fidelity's mutual funds, it assessed the funds' expense ratios against participants' investments, collected the resulting monies and, from these monies transferred revenue sharing allocations to its affiliate FMTC. Doc. 470 p. 18. FMRCo did so as part of a pre-arranged scheme under

---

[3] This involved a number of discrete steps that will be set forth primarily in the testimony of Fidelity's witness Brigit Gentile.

which, even before any Fidelity mutual fund was chosen for the Plan, it was certain *both* that

FMRCo would make such internal revenue sharing transfers to FMTC *and* the amount (in basis

points of the Plan assets invested) that such transfers would be.  Thus, as the Court observed,

FMRCo was, at the very least, "involved as a non-fiduciary third party in the alleged scheme

between ABB and Fidelity Trust." Id. at 6.  As such, even if not a fiduciary, it is liable because it

knowingly participated and assisted in a fiduciary breach.

III.  **Fidelity's Decision to Provide Free and Discounted Services to ABB was Based on the Excessive Revenue Generated from the Plans and Their Imprudent Investment Options.**

    A.  **Fidelity admits that they would not have provided these free and discount priced services but for the already existing profitable relationship with the PRISM Plans.**

Fidelity admits that the free and discounted services it gave to ABB were the result of its

profitable relationship with the PRISM Plans.  *See* Doc. 321-1 ¶ 20 ("In determining whether to

offer DB, H&W, and HRP administrative services to existing defined contribution administrative

service clients . . . at the risk of . . . negative profit margins on such services, Fidelity considered

whether the overall client relationship was a profitable one.").  The evidence supports Fidelity's

admission.

When PricewaterhouseCoopers questioned Fidelity about whether Fidelity negotiated the

401(k) Plans' service contract with the H&W services, Fidelity responded that "[a]nytime there

is a possibility to add a new practice for an existing client, it is FESCo's practice to look at the

overall relationship with the client since engaging in multiple services with a client solidifies the

relationship and keeps the client from going out to bid in the future."  App. 01178. This was

consistent with Fidelity's practice of "net[ting] the profit on DC against the loss on H&W [DB,

and HRP]."  App. 01126.  This case is no different.  Fidelity was only able to provide these

discounted and free services because of the excess revenue of the PRISM Plans. Fidelity specifically ensured that this overall profitable relationship, exclusively due to the PRISM Plans, would continue when Defendants agreed to synchronize the contract renewal dates of the PRISM Plans with the discounted and free services. In this way, Fidelity ensured that it would not be stuck providing the discounted and free services if it was terminated and no longer receiving the subsidies from the PRISM Plans. Rather than exercise their statutory duty to select and retain prudent investment choices based upon the best interests of the PRISM plan participants, the Defendants' were making choices that would provide themselves, ABB, and the highly paid participants in the non-qualified plans free and discounted services.

### B. ABB knew that the free services it received from Fidelity, administering the retirement plans for its highly compensated executives, were bundled with the PRISM Plans' fees.

ABB requested that Fidelity administer a plan for its highly compensated officers in order to "save money at ABB and to consolidate administration." Doc. 258 ¶ 39. Fidelity first analyzed the revenue derived from, or in connection with, its services to the PRISM Plans and based its decision to provide free services to ABB directly on this revenue being sufficient. In order to maximize the "goodwill" generated from this waiver, Fidelity ensured that the relationship manager communicated to ABB both (1) the amount of the fees for the non-qualified plans and (2) that Fidelity was waiving these fees. App. 1175.

A consultant to ABB (Mercer) confirmed that the non-qualified plans' free services were being paid for by the PRISM Plans. Mercer warned ABB that the non-qualified plans' fees should be priced separately and paid by ABB. *Id.* Instead of following their consultants' advice, Defendants did two things: (1) used the non-qualified plans as a bargaining tool (Fidelity threatened to charge ABB for these free services if the non-qualified plans were unbundled from

the PRISM Plans) and (2) as fiduciaries to the Plans, caused the Plans to pay for non-qualified and H&W services directly. *See* Docs. 437, 439, 441, 447.

### C. ABB knew that it was receiving discounted services for its H&W plans and for payroll services from Fidelity as a result of the fees paid by the PRISM Plans.

Fidelity specifically told ABB that the H&W services were priced under market. In addition, the Mercer's report referenced above, warned the Plans' fiduciaries that the PRISM Plans were subsidizing other TBO (Total Benefits Outsourcing) services (H&W and Payroll Services) to ABB. App. 00376. Indeed, at its deposition in this case, Mercer admitted that Fidelity was engaging in "relationship pricing." Further, as late as 2006, Fidelity continued to assess the PRISM Plans charges for integrating the TBO or non-Plan related services.

### D. Despite the overwhelming evidence that Defendants purposefully tied the PRISM Plans fees to non-Plan related services, including explicit negotiations and a consultant's warnings, the prohibited behavior continues.

Four years after ABB was warned by Mercer that the PRISM Plans were improperly paying expenses for corporate plans, neither ABB nor Fidelity have properly addressed the findings contained in the Mercer report. To make matters worse, the Plans' fiduciaries proceeded to pay these charges (non-qualified and H&W) directly from the PRISM Plans. *See* Docs. 437, 439, 441, 447. Despite having continuously representing to this Court that they were not doing so, Defendants recently admitted that they had been in fact doing so for years.

## IV. Under ERISA § 406, the Burden of Demonstrating the Absence of Self-Dealing is on the Plans' Fiduciaries.

Although Plaintiffs are only required to show that the Plans' fiduciaries were in a position where their personal interests *might* conflict with the interests of the Plans', as demonstrated above, Plaintiffs have shown a direct causal connection between the imprudent decisions of the Fiduciaries and their own pecuniary gain. *See Braden*, 2009 WL 4062105, *13; *Lowen*, 829 F.2d

9

at 1215-16. Defendants now bear the burden to prove that the benefits conferred upon both ABB and Fidelity Defendants were not connected to a transaction involving the assets of the Plans. *Id.; Fulton Nat'l Bank v. Tate*, 363 F.2d 562, 571-72 (5th Cir. 1966). Defendants cannot plausibly meet this burden based on the undisputed facts and evidence set forth above.

In *Braden v. Wal-Mart Stores, Inc*., 2009 WL 4062105, *13 (8th Cir. Nov. 25, 2009), the Eighth Circuit held that traditional trust law principles inform the burden of proof analysis under the *per se* prohibitions of enumerated self-interested transactions under ERISA §406, 29 U.S.C. §1106. Relying on trust law principles, *Braden* explained that to prevail on breach of loyalty claims, plaintiffs "need only show that the fiduciary allowed himself to be placed in a position where his personal interest *might* conflict with the interest of the beneficiary, and the law presumes that the fiduciary acted disloyally." *Id*. quoting *Fulton Nat'l Bank v. Tate*, 363 F.2d 562, 571-72 (5th Cir. 1966)(emphasis added). The Eighth Circuit emphasized that "the transactions prohibited by [ERISA §406] tend to be those in which a fiduciary might be inclined to favor a party in interest at the expense of the plan's beneficiaries." *Braden* at *13 quoting *Harris Trust & Sav. Bank*, 530 U.S. 238 at 242, 120 S.Ct. 2180 (2000). "In such situations the burden of proof is always on the party to the self-dealing transaction to justify its fairness." *Id*. citing *Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978) ("[I]t would be new law to find that in a self-dealing transaction and prohibited transactions involving self-dealing the party representing the beneficiaries of the fiduciary whose self-dealing transaction is challenged must prove the unfairness of the transaction. The settled law is that in such situations the burden of proof is always on the party to the self-dealing transaction to justify its fairness.").

Similarly, in *Lowen v. Tower Asset Mgt. Inc.*, 829 F.2d 1209, 1215-16 (2d Cir. 1987), the court held that where a fiduciary is charged with a self-dealing transaction under ERISA

§406(b), it has the burden of proving that the transaction was not improper.  The court reasoned that the fiduciary "has the power to arrange [transactions] in a way that dispels all ambiguity. Any doubt about a causal connection between compensation to such a fiduciary and an investment of a pension plan's assets should therefore be resolved against the fiduciary."  *Id*. at 1215-16.

In *Fulton Nat'l Bank v. Tate*, the Fifth Circuit emphasized that once plaintiffs show that the fiduciary is in a position where her personal interests may conflict with those of his beneficiary, Plaintiffs need not "show that the fiduciary succumbed to this temptation, that he acted in bad faith, that he gained an advantage, fair or unfair, that the beneficiary was harmed… the fiduciary is punished for allowing himself to be placed in a position of conflicting interests in order to discourage such conduct in the future." 363 F.2d at 571-72.

Here, Defendants received consideration in connection with transactions involving Plan assets along with other benefits and gratuities, thereby placing themselves in a position where their interests directly conflicted with those of the Plans.  Plaintiffs have in fact proven but are not obligated to prove that this prohibited consideration was connected to transactions involving the Plans; Defendants must demonstrate by clear and convincing evidence that they were not. *Chao v. Linder*, 2007 WL 1655254, *7-*8 (N.D.Ill. May 31, 2007).  With regard to self-dealing under ERISA § 406(b)(3), once a conflict of interest has been shown, there is no need to show a "*quid pro quo*."  *Id. See also Brink v. DaLesio*, 496 F.Supp. 1350 (D.Md. 1980), aff'd in part and rev'd in part, 667 F.2d 420 (4th Cir. 1982) (trustee of a pension plan, having accepted gratuities from plan service providers, violated ERISA §406(b)(3) even though plaintiffs did not prove that the challenged transaction was a *quid pro quo* for the gratuities or that harm had resulted); *Fulton Nat. Bank*, 363 F.2d at 571 ("If the trustee receives a commission or bonus for acts done in

connection with the administration of the trust, he is accountable therefore, even if he does not commit a breach of trust in receiving the commission or bonus"); *Shirk v. Fifth Third Bancorp*., 2008 WL 4449024, \*17 (S.D.Ohio Sept. 26, 2008).

The policy underlying this lack of a quid pro quo requirement arises from the self-dealing that defines a violation under ERISA § 406(b)(3). ERISA's exacting duty of loyalty is clear and unyielding. Once violated, fiduciaries then incur a burden of proof that they could have avoided with proper behavior. Hence, self-dealing is a per se violation of ERISA and is not exempted by ERISA § 408. *Westoak Realty & Inv. Co. v. C.I.R.,* 999 F.2d 308, 310 (8th Cir. 1993). These rules are intended "to bar categorically a transaction that was likely to injure the pension plan" and "to eliminate the 'potentialities for abuse.' " *Id.(citing Commissioner v. Keystone Consol. Indus., Inc.,* 508 U.S. 152, 160 (1993)). The prohibited transaction rules are read broadly and liability is imposed even in the absence of bad faith. *See Keystone Consol.Indus., Inc.,* 508 U.S. at 160 (expansive "construction of the statute's broad language is necessary to accomplish Congress' goal"); *Lowen,* 829 F.2d at 1213 ("protection of beneficiaries ... requires that Section 406(b) be broadly construed" and fiduciaries are liable no matter how sincerely they believed that the prohibited transaction would benefit the plan); *Leigh v. Engle,* 727 F.2d 113, 126 (7th Cir. 1984).

## V. Defendants' Multiple Breaches of Fiduciary Duty and Prohibited Transactions Caused Losses to the Plans.

The Plan participants were entitled to have their fiduciaries select prudent investment options with the sole consideration being the *participants'* best interests. Instead, the Defendants selected exorbitantly over-priced choices that provided a "win-win" to Fidelity, ABB, and it executives, paid for by the plan participants. As a result of the undeniable breaches of fiduciary duty and prohibited transactions between ABB and Fidelity, the Plans suffered profound losses.

This is amplified when compared to the return generated in the defined benefit plan, which is administered by the same ABB fiduciaries; the PRISM Plans underperformed by $357.6 million. Mr. Cutler admitted that the five year performance of the PRISM Plans was on average 250 basis points less than the return of the defined benefit plan, whose performance directly impacts the corporation. ERISA §409(a), 29 U.S.C.1109(a), provides that the breaching fiduciary is "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. §1109(a). Under the plain language of the statute, Plaintiffs are entitled to damages sufficient to make the Plans whole for their losses.

Notably, Defendants themselves have acknowledged this measure of damages. In a June 27, 2005, presentation to the ABB's Pension Review Committee, Defendants were warned that, where they breach their duties, fiduciaries are personally liable not only to pay back any profits, gifts or kickbacks obtained, but also to restore any resulting losses to the plan. Defendants acknowledged that liability is "joint and several" among fiduciaries and that the "measure of loss" is what the plans earned or lost "on imprudent investment versus what it would have earned on another investment (at prevailing rate or the rate of return anticipated on the imprudent investment)."[4]

The measure of these damages is not the benefit received by ABB from its fiduciary breaches, but rather, "a comparison of what the Plan actually earned" in the imprudent and self-interested investment options "with what the Plan would have earned had the funds been available for other Plan purposes." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985); *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992)(adopting *Bierwirth*). In *Bierwirth*, the

---

[4] App. 415.

Second Circuit explained that "[i]n determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions." *Id.* The court emphasized that "[w]here several alternative investment strategies were equally plausible, *the court should presume that the funds would have been used in the most profitable of these*." *Id.* (emphasis added). If Defendants contest that the damages calculated by this measure are not proper, "[t]he burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty." *Id.* at 1056. Finally, the court explained that "[t]he trial court has discretion to fix a reasonable time period to compare actual performance of the improper investment with the performance which would have been realized from a prudent investment, but should ensure that defendants to not delay determinations of loss in the hope of avoiding or reducing that calculation." *Id.* at 1057.

Other courts agree. *See, e.g.*, *Evans v Akers*, 534 F.3d 65, 74 (1st Cir. 2008) ("Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio."); *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1046 (9th Cir. 2001)(noting that the measure of damages is the difference between the actual performance and the performance that the funds would have enjoyed in prudent but comparable assets); *Meyer v. Berkshire Life Ins. Co.*, 250 F.Supp.2d 533, 572 (D.Md. 2003) ("[T]he proper measure of damages is the difference between the investments' actual value and the value prudent investments would bear."); *Chao v. Moore*, 2001 WL 743204, *8 ("[C]omparing the return on the improper investment with that of a reasonably prudent

alternative investment represents an appropriate means of assessing damages under 29 U.S.C.

§1109."); *Chao v. Trust Fund Advisors*, 2004 WL 444029, *6-*7 (D.D.C. 2004).

### A. Plaintiffs' damages are not limited to the improper consideration received by Defendants.

Plaintiffs' damages are measured by the losses to the Plans; the damages are not limited to the value of the free and discounted services that ABB received. As a result of Defendants prohibited transactions, violations of their duties of loyalty to the participants, and egregious conflicts of interests as fiduciaries for the Plans, participants did not get that to which they were statutorily entitled -- prudent investment choices selected solely in participants' best interests. Instead, the participants got imprudent, exorbitantly priced, underperforming choices that were selected because of the benefit that such choices would confer on Defendants, the corporate sponsor, ABB, and their highly compensated executives. Plaintiffs are entitled to be made whole from these breaches, that is to be put as nearly as possible in the position they would have been in had they gotten what ERISA declares they were entitled to receive.

If a government procurement official awarded a contract to an unqualified, underperforming and over priced bidder from whom he accepted tickets and a trip to the Super Bowl, no one would argue that the damages that that government would be entitled to would be limited to the value of the trip and the tickets; the harm from the bribe is far more profound. ERISA §409 specifically states that Defendants who commit fiduciary breaches are liable to the Plans for "losses." The amount of benefit to ABB from the relationship with Fidelity does not define those losses, it is the *reason* Defendants chose imprudent funds.

Such a limitation of damages also defies logic. In 2006, in the context of Fidelity's misconduct in the operation of its mutual funds (including some of the same funds in the PRISM Plans), the Honorable John S. Martin, Jr. analyzed the damages to the funds caused by Fidelity

traders' acceptance of gratuities that were minimal compared to their impact.[5] Judge Martin specifically considered the traders' receipt of free travel, gifts, and other gratuities from brokers, analyzing the impact and resulting damages of these gratuities on the Fidelity Mutual Funds at issue. *Id.* at p.1. In one tainted trade alone, Judge Martin found $18 million of damages that resulted from a free flight to the Super Bowl, which was hardly worth a fraction of the cost paid by shareholders. *Id*. at p. 4-5.

Despite Defendants' arguments, Judge Martin's study of Fidelity makes clear that the disloyalty and self-interest that results from the acceptance of modest "gifts" causes far greater harm than the value of the gifts. Here, the value of the free and discounted services that ABB received pales in comparison to the damages the Plan suffered as a result of the excessively expensive, imprudent, and underperforming investment options Defendants selected and retained.

### B. Defendants bear the burden to prove the losses to the Plans resulted from something other than Defendants' breach.

Once the ERISA plaintiff has proved a breach of fiduciary duty of loyalty, particularly based upon conflicts of interest or prohibited transaction, the burden of proof shifts to the fiduciary to prove that the loss was ***not*** caused by the breach of duty. *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992). *See also Chao v. Trust Fund Advisors*, 2004 WL 444029, *6 (D.D.C. 2004)(once plaintiffs proved a breach of fiduciary duty and a prima facie case of loss to the plan, Defendants must then prove that the loss was not caused by their breach of fiduciary duty and "where there are ambiguities in determining loss, courts resolve them against the trustee in breach."). *See New York State Teamsters Council Health and Hospital Fund v. Estate of DePerno*, 18 F.3d 179, 182 (2d Cir. 1994)("In the law of trusts, however, it has been held that

---

[5] http://www.sec.gov/litigation/admin/2008/ia-2713-attorney_report.pdf (last visited December 26, 2009).

once the beneficiaries have established their *prima facie* case by demonstrating the trustees' breach of fiduciary duty, 'the burden of explanation or justification . . . shift[s] to the fiduciaries.'").

Indeed, *Donovan*, as adopted by the Eighth Circuit in *Martin*, explains that "where several alternative investment strategies [could have prudently been invested in, such as in a 401(k) plan,] the court should presume that the [imprudently invested] funds would have been used in the *most* profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty." Again, "any doubt or ambiguity should be resolved against them." *Id*. at 1056. This method of calculation is consistent with the common law of trusts. Restatement Third of Trusts §205 (a trustee who commits a breach of trust is "chargeable with the amount required to restore the values of the trust estate and trust distributions to what they would have been if the trust had been properly administered," in addition to "such liability as necessary to prevent the trustee from benefiting personally.")

Despite this, Plaintiffs' calculations of damages do not use the most profitable investment alternative. Plaintiffs could have calculated damages based upon selecting investments that performed best over the period. They could have shown the returns of the best managers anywhere or could have cherry picked only the underperforming funds. Instead, Plaintiffs took a far more conservative approach. They compared the underperformance to a real return which these same fiduciaries actually produced for their own corporate pension plan, whose IPS Mr. Cutler used as the model for the IPS of the PRISM Plans. The return of the PRISM Plans greatly underperformed this actual return of the defined benefit plan by $357.6 million..

17

As a starting point for damages, the underperformance of the Plans can be measured against a market index return available to anyone. On that measure alone, the underperformance is over $78 million. Defendants distort Plaintiffs' position by suggesting that Plaintiffs will contend at trial that active management is a *per se* violation of ERISA. As Defendants know from the expert reports and depositions and in response to the Court's inquiry in this regard, Plaintiffs will not make such a *per se* claim at trial. It is the case that, because active management carries higher costs, because very few active managers outperform the market after fees, and because a market return is always available from an index fund, a prudent fiduciary who chooses active managers must have a reasonable expectation of outperforming the market after fees. Here, such a market return is the starting point for measuring damages from underperformance.

## VI. Defendants' Contentions That Other 401(k) Plans Include Retail Mutual Funds That Engage in Revenue Sharing Are Irrelevant to Defendants' Misconduct Here.

Defendants' reliance on the practices of some other 401(k) plans, which allegedly include retail mutual funds, is irrelevant to Defendants' failures to comply with fiduciary standards established by them in the Plans (as set forth in the IPS) and to avoid even the appearance of impropriety under ERISA § 406. Defendants failed to abide by the IPS by, among other things: (1) including retail mutual funds without ensuring that alliance rebates "[were] used to offset or reduce the cost of providing administrative services to plan participants;" (2) by including retail mutual funds, failing to use "purchasing power afforded by the size of plan assets to reduce the cost to participants;" (3) failing to consider readily available institutional commingled funds rather than retail mutual funds; and (4) failing to select mutual fund share classes "that provide[] participants with the lowest cost of participation."

Second, Defendants arguments ignore that prudent fiduciaries who include mutual funds as investment options: (1) account for all available revenue sharing: (2) break down all plan expenses into discrete services and determine the reasonable value of each; (3) ensure that revenue sharing transfers are used to pay only reasonable fees for each discrete service; and (4) to the extent that more revenue sharing monies are available than necessary to pay such fees, require that it be returned to the Plan. Defendants' expert, Mr. Gissiner, correctly insists in his everyday practice that prudent fiduciaries must do just that, "peeling the onion" to determine the charge for, and value of, each discrete service. Similarly, the Texa$aver Plan, of which Defendants' expert, Ms. Starks is a fiduciary, requires that mutual fund revenue sharing be rebated directly into participants' accounts.

Despite Fidelity having specific procedures to take corrective actions to reduce Plan fees, Defendants failed to do anything. Defendants' failure to act is amplified when they received reports at least quarterly indicating the Plans' excessive fees. Defendants are thus liable for these excessive fees.

## VII. Defendants Are Not Entitled To a Three Year Statute of Limitations.

### A. Defendants Cannot Prove That Plaintiffs Had Actual Knowledge of Their Fiduciary Breaches So As Invoke ERISA's Three Year Statute of Limitations.

ERISA §1113 "sets a high standard for barring claims against fiduciaries prior to the expiration of the section's six-year limitations period." *Gluck v. Unisys Corp.,* 960 F.2d 1168, 1176 (3d Cir. 1992). To rely on ERISA's three-year statute of limitations, Defendants have the burden of showing when or if the Plaintiffs acquired *actual knowledge* of Defendants' fiduciary breaches. *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 201 (D.Del. 2000). To have "actual knowledge" of a breach, a plaintiff "must have had specific knowledge of the actual breach of duty upon which he sues," more than "notice that something was awry." *Martin*, 966 F.2d at

1086 [need full cite].  Information giving rise to such knowledge "could include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Caputo v. Pfizer Inc*., 267 F.3d 181, 193 (2d Cir. 2001); *see also Radiology Ctr. v. Stifel, Nicolaus & Co.,* 919 F.2d 1216, 1222 (7th Cir. 1990); *Bona v. Barasch*, 2003 WL 1395932, *16 (S.D.N.Y. 2003).

Here, Defendants cannot prove that Plaintiffs had actual knowledge of Defendants' fiduciary misconduct.  As set forth above, Defendants concealed the facts from which Plaintiffs could have discerned that "something was awry," much less that from which they would have actual knowledge of such causes of action.  Thus, the three year statute of limitations simply does not apply.

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON

By: /s/Troy A. Doles
Jerome J. Schlichter,
Daniel V. Conlisk
Heather Lea,
Troy A. Doles
100 S. Fourth Street, Suite 900
St. Louis, Missouri 63102
(314) 621-6115
(314) 621-7151 (Fax)
jschlichter@uselaws.com
dconlisk@uselaws.com
hlea@uselaws.com

ATTORNEYS FOR PLAINTIFFS/
CLASS REPRESENTATIVES
*Ron Tussey, Charles Fisher, Timothy Hendron and Timothy Pinnell*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 28, 2009 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Adam B. Walker, Azeez Hayne, Brian Boyle, Brian T. Ortelere, Charles Lee Jolley, Gregory C. Braden, Henry D. Fellows, Jr., James O. Fleckner, James S. Dittmar, Jeffrey A. Strgeon, Jeffrey S. Russell, Michael J. Nester, Richard N. Bien, Robert N. Eccles, Shannon Barrett, Stephen D. Brody, Thomas E. Wack, William J. Delany.


                                        /s/ Troy A. Doles