**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

|  |  |  |
|---|---|---|
| RONALD C. TUSSEY, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 06-cv-04305 (NKL) |
| | : | |
| v. | : | |
| | : | |
| ABB, INC., et al., | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Brian T. Ortelere
William J. Delany
Azeez Hayne
Jeffrey A. Sturgeon
Melissa D. Hill
Erica E. Flores
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel:  (215) 963-5000
Fax:  (215) 963-5001
*admitted pro hac vice*

Jeffrey S. Russell
BRYAN CAVE LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102
Tel:  (314) 259-2000
Fax:  (314) 259-2020

*Attorneys for the ABB Defendants*

Richard N. Bien
LATHROP & GAGE, L.C.
2345 Grand Blvd., Suite 2800
Kansas City, MO 64108

M. Randall Oppenheimer
Robert N. Eccles
Brian D. Boyle
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
*admitted pro hac vice*

James S. Dittmar
James O. Fleckner
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
*admitted pro hac vice*

*Attorneys for the Fidelity Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PROPOSED FINDINGS OF FACT ................................................................... 2

I.     BACKGROUND ........................................................................................ 2

II.    ABB'S SELECTION AND MONITORING OF INVESTMENT OPTIONS MET
FIDUCIARY STANDARDS ................................................................... 3

    A.    The November 2000 Plan Redesign Was State Of The Art ................. 3

        1.    Tier 1 – "Managed Allocation" Funds ..................................... 3

        2.    Tier 2 – Passively-Managed Funds ........................................... 4

        3.    Tier 3 – Actively-Managed Funds ............................................ 4

    B.    The Cost Of The Plan's Options Was Reasonable ............................. 7

    C.    ABB Prudently Monitored Plan Performance ..................................... 9

    D.    ABB's Selection And Monitoring Process Was Not Tainted By Its
Relationship With Fidelity ................................................................ 12

        1.    Fidelity Has No Authority To Select Investment Options ....... 12

        2.    Fidelity Had No Influence Over ABB's Fund Selections ....... 13

III.    ABB COMPLIED WITH THE INVESTMENT POLICY STATEMENT ..... 15

IV.    ABB PRUDENTLY ARRANGED FOR AND MONITORED PLAN SERVICES ....... 17

    A.    Background ........................................................................................ 17

    B.    The Use Of Revenue-Sharing And Absence of Participant Rebates Was
The Norm for 401(k) Plans .............................................................. 19

    C.    ABB Prudently Monitored The Reasonableness Of All Recordkeeping
Fees .................................................................................................. 20

V.    THE PLAN'S FEES AND FIDELITY'S COMPENSATION WERE
OBJECTIVELY REASONABLE ........................................................ 21

    A.    The Plan's Total Costs Were In The Mainstream ............................. 21

    B.    ABB's Recordkeeping Fees, And Fidelity's Compensation For Those
Services, Were Reasonable ............................................................... 22

    C.    Fidelity's Fees For Investment Management Were Reasonable ......... 27

VI.    ABB'S SELECTION OF FIDELITY TO PROVIDE OTHER SERVICES DID
NOT AFFECT PLAN DECISIONS ..................................................... 27

    A.    Background ........................................................................................ 27

    B.    Fidelity's TBO Losses Are Not Evidence Of Below-Market Prices ... 28

Case 2:06-cv-04305-NKL   Document 552   Filed 02/11/10   Page 2 of 67

C. Plaintiffs' Theory That Fidelity Sought To Influence ABB's Plan Decision Making Through Below-Market TBO Concessions Is Implausible ................... 29

D. TBO Pricing Terms Were Not Linked To Plan Pricing Or Transactions ........... 29

E. Fidelity's Non-Qualified Plan Services Did Not Influence Any Plan Transactions ....................................................................................................... 31

    1. Background ............................................................................................ 31

    2. Fidelity's Decision To Absorb Certain Non-Qualified Plan Costs Was Not Tied To Any Plan Transaction ................................................ 32

F. Any Errors In Invoicing The Plan For Non-Plan Services Have Been Corrected ........................................................................................................... 33

VII. FIDELITY'S HANDLING AND INVESTMENT OF FLOAT WAS PROPER ........... 34

PROPOSED CONCLUSIONS OF LAW ...................................................................... 35

I. THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' PRINCIPAL CLAIMS ................................................................................................................ 35

II. FIDUCIARY STATUS ........................................................................................... 36

A. FMT Has No Fiduciary Status With Respect To The Selection Of Plan Investment Options .......................................................................................... 37

    1. The Trust Agreement Denies FMT Any Discretionary Authority Over Investment Selection ..................................................................... 37

    2. Fidelity Is Not A Fiduciary With Respect To Its Compensation Terms ..................................................................................................... 39

    3. Fidelity Did Not Act As An Investment Adviser .................................... 40

B. FMR Is Not A Plan Fiduciary With Respect To Investment Selections Or Fidelity Compensation And Did Not Breach Duties Concerning Float ............. 40

C. Neither FMT Nor FMR Is Liable As A Co-Fiduciary ......................................... 40

III. DEFENDANTS DID NOT BREACH ERISA'S DUTY OF PRUDENCE ................... 41

A. The Plan's Investments Were Chosen Using A Prudent Process And Were Substantively Reasonable ................................................................................ 43

    1. ABB Employed A Prudent Process ........................................................ 43

    2. The Plan's Investment Selections Were Objectively Reasonable ........... 43

B. The Plan's Asset-Based Structure Was Not Imprudent ...................................... 44

C. The Plan's Recordkeeping Fees Were Reasonable ............................................. 45

IV. DEFENDANTS DID NOT BREACH THE IPS ........................................................ 47

Case 2:06-cv-04305-NKL   Document 552   Filed 02/11/10   Page 3 of 67

**TABLE OF CONTENTS**
(continued)

V.     DEFENDANTS DID NOT BREACH ANY DUTY OF LOYALTY ............................ 48

VI.    PLAINTIFFS' Prohibited Transaction CLAIMS FAIL ................................... 49

VII.   PLAINTIFFS HAVE FAILED TO ESTABLISH A RIGHT TO RELIEF AGAINST THE FIDELITY DEFENDANTS AS NONFIDUCIARIES ........................ 51

VIII.  DAMAGES ................................................................................................... 52

       A.    The Alleged Breaches Had No Causal Connection To Any Damages ............... 52

       B.    Plaintiffs Misread Donovan v. Bierwirth ............................................. 53

# TABLE OF AUTHORITIES

## CASES

*Adamson v. ARMCO, Inc.*,
44 F.3d 650 (8th Cir. 1995) ..........................................................................................35

*Aetna Life Insurance Co. v. DFW Sleep Diagnostics Center*,
No. 02-1335, 2004 WL 1922033 (E.D.La. Aug. 25, 2004) ........................................52

*Angell v. John Hancock Life Insurance Co.*,
421 F. Supp. 2d 1168 (E.D. Mo. 2006)......................................................................35

*Armstrong v. LaSalle Bank National Association*,
446 F.3d 728 (7th Cir. 2006) ......................................................................................42

*Barker v. Ceridian Corp.*,
193 F.3d 976 (8th Cir. 1999) ......................................................................................48

*Braden v. Wal-Mart Stores, Inc.*,
No. 08-3109, 2009 WL 4062105 (8th Cir. Nov. 25, 2009) ...................................43, 44

*Brandt v. Principal Life and Disability Ins. Co.*,
50 F. App'x 330 (8th Cir. 2002)..................................................................................43

*Brandt v. Grounds*,
687 F.2d 895 (7th Cir. 1982) ......................................................................................52

*Brock v. Robbins*,
830 F.2d 640 (7th Cir. 1987) .................................................................................41, 42

*Calhoon v. TWA*,
400 F.3d 593 (8th Cir. 2005) ......................................................................................52

*Chao v. Merino*,
452 F.3d 171 (2d Cir. 2006).......................................................................................42

*Chi. District Council of Carpenters Welfare Fund v. Caremark, Inc.*,
474 F.3d 463 (7th Cir. 2007) ......................................................................................39

*Curtiss-Wright v. Schoonejongen*,
514 U.S. 73 (1995)......................................................................................................47

*DiFelice v. U.S. Airways, Inc.*,
397 F. Supp. 2d 735 (E.D. Va. 2005) .........................................................................41

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982)............................................................................49, 53, 54

*Dupree v. Prudential Insurance Co. of America*,
No. 99-8337, 2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) ....................................41, 42

*Eckelkamp v. Beste*,
201 F. Supp. 2d 1012 (E.D. Mo. 2002)...........................................................................36

*Edgar v. Avaya, Inc.*,
501 F.3d 340 (3d Cir. 2007)...........................................................................................42

*Etter v. J. Pease Construction Co.*,
963 F.2d 1005 (7th Cir. 1992) .......................................................................................52

*Evans v. Bexley*,
750 F.2d 1498 (11th Cir. 1985) .....................................................................................50

*Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v.*
*Edward D. Jones & Co.*,
884 F.2d 288 (7th Cir. 1989) .........................................................................................40

*Finkel v. Romanowicz*,
577 F.3d 79 (2d Cir. 2009)............................................................................................38

*Firestone Tire & Rubber Co. v. Bruch*,
489 U.S. 101 (1989)......................................................................................................37

*Firstier Bank v. Zeller*,
16 F.3d 907 (8th Cir. 1994) ...........................................................................................50

*Frommert v. Conkright*,
433 F.3d 254 (2d Cir. 2006)..........................................................................................35

*George v. Kraft Foods Global, Inc.*,
No. 07-1713, 2010 WL 331695 (N.D. Ill. Jan. 27, 2010)................................42, 43, 45

*Great-West Life & Annuity Insurance Co.v. Knudson*,
534 U.S. 204 (2002)......................................................................................................51

*Harley v. Minnesota Min. and Manufacturing Co.*,
284 F.3d 901 (8th Cir. 2002) ...................................................................................49, 50

Case 2:06-cv-04305-NKL   Document 552   Filed 02/11/10   Page 6 of 67

*Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.,*
530 U.S. 238 (2000)................................................................................................................51

*Hecker v. Deere & Co.,*
556 F.3d 575 (7th Cir. 2009) ............................................................................... passim

*Henglein v. Colt Industrial Operating Corp.,*
260 F.3d 201 (3d Cir. 2001)................................................................................................35

*Herman v. Mercantile Bank, N.A.,*
143 F.3d 419 (8th Cir. 1998) ..............................................................................................42

*In re Honda of America Manufacturing ERISA Fees Litigation,*
No. 08-cv-1059, 2009 U.S. Dist. LEXIS 95087 (S.D. Ohio Oct. 9, 2009)....................43

*Hughes Aircraft Co. v. Jacobson,*
525 U.S. 432 (1999)................................................................................................36, 37

*ING Principal Prot. Funds Derivative Litigation,*
369 F. Supp. 2d 163 (D. Mass. 2005) ............................................................................47

*Ince v. Aetna Health Management, Inc.,*
173 F.3d 672 (8th Cir. 1999) ..............................................................................................43

*Jenkins v. Yager,*
444 F.3d 916 (7th Cir. 2006) ..............................................................................................43

*Johnson v. Georgia-Pacific Corp.,*
19 F.3d 1184 (7th Cir. 1994) ..............................................................................................38

*Jordan v. Mich. Conference of Teamsters Welfare Fund,*
207 F.3d 854 (6th Cir. 2000) ..............................................................................................50

*Katsaros v. Cody,*
744 F.2d 270 (2d Cir. 1984)................................................................................................41

*Keach v. U.S. Trust Co.,*
240 F. Supp. 2d 840 (C.D. Ill. 2002) ................................................................................40

*Knieriem v. Group Health Plan, Inc.,*
434 F.3d 1058 (8th Cir. 2006) ......................................................................................51, 52

*Krinsk v. Fund Asset Mgmt., Inc.*,
715. F. Supp. 472 (S.D.N.Y. 1987),
*aff'd*, 875 F.2d 404 (2d Cir. 1989) ..........................................................................47

*Kuper v. Iovenko*,
66 F.3d 1447 (6th Cir. 1995) ....................................................................................41

*Landro v. Glendenning Motorways, Inc.*,
625 F.2d 1344 (8th Cir. 1980) ...........................................................................37, 38

*Larson v. Northrop Corp.*,
21 F.3d 1164 (D.C. Cir. 1994) ..................................................................................36

*Larson v. University Women's Health Pension Plan*,
971 F. Supp. 398 (D. Minn. 1997) ............................................................................35

*Leigh v. Engle*,
727 F.2d 113 (7th Cir. 1984) ...............................................................................49, 52

*Leister v. Dovetail, Inc.*,
546 F.3d 875 (7th Cir. 2008) ....................................................................................54

*Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mutual of Ohio*,
982 F.2d 1031 (6th Cir. 1993) ..................................................................................38

*Librizzi v. Children's Mem'l Medical Ctr.*,
134 F.3d 1302 (7th Cir. 1997) ..................................................................................36

*Lockheed Co. v. Spink*,
517 U.S. 882 (1996).......................................................................................36, 37, 50

*Loomis v. Exelon Corp.*,
No. 06-4900, 2009 WL 4667092 (N.D. Ill. Dec. 9, 2009)........................................43

*Loomis v. Exelon Corp.*,
40 EBC 1184 (N.D. Ill. Feb. 21, 2007)......................................................................54

*Maniace v. Commerce Bank, N.A.*,
40 F.3d 264 (8th Cir. 1994) ......................................................................................36

*Marks v. Independence Blue Cross*,
71 F. Supp. 2d 432 (E.D. Pa. 1999) ..........................................................................39

Case 2:06-cv-04305-NKL   Document 552   Filed 02/11/10   Page 8 of 67

*Martin v. Feilen*,
965 F.2d 660 (8th Cir. 1992) ...........................................................................................40, 50, 53

*McLaughlin v. Bendersky*,
705 F. Supp. 417 (N.D. Ill. 1989) .................................................................................................47

*NLRB v. Bolivar-Tees, Inc.*,
551 F.3d 722 (8th Cir. 2008) ........................................................................................................40

*Nechis v. Oxford Health Plans, Inc.*,
421 F.3d 96 (2d Cir. 2005).............................................................................................................52

*Pegram v. Herdrich*,
530 U.S. 211 (2000)........................................................................................................................36

*Pendleton v. Quiktrip Corp.*,
567 F.3d 988 (8th Cir. 2009) ........................................................................................................48

*Phillips v. Alaska Hotel & Restaurant Employee Pension Fund*,
944 F.2d 509 (9th Cir. 1991) ........................................................................................................35

*Roth v. Sawyer-Cleator Lumber Co.*, ("*Roth I*")
16 F.3d 915 (8th Cir. 1994) ...........................................................41, 42, 49, 52, 53, 54

*Roth v. Sawyer-Cleator Lumber Co.*, ("*Roth II*")
61 F.3d 599 (8th Cir. 1995) ..........................................................................................................53

*Schloegel v. Boswell*,
994 F.2d 266 (5th Cir. 1993) ........................................................................................................40

*Schulist v. Blue Cross*,
717 F.2d 1127 (7th Cir. 1983) ......................................................................................................39

*Seaway Food Town, Inc. v. Medical Mutual*,
347 F.3d 610 (6th Cir. 2003) ........................................................................................................39

*Shirk v. Fifth Third Bancorp.*,
No. 05-cv-049, 2009 U.S. Dist. LEXIS 90775 (S.D. Ohio Sept. 11, 2009) .................................35

*Silverman v. Mutual Ben. Life Insurance Co.*,
138 F.3d 98 (2d Cir. 1998)............................................................................................................52

Case 2:06-cv-04305-NKL    Document 552    Filed 02/11/10    Page 9 of 67

*Taylor v. United Tech.*,
No. 06-1494, 2009 WL 535779 (D. Conn. Mar. 3, 2009) ............................................................42

*In re Unisys Sav. Plan Litigation*,
173 F.3d 145 (3d Cir. 1999) ........................................................................................................42

*Vanvels v. Betten*,
No. 06-710, 2007 WL 329048 (W.D. Mich. Jan. 31, 2007) ........................................................50

*Varity Corp. v. Howe*,
516 U.S. 489 (1996) ....................................................................................................................38

*Wright v. Oregon Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004) ....................................................................................................50

*Wsol v. Fiduciary Management Associates, Inc.*,
266 F.3d 654 (7th Cir. 2001) ..........................................................................................41, 42, 50, 52

*Young v. GM Investment Management Corp.*,
550 F. Supp. 2d 416 (S.D.N.Y. 2008) ........................................................................................35

## STATUTES

15 U.S.C. § 80a-32 ......................................................................................................................44

15 U.S.C. § 80a-(a)(1) ................................................................................................................44

15 U.S.C. § 80a-18(f) ..................................................................................................................45

15 U.S.C. § 7241(a) ....................................................................................................................44

26 U.S.C. § 401(k) ........................................................................................................................2

26 U.S.C. § 851(b)(3) ..................................................................................................................44

29 U.S.C. § 1002(21) ..............................................................................................................36, 38

29 U.S.C. § 1101(b)(1) ................................................................................................................39

29 U.S.C. § 1104(a)(1)(B) ..........................................................................................................41

29 U.S.C. § 1105(a)(3) ................................................................................................................40

29 U.S.C. § 1106(b) ........................................................................................................50

29 U.S.C. § 1109(a) ........................................................................................................52

29 U.S.C. § 1113(1) .........................................................................................................35

29 U.S.C. § 1113(2) .........................................................................................................35

29 U.S.C. § 1132(a)(3) .....................................................................................................51

29 U.S.C. § 1144(d) .........................................................................................................46

29 U.S.C. § 1108(b)(2) .....................................................................................................49

29 U.S.C. § 1108(c)(2) .....................................................................................................49

**REGULATIONS**

17 C.F.R. § 270.0-1(a)(7)..................................................................................................44

17 C.F.R. § 270.22c-1........................................................................................................44

17 C.F.R. § 270.2a-4, 270.18f-3(a)(1), (4) .......................................................................45

17 C.F.R. § 270.38a-1........................................................................................................44

26 C.F.R. § 1.162-7(b)(3) .................................................................................................42

29 C.F.R. § 2509.08-2.......................................................................................................47

29 C.F.R. § 2510.3-21.......................................................................................................40

72 Fed. Reg. 70988, 70991 (Dec. 13, 2007) ...................................................................46

72 Fed. Reg. 64731, 64742 (November 16, 2007)............................................................46

**MISCELLANEOUS**

DOL Adv. Op. 2009-04a (Dec. 4, 2009) ....................................................................39

DOL, 401(k) Fiduciary Education Campaign, *at* http://bit.ly/b24lfg ...........................43

H.R. Rep. No. 93-1280, at 308 (1974).....................................................................40

*Investment Company Institute,*
SEC No-Action Letter, 1998 SEC No-Act. LEXIS 976, at *14 (Oct. 30, 1998)..........................47

Restatement Third of Trusts § 91..............................................................................42

Case 2:06-cv-04305-NKL   Document 552   Filed 02/11/10   Page 12 of 67

## INTRODUCTION

Plaintiffs claim that this lawsuit is not a challenge to industry practices, but rather a case of ABB being "in bed" with Fidelity. They argue that conflicts of interest caused ABB to make decisions for the purpose of advancing its own and Fidelity's interests at the expense of Plan participants. Plaintiffs argue that ABB chose investment options not because of the inherent advantages of those options, but rather with the intent to enrich Fidelity and to secure free or discounted services for itself by providing investments that generated revenue for Fidelity. Plaintiffs ignore the fulsome process that Cutler and the PRC employed to make well-reasoned decisions in selecting investment options for the Plan, despite two volumes of real-time PRC minutes attesting to it. They also ignore that Cutler – the individual responsible for identifying and recommending the Plan's options – was entirely disconnected from ABB's selection of Fidelity for non-401(k) services.

Plaintiffs also ignore the fact that mutual fund investments provide benefits not offered by other types of investments, that active management offers participants the option to elect risks and seek returns other than at overall market rates, and that ABB made a conscious, thoughtful decision to use actively managed mutual funds because of those benefits.

As there is no direct evidence of any scheme to enrich Fidelity at the expense of Plan participants, plaintiffs resort to strained inferences from a handful of documents. Plaintiffs, however, simply ignore the undisputable (indeed, largely stipulated) evidence that directly undercuts any such inference. Thus, plaintiffs posit that ABB worked to enrich Fidelity even though the fund selection process reflects the steady removal of Fidelity funds – including the largest and most profitable Fidelity funds – from the lineup; even though the total plan assets Fidelity managed plummeted during the relevant period; and even though Fidelity's total compensation derived from the Plan plunged from a high of more than $8 million in 2000 to just $3 million in 2008.

Finally, plaintiffs' claims are defeated by the evidence that the structure of this Plan was consistent with industry norms and that the costs incurred by the Plan were reasonable.

## PROPOSED FINDINGS OF FACT

### I.  BACKGROUND

1.  The Personal Retirement and Savings Management Plan for Employees of ABB Inc. ("PRISM") and the Personal Retirement and Savings Management Plan for Certain Represented Employees of ABB Inc. ("Represented PRISM") (together, the "Plan") are defined contribution ("DC") plans under Section 401(k) of the Internal Revenue Code.[1] 26 U.S.C. § 401(k).  The Plan was established to attract and retain employees and to assist them in saving for their retirement.  (Wentworth.)  Participants save money for retirement by investing a portion of their income in one or more of the Plan's investment options on a tax-deferred basis.

2.  Defendant ABB Inc. is the Plan sponsor.  Defendant Employee Benefits Committee of ABB Inc. ("EBC") is a three-member committee appointed by ABB's board of directors to oversee all of ABB's employee benefits programs.  It has sole authority to amend or modify the Plan.  (DA1061.)  Defendant Pension Review Committee of ABB Inc. ("PRC") is a named fiduciary of the Plan and is responsible for selecting and monitoring the Plan's investment options.  (DA1061.)  It typically consisted of ABB's Chief Financial Officer, Treasurer, and the Vice President of Human Resources.  (DA1061, Article 12 §§ 2.25, 2.44, 3.2.)  Defendant Pension & Thrift Management Group of ABB Inc. ("PTM") acts as the staff of the PRC. Defendant John W. Cutler, Jr. ("Cutler") has been Director of the PTM since 1999.  (Cutler.)  He has a Masters of Business Administration and has substantial prior experience managing 401(k) plans.  (*Id.*)  Hereinafter, ABB, the PRC, the EBC, the PTM and Cutler may be referred to collectively as "ABB."

---

[1]  PRISM and Represented PRISM are functionally identical.  They differ only with respect to participant eligibility. Salaried and non-unionized hourly employees are eligible to participate in PRISM.  Unionized employees are eligible to participate in Represented PRISM.

3. Pursuant to a Trust Agreement (the "TA"), Defendant Fidelity Management Trust Company ("FMT") is the Plan trustee and recordkeeper. (P1; JD41.) As such, FMT acts as a directed trustee of the trust that holds Plan assets and provides various recordkeeping and administrative services to the Plan and its participants. FMT does not exercise discretion in carrying out its duties and instead follows the instructions of ABB and Plan participants. (JD41 at §§ 3-7.)

4. Defendant Fidelity Management & Research Company ("FMR") (together with FMT, "Fidelity") is the investment adviser to the Fidelity mutual funds offered by the Plan. (Jarczyk; JD41 at § 4, Sch. C.) FMR's only other connection to the Plan is its investment of the bank account balances held for the benefit of the Plan's investment options. *See infra* Section VII.

## II. ABB'S SELECTION AND MONITORING OF INVESTMENT OPTIONS MET FIDUCIARY STANDARDS

### A. The November 2000 Plan Redesign Was State Of The Art

5. In November 2000, the PRC adopted the Plan's Investment Policy Statement (the "IPS"). (P460; Wentworth; Cutler.) The IPS contemplates investment options in each of three categories or tiers – managed allocation, passively-managed and actively-managed. (P20 at § 4; Cutler; P348 at 45155.) To implement this strategy, the PRC approved the addition of 17 new funds to the Plan's existing lineup on November 14, 2000. (J7 at 50927-29.)

#### 1. Tier 1 – "Managed Allocation" Funds

6. The "managed allocation" tier was intended for Plan participants "unwilling or unable to make a personal asset allocation decision." (P20 at § 4(1).) For this tier, Cutler and the PRC opted for funds whose asset mixes change over time, rather than remain static. (Cutler; Wentworth; *see also* P447.) They reasonably believed that such dynamic "target-date" funds would be more attractive and beneficial to participants because their asset allocations automatically adjust over time to reflect a level of risk that is appropriate for a particular retirement date. (*Id.*)

3

7.     Since target-date funds were relatively new to the industry at the time, there were only a few providers to consider.  (Cutler.)  Cutler considered T. Rowe Price, Barclays Global Investors ("BGI") and Fidelity and, after meeting with the fund managers, selected the Fidelity Freedom Funds.  (*Id.*; DA938, DA940.)  He believed the Freedom Funds were the most appropriate for the Plan because of their make-up, their "glide path," *i.e.*, how their asset allocation changes over time, and his confidence in their managers.  (Cutler; J7 at 50927.)  ABB's selection of the Freedom Funds was reasonable and consistent with industry standards.  (Starks.)  Indeed, the Freedom Funds are one of the most popular suites of target-date funds in the industry.  (*Id.*)

8.     In connection with this decision, Cutler also recommended, and the PRC agreed, that the Vanguard Wellington Fund should be removed from the Plan's lineup because it was no longer structurally necessary given the addition of the Freedom Funds.[2]  (P447 at 50874; P324; J7 at 3664; Cutler.)  This determination was not imprudent.

### 2.     Tier 2 – Passively-Managed Funds

9.     The passively-managed tier was intended for participants who "wish to establish and maintain their own asset allocation . . . without active management risk."  (P20, at § 4(2).)  The IPS called for four types of funds – a bond index fund, an S&P 500 index fund, an extended U.S. equity market index fund, and an international equity "EAFE" index fund.  (*Id.*)  This tier allowed participants to create fully diversified portfolios at very low cost.  (Starks; Cutler.)  The PRC selected four very inexpensive BGI institutional commingled funds for this tier.  (*Id.*)

### 3.     Tier 3 – Actively-Managed Funds

10.    The actively-managed tier was intended for participants who "wish to take on active management risk and the associated potential for higher return."  (P20 at § 4(3).)  For this tier, the IPS called for a variety of "style-specific" funds with "comparatively tight tracking error to their benchmarks" and without "high concentrations in industry or regional sectors."  (*Id.*)  The

---

[2]  The Wellington Fund was underperforming the PRC's benchmarks on three- and five-year bases at the time. (J7 at 3664)

intent was to give participants the ability to build a unique portfolio that suited their individual appetites for risk. (Wentworth.)

11. To accomplish this goal, ABB decided to offer three domestic equity options in each of four distinct styles, as well as a variety of fixed income and international equity options. (Cutler; Wentworth.) All of these funds were mutual funds except the Income Fund, a separate account that ABB has offered participants since at least 1995. The Income Fund is a unique "hybrid" stable value fund that is not available as a mutual fund. (Cutler; Wentworth.)

12. ABB chose mutual funds for the actively-managed equity options over separate accounts or commingled pools for a number of reasons: first, they are more heavily regulated by the federal government, which provides additional protection for participants' investments; second, information about the performance and composition of mutual funds is readily available in newspapers, prospectuses, government filings and independent third-party analyses;[3] and, third, because separate accounts and pools require larger minimum investments than mutual funds, ABB would have had to reduce the total number of available options in order to use more separate accounts or commingled pools, a result that would have been directly contrary to the IPS. (Cutler; Kampner; Starks; Wentworth; P20 at 2735.) In short, ABB chose mutual funds because they offer a number of distinct advantages over separate accounts and commingled pools. This decision was reasonable.

13. At least three years before Plaintiffs commenced this lawsuit, Plan participants were provided materials stating that "most of the funds offered through PRISM are mutual funds," including all of the Plan's actively-managed equity options and the Freedom Funds. (JD45 at 42-55; Halsey.)

14. Populating the third tier required a major overhaul of the Plan's existing lineup. In total, the PRC voted to remove four existing Plan options, including two Fidelity funds, and to add

---

[3] This lack of information was not a concern with the BGI Index Funds – since they are not trying to beat the market, index investors have far less need for third-party information and analysis than those who invest in active management. (Starks.)

twelve new funds.  (P447 at 50873-75; J7 at 50927-29; Cutler; Dahling; FD Dahling 4.)  Of those twelve new funds, only one – the Fidelity Low-Priced Stock Fund – was a Fidelity fund. (J7 at 50928-29.)

15.     ABB's fund selections are the product of a complex process Cutler designed to identify low cost mutual funds that outperform their comparable peers.  (Wentworth.)  He began with the universe of funds in the desired style as classified by Morningstar.  He then eliminated every fund with an expense ratio that was above the average for that style, every fund that did not have at least a four-star rating, and every fund that was too small to be an appropriate option for the Plan.  Next, Cutler eliminated funds that did not have at least a three-year track record, funds that are closed to new investors, funds that did not have a strong performance record relative to an appropriate benchmark, and funds with higher volatility and lower return.  From the funds that remained, Cutler used statistics to target the funds that were the most suitable for the Plan's needs, and then reviewed Morningstar reports and other publicly-available information to reduce that number down to a few finalists.  Finally, after an interview with each fund manager and the determination of an appropriate benchmark, Cutler presented his selection to the PRC for approval.  (Cutler; *see also* DA922; DA982; DA681; DA97.)  This process was reasonable and consistent with prevailing industry standards.  (Starks.)

16.     ABB's plan design choices were consistent with the choices made by fiduciaries of other plans.  For example, Defendants' expert Professor Starks testified without contradiction that active management and mutual funds are virtually ubiquitous in 401(k) plans.  (Starks (over 90% of plans use mutual funds; over 80% of plans offer actively-managed equity options; every one of comparably sized plans Starks reviewed included actively-managed mutual funds).)  Target date funds are also widely used, and indeed are the default options in over 60% of plans.  (*Id.*) The Plan's asset-based pricing model, bundled service delivery model, and reliance on revenue sharing are also common among 401(k) plans.  (Gissiner; Hubbard; Starks.)  Indeed, asset-based pricing is nearly ubiquitous in 401(k) plans.  (Gissiner.)

6

## B.   The Cost Of The Plan's Options Was Reasonable

17.    The cost of the Plan's investment options was well within the range of reasonableness. First, as previously noted, the BGI Index Funds and the Income Fund are very inexpensive, as low as three basis points ("bps"). (J7 at 50927; Starks.) These non-mutual fund options together accounted for over 40% of the Plan's assets. (Dahling.) Second, the expense ratios of the Plan's mutual funds, with limited exceptions, consistently have been below their Morningstar category averages. (Starks; ABB Starks 2.) In fact, in 2005, the weighted average expense ratio of ABB's actively-managed options was far lower than even the average expense ratio for institutional mutual fund share classes.[4] (FD Dahling 2.) This comports with the standard propounded in a text plaintiffs' expert Al Otto relied upon in formulating his opinions in this case. (Otto (admitting that the text recommends that plan options have fees below their peer group's highest quartile).)

18.    Despite this evidence, plaintiffs' expert Dr. Steven Pomerantz opined that the Plan's options were excessively priced when compared to separate accounts. (Pomerantz.) Pomerantz's opinion is unpersuasive. He ignores, and assigns no value to, the many beneficial attributes of mutual funds (*e.g.*, communications, independent media coverage, and regulation) which motivated ABB to select them in the first instance. His opinion, therefore, is irrelevant, for it is predicated solely on a comparison of cost when ABB chose mutual funds not to obtain the cheapest possible investments, but rather for other sound reasons. *See ¶¶ 10-14 supra*.

19.    Even accepting his comparison at face value, Pomerantz offered no objective standards or criteria for determining whether an investment selection was imprudent due to excessive fees.

---

[4]  The Plan's weighted average expense ratio in total, including mutual funds and non-mutual fund investment options, was even lower. (Dahling, DA16.) Compared to similarly-sized plans recordkept by Fidelity without company stock as an investment option, the ABB Plan's weighted average investment expense ratio was only slightly above the median. (Pisacreta.) Moreover, nothing in the record evidence puts the Plan outside the mainstream in this regard. Fidelity's internal "Action Plans," on which plaintiffs rely, examine the expenses solely of *mutual fund* assets in Fidelity-recordkept large plans, and thus fail to account for the expenses of the large percentage of Plan assets (nearly half) invested in non-mutual fund options such as the ABB Income Fund and BGI Index Funds. The Action Plans thus cannot be relied upon to assess the costs of the investment options in the Plan as a whole. (Dahling, (citing P851; P856).)

(Pomerantz.)  Instead, he offered three different standards yielding inconsistent results, as Defendants' expert, Dr. Lassaad Turki, demonstrated.  (Turki.)

20.     Pomerantz's three analyses are also seriously flawed.  With the first two, he posits that, by moving from mutual funds to separate accounts, investment management costs can be reduced by 75 or 50 percent.  (Pomerantz.)  This opinion is based on sources concerning market wide mutual fund fees.  (*Id.*)  These sources do not establish that this Plan's mutual fund fees, which are already below average, could have been reduced by 75 or 50 percent.  (*Id.*; Turki.)

21.     For his third calculation, Pomerantz assumed that the Plan would have offered participants no more than five hypothetical separate accounts.  While he has no factual basis to assume that the Plan would have offered only five options, he takes this approach because he has to aggregate the Plan's assets to get the high asset levels that correspond to the low fee benchmark he applies.  Such aggregation (and limiting of participant choices) is necessary to obtain the savings that Pomerantz suggests, but is inconsistent with the IPS's three-tiered structure and express mandate that ABB "provide participants with a range of investment alternatives." (P20, at 2735.)  This methodology is also unreliable because the Callan Associates survey upon which he relies did not report data at the asset levels he assumes.  For this reason, he had to use a statistical technique to predict the fees associated with those asset levels from the Callan data.  Such predictions are unreliable and in any event his statistical calculations were flawed.[5]  (Welch)

22.     When the Plan's assets are not arbitrarily aggregated into five accounts, but are individually compared to the Callan data, the Plan's mutual fund fees fall within the range of separate account fees reported by Callan.  (Turki.)

---

[5]  ABB's expert statistician, Dr. Finis Welch, testified that, when calculated correctly, there is no statistically significant difference between ABB's actual fees and the fees Pomerantz predicted for hypothetical separate accounts.  (Welch.)

## C.     ABB Prudently Monitored Plan Performance

23.     Once a fund was added to the Plan's lineup, ABB continuously monitored its

performance.  Specifically, the PTM monitored the fund's performance "against a relevant

benchmark selected by PTM in collaboration with the investment manager."  (P20 at 2737.)

Returns for the previous one-, three- and five-year periods were reported to the PRC quarterly.

(*Id.*; Cutler; Halsey; Wentworth; DA113 at 3804.)  If a fund's performance in any quarter caused

it to fall behind its benchmark for each of these time periods, the fund was typically placed on

the Plan's "watch list."  (Cutler.)  At that point, Cutler met with the fund manager to try to

understand the reasons for the underperformance and the actions that would be taken to correct

it.  (*Id.*)  If the fund failed to improve after six months, it was usually removed from the Plan

lineup.  (DA103 at 3497-517.)  This process is prudent and was diligently followed by ABB.

(Starks; Cutler; J7; DA109; DA111; DA113; DA67; DA68; JD21; DA993; DA78; DA81; DA83;

DA979; DA91; DA93; DA96; DA97; JA13; DA983; DA981; DA103; DA105; DA990.)

24.     The Fidelity Magellan Fund consistently passed ABB's one-, three- and five-year

performance test from the start of the limitations period until mid-2003.[6]  (J7 at 3664; DA109 at

3677; DA111 at 3712; DA113 at 3806; DA67 at 2482; DA68 at 2502; JD21 at 2544; DA993 at

45499; DA78 at 2775; DA81 at 2805; DA83 at 2858; DA979 at 44867; DA91 at 3028; DA93 at

3064; DA96 at 3107; DA97 at 3252; JA13 at 3313; Starks.)  It then failed in consecutive

quarters, prompting Cutler to recommend its replacement in September 2004, roughly nine

months after its first failing quarter and despite a passing grade in the second quarter of 2004.

(*Id.*; DA96 at 3113-19, 3136.)  Given the large number of Plan participants invested in Magellan,

the PRC initially decided first to freeze it to new contributions for a time before removing it.

(DA97 at 3176.)

---

[6]  Plaintiffs' attempt to show that Magellan had been underperforming for as long as 9.5 years is unsupported by the
record and based on a fundamental misunderstanding of the one-, three- and five-year performance measures.  As
Starks explained, short-term underperformance can eliminate long-term outperformance when measured
cumulatively over a specified time-period.  (Starks; Cutler.)

25. ABB's decision to retain the Freedom Funds was likewise consistent with ABB's monitoring process. Upon Cutler's recommendation, the PRC voted to place the Freedom Funds on the "watch list" on September 22, 2005. (DA981 at 44883-84.) At the next meeting, Cutler informed the PRC that the Freedom Funds' performance had improved but the PRC took no action to remove them from the "watch list" at that time. (DA103 at 3492.) On March 21, 2006, Cutler presented a detailed summary of the performance of all watchlisted funds through 2005, noting, among other things, that the Freedom Funds' long-term prospects had improved. (*Id.* at 3500.) As a result, the PRC removed them from the "watch list." (DA105, at 3533.)

26. Of course, nothing requires a fund to be removed from the lineup if it fails to improve after six months. On the contrary, the evidence presented at trial makes clear that the decision whether or not to remove a fund is a discretionary decision requiring the exercise of judgment that may be based on a number of less formulaic considerations, including the specific reasons for the underperformance and its prospects for improvement. (Cutler; Wentworth; DA93 at 3037.) The PRC's handling of Magellan and the Freedom Funds was consistent with fiduciary practice and reasonable. (Starks.)

27. Although Pomerantz claims that the Plan's actively managed mutual funds underperformed, he provides no objective standards for evaluating ABB's investment selection decisions at the time they were made.[7] He admitted that the prudence of every fund selection must be determined on a case-by-case basis but he conducted no such analysis with respect to the funds at issue in this case. (Pomerantz.) Instead, he simply asserted without basis that every single mutual fund selected was imprudent. (Pomerantz; *contra supra* ¶¶ 10-14 (ABB's selection process was prudent).)

28. Second, Pomerantz's calculations were highly sensitive to the particular benchmarks he selected. (Turki (explaining how Pomerantz's chosen benchmarks inflated his damages calculations by a factor of four).) Nonetheless, he did not base his calculations on the

---

[7] It bears noting that plaintiffs do not argue that active management is *per se* imprudent. (Pomerantz.)

benchmarks that were reasonably selected and actually used by ABB, rendering his opinion completely arbitrary. (Pomerantz.) He offered no basis for selecting these particular benchmarks, which have the effect of inflating the damages figures.[8] (Turki.)

29. Pomerantz also opined that ABB's process was lacking because certain Plan investment options failed a performance standard set forth in the defined benefit ("DB") plan IPS. (Pomerantz.) This opinion is unreliable. First, he applied the DB standard incorrectly.[9] (*Id.*) More importantly, the DB plan's standard is *not* the standard ABB employed to evaluate the Plan's investment options, and he offered no reason why it was applicable in the DC context. (*Compare* P20 *with* P225.) Pomerantz's conclusion is, therefore, irrelevant. In any event, four of the five funds that Pomerantz identified as failing the DB plan's performance standard in fact *were* removed from the Plan. (Pomerantz.) Far from demonstrating a lack of process, therefore, Pomerantz's analysis actually supports the conclusion that ABB's process was sound.

30. Pomerantz also calculated the difference between the Plan's return and the DB plan's return as a measure of damages. This analysis too is flawed. Most fundamentally, Pomerantz did not explain what, if any, breach of duty purportedly caused this supposed loss and in fact admitted that he had no knowledge of why their performance differed. (Pomerantz; FD789.) This alone renders Pomerantz's opinion unreliable.

31. Furthermore, there is no logical reason to expect the performance of the two plans to be similar. On the contrary, Pomerantz's own source material reported that DB plans routinely outperform DC plans by 100 bps on an asset-weighted basis and commonly outperformed DC plans by more than 250 bps during the relevant time period.[10] (Pomerantz.) Additionally,

---

[8] Pomerantz also calculated damages for losses caused by participant choice (Turki), and largely ignored the fact that ABB continuously monitors fund performance and diligently removes underperforming funds.

[9] The DB plan IPS sets out "triggering events" for the removal of an investment manager based upon a statistical measure called the Value of Active Management, or VAM. (P225, at 12332.) These triggering events are separated by the operator "and." (*Id.*) Contrary to grammar and logic, Pomerantz treated the word "and" as disjunctive rather than conjunctive. (Pomerantz.)

[10] Given the fundamental differences between the two, this is not surprising. In a DB plan, the company makes investments to meet its pension obligations, decides how to allocate the plan's assets and bears the full risk of the investments. (Cutler; Pomerantz; Hubbard; Starks.) In a DC plan, by contrast, thousands of participants make their own asset allocation decisions consistent with their own risk preferences, which tend to be more conservative.

though he admits that asset allocation is the primary driver of performance, Pomerantz failed to account for the fact that the DB and DC plans have very different asset allocations, and performed no analysis of the impact of those different asset allocations on the respective performance of the plans.  For example, under the DB IPS, 35% of the DB plan's assets were invested in international stocks, (Wentworth; P225), which tend to carry greater risks and a higher potential return.  (Starks.)  By contrast, during the relevant time period, only 5 to 15% of the Plan's assets were invested in international stocks.  (Stip. 2.)  For all these reasons, Pomerantz's calculation of damages based on the DB plan's returns is unreliable.

### D.    ABB's Selection And Monitoring Process Was Not Tainted By Its Relationship With Fidelity

#### 1.    Fidelity Has No Authority To Select Investment Options

32.    Subject to certain limitations, the TA requires the PRC to direct FMT as to the investment options in which Plan participants may invest and expressly provides that FMT "shall have no responsibility for the selection of investment options."[11]  (JD41 at § 4.)  The TA incorporated the funds initially selected by the PRC into schedules and provided that funds could be added only by amending the TA.  (JD41.)

33.    Although the TA initially provided that Fidelity would undertake to service non-Fidelity funds only "as agreed to" between the parties,[12] (JD41 at § 4(b)), the evidence indicates that both ABB and Fidelity understood that Fidelity only had the right to decline to recordkeep a proposed fund addition if there were operational impediments to its inclusion.  (Cutler; Morlan; Dahling.)  The parties to the contract understood that ABB had sole authority to determine the options that would be included in the Plan.  (JD41)  In accordance with that understanding, ABB never

---

(Pomerantz; Hubbard; Starks; Tussey.)  Many of the DB plan investments are incompatible with the needs of a participant-directed 401(k) plan.  (Cutler.)  For example, many do not provide daily valuation and may tie up capital for long periods of time.  (*Id.*)  DB plans generally can also choose non-traditional investments like hedge funds and private equity that tend to have higher returns but are inappropriate for DC plans.  (Starks; Cutler; Wentworth.)

[11]  The TA further provides that FMT "shall be considered a fiduciary with investment discretion only with respect to Plan assets that are invested in guaranteed investment contracts chosen by the Trustee or in the collective investment funds maintained by the Trustee for qualified plans."  (JD41 at § 4.)

[12]  On April 1, 2004, the TA was amended to remove this provision.  (JD41, 12th A.)

sought Fidelity's permission to change Plan investment options. (Cutler; Morlan; Dahling.) Fidelity never refused to provide recordkeeping services for ABB's fund selections, even when those fund selections dramatically reduced Fidelity's revenue. (Cutler; Morlan; Dahling.)

34.     Throughout the parties' relationship, the TA provided that either party could terminate the agreement at will upon 60 days' notice, without penalty. (JD41 at § 10.)

## 2. Fidelity Had No Influence Over ABB's Fund Selections

35.     There is no evidence that Fidelity's interests were a factor in ABB's fund selection process. Fidelity did identify funds for ABB's consideration as part of its regular investment review process. However, of the 30 funds identified by Fidelity, only one ever made it onto the Plan lineup and its selection was the product of Cutler's independent screening process. (DA97, at 3208-23; JD13 at 3271; Cutler; Dahling.) There was no understanding between Fidelity and ABB that Fidelity's input would serve as a basis – much less the primary basis – for investment decisions concerning the Plan.[13] (Cutler; Dahling.)

36.     Plaintiffs argue that a "revenue neutrality" agreement existed between Fidelity and ABB pursuant to which ABB would not make any fund changes that would decrease Fidelity's revenue. Plaintiffs mischaracterize the evidence. Following Magellan's removal, Fidelity proposed an $11 per-participant fee to help make up for its substantial decline in revenue. (Scarpa.) During negotiations over the $11 fee, Fidelity proposed to forego that fee provided that ABB's investment decisions for the Plan thereafter were "revenue neutral." (P190.) Fidelity intended, and ABB understood, this to mean that if future lineup changes affected Fidelity's revenues, Fidelity intended to resume discussions over the imposition of a per-participant fee. (Cutler; Pisacreta; Morlan.) The actual terms of the 2006 amendment to the TA do not include any "revenue neutrality" provision (P1 18th A), nor has Fidelity's compensation remained "neutral" – it has fallen by more than 25 percent since 2005 (P1047; FD760), driven in

---

[13] This finding is supported by contemporaneous communications between ABB and Fidelity. When Cutler and Dahling disagreed in 2005 over whether certain Fidelity funds should be placed on the PRC's "watch list," Cutler made the decision and recommended to the PRC that the funds be placed on the watch list. The PRC accepted Cutler's recommendation. (P848; DA981 at 44884.)

significant part by ABB's removal of Fidelity's Equity Income II fund from the Plan's lineup. (P1 at 18th A; Jarczyk; Zimmerman-Decker).

37.     The idea of "revenue neutrality" had virtually no effect on ABB's fund selection process. Prior to Magellan's removal, Cutler always chose the cheapest share class that was available for the fund he selected. (Cutler.)  The only change after Magellan's removal was that Cutler began to consider the extent to which a particular share class shared revenue with Fidelity *after he had already selected a fund*.  If the fund he had already chosen had a share class that shared revenue in an amount equal to the fund being removed, he chose that class. (Cutler.)  This decision was reasonable, as it avoided a likely fee increase for all participants and allowed participants to exercise control over their own costs.  Consequently, it is consistent with the IPS, which states that ABB will select the share class with the "lowest cost of participation." (Cutler; P20 at 2736; P223.)

38.     Later events also directly contradict plaintiffs' interpretation of "revenue neutrality."  Not long after Magellan was removed, the PRC watchlisted and ultimately removed the Fidelity Equity Income II Fund for performance problems in accordance with its monitoring process. (DA983 at 45027; DA981 at 44884; DA103 at 3492, 3502-09.)  At the time, the fund held more than $164 million in Plan assets, the second largest total of any mutual fund on the platform. (Wentworth; DA105 at 3533, 3577.)  Accordingly, its removal was anything but a "revenue neutral" event for Fidelity.  As Wentworth testified, however, this fact was "irrelevant" to the PRC's decision. (Wentworth.)

39.     Additionally, there is no evidence that Fidelity ever tried to veto any ABB fund selection, even when it reduced Fidelity's compensation. (Morlan; Cutler; Dahling; Pisacreta.)  In particular, Fidelity did not hold up ABB's replacement of the Magellan fund pending negotiations over its proposed $11 per-participant fee. (Pisacreta.)

40.     Finally, the work of the PTM and PRC in selecting and monitoring Plan investment options was segregated from fee negotiations with Fidelity, not only with respect to TBO and non-qualified plan services, but also Plan administrative services.  As former PRC member Barry

Wentworth testified, Cutler's activities were effectively walled off from the ABB benefits department's negotiations with Fidelity. (Wentworth.) Additionally, both Sackie and Scarpa testified that they were solely responsible for selecting benefits service providers and that neither Cutler nor the PRC had any involvement in those negotiations. (Sackie; Scarpa.) They further confirmed that they had no involvement in the selection and monitoring of Plan investment options. (Sackie; Scarpa.)

41. The absence of any influence by Fidelity is also reflected in the fact that ABB's fund selection decisions have not favored Fidelity. Between 2000 and 2008, ABB removed more Fidelity funds from the Plan lineup than it added. (P1; FD Dahling 4.) At the same time, the percentage of Plan assets managed by Fidelity has declined significantly, from 58% in 2000 to 14% in 2006. (Stip. 2.) As a result, Fidelity's total compensation declined by 64% from 2000 to 2008. (P1047; FD760; Jarczyk; Zimmerman-Decker.)

42. Fidelity mutual funds held shares of ABB stock at some point. (P888.) However, there is no evidence that these holdings in any way affected ABB's decision-making, or that the individuals responsible for the Plan were even aware of them prior to this litigation. (Wentworth.)

III.  **ABB COMPLIED WITH THE INVESTMENT POLICY STATEMENT**

43. The IPS is a summary of the "underlying philosophy and process for the selection, monitoring and evaluation" of the investment options in the Plan. (P20 at § 1.) It specifically provides that its investment strategy was "designed to be flexible." (P20 at § 4.) It necessarily contemplates that ABB will exercise judgment in implementing its guidelines. (Cutler.)

44. First, the "Alliance Rebates" provision does not require ABB to procure rebates from mutual fund companies directly back to the Plan or its participants. Rather, the provision specifies that ABB may "employ a record-keeper that has a strategic alliance with one or more fund managers" and that any rebates arising out of such alliances would be used to "offset or reduce" administrative costs. (P20 at § 7.) As Cutler – the primary author of the IPS – and

Wentworth testified, this provision refers to revenue-sharing, not direct rebating to the Plan or its participants. (Cutler; Wentworth.) It is undisputed that ABB used revenue-sharing to "offset or reduce" the Plan's administrative expenses – it was expressly identified in the TA as a primary source of Fidelity's compensation. (JD41.) Thus, ABB complied with the IPS' "Alliance Rebates" provision.

45. Second, the IPS does not require ABB to offer separate accounts instead of mutual funds. Rather, the IPS states that ABB will "use the purchasing power afforded by the size of the plan assets to reduce the cost to participants of providing the Plans' investment options" through "readily available mutual funds and institutional co-mingled funds." (P20 at 2736.) Indeed, the IPS was *amended* in May 2006 to allow ABB to offer separate accounts when they provide significant advantages compared to mutual funds. (DA105 at 3541; Wentworth.) Accordingly, there is no evidence that the IPS required ABB to offer separate accounts.

46. Furthermore, offering additional separate accounts would have undermined other aspects of the IPS. For example, the IPS expressly states that the three-tiered approach is necessary because "a single investment strategy cannot satisfy all of the investment needs of a diverse workforce." (P20 at § 4.) It also states that ABB will provide participants with a "broad range" of options spanning the risk-return spectrum "in at least four major asset classes including cash, fixed income, domestic equities and international equities." (P20 at §§ 4, 5.) As discussed above, the PRC selected a number of actively-managed mutual funds in every style to offer the wide "range" of options mandated by the IPS. To offer additional separate accounts at a lower overall cost than mutual funds, ABB would have had to drastically reduce the number of available options, undermining both the three-tiered structure and the stated goals of the IPS.[14] (Cutler; Wentworth; Pomerantz; Turki; Starks.) Accordingly, there was nothing imprudent about ABB's decision not to offer more separate accounts.

---

[14] The IPS also states that "[f]ees should be competitive with funds utilizing *similar investment strategies* and should reflect the historical value added by the fund manager." (P20 at § 7 at 2737 (emphasis added).) Since the IPS states ABB will offer mutual funds, not separate accounts, the only logical reading of this provision is that mutual fund fees should be competitive with other mutual funds, not unlisted alternatives like separate accounts. As discussed above, they clearly were.

47.     Finally, ABB did not fail to use the purchasing power afforded by the size of the Plan's assets to reduce participant costs.  The BGI index funds, which have extremely low expense ratios, are available only because of the collective size of the Plan's assets.  (Cutler; Wentworth.) Institutional classes of certain mutual funds have also been offered and load fees that are often charged to retail investors have been waived.  (Cutler.)  Non-Plan investors with minimal capital would not have enjoyed these cost reductions outside the Plan.  (Cutler; Wentworth.)  Similarly, the relatively inexpensive Income Fund, a very popular stable value fund, cannot be purchased outside of the Plan and offers participants a higher rate of return and lower volatility than is available in the general marketplace.  (Cutler; Wentworth.)

48.     Neither the TA nor the formal Plan documents incorporate the IPS or authorize the PRC to issue an IPS applicable to FMT.  (JD41; DA1061; P391.)  The IPS itself allocates responsibility for investment decisions to ABB, not Fidelity. (P20 at § 9.)

## IV.     ABB PRUDENTLY ARRANGED FOR AND MONITORED PLAN SERVICES
### A.     Background

49.     In 1995, ABB conducted a competitive request for proposal ("RFP") process to obtain recordkeeping services for PRISM.  After carefully analyzing the costs and services of all who responded, ABB selected FMT.  ABB found that Fidelity offered better, more extensive services and competitive prices.  (Sackie; DA964; JD226; JD228; DA962; JD229; JD230; JD231.)  In particular, ABB preferred Fidelity over its then-current recordkeeper, Hewitt Associates, due to the numerous a la carte charges in Hewitt's unbundled fee model.  (Sackie.) As is typical in unbundled fee arrangements, Hewitt regularly billed the Plan at high hourly rates for any work it deemed outside the scope of its basic agreement.  (*Id*.; Morlan (describing Hewitt's fee-for-service model).)  Another reason ABB preferred an asset-based fee arrangement was because it is progressive, *i.e.*, participants with higher balances would shoulder a larger portion of the administrative fees.  (Halsey.)

50.     In September 2000, Fidelity offered ABB a new pricing arrangement depending on the makeup of the Plan's lineup.  (P324; Sackie.)  Under the amended TA, as before, Fidelity was

compensated primarily through asset-based fees on Fidelity funds and revenue-sharing from outside fund providers. (JD257 at 11107-08.) In addition, Fidelity received an annual per-participant fee of $8 for Represented PRISM participants.[15] (JD257 at 11107; Sackie.) This pricing was accepted by the PRC in November 2000 and became effective in April 2001. (Sackie.)

51. Revenue-sharing payments to Fidelity from outside funds totaled $4.036 million over the 2001 to 2008 period, 11.1% of Fidelity's total compensation from the Plan over the period. (FD760; P1047.) While some mutual funds in the Plan's lineup paid Fidelity 35 bps or more for its services, the asset-weighted average rate of revenue-sharing from the non-Fidelity funds was 11.5 bps, reflecting that ABB selected many institutional-class mutual funds that did not pay Fidelity any revenue sharing at all. (Pisacreta; P44 at 04358.) Fidelity also received minimal compensation in connection with the 40% of the Plan's assets invested in the BGI Index Funds and the Income Fund. (JD41, Sch. B, Dahling.)

52. The revenue-sharing rates Fidelity receives from outside fund providers are disclosed to ABB in the schedules to the TA and via an online tool called Plan Sponsor Webstation. (JD41; Otto.) They were not reported to participants, but the record precludes a finding that such information would have been material to participants' investment allocations, because revenue sharing had no effect on the expense ratios of the investment options. (Starks, Otto.)

53. The named plaintiffs could not have relied on this to their detriment in any event, as each testified that he did not read any part of the fund prospectuses and other documents that contained fee information that were sent to him, and instead threw them away. (Fisher; Pinnell; Tussey.)

54. Fidelity does not book any of its revenue from plan services, including its revenue-sharing revenue, in a plan-specific manner. (Jarczyk.) Further, the actual cash is swept into a central disbursement account registered to Fidelity's ultimate parent, FMR LLC, where it is

---

[15] After collective bargaining, ABB agreed to pay the $8 fee for the Represented PRISM participants. (Sackie.)

commingled with unidentified funds from other sources.  (*Id.*)  This centralized form of cash management is the norm in modern business organizations.  (*Id.*)

### B. The Use Of Revenue-Sharing And Absence of Participant Rebates Was The Norm for 401(k) Plans

55.     Revenue-sharing consists of payments from outside fund providers to the recordkeeper in consideration for work performed by the recordkeeper that the outside fund companies would otherwise have had to perform themselves.  (Starks.)  These payments amount to a percentage of the plan assets invested in each fund and, therefore, vary depending on how participants choose to invest their money.  (*Id.*)  The use of revenue-sharing to provide compensation for recordkeeping services is extremely common and consistent with industry standards.  (Starks; Pisacreta; Sackie; Gissiner.)  Indeed, revenue-sharing does not affect the total amount that participants pay for their investments.  (Starks; Otto.)  In other words, any change in the amount of revenue-sharing does not change the stated expense ratio paid by Plan participants for each investment option.  (*Id.*)

56.     Plaintiffs contend that ABB should have obtained agreements with mutual fund providers to rebate revenue sharing directly to Plan participants.  This practice, however, is extremely uncommon in the industry.  (Starks; Pisacreta; Sackie; Gissiner.)  Indeed, in 30 years of industry experience, defense expert Steven Gissiner was aware of only one instance in which a recordkeeper rebated revenue-sharing to plan participants.  (Gissiner.)  Rebating also does not guarantee that total costs will be lower, as Starks' experience with the Texa$aver plan graphically illustrated.  (Starks.)

57.     More importantly, rebating to participants may also present adverse securities or tax law consequences, as Plaintiffs' expert Otto conceded at trial.  (Otto; Gissiner.)  In particular, such rebates may constitute unlawful "preferential dividends" by allowing 401(k) participants to pay a lower expense ratio than other investors in the same mutual fund share class.  (Pisacreta.)  A rebating program of the type advanced by plaintiffs would also be complicated from a logistical standpoint – revenue sharing payments are made quarterly and in arrears based on aggregate

fund balances but individual participants may make investment decisions at any time. (*Id.*) For these reasons, Fidelity does not rebate revenue-sharing to Plan participants. (*Id.*)

58.     ABB does have pre-2000 rebating arrangements in which revenue sharing is rebated to the Plan, not to participants, in order to pay Plan expenses. (Sackie; Cutler.) ABB used its existing relationship with T. Rowe Price to obtain additional Plan rebates on a "grandfathered" basis. (Cutler.) The evidence also shows that ABB did try without success to obtain additional new rebate agreements. (P326; P331; Cutler.)

### C.     ABB Prudently Monitored The Reasonableness Of All Recordkeeping Fees

59.     ABB carefully monitored the services it received from Fidelity in a number of ways. In particular, ABB developed service metrics that were monitored on a quarterly basis. (DA21; DA22; Sackie.) Consistent with its explicit preference for the best, rather than the cheapest, service, ABB's standards were more stringent than Fidelity's usual goals and more stringent than the industry standard. (Sackie.) Deficiencies were addressed on an ongoing basis. (*Id.*; P880.) As Sackie testified, ABB received more and better services than the industry standard. (Sackie; *see also* Pisacreta.) In particular, Fidelity has superior technology, including a more robust communications platform. (Sackie.)

60.     In ABB's experience, employees had a "high degree of satisfaction" with Fidelity's services. (Sackie; Scarpa.) When participants have become eligible to receive payments from the DB plan, approximately half of them, including plaintiff Tussey, have elected to receive a lump sum payment and then deposit the payment into the Plan, rather than receive the sum in cash or roll it over into some other tax qualified investment vehicle. (Cutler; Tussey.)

61.     ABB also diligently monitored the reasonableness of the cost of the bundle of services received by the Plan. Before April 2001, Sackie compared the Plan's per-participant fee to those available in the market while Cutler and the PRC carefully monitored the expense ratios of the Plan's investment options to ensure that they remained reasonable. (Sackie; Cutler.)

62.     After 2000, the vast majority of the costs to participants for the services they received were the expense ratios of the Plan's investment options.  (JD249; JD257; Sackie.)  As a result, ABB monitored the cost of the Plan's services by monitoring the expense ratios of its investment options.  (Sackie; Cutler.)  This was consistent with the practices of other large plans with bundled service arrangements, particularly in the early part of the decade.  (Starks; Sackie; LaBonte; ABB LaBonte 1; Gissiner.)

63.     Finally, in 2005, when Fidelity proposed a new $11 per-participant fee to make up revenue lost as a result of the Magellan fund's removal from the Plan lineup, ABB hired Mercer, a well-known national human resources consulting firm, to help it evaluate the reasonableness of Fidelity's proposal.  (Scarpa; LaBonte.)  This evaluation involved an attempt to estimate, on the basis of certain assumptions, the portion of Fidelity's bundled, asset-based compensation that was attributable to its administrative services.  (Pisacreta; Gissiner.)  This type of evaluation of a bundled arrangement was relatively new to fiduciary practice at the time.  (Pisacreta; Gissiner.)

64.     All of these methods were appropriate means of monitoring the reasonableness of the Plan's recordkeeping fees.  (Starks; Sackie; LaBonte; ABB LaBonte 1; Gissiner.)

## V.     THE PLAN'S FEES AND FIDELITY'S COMPENSATION WERE OBJECTIVELY REASONABLE

### A.     The Plan's Total Costs Were In The Mainstream

65.     Defendants' experts' analyses of ABB's total plan costs – inclusive of all recordkeeping and investment management fees paid by Plan participants – confirmed that ABB's costs were consistent with those borne by other similar 401(k) plans.  (Hubbard; Gissiner; Starks.)

66.     Professor Hubbard demonstrated that determining the reasonableness of fees for bundled investment and administrative services requires examining the total plan costs for the services as a whole.  (Hubbard.)  Hubbard's economic analysis of total plan costs rests on reliable, public data, can be replicated, and does not depend on artificial assumptions about intracompany allocations. (Hubbard; Gissiner.)

67. Hubbard calculated the total plan costs of large plans of a size similar to the Plan – those sponsored by 62 large companies such as American Express, CBS, Delta Air Lines, and Disney. (Hubbard; FD439.) He used publicly available data, including data filed with the DOL and the SEC, and data from publicly available databases. (Hubbard.)

68. In his separate analysis of total plan costs, Gissiner – who has worked in the 401(k) plan industry for 30 years, including as a consultant to plan sponsors on the selection and evaluation of service providers – benchmarked ABB's total costs against those he had calculated in the ordinary course of his consulting work in 21 contemporaneous benchmarking analyses of 18 separate plans. (Gissiner.)

69. Hubbard and Gissiner independently concluded that the Plan's total costs fell in the middle of the range of total plan costs of comparable large 401(k) plans. (Hubbard; Gissiner.)

70. The possibility that some of the comparator plans made rebates to plan participants does not affect Hubbard's or Gissiner's total plan cost calculations. (Hubbard; Gissiner.) For instance, Gissiner testified that any rebates that went through the plans' recordkeepers were captured in his benchmarking analyses. (Gissiner.) And, as discussed above, rebating directly to plan participants is extremely rare. (Gissiner; Pisacreta.)

### B. ABB's Recordkeeping Fees, And Fidelity's Compensation For Those Services, Were Reasonable

71. As is commonplace, Fidelity and ABB agreed upon a "bundled" arrangement in which Fidelity was compensated for its management of the Fidelity funds in the Plan via their expense ratios and for its administrative services to the Plan through revenue-sharing paid by non-Fidelity fund providers. (Pisacreta.) As the investment advisor to Fidelity mutual funds, FMR does not share revenue with Fidelity's recordkeeping business. (Jarczyk.) Accordingly, to identify the portion of Fidelity's compensation that is or may be attributable to its administrative services requires a hypothetical division of Fidelity fund revenue between the investment management and recordkeeping businesses. (Pisacreta; Hubbard.)

72.     Fees attributable to Fidelity's recordkeeping services were objectively reasonable under all reasonable hypothetical divisions of Fidelity fund revenue between its investment management and administrative roles.  (Starks; Gissiner; LaBonte.)[16]

73.     Gissiner's fee benchmarking analysis confirms that fees attributable to administration were reasonable.  Assuming that Fidelity funds contributed a full 35 bps toward its estimated administrative fees, Gissiner found that Fidelity's per-participant compensation was comparable to the fees paid by similarly sized 401(k) plans.  (Gissiner.)

74.     Under that assumption, moreover, Fidelity's administrative compensation actually decreased over the limitations period despite the fact that the average participant balance increased (Otto; Gissiner), and was not significantly greater than Fidelity's estimated per-participant *costs* of providing recordkeeping services to the Plan. (Pisacreta; FD VP11).  This is in sharp contrast to plaintiffs' suggestion that the asset-based fee arrangement with Fidelity subjected the Plan to unchecked, ever-escalating administrative fees.

75.     Comparing per-participant asset-based administrative fees to fixed per-participant fees can be misleading because asset-based fees are contingent on market performance (Pisacreta), and participants' investment decisions and account size.  (Gissiner.)  In evaluating the reasonableness of asset-based fees, therefore, percentage-of-assets benchmarks are more common in the industry and more reliable.  (LaBonte; Gissiner.)  Expressed as a percentage of assets, the fees attributable to Fidelity's administrative services (assuming a 35 bp-contribution from Fidelity funds) was below the average administrative fee Fidelity received from other large plan clients (Pisacreta); was on the low end of the range Gissiner observed for a group of similar plans (Gissiner);[17] and was in the middle of the range of the comparable plans Mercer selected in 2005.  (LaBonte.)

---

[16]  While other fund providers pay Fidelity up to 35 bps in revenue sharing to recordkeep their funds, Fidelity pays no more than 25 bps in revenue-sharing to other service providers to recordkeep its funds.  (Otto; Pisacreta.)

[17]  In evaluating the Plan's fees, Gissiner followed the same protocol he uses in client engagements, benchmarking the Plan's metrics in three respects: (1) total plan costs as a percentage of assets: (2) fees attributable to administration as a percentage of plan assets; and (3) fees attributable to administration divided by the total number of participants.  (Gissiner; SG 1.)  Total plan costs as a percentage of assets are the sum of all plan fees, for both

76. Fidelity's contemporaneous internal analyses also demonstrate the Plan's administrative fees were reasonable. Assuming that the Fidelity funds contributed between 25 and 35 bps toward Fidelity's administrative fees, Fidelity's estimated annual per-participant compensation for those services was comparable to fixed per-participant prices paid in the market for similar services. (P44 at 4358; FD162.) Relative to the unbundled fixed-fee benchmark for the same services, Fidelity's per-participant compensation was also in the middle of the pack among Fidelity's 150 to 160 large plan clients. (Pisacreta; FD VP03; FD VP04.)

77. Finally, the contemporaneous analyses of experienced professionals confirm that the Plan's administrative fees were reasonable. Specifically, Mercer's LaBonte considered ABB's fee arrangement to be "standard" for a "typical" billion dollar plan and concluded that its fees were reasonable. (LaBonte.) She further indicated that she would have informed ABB if its fees were unreasonable, and did not do so. (LaBonte; Scarpa.)[18]

78. Otto's opinion to the contrary was not persuasive. His opinion concerning a "limit of reasonableness" was based on a handful of unscientific conversations with unidentified industry insiders and his limited experience with a few much smaller plans. (Otto; Turki.) He kept no worksheets or notes detailing his prior experience. (*Id.*) As a result, his opinion cannot be verified or tested by any other party. (Otto; Turki.) Revealingly, Otto's own clients exceeded his "limit" and his own publications contain estimates of expected market fees that are significantly higher. (*Id.*)

79. Otto's opinion also fails to account for the value of the trust and custody services Fidelity provided to the Plan, which would have carried a separate fee in an unbundled contract. (Otto.)

---

administrative and investment management services, divided by the total assets in the plan. (SG 02.) The second metric, administrative expense percentage, is the sum of fees attributable to administration (explicit fees plus revenue sharing from outside funds plus hypothetical revenue sharing from Fidelity proprietary funds) divided by total plan assets. (SG 03.) His third metric, administrative per-participant expense, is simply the estimated administrative expenses divided by the number of participants. (SG 04.)

[18] Consistent with arms-length negotiations between the parties, there is no evidence that ABB supplied Fidelity with a copy of Mercer's report. (Pisacreta (Mercer report was not in his or Fidelity's files).)

80.     Otto's effort to validate his "limit" by purporting to compute administrative fees for 12 plans he deemed comparable to the Plan failed, as the majority of the comparator plans violated his "limit."  Moreover, in attempting this validation, Otto did not consider sources of recordkeeper compensation that he expressly considered in performing similar analyses in other cases for plaintiffs' counsel, thereby understating fees paid.  (*Id.*)  Otto conceded that his estimates of the fees they paid would have been much higher if he had used the same methodology that he used in the other cases.  (*Id.*)

81.     Finally, according to Otto's own source material, his "limit" is roughly half the industry's average per-participant *costs* of providing 401(k) administrative services, and roughly half of Fidelity's estimated per-participant *costs* of providing administrative services to the Plan.[19]  (*Id.*; P1229; P1351 at 6; VP11.)  For all of these reasons, Otto's opinion with respect to the reasonableness of ABB's recordkeeping fees is unreliable.

82.     Fidelity's profitability is irrelevant to the reasonableness of the Plan's fees and Fidelity's compensation.  Plaintiffs' argument to the contrary mischaracterizes Hubbard's testimony – given in another case – applying not ERISA standards, but a particular factor judicially developed to apply Section 36(b) of the Investment Company Act of 1940.  (Hubbard.)

83.     There is no evidence showing Fidelity's profitability on services to the Plan calculated according to generally accepted accounting principles.  Instead, Fidelity had multiple ways of estimating profitability for internal purposes, the results of which varied widely depending on the assumptions made.  Some estimates did not represent overall profit, but rather showed the revenue generated from the relationship net of the client's direct expenses without accounting for the fixed costs of running the business (contribution or direct margin).  Other estimates – especially higher figures cited by relationship management personnel – represented multiyear

---

[19]   Otto also sought to derive support for his opinion from an internal Fidelity document (P1093), but testimony at trial made clear that the document was a draft report that erroneously compared ABB's assumed administrative fees for *all* of its services to typical unbundled fees for basic recordkeeping services only, excluding fees for many other services Fidelity provided to the Plan in addition to basic recordkeeping.  (Pisacreta; *see also* Morlan.)  Because of these flaws, the analysis Otto relied upon does not appear in the final report presented to Fidelity management.  (Pisacreta.)  Even assuming its accuracy, moreover, the draft analysis did not support Otto's limit.  (Turki.)

*projected* profits (not past results) that were based on favorable assumptions that never materialized. (Pisacreta.)

84. In making these estimates during the years at issue, it was Fidelity's practice to assign to managers of the recordkeeping business credit for half of the revenues received by FMR, the Fidelity mutual fund adviser, when in fact no transfer of revenues actually occurred. Assuming instead that the Fidelity funds in the Plan lineup contributed to the recordkeeping business unit the 25 bps that Fidelity funds pay external recordkeepers, Fidelity's estimated overall profit margins on the Plan ranged from -33% to 13% between 2002 and 2006. (Pisacreta; FD VP10.) Assuming 35 bps, Fidelity's estimated overall margins ranged from -6% to 32% in that same period. (*Id.*)

85. In any event, Fidelity's estimates of its overall profit margins for administrative services to the Plan were closely comparable to its estimates of average overall profit margins for services to its other large 401(k) clients. (Pisacreta; VP9B.)

86. Finally, the reasonableness of Fidelity's compensation is also supported by the extent and quality of the services it provided. In addition to handling the highly complex function of daily-valued recordkeeping (Gentile), Fidelity provided a variety of services to the Plan, including (as noted) trust and custody services, custom and targeted participant communications, customized scorecards with which ABB could measure Fidelity's performance, access to daily account balances and planning tools via the Net Benefits website, and live call center representatives from 8:30 am to midnight. (Morlan; DA129.) Fidelity had superior technology backing many of these services, including a communications platform that was much more robust than Hewitt provided. (Sackie.) Due to the range and quality of its administrative services, Fidelity has an excellent reputation among plan sponsors (Sackie), and ABB considered it to be the "best recordkeeper in the business." (Scarpa.) In a market that plaintiffs concede to be "very competitive" (Otto; *see also* Pisacreta), Fidelity has maintained the leading share of large plan service engagements, and has retained over 98 percent of its large plan clients each year and typically kept clients for 15 years or more (Pisacreta).

### C.    Fidelity's Fees For Investment Management Were Reasonable

87.    The expense ratios for the Fidelity funds in the Plan lineup are significantly below their Morningstar category averages and close to or below the Morningstar institutional category averages.  (Starks; Dahling; FD Dahling 1, 2; Hubbard.)  This component of Fidelity's compensation was reasonable.

## VI.    ABB'S SELECTION OF FIDELITY TO PROVIDE OTHER SERVICES DID NOT AFFECT PLAN DECISIONS

### A.    Background

88.    Total benefits outsourcing ("TBO") refers to three specific types of benefits services:  DB and health and welfare ("H&W") recordkeeping and human resources and payroll ("HRP") administration.

89.    ABB selected Fidelity to provide recordkeeping services to its DB plan in 1997.  (DA1889.)  At the time, ABB had been performing its DB recordkeeping in house.  It chose to outsource these services to Fidelity because a single service provider would simplify administration and ABB was highly satisfied with the quality of Fidelity's 401(k) services.  (Sackie.)  Additionally, although Fidelity was not the cheapest provider, its fees for DB recordkeeping services were competitive with the market.  (*Id.*)

90.    With the help of an internal task force and a consultant, ABB decided to outsource administration of its H&W plans to Fidelity in January 2000.  (Sackie; DA1883.)  Previously, it had administered its H&W plans internally with some assistance from Watson Wyatt.  (Sackie.)

91.    ABB considered alternatives to Fidelity, but was not comfortable with the manner in which they planned to administer the benefits.  (*Id.*)  As it had with the DB plan, ABB selected Fidelity because it was very satisfied with the quality of Fidelity's services and because outsourcing to a single service provider made practical sense.  (*Id.*)  Additionally, Fidelity had market competitive prices.  (*Id.*)

92.     On December 17, 2004, ABB outsourced its HRP administration to Fidelity.  (DA1976.)  It had previously administered these services in house but its existing systems were so old that ABB had to either purchase and implement updated software or outsource.  (Sackie; Halsey.)

93.     ABB carefully considered the merits of outsourcing its HRP services.  Its previous experience suggested that implementing a new system would be difficult and expensive.  Furthermore, administering the system in-house would require expensive periodic upgrades.  Outsourcing avoided these problems.  (*Id.*)

94.     ABB considered a number of different models offered by a number of different providers, including ADP, Accenture, Mercer, and SAP (whose software ABB had previously attempted to implement without success).  (Halsey.)  ABB ultimately selected Fidelity not only because its pricing was competitive but because of the efficiency of having a single employee benefits service provider.  (*Id.*; *see also* DA587.)

### B.     Fidelity's TBO Losses Are Not Evidence Of Below-Market Prices

95.     Fidelity entered the TBO market in order to make money.  (Pisacreta.)  Other 401(k) competitors, including Hewitt, entered the TBO market and sought to sell their services to the same clients.  (Breslawski.)  Fidelity's revenue from TBO sales has been substantial.  (Pisacreta.)  Among multi-practice clients – those who used more than one of Fidelity's 401(k), DB, H&W or HRP services – 2006 TBO revenues were almost three times the revenues attributable to 401(k) services.  (*Id.*; FD VP 12.)  Nonetheless, Fidelity's TBO businesses have lost money since their inception, with 401(k) clients and non-401(k) clients alike.  (Pisacreta.)  In fact, Fidelity did not earn an overall positive margin on *any* of its H&W and HRP contracts, including contracts with companies that were not also obtaining 401(k) services from Fidelity.  (Pisacreta.)

96.     Fidelity's TBO losses did not result from a failure to price at market rates.  Fidelity's practice was to seek prices within the market range for each TBO service.  (Pisacreta; Breslawski.)  Fidelity priced TBO services the same way to both 401(k) and non 401(k) clients.  (*Id.*)  While Fidelity would consider the overall client relationship (including its profitability) in

deciding whether to offer an additional service, Fidelity sought market prices on any such additional services. (Pisacreta.)

97. Fidelity's TBO losses occurred, instead, because Fidelity's cost structure was higher than its competitors' cost structures, and because Fidelity failed to achieve the desired scale in each of the TBO businesses. (*Id.*; Breslawski.) For example, Fidelity spent as much as $300 million in attempting to build a new HRP system, but by June 2007 had been unable to place a single HRP client on the system. (Breslawski.)

98. Fidelity had some success in reducing its costs of providing TBO services, but these cost-reduction efforts were not as effective as anticipated. (Pisacreta.) Fidelity's continued HRP losses led it to recently withdraw from the large market HRP business altogether. (Breslawski.)

### C. Plaintiffs' Theory That Fidelity Sought To Influence ABB's Plan Decision Making Through Below-Market TBO Concessions Is Implausible

99. In 2006, Fidelity lost more than four times as much money providing TBO services to multi-practice clients than it made on 401(k) services to those clients. (Pisacreta.) The same year, Fidelity lost approximately ten times as much providing TBO services to ABB (over $7 million) as it earned providing administrative services to the Plan (approximately $715,000).[20] (*Id.*; FD131; FD VP12.)

100. It is implausible that Fidelity would have sought to induce ABB to maintain a fee structure for a plan on which it anticipated profits of approximately $715,000 by agreeing to TBO pricing that would bring over $7 million in annual losses. As Pisacreta – Fidelity's lead large plan finance official – testified, the theory is "ridiculous." (Pisacreta.)

### D. TBO Pricing Terms Were Not Linked To Plan Pricing Or Transactions

101. In negotiating TBO pricing, neither Fidelity nor ABB drew any connection to the Plans' fee arrangement. (Pisacreta; Morlan; Scarpa; Sackie.) The terms on which Fidelity offered TBO services to ABB were not dependent or conditioned upon acceptance or maintenance of any

---

[20] The 401(k) revenues described in Exhibit FD131 do not include estimated margins from investment management on Fidelity funds. (Pisacreta.) Even including those estimated margins, however, the estimated overall margin on Fidelity's 401(k) services to the Plan was $1.4 million, far less than the over $7 million in TBO losses. (*Id.*)

pricing terms with respect to the Plans. (*Id.*) Further, Fidelity never informed ABB of its profit margins on any of the services it was contracted to provide, including TBO services. (Sackie; Wentworth.)

102.     On the contrary, Fidelity's practice was to price each TBO contract with a client so that it would achieve a fair market recovery on a standalone basis. (Pisacreta.) ABB followed the same approach, requiring each contract to stand on its own merits. (Scarpa.) Even when ABB and Fidelity were renegotiating the 401(k) and TBO contracts during the same period, the pricing terms for each contract were kept separate and distinct. (*Id.*)

103.     In 2005, the parties discussed conforming the termination dates for the 401(k) and TBO contracts. This was not an effort to link the pricing terms, but instead an effort to achieve administrative convenience by having all renewal discussions at one time. (Scarpa; Morlan.) In any event, there was no such agreement; the Plan contract remained terminable at will by either party, without penalty, on 60 days' notice. (JD41 at §§ 8, 10, 12; Morlan.)

104.     In each TBO negotiation, Fidelity and ABB sought market prices. (Scarpa; Breslawski; Pisacreta; DA641 at 20527.) These negotiations were lengthy. (Breslawski; Morlan.)

105.     For HRP, Fidelity and ABB negotiated fees that were at the high end of the range Fidelity charged other similarly-sized clients or had offered to other similarly-sized prospects, according to a contemporaneous Fidelity internal document.[21] (Breslawski; FD565.) Fidelity's prices for HRP services were generally higher than competitors' prices. (Breslawski.) ABB estimated that the agreed-upon fee would impose approximately the same costs as its next best choice for meeting HRP needs, an insourcing option. (Halsey; DA587.)

106.     Fidelity sought price increases from ABB for H&W and DB in 2005 because it believed significant headcount reductions since the prices were last negotiated in 2002 had moved ABB into a different market range, as headcount is inversely correlated with per-participant market

---

[21]  A later Fidelity document describing ABB's HRP prices as "below" market was based on incomplete data, and the pricing points that were used were not properly adjusted to take into account the value of additional services beyond the standard HRP services. (Breslawski (discussing P1093 at 53694).)

prices. Fidelity also believed that these headcount reductions had aggravated Fidelity's servicing costs. (Pisacreta.) For instance, Fidelity included a "direct billing" service in its bundled H&W price, through which Fidelity would directly bill terminated participants who exercised their COBRA rights and remit the premiums to the health carriers. Due to ABB reductions in force, Fidelity had to provide significantly greater direct billing services than it anticipated. (*Id.*) Fidelity's conclusion that these changed circumstances caused ABB's pre-2005 H&W and DB prices to drift below the midpoint of the market range by 2005 does not establish that the prices were below that midpoint when negotiated in 2002.

107. The renewal prices negotiated in 2005 and 2006 were $99 per participant for H&W and $56 per participant for DB, reflecting increases over the previous prices. The H&W figure was above the $85-$95 market price range indicated by ABB's outside consultant, Mercer. (P1119; DA641 at 20533.) The DB figure was in the top half of Mercer's $45-$60 market price range. (P1119; DA641 at 20536.) The new prices were approximately at the midpoint of the market price range per Fidelity's market price data. (FD9 at 33845, 33849; Pisacreta.)

### E. Fidelity's Non-Qualified Plan Services Did Not Influence Any Plan Transactions

#### 1. Background

108. The Restoration Plan was a non-qualified plan that continued Plan and DB plan benefit accruals for participants whose compensation exceeded certain tax-related limits. (Sackie; Morlan; DA1883; DA1889.) In 1997, ABB selected Fidelity to recordkeep the Restoration Plan because consolidating administration with Fidelity was much easier than outsourcing to a different provider and it gave participants a single point of contact for the administration of their benefits. (Sackie.) Before Fidelity took over, ABB had not paid the prior recordkeeper a large amount for its services. (*Id.*) Fees for the Restoration Plan were invoiced to and paid by ABB Inc. (Sackie; Zimmerman-Decker; DA1129; DA1130.)

109. ABB had two non-qualified deferred compensation plans. The first (the "Old DCP") did not actually hold any assets. (Morlan.) Instead, participants' deferred compensation benefits

were essentially just bookkeeping entries. (*Id.*) The Old DCP had only about 50 participants. (*Id.*) In 2002, ABB decided to move administration of the Old DCP to Fidelity because that would simplify administration. (Sackie.) Consistent with its ordinary practice with respect to nonqualified plans related to 401(k) plans for which it was providing bundled services, Fidelity made the business decision not to charge ABB for the work.[22] (Pisacreta.) ABB never requested that Fidelity administer the Old DCP for free. (Sackie.)

110.    ABB subsequently froze the Old DCP and created the second non-qualified deferred compensation plan (the "New DCP"), which it asked Fidelity to recordkeep along with the Old DCP. (Morlan.) The New DCP was assetized and has fewer than 100 participants. (*Id.*) The New DCP generated compensation for Fidelity through revenue-sharing payments just like the Plan. (Zimmerman-Decker.) Fidelity received compensation of more than $15,000 per year in connection with the New DCP. (*Id.*)

### 2. Fidelity's Decision To Absorb Certain Non-Qualified Plan Costs Was Not Tied To Any Plan Transaction

111.    Fidelity received compensation for servicing two of the three non-qualified plans: ABB paid Fidelity $34,000 per year for the Restoration Plan and Fidelity has received asset-based compensation of approximately $33,000 for the New DCP. (Zimmerman-Decker; DA1883.)

112.    Fidelity did not receive any compensation for its services to the Old DCP and itself absorbed the cost of those services. However, the Old DCP was a small, relatively inactive plan with fewer than 50 participants that required very little time and money to administer. (Sackie; Morlan; LaBonte.) The market value of Fidelity's ongoing services to the Old DCP was $5,000 to $10,000 per year. (Pisacreta; Otto.) When Fidelity started to service the New DCP in 2006, ABB closed the Old DCP to new participants. (Morlan.)

113.    Fidelity's waiver of very modest Old DCP fees did not influence ABB's investment selections for the Plans. Cutler was not aware that Fidelity had waived any fees for non-qualified plan services prior to this lawsuit. (Cutler.) Further, ABB personnel responsible for

---

[22] The prior recordkeeper had charged a "fairly small" amount of money to recordkeep the Old DCP. (Sackie.)

negotiating Fidelity's administrative services to the non-qualified plans did not make Plan investment decisions and ABB did not consider Fidelity's waiver of non-qualified plan fees in making decisions affecting Fidelity's compensation related to the Plan. (Sackie; Scarpa.)

114. In 2005, Fidelity drew attention to its services to the Old DCP and the New DCP, during negotiations over Fidelity's request for an $11 per-participant fee for the Plan. While Pisacreta acknowledged that it was wrong to seek to use the non-qualified plans to obtain a Plan fee increase, that effort had no effect, because ABB rejected the $11 fee. (Pisacreta; Scarpa.) Subsequently, Fidelity continued to waive annual recordkeeping fees for Old DCP and to absorb those costs out of its general profits. (Pisacreta.)

### F. Any Errors In Invoicing The Plan For Non-Plan Services Have Been Corrected.

115. During the course of the litigation, Fidelity discovered that on eight occasions (out of 76 invoices in total) H&W services or services to the nonqualified plans, totaling less than $80,000, had been invoiced to and paid by the Plan. (Zimmerman-Decker.)

116. Upon discovering the errors, Fidelity informed ABB and ABB thereafter repaid the fees erroneously billed to the Plan back to the Plan's H Account, using the methodology from the Department of Labor's Voluntary Fiduciary Correction Program to calculate the amount of lost earnings and interest on the mistaken charges and payments. (Zimmerman-Decker; FD ZD 3; Dkt. No. 447-1.) The lost earnings and interest on the $71,466.70 inadvertently paid by the Plan amounted to $12,772.21 pursuant to the DOL's online calculator, for a total of $84,238.91. (*Id.*)

117. Had the invoices not been paid, the money would have resided in the H Account. (Dkt. No. 437-1.) The H Account assets are invested in the Fidelity Retirement Money Market Fund. (Zimmerman-Decker; Cutler; P1086) If invested in that fund, the $71,466.70 mistakenly paid pursuant to the incorrect invoices would have yielded returns of $5,999.95. (Zimmerman-Decker; ZD3.)

118. Since identifying these ABB billing errors, Fidelity has undertaken an extensive review of its entire fee for service process, has identified weaknesses in its systems and processes that

led to the errors, and currently is in the process of remedying these system/process weaknesses to ensure that such billing errors do not recur.  (Zimmerman-Decker.)

## VII.   FIDELITY'S HANDLING AND INVESTMENT OF FLOAT WAS PROPER

119.    When a plan sponsor or participant makes contributions to a plan, Fidelity processes those contributions into the plan's investment options and credits participant accounts with shares in those options based on the share price on that date.  (Gentile.)  For logistical reasons, payments for those shares cannot be transferred to bank accounts for the specific investment options until the next business day.  Accordingly, those amounts, referred to as "float," are deposited into an omnibus depository account for the benefit of the investment options.  (*Id.*)  An omnibus account is used instead of individual accounts for each of the 16,000 plans Fidelity recordkeeps in order to streamline administration, reduce cost and minimize errors.  (*Id.*)

120.    Overnight balances in the depository account are invested by FMR in repurchase agreements.  (*Id.*)

121.    The following business day the principal is returned to the depository account and remitted to accounts for the specific investment options.  (*Id.*)  Earnings generated through the overnight investment of float are ultimately disposed of in two ways: (1) they are used to pay bank fees for the omnibus accounts of the investment options, and (2) the remaining earnings are allocated to the investment options on a pro rata basis.  (*Id.*)  A similar process applies to monies removed from investment options for disbursement to participants.

122.    No Fidelity entity earns any fee for the handling and investment of float, and no Fidelity entity receives any portion of the float earnings.  (*Id.*)  While Fidelity does not attempt in the normal course to track allocable portions of bank fees by client plan, it did manually perform a rough estimate for the purpose of this case.  Such estimated bank fees totaled $550 per month. (*Id.*)

# PROPOSED CONCLUSIONS OF LAW

## I.     THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' PRINCIPAL CLAIMS

1.     ERISA bars claims brought more than "three years after the earliest date on which the plaintiff had actual knowledge" of a purported breach.  29 U.S.C. § 1113(2).  A participant is deemed to have "actual knowledge" "from the date that documents were provided, or made available, to [p]articipants disclosing the facts underlying the alleged breach of fiduciary duty." *Shirk v. Fifth Third Bancorp.*, No. 05-cv-049, 2009 U.S. Dist. LEXIS 90775, at *11-12 (S.D. Ohio Sept. 11, 2009).[23]  The three-year period applies regardless "whether the individual plaintiffs actually saw or read the documents."  *Young v. GM Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 & n.2 (S.D.N.Y 2008), *aff'd* 325 F. App'x. 31 (2d. Cir. 2009); *see also Shirk*, 2009 U.S. Dist. LEXIS 90775, at *11-12.  The limitation period bars claims even if the violation is "continuing."  *Larson v. Univ. Women's Health Pension Plan*, 971 F. Supp. 398, 400 (D. Minn. 1997).

2.     Plaintiffs challenge the use of actively managed mutual funds as plan investment options.  But Plan participants had actual knowledge of that fact before December 29, 2003.  In addition, to the extent plaintiffs are complaining about fund performance (either on an absolute basis or compared to an index or another mutual fund), they also had actual knowledge of performance from mutual fund prospectuses.  These claims are time barred.

3.     ERISA Section 413 also provides that fiduciary breach claims must be brought within 6 years after the "date of the last action which constituted a part of the breach or violation."  29 U.S.C. § 1113(1)(A).  As this Court previously held, this period was not tolled.  And the six-year statute of repose bars claims that are deemed "continuing."  *Adamson v. ARMCO, Inc.*, 44 F.3d 650, 653-54 (8th Cir. 1995); *Angell v. John Hancock Life Ins. Co.*, 421 F. Supp. 2d 1168, 1175 (E.D. Mo. 2006), *aff'd* 223 F. App'x 527 (8th Cir. 2007).[24]  Because plaintiffs filed this action on

---

[23] *Accord Frommert v. Conkright*, 433 F.3d 254, 272 (2d Cir. 2006); *Young v. GM Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 & n.2 (S.D.N.Y. 2008), *aff'd* 325 F. App'x. 31 (2d. Cir. 2009).

[24] *Accord Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 214 (3d Cir. 2001); *Phillips v. Alaska Hotel & Rest. Emp. Pension Fund*, 944 F.2d 509, 520 (9th Cir. 1991).

December 29, 2006, all claims that accrued before December 29, 2000 are time-barred.

4. Most of the relevant fiduciary decisions were made before December 29, 2000. ABB chose an asset-based fee model in 1995; it chose to outsource DB and H&W recordkeeping to Fidelity in 1997 and January 2000, respectively; it adopted it 3-tier IPS in May 2000; and it selected the vast majority of all fund options offered to participants before December 29, 2000. *See* FF ¶¶ 5, 49, 93-94; P1; FD Dahling 4. ABB's PRC also decided to use only mutual funds for the actively managed component of the Plan (tier 3) shortly after it adopted the initial IPS. FF ¶¶ 10-12. Plaintiffs' challenges to all the foregoing transactions are time barred.

5. Plaintiffs claim that they may challenge the PRC's November 2000 fund selection decisions because those decisions were not implemented until 2001. The PRC's decision, however, was the last *fiduciary* act that constituted part of the alleged breach. *See Librizzi v. Children's Mem'l Med. Ctr.*, 134 F.3d 1302, 1306 (7th Cir. 1997) ("An adverse decision whose effect is deferred gives rise to a claim when the decision is made, not when the effect is felt."); *Larson v. Northrop Corp.*, 21 F.3d 1164, 1169-74 (D.C. Cir. 1994) ("last act" was termination of plan, not subsequent failure to pay benefits). Indeed, as plaintiffs have asserted and the Court accepted, the subsequent implementing amendments were *pro forma*.[25] 12/7/2009 Tr. at 4:18-21.

## II. FIDUCIARY STATUS

6. A defendant can be held liable for breach of fiduciary duty only if it was acting as a fiduciary to the Plan with respect to the decision being challenged, even if it is a Plan fiduciary for other purposes. 29 U.S.C. § 1002(21)(A) (a person is a fiduciary only "to the extent" that person performs fiduciary functions); *see Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *Eckelkamp v. Beste*, 201 F. Supp. 2d 1012, 1022 (E.D. Mo. 2002), *aff'd*, 315 F.3d 863 (8th Cir. 2002); *Maniace v. Commerce Bank, N.A.*, 40 F.3d 264, 267 (8th Cir. 1994).

7. Cutler was a fiduciary only to the extent that he made discretionary decisions regarding investment selection and monitoring. The PRC was a fiduciary only to the extent it made

---

[25] They also were not fiduciary acts. *See Lockheed Co. v. Spink*, 517 U.S. 882, 890 (1996); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999).

discretionary decisions regarding investment selection and monitoring. There is no evidence that the EBC played any fiduciary role with respect to the Plan regarding any of the challenged decisions. In particular, the EBC did not act in a fiduciary capacity in deciding to amend the Plan. *See, e.g., Spink*, 517 U.S. at 890; *Hughes Aircraft*, 525 U.S. at 444. ABB Inc. was a fiduciary to the Plan only to the extent that it administered the Plan or made discretionary decisions regarding management of the Plan or the management or disposition of its assets.

### A. FMT Has No Fiduciary Status With Respect To The Selection Of Plan Investment Options

8. Although FMT had a limited fiduciary role as a directed trustee, it had no fiduciary responsibility for the conduct challenged by plaintiffs.

### 1. The Trust Agreement Denies FMT Any Discretionary Authority Over Investment Selection

9. The record showed without ambiguity that FMT never exercised any discretionary authority over selection of the Plans' investment options. *See* FF ¶¶ 32-42. Plaintiffs nevertheless argue that FMT is a fiduciary with respect to investment selections because it possessed latent authority under the TA to "veto" ABB's selections. The trial record, the Agreement, and ERISA itself all refute plaintiffs' theory.

10. First, the trial record established that both parties understood the TA as authorizing FMT to decline to provide recordkeeping services for a given option only if the option was operationally incompatible with FMT's platform. FF ¶¶ 33. Consistent with that understanding, FMT never refused to service any option directed by ABB, even when ABB's lineup alterations negatively affected Fidelity's compensation. FF ¶¶ 33, 36, 39. Under ERISA, as in contract law generally, the parties' course of performance under a plan document is an important indicator of its meaning. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989); *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1353 (8th Cir. 1980). Here, the course of performance confirms the plain language of the TA, which states in multiple provisions that only ABB has authority to choose investment options, that FMT lacks any such authority, and that

FMT's functions are "purely ministerial" and limited to its directed trustee role.  (JD41 §§ 4(a), 4(k); *id.*, p.1 and Sch. A.)  The fact that FMT never exercised any right to control ABB's investment selections – a right that would have been very valuable to FMT if it existed – confirms that no such right existed under the TA.

11.     Second, under the statutory provision applicable to investment selection, ERISA fiduciary status rests on the *exercise* of fiduciary power, not its mere possession.  29 U.S.C. § 1002(21)(A)(i).  Subsection (i) governs the "management or disposition of plan assets" – the function here at issue.  *Id.*; *see Finkel v. Romanowicz*, 577 F.3d 79, 86 (2d Cir. 2009); *Johnson v. Georgia-Pacific Corp.*, 19 F.3d 1184, 1189 (7th Cir. 1994).[26]  Because FMT did not *exercise* fiduciary power over investment selection, it is not a fiduciary under subsection (i).

12.     Third, plaintiffs' theory misconstrues the TA.  As already noted, the TA clearly states that only ABB has authority over investment selections, but plaintiffs contend that FMT has power under the TA to veto new selections, making FMT a fiduciary.  However, the TA governs FMT's *provision of recordkeeping and trustee services*, and thus at most only authorizes FMT to refuse to *provide services* for a new option.  It does not give FMT any authority to prevent ABB from adding the option to the Plan's lineup using a different recordkeeper.  Nor does the TA empower FMT to prevent the deletion of options from the lineup.  FMT thus does not possess any latent, unexercised power under the TA to control ABB's investment selections.

13.     Guidance from the DOL confirms that FMT lacked fiduciary authority over ABB's investment selections.  *See* DOL Advisory Opinion 97-16.  In that matter, the recordkeeper itself (a unit of Aetna) identified the funds eligible to be included in a plan lineup, giving the sponsor notice and 60 days to terminate Aetna as recordkeeper if the sponsor objected to the new lineup.  The DOL advised that Aetna was not a fiduciary, because the sponsor itself had the final say

---

[26]  Plaintiffs incorrectly cite Subsection (iii), which states that a party who merely *possesses* "discretionary responsibility in the administration of [the] plan" is a fiduciary.  29 U.S.C. § 1002(21)(A)(i). But "plan administration" involves not management of plan assets, but operational issues such as participant communications, construction of plan documents, and claims determinations. *See Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996) (employer exercised "administrative power" when it conveyed information about likely future of plan benefits); *Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1035 (6th Cir. 1993).

over its plan's investment options, through its power to terminate Aetna. FMT clearly has much *less* authority than did Aetna—unlike Aetna, FMT has no power to impose a plan lineup on a take-or-leave-it basis. If Aetna was not a fiduciary, FMT certainly is not.

### 2. Fidelity Is Not A Fiduciary With Respect To Its Compensation Terms

14. Fidelity's compensation, including the asset based component, was established by and disclosed in the TA. FF ¶ 52; JD41, Sch. B. A service provider, even one who acts as a fiduciary for certain limited functions—such as a directed trustee—does not act as a fiduciary in negotiating or renegotiating the terms (including compensation) under which it will provide services. *See Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009), *cert. denied*, 2010 U.S. LEXIS 675 (Jan. 19, 2010); *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 473 (7th Cir. 2007); *Seaway Food Town, Inc. v. Med. Mut.*, 347 F.3d 610, 618-19 (6th Cir. 2003); *Schulist v. Blue Cross*, 717 F.2d 1127, 1131-32 (7th Cir. 1983); *Marks v. Independence Blue Cross*, 71 F. Supp. 2d 432, 436 (E.D. Pa. 1999). Plaintiffs' expert agreed. (Otto.)

15. Further, mutual fund assets are not plan assets, and they do not become plan assets merely because revenues from those assets are paid to Fidelity. 29 U.S.C. § 1101(b)(1); *Hecker*, 556 F.3d at 584; DOL Adv. Op. 2009-04a (Dec. 4, 2009). Fidelity's negotiation of revenue sharing thus does not constitute control over plan assets. DOL *Hecker* Br. 22.

16. Plaintiffs also err in contending that FMT had fiduciary authority over its compensation pursuant to § 13 of the TA, which authorized FMT to increase fees annually with 75 days notice to ABB. (JD41.) This provision works very much like the provision addressed in DOL Advisory Opinion 97-16. Although FMT could in theory impose a fee change with 75 days notice, ABB could terminate in response with 60 days notice. (JD41 § 10.) ABB thus had final say over the fees the Plan would pay. The DOL has recognized that, so long as the sponsor can terminate a service agreement on short notice without penalty, the service provider may seek

additional compensation when its compensation is adversely affected by an unaffiliated plan fiduciary's changes to the plan's investment lineup. DOL Adv. Op. No. 2003-09A.

### 3. Fidelity Did Not Act As An Investment Adviser

17.     Fidelity did not provide investment advice to ABB for a fee within the meaning of ERISA § 3(21)(A)(i). Fidelity did not provide investment recommendations to the plan "on a regular basis" or pursuant to any "mutual agreement" that those recommendations would "serve as a *primary basis*" for ABB's investment decisions. 29 C.F.R. § 2510.3-21 (emphasis added); *see Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir. 1989); FF ¶ 35. Fidelity's suggestion of options for ABB to consider does not establish fiduciary status. *See Hecker*, 556 F.3d at 584; *Schloegel v. Boswell*, 994 F.2d 266, 271 (5th Cir. 1993).

### B. FMR Is Not A Plan Fiduciary With Respect To Investment Selections Or Fidelity Compensation And Did Not Breach Duties Concerning Float

18.     As investment adviser to Fidelity mutual funds, FMR did not possess or exercise any control over ABB's investment selections, and neither mutual fund assets nor revenues received from those assets were plan assets. *Supra* ¶ 15. Nor did FMR breach any asserted duty in handling float: FMR received no fees for the investment or handling of float, nor did it derive any benefit from or receive any of the float interest. FF ¶ 91. And FMR cannot otherwise be held liable for the acts of FMT—plaintiffs did not even attempt to make the elaborate showing necessary to pierce the corporate veil separating the entities. *See NLRB v. Bolivar-Tees, Inc.*, 551 F.3d 722, 728-29 (8th Cir. 2008).

### C. Neither FMT Nor FMR Is Liable As A Co-Fiduciary

19.     Co-fiduciary liability attaches under ERISA § 405 only where the defendant fiduciary has *actual* knowledge that its co-fiduciary's conduct constitutes a breach of fiduciary duty. 29 U.S.C. § 1105(a)(3); *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992); *Keach v. U.S. Trust Co.*, 240 F. Supp. 2d 840, 844 (C.D. Ill. 2002). The actual knowledge standard requires more than proof that the fiduciary "should have known" about the co-fiduciary's breach—the

defendant must *actually* "know that it was a breach." H.R. Rep. No. 93-1280, at 308 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5080. A limited fiduciary also is only liable for a co-fiduciary's breach of duties within the scope of the limited fiduciary's duties. *DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 735, 757 (E.D. Va. 2005). Because neither FMT nor FMR had fiduciary duties concerning investment selections or negotiation of Fidelity compensation, they cannot be liable for any breach by ABB of its duties concerning those subjects. Moreover, far from having actual knowledge of any breach by ABB, Fidelity believed its fees were competitive and ABB's investment selections were reasonable. (Morlan; Pisacreta.)

## III.   DEFENDANTS DID NOT BREACH ERISA'S DUTY OF PRUDENCE

20.   ERISA Section 404(a) requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The Eighth Circuit has adopted a two part prudence test. First, the court must evaluate the process by which a fiduciary reached a decision (so called "procedural prudence"). Second, the court determines whether the end results of the process were "objectively reasonable" (*i.e.* "substantive prudence" or the "hypothetical prudent fiduciary" test.). *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917-19 (8th Cir. 1994) ("*Roth I*"). Plaintiffs bear the burden on each prong, *id.* at 917, and a claim of imprudence will fail unless plaintiffs prove *both* that the Defendants' process was deficient *and* that the results were unreasonable. *Id.* at 917-19; *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

21.   The procedural prudence test "focuses on the fiduciary's conduct preceding the challenged decision." *Roth I*, 16 F.3d at 917-18. The question is whether the fiduciaries "at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Katsaros v. Cody,* 744 F.2d 270, 279 (2d Cir. 1984). The action taken must simply be reasonable under the then prevailing circumstances, as measured by the contemporaneous conduct of similarly situated fiduciaries. *See Wsol v. Fiduciary Mgmt. Assocs., Inc.*, 266 F.3d 654, 657 (7th Cir. 2001); *Brock*

41

*v. Robbins*, 830 F.2d 640, 644-46 (7th Cir. 1987); *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337, 2007 WL 2263892, at *41 (S.D. Fla. Aug. 7, 2007). The comparison must be made to other fiduciaries' conduct *at the time*, "rather than from the vantage point of hindsight." *Roth I*, 16 F.3d at 918 (quotations and alterations omitted).

22.     Even if the fiduciary's process was flawed, he will not be liable if the decision was "objectively reasonable." *Id.* at 919; *see Herman v. Mercantile Bank, N.A.*, 143 F.3d 419, 421 (8th Cir. 1998) (flawed process is not fiduciary breach "if a hypothetical prudent fiduciary would have made the same decision anyway")(internal quotations omitted). What is objectively reasonable is again measured by "the conduct of similarly situated fiduciaries." *Dupree*, 2007 WL 2263892, at *46; *Brock*, 830 F.2d at 644-46 (affirming finding that service fees were reasonable because fees fell within market range for similar services); *George v. Kraft Foods Global, Inc.* No. 07-1713, 2010 WL 331695 at *12-13 (N.D. Ill. Jan. 27, 2010) (finding recordkeeping fees reasonable where they were "within a reasonable . . . range for similarly sized plans"); 12/7/2009 Tr. at 13:21-23 (evidence of industry standards is "substantial evidence of what a prudent plan fiduciary might do").[27]

23.     Because "prudence involves a balancing of competing interests under conditions of uncertainty," the "prudent person standard does not require the fiduciary to take any particular course of action, even if one course later may seem to have been preferable to another." *George*, 2010 WL 331695 at *12-13 (internal quotations omitted); *see Chao v. Merino*, 452 F.3d 171, 182 (2d Cir. 2006); *Taylor v. United Tech.*, No. 06-1494, 2009 WL 535779 at *8 (D. Conn. Mar. 3, 2009), *aff'd* 2009 WL 4255159 (2d. Cir. Dec. 1, 2009). For the same reason, fiduciary decisions are analyzed under a deferential standard. *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728,

---

[27]   *See also Wsol*, 266 F.3d at 657 (measuring reasonableness by reference to the "standard" price available in the "market."); *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 151 (3d Cir. 1999) (affirming district court finding of prudence in part because "[t]he prevailing view in the investment world at the time was that high yield guaranteed insurance contracts were good risks"); *Vanvels v. Betten*, No. 06-710, 2007 WL 329048, at *6 (W.D. Mich. Jan. 31, 2007) (finding arrangement was reasonable where the defendant was "offered and paid market rates for investment services."); *cf.* 26 C.F.R. § 1.162-7(b)(3) ("It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances.").

733 (7th Cir. 2006).[28]

### A. The Plan's Investments Were Chosen Using A Prudent Process And Were Substantively Reasonable

#### 1. ABB Employed A Prudent Process

24.     ABB followed a reasonable, industry standard process to select and monitor investment options and plan fees. FF ¶¶ 15, 23.  Plaintiffs' expert Pomerantz suggested that ABB's process was flawed because the options it selected underperformed the benchmarks he chose in hindsight.  Pomerantz's opinion is not relevant to whether the initial selection decision was prudent, which it was.  *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) ("investment losses are not proof that an investor violated his duty of care"); *George*, 2010 WL 331695, at *17 (same).[29]

#### 2. The Plan's Investment Selections Were Objectively Reasonable

25.     ABB's selection process also resulted in the selection of prudent options.  Plaintiffs focus on the fact that not every option selected was the cheapest option available, but there are a wide range of features and qualities that may make an option a prudent choice for a given plan even if it is not the least expensive.  *See Braden v. Wal-Mart Stores, Inc.*, No. 08-3109, 2009 WL 4062105, at *8 (8th Cir. Nov. 25, 2009) (pet. for reh'g filed Dec. 14, 2009); *Hecker*, 556 F.3d at 586; *Loomis v. Exelon Corp.*, No. 08-3109, 2009 WL 4667092, at*3-4 (N.D. Ill. Dec. 9, 2009); *In re Honda of Am. Mfg. ERISA Fees Litig.*, No. 08-cv-1059, 2009 U.S. Dist. LEXIS 95087, at *13 (S.D. Ohio Oct. 9, 2009); *cf.* DOL, 401(k) Fiduciary Education Campaign, *at* http://bit.ly/b24lfg ("The service provider offering the lowest cost services is not necessarily the

---

[28]  In addition, because the Plan specifies the investments to be offered (DA1061), ABB's decision to offer those investments is entitled to a presumption of prudence.  *See* Restatement Third of Trusts § 91 (duty of prudence is ordinarily supplanted by mandatory investment terms of a trust); *Edgar v. Avaya, Inc.*, 501 F.3d 340, 347 (3d Cir. 2007) (applying presumption of prudence to investment mandated in plan).

[29] Plaintiffs do not appear to claim that Defendants failed to disclose material facts.  In any event, this claim was previously dismissed with prejudice (Dkt. No. 209), and Plaintiffs have not reasserted it.  Further, to prevail on such a claim, Plaintiffs must prove reasonable and detrimental reliance.  *Brandt v. Principal Life and Disability Ins. Co.*, 50 Fed. App'x 330, 332 (8th Cir. 2002); *Ince v. Aetna Health Mgmt., Inc.*, 173 F.3d 672, 676 (8th Cir. 1999).  Plaintiffs cannot make this showing, because they did not read materials sent to them by the Plans.  FF ¶ 53.  The fact and amount of any revenue sharing is also not material.  *Hecker*, 556 F.3d at 586.

best choice for [a 401(k)] plan.").

26.     ABB reasonably chose the mutual funds attacked by plaintiffs because the funds provided value to Plan participants that they would not have obtained through the purportedly cheaper alternatives plaintiffs cite. FF ¶¶ 12.  Plaintiffs insist that there should be categorical preference for separate accounts over mutual funds, but the two are different products:  mutual funds offer distinct features that a fiduciary could reasonably determine warrant their additional costs.[30]  It is the essence of fiduciary discretion to choose from among reasonable options; there is certainly nothing imprudent about providing participants with *both* types of option.  The use of mutual funds and actively-managed options is widespread among large 401(k) plans. FF ¶ 16.  And the ABB plans' options reflected fees within the range considered reasonable as a matter of law. *Hecker*, 556 F.3d at 586 (fees ranging from 0.07% to "just over 1%").

27.     A plan sponsor may choose a more expensive option, so long as it has lawful reasons for doing so.  *Braden*, 588 F.3d at 596.  A fiduciary need not "scour the market to find and offer the cheapest possible fund."  *Id.* at 596 n.7 (quoting *Hecker*, 556 F.3d at 586).  Where a choice between competing alternatives requires judgment calls balancing additional value against additional costs (e.g., separate accounts vs. mutual funds), nothing in *Braden* permits a court to second-guess a fiduciary's reasonable judgment call.  *Supra* ¶ 25.[31]

        **B.      The Plan's Asset-Based Structure Was Not Imprudent**

28.     Plaintiffs do not dispute that asset-based fees are more "progressive" than normal fixed fees, or that ABB reasonably considered progressivity as a factor. FF ¶ 37, 55.  Plaintiffs instead

---

[30] Mutual funds have numerous features to protect investors, which are not required or typically offered by commingled pools or separate accounts.  These include:  (a) information transparency, including standardized disclosure of investment risk, investment performance, fees, and mandatory shareholder reports containing fund holdings (15 U.S.C. §§ 77e, 80a-8, 80a-30; SEC Form N-1A (registration statement for mutual funds)); (b) governance by an independent board of directors or trustees (17 C.F.R § 270.0-1(a)(7)); (c) annual independently audited financial statements (15 U.S.C. § 80a-32); (d) daily publication of share price (17 C.F.R. § 270.22c-1); (e) substantive investment regulation, such as requiring investment diversification and limiting leverage (15 U.S.C §§ 80a-(a)(1), 80a-18(f); 26 U.S.C. § 851(b)(3)); (f) compliance program requirements (15 U.S.C. § 7241(a) (Sarbanes-Oxley); 17 C.F.R. 270.38a-1 (mutual fund compliance); and (g) separate registration and regulation of fund investment adviser (15. U.S.C. § 80b-3).

[31] Pomerantz's opinion is a flawed, insufficient basis for second-guessing ABB's judgments. FF ¶ 18.

contend that ABB acted imprudently in failing to employ "progressive" fixed fee structures (*i.e.*, higher fixed fees for participants with greater assets), and in failing to secure "rebates" of mutual fund revenue sharing to participant accounts. But the analysis of *Braden* and *Hecker* that plan sponsors need not "scour the market" to find the cheapest available investment options applies logically to plan fee structures as well – a sponsor may permissibly employ standard fee structures, rather than scouring the market for rare and exotic schemes that may introduce new and different problems. *See George*, 2010 WL 331695 at *19 (extending the *Hecker/Braden* reasoning to service providers). The use of asset-based fees to compensate service providers has long been prevalent among large plans. FF ¶ 55. By contrast, progressive fixed fee structures (while theoretically possible) are difficult to administer (given shifting balances) (Gissiner), and plaintiffs failed to demonstrate that this technique is commonly employed by large 401(k) plans (the sole example cited was the Texa$aver plan). Likewise, the record showed that rebates to participants were a legally controversial issue, were rarely done, and actually could have *increased* some participants' fees. FF ¶¶ 56, 57.[32] ABB was not required to reject a common fee structure in favor of untested and controversial schemes.[33]

### C. The Plan's Recordkeeping Fees Were Reasonable

29.     Plaintiffs contend that ABB failed to monitor recordkeeping fees and that the Plan's recordkeeping fees were unreasonable. According to plaintiffs, in a bundled arrangement, a fiduciary is legally required to "peel the onion," *i.e.*, to separately calculate the portion of the total cost for the bundle of services that relates to recordkeeping and determine whether this

---

[32] One reason many funds will not provide rebates is that a fund's investment adviser cannot selectively waive, discount or rebate its fees for any subgroup of shareholders. In order to comply with the Investment Company Act ("ICA") and avoid unfavorable income tax treatment, mutual funds must pay the same investment advisory and other fees on all shares in each share class and avoid paying preferential dividends. 15 U.S.C. §§ 80a-18(f); 80a-22; 17 C.F.R. 270.2a-4, 270.18f-3(a)(1), (4) (conditions for multiple class funds; all classes must bear same advisory fees); SEC Form N-1A, *infra*, item 24 (tax status disclosure); 26 U.S.C. §§ 562(c); 852(b)(2)(D); IRS Rev. Proc. 99-40 (conditions for retaining pass-through tax status). For this reason, the SEC has warned that individual shareholder rebates "raise serious concerns" under applicable securities law. E*TRADE Securities, LLC, SEC No Action Letter, No. 2005511 (Nov. 30, 2005).

[33] Rebates to *plans* for defraying *plan* expenses are different from rebates directly to participants, though plan rebates are also uncommon. FF ¶¶ 55-56. The Plan did receive legacy rebates from two fund families, which it used to defray plan expenses, and ABB attempted to obtain additional rebate arrangements. FF ¶ 58.

distinct portion is reasonable. This theory fails for numerous reasons.

30. First, fiduciaries have no legal duty to identify and calculate the portion of bundled services that might be hypothetically attributable to recordkeeping services. *See Hecker*, 556 F.3d at 586 (amount of revenue-sharing is immaterial because "[t]he total fee, not the internal, post-collection distribution of the fee, is the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment"). Although the DOL is well aware of the current controversy regarding recordkeeping fees, it has not required fiduciaries to evaluate the cost of bundled services in the manner plaintiffs would have the Court require. *See* 72 Fed. Reg. 64731, 64742 (November 16, 2007) (prospectively requiring only that fiduciaries disclose "a description of the formula used to calculate" revenue-sharing). The DOL's proposed regulations providing guidance on this issue expressly provide that a bundled provider "is not required to break down this aggregate compensation or fees among the individual services comprising the bundle." 72 Fed. Reg. 70988, 70991 (Dec. 13, 2007). And the proposed regulation would prospectively require bundled service providers *only* to provide plan fiduciaries with the *aggregate* compensation received. *Id.*[34]

31. Second, the trial record shows that *total plan costs* are what matter economically to plan sponsors and participants, not the cost of individual components of the bundle. (Starks; Hubbard.) To analogize, when purchasing a home computer (*e.g.*, a bundle of CPU plus monitor plus keyboard), the purchaser cares only about the total cost of the computer bundle, not about how much the seller internally attributes to each component part.

32. ABB carefully monitored the Plan's total costs by monitoring the expense ratios of the funds on its platform – *i.e.*, "the critical figure for someone interested in the cost of including a certain investment in her portfolio and the net value of that investment." *Hecker*, 556 F.3d at

---

[34] The manner in which fees are disclosed in a mutual fund prospectus is controlled by SEC regulations, which require uniform disclosures among all funds in order to ensure comparability. SEC Form N-1A (prospectus) items 2, 3, 13, 26, 27; SEC Rel. No. IC-23064 (Mar. 13, 1998) (N-1A revised to promote understanding and comparability). There was no evidence that anyone failed to comply with those regulations. Nor can Plaintiffs challenge the sufficiency of SEC-regulated prospectus disclosure in this ERISA action. *See* 29 U.S.C. § 1144(d).

586.  And the undisputed evidence showed that total plan costs were well within the mainstream of similar plans.  FF ¶ 69.  This is unsurprising in that ABB almost always selected funds that were at or below the average cost for funds of that type.  FF ¶ 17.

33.      Third, even considering only the revenues received by Fidelity, those revenues were reasonable.  Fidelity's average revenue sharing from non-Fidelity funds in the line-up was well below the 35 bps market rate for equity funds.  FF ¶ 51.  Its revenues from such funds totaled only $4.036 million from 2001-2008.  *Id.*  And even considering the hypothetical administrative share of Fidelity's mutual fund asset-based fees, those revenues were well within market norms.  FF ¶¶ 71-77.  Finally, price is not the only metric – service matters too, and the Plans at all times received high quality services.  FF ¶¶ 59-60, 86.

34.      Fidelity's profits are legally irrelevant to the reasonableness of plan fees.  *See McLaughlin v. Bendersky*, 705 F. Supp. 417, 420 (N.D. Ill. 1989).

35.      Last, Plaintiffs err in implying impropriety from the use of funds that pay Rule 12b-1 fees, as those fees are properly paid for services to existing shareholders.  *Krinsk v. Fund Asset Mgmt., Inc.*, 715. F. Supp. 472, 490 n.37 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 167 (D. Mass. 2005); *Investment Company Institute*, SEC No-Action Letter, 1998 SEC No-Act. LEXIS 976, at *14 (Oct. 30, 1998).

36.      In sum, the fees paid by the plan, and the revenues received by Fidelity were reasonable in light of the services provided.

## IV.     **DEFENDANTS DID NOT BREACH THE IPS**

37.      Plaintiffs claim that ABB failed to adhere to standards set forth in the IPS.  But the IPS is not a governing plan document because it was adopted by the PRC, which does not have authority to amend the Plan.  *See Curtiss-Wright v. Schoonejongen*, 514 U.S. 73, 82 (1995) (every plan must specify an amendment procedure so that fiduciaries can "sort out" the "bona fide amendments" that they must follow from other "corporate communications.").

38.      The IPS certainly did not bind FMT.  An IPS binds a trustee only where the plan or trust

47

agreement: (1) "expressly provide[s] a statement of investment policy to guide the trustee"; or (2) "authorize[s] a named fiduciary to issue a statement of investment policy applicable to a trustee." 29 C.F.R. § 2509.08-2. Neither circumstance exists here. The relevant ABB documents do not expressly establish the IPS, or authorize the named fiduciary to create an IPS to bind FMT. And the IPS by its terms allocates investment decision making only to ABB. FF ¶ 48.

39.     Even assuming the IPS were a binding plan document, extrinsic evidence is relevant to determine its intent. *Pendleton v. Quiktrip Corp.*, 567 F.3d 988, 992-993 (8th Cir. 2009). Because Cutler was the primary drafter of the IPS, his testimony concerning the meaning of the document is especially relevant in interpreting its meaning. *See*, *e.g.*, *Barker v. Ceridian Corp.*, 193 F.3d 976, 981 (8th Cir. 1999), *cert. denied*, 529 U.S. 1109 (2000) (meaning of ambiguous plan document should be ascertained based on "extrinsic evidence of the settlor's intent"). Indeed, there is no contrary extrinsic evidence of the meaning of the IPS. Accordingly, Cutler's testimony that the IPS was intended to allow the investment selections made by ABB as well as the use of revenue sharing to compensate Fidelity, that it did not require the use of separate accounts rather than mutual funds, and that ABB satisfied the "leveraging" guideline established in the IPS, is adopted as a reasonable interpretation of the IPS.

40.     In any event, the plain language of the IPS permits use of mutual funds. FF ¶ 45.

41.     The record also refutes the claim that ABB failed to "use the purchasing power afforded by the size of the plan assets to reduce the cost to participants." (P20, at 2736.) ABB did use its size to select cheaper available investment options not available to smaller plans, such as the BGI index options, the Income Fund and a number of institutional-class mutual funds. FF ¶ 47.

42.     ABB also ensured that "alliance rebates" would be "used to offset or reduce the cost of providing administrative services to plan participants." (P20, at 2738.) "Alliance rebates" as used in the IPS referred to revenue sharing, which (except for portions returned to the Plan) was used to pay Fidelity for its recordkeeping services pursuant to the TA. FF ¶ 44.

## V.    DEFENDANTS DID NOT BREACH ANY DUTY OF LOYALTY

43.    ERISA requires fiduciaries to act "solely in the interest of the participants … and (A) for the exclusive purpose of: (i) providing benefits to participants … and (ii) defraying reasonable expenses of administering the plan.  29 U.S.C. § 1104(a).

44.    Plaintiffs argue that, once they show that a fiduciary "might" have a conflict, the burden shifts to the fiduciary to disprove a breach.  Plaintiffs rely on cases decided under ERISA § 406, which have no application to the burden of proof under § 404.  Under § 404, it is plaintiffs who bear the burden of proving that ABB made conflicted decisions and that these decisions resulted in losses to the Plan.  12/7/2009 Tr. at 12:14-16; *Roth I*, 16 F.3d at 917.  Plaintiffs have failed to carry that burden.

45.    ABB created a structure that prevented investment decisions from being tainted by any conflict.  Cutler – the person primarily responsible for making investment decisions – was entirely uninvolved in making decisions regarding Fidelity's compensation for TBO and non-qualified plan services (both HR functions).  FF ¶ 40.  And the individuals responsible for those functions had no role at all in selecting Plan investments.  FF ¶¶ 40, 113.  There is no evidence that ABB made any decisions concerning either investment selections or TBO and non-qualified services based on any conflict of interest.

46.    Moreover, even a conflicted fiduciary will escape liability where he employs "an intensive and scrupulous independent investigation" into an investment.  *Leigh v. Engle*, 727 F.2d 113, 125-126 (7th Cir. 1984).  ABB's process satisfied that standard.  *Supra* ¶ 24.

47.    Finally, it was not an ERISA violation for Fidelity to market other services to ABB based on the relationship Fidelity developed providing services to the Plan.  Because Fidelity did not act as a fiduciary in offering Plan services, it did not violate any fiduciary duty in marketing those services.  Nor does ERISA not prohibit an action that primarily benefits a plan simply because that same action "incidentally benefits" a party in interest.  *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).  Fidelity's provision of high-quality services to the Plan primarily benefited the Plan and its participants; any benefit Fidelity may have derived in its relationship

with ABB was merely "incidental."

## VI.  PLAINTIFFS' PROHIBITED TRANSACTION CLAIMS FAIL

48.     The substance of plaintiffs' prohibited transaction claims under ERISA § 406 need not be addressed because § 406 is subject to an exemption for reasonable compensation, and the compensation paid to Fidelity was reasonable.  29 U.S.C. §§ 1108(b)(2), (c)(2); *see Harley v. Minnesota Min. and Mfg. Co.*, 284 F.3d 901 (8th Cir. 2002).  Fidelity's compensation from the Plan was consistent with the market.  FF ¶¶ 65-69; *see Wsol*, 266 F.3d at 657 (affirming judgment for defendant because "what the fund got for its 6 cents per share was as good as what it could have bought in a market free of kickbacks and undue influence"); *accord Harley*, 284 F.3d at 909; *Vanvels*, 2007 WL 329048, at *6.

49.     Plaintiffs' § 406 claims also fail on the merits.  Their § 406(a) claims are time-barred for the reasons stated *supra* ¶¶ 1-5, and they fail to establish any "transaction" under § 406(b).[35]

50.     Section 406(b) in relevant part prohibits a plan fiduciary from "(1) deal[ing] with the assets of the plan in his own interest or for his own account" and "(3) receiv[ing] any consideration for his own personal account from any party dealing with such plan in connection with a *transaction* involving the assets of the plan."  29 U.S.C. § 1106(b) (emphasis added).  Unlike § 406(a), § 406(b) by its terms *does not* prohibit "indirect" transactions.  "Congress did not intend an expansive interpretation of [§ 406]."  *Evans v. Bexley*, 750 F.2d 1498, 1500 & n.3 (11th Cir. 1985); *see Martin*, 965 F.2d at 665.  Rather, § 406 is narrowly construed to prohibit *only* transactions that meet each of its specific requirements.  *Firstier Bank v. Zeller*, 16 F.3d 907 (8th Cir. 1994); *Jordan v. Mich. Conference of Teamsters Welfare Fund*, 207 F.3d 854, 858-59 (6th Cir. 2000).  Each transaction must be analyzed separately, *Martin*, 965 F.2d at 665, and only those transactions "caused" by a fiduciary are prohibited, *Spink*, 517 U.S. at 888-889.  Continuing an existing course of dealing is not a "transaction."  *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004).

---

[35] Any § 406(b) claim based on transactions occurring before December 29, 2000 are also time barred.

51.     There is no "transaction" governed by § 406(b).  First, no individual who made decisions regarding TBO and non-qualified services was acting as a Plan fiduciary in making that decision.  FF ¶¶ 40, 113.  Second, ABB received no consideration – *i.e.*, any discount from market prices for TBO services.  FF ¶ 102  Fidelity's TBO losses were caused by high costs, not below-market prices, and Fidelit – like any other business – was allowed to invest its profits how it wished, even in a new, unprofitable line of business.  FF ¶ 97-98.  Third, ABB and Fidelity did not "link" TBO and Plan services or pricing during any pricing discussions, but instead sought only market prices.  FF ¶¶ 101-02; 104.  And, over time, Fidelity revenues from TBO services *increased* while revenues from Plan services decreased.  (Zimmerman-Decker.)  Plaintiffs' theory would also require the Court to reach the implausible conclusion that Fidelity intentionally, as a reward for ABB's 401(k) business, incurred losses on TBO services that more than wiped out its profits on the Plan.  FF ¶ 100.[36]

52.     Plaintiffs' claims with respect to nonqualified plan services also fail to satisfy § 406(b)(3).  There was again no evidence indicating that ABB's plan investment decision makers were influenced by Fidelity's *de minimis* fee waiver for nonqualified plan services.  FF ¶ 113.  Fidelity provided services without compensation only for the Old DCP – a very small, relatively inactive whose ongoing services would command a market price of no more than $10,000 – and that decision was not made in connection with a 401(k) transaction.  FF ¶¶ 112-13.  The 401(k) fees were set *before* the Old DCP waiver.  FF ¶¶ 50, 109.  Fidelity provided those services out of its own profits.  FF ¶¶ 114.

## VII.     PLAINTIFFS HAVE FAILED TO ESTABLISH A RIGHT TO RELIEF AGAINST THE FIDELITY DEFENDANTS AS NONFIDUCIARIES

53.     ERISA limits a nonfiduciary's liability to "appropriate equitable relief."  29 U.S.C. § 1132(a)(3); *Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000).  Under this provision, however, "it is not enough that the defendant merely owes the plaintiff

---

[36] Plaintiffs point to several isolated billing mistakes in which services for other plans were accidentally billed to and paid from the Plans' assets.  Defendants themselves identified these errors and fully corrected them pre-trial using the DOL's Voluntary Fiduciary Correction Program.  *See* FF ¶¶ 115-18.

some money." *Knieriem v. Group Health Plan, Inc.*, 434 F.3d 1058, 1064 (8th Cir. 2006) (emphasis omitted). Equitable restitution is available only "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002). When money sought by the plaintiff has been "dissipated or commingled with other funds received from various other payors or sources," that money is no longer "specifically identifiable" and cannot be recovered from a non-fiduciary. *Aetna Life Ins. Co. v. DFW Sleep Diagnostics Center*, No. 02-1335, 2004 WL 1922033, at *4-5 (E.D. La. Aug. 25, 2004).

54.     As explained *supra* ¶ 15, the revenues attributable to Fidelity's fund management fees are not Plan assets but are fund assets, assessed at a fund level via the fund's uniform expense ratio and not associated with any fund shareholder. They are invoiced and recorded in aggregate, and deposited in a centralized Fidelity account. *Supra* ¶¶ 54. There is thus no distinct *res* of funds in the Fidelity Defendants' possession belonging to the Plan. *See Calhoon v. TWA*, 400 F.3d 593, 597 (8th Cir. 2005) (monetary relief is equitable only where the money sought is "specifically identifiable" and can "clearly be traced to particular funds or property in the defendant's possession") (internal quotations omitted); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir. 2005). Plaintiffs' request simply seeks general monetary damages, which is not authorized by § 502(a)(3). *Knieriem*, 434 F.3d at 1064.

## VIII.   DAMAGES

### A.      The Alleged Breaches Had No Causal Connection To Any Damages

55.     Under ERISA § 409(a), a breaching fiduciary is liable only for plan losses that "result[] from [the] breach." 29 U.S.C. § 1109(a). Section 409(a) thus imposes liability only if there is both a loss to the plan and a "causal connection" between a breach of fiduciary duty and plan losses. *Roth I*, 16 F. 3d at 919-21; *see Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982); *Silverman v. Mut. Ben. Life Ins. Co.*, 138 F.3d 98, 104-05 (2d Cir. 1998). A breaching fiduciary is not subject to damages "if no losses are incurred … that differ from what would have been had

there been no breach of fiduciary duty." *Wsol*, 266 F.3d at 658. If an alleged fiduciary breach relating to the cost of plan services does not result in excessive costs, there are no damages. *Id.*

56. The same rules apply to disgorgement claims under § 409(a): the fiduciary must disgorge only those profits obtained "*through use of assets of the plan* by the fiduciary." 29 U.S.C. § 1109(a) (emphasis added). This requires a "causal connection" between the improper use of plan assets and the profits made by the fiduciary. *Leigh*, 727 F.2d 137; *see Wsol*, 266 F.3d at 658; *Etter v. J. Pease Constr. Co.*, 963 F.2d 1005, 1009 (7th Cir. 1992).

57. Plaintiffs bear the burden of proving a fiduciary breach and a *prima facie* case of loss to the plan. *Roth I,* 16 F.3d at 917; *Martin*, 965 F.2d at 671. To prove the latter, Plaintiffs must show that "the alleged breach of trust resulted in the identified losses to the Plan." *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir. 1995).

58. Plaintiffs have failed to carry their burden of showing that the Plan suffered any damages caused by the wrongful conduct alleged. The costs incurred by the ABB Plan were reasonable, whether calculated as total plan cost or as compensation hypothetically attributable to Fidelity's administrative services. FF¶¶ 65-77.[37] Nor did damages result from the inclusion of retail mutual funds as investment options, which consistently had below average expense ratios. FF ¶¶ 17, 20. No evidence established that any specific fund was "overpriced."

59. ABB's investment selection decision makers also were insulated from any influence related to non-qualified plan or TBO services. FF¶¶ 40; 113. Accordingly, even if the Plan's investment selections performed less well than other selections that might have been made, that performance differential was *not* caused by any improper influence related to non-qualified plans or TBO services. Hence, it cannot be recovered as damages under § 409(a).

60. Even if the failure to monitor revenue sharing to Fidelity were a breach, the proper measure of damages would be the *excessive portion* of Fidelity's compensation based on that revenue sharing, not the performance of the Plan's investment options. There is no "nexus

---

[37] Specifically, plaintiffs' $36.3 million figure is not a measure of Fidelity's profit, much less of excessive compensation, where the figure expressly represents *all* of Fidelity's revenues. Pls. Demo. Ex. 3.

between the administrative fees charged [to] participants and their market-based losses, as required by [§ 409(a)]." *Loomis v. Exelon Corp.*, 40 EBC 1184, 1185 (N.D. Ill. Feb. 21, 2007).

### B. Plaintiffs Misread *Donovan v. Bierwirth*

61. The goal of § 409(a) is the "the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Bierwirth*, 754 F.2d at 1056. In applying this rule, the Court must "determine the specific damages that resulted from each [breach]." *Martin*, 965 F.2d at 672.

62. This case is unlike *Bierwirth*. Because plan fiduciaries there had invested plan assets for an improper purpose, the court sought to "determin[e] what the Plan would have earned had the funds been available for other Plan purposes," and the court based damages on the "most profitable" of plausible investment alternatives. 754 F.2d at 1056. By contrast, Plan assets were *actually invested* according to participant choices from a varied menu of investment options. Plaintiffs' reliance on *Bierwirth* in this case is simply an after-the-fact substitution of better performing investment funds for the options in the Plan. *Bierwirth*, however, "should not be [understood] to mean that at the time of suit the court should look back and decide which of those investment strategies has proved most profitable. Such a methodology would yield a windfall, given the uncertainty of investments." *Leister v. Dovetail, Inc.*, 546 F.3d 875, 881 (7th Cir. 2008), *see Roth I*, 16 F. 3d at 916.

63. Moreover, under *Bierwirth*, the Court may compare a plan's investment performance to the "most profitable" of alternative investments *only* where the alternatives are "equally plausible." *Bierwirth*, 754 F.2d at 1056. Yet the investment alternatives presented by plaintiffs are not plausible for the Plan. For example, the ABB DB plan's investments are not a plausible alternative given fundamental differences between DB and DC plans, and Pomerantz conceded that he had no basis for that comparison. (Pomerantz.) Similarly, the Vanguard Wellington Fund is not a plausible alternative to Fidelity Freedom Funds; the former is a static balanced fund and the latter is a dynamic asset allocation fund. (Starks, Turki.) Likewise, because there is no *per se* challenge to use of actively managed investment vehicles, four specific Vanguard index

funds are not plausible alternatives to the Plans' lineup of actively managed funds. Finally, plaintiffs provide no plausible alternatives to mutual funds, relying instead on theories of universal fee discounts for separate accounts, rather than identifying specific plausible alternatives.

_____

Brian T. Ortelere
William J. Delany
Azeez Hayne
Jeffrey A. Sturgeon
Melissa D. Hill
Erica E. Flores
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel:  (215) 963-5000
Fax:  (215) 963-5001
*admitted pro hac vice*

Jeffrey S. Russell
BRYAN CAVE LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102
Tel:  (314) 259-2000
Fax:  (314) 259-2020

*Attorneys for the ABB Defendants*

_____

Richard N. Bien
LATHROP & GAGE, L.C.
2345 Grand Blvd., Suite 2800
Kansas City, MO 64108

M. Randall Oppenheimer
Robert N. Eccles
Brian D. Boyle
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
*admitted pro hac vice*

James S. Dittmar
James O. Fleckner
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
*admitted pro hac vice*

*Attorneys for the Fidelity Defendants*