IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


RON TUSSEY, et al.,                    )
                                       )
              Plaintiffs,              )  No. 06-04305-CV-C-NKL
                                       )  January 5, 2010
       V.                              )  Kansas City, Missouri
                                       )  CIVIL
ABB, INC., et al.,                     )
                                       )  VOLUME I
              Defendants.              )  (PAGES 1-277)
                                       )


TRANSCRIPT OF BENCH TRIAL


BEFORE THE HONORABLE NANETTE K. LAUGHREY
UNITED STATES DISTRICT JUDGE


Proceedings recorded by electronic stenography
Transcript produced by computer

Kathleen M. Wirt, RDR, CRR
United States Court Reporter
400 E. 9th Street, Suite 7452 * Kansas City, MO 64106

```
 1
                        APPEARANCES
 2

 3    For Plaintiffs:          MR. JEROME SCHLICHTER
                               MR. DAN CONLISK
 4                             MR. TROY DOLES
                               MS. HEATHER LEA
 5                             Schlichter, Bogard & Denton
                               100 S. Fourth Street, Suite 900
 6                             St. Louis, MO 63102

 7    For ABB Defendants:      MR. BRIAN ORTELERE
                               MR. WILLIAM DELANY
 8                             MR. AZEEZ HAYNE
                               Morgan, Lewis & Bockius, LLP
 9                             1701 Market Street
                               Philadelphia, PA 19101-2921
10
                               MR. JEFF RUSSELL
11                             Bryan Cave
                               211 North Broadway, Suite 3600
12                             St. Louis, MO 63102-2750

13    For Fidelity             MR. M. RANDALL OPPENHEIMER
      Defendants:              O'Melveny & Myers, LLP
14                             1999 Avenue of the Stars,
                               7th Floor
15                             Los Angeles, CA 90067

16                             MR. BRIAN BOYLE
                               MR. ROBERT ECCLES
17                             MR. BENJAMIN BRADSHAW
                               MR. ADAM J. COATES
18                             O'Melveny & Myers, LLP
                               1625 Eye Street, NW
19                             Washington, DC 20006

20                             MR. JAMES S. DITTMAR
                               MR. JAMES O. FLECKNER
21                             Goodwin, Procter, LLP
                               53 State Street, Suite 20
22                             Boston, MA 02109

23                             MR. RICHARD N. BIEN
                               Lathrop & Gage, L.C.
24                             2345 Grand Blvd., Suite 2500
                               Kansas City, MO 64108
25
```

1                          I N D E X

2                          VOLUME I
                        (PAGES 1-277)
3                       JANUARY 5, 2010

4    Opening statement by Plaintiffs              28
     Opening statement by ABB Defendants          56
5    Opening statement by Fidelity Defendants     83

6

     PLAINTIFFS' WITNESSES:
7
        JOHN SACKIE
8           Direct Examination by Mr. Schlichter   109
            Cross-examination by Mr. Ortelere      246
9
                              * * *

10                          VOLUME II
11                       (PAGES 278-520)
                        JANUARY 6, 2010
12
     PLAINTIFFS' WITNESSES CONTINUED:
13
        JOHN SACKIE
14          Resumed Cross-examination by Mr. Ortelere   302
            Redirect Examination by Mr. Schlichter      340
15          Recross-examination by Mr. Ortelere         355

16      MICHAEL SCARPA
            Direct Examination by Mr. Schlichter        356
17          Cross-examination by Mr. Delany             477
18                            * * *

19                          VOLUME III
                         (PAGES 521-731)
20                      JANUARY 7, 2010

21   PLAINTIFFS' WITNESSES CONTINUED:

22      MICHAEL SCARPA
            Resumed Cross-examination by Mr. Delany     525
23          Redirect Examination by Mr. Schlichter      602

24      JOANNE MORLAN
            Direct Examination by Mr. Doles             644
25
                              * * *

1

VOLUME IV
(PAGES 732-974)
JANUARY 8, 2010

2

3 PLAINTIFFS' WITNESSES CONTINUED:

4
    JOANNE MORLAN
        Cross-examination by Mr. Oppenheimer    737
5
        Redirect Examination by Mr. Doles    831
        Recross-examination by Mr. Oppenheimer    833
6

    CHARLIE FISHER
7
        Direct Examination by Mr. Conlisk    834
        Cross-examination by Mr. Ortelere    843
8

    JOHN CUTLER, JR.
9
        Direct Examination by Mr. Schlichter    848
        Cross-examination by Mr. Delany    962

10

* * *

11

VOLUME V
12
(PAGES 975-1210)
JANUARY 11, 2010

13

PLAINTIFFS' WITNESSES CONTINUED:

14

    JOHN CUTLER, JR.
15
        Resumed Cross-examination by Mr. Delany    978
        Redirect Examination by Mr. Schlichter    1127
16

    BRIGITTE GENTILE
17
        Direct Examination by Ms. Lea    1176
        Cross-examination by Mr. Eccles    1189

18

* * *

19

VOLUME VI
20
(PAGES 1211-1459)
JANUARY 12, 2010

21

PLAINTIFFS' WITNESSES CONTINUED:

22

    BRIGITTE GENTILE
23
        Resumed Cross-examination by Mr. Eccles    1214
        Redirect Examination by Ms. Lea    1230

24

25

JEFF JARCZYK
    Direct Examination by Mr. Schlichter         1235
    Cross-examination by Mr. Bradshaw            1251
    Redirect Examination by Mr. Schlichter       1275

ALBERT OTTO
    Direct Examination by Mr. Schlichter         1291
    Cross-examination by Mr. Boyle               1358
    Cross-examination by Mr. Ortelere            1441

                       * * *

                     VOLUME VII
                 (PAGES 1460-1695)
                 JANUARY 13, 2010

PLAINTIFFS' WITNESSES CONTINUED:

ALBERT OTTO
    Resumed Cross-examination by Mr. Ortelere    1466
    Redirect Examination by Mr. Schlichter       1502
    Recross-examination by Mr. Boyle             1526
    Further Redirect by Mr. Schlichter           1529

TIM PINNELL
    Direct Examination by Mr. Conlisk            1530
    Cross-examination by Ms. Hill                1536

PAUL KAMPNER
    Direct Examination by Mr. Schlichter         1547
    Cross-examination by Mr. Dittmar             1585
    Cross-examination by Mr. Ortelere            1616
    Redirect Examination by Mr. Schlichter       1621
    Recross-examination by Mr. Dittmar           1627
    Further Redirect by Mr. Schlichter           1635
    Further Recross by Mr. Dittmar               1641
    Further Redirect by Mr. Schlichter           1642
    Recross-examination by Mr. Ortelere          1643
    Further Recross by Mr. Dittmar               1644

RON TUSSEY
    Direct Examination by Mr. Conlisk            1646
    Cross-examination by Mr. Sturgeon            1654

                       * * *

1                          VOLUME VIII
                       (PAGES 1696-1936)
2                        JANUARY 14, 2010

3    PLAINTIFFS' WITNESSES CONTINUED:

4       STEVE POMERANTZ
            Direct Examination by Mr. Schlichter        1737
5           Cross-examination by Mr. Dittmar            1891

6                            * * *

7                          VOLUME IX
                       (PAGES 1937-2183)
8                        JANUARY 19, 2010

9    PLAINTIFFS' WITNESSES CONTINUED:

10      STEVE POMERANTZ
            Resumed Cross-examination by Mr. Dittmar    1942
11          Cross-examination by Mr. Delany             1991
            Redirect Examination by Mr. Schlichter      2011
12          Recross-examination by Mr. Dittmar          2040
            Recross-examination by Mr. Delany           2045
13          Further Redirect by Mr. Schlichter          2047

14   FIDELITY DEFENDANTS' WITNESS:

15      ROBERT GLENN HUBBARD
            Direct Examination by Mr. Dittmar           2051
16          Cross-examination by Mr. Schlichter         2108

17                           * * *

18                         VOLUME X
                       (PAGES 2184-2472)
19                       JANUARY 20, 2010

20   ABB DEFENDANTS' WITNESSES:

21      JEFFREY HALSEY
            Direct Examination by Mr. Ortelere          2188
22          Cross-examination by Ms. Lea                2259
            Redirect Examination by Mr. Ortelere        2295
23          Recross-examination by Ms. Lea              2301

24      LAURA STARKS
            Direct Examination by Mr. Ortelere          2302
25

* * *

VOLUME XI
(PAGES 2473-2728)
JANUARY 21, 2010

ABB DEFENDANTS' WITNESSES CONTINUED:

LAURA STARKS
    Resumed Direct Examination by Mr. Ortelere   2477
    Cross-examination by Mr. Schlichter          2514
    Redirect Examination by Mr. Ortelere         2702
    Recross-examination by Mr. Schlichter        2722

* * *

VOLUME XII
(PAGES 2729-2908)
JANUARY 22, 2010

ABB DEFENDANTS' WITNESSES CONTINUED:

BARRY WENTWORTH
    Direct Examination by Mr. Delany             2743
    Cross-examination by Mr. Schlichter          2822

FINIS WELCH
    Direct Examination by Mr. Hayne              2873
    Cross-examination by Ms. Lea                 2895
    Redirect Examination by Mr. Hayne            2897
    Offer of Proof by Mr. Hayne                  2898

* * *

VOLUME XIII
(PAGES 2909-3159)
JANUARY 25, 2010

ABB DEFENDANTS' WITNESSES CONTINUED:

LASSAAD TURKI
    Direct Examination by Mr. Hayne              2914
    Cross-examination by Mr. Schlichter          2968
    Redirect examination by Mr. Hayne            3022

1  FIDELITY DEFENDANTS' WITNESSES:

2     THOMAS BRESLAWSKI
          Direct Examination by Mr. Boyle              3028
3         Cross-examination by Mr. Doles              3071
          Redirect Examination by Mr. Boyle           3086
4
      RICHARD DAHLING
5         Direct Examination by Mr. Bradshaw          3088

6                          * * *

7                       VOLUME XIV
                     (PAGES 3160-3421)
8                   JANUARY 26, 2010

9  FIDELITY DEFENDANTS' WITNESSES CONTINUED:

10    RICHARD DAHLING
          Resumed Direct by Mr. Bradshaw              3164
11        Cross-examination by Mr. Schlichter         3167
          Redirect Examination by Mr. Bradshaw        3210
12        Recross-examination by Mr. Schlichter       3214

13    VINCENT PISACRETA
          Direct Examination by Mr. Boyle             3218
14        Cross-examination by Mr. Schlichter         3371

15                         * * *

16                      VOLUME XV
                     (PAGES 3422-3686)
17                  JANUARY 27, 2010

18 FIDELITY DEFENDANTS' WITNESSES CONTINUED:

19    VINCENT PISACRETA
          Resumed Cross by Mr. Schlichter             3426
20        Redirect Examination by Mr. Boyle           3499
          Recross-examination by Mr. Schlichter       3528
21
      DIANE ZIMMERMAN-DECKER
22        Direct Examination by Mr. Bradshaw          3536
          Cross-examination by Mr. Doles              3554
23        Redirect Examination by Mr. Bradshaw        3573

24    STEVEN KARL GISSINER
          Direct Examination by Mr. Oppenheimer       3578
25        Cross-examination by Mr. Schlichter         3631
          Redirect Examination by Mr. Oppenheimer     3683

* * *

VOLUME XVI
(PAGES 3687-3859)
JANUARY 28, 2010

ABB DEFENDANTS' WITNESS:

Videotape deposition of Kathleen LaBonte was
Played for the court (Exhibit LaBonte 1)     3691

PLAINTIFFS' REBUTTAL WITNESS:

STEVE POMERANTZ
Direct Examination by Mr. Schlichter     3704

Plaintiffs' Opening Argument     3734

ABB Defendants' Closing Argument     3772

Fidelity Defendants' Closing Argument     3800

Plaintiffs' Closing Argument     3835

* * *

# E X H I B I T S

| PLAINTIFFS' EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| | | (On the record) |
| P1 - trust agreement | | 192 |
| P7 - 2003/06/25 investment review | | 931 |
| P16 - 1997/12/29 FundsNet letter | | 206 |
| P20 - 2000/11/27 IPS draft | | 152 |
| P30 - August 2006 PRC info | 2904 | 2913 |
| P38 - 2005/11 Mercer report | | 435 |
| P44 - 2005/11/11 DC plan Cost competitiveness | | 416 |
| P141 - 10/1-12/31/2002 DC Remittance | | 211 |

```
 1
     P176 - 2001/04/01 H account
 2      Reconciliation                          642

 3   P184 - 2005/01/07 Morlan e-mail            367

 4   P187 - 2005/08/17 Morlan e-mail            724

 5   P188 - 2005/11/18 Morlan e-mail            431

 6   P190 - 2006/01/06 Morlan e-mail            702

 7   P192 - resolution                          124

 8   P197 - 2005/06/27 PRC presentation         130

 9   P199 - Reicher legal issues       2904     2913

10   P210 - 2005/03/09 Scarpa e-mail            602

11   P223 - 2006/05/10 Cutler e-mail            875

12   P225 - 2002 pension investment policy 2904 2913

13   P227 - 2006/06/20 Scarpa e-mail            640

14   P232 - 2006/10/11 Cutler e-mail            956

15   P242 - 2004/03/22 Keller e-mail            225

16   P244 - 2004/06/09 Sackie e-mail            226

17   P250 - 2004/10/13 Domonkos e-mail          228

18   P253 - 2004/10/14 Labelle e-mail           434

19   P267 - 2003/11/08 PRISM investment   2904  2913
        Policy
20
     P270 - 2004/03/10 Cutler e-mail            215
21
     P276 - 2005/09/08 Scarpa e-mail            410
22
     P277 - 2005/09/10 Cutler e-mail            959
23
     P283 - 2004/11/16 PRISM investment   2904  2913
24      Policy

25   P284 - 2006/01/31 meeting summary          1152
```

| | | | |
|---|---|---|---|
| 1 | P298 - 2005/12/09 Morlan e-mail | | 454 |
| 2 | P301 - 2007/04/10 Morlan e-mail | | 474 |
| 3 | P303 - 2004/12/10 Morlan e-mail | | 364 |
| 4 | P313 - 2007/02/27 PRC minutes | 2904 | 2913 |
| 5 | P317 - 2002/09/25 Cutler e-mail | | 886 |
| 6 | P318 - 2002/07/18 mapping e-mail | | 879 |
| 7 | P323 - 2000/09/27 Cutts e-mail | | 191 |
| 8 | P324 - 2000/09/20 Cutts e-mail | | 306 |
| 9 | P325 - 2000/09/20 Isaacs e-mail | | 164 |
| 10 | P326 - 2000/09/25 Sackie e-mail | | 183 |
| 11 | P328 - 2000/06/16 Cutler letter | | 867 |
| 12 | P330 - 2000/06/01 PRISM investment Policy | 2904 | 2913 |
| 13 | P331 - 2000/09/25 Sackie e-mail | | 183 |
| 14 | P332 - 1999/05/25 PRC minutes | 2904 | 2913 |
| 15 | P333 - 1999/05/28 PRC minutes | 2904 | 2913 |
| 16 | P334 - 1998/12/16 PRC minutes | 2904 | 2913 |
| 17 | P335 - 1996/12/16 PRC minutes | 2904 | 2913 |
| 18 | P338 - 1994/05/20 PRC minutes, etc. | 2904 | 2913 |
| 19 | P343 - 1995/03/28 PRISM Transition Update | | 1569 |
| 20 | | | |
| 21 | P348 - 2005/03/03 PRC materials | | 932 |
| 22 | P349 - 2005/06/03 PRC materials | 2904 | 2913 |
| 23 | P368 - 2007/01/01 rep PRISM Plan | 3693 | 3695 |
| 24 | P369 - 2007/01/01 PRISM Plan | 3693 | 3695 |
| 25 | P370 - 2002/05/24 EBC actions | 2904 | 2913 |

| | | | |
|---|---|---|---|
| 1 | P391 - 2002/01/01 rep PRISM Plan | 3693 | 3695 |
| 2 | P431 - 1999/10/01 rep PRISM | 3693 | 3695 |
| 3 | P432 - 1999/10/01 PRISM | 3693 | 3695 |
| 4 | P447 - 2000/05/23 PRC minutes | | 151 |
| 5 | P460 - 2000/11/14 PRC minutes | 2904 | 2913 |
| 6 | P471 - 1996/05/22 Magellan Prospectus | 2904 | 2913 |
| 7 | P497 - 2005/12/23 Texa$aver plan | 2551 | 2551 |
| 8 | P546 - 2001 Texa$aver agreement | | 2564 |
| 9 | P558 - 2009/05/16 memo | 2732 | 2732 |
| 10 | P559 - 2009/06/15 memo | 2732 | 2732 |
| 11 | P569 - Great West response | 2904 | 2913 |
| 12 | P570 - Texa$aver chart | 2698 | 2698 |
| 13 | P585 - TPA contract | 2584 | 2584 |
| 14 | P588 - TPA contract | 2600 | 2600 |
| 15 | P621 - Barclays documents | | 1156 |
| 16 | P792 - mapping strategy | | 878 |
| 17 | P793 - FMRCo flow chart | | 1236 |
| 18 | P811 - seventh amendment | 2904 | 2913 |
| 19 | P848 - 2005/09/12 Cutler e-mail | | 906 |
| 20 | P850 - action plan | 730 | 736 |
| 21 | P851 - action plan | 730 | 736 |
| 22 | P852 - action plan | | 727 |
| 23 | P853 - action plan | 730 | 736 |
| 24 | P854 - action plan | 730 | 736 |
| 25 | P856 - action plan | 730 | 736 |

| | | | |
|---|---|---|---|
| 1 | P857 - action plan | 730 | 736 |
| 2 | P859 - action plan | 730 | 736 |
| 3 | P860 - action plan | 730 | 736 |
| 4 | P861 - action plan | 730 | 736 |
| 5 | P862 - action plan | 730 | 736 |
| 6 | P863 - action plan | 730 | 736 |
| 7 | P864 - fee transparency | 3534 | 3535 |
| 8 | P865 - ABB fund spreadsheet | | 712 |
| 9 | P871 - FESCo pricing P&L | | 668 |
| 10 | P872 - 2005 Fidelity Executive Summary | | 655 |
| 11 | P874 - FIRSCO report card | 3339 | 3339 |
| 12 | P880 - Fidelity letter to Sackie | | 230 |
| 13 | P887 - 2002/11/26 IPS | | 163 |
| 14 | P888 - 2007/02/14 Scarpa e-mail | | 1577 |
| 15 | P889 - 2005/02/14 Tenaglia e-mail | 889 | 889 |
| 16 | P890 - 2005/12/14 Pisacreta e-mail | | 343 |
| 17 | P894 - 2005/07/12 contract renewal | | 688 |
| 18 | P909 - ABB prices | | 718 |
| 19 | P910 - client report card | 3332 | 3332 |
| 20 | P914 - 2005/12/08 Pisacreta e-mail | | 698 |
| 21 | P917 - 2005/11/02 Dahling e-mail | | 414 |
| 22 | P918 - 2002/02/27 Kuppens e-mail | 238 | |
| 23 | P919 - 2005/01/04 Ziegler e-mail | | 707 |
| 24 | P920 - realigned budget | 2904 | 2913 |
| 25 | P938 - profitability review | 3534 | 3535 |

| | | |
|---|---|---|
| P961 - profitability review | 3534 | 3535 |
| P1047 - 2000-2006 total Fidelity Compensation | | 1243 |
| P1048 - 2000/10/01 first amendment | 2904 | 2913 |
| P1049 - 1999 restatement | 2904 | 2913 |
| P1050 - Second Amendment | 2904 | 2913 |
| P1051 - First Amendment | 2904 | 2913 |
| P1052 - 1997 DB recordkeeping | 2904 | 2913 |
| P1054 - 2004/08/10 Cutler e-mail | | 943 |
| P1062 - 2005/12/22 Morlan e-mail | | 463 |
| P1063 - 2005/09/18 Scarpa e-mail | | 524 |
| P1068 - 2004/12/24 Scarpa e-mail | | 368 |
| P1069 - 2004/12/16 Morlan e-mail | | 366 |
| P1072 - 2006/11/20 Morlan e-mail | | 1166 |
| P1073 - 2006/11/20 Morlan e-mail | | 1166 |
| P1080 - 2005/05/12 Morlan e-mail | | 390 |
| P1086 - 2005/08/09 Morlan e-mail | | 903 |
| P1093 - 2005/04/29 pricing review | | 664 |
| P1102 - 2003/06/04 Staats e-mail | | 223 |
| P1106 - 2005/09/13 Cote e-mail | | 223 |
| P1115 - DC remittance | | 471 |
| P1119 - amendment to restatement | 3572 | 3572 |
| P1120 - amendment to restatement | 2904 | 2913 |
| P1121 - amendment to restatement | 2904 | 2913 |
| P1122 - amendment to restatement | 2904 | 2913 |

| | | | |
|---|---|---|---|
| 1 | P1123 - Schedule D to amendment | 2904 | 2913 |
| 2 | P1124 - amendment to restatement | 2904 | 2913 |
| 3 | P1125 - amendment to restatement | 2904 | 2913 |
| 4 | P1140 - 2005/07/08 Mercer letter | | 410 |
| 5 | P1229 - 2003 modeled cost of RK | | 1373 |
| 6 | P1254A - exhibit to Otto report | | 1335 |
| 7 | P1254B - Otto chart | | 1349 |
| 8 | P1254C - Otto chart | | 1354 |
| 9 | P1255A - Otto chart | | 1350 |
| 10 | P1260 - presentation | 3683 | 3683 |
| 11 | P1275 - interrog. responses | | 1241 |
| 12 | P1276 - supplemental responses | 2904 | 2913 |
| 13 | P1278A - Pomerantz exhibit | | 1867 |
| 14 | P1278B - Pomerantz exhibit | | 1870 |
| 15 | P1278C - Pomerantz exhibit | 2174 | 2175 |
| 16 | P1298 - Hubbard Exhibit DD (Last page only) | 2174 | 2175 |
| 17 | P1327 - notice of 30(b)(6) depo | | 114 |
| 18 | P1351 - SPARK PowerPoint | | 1374 |
| 19 | P1358 - 401(k) report (in for Notice) | 238 | 294 |
| 20 | 1358A - Section 2.4.1.3 | 1777 | 1794 |
| 21 | P1365 - Texa\$aver program | 2581 | 2581 |
| 22 | P1367 - Texa\$aver stats | 2581 | 2581 |
| 23 | P1395 - 3/22/04 letter to Buckley | 3534 | 3535 |
| 24 | P1396 - 3/22/04 letter to Nostro | 3534 | 3535 |
| 25 | | | |

| | | | |
|---|---|---|---|
| 1 | PD2 - effect of 1% difference in Fees | 3425 | 3425 |
| 2 | | | |
| | PD3 - total Fidelity compensation | 3425 | 3425 |
| 3 | | | |
| | PD18 - 2003 modeled cost of RK | 2605 | 2605 |
| 4 | | | |
| | PD18A - 2003 modeled cost of RK Transparency | 2605 | 2605 |
| 5 | | | |
| 6 | PD19 - float description | 3425 | 3425 |
| 7 | PD20 - 5-yr performance | 3425 | 3425 |
| 8 | PD23 - large paper | 3425 | 3425 |
| 9 | PD27 - quotes from Freeman and Brown | 3425 | 3425 |
| 10 | | | |
| | PD30 - American Funds fee Litigation | 2174 | 2174 |
| 11 | | | |
| 12 | PD39 - 2001 Texa$aver agreement | 3572 | 3573 |
| 13 | PD40 - 2009 Texa$aver agreement | 2600 | 2600 |
| 14 | PD42 - Texa$aver FAQ's | 2551 | 2551 |
| 15 | PD43 - State of TX FAQ | 3425 | 3425 |
| 16 | PD44 - 401kwire.com | 2701 | 2701 |
| 17 | Plaintiffs' Depo Clips 1-24 (for ID) | | 3730 |
| 18 | Stipulation 1 regarding rates of Revenue sharing | | 1326 |
| 19 | | | |
| | Stipulation 2 regarding fund Performance | 2904 | 2913 |
| 20 | | | |
| 21 | Pisacreta declaration | 2904 | 2913 |
| 22 | Scarpa declaration | 2904 | 2913 |
| 23 | Lockhart declaration | 2904 | 2913 |
| 24 | Lockhart declaration | 2904 | 2913 |
| 25 | | | |

| JOINT EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| | (On the record) | |
| J1 - 1995/10/01 rep PRISM | 3693 | 3695 |
| J7 - 2001/02/23 PRC materials | | 1043 |
| J10 - 2006/05/24 PRISM policy | 2904 | 2913 |
| J27 - 2003/05/21 Magellan Prospectus | | 1286 |
| J84 - 2006 service review | 3132 | 3132 |
| J271 - Trust Agreement | 3541 | 3541 |

| FIDELITY DEFENSE EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| | (On the record) | |
| FD6 - investment review materials | 3121 | 3121 |
| FD9 - Pisacreta e-mail | 3369 | 3369 |
| FD131 - 2006 Client P&D View | 3357 | 3357 |
| FD160 - alpha sort report | 3332 | 3332 |
| FD161 - client pool report | | 1405 |
| FD162 - RK sort report | 3279 | 3279 |
| FD360 - diversification document | 2904 | 2913 |
| FD380 - scorecard | | 774 |
| FD383 - Scarpa e-mail | | 500 |
| FD436 - chart | 2171 | 2173 |
| FD439 - Hubbard chart | 2171 | 2173 |
| FD463 - amendment to RK agreement | | 589 |
| FD480 - Hubbard chart | 3692 | 3695 |
| FD565 - HRP curve | 3065 | 3065 |
| FD760 - chart | | 1248 |

| | | |
|---|---|---|
| FD775 - Charles e-mail | | 780 |
| FD781 - In re American Mutual Fund Fee Litigation | 2177 | 2177 |
| FD783 - Hubbard white board drawing | 3692 | 3695 |
| FD784 - Hubbard white board drawing | 3692 | 3695 |
| FD787 - Pomerantz depo clip (for ID) | 3693 | 3695 |
| FD788 - Pomerantz depo clip (for ID) | 3693 | 3695 |
| FD789 - Pomerantz depo clip (for ID) | 3693 | 3695 |
| Dahling #1 - expense analysis | 3114 | 3115 |
| Dahling #2 - expense analysys | 3114 | 3115 |
| Dahling #3 - 30 funds document | | |
| Dahling #4 - lineup changes | | |
| Gentile Graphic 1 | 3692 | 3695 |
| Gentile Graphic 2 | 3692 | 3695 |
| Gentile Graphic 3 | 3692 | 3695 |
| Jarczyk Graphic 1 | 3692 | 3695 |
| Jarczyk Graphic 2 | 3692 | 3692 |
| Jarczyk Graphic 3 | 3692 | 3692 |
| Jarczyk Graphic 4 | 3692 | 3692 |
| Morlan Graphic 2 | 3692 | 3692 |
| Morlan Graphic 3 | 3692 | 3692 |
| Morlan Graphic 4 | 3692 | 3692 |
| Morlan Graphic 5 | 3692 | 3692 |
| Morlan Graphic 6 | 3692 | 3692 |
| Morlan Graphic 7 | 3692 | 3692 |
| Morlan Graphic 8 | 3692 | 3692 |

| | | |
|---|---|---|
| RGH1 - total plan cost comparison | 3692 | 3695 |
| RGH9B - benchmark total plan costs | 3692 | 3695 |
| SG1 - three benchmark metrics | 3692 | 3732 |
| SG2 - total plan cost percentage | 3692 | 3732 |
| SG3 - administrative expense percentage | 3692 | 3732 |
| SG4 - administrative expense per participant | 3692 | 3732 |
| SG5 - ABB total plan cost percentage | 3692 | 3732 |
| SG6 - ABB administrative expenses | 3692 | 3732 |
| SG7 - ABB administrative expenses | 3692 | 3732 |
| SG8 - ABB administrative expenses | 3692 | 3732 |
| SG10 - benchmark study info | 3692 | 3732 |
| SG11 - consulting services | 3692 | 3732 |
| SG12 - ABB plan worksheet data | 3692 | 3732 |
| SP41B - Wellington Composite Index | 3692 | 3695 |
| VP1 - 401(k) fee arrangements | 3693 | 3695 |
| VP2 - bundled v. unbundled | 3693 | 3695 |
| VP3 - large plan pricing analysis | 3693 | 3695 |
| VP4 - large plan pricing analysis | 3693 | 3695 |
| VP6 - return v. expense ration | 3693 | 3695 |
| VP7 - attribution of revenue | 3693 | 3695 |
| VP8 - expenses and margins | 3693 | 3695 |
| VP9A - estimated profitability | 3693 | 3695 |
| VP9B - estimated profitability | 3693 | 3695 |
| VP10 - profitability estimates | 3693 | 3695 |

```
VP11 - RK costs to Fidelity          3693      3695

VP12 - 2006 total accountability     3693      3695

VP19 - experience v. assumptions     3534      3535

VP22 - revenue sharing               3693      3695

ZD3 - invoice error amounts          3576      3576

SP8 - P1358 (for offer of                      1795
    Proof only)

SP9 - RogersCasey survey (for                  1795
    offer of proof only)
```

| ABB DEFENSE EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| | | (On the Record) |
| DA16 - 7/27/05 investment review | | 265 |
| DA21 - 2001 integrated service Review | | 268 |
| DA22 - 2001 integrated service Review | 2253 | 2255 |
| DA67 - 2/12/02 memo | 2253 | 2255 |
| DA68 - 5/14/02 memo | 2253 | 2255 |
| DA78 - 2/18/03 memo | 2253 | 2255 |
| DA81 - 6/9/03 memo | 2253 | 2255 |
| DA83 - 8/13/03 memo | 2253 | 2255 |
| DA91 - 2/17/04 memo | 2253 | 2255 |
| DA93 - 5/11/04 memo | 2253 | 2255 |
| DA96 - 9/22/04 memo | | 985 |
| DA97 - 11/9/04 memo | | 989 |
| DA98 - 9/29/04 PRC minutes | 2258 | 2259 |
| DA99 - 11/16/04 PRC minutes | 2259 | 2259 |

| | | |
|---|---|---|
| 1 DA100 - 1/10/05 PRC minutes | 2259 | 2259 |
| 2 DA101 - 3/1/05 PRC minutes | 2259 | 2259 |
| 3 DA103 - 3/14/06 memo | | 1106 |
| 4 DA105 - 5/16/06 memo | 2904 | 2913 |
| 5 DA108 - 6/22/06 PRC minutes | 2253 | 2255 |
| 6 DA109 - 6/27/01 memo | 2253 | 2255 |
| 7 DA111 - 8/21/01 memo | 2253 | 2255 |
| 8 DA113 - 11/6/01 memo | | 1099 |
| 9 DA116 - March '05 letter re | 2259 | 2259 |
| 10 Financial Engines | | |
| 11 DA129 - value of 401(k) document | | 762 |
| 12 DA310 - 5/10/06 Cutler e-mail | | 1092 |
| 13 DA587 - 12/15/03 Sackie e-mail | 2259 | 2259 |
| 14 DA641 - 11/30/05 Scarpa e-mail | | 586 |
| 15 DA681 - 4/23/04 Cutler e-mail | | 1084 |
| 16 DA798 - 2/27/07 PRISM performance | 2698 | 2698 |
| 17 DA815 - rep PRISM summary plan | 2259 | 2259 |
| 18 DA830 - 1/6/06 Scarpa e-mail | | 580 |
| 19 DA855 - 2/9/07 Scarpa e-mail | 2904 | 2913 |
| 20 DA906 - July 2001 update | 2253 | 2255 |
| 21 DA922 - 10/16/00 Bailey e-mail | | 1084 |
| 22 DA938 - 5/11/00 Cutler e-mail | | 1045 |
| 23 DA940 - 9/21/00 Geller e-mail | | 1045 |
| 24 DA962 - PRISM Transition Update | | 256 |
| 25 DA964 - PRISM Transition Update | | 256 |

| | | | |
|---|---|---|---|
| 1 | DA979 - 11/11/03 memo | 2253 | 2255 |
| 2 | DA981 - 12/7/05 memo | 2253 | 2255 |
| 3 | DA983 - 9/15/05 memo | 2253 | 2255 |
| 4 | DA990 11/21/06 memo | 2253 | 2255 |
| 5 | DA993 - 11/13/02 memo | 2253 | 2255 |
| 6 | DA1024 - amendment to PRISM Plan | 2259 | 2259 |
| 7 | DA1061 - PRISM Plan, 1/1/02 | 2259 | 2259 |
| 8 | DA1129 - 4/16/04 invoice | 3543 | 3542 |
| 9 | DA1130 - 1/15/04 invoice | 3543 | 3543 |
| 10 | DA1799 - 7/27/05 investment review | | 1115 |
| 11 | DA1805 - 1/22/02 Kuppens letter | | 273 |
| 12 | DA1883 - 7/1/99 agreement | | 322 |
| 13 | DA1889 - 2/28/97 agreement | | 315 |
| 14 | DA1897 - 10/31/05 Cutler e-mail | | 1107 |
| 15 | DA1976 - amendment to agreement | | 329 |
| 16 | ABB Cutler Demo 1 | 3696 | 3697 |
| 17 | ABB Cutler Demo 2 | 3696 | 3697 |
| 18 | ABB Cutler Demo 3 | 3696 | 3697 |
| 19 | ABB Cutler Demo 4A | 3696 | 3697 |
| 20 | ABB Cutler Demo 4B | 3696 | 3697 |
| 21 | ABB Cutler Demo 4C | 3696 | 3697 |
| 22 | ABB Cutler Demo 4D | 3696 | 3697 |
| 23 | ABB Cutler Demo 4E | 3696 | 3697 |
| 24 | ABB Cutler Demo 4F | 3696 | 3697 |
| 25 | ABB Cutler Demo 4G | 3696 | 3697 |

| | | | |
|---|---|---|---|
| 1 | ABB Cutler Demo 4H | 3696 | 3697 |
| 2 | ABB Cutler Demo 4I | 3696 | 3697 |
| 3 | ABB Cutler Demo 4J | 3696 | 3697 |
| 4 | ABB Cutler Demo 4K | 3696 | 3697 |
| 5 | ABB Cutler Demo 4L | 3696 | 3697 |
| 6 | ABB Cutler Demo 5 | 3686 | 3697 |
| 7 | ABB Cutler Demo 6 | 3696 | 3697 |
| 8 | ABB Cutler Demo 7 | 3696 | 3697 |
| 9 | ABB Cutler Demo 8 | 3696 | 3697 |
| 10 | ABB Cutler Demo 9 | 3696 | 3697 |
| 11 | ABB Cutler Demo 10 | 3696 | 3697 |
| 12 | ABB Cutler Demo 11 | 3696 | 3697 |
| 13 | ABB LaBonte 1 - videotape depo | 3690 | 3691 |
| 14 | ABB LaBonte 2 - depo transcript | 3690 | 3691 |
| 15 | ABB Opening Graphic 1 | 3696 | 3697 |
| 16 | ABB Opening Graphic 2 | 3696 | 3697 |
| 17 | ABB Starks 1 | 2343 | 2343 |
| 18 | ABB Starks 2 | | |
| 19 | ABB Starks Dem-7 | 2337 | 2337 |
| 20 | ABB Starks Dem-14 | 3696 | 3731 |
| 21 | ABB Starks Dem-16 | 3696 | 3697 |
| 22 | ABB Starks Dem-24 | 3696 | 3697 |
| 23 | ABB Starks Dem-29A | 3696 | 3697 |
| 24 | ABB Starks Dem-29B | 3696 | 3697 |
| 25 | | | |

| JOINT DEFENSE EXHIBITS | OFFERED | ADMITTED |
|---|---|---|
| | (On the record) | |
| JD13 - Cutler memo | 2253 | 2255 |
| JD21 - Cutler memo | 2253 | 2255 |
| JD33 - Sackie memo | | 322 |
| JD34 - Morlan e-mail | | 571 |
| JD41 - trust agreement | | 1268 |
| JD45 - PRISM handbook | 2259 | 2259 |
| JD168 - PRC minutes | | 308 |
| JD218 - Mercer document | | 537 |
| JD226 - PRISM transition plan | | 256 |
| JD227 - PRISM transition plan | | 256 |
| JD228 - PRISM transition plan | | 256 |
| JD229 - PRISM transition plan | | 256 |
| JD230 - PRISM transition plan | | 256 |
| JD231 - PRISM transition plan | | 256 |
| JD249 - amendment to trust agreement | | 304 |
| JD257 - amendment to trust agreement | | 305 |
| JD266 - RK and administrative Services agreement | | 327 |

* * *

JANUARY 5, 2010

- - -

1  THE COURT:  This is the matter of Tussey versus ABB,

2  et al., 06-4305.  Who represents the plaintiff?

3  MR. SCHLICHTER:  Jerry Schlichter, Your Honor, along

4  with Troy Doles, Heather Lea, Dan Conlisk.  And this is Ron

5  Tussey, Your Honor, who is a named plaintiff who worked in Jeff

6  City and is here today.  We expect that chair will have some

7  rotation among various plaintiffs.

8  THE COURT:  All right.  And who represents ABB?

9  MR. ORTELERE:  Your Honor, Brian Ortelere.  I'm

10  joined by Bill Delany, Azeez Hayne, Kathy Kordeleski and Jeff

11  Russell.

12  THE COURT:  And for Fidelity?

13  MR. OPPENHEIMER:  Your Honor, good morning.  Randy

14  Oppenheimer, and with me is my partner Brian Boyle, Mr. Jim

15  Dittmar, Bob Eccles, our colleague handling everything else for

16  us, Adam Coates and Mr. Bien I think you know.  And in the

17  audience we have Ms. Jody Forchheimer and Margaret Raymond,

18  associate general counsel.

19  THE COURT:  Welcome, ladies and gentlemen, to all of

20  you.  The first thing I want to do is address the outstanding

21  motions that were filed by the parties.  What I'm going to do

22  with them both is that I'm going to deny them without

23  prejudice.  And this is the motion of the plaintiffs objecting

1    to the late filed discovery and the motion of the defendants

2    objecting to the deposition designations.

3         I will deny them without prejudice.  When there is

4    an attempt to actually introduce a document, you can, you know,

5    renew your objection as to that specific document or that

6    specific deposition designation.

7         I will tell you as a general rule, I do not expect

8    to preclude deposition testimony based upon the deposition

9    designations.  If there's some other objection to them, I will,

10   of course, address that.  As to late filed documents, I do not

11   expect that I will grant a motion to strike a late filed

12   document, if, in fact, the plaintiff had access to the

13   underlying information at an earlier date, even though it may

14   not be in the same format.

15        And the one issue that I am very concerned about is

16   the extent to which experts have relied on additional documents

17   or summaries that have been prepared by the parties subsequent

18   to their deposition.  And that I will look at closely to see

19   whether or not it has prejudiced one of the parties.

20        But that's general guidance as to my attitude toward

21   these motions.  I'm going to deny them without prejudice.  You

22   can make your own decision as to how much you want to argue

23   about that.

24        All right.  Any other matters for the parties before

25   I take opening statement from each of the parties?

1          MR. SCHLICHTER:  Not on behalf of the plaintiffs,

2     Your Honor.

3          MR. ORTELERE:  Nothing for ABB, Your Honor.

4          MR. OPPENHEIMER:  Your Honor, we had one very quick

5     matter that perhaps we can still try to resolve.  We raised in

6     Your Honor's conference call yesterday the issue of withdrawing

7     one of the witnesses on our witness list, Mr. Brian Walters,

8     because of our efforts to cut down on the timing issues.

9          And Mr. Schlichter and I have had conversations

10    about that.  We haven't been able to reach an agreement on it.

11    So I guess I would ask Your Honor's preference.  We could queue

12    it up through a brief filing or we could just address it now.

13    Our position is simply that --

14         THE COURT:  I'll tell you what.  I want to go ahead

15    and get started.  On something like that -- unless he's going

16    to be a witness today?

17         MR. OPPENHEIMER:  He's not, Your Honor, he's not.

18         THE COURT:  Okay.  Then let's regard that as a

19    diversion at some point we're looking at.

20         MR. OPPENHEIMER:  Okay.

21         THE COURT:  All right.  If there's nothing further,

22    let's begin with opening statement.  Renea, refresh my

23    recollection as to time.

24         COURTROOM DEPUTY:  Plaintiffs, 45 minutes;

25    defendants collectively will have one hour.

1    THE COURT:  Have the defendants decided how to

2  divide that up?

3    MR. ORTELERE:  30 minutes per defendant, Your Honor.

4    THE COURT:  Thank you, gentlemen.  You may proceed

5  with opening statement for the plaintiff.

6    MR. SCHLICHTER:  Thank you, Your Honor.  May it

7  please the court.

8    Let me first start, Your Honor, by speaking about

9  what this case is not about.  Unlike the characterizations in

10  the defendant's papers, Your Honor, this is not about the

11  demise of the mutual fund industry or an attack on the mutual

12  fund industry.  This is also not about the demise of the

13  retirement system, the 401(k) system in America.  There's some

14  grandiose statements made by them, and this is not what this

15  case is about.

16    What this case is about, Your Honor, is in this

17  specific situation, in this company's case, the ABB PRISM

18  Plans, the two 401(k) plans, it's about their being in bed with

19  Fidelity and the two of these entities combined caring about

20  the profits of themselves and entering into arrangements with

21  no check, with no ability, with no willingness on the part of

22  ABB to work for the exclusive benefit and interest of its

23  employees and retirees.  That's what this case is about.  And

24  all of the references to how all of the mutual funds are going

25  to come down if you rule in favor of the plaintiffs or the

retirement system will fall apart are simply incorrect.

It is also -- to your question, Your Honor, in one of the prior conference calls, we're not contending here at trial that active management is per se a breach of fiduciary prudence. What we are saying is, Your Honor, and as the law requires is that given that active management in general doesn't beat the market after fees, there must be an analysis by a fiduciary to determine whether the particular funds it chooses or the particular investment options it chooses are, in fact, likely to lead to beating the market after fees.

Because obviously there's an easy market return available, a guaranteed return at very low cost called the index fund. In fact, that is the -- in the Thrift Savings Plan that all the federal employees, in fact, perhaps, including all of the federal employees in this room are in, that is a series of low cost purely index funds. So it is not about those things.

Now, when you look at what happened, it's necessary to look at some history. And we recognize and do not -- and respect the court's ruling on the statute of limitations, but as the federal rules are clear, evidentiary issues are not governed by the statute.

So there will be some history we intend to point out, Your Honor, going back to '95 when this arrangement all began. And that history is going to be important because, and

1   I'm going to speak to that now.  What we had is a situation in
2   which Hewitt was doing the record keeping for this plan, these
3   plans.  Hewitt is a, what I call a pure record keeper not in
4   the business of selling investment products, as is Fidelity.
5   And the reason that makes a difference, Your Honor, is because
6   when they had Hewitt, they didn't, they had a fixed fee per
7   participant charge for record keeping.

8           They put out RFPs in '95.  Fidelity responded to an
9   RFP.  But the difference is that Fidelity, with its approach
10  that was ultimately accepted by ABB, had a bundled arrangement.
11  And by that I mean, as the court well knows from the prior
12  summary judgment papers, it's all lumped together.

13          So there was a small hard dollar fee that was built
14  into that original bid, and ABB looked only at that fee for
15  record keeping.  They have a duty under the law to analyze each
16  service and its cost for reasonableness, and to allow no more
17  than reasonable fees on those services.

18          So pure record keepers like Hewitt will bid on pure
19  record keeping, and the evidence will be that is a market, a
20  separate market.  You can go out and ask record keepers to bid.
21  It's a commodity service.  If you have a $50,000 balance in
22  your 401(k) plan and I have a $5,000 balance in mine, it costs
23  no more to record keep your plan than mine.  Same monthly
24  statements, same 800 number, and so on.  That cost for that
25  commodity is not related to assets in someone's account.

1    Now, the way Fidelity priced their bid was small

2  charge hard dollar, putting them under any pure record keepers

3  who don't have products to offer, and then this concept of

4  revenue sharing.

5    Also what this case is not about, Your Honor, is

6  this is not about your having to decide if revenue sharing

7  across the board is per se illegal.  That is not what's

8  involved here.  It's, under these facts, these companies'

9  treatment of revenue sharing and record keeping fees that's

10  involved here.

11    And there are many companies in this country, Your

12  Honor, many large companies comparable sized to ABB that have

13  perfectly proper arrangements for record keeping services and

14  investment management.  There are many companies that have

15  investment products that do them in a perfectly proper way,

16  don't take over or try to take over 401(k) plans, yet say

17  they're not a fiduciary.  There are lots of them out there.  So

18  this is, I want to be clear that this is not a generic attack

19  of some kind as we are charged with making.

20    Now, in this bundled arrangement, the problem is

21  this.  The fee for record keeping services is built into the

22  uncapped open-ended expense ratio of these mutual funds through

23  this revenue sharing.  And that's done two ways, Your Honor.

24  One is on internal proprietary Fidelity funds, and the original

25  agreement in '95 required eight of those, I believe it was, to

be in the plan.  So Fidelity says, we'll do the record keeping,
we'll do it for almost free, but you've got to have our funds
which pass on to us record keeping fees through revenue
sharing.

In this case the revenue sharing to FMTC, its entity
for record keeping, is never disclosed.  They don't tell ABB
that.  ABB doesn't care to ask.  The only thing that ever
happens is a fictional number is used, and it's called assumed
revenue sharing for our internal funds.  But they've admitted
in their recent papers and their trial memo that this is all
lumped together.  So any internal revenue sharing number is
fictional.  It's all one pot, though they have a separate legal
entity FMTC that they share revenue with.

THE COURT:  Okay.  I didn't understand that.  Go
back again.

MR. SCHLICHTER:  What I'm saying, Your Honor, is
that they, in the papers they show to ABB and what you'll see
here, it will always say for their internal funds, assumed
revenue sharing.  This is assumed, ABB, that we get this amount
of 25 basis points or 35 basis points of revenue sharing.  You
just assume it.  We don't tell you, you make that assumption.
And the basis for that assumption, they say --

THE COURT:  Will the record show that, in fact, ABB
was told that there was revenue sharing and what this revenue
sharing was?

1        MR. SCHLICHTER:  The record will not show that they

2   were told what the revenue sharing was.  Through the course of

3   dealing, ultimately there were documents given to ABB that

4   showed assumed revenue sharing.  But ABB never found out what

5   the revenue sharing was.

6        THE COURT:  Okay.

7        MR. SCHLICHTER:  That's as to proprietary funds of

8   Fidelity.

9        Now, as to -- the other piece of this is Fidelity

10  also has and anticipated having non-Fidelity proprietary funds

11  in this plan.  However, Fidelity makes the arrangement with,

12  makes arrangements with these non-proprietary funds to be on

13  what they call their FundsNet of funds.  This is an

14  agreement --

15       And Fidelity is the big elephant in the room in the

16  retirement industry.  They have a lot of leverage.  And when

17  they are in a plan as you'll see in this case and they allow,

18  and ABB allows them to have veto power and the power to agree

19  on funds, that's a powerful statement to make to an outside

20  fund to say, if you want to have shelf space on the ABB plan,

21  you have to play ball with us, Fidelity.  And what playing ball

22  means is, they will say it just means having a compatible

23  record keeping system.  Playing ball means share revenue with

24  us, Fidelity, in an amount that we insist on.

25       THE COURT:  What's the evidence going to be as to

1    when those revenue sharing arrangements were made, before the

2    funds were chosen to be included in the portfolios or the plan,

3    or after?

4           MR. SCHLICHTER:  There were ongoing -- pre those

5    funds being in the plan, there were ongoing arrangements that

6    Fidelity has with many mutual fund companies, and then there

7    were ongoing discussions very regularly that Fidelity had and

8    didn't tell ABB about until after they made the arrangements,

9    adjusting those arrangements.  I'll give you an example, Your

10   Honor, it might help.

11          They start out in 1995 with an agreement that says,

12   in appendix B, the outside funds, they named specific funds,

13   these outside funds will share revenue with us for 15 basis

14   points of revenue.  Of course, a basis point is a hundredth of

15   a percent.  But when you talk about basis points in a context

16   like this, that's significant money.

17          Within a matter of a few months after being in the

18   plan, Fidelity sends an e-mail to ABB saying, oh, we have now

19   increased our revenue sharing with these outside funds to 25

20   basis points.  And then there's a series of developments that

21   end up, well, now it's 35 and then some are 40, and the

22   agreement ultimately after, I believe it's the tenth amendment,

23   says they can have up to 50 basis points of revenue sharing.

24          So what we have is an open-ended asset base record

25   keeping charge that Fidelity controls both with its own funds

1  and with these outside funds.

2          And when you look at the numbers and you see this

3  open-ended uncapped asset based charge, that number exposed,

4  because when they signed the agreement in 1995, the trust

5  agreement, the assets were $589 million.  Within five years,

6  less than five years, those assets in the plan had tripled,

7  roughly, to 1.4 billion and change.

8          So what happened then is that the record keeping

9  fees tripled, essentially, close to tripled, over that same

10 period of time because the assets grew.  Not because there are

11 more services needed, not because there were appreciably more

12 participants.  I think at the time roughly the number was

13 18,000 at the time in '95.  I think when the assets had grown

14 to 1.4 billion, the evidence will be there were about 17

15 thousand and some odd number of participants.

16         So think about what happened.  They could have had a

17 flat charge, $50 per participant or something like that.

18 That's available, that's what the market provides.  Instead, we

19 have this exploding number open ended because even the original

20 agreement for 15 basis points with outside funds, that number

21 has now gone up to 35 basis points, which is a 40 percent

22 increase.  And then for some to 40 percent, which is more than

23 a 50 percent increase with the outside funds.  And then the

24 assets tripled on top of that.  So the number of dollars that

25 go for record keeping goes off the chart.

1          THE COURT:  Is your claim, in fact, that it's always

2  a violation of fiduciary duty to have an asset-based fee

3  schedule?

4          MR. SCHLICHTER:  No, Your Honor.

5          THE COURT:  What's different about this case?

6          MR. SCHLICHTER:  It's uncapped in violation of both

7  the law letting the fees being excessive, and in violation of

8  the IPS.

9          In this case, we have an investment policy

10  statement, Your Honor, that says several things.  First of all,

11  it says there must be consideration of commingled accounts

12  which are less expensive, considerably less expensive and large

13  plans can command them, and separate accounts which are even

14  less expensive than commingled funds, and that was not done.

15  But the IPS also speaks to this point directly about revenue

16  sharing.  And it says that --

17          THE COURT:  Let me go back a minute.  You're saying

18  that the IPS itself says specifically you must consider

19  commingled funds?

20          MR. SCHLICHTER:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. SCHLICHTER:  And it also says you must consider

23  choices which reduce costs.

24          THE COURT:  Yeah, I'm aware of that.  I wasn't clear

25  on the other.  Go ahead.

1    MR. SCHLICHTER:  There are amended versions of the

2 IPS, and there's some modification in the language, Your Honor.

3 However, every version to this date has, the second section of

4 section 4 says that Fidelity has a right to approve or agree to

5 amending the plan to add funds.  And every section has, every

6 amendment has section 13, which says that the trustee,

7 Fidelity, FMTC, must sign and approve any amendments.

8    Now, because they put the funds they have, they

9 identify the funds they have in the plan in the trust

10 agreement, any funds that become a part of the plan end up --

11 to this date, this has not changed -- having to be signed off

12 on by Fidelity.  It's an enormous power.  There's no

13 justification for giving that kind of power, and that's

14 different from many other plans that have asset-based revenue

15 sharing.

16    But other plans that have asset-based revenue

17 sharing do what the IPS in this case says they should do, which

18 is you can set a ceiling.  You can say revenue sharing of a

19 million dollars a year, that's whatever $50 per participant is,

20 as an example.  If the asset-based revenue sharing gets above

21 that, you rebate it to the plan.

22    That's what the IPS says.  Alliance rebates.  And

23 that's not unusual.  The Texa$aver plan, which is a plan that

24 one of their experts, Laura Starks, is on the board of for the

25 Texas retirement system does that very thing.  It says all

1  right, you get above that level, rebate it back to the plan.

2  You could also --

3  COURTROOM DEPUTY:  What was that?

4  THE COURT:  My keyboard just fell on the floor.

5  We're going to have to stop for a minute.

6  (So done.)

7  THE COURT:  You may proceed.  Are you done?

8  MR. SCHLICHTER:  Let's hope we don't have any other

9  catastrophes in the next month.

10  In addition, Your Honor, unbelievably they entered

11  into an evergreen contract.  By evergreen they mean in

12  perpetuity, no end date in sight.  Why ABB did that, giving

13  Fidelity that power, they'll have to explain.  But I submit to

14  you all kinds of people out there who even enter into

15  arrangements with even Fidelity don't give them carte blanche

16  to have a contract that never expires.  In contrast with what

17  they did in their own defined benefit and corporate plans where

18  every one of them had a fixed expiration date, three-year

19  contract, four-year contract, contract is up, we'll review it,

20  put it out for bids.

21  In 14 years, more than 14 years, Your Honor, since

22  this went into effect in 1995, there's never been a bid for

23  record keeping services.  And only recently did they lock in a

24  date of years for an outside termination of the contract.  But

25  even then, even then under Fidelity's proposal, which ABB went

1  along with, they had the termination date coexist with the

2  termination date of the corporate contracts.

3         So that this bundling -- we have bundling on two

4  levels here, Your Honor.  There's bundling as I described

5  within the record keeping bid, bundling investment management

6  products that Fidelity's in the business of selling and record

7  keeping.  But then they take that bundle and bundle it over

8  here with all the corporate plans.  And that's what is

9  different, as well, from other plans.  That's what created the

10 incentive for ABB as they went forward to benefit itself at the

11 expense of plan participants.

12        Because what we did, what we have here is a

13 situation where this 401(k) plan for these employees, which is

14 supposed to be a Chinese wall, a Chinese wall just the way

15 lawyers have a Chinese wall in their office from all of their

16 corporate business, was bundled together and these folks were

17 played off against the corporate interests.

18        Squeeze the balloon in one of the e-mails.  Okay.

19 You give us a free plan for executives, highly compensated

20 executives, you give us discounts on corporate plans, and

21 something else has to pop out.  We've got to make more money on

22 the 401(k) plan.

23        To this date, they admit they lose money on their

24 corporate plans, and they have made a very substantial profit

25 on the 401(k) plan.

1    In fact, I want to show you, Your Honor, an exhibit
2   that will be in evidence.  This is their multi-practice pricing
3   model.
4        THE COURT:  I'm not able to read it.
5        MR. SCHLICHTER:  Can you see it on your screen, Your
6   Honor?
7        THE COURT:  I can see it.  It's blurred.  I cannot
8   see it well enough to identify it.
9        MR. SCHLICHTER:  We'll try to clarify the exhibit.
10  But I'll just circle this, and I guess you'll have to take my
11  word for it what I'm telling you it shows.  Bear with me one
12  second.
13       We'll give you a hard copy, Your Honor, that will
14  probably be able to be better seen.
15       THE COURT:  Tell me, what exhibit this is?
16       MR. SCHLICHTER:  This is APP 01147.
17       THE COURT:  Is that the number which is on our
18  exhibit index?
19       MR. SCHLICHTER:  No, Your Honor, we'll give you that
20  in a second.  871.
21       THE COURT:  871?  Somehow you're going to have to
22  refer to the exhibit numbers that my staff is working with so
23  that they will know whether that is admissible or not.
24       MR. SCHLICHTER:  I'm sorry, Your Honor.  For
25  purposes of the opening I hadn't marked it that way.  That's P,

obviously, Plaintiffs' Exhibit.

If you look at the cumulative six-year history, Your Honor, you see that for the DB plan, there's a loss of 3 percent. This is cumulative for six years. Loss of 17 percent in the health and welfare. Loss of 59 percent in the HR/Payroll. Yet if you look at the top of that column for the profit in the 401(k) plan, it's 51 percent. And that's what has carried, that's what has carried these corporate plans. That doesn't even mention the non-qualified plans for highly paid executives that they do for free at the expense of their participants in this plan.

A second document, Your Honor, that I'd like to show you, and we'll give you a hard copy, print copy of that, is Exhibit No. -- this is P920. And if you look at P920, you see that the DC -- they've redacted a bunch of other plans here, the ABB plan's on the left. You see that the DB plan, this is as of 19 -- I'm sorry, 2007, the DC plan, DC meaning defined contribution, 401(k) PRISM Plans -- we'll use those terms interchangeably, Your Honor -- expected a profit of 12 million. And the other is, the other plans cumulatively lose. So if you look at the column on total, they expect to make on this multi-practice relationship 4.9 million going forward as of '07.

So what we have is these DC plans are subsidizing their corporate interests. And that's the trade-off they've

made here.  They have traded their corporate interests and the

interests of their highly paid executives for the benefit of

their employees and retirees.

THE COURT:  Would there be anything wrong with that

if, in fact, ABB and the plan are paying the market for the

services that are being rendered?

MR. SCHLICHTER:  Well, it still would be

self-dealing, and self-dealing, we submit, is something that is

a prohibited transaction under section 406(b), independent of

the rate, the market rate.  But in any event, these were not

market rates, and there will be lots of evidence about that.

One other thing I want to point out is a couple of

e-mails, a couple of exhibits.  This next one, Your Honor, is

P890.  Can you read that on yours?

THE COURT:  Yes, I can.

MR. SCHLICHTER:  All right.  This is a memo from

Mr. Pisacreta, he's a Fidelity employee, to Joanne Morlan.

She'll be testifying here.

(Quoted as read.)  "Have you shared this with ABB?

It shows why we believe," speaking of the DB corporate plans,

"why we believe their current pricing is below market."

So Fidelity is offering these services to the

corporation at a below market rate.  And they're doing, they're

in this business, and we see that they still expect to make a

profit on the whole relationship.  That profit comes at the

1  expense of the 401(k) plan participants.

2         One other document that I'd like to show you that

3  bears on this is, this is from the summary judgment papers, the

4  declaration of Mr. Pisacreta in opposition to the motion for

5  summary judgment.  And it's paragraph No. 20, which is in the

6  court file.

7         Paragraph 20 near the top of the page specifically

8  says -- it's a but-for statement.  It specifically says,

9  (quoted as read) "In determining whether to offer corporate

10 services to existing defined contribution plans or

11 administrative services clients, at the risk of early year

12 negative profit margins, Fidelity considers whether the overall

13 relationship was a profitable one based on the services

14 Fidelity was providing."

15        So what they do -- that is evidence, Your Honor,

16 that they would not have been in the corporate world at all,

17 the corporate plan at all, any of the corporate plans, as they

18 say.  In determining whether to even offer them, they're going

19 to determine whether it will be a profitable one based on the

20 whole relationship.

21        The profitable -- and there's nothing wrong with

22 that if it were all in regard to the corporation 's interests,

23 but they're playing off the corporation against their

24 employees.  So but for this 401(k) plan, by that admission,

25 these corporate plans would not have been offered.

1    Now, after they get the foot in the door, as I said,
2    they then start offering all of these corporate plans.  And it
3    isn't the amount of the benefit to ABB that determines what's
4    going on here.  That's the inducement.  That's the bribe, if
5    you will.  It's what is the damage to the employees.  And the
6    damage to the employees is they're putting high-priced funds
7    controlled by Fidelity, for the most part, Fidelity allows some
8    that don't pay them revenue sharing when ABB puts some in, but
9    it's the mix.  It's the mix of their funds and these outside
10   funds that Fidelity cares about.

11   And they get these high-priced funds and they don't
12   look at performance as they should because the whole analysis
13   is tainted by this relationship.  And they look at revenue
14   sharing and what their profit would be.

15   Now, after -- I want to talk very briefly about one
16   thing.  At the, I believe recently what was filed, there's a
17   chart that was filed of revenue by Fidelity in the trial brief,
18   or the pretrial memo.  It's at the last part.  And it shows a
19   chart showing their health and welfare revenue is going up high
20   recently because they added payroll, while there's a declining
21   amount of revenue from the DC plans.

22   We submit to you, Your Honor, that chart is
23   misleading, at best.  Because revenue is not what this is
24   about.  If this were only about revenue, then General Motors
25   would be a wonderfully successful company instead of being,

1  having gone through bankruptcy.  It's about profitability,

2  profit and loss.

3         So they admit they are losing money on their

4  corporate plans, and the only reason they're even offering them

5  is because of the 50-plus percent profits they've been making,

6  51 percent over six years on the DC plans.

7         Now, I want to mention briefly the Magellan

8  situation.  Magellan was a very, is a very large fund.  It

9  performed terribly over a decade prior to '04, '04 and before.

10  I think in two of those years it beat the market by a little

11  bit, vastly underperformed the market on the others.

12         Magellan was in this plan and was a very profitable

13  retail mutual fund that a $500 purchaser can buy for years.  It

14  violates the IPS because they never shopped Magellan to look at

15  whether it's, to look at separate accounts.  They didn't get

16  rebates on it and, as I said, it hasn't performed well.

17         It performed -- when finally ABB got around to

18  deciding that they might have to dump it because it's such a

19  terrible fund, Fidelity flexed its muscles at that point in

20  time.  Having veto power in their pocket, they threatened to

21  add, if Magellan is dumped, an $11 per participant hard dollar

22  fee.

23         All of a sudden participants would get a statement

24  saying we're actually being charged now for record keeping, our

25  charge for record keeping went up because they're in the dark,

1  they don't know.  Ron Tussey has not known that these charges,

2  that they're tripling their record keeping fee just by asset

3  growth, they are getting all of these arrangements with the

4  outside funds for more revenue sharing.  Participants don't

5  know any of that.  But a hard dollar fee they can see and they

6  might ask questions.

7          So Fidelity then says, you can avoid this charge if

8  you pick this menu of combinations of Fidelity and

9  Fidelity-approved funds and so on.  They use the argument of

10  revenue neutrality, Your Honor, and I want to speak to that.

11          Revenue neutrality is something that they say, well,

12  if we lose a fund, then we have to have it be revenue neutral,

13  whatever you map it into.  Mapping is a term of art in this

14  industry.  It's what you go into from an existing fund, plan.

15  But revenue neutrality is not written down anywhere.  It's not

16  written in the IPS, it's not in any prospectus.  Participants

17  aren't told anything about it.  It's in e-mails that they

18  exchange, and it prevents any less expensive funds from being

19  added to the plan because Fidelity says it has to be revenue

20  neutral.

21          But that's not the most egregious.  Obviously

22  Fidelity's motive, though they are a fiduciary, and once they

23  become a fiduciary, their motive for making profits has to

24  change in the plan.  But their motive is to maximize revenue.

25          THE COURT:  Let me stop there for a minute.  They're

1  a fiduciary, but only in relationship to those aspects that

2  they have a fiduciary obligation for.  They're not a blanket

3  fiduciary; is that correct?

4           MR. SCHLICHTER:  On paper, that's correct, Your

5  Honor.  But as we know, the definition of a fiduciary also

6  includes a functional fiduciary, depending on how the facts

7  turn out and how they operate.  And we contend -- yes, they are

8  a fiduciary as to FMTC on paper for limited functions, as

9  record keeper and trustee.

10          However, Fidelity has great discretion in this plan

11  and control over what happens by a combination of factors that

12  we'll point out in this case, including the ability to set

13  their own compensation on float, the ability to invest --

14          THE COURT:  There's an example.  Okay.  They have

15  the ability -- let's assume your facts.  They have the ability

16  to set their own compensation on float.  Doesn't that mean

17  they're a fiduciary as to float?  It doesn't mean that they're

18  a fiduciary as to every aspect of this arrangement, are they?

19          MR. SCHLICHTER:  That's correct, Your Honor, it

20  doesn't mean they're a fiduciary as to every aspect.  But their

21  control and discretion applies to the addition of investment

22  vehicles, investment options in this plan.  They have that

23  determination --

24          THE COURT:  I understand that they may have a

25  fiduciary role in multiple ways, but because they have a

1  fiduciary role in one way does not automatically mean they're a

2  fiduciary in all regards; is that correct?

3      MR. SCHLICHTER:  Yes, Your Honor, we agree.

4      THE COURT:  So it would be important to me to see

5  how it is that their status as a fiduciary as to this role

6  somehow obligates them to do a specific act that may be

7  unrelated to that role.

8      MR. SCHLICHTER:  We agree with you, Your Honor, and

9  we intend to point that out, and without taking a lot of time

10 right now --

11     THE COURT:  Right.  I just want to give everybody a

12 heads up that that's one of the things that I'm looking for.

13     MR. SCHLICHTER:  We appreciate that.  In so far as

14 the choosing of the investment options, in so far as that

15 piece, Your Honor, they perform financial, they give financial

16 advice.  You'll see that there are funds that they're screening

17 for ABB.

18     So here we have this conflicted relationship with a

19 proprietary interest in their own funds and an interest in

20 outside funds that play ball with Fidelity, and what they end

21 up doing is then ABB says, well, we'd like you to screen funds

22 for us, cull down funds.  And there's one example where they

23 started with 5,000 and they culled it down to three.  In that

24 example, ABB didn't pick any funds.

25     But that's the process.  So they're performing

investment advice here to ABB.  And you'll see other examples,
Your Honor, where ABB tentatively selected a couple of funds
and then sends an e-mail to Fidelity saying, what do you think
about these funds?  Do you approve?  Fidelity comes back and
says no, take these two, and they end up in the plan.

That's functioning as a fiduciary, we submit, Your
Honor, in terms of choosing of investment options.  And that
means Fidelity is a fiduciary with respect to these imprudent
choices that ended up in the plans.

Ultimately with Magellan -- and I wanted to finish
the revenue neutrality piece.  The insidious thing about
revenue neutrality, it would be bad enough if they agreed to
revenue neutrality, meaning you never get a cheaper fund and
you also don't have that -- participants don't know that part
of the equation for the funds they're given is some kind of
benefit to Fidelity of revenue neutrality.

THE COURT:  What difference would it make if they
knew or they didn't know?  They have a limited plan that they
can choose from.  Knowing that, in fact, Fidelity is getting
money in addition to what has been disclosed to them, how would
it alter how they would choose their plan, or their investment?

MR. SCHLICHTER:  It could a couple of different
ways, Your Honor.  One way is if the true revenue sharing
that's being done were disclosed, that means that out of that
expense ratio, there's less being paid for investment

1    management.

2            THE COURT:  I thought that the investment management

3    was segregated by fund so that somebody who was investing in a

4    fund could see how much was for management and how much was for

5    whatever else, which I'm a little unclear on.

6            MR. SCHLICHTER:   There are -- in the prospectuses of

7    these funds, there are, it varies with funds and with fund

8    companies.   There are some that have an expense ratio that says

9    of the, say, 75 basis point expense ratio, 50 basis points goes

10   for investment management and 25 basis points goes for revenue,

11   for administrative, or other is sometimes used.

12            But as I said before, Fidelity's negotiating with

13   these outside funds to increase that revenue sharing percentage

14   all the time.   When they make a new arrangement, there's no new

15   prospectus sent out saying, okay, now less of the money is

16   going to investment management and more is going to kick back

17   to Fidelity.

18            So to answer your question, one way it might make a

19   difference, Your Honor, is if somebody is paying 50 basis

20   points expense ratio and originally the prospectus says there's

21   15 basis points for other, meaning they're getting 35 basis

22   points worth of investment management, when Fidelity kicks it

23   up to 35 or 40 percent and there's only 10 basis point figure

24   applied to investment management, an investor might say, well,

25   they're not getting enough to make it worth their time to

really research these stocks, I'll go to an index fund or I won't put my money in the 401(k) plan, I'll invest it on my own in some low cost fund elsewhere that cares more about investment management. These are all choices that are denied to participants. They don't know about it.

And in addition, the point I wanted to make is that on this revenue neutrality issue, ABB doesn't have one piece of the equation, the essential piece. They don't know Fidelity's revenue. Mr. Cutler admits that, and he says he doesn't even think it's his business to inquire. So when Fidelity asserts revenue neutrality as a reason for needing more charges, whether it be in Magellan or whether it be in something else, ABB makes no attempt to determine revenue -- they don't know the revenue that Fidelity was getting, and they make no attempt to find out what the revenue will be. So they can't even determine whether it's revenue neutrality or whether it's revenue maximization.

Now, ultimately, Magellan was dropped from this plan and, despite all of this, some other funds were added, and Fidelity had a $900,000 loss of revenue after dropping Magellan, yet continued to operate the plan, and that participant fee was not enclosed, was not added. Which means either they got the revenue they wanted out of the other funds that they were mapped into, or they were making so much money that a $900,000 reduction still was plenty of money to run

1   this, what they were doing.

2          I want to mention another issue, the Freedom Funds.

3   I see that my time is running.   The Freedom Funds are funds of

4   funds.   They're target date funds, and nothing wrong -- again,

5   we're not attacking the concept of target date funds, the idea

6   being that as you near retirement, we have a more conservative

7   mix of stocks and bonds.   Nothing wrong with the concept.   It's

8   the execution here.

9          What we have here is these Freedom Funds of Fidelity

10  which are funds of retail mutual Fidelity funds, violate the

11  IPS.   There's no shopping for separate accounts or cheaper than

12  retail funds.   They don't get alliance rebates on them.   And

13  they have as many as 25 individual Fidelity mutual funds in the

14  fund-of-funds, the Freedom Funds, in any one of them.   That's

15  twice as much as other fund companies have in target date

16  funds.

17         What each of those funds is is a collection of maybe

18  75, 150 stocks, somewhere -- some large number of stocks.   So

19  think about what you end up with.   You end up with hundreds and

20  hundreds and hundreds of stocks in 25 mutual funds.   And on a

21  gross basis, the evidence will be you're never going to exceed

22  the market after fees with that kind of an arrangement because

23  you've got so many stocks, you're going on a gross basis,

24  you're going to have something like an index fund return, but

25  at high-priced active management prices.

1     COURTROOM DEPUTY:  You have two minutes.

2     MR. SCHLICHTER:  So you'll hear a lot about those

3  Freedom Funds.

4     Very quickly, Your Honor, with that time left, I

5  want to show you a slide that talks -- that's important, and

6  this is a demonstrative exhibit, so it's not a numbered

7  exhibit.

8     This is a -- these are the differences between a

9  corporate and DB and DC plans.  On the left, the DB plan.

10  Unbundled record keeping.  Fidelity's got unbundled record

11  keeping fees.  Record keeping at a fixed dollar rate.  No

12  Fidelity funds in their DB plan.  Fidelity is not a financial

13  advisor.  Locked-in hard dollar fees with no right to increase

14  fees.  No unilateral ability of Fidelity to increase revenue

15  sharing, performance guarantees, no evergreen contracts.  ABB

16  doesn't need to get Fidelity's approval for investments.  And

17  ABB negotiates the float.  All of which are different in the DC

18  plan, and we'll be happy to provide you with a copy of this,

19  Your Honor.

20     The damages here, there's a -- this is another

21  demonstrative exhibit.  All of this stuff sounds like a minor

22  difference, Your Honor, but the DOL has on its website this

23  exhibit, and that shows that a 1 percent difference in fees

24  over a work life expectancy causes a 28 percent reduction in

25  the retirement assets available to an employee.  That's a big

1  deal.  And I submit a 1 percent difference in fees is the same

2  as a 1 percent lesser performance.  Well, it's a 28 percent

3  difference in retirement assets at retirement.

4         They modelled the IPS for the DC plan after the IPS

5  for the defined benefit plans, but there was a difference in

6  performance of 250 basis points, 2.5 percent in a five-year

7  cumulative period, according to their documents.  And that

8  difference is a massive difference which resulted in over $300

9  million less to these participants than if the return that

10  these same people got in their own corporate plans had been

11  obtained.

12         And the law in the Bierwirth case says the

13  plaintiffs on damages are entitled to the most profitable

14  choice that would have been made.  Here there's no speculation

15  needed, this is the choice that these fiduciaries actually made

16  and resulted in that kind of return.  They're saying that's due

17  to poor asset allocation by the plaintiffs.

18         COURTROOM DEPUTY:  Time.

19         MR. SCHLICHTER:  We say these were hand-picked by

20  ABB, and studies show that asset allocation shouldn't make

21  anything like that kind of a difference.  In fact, this is 25

22  times greater than the difference we would expect.

23         So that completes the time, Your Honor.  I do want

24  to add that we will -- in addition to damages, we will seek

25  affirmative relief to reform this plan and make this plan free

1  of conflicts of interest.  That will be very important going

2  forward and will be part of the relief we request.

3          THE COURT:  What specifically?

4          MR. SCHLICHTER:  Specifically, Your Honor, we will

5  ask that ABB and Fidelity, ABB unbundle both bundles, both

6  internally and then with their corporate plans.

7          We will ask that you order that they do not allow

8  self-interest of the company and its executives to be used to

9  trade off costs with the 401(k) plan.

10          We will ask that you enter an order directing that

11  these fiduciaries be removed and fiduciaries who run this plan

12  run it for the sole exclusive benefit for these participants as

13  required by law, by ERISA.

14          We will ask for full disclosure of all fees and any

15  business relationships between ABB and Fidelity or any other

16  service providers.

17          We will ask that there be no uncapped open-ended,

18  asset-based revenue sharing; and that if they want to consider

19  asset-based charges that there be a rebate arrangement which

20  limits the amount of money that any service provider can obtain

21  after a market rate is determined for that.  A fixed cost per

22  participant is a way of solving that.

23          Also, no services in the 401(k) plan which benefit

24  ABB Corporation or its executives.

25          A process to evaluate separate accounts and

1   commingled funds as required by the IPS that don't pay revenue

2   sharing and are available to a billion and a half dollar asset

3   holder, as opposed to just considering retail mutual funds or

4   considering mostly retail mutual funds.

5         And finally, we're going to ask that you order that

6   they require RFPs, bids for all services, keeping in mind -- we

7   are continuing now, it's almost 15 years since they had bids

8   for record keeping services. And without those bids, there's

9   no way that there are any market forces being applied to keep

10   them honest.

11         That's what we would ask for, Your Honor. And we

12   think the affirmative relief here is a very important part of

13   what has to be done here because over time in the future, based

14   on this DOL study, what just 1 percent difference in fees or

15   performance, for that matter, makes, this is going to have a

16   big impact going forward on retirement assets of the ABB

17   employees. And retirees. Thank you.

18         MR. ORTELERE: Hello again, Your Honor, Brian

19   Ortelere for the ABB defendants.

20         Your Honor, ABB is a global provider of power and

21   automation technologies for utility and industrial customers.

22   As noted by Mr. Schlichter, ABB is also the plan sponsor of two

23   ABB defined contribution retirement savings plans that are at

24   issue in this lawsuit.

25         Now, for simplicity's sake, Your Honor, whenever

1  possible, I'll simply refer to the two plans as the PRISM

2  Plans.  But I think it's critical to note at the outset, Your

3  Honor, that ABB's offering of these plans is entirely voluntary

4  on the part of the company.  And the plan's design --

5          THE COURT:  Does it make any difference?

6          MR. ORTELERE:  Let me say further, the plan is

7  designed with an eye towards making certain that ABB remains

8  competitive in a very tight labor market.  And I'll speak more,

9  Your Honor, to these design issues that are important to our

10  defense.

11          Now, these savings plans are commonly referred to as

12  401(k) plans because under section 401(k) of the Revenue Code,

13  taxes are deferred until the employee reaches retirement and

14  then the money will be taxed at a lower rate.

15          Now, the money ultimately available at retirement is

16  determined by the investment allocations made by the individual

17  participants and the returns on those allocations.  In other

18  words, as Congress specifically provided, investment risk in

19  these sorts of plans is borne by the plaintiffs, not ABB.

20          Speaking to voluntariness --

21          THE COURT:  And that goes to your claim that, in

22  fact, as long as the 404 defense requirements are met, you can

23  choose anything you want.

24          MR. ORTELERE:  It's also just critical to an

25  understanding, I think, Your Honor --

1          THE COURT:  But is that true, is that your --

2          MR. ORTELERE:  It is true -- under 404(c), it's one

3    of the issues that if, in fact, the requisites to 404(c) are

4    satisfied, it's a complete defense to any claim of liability.

5    That's true, but it's equally related to, there are separate

6    causation requirements in the statute that are implicated, as

7    well.

8          Now, again, on the voluntariness side, participation

9    or employee participation in PRISM is completely voluntary, as

10   well.  And once an employee signs up or enrolls in the plan,

11   again, they pick and choose as among the investment options as

12   they see fit.

13         Now, here is something absolutely critical to keep

14   in mind, Your Honor.  And there will be abundant evidence on

15   this later, but another feature of the PRISM Plan is the

16   matching contributions from ABB directly into the participants'

17   accounts.

18         Now, since the selection of Fidelity as the record

19   keeper in 1995, ABB with corporate assets, corporate money

20   poured over $200 million directly into the participants'

21   accounts.

22         THE COURT:  I understand that.  What's the

23   relevance?

24         MR. ORTELERE:  I'll come back to that in a moment,

25   but it bears on these corruption and collusion claims.  There

1  are all sorts of allegations that we're in bed with Fidelity.

2  We're throwing mountains of money directly into the employees'

3  pockets which vastly exceed the so-called subsidies.

4           THE COURT:  Isn't that how you compete in the labor

5  market?

6           MR. ORTELERE:  That's part of it, Your Honor, but

7  again, I think it goes to ABB is accused of all sorts of

8  horrendous behavior here.  Which as you'll see and hear from

9  the witnesses, individuals who are themselves participants in

10  the plan, there's really no conspiracy, but I'll come back to

11  that in a few moments.

12           Now, despite what might appear to be the seeming

13  complexity of the case, I submit that the court need only keep

14  in mind as we go forward three basic principles from ERISA.

15           Now, the statute specifically provides that the ABB

16  defendants' process in administering the plan should be

17  considered next to the steps taken by other fiduciaries

18  administering similar plans.

19           (Quoted as read.)  "A fiduciary's action" -- and now

20  I'm quoting from section 404 of ERISA -- "is compared to the

21  conduct that other fiduciaries would use in the conduct of an

22  enterprise of a like character and with like aims."

23           THE COURT:  Is that the same thing as saying people

24  in the market?

25           MR. ORTELERE:  Well, I think what --

1           THE COURT:  Or does a fiduciary change the meaning

2  of that phrase?

3           MR. ORTELERE:  No, as the court recognized in the

4  ruling on summary judgment, all it really means, Your Honor, is

5  that, you know, industry standards and practices are relevant

6  to assessing the prudence of ABB.  Nothing particularly magical

7  beyond that.

8           Now, there's another significant aspect to the

9  threshold prudence inquiry.  Now, ERISA doesn't guarantee

10  outcomes.  So long as a reasonable process is employed in the

11  first instance, there can be no finding of liability.

12           THE COURT:  And I understand that.  And so are you

13  saying that if you go through a reasonable process and once

14  you're done with that you take a position that it's

15  inconsistent with the process you've just gone through that

16  somehow you're relieved of any responsibility?

17           MR. ORTELERE:  I think, Your Honor, let me say this.

18  In the first instance, I'm pointing out, and as the court

19  recognized in summary judgment, process matters.  And the court

20  went on to say, but what if the process is corrupted.

21           In the first instance, we will show a reasonable

22  process.  And then we'll come back and we'll demonstrate no

23  corruption.

24           But I think it's important -- and you'll hear from

25  Jack Cutler, whose name has already been mentioned this

morning, and understand his process.  And, in fact, the

indisputable or incontrovertible fact is that Mr. Cutler was

essentially walled off from all of these other decisions, but

I'll come back to that in a moment.

Now, aside from process, the statute demands much,

much more before there can be a finding of liability.  Even if

there is some flaw in the process, which the evidence will

reveal no such flaw, there cannot be a finding of a breach if

the outcome is reasonable.

In other words, assuming a process problem, the

analysis then turns, finally, to looking at the results.  ABB

cannot be held liable if the results of the process favorably

compare with the results secured by other fiduciaries.

So there's three guideposts, I submit, Your Honor,

to keep handy as we go forward.  Step one, we look at process.

And that process, not outcomes, first determines reasonableness

under ERISA.

Second, we look at the results, assuming a process

problem.  And once again, and I submit it's critical, the last

thing to keep in mind is that both of these threshold tests,

process and outcome, are informed by other fiduciaries' conduct

of an enterprise of a like character and with like aims.

As I mentioned a moment ago, Your Honor, in the

summary judgment ruling, the court indicated that evidence of

industry practice is substantial evidence of prudence,

1  dovetailing that aspect of the prudence analysis.

2          Now, to be sure, the court's observations regarding

3  the prudence standards were qualified by finding disputed

4  issues of material fact, and I'll come back to those as

5  promised earlier in a few moments.

6          But first let's take a close look at what the

7  evidence will show regarding the PRISM Plan and its

8  administration.  Further to a point I was making earlier, Your

9  Honor, ABB has a highly diverse work force, and that diversity

10 becomes important when the court considers the reasonableness

11 of the investment options made available to participants.  The

12 fact that the company has more than 80 facilities nationwide

13 demonstrates the complicated nature of this undertaking and

14 speaks also to the diversified participant population.

15         That said, and, again, mindful of the employee

16 hiring and retention challenges I mentioned a moment ago, a

17 critical consideration in forming the investment lineup is

18 making available investments that they, the employee

19 participants find attractive.  Offering a variety of investment

20 options is critical to ensuring the participants avail

21 themselves of the opportunity to save for their retirement and

22 reap those tax benefits we talked about a few moments ago.

23         Now, the evidence will show that the sophistication,

24 risk tolerances, and ages vary widely among the participants.

25 And the Pension Review Committee properly took into account

these varying characteristics when making the decisions related

to the lineup. In this regard, the PRISM Plan mirrors its

peers precisely. Incontrovertible evidence of reasonableness.

Now, the reason we're here, however, is that

plaintiffs say that the fees charged the plan were excessive

and in breach of ERISA's fiduciary standards. Now, before I

address specifically the reasonableness of these fees and steps

taken by Mr. Cutler and the committee to monitor the

investments, I think it's very useful to take a step back and

look at the means by which the PRISM Plan paid Fidelity for

record keeping. And we've heard something of this from Mr.

Schlichter already.

Now, each investment option includes the expense

ratio. And the expense ratio is simply a compilation of all of

the fees netted out of that investment to pay for things like

investment management.

Now, the expense ratio is set out, I think as the

court already acknowledged, in prospectuses and fact sheets

that are given to participants; and, in fact, I don't think

there's a serious dispute that they had that information

available to them.

THE COURT: So each time that there was a change in

the amount of revenue sharing, they sent out a new prospectus?

MR. ORTELERE: No, Your Honor, and I'll come to that

in a moment. The revenue sharing arrangements are not

1  disclosed to participants, but at the end of the day, it

2  doesn't matter.

3        THE COURT:  But -- I understand that.  But each time

4  there was a change in revenue sharing, there was a new

5  prospectus that was sent out that showed the difference between

6  the administrative costs and the investment management costs.

7        MR. ORTELERE:  No, Your Honor, the prospectus

8  doesn't change.  The prospectus's terms are dictated by SEC

9  regulation law, and it has a mandated sort of chart.  And

10  you'll see one later in the trial and how this works.  And it

11  says this much goes for investment management, as the court

12  noted earlier, this amount for administration.

13        THE COURT:  So every fund is the same for --

14        MR. ORTELERE:  It's a standardized format which the

15  SEC insists on.

16        THE COURT:  Let me make sure I understand.  Maybe

17  I'm missing something here.  You're saying that every single

18  mutual fund has the same breakdown between administrative costs

19  and investment management, investment advice?

20        MR. ORTELERE:  Right.  Investment management.  And

21  that's the bottom line number when you tally it up.  And you'll

22  see these charts in the prospectuses.

23        THE COURT:  Regardless of how much actually is spent

24  by the fund?

25        MR. ORTELERE:  It's the total amount spent.  The

1    court needs to keep in mind, revenue sharing -- let's assume

2    it's a --

3              THE COURT:  I'm not talking about revenue sharing.

4    I'm just talking about the prospectus.

5              MR. ORTELERE:  Okay.  It's an agreed upon format or

6    a format mandated by the SEC.  It has certain categories and

7    includes a bottom line number expressed in a percentage.  That

8    number is applied to net out performance for the investor.

9              And by the way, it has a little -- also required by

10   the SEC, it gives the participant or the investor an

11   opportunity to do the math that they want.  If you invest a

12   thousand dollars, you apply the expense ratio, and the

13   investment --

14             THE COURT:  I understand expense ratio.  I'm having

15   difficulty with the distinction, the extent to which the

16   prospectus will show how much money the fund, or money or

17   percentages or whatever else is used, is devoted to doing

18   research and deciding how to invest funds versus how much is

19   administrative overhead for record keeping.

20             MR. ORTELERE:  It will say investment management.

21             THE COURT:  Okay.  That's what I'm trying to figure

22   out.  It says investment management, and it says overhead?

23             MR. ORTELERE:  I think it will say something like

24   administrative fees and then 12b-1 fees, which can be marketing

25   fees.  There's a certain itemization called for by the

1    Securities & Exchange Commission.

2            THE COURT:  Okay.  I understand that the categories

3    are all uniform.  My question is, is the amount filled in on

4    the prospective, i.e., we spend $10 for investment management

5    versus administration, $20; that number is the same for every

6    single mutual fund?

7            MR. ORTELERE:  I'm sorry, no.  The percentages --

8    it's indicated as a percentage and those percentages vary among

9    funds.  And we'll talk about in a moment in the ABB plan how

10   they vary widely.

11           THE COURT:  Okay.

12           MR. ORTELERE:  Now, Your Honor, for the time period

13   relevant to the dispute, essentially all of the compensation

14   paid to Fidelity was in the form of revenue sharing.  And

15   revenue sharing is very, very common, as the evidence will

16   show, for 401(k) plan record keeping.

17           Now, further to the point all courts that have

18   looked specifically at the question, as well as the Department

19   of Labor, agree that revenue sharing is a reasonable means to

20   pay for services to 401(k) plans.

21           Now, further to the court's question, I think, here

22   is how revenue sharing works.  Now, certain fund or investment

23   companies will enter into an agreement with Fidelity to pay a

24   portion of the expense ratio over to Fidelity to compensate

25   Fidelity for its record keeping of the PRISM Plan.

1          Now, the evidence will show ABB plays no role in the

2     negotiations between Fidelity and those other investment

3     management companies on revenue sharing.

4          But this is the important point.  Revenue sharing

5     does not negatively impact the participants' returns for the

6     very simple reason that the payment is but a portion of the

7     fees charged against the investment which are set out in the

8     expense ratio.  You're taking some portion of that money, which

9     the participant is told the bottom line number, and you're

10    paying it out to Fidelity.  Much like the investment management

11    company pays its support staff.  To the investor who is

12    concerned about the bottom line, they want to know that

13    percentage that's applied to their investment to realize and

14    determine the return.

15          Now --

16          THE COURT:  I understand that, but if ABB had

17    negotiated with Fidelity to cap it, that would have been a

18    benefit to the individual investors, would it not have?  Even

19    if the revenue sharing --

20          MR. ORTELERE:  No, because the expense ratio can

21    never change.  This is what the court needs to understand.  The

22    expense ratio has to be applied to all of the investors in the

23    fund.  In other words, a special deal can't be cut on that

24    bottom line number, which is the total fees charged can never

25    change.  Now, whether or not an --

1    THE COURT:  So it's ABB's position that, in fact,

2    because of your size you have no marketability to get a better

3    deal.

4    MR. ORTELERE:  No, nor is it legal, Your Honor.

5    It's preferred dividends under securities law.  It would be

6    problematic to try to go in and change the expense ratio.

7    THE COURT:  Right.  I understand that.  You could

8    not, though, leverage to get a different investment that would

9    have lower fees.

10   MR. ORTELERE:  Your Honor, there are myriad

11   investments available, and we'll talk about that in a minute,

12   and how the payment to Fidelity is the sum of the expense

13   ratios.  I think if the court bears with me, all might become

14   clear.

15   THE COURT:  Okay.

16   MR. ORTELERE:  As I said, revenue sharing does not

17   impact participants' return.  But the fact that this model is

18   used is critical for a number of other reasons.

19   Your Honor, it's undisputed that the expense ratios

20   among the PRISM options vary widely.  The cheapest investment

21   option in the PRISM lineup has an expense ratio of three one

22   hundredths of a percent.

23   THE COURT:  They don't have the benefit of active

24   investment, correct?

25   MR. ORTELERE:  That, admittedly, is a passive fund

which I believe the plaintiffs would like to see the fund
populated with nothing else. But my point is the
participants -- and this matters, it's critical. The plan
offered a number of these very inexpensive investment options.
The plaintiffs themselves, Your Honor, admitted in their
depositions that they could create fully diversified investment
portfolios by putting their money only in those options. The
revenue sharing approach puts in the hands of participants the
opportunity to determine their own fees. Now, this is a
particularly reasonable --

THE COURT: Within the choices that are given.

MR. ORTELERE: Right.

THE COURT: I mean, they don't have the ability to
choose all investments.

MR. ORTELERE: In the first instance, the committee
determines the array of investment, and we'll talk about that
and the reasonableness of the array. But it's somewhat -- I
think it's critical for the court to understand that this
lineup for those that are concerned with fees -- and, by the
way, some people want to pay more for active management, we'll
talk about them in a moment. But for the people who are
concerned about fees, they can create, as their experts admit,
a fully diversified portfolio at dirt cheap prices.

Now, the ABB investment professionals empowered
those participants seeking to pay lower fees with the means to

1  readily accomplish that objective by directing their money to

2  these extraordinarily inexpensive options.

3           Now, it's also important to understand something,

4  Your Honor.  The compensation to Fidelity is ultimately

5  determined by the participants themselves.  As I noted, I

6  think, a moment ago, essentially all of the money flowing to

7  Fidelity is the sum of the revenue sharing payments which are a

8  portion of the expense ratios applied to each individual

9  participant's selections.

10          Now, some choose the less expensive options, and

11 some who want active management will choose the higher cost

12 options.  But at the end of the day, the compensation to

13 Fidelity represents the aggregate of the participant choices.

14 So given the participants' role here, ABB's first

15 responsibility is to offer up an array of investments at

16 certainly reasonable cost.

17          Now, the evidence will show ABB offered PRISM

18 participants options spanning the entire investment spectrum

19 from conservative fixed income investments to aggressive

20 foreign equity investments or offerings.

21          Now, PRISM participants, if they wanted to, could

22 direct their money into passively managed index funds, as well

23 as actively managed growth and value funds.  And, as Mr.

24 Schlichter pointed out, investors were also offered the

25 opportunity to invest in the Fidelity Freedom Funds, which are

1  described in the industry as target date funds.

2          THE COURT:  Let me go back to an earlier question.

3  You said that mutual funds, by law, if they are sold to

4  somebody on the street versus a large organization, the expense

5  ratio, it has to be the same.

6          MR. ORTELERE:  In a particular mutual fund offering,

7  the expense ratio --

8          THE COURT:  Is that correct?

9          MR. ORTELERE:  I'm sorry, yes.

10          THE COURT:  Okay.  What about the rebate issue?

11          MR. ORTELERE:  I will turn to that momentarily but,

12  again, Your Honor, that's determined -- and you will hear from

13  Fidelity on this point -- between Fidelity and the investment

14  management company.

15          THE COURT:  Is it the position of ABB that you had

16  no role --

17          MR. ORTELERE:  That's right.

18          THE COURT:  -- in trying to figure out what the

19  rebate, what the amount of revenue sharing was and getting any

20  kind of rebate, alliance rebate for the fund?

21          MR. ORTELERE:  To be sure, though, we'll talk about

22  how fees are calculated by ABB to assure reasonableness.

23          THE COURT:  We'll get to that in a minute.

24          MR. ORTELERE:  I'm getting there, Your Honor, I

25  promise.

1    Again, the plan did offer these target date funds

2  which allow a participant to determine a projected retirement

3  date.  As that date approaches, the fixed income investments in

4  the fund go up and the risk, because they're conservative

5  investments, go down to the participants.  These are things

6  participants want.  They choose where to put their money.

7    And, again, ABB needs to put on the investment

8  platform options that are attractive to the work force.  I

9  think we need to touch on for a moment -- and, again, I'd like

10  to think that all things interrelate here and, again, all will

11  be clear.

12    I'll return to the investment policy statement in a

13  moment, but it's important to note that the very investment

14  options that we're talking about are mandated under the

15  specific provisions of the investment policy statement's

16  three-tier structure.  And by way of example, these target date

17  funds are investment options which are specifically described

18  in the investment policy statement.  So, again, ABB's first job

19  is to offer an array of investment options that are attractive

20  to a diversified investment community.

21    Now, consistent with industry standards, ABB offered

22  its employees some 23 different investment options with a broad

23  range of risks, investment styles, and associated expenses.

24  But ABB's responsibility certainly doesn't end there after just

25  identifying the categories of investment options.

1          Now, the evidence will show that Mr. Cutler -- by

2     the way, Mr. Cutler is in the back.  Please raise your hand,

3     Jack.

4          The evidence will show that Mr. Cutler and the

5     Pension Review Committee used an exacting process to select and

6     monitor these investments.  Mr. Cutler will explain the

7     painstaking process by which each investment was carefully

8     vetted before being added to the lineup.

9          Now, all of those steps were entirely consistent

10    with industry practice.  On these points, the court will hear

11    from Dr. Laura Starks, the Chair of the Finance Department at

12    the University of Texas at Austin.  Dr. Starks will bring into

13    the courtroom real outside world experience and will describe

14    the typical practices of fiduciaries in this context and then

15    compare ABB's process to those standards.

16         The evidence will also show that Mr. Cutler used a

17    number of screening tools widely used by investment

18    professionals, interviewed fund managers, he negotiated with

19    those managers to determine appropriate benchmarks for

20    monitoring those investments, and then his recommendations were

21    taken for careful review by the Pension Review Committee, the

22    group ultimately responsible for the investment lineup.  Dr.

23    Starks will further testify these steps were all consistent

24    with industry standards.

25         Now, the evidence will further show that Mr. Cutler,

1    as part of the screening process used to select options for

2    inclusion on the PRISM platform -- it's important to note, Your

3    Honor, over time Fidelity funds became, there were fewer and

4    fewer.  We'll talk about that more in a moment.  But over time,

5    Fidelity, Fidelity's assets went down.  But what Mr. Cutler did

6    during the screening process is he --

7              THE COURT:  Is that the assets in the plan or in

8    general?

9              MR. ORTELERE:  Your Honor, this is the class period.

10   Now, by the way, you heard a lot about assets doubling and

11   tripling over time and somehow these uncapped fees were causing

12   all sorts of fiduciary breaches.

13             But what we have here, the green line, Your Honor --

14   this is based on a stipulation that was agreed to last night.

15   The green line is the, I think it's a little tough to read on

16   the right, total Fidelity assets going down over time.  And,

17   again, total assets in the plan in the period remains constant.

18   There's really not a problem with uncapped fees here causing

19   excessive fees to be paid for Fidelity.  But going back to the

20   fund level, Your Honor, and I'll get back --

21             THE COURT:  Let me make sure I understand.  You're

22   saying that that represents the -- I understand the

23   relationship between the two lines.  But the blue line, that

24   represents the total value of the fund, that it was pretty

25   static from 2000 to 2007?

1          MR. ORTELERE:  Those are total plan assets along the

2     bottom, and that's sort of -- those are Fidelity assets in the

3     plan, the green line.  And the takeaway, Your Honor, is despite

4     the stated concern about uncapped asset management fees, you

5     know, being excessive, Fidelity's portion of this goes down.

6          THE COURT:  I understand that part of the diagram.

7     My question is are the plaintiffs incorrect that there was a

8     substantial increase in the value of the PRISM Plans over the

9     cost --

10          MR. ORTELERE:  Very fair question.  There was an

11     increase in the assets prior to the class period.  Now,

12     specifically those numbers, I couldn't tell you.  But yet in

13     the relevant time period, this is what we're looking at.

14          Now, back to the fund level, Your Honor, and this is

15     critical.  Mr. Cutler as part of the screening process selected

16     only funds falling below the median expense ratio for the asset

17     class.

18          What that means, simply, whether a participant chose

19     a cheap fund or an expensive fund, it was reasonably priced.

20     He lopped off everything above the midline while screening

21     funds.  So as to fund selection and monitoring, the process

22     employed was sound and consistent with industry standards.

23          Now, there's another thing to keep in mind, Your

24     Honor, at this point.  While the fees were reasonable, they're

25     just one of the many considerations in forming the fund

selection process.

THE COURT: I want to make sure I understand this part. You mean he was aware of how much revenue sharing Fidelity received and then he looked at the average and cut off the top and the bottom?

MR. ORTELERE: He looked at the universe of funds in an asset class. And, again, because the revenue sharing piece is just a part of the expense ratio, when selecting an investment, it's immaterial to Mr. Cutler and it's immaterial to the participants, but what he would do is he would compare all of the funds in a certain class and then immediately --

THE COURT: And look at the expense ratio.

MR. ORTELERE: Look at the expense ratio, right.

THE COURT: And then do the midline.

MR. ORTELERE: Right. And then lop off everybody, everything above the midline. And that matters, again, if the court bears with me, I'll bring it all together. Hopefully sooner rather than later.

COURTROOM DEPUTY: Two minutes.

MR. ORTELERE: Two minutes. Your Honor, might I have a couple more minutes because we've had an expansive colloquy, and I haven't even gotten to the questions the court raised on summary judgment.

THE COURT: How much extra time did I give the plaintiff? At the end, after their time was up?

1    COURTROOM DEPUTY:  Defendants had four extra

2  minutes -- or plaintiffs did.

3    THE COURT:  I'll give you five minutes.

4    MR. ORTELERE:  Very quickly, Your Honor.  If the

5  fund level expenses are reasonable, what it means for the plan

6  level, they will be reasonable, as well.

7    And we have objective evidence of proof of that.

8  Dr. Glenn Hubbard, the Dean of the Columbia Business School, is

9  going to pay a visit to this courtroom.  And what Dr. Hubbard

10  did simply was look at peer plans, no matter what mechanism was

11  used, and ABB fits comfortably in that universe.

12    But I want to talk about the court's questions on

13  summary judgment.  I say there are three, broadly stated.  The

14  court raised the possibility that ABB's process was corrupted

15  by the illicit pursuit of free or discounted services,

16  supposedly at the expense of the PRISM Plan.  The court

17  expressed concern that ABB may have violated its investment

18  policy statement, and the court asked some questions about

19  whether or not there was a violation of the prohibited

20  transaction rules.

21    Turning first to so-called corruption.  Back to the

22  match, Your Honor, and this matters, and the court asked why

23  did I mention the match upfront as a design feature of the

24  plan.  The theory, the corruption theory makes no sense when

25  the court focuses on the match.

1    Again, since the beginning of the relationship with

2    Fidelity, ABB has poured at least $200 million of its own

3    corporate assets into the participants' pockets in the form of

4    a match.  No matter how the plaintiffs measure the so-called

5    subsidies, these voluntary payments from the company directly

6    to the participants vastly outnumber any supposed subsidies if

7    the court suspends disbelief and employs the numbers that the

8    plaintiffs are bandying about.  So that fact alone, I submit,

9    demonstrates the theory is nonsensical.

10    Now, ABB fought vigorously throughout the period to

11    reduce participant fees at the expense of Fidelity.  I submit

12    that's conclusive evidence of an arm's length relationship.

13    Now, the best example, and Mr. Schlichter touched on

14    it for a moment, is in 2004 ABB determined to deselect

15    Fidelity's Magellan Fund with some $243 million then managed by

16    Fidelity.  Fidelity fought tooth and nail to avoid losing the

17    assets, as well as the annual one and three quarter million

18    dollars in investment management fees.

19    Now, it's worth pausing for a moment to consider the

20    various proposals Fidelity made to hang on to this money and

21    ABB's refusals, which were all calculated to save participants'

22    money at Fidelity's expense.

23    First, as I said a moment ago, ABB said, we're

24    getting rid of Magellan, it had to get off the lineup for

25    performance reasons.  And the money the committee determined

1   was to go to another investment management company called T.

2   Rowe Price.

3           Now, given the amount of money involved, ABB

4   pushed -- excuse me, Fidelity pushed back aggressively.  They

5   lobbied to keep Magellan on the platform; but given the

6   performance problems and after doing the due diligence that I

7   touched on before, ABB stood by its guns and refused to

8   reconsider its determination to kick the fund off the platform.

9           Next up, Fidelity comes back.  They said, okay, how

10  about we transfer that Magellan money, those $243 million, and

11  move it into a T. Rowe Price fund.  Instead of T. Rowe Price,

12  Fidelity said, give us the money, we'll put it in a different

13  fund.  ABB said no.

14          Fidelity comes back again and they say, okay, you

15  can put half the money in the T. Rowe Price fund, but give us

16  the other half in a different Fidelity fund.  ABB says no way.

17          And then Fidelity argues, okay, how about we get the

18  revenue sharing from that T. Rowe Price fund?  ABB says no.

19          As Mr. Schlichter notes, Fidelity then announces

20  that it would unilaterally impose an $11 per participant fee on

21  PRISM.  ABB said no way.

22          THE COURT:  Let me go back.  You're saying that

23  Fidelity tried to get the T. Rowe Price revenue sharing but ABB

24  said that that revenue sharing had to be for the benefit of the

25  plan?

1    MR. ORTELERE: I'll jump ahead. Ultimately, Your

2  Honor, the plan has what's called an H account, which is used

3  to pay legal and auditing expenses associated with the plan,

4  charges that are not at issue in this lawsuit because they

5  don't go to Fidelity.

6         At the end of the day, after refusing the myriad

7  demands and counter offers -- and the court will see it's a

8  vigorous arm's length mud wrestling match. At the end of the

9  day, ABB negotiated to take that revenue sharing and apply it

10  to those other types of costs incurred by participants.

11         In other words, despite their spirited effort to

12  hang on to this 243 million, despite their six or seven options

13  to keep at least a chunk of that change, the money goes into

14  the participants' pockets.

15         The point being that's not collusion, Your Honor,

16  and you will see the exchanges between the parties around this

17  issue as ABB digs in and says, again and again, no way.

18         Now, as I said earlier, I touched on this, Mr.

19  Cutler in the back, he makes the recommendations in the first

20  instance to the Pension Review Committee on the fund lineup.

21  And by the way, you will see this, Your Honor, over time, the

22  number of Fidelity investment options falls off the table

23  because of Mr. Cutler's good work.

24         Now, it's important as we talk about these collusion

25  and conspiracies, Mr. Cutler is completely walled off from

1  these other plans and services which, again, there can't be a

2  finding of collusion or improper subsidy here.

3          Let's quickly turn to the investment policy

4  statement, Your Honor.  The court in its summary judgment

5  ruling raised some questions.  Was there a breach of the IPS

6  related to using the size of the plan, and were we properly

7  using revenue sharing.

8          Now, a little bit of legalese.  If the IPS is a plan

9  document under settled ERISA case law, ABB is entitled to

10  judicial deference when the court reviews its decisions made

11  under the IPS because at the end of the day, the IPS, in fact,

12  allows investments in publicly available mutual funds.  So to

13  the extent it says one provision, you could invest in separate

14  accounts.  It also says elsewhere the fiduciaries are free to

15  invest in publicly available mutual funds.

16          COURTROOM DEPUTY:  Time.

17          MR. ORTELERE:  Can I have just three minutes?

18          THE COURT:  No.  Two.

19          MR. ORTELERE:  Thank you, Your Honor.

20          THE COURT:  I'll give you two.

21          MR. ORTELERE:  Two.

22          THE COURT:  But hurry.

23          MR. ORTELERE:  Okay.

24          THE COURT:  Get to the point.

25          MR. ORTELERE:  There can be no breach of the

1  investment policy statement because it specifically endorses

2  everything we did here.

3          THE COURT:  I understand that argument.  Anything

4  else?

5          MR. ORTELERE:  Can we have the other slide, Brian,

6  please?

7          Just real quick, Your Honor, about the statute of

8  limitations.  This graph, this demonstrative, that's a timeline

9  along the bottom, Your Honor, the red vertical line up and down

10  is six years before the filing of the complaint.

11          And what I did here, first of all, many of the

12  issues that the plaintiffs say formed their collusion or breach

13  of loyalty claims and the prohibited transaction claims are on

14  the left side of the red line, meaning they cannot inform the

15  court's decision in terms of a prudence breach.

16          But, Your Honor, there's a much more important point

17  here.  And the court noted in its opinion that it's the

18  plaintiffs' burden to show a connection between the actions.

19          Now, understand that above the gray line are the

20  actions related to PRISM.  Starting on the left in 1995 is the

21  selection of Fidelity as the record keeper.  On the bottom are

22  the other services that the plaintiffs say form the basis of

23  the collusion and prohibited transaction charges.

24          As a temporal matter, the court can see, there's no

25  linkage anywhere from top to bottom, so there could never be a

1  finding of this collusion or conspiracy.  These deals were

2  negotiated separately.  And while the plaintiffs will try to

3  confuse and conflate that timeline, I suggest that the court

4  keep an eye on that because at the end of the day, there can

5  never be a finding of an illicit connection or transaction.

6         COURTROOM DEPUTY:  Time.

7         MR. ORTELERE:  Thank you, Your Honor.  Would the

8  court like a copy of the timeline?  I think it's

9  something worth keeping handy.

10        THE COURT:  At some point, I'm going to want all of

11 your demonstrative exhibits.

12        MR. ORTELERE:  I can hand this one up right now.

13        THE COURT:  Hand it to her.

14        MR. ORTELERE:  Okay.  Thank you.

15        THE COURT:  I have a feeling there will be a lot of

16 paper.

17        MR. OPPENHEIMER:  Good morning, Your Honor, Randy

18 Oppenheimer.  I think it's a measure of the profitability of

19 the colloquy we've been having that my team is just about ready

20 to violate the Post-it rule of thoughts and ideas, but it's

21 because I think we've hit some points that Your Honor wanted us

22 to address.

23        In only 30 minutes, I'm going to endeavor not to

24 repeat anything that Mr. Ortelere said except at a very high

25 level and to focus in on some of the issues that I think Your

1  Honor has indicated she wants us to address in terms of claims

2  and defenses.  There's obviously a general relationship.

3       But if I could set the stage just a little bit, one

4  of the things that obviously will be important here is what are

5  the roles of various parties who are involved here.  And I

6  think you'll hear an awful lot of evidence about the process

7  that ABB used to choose the funds that went into the plan

8  lineup.

9       And I won't go back over the merits of those

10 choices, but suffice it to say we think they did an excellent

11 job.  And I think it is important in order to understand

12 Fidelity's role to understand what it was that ABB was doing in

13 terms of the system that they were creating.  It's quite often

14 referred to today as an open architecture system, meaning that

15 ABB goes through a process that Mr. Cutler will explain in

16 which he makes fund selections that go, in effect, to make an

17 open architecture for the participants, the employees in the

18 401(k) plan, to choose, and then they choose how they will

19 allocate their investments.  They can put them all into one

20 type of fund or they can choose and put them into a different

21 type.  They can spread it around.

22       As this system has evolved, it's started to develop

23 some really profoundly useful bells and whistles.  There are

24 now websites that help employees make those kinds of decisions.

25 But the fundamental idea here is that what the employees see

1    when they look into this system is this menu.  And the point

2    I'd like to emphasize at the moment is that that menu is

3    diverse.

4         When we say diverse, what do we mean?  It has within

5    it essentially representatives of all the different types of

6    investments that you could choose in that environment.  And the

7    consequence of that, if you will, is that somebody has to set

8    up a system that actually allows that all to work.

9         The manner in which that's done is up to Fidelity.

10   Fidelity is the entity that creates the infrastructure that

11   allows those websites to run, those phone banks to run, that

12   allows daily reporting of these literally -- well, over more

13   than daily -- but literally millions of transactions over the

14   year.  That's what --

15        THE COURT:  You're talking about Fidelity Trust?

16        MR. OPPENHEIMER:  FMTC.

17        THE COURT:  Sometimes all of you, I get a little

18   confused when we talk about Fidelity.  I know there's different

19   entities.

20        MR. OPPENHEIMER:  Certainly, Your Honor, let me

21   address that.  We'll spend more time on that during the trial.

22   We have scheduled some folks to address that specifically.  But

23   for our purposes, we're dealing with two entities today:  FMTC,

24   which runs this structure I've been discussing; and FMRCo,

25   which you've seen in the briefing.  FMRCo is an investment

1    advisor.   FMRCo's primary function --

2                   THE COURT:  To the plan?

3                   MR. OPPENHEIMER:  To the funds, to some -- to the

4    Fidelity funds that are in the plan.

5                   THE COURT:  Other side of the line.

6                   MR. OPPENHEIMER:  Other side of the line, exactly

7    the point.  That's why I say when you think of this as I do --

8    and I caution the court because I've made this mistake numerous

9    times.   The open architecture terminology is a bit of a newer

10   terminology.  What we're dealing with in this case is an

11   evolving level of sophistication, if you will, for these 401(k)

12   plans.

13              And by that I mean, for example, now there's a lot

14   more choice for participants and there's a commensurate

15   increase in the technology required to deal with all of that.

16   It is not an understatement to say that Fidelity invests

17   literally billions of dollars in this process.  I don't want to

18   focus on that.  We'll talk about what we actually do and what's

19   involved and the general investment in it.

20              But suffice it to say that the reason all of that

21   activity goes on to facilitate ABB's vision of what they want

22   for their plan is because it's very diverse.

23              I want to give an example in which that's directly

24   relevant to something that was said this morning.  A lot has

25   been made of the difference in performance between the defined

benefit plan and the defined contribution or 401(k) plan.  I

believe that Mr. Schlichter ended on that note by pointing out

that there's a substantial performance difference between those

two.  And the implication is that there's something that ABB

did in selecting the funds that go on the menu that employees

can then choose among that caused that in some way, shape, or

form.

And the reason I want to focus on that is that I

think it's an insight, it's a window into how profoundly wrong

that idea is.  In that if you took the same options that the

employees had under their 401(k) DC plan, and if they had just

made different decisions, Your Honor, the evidence will show

that their plan would have produced the same or remarkably a

better result than the DB plan.

Or to put it another way, if we think of these plans

with their choices of investment options as a tool kit or an

arsenal, they had within that arsenal the choices that would

enable them to have performance identical to or better than the

DB performance.

Well, why didn't that happen?  And what Your Honor

will hear in the course of the evidence is I think it turns out

to be pretty simple.  During that period of time, the

investments in international stocks did extremely well.  But

they're also a lot riskier than a lot of the other investments

that are present in the ABB lineup.

1        There is absolutely nothing wrong with the employees

2   in the 401(k) plan being more conservative than the people who

3   are managing the defined benefit plan.  There's absolutely

4   nothing wrong with that because Fidelity does not choose these

5   funds and was not involved in that.

6        I don't want to spend that much of my time on that

7   point, but what I do want to emphasize is that the performance

8   of the DB plan and the performance of the 401(k) DC plan simply

9   represents a perfectly legitimate choice of one group of people

10  being a little more conservative and, for reasons that will be

11  explained in trial, the DB managers taking more aggressive

12  risks that the employees chose not to take, and so they didn't.

13       Had they, and if you asked me would they have had

14  the tools in their tool kit to perform identically, the answer

15  remarkably is yes.  One of the things about this case that I

16  find so interesting is every type of fund that the plaintiffs

17  wish to see in operation for these employees is in the open

18  architecture as a practical matter.  Is it literally the same?

19  No.  But as we show in the evidence, they have all the same

20  options as a practical matter.

21       THE COURT:  This is completely off, not relevant.

22  Have the DB plans done worse in this bad market?

23       MR. OPPENHEIMER:  You know, Your Honor, I believe

24  they have done worse than they have historically done.

25       THE COURT:  No, worse than the defined contribution

1  plans.

2        MR. OPPENHEIMER:  I don't know the answer to that,

3  Your Honor.  We'll have to get that.  I don't want to give you

4  my --

5        THE COURT:  That would follow from the greater risk

6  you take, the greater benefit you have, but at some point you

7  will pay the piper.

8        MR. OPPENHEIMER:  Yes, at some point you do,

9  although if my investments are any guide, you never know when

10 that's going to be or what form it will take.  But if that is

11 the case -- we'll answer that question.  I agree it's not

12 directly relevant, but it's in the spirit of the point I'm

13 making, Your Honor, which is that I think it's powerfully

14 important to appreciate what ABB has done with this plan here,

15 which is to really provide a lot of optionality and, my

16 substantive point on their elections, they're afforded the

17 choices they make for the menu.  The employees make the

18 investment choices.

19        And that is that, the import really of plaintiffs'

20 argument is that we should be taking things out of there, we

21 should be eliminating choices.  Clearly there's a spirit here

22 in which we should be by implication eliminating mutual funds.

23 Mutual funds have more expensive costs associated with it.  The

24 expense ratios that Mr. Ortelere and the court were discussing

25 is an example of that.

It's absolutely true that mutual funds have more expensive costs, more expensive expense ratios than, say, a so-called index fund. And that's for a lot of reasons, one of them is that you have active management and another one, Your Honor, I just noticed this. It was brought to my attention. There are features of mutual funds -- I apologize for turning my back on the court. There are features of mutual funds --

THE COURT: You must be staying in a hotel also.

MR. OPPENHEIMER: Yes. You're exactly right, Your Honor. But what was so interesting about this, and this was very much -- you'll hear from Mr. Cutler I think it was very much on his mind when he was making some of these decisions. If you go to the Money section of USA Today which I was holding up there, you see on the front page here it says stock mutual funds on page 4-5B. And you turn to that page 4-5B and, sure enough, there's an entire page of reports on those mutual funds.

Now, why do I bring this up, apart from proving that I'm actually staying at a hotel? Because there are other choices in the ABB lineup that are cheaper than these mutual funds, but you will not be able to read about them here. Their names will not be known to you and many people, whether they're employees of ABB or, frankly, me or a lot of people who like mutual funds, don't necessarily want a fund that doesn't have these attributes that I cannot read about in the newspaper.

1        And perhaps, Your Honor, more importantly, or as

2   importantly, a lot of the other investment selections that are

3   cheaper do not have many of the safeguards that mutual funds

4   do.   We've talked, or you've heard about commingled funds or

5   separately managed accounts, so-called SMAs, and we'll talk a

6   lot more about what those are.   But bottom line is those are

7   funds that can have reduced costs, they can result in a

8   situation where they're actively managed or not.   They can

9   collect money from different entities, and they can be invested

10  by banks or specialists, or they might not be invested by an

11  active manager at all, they might track an index.   Each one of

12  those things I've identified could have a different cost

13  associated with it.

14       Many of them, however, will not be SEC regulated.

15  Many of them will not be subject to the disclosure and

16  reporting requirements that many people like and feel

17  comfortable with.   Does that mean that they're bad, does that

18  mean that they're imprudent?  Does that mean that people should

19  stay away from them?  No.   No.   And, indeed, Mr. Cutler

20  includes all of those types of things in the choices that the

21  participants have.

22       So if they're a little more risk averse or they'd

23  like lower cost and are able to make some of their own

24  investment decisions, they're free to do that, and they will

25  lower their cost.   They can take more or less risk.   They can

1  perform in the international markets, if they want. They can
2  do all of those things. They can do all of that.

3       Now, Fidelity services all of that. When I say
4  Fidelity, FMTC is an administrative service provider. They
5  make it possible for this to work. They allow the transactions
6  to occur, they allow the daily valuations to occur. And Your
7  Honor will hear that's a big deal, that's a huge deal.

8       When ABB came over from Hewitt, they went from a
9  system where they had, I believe it was quarterly valuations
10 that the employees could get, to daily valuations. And that
11 one change was just hugely dramatic in terms of what was needed
12 to service that kind of activity.

13       The world of service has gone from just telephone
14 banks to websites. We'll provide some detail of this to the
15 court. But all of that's designed to allow the employees to
16 make their investment decisions on their own and to be
17 monitoring them and to basically hopefully continue to invest
18 and grow their savings and, indeed, that has been exactly what
19 has happened.

20       Now, how do we get paid? Okay? How do we get paid?
21 We get paid really in one of two ways. We are traditionally a
22 bundled provider. What does that mean? We got into the
23 business originally because we were a mutual fund company.
24 This is now FMRCo. We had mutual funds just like the ones I
25 alluded to in USA Today. That gave us a lead really, if you

think about it, in all of the technology we needed to report

and deal with investors, so we had huge, huge capital

investments in computer technology and that sort of stuff that

lends itself very well to the 401(k) world.

And part of the process early on was to have our

funds in 401(k) plans and maybe even in some plans, although

not really ABB's ever predominantly.  But over time the

customers, the plan sponsors, the people like the PRC and Mr.

Cutler at ABB, and many, many others, wanted different things

because the employees wanted different things.  So Fidelity's

plans that FMRCo would manage became fewer and fewer on these

platforms.  And that's true with ABB, as well.

But let me come back to the, how do we get paid.

When we have our own funds on the platform, they're paid an

investment ratio, the investment ratio that Mr. Ortelere

discussed.  They were disclosed.  There are many different

filing requirements that set that forth.  And they then

basically receive a fee that's identified for the work that

they do.  And the nature of the disclosure, there will be a

witness here who can describe this in more detail, generally

distinguishes between the amounts for investment and the

amounts for administration.

We'll go into more detail about how within Fidelity

there's a management allocation, if you will.  It's not a money

moving allocation, it's not anything that has to do with cash

1  moving from one place to another, but there is an allocation

2  for management purposes of the value of --

3          THE COURT:  When you say Fidelity has this, who --

4  what Fidelity?

5          MR. OPPENHEIMER:  Let me take an example where let's

6  say ABB has the Magellan Fund before it was taken off, it would

7  have an investment ratio, it would be paid to FMRCo.  FMRCo is

8  the manager of the Magellan Fund.  They're making the

9  investment decisions for the Magellan Fund.  The law is clear

10 in that capacity they have zero fiduciary responsibility to the

11 plan.

12          They do have a responsibility to the fund.  That

13 fund, if it's on the ABB platform, will be managed by FMTC,

14 meaning not, no investment decisions made by FMTC, none of

15 that, but the daily reporting, the transfer of funds that

16 people buy in and out of it, that sort of thing, and telephone

17 bank and website, all of it, it will fit into that

18 architecture.  Inside Fidelity --

19          THE COURT:  So that's Fidelity Trust?

20          MR. OPPENHEIMER:  Yes, FMTC, Fidelity Trust is, in

21 effect, a service provider for --

22          THE COURT:  Works on both lines.

23          MR. OPPENHEIMER:  No, it only works on the service

24 side.

25          THE COURT:  When I say the line, I mean the fund and

the plan.

MR. OPPENHEIMER:  Yes, I believe that's right.

THE COURT:  Is FMTC doing record keeping for the funds?

MR. OPPENHEIMER:  No, doing record keeping for the plan.

THE COURT:  Only for the plan.

MR. OPPENHEIMER:  Yes, but, Your Honor, it's doing the same services, really, for the Magellan Fund, which is a Fidelity fund, as it would do for a non-proprietary fund, in other words, a fund that's not a Fidelity fund.  Let's take two examples.

THE COURT:  But they're doing it for the plan.

MR. OPPENHEIMER:  They're doing it for the plan.  In other words, their job --

THE COURT:  Who is doing the record keeping -- I don't know what the proper word is here.  The kinds of things that Fidelity Trust is doing for the plan, keeping track of valuation, for example.

MR. OPPENHEIMER:  I believe I see your question better now.  Can I take one more shot at it?  My answer was not a good one, given your question.

If I could give an example, maybe this is the easiest way for me to think about it.  Let's assume that the ABB open architecture had only two plans on it.  One, let's say

1  Magellan before it was booted off; and the other, a

2  non-Fidelity fund, okay?  Somebody would be managing a

3  non-Fidelity fund.  It could be any professional fund manager.

4  Let's just assume it's actively managed.  FMRCo would be

5  managing the Magellan Fund.  FMTC would be sitting, if you

6  will, next to both of them or apart from both of them handling

7  the administrative, ministerial work, although it's a big job,

8  for both of them, essentially in the same way.  How do we get

9  paid for that?

10       THE COURT:  The work, though, for the plan.  In

11  other words, the mutual fund owns stock, right?

12       MR. OPPENHEIMER:  Correct.

13       THE COURT:  Okay.  FMTC isn't worried about the

14  stock investments and record keeping for the mutual fund

15  itself, only as it relates to the work it's doing for the plan.

16       MR. OPPENHEIMER:  Yes, Your Honor.  Yes, that's

17  correct.  And the way that the plan sees FMTC, and one of the

18  reasons plans do pay revenue sharing -- and let me describe

19  this from the point of view of, say, a non-Fidelity fund

20  because it's really easy to see, I think.

21       They see basically one account.  That account is the

22  ABB pension plan -- I mean, I'm sorry, the ABB 401(k) plan.  So

23  let's assume it's, you know, AJAX Company's fund.  They see

24  they're going to push all of their computer data and everything

25  to one account.  They don't see in their system all of those

1  individual 401(k) participants.  They see the ABB plan.

2         And they send all of that information to FMTC, which

3  is an administrative function.  FMTC then blows that back out

4  to all of the participants in the ABB 401(k) plan, okay?  And

5  it essentially does the same thing for a Fidelity plan.

6         THE COURT:  So those mutual funds are benefitting

7  from having worked with this ABB plan and are willing to pay

8  for that.

9         MR. OPPENHEIMER:  You've got it.  That's why they

10  engage in revenue sharing, Your Honor, because if we did not do

11  that work for those other funds, they would have to do it

12  themselves.  And they would take part of their investment

13  ratio, the same part that they give to FMTC, and they either

14  have to pay for people to do it, or they would have to pay a

15  company other than FMTC to do it.

16         THE COURT:  So, for example, with retail funds,

17  individuals buy it, they've got to do all of that work; but

18  because it all goes into one lump piece of information to the

19  plan, they don't have to do that individual work.

20         MR. OPPENHEIMER:  I think that's correct.  The

21  information goes to FMTC, and then it blows it back to the

22  plan.  That's right.  And Your Honor has hit the nail on the

23  head.  That's basically what we get paid to do.

24         And it's a big job.  We'll get into it later, but

25  it's an interesting thing to learn how complicated that is, and

1    we're very proud, Fidelity does a very good job of it, I think.

2    But it's hard work because it requires a lot of things that

3    need to be done.

4            Now, the other non-Fidelity funds, Your Honor,

5    they've actually in some cases agreed to pay part of their

6    investment ratio, part of their investment charge which in

7    this, the way you and I are talking about it, they would

8    otherwise have to pay to somebody to do this work, to Fidelity.

9    And if it's not Fidelity, then they pay it to somebody else

10   too.   Revenue sharing is highly common.

11           That's real money that gets paid.   The Fidelity

12   funds don't actually transfer money to FMTC.   They keep

13   internal books which we're talking about, but it's still the

14   same idea.   And there are levels of revenue sharing which are

15   quite common that Your Honor will hear about.   They do tend to

16   be measured in these hundredth of a percent notations, which

17   people call basis points.   And I've heard it referred to a lot

18   recently as bps, B-P-S.

19           But the money that's paid by the outside funds that

20   comes to Fidelity is in the form of revenue sharing.   Now, when

21   Fidelity, FMTC, now, the administrator, not the fund manager,

22   goes to a company like ABB to do work, they have to strike a

23   price.   They have to find out what people are going to charge.

24   And quite often, Fidelity is perfectly comfortable to charge

25   few or no explicit per participant dollar charges, depending on

1   the revenue sharing it's getting, or depending upon how many of

2   its funds are on the open architecture.

3         And in cases where a plan starts eliminating funds

4   that do not pay revenue sharing, if they're non-Fidelity funds,

5   if they start eliminating Fidelity funds, they can reach a

6   point where an explicit fee may need to be added so that

7   Fidelity can make money doing this business.

8         There was mention earlier of rebates, and we may

9   have some discussion of that in the trial.  What I'd like to

10   point out about rebates this morning is simply that, you know,

11   under some circumstances it's complex because you have to avoid

12   that problem Mr. Ortelere was talking about of differential

13   treatment of investors, which I'll get to in a minute.

14         But you could have a rebate or not in some

15   circumstances, but it won't change a fundamental fact, which is

16   that these very complex administrative services aren't free.

17   Whether it's Fidelity or whether it's Hewitt or whether it's

18   Mercer or other companies, they're in business, and the law is

19   quite clear that these companies have no fiduciary duty in

20   connection with the negotiation of their fees.  It doesn't mean

21   the fees aren't reasonable.  They are.

22         It just means that if you think of it like a water

23   level, if the revenue sharing is adequate for these companies

24   to earn what they need to earn to be in business, that's great.

25   But if Mr. Cutler chooses funds that bring that revenue sharing

1   down below a specific point, well, then, there are going to

2   need to be some explicit fees.

3          Now, is Fidelity ever, ever, ever in a position to

4   slam its hand down on the table and say, okay, Mr. Cutler, or

5   the committee to whom you make your recommendations, you've

6   just changed a fund and now you have to pay more fees?  No.

7   They can try.  It's a market.  They can negotiate.

8          The example Mr. Ortelere gave in 2005 is a good

9   example.  Mr. Cutler going through his normal procedures where,

10  as I view it, and Mr. Cutler will speak for himself, obviously,

11  but I sort of see what he does.  His first order of judgment is

12  what do I want, what fees -- excuse me, exactly the opposite.

13  What choices do I want for my participants?  And he goes and he

14  makes that choice through a process.

15         Fidelity has nothing to do with dictating that to

16  him.  We are absolutely not a fiduciary in connection with

17  advising him on those things.  He may ask our opinion, and Your

18  Honor, you will hear from a witness by the name of Mr. Dahling

19  who will be here.  He's our counterpart, he's on the other side

20  of Mr. Cutler.  And quite often you will hear Mr. Dahling would

21  learn a lot from Mr. Cutler because Mr. Cutler had a lot of

22  opinions because he's a hard working and I think careful

23  gentleman.

24         The fact, though, is that the funds that the people

25  at ABB thought would be best for the employees were chosen, and

1  then there would be negotiations over what the servicing charge

2  would be.  If the revenue sharing was enough, fine.  If the

3  revenue sharing wasn't enough, then maybe Fidelity would try to

4  get an explicit fee.

5      In 2005, they took one of our biggest funds out.

6  Which means we lose the whole -- you know, FMRCo doesn't get

7  the investment and there's -- literally that entire chunk of

8  revenue just disappears.

9      THE COURT:  Is it correct that in the Magellan

10 negotiations that ABB eventually was able to reduce the amount

11 of fees paid by the plan?  Or did it end up that they just got

12 it somewhere else or you just got it somewhere else?

13     MR. OPPENHEIMER:  No, they reduced the fees.  Let me

14 give you as an overview for how -- Matt, could you bring up

15 graphic No. 12 for me?

16     I'll show you, Your Honor, what happened over

17 time -- and Magellan was a -- have you got 12?  No problem.

18 That's good.  Here we go, Your Honor.

19     The Magellan discussions, as you can see on this

20 timeline, took place in this 2004/2005 time frame that

21 Mr. Ortelere mentioned.  And it resulted in a substantial

22 decrease in the percentage of assets that will be managed by

23 Fidelity.  So Fidelity lost -- these percentages are

24 percentages of assets managed by Fidelity.  You can see that

25 drop off during the Magellan negotiation.

1          Now, what effect did that have on that?  Because

2   remember, how are we getting paid?  Outside funds are paying us

3   revenue sharing.  Our own funds are earning their management

4   fees, part of which FMTC uses, but, again, there's no actual

5   cash transfers, it's just an internal accounting for ourselves

6   is paid by that.  And then there could be some explicit fees.

7   When this is reduced when they take Magellan out, here is what

8   happens.  If you could go, Matt, to 6.

9          As you might expect, Your Honor, this is what

10  happens to our revenue.  Now, it's been dropping the whole time

11  anyway.  Why has it been dropping, Your Honor?  We're talking

12  about Magellan.  Magellan is only an example.  Frankly, this

13  has been happening -- it's systemic over the entire period of

14  time relevant to this lawsuit.  Fidelity, our product has been

15  going down as the prior slide showed and, correspondingly, our

16  revenue has been going down, and that's because we're not

17  getting the investment management fee for managing the funds

18  and because Mr. Cutler is choosing all of his funds by

19  reference to what he wants as choices, and so some funds pay us

20  revenue sharing, and some funds don't pay us revenue sharing.

21  And over time, that revenue has been going down and down and

22  down.

23          COURTROOM DEPUTY:  Two minutes.

24          MR. OPPENHEIMER:  Thank you.  Your Honor, if I were

25  to make a comparable plea to Mr. Ortelere.

1    THE COURT:  I'll give you five minutes.

2    MR. OPPENHEIMER:  Thank you.  I appreciate it.

3    Fidelity would love to have that line look

4 differently, make no mistake.  The negotiations which you'll

5 hear about are hard fought.  When Magellan was taken out,

6 Fidelity wanted to impose where there had been no explicit

7 fee -- it had been Magellan and basically no explicit fee.

8 There was a plan for represented employees that had a small

9 fee, but essentially no fee.  But essentially Magellan and no

10 fees with all of the other plans that Mr. Cutler chose, and

11 that was fine.

12    When they took Magellan out, we needed $11.  We

13 wanted that money back.  Were we able to get that money back?

14 We were not able to get that money back.  Was it a hard fought

15 negotiation?  You bet.  And at the end of the day, the market

16 was what the market was.  We couldn't get that back.

17    Now, with only a little bit of time left, I want to

18 quickly address two points in order.  When Mr. Cutler makes his

19 choices, I said he originally chose the materials that, or the

20 funds that he wanted for his folks in the plan.  He then

21 looked, as Mr. Ortelere said, for the reasonable cost, he

22 looked for the median or below.

23    If you could bring up, let's do slide 1, go back to

24 slide 1.

25    This is what it produced, Your Honor, the green line

1   is ABB, and they ended up right in the middle of all of these

2   other total plan costs, meaning no matter how the other plans

3   were paying for their administrative services, whether it was

4   all explicit fees or per participant fees, revenue sharing,

5   combination, didn't matter.  Right in the center of the mix.

6   And keep in mind, that's after he's chosen the most important

7   thing, which is what he thinks the best funds are for his

8   folks.

9           We did not control that process.  We were not

10  retained as an advisor to advise that process.  The trust

11  agreements pursuant to which we operate make us a limited and

12  directed trustee.  They are explicit that we have no fiduciary

13  duties, indeed, no responsibilities for the fund selection that

14  Mr. Cutler and the PRC were engaged in.

15          Really, as we go through the contract, we see our

16  duties are laid out in the schedule.  The schedule reiterates

17  that that is not our role.

18          THE COURT:  So you did not have veto power over

19  funds that --

20          MR. OPPENHEIMER:  Let me address that, Your Honor.

21  The word veto has sort of crept into our vocabulary.  I would

22  suggest or strongly argue, we have no veto power.  Here is how

23  this works.

24          The contracts have been referred to as evergreen.

25  The impression may have been created that they go on forever.

1  It is exactly to the contrary.  The contracts are terminable at

2  will, for all practical purposes.  ABB cannot be bound by that

3  contract.  Every time they change a lineup, there's a trust

4  amendment, and the parties are in the forum of negotiating with

5  each other once more over compensation and what Fidelity will

6  do.

7  Imagine this.  Imagine one day Mr. Cutler decides --

8  and he may have good reasons for this -- I need to completely

9  revamp my lineup.  Fidelity, here is my new lineup.  By the

10  way, nobody does revenue sharing, they just don't want to do

11  it, so what do we do?

12  Fidelity is not, and no company on the planet is

13  going to work for free, that's not going to happen, so there

14  will be a negotiation.  There is no rule under ERISA and

15  there's nothing in the contract at all that says the parties

16  have to continue doing business with each other.  They do not.

17  So they have a negotiation.  Again, a non-fiduciary event.

18  At that point they come to an agreement.  2005,

19  let's use that as an example again.  He takes Magellan out.  If

20  we had said, no, Mr. Cutler, we really mean it, we have to have

21  $11, he would say okay, that's it, I'm not dealing with you

22  anymore.  If he said to us, you have to do it and not take $11

23  and our management said, well, we really can't do that, we get

24  to walk.  Either party can walk.  This contract is terminable

25  at will under law by ERISA for them and as a matter of the

1  contract terms for both parties.

2          And it makes perfect sense.  Mr. Cutler cannot have

3  his hands tied in the choices he makes.  And there's nothing in

4  that contract that ties his hands.

5          If you think of it as a machine, the machine is

6  designed to put Mr. Cutler and the PRC in a position where they

7  can make any choice they want.  As long as we get market rates

8  for our services, as long as we get rates that pay us, we'll

9  service it.

10          If he for some reason picks a lineup -- and there's

11  two situations where this might happen where we have no revenue

12  sharing and they don't want to pay anything for record keeping.

13  That's tantamount to asking us to do it for free.  We're not

14  going to do it for free, Hewitt is not going to do it for free.

15          So we have a negotiation, the lineup changes,

16  there's a trust amendment, we've had a negotiation not subject

17  to fiduciary limitations, and the parties move on to the next

18  step.

19          The provision that receives some attention in the

20  plaintiffs' brief which sometimes we think of as a veto

21  provision, is really a legacy, and still it's of continuing

22  effect today, I think, of an environment in which when the open

23  architecture was first working and Fidelity was first managing

24  all of these funds, there were some funds that could not work

25  with us.  That is to say, they couldn't give us feeds fast

1 enough, they couldn't give us daily reports fast enough. We
2 would not be able to do the services we told ABB we would do.

3          And, Your Honor, if you will, it's almost like
4 contractual archeology. If you look at that contract, you'll
5 see the pentimento of that history because it's not
6 symmetrical, it's a weird provision, to be perfectly honest.
7 It says that we can veto additions but not deletions. Well,
8 what hurts us more, if you really think about it? Deletions.
9 If we're making what we need to make from the funds that are on
10 there and he wants to add a few more, that's not likely to
11 create a firestorm. But when he takes Magellan out, if that
12 provision really worked as a veto, would we ever have let him
13 take Magellan out and then refuse to pay us $11? Not in a blue
14 moon.

15          COURTROOM DEPUTY: Time.

16          THE COURT: Finish up your sentence.

17          MR. OPPENHEIMER: So that's not, in my opinion, the
18 way the provision works. It's also not, I think, in the end,
19 Your Honor, terribly important to the issue that is raised
20 there. Because the point is ABB is not bound by that
21 agreement, ultimately we're not -- every time there's a line of
22 change there has to be an understanding. There's nothing wrong
23 with that. It doesn't violate ERISA. It's an act of
24 negotiating compensation. It's not subject to the fiduciary
25 rules. And it's important that we take that idea away because

1   everything Fidelity does is to try to be a service provider to

2   provide Mr. Cutler and ABB with the state of the art machine

3   that will allow them to put their vision for their employees

4   into effect. We have no interest in controlling it, and we

5   don't. Thank you, Your Honor.

6           THE COURT: Thank you. Let's go ahead and take a

7   15-minute break. We'll reconvene at 11:30. Probably go for an

8   hour and take a break for lunch. We'll begin with your first

9   witness.

10          MR. SCHLICHTER: Your Honor, would you consider

11  having the lunch break early, in view of the timing, to avoid

12  maybe a delay with the break in the middle of the testimony?

13          THE COURT: Okay. We'll take a break until 12

14  o'clock. We're going to have to take regular breaks. I've got

15  a court reporter, and I need to take regular breaks in order to

16  give all of us an opportunity to relax. 12 o'clock we'll

17  reconvene.

18          (A recess was taken from 11:13 a.m. to 12:05 p.m.)

19          THE COURT: All right. We'll continue now with

20  plaintiffs' first witness.

21          MR. SCHLICHTER: Yes, Your Honor, we'll call

22  Mr. John Sackie.

23                          - - -

24                  JOHN SACKIE,

25   being first duly sworn by the courtroom deputy, testified as

1 follows:

2         MR. SCHLICHTER: Before we begin, Your Honor, while

3 Mr. Sackie is being seated, I request that the court take

4 notice of the fact that at least our understanding is there is

5 a joint defense agreement between the two parties. I believe

6 that's something that under the federal rules, under federal

7 cases goes to bias of witnesses. And, without producing the

8 document, we believe that should be acknowledged because it's

9 pertinent.

10         THE COURT: Is there a joint defense agreement,

11 Mr. Oppenheimer?

12         MR. OPPENHEIMER: Your Honor, there is not a written

13 defense agreement.

14         THE COURT: Is there an oral agreement?

15         MR. OPPENHEIMER: There is, Your Honor.

16         THE COURT: I'll take judicial notice of the oral

17 agreement. You may proceed.

18         MR. SCHLICHTER: Thank you, Your Honor.

19                        - - -

20                 DIRECT EXAMINATION

21 By Mr. Schlichter:

22 Q. State your name, please, sir.

23 A. John Sackie.

24 Q. Mr. Sackie, you're not currently employed by ABB; is

25 that correct?

1   A.      That's correct.

2   Q.      But at one time you were?

3   A.      Yes, I was.

4   Q.      And can you tell us what the duration of that

5   employment was?

6   A.      I worked for a predecessor company of ABB beginning in

7   1985, and I retired in 2004.

8   Q.      All right.  And after you no longer worked for the

9   predecessor company, when did you go to work for -- did you say

10  for ABB?

11  A.      ABB acquired Combustion Engineering, the company I

12  worked for in, 1990.

13  Q.      And in what capacity did you begin with your employment

14  there at ABB?

15  A.      At ABB I was director of employee benefits.

16  Q.      And as director of employee benefits, it's fair to say,

17  is it not, that you were over the health and welfare, DB, DC

18  plans in general?

19  A.      I had responsible for those plans, responsibility for

20  those plans, yes.

21  Q.      And did you remain in that capacity, or did your

22  capacity change?

23  A.      My title changed.

24  Q.      What did it become?

25  A.      It became vice-president of employee benefits.

1   Q.      And as vice-president of employee benefits, you did

2  have responsibility, you oversaw all ABB employee benefits,

3  including the DC plans, that is, the PRISM, 401(k) plans, as

4  well as the corporate plans; is that correct?

5  A.      I'm not sure what you mean by corporate plans.

6  Q.      The DB, health and welfare, payroll, and so on?

7  A.      Yes.

8  Q.      Now, you also had people, investment people who worked

9  for you in reviewing investment options for the plan, did you

10  not?

11  A.      I did not.

12  Q.      Okay.  Do you recall when your deposition was taken?

13  A.      I think it was September of 2008.

14  Q.      Yes, September 17, 2008, in New York, New York City,

15  page 20, line 22.  Do you recall this question as it relates to

16  what I'll refer to generally as the defined contribution plans?

17         (Quoted as read.)  "What were your responsibilities

18  as vice-president of human resource services?"

19  A.      Is it possible for me to see something?  Is it going to

20  come on the screen or something?

21  Q.      This one I will read, but if you want to verify it,

22  I'll show it to you when we get to your answer.

23  A.      Okay.  Thank you.

24  Q.      Your answer, according to page 21, line 2, says,

25  (quoted as read) "I was responsible for people who reported to

1  me who were responsible for working with the record keeper on

2  the day-to-day administration of the plan.  And I worked with

3  the investment people, or actually they did work for me on

4  reviewing the investment options offered in the plan.  The

5  overall responsibility for the plan, communications,

6  administration."

7  A.      May I take a look at that?

8  Q.      Sure.  Did you give those answers is my question.

9  A.      I'd like to take a look at it.

10         MR. SCHLICHTER:  May I approach the witness, Your

11 Honor?

12         THE COURT:  You may.

13         THE WITNESS:  Thank you.

14 A.      When I commented they did work for me, I didn't mean

15 they reported to me, I meant that they performed tasks as part

16 of the oversight of the, and development of the ABB benefit

17 programs.  They did not report to me.

18 BY MR. SCHLICHTER:

19 Q.      Well, so that it's clear, you had a role, then, in the

20 investment options, did you not, whether they worked for you or

21 worked with you?

22 A.      I had a role.  I had overall responsibility for the

23 defined contribution plans, PRISM.  Part of that responsibility

24 meant I had to be aware of what investment options were being

25 considered for addition to the plan.

1 Q.      As you said in the -- whether they worked for you or

2 worked with you, you said the task was in reviewing the

3 investment options offered in the plan.  You did that, right?

4 A.      I did not do that.  I did not personally review the --

5 you see, again, there is a difference here.  The Pension and

6 Thrift Management group was responsible for reviewing the

7 universe of mutual fund options that could have been offered in

8 the plan.  That group, that Pension and Thrift Management group

9 was also responsible for going through, deselecting, and

10 ultimately coming up with a list of recommendations.

11 Q.      Well, then, if you had no role in reviewing the

12 investment options offered in the plan, Mr. Sackie --

13 A.      If I could just finish.

14 Q.      Sure.

15 A.      What I did is I reviewed the results of their analysis

16 to make sure I understood what they went through.  I didn't

17 actually do the review.  I reviewed the results that they were

18 getting ready to present to the Pension Review Committee.

19 Q.      Okay.  In any event, you had responsibility, then, for

20 overseeing the review of investment options in the plan, right?

21 A.      No, I did not.  I mean, ultimately, I was -- I

22 participated in the Pension Review Committee meetings where the

23 recommendations were made and the committee voted on those

24 recommendations.  Since I had overall responsibility for the

25 plan, ultimately once the options were chosen, then I guess I

1    had responsibility for those.

2    Q.      All right.  By overall responsibility for the plan, I

3    don't want to belabor the point.

4    A.      Okay.

5    Q.      The buck stops with you at the end of the day, doesn't

6    it, in terms of what the plan looks like, what's in it?

7    A.      What the plan looks like?  Yeah, sure.

8    Q.      Okay.  So however you get there, those investment

9    options ultimately you have overall responsibility for?

10   A.      For the administration of the plan, once those options

11   are approved for inclusion in the plan.  I did not have

12   responsibility for presenting, for example, the options that

13   were to be added to the plan to the Pension Review Committee,

14   and they had responsibility for approving or not approving

15   them.

16   Q.      And if you saw something you didn't like or didn't

17   approve of for whatever reason, Mr. Sackie, in this overall

18   review of investment options offered in the plan, you then

19   would take some action to correct that, I assume?

20   A.      It never happened.

21   Q.      You agree with everything that was done?

22   A.      I agreed with the analysis that was done.

23   Q.      Now, referring you to P1327 which is a notice of your

24   deposition, is it correct to say that -- I'll just put it on

25   the screen.

1  A.    Okay.

2        MR. ORTELERE:  Your Honor, if Mr. Sackie prefers,

3  may he be provided a hard copy of the document?

4        THE COURT:  Do you have a copy of it?

5        MR. ORTELERE:  I assume plaintiffs' counsel has it.

6        MR. SCHLICHTER:  We do.  If you would like a hard

7  copy, we can bring one up.

8        THE WITNESS:  Thank you.

9        MR. SCHLICHTER:  We're going to put it up on the

10  screen anyway.

11        COURTROOM DEPUTY:  What is that Exhibit number?

12        MR. SCHLICHTER:  P1327.

13        THE COURT:  Let's talk about how these exhibits are

14  going to come into the record.  Are we going to go through, I

15  offer up Plaintiffs' Exhibit 1327, or how do we plan to do

16  that?  Have you reached an agreement as to what is admissible

17  and what's not admissible?

18        MR. SCHLICHTER:  We have reached an agreement, as I

19  informed you yesterday, Your Honor, on quite a number of what I

20  would call foundation types of documents.  We have

21  disagreements on some other documents that are not foundation.

22        THE COURT:  What's an expeditious way that we can

23  simply get this stuff in the record without having to go

24  through and --

25        MR. SCHLICHTER:  What we would suggest is at the end

1  of a witness's testimony to offer the documents.

2  THE COURT:  Okay.  And I assume that if somebody is

3  offering and talking about a document that there's an objection

4  to, I will hear about it.

5  MR. ORTELERE:  Without a doubt, Your Honor.

6  THE COURT:  Okay.  And that time will be allocated

7  to that person who raises the objection.

8  MR. SCHLICHTER:  Okay.

9  BY MR. SCHLICHTER:

10  Q.  Mr. Sackie, take a look at the exhibit that you have in

11  front of you, paragraph 3, which was a designation of you as a

12  corporate designee speaking for the corporation on behalf of --

13  I think I figured out -- I thought I figured out how

14  to zoom this, but maybe I didn't.  Yeah, I did.

15  Paragraph 3, you were designated as a corporate

16  designee, were you not, to speak to the payment, review,

17  discussion, consideration, and so on, of comparison,

18  benchmarking, analysis, decision making process regarding

19  and/or for the fees and expenses and reasonableness of same,

20  including, but not limited to, the administrative and

21  investment fees borne by ABB -- skipping some of the

22  language -- whether directly, invoiced and/or per participant,

23  or through revenue sharing, soft dollar costs, and trading

24  costs.  This includes the return of and/or sharing of any fees,

25  expenses, rebates, credits or the like to Fidelity, ABB, the

1  plans, and/or any other third party.   Right?

2   A.      That's what this says, but I don't know that I was the

3  corporate designee.

4   Q.      I'm sorry.   That's a legal term.   But you understood

5  when your deposition was taken that you were speaking as the

6  corporate representative of those matters, did you not?

7   A.      I have to say no because I don't think that I would be

8  designated to discuss investment fees.

9   Q.      Well, you were, so -- and you spoke about them in your

10  deposition, didn't you?

11   A.      I can speak to them, but I wasn't responsible for them.

12   Q.      Now, if you also look at No. 14 in that same document,

13  you were also designated in that pleading to speak as the

14  corporate representative on the review, analysis, discussion,

15  and decision making process regarding the performance of

16  Fidelity providing services to and/or for ABB and/or the plans,

17  including, but not limited to, Fidelity fund reviews, service

18  reviews, investment reviews, scorecards, ratings, and GAP

19  analyses.

20          Do you believe you were knowledgeable about those

21  items when you were designated by the company to speak on

22  those?

23   A.      Is this a complete summary of what I was designated to

24  discuss?  Everything on this document?

25   Q.      This is the 30(b)(6) notice, those two items is all I'm

1 asking.

2         MR. ORTELERE:  Just for clarification, the document

3 bears Mr. Cutler's name, and I think the witness's confusion is

4 well grounded.  There's been no foundation that he was the

5 designee for any of these topics.

6         THE COURT:  I'm sorry.  Where do you see Cutler?

7         MR. ORTELERE:  The exhibit stamp on the first page

8 of the document, at least the copy I was given by plaintiffs'

9 counsel, says Cutler 1.

10         MR. SCHLICHTER:  That's a deposition exhibit

11 sticker.  It's not designating Mr. Cutler.

12         THE COURT:  Where does it say on the document that

13 the document designated that this was the corporate designee?

14         MR. SCHLICHTER:  First page of the document in a

15 notice, in accordance with Rule 30(b)(6), the defendant's

16 designee should be fully knowledgeable of the matters --

17         THE COURT:  How do I know he's the one who was

18 designated as opposed to Cutler or somebody else?

19         MR. SCHLICHTER:  I believe, Your Honor, there was a

20 discussion of that, if you give me a moment.

21         THE COURT:  This is the kind of thing that's a waste

22 of time to fight about.  If it turns out, in fact, he was the

23 corporate designee, that's irritating that we're talking about

24 it.  On the other hand, if he wasn't the corporate designee,

25 it's really relevant.

1          MR. SCHLICHTER:   Page 8, I believe, in 17 through

2    23.    Page 8, the intent was to provide the witness with copy of

3    30(b)(6) notices for ABB Pension Review Committee, Employee

4    Benefits Committee.   And then Mr. Sackie in line 17, the

5    30(b)(6) depositions have various topics, my understanding you

6    are here to speak today with respect to various topics, and we

7    included in that the paragraphs named there, which include No.

8    3 and No. 14 on page 8 of the deposition.   I can show you that

9    language here, Your Honor.

10          And I agree that this is taking up a lot of --

11          MR. ORTELERE:   My point is the document was marked

12    in Mr. Cutler's deposition.

13          THE COURT:   That's irrelevant.   Is he the designee

14    or is he not?   Do you agree that he's the designee for that

15    deposition that he's just put in front of me?

16          MR. ORTELERE:   No, Your Honor.   My point is that it

17    could be different paragraphs from a different document.   And

18    I'm not sure, but this document was not used in Mr. Sackie's

19    deposition.

20          MR. SCHLICHTER:   This is Mr. Sackie's deposition.

21    This is the question of Mr. Sackie, these topics, these

22    specific numbers are identified.   I asked him about No. 3, Your

23    Honor, and I asked him about No. 14, and he said yes.

24          THE COURT:   I think his point is that maybe this

25    document isn't the No. 3 and the No. 14.

1          MR. ORTELERE: I don't know, Your Honor.

2          THE WITNESS: If you look at item No. 5, I don't

3    even know what that is.

4          THE COURT: We're not talking about item No. 5.

5          THE WITNESS: I'm sorry, Your Honor.

6          THE COURT: Just look at the ones that are

7    specifically identified.

8          THE WITNESS: I thought they all were mine.

9          THE COURT: It's irrelevant whether they're all

10   yours or not.

11         MR. ORTELERE: You Honor, Fidelity's counsel gave me

12   Mr. Sackie's notice, and I'm willing to share it with

13   plaintiffs' counsel. Paragraphs look similar, though I haven't

14   read them.

15         MR. SCHLICHTER: There's one corporate designee

16   notice that's the same. If you want me to put it up there,

17   I'll put it up there. But I agree with the court it's

18   something that's a waste of time, but I'll put it up.

19   BY MR. SCHLICHTER:

20   Q.    We agree that you said you are speaking as to 3 and 14,

21   among others; do you not agree with that, Mr. Sackie?

22   A.    Yes, I agree with that.

23   Q.    You said that. And now I've been handed what your

24   counsel says is the notice, which is the same notice, I submit.

25         Here is paragraph 3, the payment, review,

1  discussion, monitoring, et cetera, et cetera.  Do you know

2  agree that that was the subject of your deposition notice,

3  speaking on behalf of the corporation, the same thing we just

4  read?

5  A.      That's what it says.

6  Q.      No. 14, also.  The review, analysis, discussion, and

7  decision making process regarding performance, as said before?

8  A.      Uh-huh.

9  Q.      Do we now agree that you were designated by the

10 corporation to speak on behalf of these topics?

11 A.      Yes.

12 Q.      Thank you.  Now, as the vice-president of human

13 resources, I think it was originally called vice-president of

14 employee benefits and then later vice-president of human

15 resources; is that correct?

16 A.      Vice-president of human resources services, so slightly

17 different but --

18 Q.      Yes.  You also had responsibility for the overall

19 handling of the payroll, health and welfare, and defined

20 benefit plans, did you not?

21 A.      Yes, I did.

22 Q.      And a number of individuals reported to you in that

23 regard, including Mr. Scarpa who will be here tomorrow; is that

24 correct?

25 A.      Yes, Mike Scarpa did report to me.

1  Q.      And eventually when you retired, he took your position;

2  is that fair to say?

3  A.      That's correct.

4  Q.      Now, what is the restoration plan?

5  A.      Okay.  The restoration plan.  I forget what year the

6  legislation changed, but the restoration plan was --

7  legislation was passed that limited the amount of pay or

8  compensation that one could accrue a benefit in a 401(k) plan

9  like PRISM or a defined benefit pension plan like our cash

10 balance plan.  And what that means is in the 401(k) plan, you

11 can only contribute to that plan and receive a company match to

12 that plan based on your pay up to a certain limit.

13         Now, for certain highly compensated employees, that

14 was a reduction in the benefit.  So ABB, like most, if not all

15 large employers, developed the restoration plan.  The

16 restoration plan for the PRISM Plan was designed to continue to

17 provide in a non-qualified plan outside of the qualified PRISM

18 Plan the benefit that you would have earned under the qualified

19 plan, but for the fact that you have now reached this limiting

20 compensation amount.

21 Q.      In other words, it's a plan provided to ABB employees,

22 highly compensated employees whose compensation exceeded the

23 limits set by the law, right?

24 A.      I believe that's what I said, yes.

25 Q.      And since at least '95, there were participants in that

1  restoration plan?

2  A.      Again, I don't remember exactly when that plan went in,

3  but from the point that plan went in, people whose compensation

4  exceeded the limit participated in that plan.

5  Q.      In fact, you were a member of the restoration plan,

6  were you not?

7  A.      Yes, I was.

8  Q.      Are you aware of any fees ever being charged to that

9  plan for the highly compensated employees?

10  A.      I fully expect that fees were charged for that plan.

11  Q.      Why do you expect it?  It costs money?

12  A.      We never asked for anything for free.

13  Q.      Who is the we you're talking about?

14  A.      Okay.  I never ask for anything for free.

15  Q.      Certainly there's a cost to running that plan, just

16  like any other plan, right?

17  A.      Yes.

18  Q.      And because there's a cost, you would expect the plan,

19  the company to pay for that, those plan services, right?

20  A.      Right.

21  Q.      You wouldn't expect members of the PRISM Plan, plans to

22  pay for services for the restoration plan, would you?

23  A.      No, never.

24  Q.      Did you ever look or inquire as the head of benefits

25  into whether the restoration plan was, it was paying any fees,

1  Mr. Sackie?

2  A.      I'm sorry.  Did I look to see if the restoration plan

3  was paying fees?

4  Q.      Yes.

5  A.      I expect that it did pay fees.  I don't recall.  I just

6  don't recall.  I assume we did.

7  Q.      Well, you assume but you never looked into it as the

8  person in charge of all plans?

9  A.      I'm sure we asked for a quote as to what the cost would

10  be for it, and I assume we were billed appropriately.

11  Q.      But you never satisfied yourself about what the

12  arrangements were?

13  A.      I really wasn't responsible for receiving, reviewing,

14  and paying the bills.

15  Q.      How many employees were in that restoration plan of

16  highly compensated employees?

17  A.      I don't recall.

18  Q.      I'm going to hand you or show you on the screen what's

19  been marked as P192.  And ask that you take a look at that.

20  I'm sorry.  Got to get the technology here, Your Honor.  I

21  think we've got it.

22  A.      Is this the entire document or just a portion of it?

23  Q.      This is a portion because others were redacted by ABB.

24          This document has been discussed and has to do with

25  the PRISM Plans.  I'm sorry.  This discusses the two committees

1  composed of the Employee Benefits Committee, and then there's

2  another committee, the PRC committee, the Pension Review

3  Committee, right?

4  A.      Yes.

5  Q.      And the, in fact, the company ABB itself, the board of

6  directors of ABB delegated authority to the committees and

7  specifically to the EBC, the Employee Benefits Committee, but

8  its authority would not extend to the matters that, or actions

9  more than $500,000 or that involve a plan that primarily

10  benefits senior management.  Do you see that sentence?

11  A.      Yes.

12  Q.      And, again, this is a redacted version.  This is a

13  board of directors meeting minutes document that was produced

14  to us.  Are you aware that the board of directors in its

15  delegation of authority to the fiduciary committees retained

16  authority for matters over a half a million dollars and

17  retained authority over the handling of the restoration plan

18  for the most senior or most highly compensated executives?

19          MR. ORTELERE:  Objection, Your Honor.  That was a

20  multi-layered, compound question that assumes certain facts

21  that haven't been related to Mr. Sackie with regard to the

22  document.

23  BY MR. SCHLICHTER:

24  Q.      I'll ask another question to save time.  Are you aware

25  of the sentence that we just read?

1   A.     The sentence that says the authority would not

2 extend -- that sentence?

3   Q.     Yes, were you aware of it at the time you were with

4 ABB?

5   A.     Yes.

6   Q.     So you knew that the board of directors retained

7 authority and did not delegate it to the committees over the

8 handling of the, what we'll call the non-qualified plans, which

9 is the restoration plan and later another one?

10   A.     I have to admit, it's not clear to me what is meant by

11 senior management. Is there a date on this document? I'm not

12 so sure that anybody whose compensation exceeded the legal

13 limit would by definition be considered senior management, as

14 opposed to something that says, you know, the top five

15 employees of a company being senior management or those

16 reporting directly to the CEO. I'm not clear on that.

17   Q.     As the former director of benefits, you're not aware of

18 any other plans, are you, besides these non-qualified plans

19 that were available for people who were senior management?

20   A.     Not exclusively.

21   Q.     Now, the back of that document, second page of that

22 document specifically says that the members of the PRC are

23 appointed by the president of the company in consultation with

24 the board of directors of the company. That's the remaining

25 part of that meeting minutes. Do you see that?

1    A.      Yes, I do.

2    Q.      And, again, the resolution there, which is formal board

3    authorization for these committees being set up, says the same

4    language as we talked about before, the resolution says that

5    the Employee Benefits Committee is not authorized to take

6    actions for matters over 500,000 or involving senior

7    management, right?  Is that right?

8    A.      Yes.

9    Q.      Now, you were a member of the EBC, were you not, the

10   Employee Benefits Committee?

11   A.      For a time I was, yes.

12   Q.      And the EBC had as its purpose, among other things, to

13   approve and adopt plan amendments, did it not?

14   A.      Yes, it did.

15   Q.      The PRC was responsible for overseeing and making

16   determinations with respect to assets in all the retirement

17   plans, including investment managers, correct?

18   A.      Correct.

19   Q.      And the board of directors which had the authority that

20   was set forth there, then retained that authority during the

21   time you were there so that it approved large contracts above

22   500,000 or plan matters involving senior management plans, the

23   non-qualified plans.

24   A.      Yes, $500,000 of annual cost, yes.

25   Q.      So in other words, ABB itself never delegated any

1  fiduciary authority in the way that the restriction we just

2  described produced.

3         THE COURT:  Say that again.

4         MR. SCHLICHTER:  I'm sorry.  That was a confusing

5  question.

6  Q.     ABB, in other words, its board, retained authority as a

7  fiduciary for these matters that we've just discussed that were

8  not delegated.

9  A.     They retained authority to make decisions on matters as

10 described in the paragraph.

11 Q.     And all contracts or agreements approved by the

12 committees in the areas that were delegated were required to be

13 signed by an officer of the company, correct?

14 A.     That's correct.

15 Q.     In many cases, if not most cases, that was you, wasn't

16 it?

17 A.     In many cases I acted on behalf of the company, who was

18 the plan sponsor, and signed the document.

19 Q.     And that would be true from what years?

20 A.     Oh, boy.  I don't remember the exact years.  From 2004

21 back to when I became vice-president in human resources

22 services, '99?

23 Q.     Now, we said before that Mike Scarpa worked for you.

24 You said that.

25 A.     Yes, he did.

1  Q.      And he handled day-to-day administration matters of the

2  plan, among other things?

3  A.      Yes.  I want to point out, Mike, when I retired, he did

4  replace me, but he did not replace me in the capacity as

5  vice-president of human resources services.  Mike replaced me

6  as the individual responsible for the oversight of the ABB

7  benefit programs only.

8  Q.      Who is Jeff Halsey?

9  A.      Jeff Halsey was my boss.

10  Q.      And he was on the Pension Review Committee, the PRC,

11  was he not?

12  A.      Yes, he was.

13  Q.      Now, it's accurate, is it not, that you and members of

14  the pension -- strike that.

15          Let's talk about Pension Thrift Management.  There's

16  something else called Pension Thrift Management that existed,

17  right?

18  A.      That's a department, Pension and Thrift Management.  It

19  was a department within the treasury function of ABB.

20  Q.      And Pension and Thrift Management was the staff for the

21  PRC, correct?

22  A.      They were the department responsible for reviewing,

23  selecting investment options, oversight of the investment of

24  the pension assets, ongoing review of mutual funds in the

25  401(k) plan.  That was the Pension and Thrift Management

1    department's responsibility.

2    Q.      Now, you and those Pension Thrift Management people

3    together were responsible for contract negotiations with

4    service providers to the plans, including the fees that were

5    charged, were you not?

6    A.      They weren't really responsible.  I signed those

7    documents.

8    Q.      Okay.  You were responsible for negotiations with

9    service providers, including fees, right?

10   A.      Fees from service providers.  And I want to make sure

11   that we differentiate that a record keeper is a service

12   provider.  In my world a mutual fund was not a service

13   provider.

14   Q.      What do you mean, in your world?

15   A.      I was not responsible for negotiating or selecting the

16   investment options.  The Pension and Thrift Management group

17   did not report to me.  They reported up to the treasury

18   function is what I'm trying to get at.

19   Q.      Let's refer to P197, which is a presentation to the

20   Pension Review Committee dated June 27, 2005.  And I want to go

21   through some foundation items with you here.

22           THE COURT:  Could I interrupt just one moment?  So

23   who was responsible for making the choice?

24           THE WITNESS:  The Pension and Thrift Management

25   group, Your Honor, was part of the treasury function within

1  ABB; as opposed to me, I was part of the human resources

2  function.

3          THE COURT:   So who was responsible, the treasury?

4          THE WITNESS:   Yeah, the Pension Review Committee.

5  They made these recommendations to the Pension Review

6  Committee, the Pension Review Committee had the responsibility

7  for saying yes or no.

8          THE COURT:   Okay.

9  BY MR. SCHLICHTER:

10 Q.      Speaking of the Pension Review Committee, referring you

11 to this document P197 dated June 27, 2007, I want to ask you

12 some questions.

13 A.      Is it possible again for me to see a copy of that?

14 Q.      Sure.   Take a look at page 409 -- I'm sorry, document

15 No. APP 409.

16 A.      I just want to ask, does it make any difference that

17 this document was prepared after I retired?

18 Q.      That's what, I wanted to ask you one other question

19 about that.   This defines the way ABB handles things, and I

20 want to ask you if this is the way things were handled while

21 you were there.   So if you look at page 9 of this document, it

22 describes fiduciary.   And in that description --

23 A.      I'm sorry.   I'll be there in one second.   You're asking

24 me if this is the way meetings were run while I was there.   I

25 want to get a handle on exactly how this entire meeting was

1   being run.

2   Q.      I'm not asking you about how the meeting was run.   The

3   questions I'm going to ask you, Mr. Sackie, have to do with the

4   way ABB looked at the role of fiduciary and other things.

5   A.      No. 9 as in 409?

6   Q.      It's 409 in one numbering system and 9 just on the page

7   number.

8   A.      I've got it, I've got it.   Yeah, yeah.

9   Q.      And that defines in broad terms the role of a

10  fiduciary, who is a fiduciary.   You see that, right?

11  A.      Yes.

12  Q.      And among the definitions, among the types of roles as

13  a fiduciary, it describes in paragraph C, (quoted as read) "A

14  person who renders investment advice for a fee or other

15  compensation, direct or indirect, with respect to plan assets

16  or has authority or responsibility to do so."

17          Isn't that a common understanding that you operated

18  on in your time with ABB as to what constitutes a fiduciary in

19  terms of operating on-the-ground practices?

20  A.      Yeah.

21  Q.      And if you turn three pages forward to, I guess it's

22  two pages forward to fiduciary conduct standard, you agree, do

23  you not, Mr. Sackie, that you operated -- the standard under

24  which you and others at ABB operated was that a fiduciary must

25  discharge its duties with respect to the plan solely in the

1  interests of participants and beneficiaries, duty of loyalty?

2  A.      Yes.

3  Q.      And for the exclusive purpose of providing benefits and

4  defraying reasonable plan administration expenses?

5  A.      Yes.

6  Q.      (Quoted as read.)  "And with the care, skill, prudence,

7  and diligence under the circumstances then prevailing that a

8  prudent person acting in a like capacity and familiar with such

9  matters would use in the conduct of an enterprise of a like

10 character and with like aims.  Prudence rule."

11 A.      Was that a question?

12 Q.      Yes.  Do you agree that that's the standard of

13 operation of clients that you dealt with in your role and as

14 far as you understood everybody was supposed to be dealing with

15 in their role in the ABB PRISM Plans?

16         MR. ORTELERE:  Your Honor, I object.  To say that

17 everybody in the company acted --

18         THE COURT:  I'll sustain.

19 BY MR. SCHLICHTER:

20 Q.      You and the people running these plans, the 401(k)

21 plans.

22 A.      Yes.

23 Q.      All right.  Now, let's go down a bit on the item C.

24 I'm sorry, yes, item C.  The prudence rule, a prudent person

25 acting in a like capacity and familiar with such matters.

1          You understood, Mr. Sackie, did you not, that that

2  meant -- and that's commonly referred to as the standard of a

3  prudent expert in finance.

4  A.      I know it as the prudent man theory, yes.

5  Q.      Okay.  So you wouldn't disagree, would you, that as

6  head of the overall plans, it would be your, and approving

7  these investment reviews, it would be your responsibility,

8  among others, to be familiar with industry practices and things

9  of that nature?

10          MR. ORTELERE:  Objection, Your Honor, the question

11  assumes that he approved the investment options, which he's

12  previously testified he didn't play a role in.

13          THE COURT:  I'll overrule the objection.  We're

14  talking about reviewing and approval.

15  A.      Okay.  I was not responsible for investment reviews.  I

16  didn't even participate in investment reviews.  These are

17  ongoing meetings between the Pension and Thrift Management

18  group and the Pension Review Committee.

19          For example, they would review the performance of

20  the managers that were managing the pension assets.  I didn't

21  participate in those meetings.

22  Q.      Well, maybe I'm misunderstanding something, Mr. Sackie.

23  But didn't you hold yourself as the head of ABB's PRISM Plans

24  and vice-president of benefits to a standard of knowing

25  industry practices in terms of plans and assets and things like

1  this?

2  A.       We as a company held ourselves to that standard.   And

3  there are, were individuals charged with that responsibility,

4  and I relied on them.   In this case, the pension thrift and --

5  Pension Thrift Management Group.

6  Q.       Well, let's ask it this way.

7  A.       Okay.

8  Q.       In the investment world, whether you're reviewing a

9  particular manager or whatever, you know and you knew when you

10 were at ABB that size matters, didn't you?  How big your

11 assets --

12 A.       Matters in regard to what?

13 Q.       Fees.   If you control a large number of assets, you can

14 get better prices than somebody off the street who has got $500

15 to invest.   You knew that, didn't you?

16 A.       What I focussed on was, you know, when we talk about

17 PRISM, we have to draw -- and this is kind of a problem I'm

18 having generally.   There are two separate types of fees.   And I

19 feel like I'm being asked to address them as though they were

20 one.   You bring up PRISM.   PRISM had a record keeping or a hard

21 dollar fee.   That was my responsibility, and that's what I was

22 involved in negotiating and managing.

23          In addition to that, in a 401(k) plan, there are

24 fees associated with investment management, administrative

25 work, the expense ratios that were talked about earlier today.

1    That was not what I was responsible for reviewing and

2    evaluating.   That is a good example of something I relied on

3    others to do.

4    Q.      All right.  Let's talk right now only about the area

5    where you say you had responsibility or even knowledge,

6    administrative fees.

7    A.      The record keeping fee, the hard dollar record keeping

8    fees.

9    Q.      Record keeping fees?

10   A.      Uh-huh.

11   Q.      Well, with regard to record keeping fees, if that's

12   your area of responsibility, there actually are two ways those

13   are charged in the industry, right?  Those being, A, hard

14   dollar or, B, soft dollar?

15   A.      I'm not -- you would have to define what you mean by

16   soft dollar to me.

17   Q.      Through revenue sharing paid on asset-based charges for

18   investment vehicles.

19   A.      I do not consider investment management fees to be a

20   record keeping fee.  That's a fee for managing the assets in

21   the plan.   The record keeping fee is the fee that we pay to

22   enable, to do the day-to-day processing, updating accounts,

23   providing statements.

24           Now, within the company, in this case Fidelity, just

25   like it would be for T. Rowe Price or Vanguard or anybody else

1 that's in the record keeping business and the mutual fund

2 business, they have both sources of these fees and how they

3 decide to -- whether they decide to call them record keeping

4 fees or not, I don't know. My focus was on that flat dollar

5 pure record keeping fee.

6 Q. Well, if you assume for a moment with me, Mr. Sackie,

7 that Fidelity charges for record keeping on an asset-based

8 administrative charge, revenue sharing, then in order to be

9 familiar with record keeping fees, you have to understand how

10 they do that, don't you?

11 A. Well, over time as the hard dollar record keeping fees

12 were managed to zero in our case and the source of revenue for

13 a company like Fidelity became a function of the expense

14 ratios, then part of what they were getting was in their mind,

15 I guess, a record keeping fee. So their record keeping fee,

16 the administrative fee, the investment management fees were all

17 being covered now by the expense ratio.

18 Q. And I'm not clear what your position is. Is it your

19 position that that was then within your responsibility and you

20 knew something about it or that it wasn't and you didn't know

21 anything about it?

22 A. I was aware of it. I was aware of it. But, you know,

23 again, these are fees -- the hard dollar record keeping fee is

24 a fee that is charged to every single participant in the plan,

25 regardless of where or how that participant chooses to invest

1 their money. The expense ratio is charged only to those people

2 that choose to invest in a particular investment option. And

3 that could be a Fidelity fund, it could be a non-Fidelity fund.

4 Q. Well, let's go through what happened historically.

5 A. Okay.

6 Q. In 1995, you know that Hewitt was the record keeper for

7 these, for the Fidelity 401(k) plans, do you not?

8 A. That's correct, I do.

9 Q. And Hewitt, you also know, do you not, from your

10 knowledge and experience with investments and investment

11 managers, is not in the investment management business?

12 A. They are not. They are an HR consulting firm.

13 Q. They don't have mutual funds, they don't have

14 investment products and so on. They're what I would call a

15 pure record keeper in that regard; is that correct?

16 A. Back in -- prior to 1995, I would say yes. I don't

17 know how they're structured today.

18 Q. Okay. And there is a market, would you agree that --

19 since you were in charge, you admit you were in charge of hard

20 dollar record keeping fees, there's a market for record keepers

21 in the retirement 401(k) industry, isn't there?

22 A. Sure.

23 Q. And you can go out, it's a commodity service, isn't it?

24 A. Yes.

25 Q. By that I mean that it can be bid, it's easily looked

1    at and priced and you can get bids.

2    A.       Yes.

3    Q.       Hard dollar bids.  And you can, if you want to, or if

4    ABB wanted to, you can ask record keepers, three or four or

5    five record keepers to make bids on record keeping of ABB plans

6    on a hard dollar basis.

7    A.       Yes.

8    Q.       In fact, there was an RFP process in 1995 for record

9    keeping?

10   A.       Yes, there was.  The interesting point there, though,

11   is if we were paying, let's say Hewitt, a hard dollar record

12   keeping fee and our PRISM Plan looked exactly the way it does

13   today, exactly the way it does today with the only difference

14   being that instead of Fidelity being the record keeper, Hewitt

15   was the record keeper, but everybody was putting their money at

16   the same level in the same options as they are today, the

17   expense ratios would be the same because that's, the prospectus

18   outlines what the expense ratio is.  And the mutual fund

19   companies would keep that, it would be deducted from the return

20   realized by the participant.  And then in addition to that, we

21   would have to pay the hard dollar fee to Hewitt which, to me,

22   is an additional cost.

23   Q.       Unless, unless you recapture it through alliance

24   rebates, the revenue sharing, right?

25   A.       I'm not familiar with the rebate process.  I don't

1  think it's -- I'm not aware that it's a common process.

2  Q.      Well, we'll get to more about that in the investment

3  policy statement, Mr. Sackie.  But would you agree with me that

4  if that does occur that that reduces record keeping fees for

5  the participants?

6  A.      I'll look at the examples if you have them.

7  Q.      Well, I'm not giving a specific numerical example.  I'm

8  asking you in concept, in concept and in fact if there are

9  revenue sharing payments made to a record keeper, the record

10  keeper can rebate those back to the plan, crediting the plan

11  and its participants, right?

12  A.      I believe as uncommon as that is, it's possible.

13  Q.      Well, you just said you're not familiar with it.  How

14  do you know it's uncommon?

15  A.      No, no, no, no.  I said rebates.  I'm not familiar with

16  how rebates work, but I am familiar with the fact that as rare

17  as they are, rebates -- we had one rebate situation in the

18  PRISM Plan that I was aware of, maybe two.  T. Rowe Price.  And

19  that predates everything that we're talking about here.  That

20  is a legacy grandfathered provision between Combustion

21  Engineering or ABB and T. Rowe Price.

22  Q.      Well, if it's the case, Mr. Sackie, that many companies

23  won't rebate -- if that is the case, and I think you're saying

24  you're not sure, but you think it's rare, then shouldn't a plan

25  sponsor who is acting prudently, as you said you did, look at

1    an alternative investment vehicle other than mutual funds so

2    that there isn't an excessive revenue sharing payment that

3    isn't rebated to the plan?

4    A.      Again, I think there's a difference between revenue

5    sharing and rebates.   Revenue sharing is a common practice.

6          And, again, to use an example to describe revenue

7    sharing and the impact on the plan, if a non-Fidelity fund has

8    a 50 basis point expense ratio and, outside of any discussions

9    that ABB would be involved in, if Fidelity and that mutual fund

10   company have a discussion that says we, third-party record

11   keeper -- I'm sorry, third-party mutual fund company, will

12   share with you, Fidelity, 15, 25 basis points of that 50 basis

13   points that we're taking off the investment return, that is an

14   acknowledgment or an agreement between those two companies and

15   an acknowledgment on the part of the non-Fidelity mutual fund

16   that Fidelity is performing administrative work that, you know,

17   but for the fact that it was in this 401(k) plan they would

18   have to be doing themselves.

19         So the 50 basis points comes off of the individual's

20   return, and then there's some discussion about how that 50

21   basis points, how that outside mutual fund company is going to

22   allocate the, that 50 basis points with a record keeper that's

23   doing some of the administrative work for them.

24         A rebate is less common, but I guess it's similar.

25   This is money that is already being deducted from the return of

1   the individual.  And instead of it going to the record keeper,

2   maybe it's going to the plan sponsor.  But I just wanted to --

3   because I don't want to -- I need to be very clear, or I'd like

4   you to be very clear to me if you're talking about revenue

5   sharing or rebates.

6   Q.      Well, so that it's clear, first of all, there was some

7   discussion in the opening about preferred dividends, and the

8   point is that mutual funds have to charge everybody the same

9   expense ratio, right?

10  A.      Everybody that invests in that mutual fund, yes.

11  Q.      Yes.  However, rebates are treated differently, the

12  charge can be rebated, can rebate it back and, in fact, the IPS

13  of ABB -- we're going to talk about you helped develop --

14  required that ABB negotiate back those advance rebates.

15         MR. ORTELERE:  Objection, Your Honor.  That's about

16  seven questions rolled into one.

17  BY MR. SCHLICHTER:

18  Q.      I'll rephrase it.  The IPS of ABB required that rebates

19  be obtained back for the benefit of the plan from revenue

20  sharing payments, didn't it?

21  A.      I don't recall that.  I did not -- that's a document

22  that was prepared by the Pension and Thrift Management group.

23  Have I ever seen it?  Yes.  Was I actively involved in

24  preparing it?  No.  Did I review it prior to presentation to

25  the Pension Review Committee?  Yes.  But was I able to add that

1  level of expertise about investment?  No.  That was not my role

2  in that at all.

3  Q.     How many ways of making money are there for an, unlike

4  a pure record keeper, a mutual fund company such as Fidelity to

5  make money off of a 401(k) plan?

6  A.     I look at it as two ways.  Hard dollar fee and then the

7  expense ratio.

8  Q.     Well, if they're the record keeper, would your answer

9  be the same?

10  A.     Yes.  I'm sorry.  I answered that -- maybe I

11  misunderstood that question.  I answered that as though they

12  were the record keeper.  If they're just the mutual fund and

13  they're not the record keeper, they have one source of revenue

14  and that's the expense ratio.  If they're the record keeper and

15  they happen to offer some of the mutual funds in a 401(k) plan,

16  then for people who invest in their mutual funds, there would

17  be a second source of income, a hard dollar fee typically, and

18  the investment management fee or the expense ratio.

19  Q.     So the most you see is two ways of making money, if

20  they have their products in the plan, right?

21  A.     That's the way I looked at it.

22  Q.     In fact, Mr. Sackie, there are four ways that a mutual

23  fund company can make money on a 401(k) plan, aren't there?

24  A.     You're going to have to tell me what the other two are.

25  I'm sorry.

1  Q.      Hard dollar record keeping fees, which you raised?

2  A.      Uh-huh.

3  Q.      Soft dollar or revenue sharing payments for record

4  keeping fees, right?

5  A.      Okay.

6  Q.      That's two.  Third, outside mutual fund companies

7  sharing their revenue with the mutual fund record keeper,

8  that's three, right?

9  A.      Right.

10  Q.      And float, that is, handling the money that comes in

11  from contributions by the employer and the employee before it's

12  put into the investments and on the way out on the back end

13  when somebody wants to cash out or take some money out of their

14  401(k) plan.  That's four, isn't it?

15  A.      Yeah, I never dealt with the float issue.

16  Q.      Never thought about it?

17  A.      No.

18  Q.      Would you agree that that's another way, a fourth way a

19  mutual fund company could make money?

20  A.      I don't think it was the case in the ABB plan.

21  Q.      You don't think it was the case?

22  A.      No.

23  Q.      Was it because you didn't deal with it or because you

24  looked into it and they weren't doing it?

25  A.      No, because we would forward the money to Fidelity on

1  pay day, and that money would be invested immediately.

2  Q.      Are you familiar with what Miss Gentile said, a

3  Fidelity employee, about how Fidelity handled the ABB float?

4  A.      On PRISM?

5  Q.      Yes.

6  A.      No.

7  Q.      Now, mutual funds are not the only investment vehicle

8  in a 401(k) plan you can have, right?

9  A.      That's correct.

10  Q.      You can have -- particularly a large billion

11  dollar-plus fund, such as this became, has other options that

12  aren't available to us retail folks, right?

13  A.      I don't know if they're technically -- I consider --

14  are you talking about the institutional funds?

15  Q.      Well, yes, that's one of them.

16  A.      Yeah, they look and feel and smell like a mutual fund,

17  but they're not available to the general public.

18  Q.      Right.  Because you have to have a certain level of

19  assets invested, five million or something like that.

20  A.      That's correct.

21  Q.      And is it fair to say, Mr. Sackie, there's a hierarchy

22  of costs and fees associated with various investment vehicles.

23  At the very top is the retail mutual fund.  Okay?  Would you

24  agree that's the highest cost of product?

25  A.      I have no way of knowing that.  Again, this is why we

1    have a Pension and Thrift Management group.  This is why I

2    relied on the Pension and Thrift Management group.

3    Q.      All right.  You don't know the hierarchy of fees

4    between institutional, retail, separate accounts, commingled

5    funds?

6    A.      That's correct.

7    Q.      Let me show you a document which is P1358.  And if you

8    don't know anything about it, then we won't pursue it, but I

9    want to ask.  This is a fee study by the DOL dated April of

10   1998, Pension and Welfare Benefits Administration, which is the

11   department of the DOL that oversees 401(k) plans.

12            MR. ORTELERE:  Objection, Your Honor.  It's not a

13   DOL study.  The document says right on the front, some other

14   consulting group did something for the DOL.  It's not a DOL

15   study.

16            MR. SCHLICHTER:  It's the Pension and Welfare

17   Benefits Administration of the Department of Labor report,

18   study of 401(k) plan fees and expenses.  If they contracted it

19   out --

20   A.      Can you move it up?  It says submitted by -- I'm sorry.

21   Down.  Okay.  Yeah, I'm not familiar with this report.

22   BY MR. SCHLICHTER:

23   Q.      Okay.  This report does discuss in section 2.4.1.3

24   after discussing some prior mutual funds, it does say, does it

25   not, institutional mutual funds resemble retail funds.  And the

1   next paragraph, (quoted as read) "Institutional mutual funds

2   typically charge lower expense ratios than do retail funds with

3   similar holdings and risk characteristics.  One estimate is the

4   typical institutional fund has an expense ratio 50 basis points

5   lower than comparable retail funds."

6           MR. ORTELERE:  Again, Your Honor, I object.  The

7   document specifically says it doesn't represent the views of

8   the Department of Labor.

9           THE COURT:  Any objection to the admission of the

10  document?  Are you objecting to the admission of the document?

11          MR. ORTELERE:  I just object to the suggestion again

12  and again when the complete document is examined that this is

13  the work of the Department of Labor.

14          THE COURT:  Okay.  I'm familiar with what the

15  document says on the front page.  You may proceed.

16  BY MR. SCHLICHTER:

17  Q.      Do you agree that institutional mutual funds can offer

18  similar holdings as retail -- in fact, identical -- and risk

19  characteristics, yet charge 50 basis points lower than retail?

20  A.      I know they're less expensive.  I don't know what

21  they're, how much less expensive, though.

22  Q.      Okay.  And then in addition, so we've got retail up

23  here, we've got institutional, 50 basis points lower, and then

24  the next paragraph goes on to talk about another type of

25  vehicle called a commingled account.  Do you see that?

1   A.      I see that, yes.

2   Q.      And in this arrangement, without going through the

3   language here, essentially I believe you know because it's in

4   the IPS that you helped develop that commingled -- we'll get to

5   it.

6           Commingled accounts are basically institutional

7   products that are available to a large asset holder and whose

8   assets are combined with a few other large asset holdings,

9   typically by banks?

10          MR. ORTELERE:  Objection, Your Honor.  In the middle

11  of the question was the assertion that Mr. Sackie prepared the

12  investment policy statement.  He's repeatedly testified to the

13  contrary.  On top of that, there are probably four or five

14  parts of that question, and I think it's unfair to ask the

15  question in that manner.

16          THE COURT:  I'm going to sustain on compound

17  question.  I'm really aware of what this witness has said about

18  what he knows or he doesn't know.  If you keep objecting, it's

19  not going to make any difference because I'm not going to hold

20  him to what this attorney says, I'm holding him to what his

21  testimony is.  Go ahead.

22  BY MR. SCHLICHTER:

23  Q.      Do you agree that commingled accounts are available and

24  would be cheaper than institutional mutual funds, or is that

25  beyond your knowledge?

1    A.        It's beyond my knowledge.

2    Q.        I take it you also don't know what I said at the very

3    bottom of that, very large plans, last paragraph, can achieve

4    even greater investment management savings by establishing

5    separate accounts for the 401(k) assets and that the sponsor

6    can define its own objectives and also that they are

7    typically -- well, I don't want to compound the question.  You

8    don't know about that either, I take it?

9    A.        That's beyond my knowledge, as well.

10   Q.        I take it the fact that this study says total

11   investment management expenses can be reduced to one fourth of

12   the expenses of retail mutual funds for very large asset

13   holders, typically plans with assets over 500 million, that

14   would be beyond your knowledge as well, I take it?

15   A.        Yes.

16   Q.        Who should know that from ABB?

17   A.        I would think somebody from the Pension and Thrift

18   Management group would be familiar with that.

19   Q.        Now, going back to the exhibit that we were discussing,

20   the Pension Review Committee presentation, if you take a look

21   at, I believe it's paragraph, or page APP 420, which is

22   corresponding page 20, the last page of that document, that

23   says that part of what should be done is to review the process

24   for documenting and retaining committee decisions.  Do you see

25   that?

1   A.      Yes, I do.

2   Q.      And review document requirements.   Do you see that?

3   A.      Yes.

4   Q.      In fact, are you aware that ABB had and currently has

5   no document retention policy?

6   A.      Throughout the company or in relation to --

7   Q.      The PRISM Plan.

8   A.      I'm not aware of that.

9   Q.      So do you agree that, as the document says, the Pension

10  Review Committee had, as a named fiduciary had responsibility

11  for appointing the trustee?

12  A.      Yes.

13  Q.      Which is FMTC, right, in the case of the PRISM Plans?

14  A.      I know them as Fidelity.

15  Q.      Okay.   They didn't differentiate with you?

16  A.      Well, they may have, but I didn't let the

17  organizational structure get in the way of my understanding of

18  who I was working with.

19  Q.      All right.   And the pension -- again, on page 10 of

20  that document, the Pension Review Committee has responsibility

21  also for controlling and managing the investment of the assets

22  of the plan, correct?

23  A.      Just give me one second.   Yes.

24  Q.      And under that, for discretionary appointment of one or

25  more investment managers, correct?

1    A.     Correct.

2    Q.     Now, let's -- we mentioned the IPS.  Let's talk about

3    that, the investment policy statement.  Going to refer you to

4    the document No. 447, P447.  P447 is the Pension Review

5    Committee meeting minutes from May 23, 2000.

6    A.     Okay.

7    Q.     All right.  Do you have it?  Okay.  And if you look at

8    that, at that meeting, you and Mr. Cutler were both present,

9    right?

10    A.     Yes.

11    Q.     If you turn to the next page of that, the fourth full

12    paragraph after the redaction, it says -- I'm sorry.  Make it

13    the fifth full paragraph.

14           (Quoted as read.)  It says, "Mr. Cutler then

15    summarized the four-tiered investment strategy that he and

16    Mr. Sackie are recommending as part of the PRISM Plans

17    investment policy."  Do you see that?

18    A.     Yes, I do.

19    Q.     That's the IPS, the investment policy statement, isn't

20    it?

21    A.     Right, uh-huh.

22    Q.     That was developed in 2000, and it was something that

23    you and Mr. Sackie recommended?

24    A.     It was something that me and Mr. Cutler --

25    Q.     I'm sorry.  I said Sackie.

1    A.      Developed by Mr. Cutler.  And as you asked me before, I

2    had no problems with what he had put together.  So we went

3    together to the Pension Review Committee for approval.

4    Q.      Yes.  And at the very top it says Mr. Cutler introduced

5    the topic of a PRISM Plan investment policy statement, doesn't

6    it?

7    A.      Yes, it does.

8    Q.      And at that time the committee approved the investment

9    policy statement, didn't it?

10   A.      I'm sorry.  Can you repeat that?

11   Q.      At that time the committee approved an investment

12   policy statement, the one that you and Mr. Cutler recommended.

13   It's at the very bottom of the page, 696.  I'll put it on the

14   screen.

15   A.      I've got it.  Yes, they did.

16   Q.      Continues on the next page.

17   A.      Uh-huh.

18   Q.      Voted to approve the ABB PRISM Plan investment policy?

19   A.      Correct.

20   Q.      Now, that investment policy, a draft of which is 11/27,

21   2000, and is Exhibit No. P20 -- I'm going to show you.  And

22   this is the document that's to guide the investments in the

23   PRISM Plans, right?

24   A.      That's what it appears to be.

25   Q.      And did you operate under the understanding,

1  Mr. Sackie, that ERISA requires that the investment policy

2  statement be filed or it is a, per se, violation?

3  A.    I am aware that ERISA required that a policy exist and

4  that if a policy exists, it was followed.

5  Q.    Now, he had mutual funds in the fund.  But if you look

6  at bullet point 3, it specifically says the policy is to use

7  readily available mutual funds and institutional commingled

8  funds.  Do you see that?

9  A.    Bear with me one second.

10  Q.    If you look on the screen, I've got it marked.

11  A.    Yeah, I have it.

12  Q.    Paragraph 3, bullet point 3?

13  A.    Yes.

14  Q.    So the size of this plan -- we're going to get to the

15  size and establish how it grew, but the size of this plan was

16  plenty big to be able to purchase and use commingled funds,

17  wasn't it, or don't you know?

18  A.    I don't know.

19  Q.    Well, you know that the investment policy that you

20  reviewed said that that should be done.

21  A.    I don't know if it says -- you know, you're asking me

22  about a document that I didn't prepare.  I'm not sure it says

23  it should be or could be.

24  Q.    It says to use.

25  A.    Yeah.

1   Q.     And you say you didn't prepare it. We understand that.

2  But you reviewed it, and you went to the Pension Review

3  Committee, and Mr. Cutler said you and he were recommending it.

4   A.     I don't want to paint the picture for a minute that

5  this is my area of expertise, let alone the area of my

6  responsibility. This is why we had a Pension and Thrift

7  Management group. This is their area of expertise, not mine.

8  Did I look at this? Yeah. Do I look at it with the same eye

9  as a Jack Cutler looks at it? No, because I don't have his

10  level of expertise.

11       When I looked at it, I may have had some questions

12  about it, I didn't have any major problems with what it was

13  suggesting. If Jack said it had to have or it should have a

14  commingled fund, I was okay with that. Okay, it should have

15  commingled funds. I left it at that.

16   Q.     All right. Referring to page ABB-KEN 02736, which is

17  the page I have shown, would you read that last bullet point?

18   A.     (Quoted as read.) "To the extent possible, ABB will

19  use the purchasing power afforded by the size of the plan

20  assets to reduce the cost to participants of providing the

21  plans' investment options. When a selected mutual fund offers

22  ABB a choice of share classes, ABB will select that share class

23  that provides plan participants with the lowest cost of

24  participation."

25   Q.     To the extent possible, ABB will use its purchasing

1 power because of the size to reduce the cost to participants of

2 providing the investment options. That's a mandatory

3 requirement that means that whoever's responsibility it is has

4 to, under law, reduce those costs by using that purchasing

5 power or the leverage that comes from it, right?

6 A.     To the extent possible.

7           MR. ORTELERE:  Objection, Your Honor, calling for an

8 abundance of legal conclusions.

9           THE COURT:  I'm aware of that.

10 BY MR. SCHLICHTER:

11 Q.     So if it's true, Mr. Sackie, as we just saw -- you

12 don't know anything about it, I understand. But if it's true

13 that separate accounts cannot only be tailored to the interests

14 of a particular large plan sponsor holding more than 500

15 million in assets, and if it's true as that study says that

16 separate accounts are one fourth the cost of retail mutual

17 funds, then would you agree that it was ABB's responsibility to

18 consider separate accounts in this plan?

19 A.     I have no way of answering that question. I'm not

20 familiar with that study. I'm not familiar with separate

21 accounts, commingled funds. I'm the wrong person to ask those

22 questions.

23 Q.     Okay. And one other provision of that is on page --

24 take a look at page ABB-KEN 2738, and this may be something

25 you're familiar with, and I want to understand it.

1    COURTROOM DEPUTY:  I'm sorry.  Did you say an

2  exhibit number?

3    MR. SCHLICHTER:  Exhibit No. P20.  It's the same

4  exhibit.  I was just referring to the page number of that

5  exhibit.  I'm sorry.  P20.

6  BY MR. SCHLICHTER:

7  Q.    There's a section in here called alliance -- this is

8  the IPS, a section in here called alliance rebates.  And that

9  says -- go ahead and read that.

10  A.    (Quoted as read.)  "Alliance rebates.  The committee

11  recognizes that ABB may employ a record keeper that has a

12  strategic alliance with one or more fund managers.  These

13  alliances provide rebates to the cost of administration,

14  including record keeping.  At all times, these rebates will be

15  used to offset or reduce the cost of providing administrative

16  services to plan participants."

17  Q.    Now, this is in the field of record keeping which you

18  said is your area?

19  A.    I can tell you right now, I am not familiar at all with

20  alliance rebates.

21  Q.    Well, the alliances provide rebates to the cost of

22  administration, including record keeping, which you say is your

23  area.

24  A.    I have no -- I don't have the expertise to agree or

25  disagree with you on that.  I mean, record keeping, if you want

1  to talk about the flat dollar fee, if you want to talk about

2  what a record keeper does, when you start asking questions

3  about how a record keeper is compensated, there are areas like

4  this that I'm just not familiar with.

5  Q.      So you have no ability, and I take it you had no

6  ability while you were with ABB, then, to compare the cost of

7  hard dollar record keeping with the cost of record keeping

8  through these kinds of revenue sharing funds to come up with

9  doing the math, making a comparison as to which is costly or

10  which might be unreasonable.

11  A.      I'm sure I had the ability, but, you know, when we

12  looked at the cost of the plans, you know, we -- again, first

13  by focusing on the flat dollar fee and doing everything we

14  could to reduce that and ultimately eliminate it.

15          On the other side, all of these kinds of fees that a

16  mutual fund and especially a record keeper that is also a

17  mutual fund company, that is exactly why we had the Pension and

18  Thrift Management group.  They had a rigorous process of

19  reviewing what was available to us and what we were able to

20  offer to our participants.  I relied on their expertise.

21  Q.      All right.  Let me understand the parameters, then, of

22  their process.  You say you're the one who is familiar with

23  hard dollar record keeping charges.

24  A.      That was my focus, yes.

25  Q.      They're familiar with soft dollar record keeping.  We

1   can use that term, using it as defined, revenue sharing paying

2   administrative and record keeping fees.

3   A.     All right.

4   Q.     Do they have expertise in your area of hard dollar

5   fees, what's reasonable of hard dollar fees?

6   A.     I would say no.

7   Q.     Then how is it if you're the one who knows about the

8   market for hard dollar fees and they're the ones who know about

9   what people charge for soft dollar fees, they don't know

10   anything about your area and you don't know anything about

11   their area, how is there ever a comparison made to the market

12   for record keeping fees if neither of you knows about what this

13   market is in its entirety?

14   A.     That's what's called teamwork.  That's why we worked

15   together on these things.  Each of us brought our expertise to

16   the table, and we were presented with a situation, and we would

17   say, we could choose option A, B, or C.  Tell me what I need to

18   know about your analysis, I'll tell you what you need to know

19   about my analysis, let's see if we can together come up with a

20   conclusion.  I didn't try to learn their job, they didn't try

21   to learn my job, but we had a mutual respect and a combined

22   effort to come up with a recommendation.  My part of it was the

23   $10 fee was relatively insignificant in the grand scheme of

24   things.  This is a more significant part of it.

25   Q.     So -- the $10 fee you mentioned.  So it's clear to the

1   court, and it may not have been made clear up to now, is when

2   Fidelity comes in and underbids on a hard dollar fee, Hewitt

3   charges only a hard dollar fee, they bid $10, right?

4   A.      That was the bid.

5   Q.      And, of course, that wasn't all they're going to get

6   paid for record keeping, that's just what they're charging as a

7   hard dollar fee, which undercut the price that a pure record

8   keeper could --

9   A.      The answer to that is yes, but, Your Honor, if I could

10  just expand on that a little bit.  Because had we -- again, as

11  you've mentioned several times, one of our objectives was to

12  provide the lowest administrative cost possible.  And if we sit

13  here and I have Hewitt with a hard dollar fee and the expense

14  ratios from the mutual funds, you know, the participants are

15  going to pay an expense ratio based on the mutual fund they

16  elect to participate in.  And it will be based on how much they

17  have in that fund.

18          If we had Hewitt as the record keeper -- and this

19  wasn't unique.  I mean, T. Rowe Price had the same model as

20  Fidelity.  Vanguard, same model as Fidelity.  Hewitt, sure,

21  they were at a disadvantage because they didn't have that

22  second source of revenue.  So they had to collect 100 percent

23  of it in the hard dollar fee.

24          So having said that, we would pay Hewitt a higher,

25  as you pointed out, hard dollar fee.  In addition, the

1  participants would be paying Fidelity, Vanguard, T. Rowe Price,

2  BGI, whatever mutual funds we offer, they would be paying the

3  expense ratio, the same expense ratio that they would have

4  deducted from their earnings with anyone else as the record

5  keeper.

6  Q.     Mr. Sackie, the case -- this case is brought for the

7  plan as a whole.  And in order to determine -- isn't it

8  conceivable, isn't it very possible that a higher hard dollar

9  record keeping fee compared to a record keep -- by a pure

10  record keeper, such as Hewitt, a higher hard dollar record

11  keeping fee could, in fact, be a far lower record keeping fee

12  for the plan than a combination of a hard dollar fee with

13  revenue sharing in mutual fund products?

14  A.     I don't see how that can be -- and the other thing you

15  have to understand is we weren't picking a record keeper solely

16  based on cost.  Cost was not the main driver here.  Was it

17  important?  Yeah, but we also wanted to have the best.  And we

18  ended up with the best.  I want to make that statement.

19         Let me get back to your statement.  Again, if a

20  third-party mutual fund -- you see, revenue sharing, I don't

21  consider if Fidelity -- if an individual or a participant

22  decides to invest in a Fidelity fund and, as outlined in the

23  prospectus, that participant is going to be charged the expense

24  ratio and Fidelity uses that to help pay the record keeping

25  fee, the other revenue sharing is if ABB offers a -- again, I

1  keep using T. Rowe Price as a -- another mutual fund, Morgan

2  Stanley.

3          And the expense ratio for that fund which is

4  outlined in the prospectus is going -- and the amount that is

5  going to be deducted from the participant return, I don't see

6  how paying -- and if there's an agreement, let's say, again,

7  between T. Rowe Price and Fidelity that 15 basis points of that

8  50 basis points fee will go from T. Rowe Price to Fidelity,

9  that doesn't change the cost to the participant at all.  And so

10 if you're deriving 100 percent of the cost of record keeping

11 from the expense ratio, direct revenue sharing, indirect

12 revenue sharing, however you want to describe it, that's going

13 to be there no matter who the record keeper.  Certainly the

14 expense ratio is going to be there, no matter who the record

15 keeper is.

16         If I'm then turning around, just to use the $10, and

17 on top of that I'm being charged $30, a $30, $40 record keeping

18 or hard dollar fee by Hewitt, which is also going to be paid by

19 the participants, that's an additional cost.

20 Q.     The fact is, Mr. Sackie, you don't know what these

21 participants paid for record keeping, do you?  You never did.

22 A.     We never did a mathematical calculation, but we were

23 100 percent confident that what they paid was reasonable and

24 competitive in the marketplace.

25 Q.     And you knew it was reasonable and competitive in the

1  marketplace without knowledge of what, in fact, was being paid
2  how?
3  A.      Because, No. 1, we -- let me back up.  The way we did
4  it is the Pension and Thrift Management group, they had a very
5  rigorous, a very robust process of ongoing review of the
6  expense ratios --
7  Q.      Mr. Sackie, hold on.  I don't want to interrupt you,
8  but you're not answering my question.  My question isn't about
9  the expense ratios.  My question is about record keeping fees.
10         You don't know, you've said you didn't know and no
11  one at ABB knew what was being paid for record keeping fees
12  through these revenue sharing arrangements.
13  A.      Okay.
14  Q.      Hold on.
15  A.      Okay.
16  Q.      Since you didn't know what was being paid, how could
17  you say, as you just said, you know it was reasonable?
18  A.      If I heard you correctly, you said revenue sharing is
19  not record keeping, then what you must mean is record keeping
20  is the hard dollar fee.  We absolutely knew what the hard
21  dollar fee was, and we knew the competitiveness of it.
22  Q.      I understand that.  I'm asking you what the money was
23  paid for the record keeping service.  You didn't know that, did
24  you?
25  A.      We didn't know the exact dollar amount, absolutely not.

1  Q.      You didn't know the inexact dollar amount either, did

2  you?

3  A.      I guess that's debatable.  If we want to delve into

4  what's inexact, if you know what the expense ratios are and if

5  you know the expense ratio for the particular fund you're

6  picking or that is in your plan is competitive and, therefore,

7  reasonable based upon the analysis that the group did, it's not

8  too difficult to come to the conclusion that what we're paying

9  is very competitive in the marketplace.  We have internal --

10 not internal, we have external auditors, we have ERISA counsel.

11 We would never, it was never suggested to us.

12 Q.      Let's move on.  There's a second investment policy

13 statement, which is P887.  That's the final version.  I submit,

14 without going through that to save time, as we spoke about

15 those items, it's the same as the draft.

16         MR. SCHLICHTER:  Your Honor, I just don't want to be

17 in the position --

18         THE COURT:  Same as the draft of what?

19         MR. SCHLICHTER:  Same as the draft we just went

20 through.  I don't want to be in a position that somebody

21 doesn't say because it's a draft, it's not, those two are not

22 identified.

23 BY MR. SCHLICHTER:

24 Q.      So it's clear you never did anything, as I understand

25 it, to address the issue required by the IPS of getting

1  alliance rebates.  You never did that.

2  A.     I personally did not, no.

3  Q.     Okay.  And nobody that you directed did it either.

4  A.     Nobody I directed did it either.

5  Q.     Okay.  After the adoption of the IPS in May of 2000,

6  then there was a significant amount of change in the plan in

7  terms of investment options that were considered, right?

8  A.     Yes.

9  Q.     In fact, ultimately, I believe 21 options were added to

10  the plan.  Does that sound ballpark correct?

11  A.     Sure.

12  Q.     Now, in that period of time, I want to refer you to an

13  e-mail dated -- I mean numbered P325, which is an e-mail dated

14  September 19, 2000 from Mr. Cutler at ABB.  A copy to you.

15  A.     Okay.  Halfway down.

16  Q.     And these e-mail --

17         MR. SCHLICHTER:  And I would also, for the court and

18  for the witnesses, Your Honor, we'll have a number of e-mail

19  strings, and you have to work backwards, you will read the last

20  one first and come back up to the first.

21  Q.     So in chronological order, this is an e-mail from Jack

22  Cutler dated September 19, 2000, to Mr. Isaacs, who is an FMRCo

23  employee, and yourself as a copy.  In that he's talking about

24  the addition of some of these funds, is he not?

25  A.     Yes.

1 Q.      Now, if you turn to the back of that, which is the next

2 page in the hard copy, you'll see that Mr. Cutler in speaking

3 to Fidelity says in this second sentence, (quoted as read)

4 "Both of the two finalists for this spot are part of FundsNet,

5 so we assume that you are," meaning Fidelity, "are indifferent

6 in this choice."

7 A.      Uh-huh.

8 Q.      What that means is, FundsNet is a group of mutual funds

9 that Fidelity has a business relationship with that paid

10 Fidelity revenue sharing, correct?

11 A.      Correct.

12 Q.      So when -- if Fidelity has no proprietary funds in a

13 plan but is the record keeper, it has the ability to get

14 revenue sharing out of that plan from outside third-party

15 mutual funds?

16 A.      Correct.

17 Q.      And that's if they're on their FundsNet platform or

18 program, right?

19 A.      Yes.

20 Q.      Shelf space, if you will.

21 A.      I don't know what you mean by shelf space, but yes.

22 They had arrangements with these mutual fund companies that

23 were prearranged, preestablished.

24 Q.      And you would agree, although you're not that familiar

25 with investment management, you would agree Fidelity is the big

1  elephant in the room, so to speak, in the retirement world,

2  wouldn't you?

3  A.      Definitely one of them.

4  Q.      Who is bigger?

5  A.      Vanguard might be.  I don't know.  You know, I --

6  Q.      Vanguard is a different model, it's a non-profit retail

7  mutual fund.

8  A.      But they're a large mutual fund company.

9  Q.      Okay.  So what's happening here is that Mr. Cutler has

10  looked at some outside funds and is telling Fidelity, here is

11  what we're considering, but of these finalists -- we assume

12  you're indifferent, you don't care because you're going to get

13  the revenue sharing from the FundsNet, right?

14  A.      I think the point here is ABB was not constrained at

15  all in looking at what mutual funds we wanted to add to the

16  PRISM Plan.  Now, if as a result of the analysis we were

17  recommending a Fidelity fund, it's safe to assume that's not an

18  issue.

19          If we're recommending funds that fall under their

20  FundsNet program, we're assuming, as we should, that's not an

21  issue because they already have an established relationship and

22  administrative process set up with these mutual fund companies

23  for daily updating and things of that nature.  And perhaps

24  prenegotiated revenue sharing, again, in recognition of the

25  work that they would be doing on the behalf of their FundsNet

1  companies. But we weren't limited to that. That's just the
2  way the analysis came out.

3       Now, there are funds that we want to add that aren't
4  Fidelity funds and they aren't FundsNet funds. So we're saying
5  here what we want to add. What do we need to talk about to get
6  you guys up to speed and get you guys in.

7  Q.     Then Mr. Cutler goes on and says, Dan, speaking to the
8  Dan Isaacs, the Fidelity FMRCo person, who should I work with
9  for the above finalists setting up a meeting regarding a
10 possible rebate to be paid to ABB's PRISM Plans for the assets
11 going into these funds? Do you see that?

12 A.     I do.

13 Q.     So what Mr. Cutler is asking at that point is exactly
14 what the IPS says should be done by ABB, which is to obtain the
15 rebates that can be obtained from the revenue sharing to go
16 back to the plan.

17 A.     Right.

18 Q.     That's what he's talking about doing --

19 A.     Sure.

20 Q.     -- at that point. Now, there was some discussion
21 earlier today, I don't know if you were here, about how there
22 can't be rebates, that would be a preferred dividend. That's
23 not accurate, is it? Rebates are done.

24 A.     Rebates -- well, I know rebates are done.

25 Q.     All right. Now, if you'll turn to the response to this

1  e-mail, which is at the top of this.  Now Mr. Isaacs, the FMRCo

2  person, gets back to Mr. Cutler.  And in that e-mail he

3  discusses that Anne Ward heads up our outside funds group, has

4  placed calls to, I believe State Street, which is one of those

5  funds.  And in that particular e-mail, Mr. Isaacs says she

6  wants to begin the dialogue to make sure Fidelity can work

7  within their systems.  Do you see that?

8  A.      Yes.

9  Q.      And the administrative and contract work will be

10 spearheaded by Laura Hughes.  For the time being, I can keep

11 you posted on our progress until we learn more.

12      So Fidelity now has said that they want to be

13 involved in this, as well, to have some discussions.

14 A.      That's not the way I read it.  I think what we're

15 saying is, Fidelity, you have to be involved because you're the

16 record keeper, you're going to have to keep the records on

17 this.  So get involved with them and make it happen.

18 Q.      Well, Mr. Cutler had asked who he should contact to

19 negotiate alliance rebates, and the response here was -- what

20 name was given?

21 A.      I'm sorry, what do you mean, what name was given?

22 Q.      Who did she give with State Street or Reynolds about,

23 who did Mr. Isaacs give as a contact with these mutual funds to

24 negotiate with?

25 A.      Are you talking about Laura Hughes?  I mean, see,

1 there's the administrative and contract work. To me, that is

2 the record keeping piece of this. In other words, they're

3 going to do what we've asked them to do, and that's make an

4 arrangement to accommodate these two funds. They're not

5 currently in FundsNet. We still want to offer them in our

6 plan. Laura Hughes was responsible for the day-to-day

7 administration, and she's the one that has to make sure that it

8 fits into the daily processing. And I don't think --

9 Q.      My point in asking the question, sir, is Mr. Cutler

10 asked who at these outside funds he could negotiate with.

11 Fidelity responded and did not give him a name, did they?

12 A.      They did not.

13 Q.      All right. Let's turn to another e-mail, which is

14 P324.

15 A.      They did not in this e-mail. I don't know if they ever

16 did, but --

17 Q.      Same day, later that night, now, here this is from

18 Jeffrey Cutts, who is another FMRCo employee, to Mr. Cutler,

19 copy to you?

20 A.      Okay.

21 Q.      And what they discuss here is now what they'll do if,

22 again, in this conversation about moving to some other funds,

23 Wellington was a group of funds that were in the plan at that

24 time before those changes, wasn't it?

25          MR. OPPENHEIMER:  Your Honor, excuse me.  Assumes

1    facts not in evidence.  The references to FMRCo, I believe, are

2    from the e-mail heading, and it assumes a fact not in evidence,

3    and there's a foundational issue.  I think we may have

4    misconstrued --

5    BY MR. SCHLICHTER:

6    Q.      You knew it as Fidelity -- I'll rephrase it to Fidelity

7    to make it simpler.  This is a letter from Mr. Cutts from

8    Fidelity, a copy to you, and sent to Mr. Cutler, in which he

9    discusses the Wellington mapping.

10   A.      Yes.

11   Q.      And mapping, so it's clear on the record, is the

12   process of steering people from a fund that's removed from a

13   plan into its replacement?

14   A.      Can I give my explanation of what mapping is?

15   Q.      Answer my question.

16   A.      Yes, but.  Wellington is a mutual fund, and when you're

17   in the process of introducing new funds and at the same time

18   you are eliminating existing funds, we communicate in advance

19   that this is going to happen.  And if an individual does not

20   take any action on their own to move the money out of

21   Wellington before the date this change takes place, then

22   whatever money is left in Wellington is going to move into one

23   of the Freedom Funds.

24          From the day those funds move into the Freedom

25   Funds, the participant is free on any business day of the year

1  to redirect those to any other fund that they want to invest

2  in.  So it's not like we're saying, hey, you have no choice or

3  no decisions in this matter, here is the process.  We have to

4  do something on the last day, we just can't let the money sit

5  there uninvested, so here is what we're going to do with it,

6  and then if you want to leave it there, great.  If you want to

7  redirect it immediately after that, you can do that, as well.

8  Q.     Now, again, this is on the same day when Mr. Cutler has

9  said he wants to negotiate rebates to these outside funds.  The

10 response he's getting now from Fidelity is here is some pricing

11 implications.  If you go from Wellington to the Freedom Funds,

12 then your hard dollar fees could go to zero, right?

13 A.     Yes.

14 Q.     Now, first of all, Vanguard Wellington are low priced

15 funds, aren't they?

16 A.     Vanguard Wellington is, to my knowledge, one fund.

17 It's a balanced fund.

18 Q.     It's a balanced fund, right, and it's low priced?

19 A.     And Vanguard typically has very competitive expense

20 ratio.

21 Q.     They're not the for-profit mutual fund model that

22 Fidelity is, they're owned by the actual shareholders

23 themselves, right?

24 A.     Okay.  I don't know.

25 Q.     So now Mr. Cutler isn't hearing anything about who to

1  negotiate with, and what is being said is if we move the

2  Wellington Funds defaulting to Freedom Funds -- which are

3  Fidelity funds, right?

4  A.      Right.

5  Q.      Then this $10 fee will be reduced to zero for salaried

6  folks and $8 for hourly.

7  A.      That's what it says.

8  Q.      In your world where all you look at is the hard dollar

9  fee, that's a tremendous deal.  Save $10 now, record keeping

10 costs are zero for salaried people.

11 A.      Actually, quite honestly, it's zero for the union

12 people or hourly people, as well.  Because as it turned out,

13 the company paid that $8.

14 Q.      So zero.

15 A.      Zero for everyone.

16 Q.      So in your mind, in terms of price of record keeping

17 services, the game is over, it's zero, no further inquiry,

18 right?

19 A.      I think that's an oversimplification, but I was pleased

20 to see the hard dollar record keeping fee go to zero.

21 Q.      You didn't inquire, did you, of what the record keeping

22 fees would be in the Freedom Funds that they defaulted into?

23 A.      We evaluated the Freedom Funds amongst their peers.  We

24 evaluated the BGI and the Fidelity and other index funds.  You

25 can see that we, the analysis produced a recommendation because

1  we went with the zero and $8 scenario, if you will.

2       The decision was made to recommend that whatever was

3  left in Wellington on the day, the last day that fund was

4  available would be transferred to one of the Freedom Funds.

5  And we decided not to go with the Fidelity index funds but,

6  rather, go with the BGI index funds for all of the reasons that

7  the Pension and Thrift Management group used to make their

8  analysis.

9   Q.     Freedom Funds are actively managed funds of funds in

10  the Fidelity proprietary arrangement, right?

11  A.     I don't look at it as a fund-of-funds.  Back in my day

12  we called these lifestyle funds, and they were fairly new at

13  the time.

14       And what made these funds attractive or, in our

15  opinion, important for PRISM participants was that one of the

16  things that we struggled with is how difficult it was for some

17  participants to know where to put their money, how to invest

18  their money, and how to revisit that, if at all, as they aged.

19       The Freedom Funds were specifically designed so that

20  based on your age, and your age in relation to age 65, which

21  I'll call normal retirement age, how conservative, neutral, or

22  aggressive you could, quote, unquote, afford to be.

23       So it took the asset allocation decision out of the

24  hands of the participant who, for the most part, wasn't

25  comfortable with having to make that decision.  And, again, if

1  this transfer or this mapping was done and the individual

2  didn't like it, on the very next day, they could change it.

3  Q.    Now, the Freedom Funds, you mentioned lifestyle, also

4  known as lifecycle funds.  There are many funds out there that

5  will do this, that will accomplish the goal of making

6  automatically investments more conservative as people approach

7  retirement age, right?

8  A.    Probably more of them today than there was in 2000.

9  Q.    Just answer my question.

10  A.    You're asking me about today, and I don't know about

11  today.

12  Q.    Okay.  At that time.

13  A.    At that time I don't think it was as common as you're

14  making it sound.

15  Q.    Okay.  They're more common now.  And there are -- since

16  you said -- now, you do know about the Freedom Funds, you do

17  know about lifecycle funds, even though you don't know a lot

18  about other investments.  Since you know about these, you can

19  get, and you could get then, target date funds more

20  conservative automatically over time, which are funds of low

21  cost index funds, right?

22  A.    I'm not aware of those.

23  Q.    You said Freedom Funds were such a good deal --

24  A.    I didn't say -- I'm sorry.  I didn't say they were such

25  a good deal.  See, you're implying that I said they were a good

1  deal because they were cheap.  What I said is that they were

2  good for participants who were uncomfortable, intimidated or

3  just didn't want to make asset allocation decisions.

4  Q.      That would be true of any lifecycle fund?

5  A.      Absolutely.

6  Q.      Now, do you know enough about the Freedom Funds to know

7  anything about their composition?

8  A.      Not right now, I don't.

9  Q.      Did you then?

10  A.      I participated in at least one meeting and the makeup

11  of the Freedom Funds was presented to me sometime prior to

12  September 20th of 2000.

13  Q.      Was Mr. Cutler more knowledgeable about them than you?

14  A.      Yes.

15  Q.      Okay.  So you attended a meeting?

16  A.      He was more knowledgeable about the underlying

17  investments of each of the Freedom Fund options.

18  Q.      All of these mutual funds within the Freedom Fund,

19  let's say Freedom Fund 2020, that's the way they're designated,

20  right?

21  A.      Yes.

22  Q.      That means somebody thinking about retirement in the

23  year 2020 would have something that's more conservatively

24  oriented as you approach 2020.

25  A.      Correct.

1  Q.      That would be true of any lifecycle fund?

2  A.      That's my understanding.

3  Q.      So in that 2020 Freedom Fund, you've now got a whole

4  bunch of Fidelity retail mutual funds, right?

5  A.      I don't know what the makeup of the mutual -- I don't

6  remember now what the makeup of the funds was back in 2000.

7  Q.      Would you remember, for example, that there were around

8  25 different individual retail mutual funds in the Freedom

9  Fund?

10 A.      I hope you can appreciate that my recollection of that

11 detail going back nine plus years is not complete.

12 Q.      And I take it you didn't bother about even examining or

13 asking about whether there's revenue sharing in each of those

14 25 in the fund-of-funds.  You didn't get into that either, I

15 take it.

16 A.      I did not.

17 Q.      Would it surprise you if I told you since they're

18 retail mutual funds, there is?

19 A.      No.

20 Q.      Okay.  Now, do you know enough about the structure of

21 the Freedom Funds to know this.  You've got a Fidelity

22 investment advisor, FMRCo is now choosing an asset allocation

23 for somebody who is going to be retiring in some time and

24 limiting who it considers from the eight thousand and something

25 mutual funds that exist to only Fidelity mutual funds, right?

1  A.      If someone elected to participate in the Freedom Funds,

2  their money would be invested in only Fidelity funds.

3  Q.      And the investment advisor who is picking the funds

4  that the investment advisor feels is appropriate to be in the

5  Freedom Funds for some period of time was paid a fee for

6  picking Fidelity only, wasn't he?

7  A.      Investment managers are paid fees, yes.

8  Q.      That's not my question.  Maybe you don't know.  Just

9  tell me if you don't.  But isn't it true that Fidelity, FMRCo

10  as the investment advisor within the Freedom Funds, each one of

11  them is then charging participants to pick itself?

12  A.      I'm not familiar with the tiers or levels of fees

13  associated with the fund, but I am sure that the total

14  expenses, expense ratio for each of the Freedom Funds was

15  information that was available to an individual who was

16  investing in those funds.  So they had access to that

17  information.  If fees were that important to them, that

18  information was available to them.

19  Q.      Do you know whether the relationship manager at

20  Fidelity was paid bonuses on pushing people into Freedom Funds?

21  A.      I would have no way of knowing that.

22  Q.      All right --

23  A.      I don't know how a relationship manager at Fidelity

24  would have any influence over our participants, but --

25  Q.      Well, who was the relationship manager at Fidelity for

1    ABB?

2    A.       When?

3    Q.       While you were there.

4    A.       Oh, boy.

5    Q.       Joanne Morlan?

6    A.       Joanne Morlan was one, Mike Zingg was one, Joe Pelgrin

7    was one, Cindy Kuppens -- I mean, there was a lot of them.

8    Q.       Did you ever inquire -- anybody at ABB inquire to your

9    knowledge for what acts Fidelity paid bonuses?

10   A.       No, and I --

11   Q.       Okay.   Let's turn to page P331.

12          MR. ORTELERE:   Your Honor, Mr. Sackie is coming off

13   a bout with the flu, and I was humbly asking whether we might

14   take a break and get him some cough drops.

15          THE COURT:   Two o'clock.

16          MR. ORTELERE:   I'm sorry.   Thank you.

17          THE COURT:   I've got an in camera review of some

18   documents.

19          MR. ORTELERE:   Thank you, Your Honor.

20   BY MR. SCHLICHTER:

21   Q.       By the way, Mr. Sackie, do you need some water or

22   something?

23   A.       I'm on my second bottle.

24   Q.       Okay.   Who did that math, if anybody did, as far as the

25   Freedom Funds and those fees?

1    A.        I'm sorry.  Can you repeat that?

2    Q.        Who did that math as far as the Freedom Funds and their

3    record keeping fees, if anybody did?

4    A.        By math you mean to calculate how much Fidelity would

5    make on those funds?

6    Q.        For record keeping services, yes.

7    A.        Again, no one did a calculation to determine what the

8    expense ratios for the Freedom Funds would create as far as

9    revenue for Fidelity.

10   Q.        All right.  Quickly we'll try to get -- if you take a

11   look at this exhibit, which is 331.  E-mail five days later

12   from Jack Cutler to Mr. Isaacs at Fidelity.  Do you have that

13   in front of you?

14            You see the next thing, you're copied on it, an

15   e-mail where Mr. Cutler reiterated that it was critical that

16   ABB negotiate these rebates separate from Fidelity.  Do you see

17   that?

18   A.        I do.

19   Q.        He highlighted the term critical because -- I don't

20   know that you know why, but the fact is in these five days of

21   e-mails or these several days of e-mails, he had not received

22   any information about who to negotiate with, right?

23   A.        Okay.

24   Q.        So he repeats it's critical ABB negotiate these

25   separate from Fidelity.  That would be following the IPS.

1   A.      Okay.

2   Q.      Take a look -- and you were copied on it.   Then less

3   than one minute later, in fact, according to the e-mail time of

4   9:28, it's actually the same time as Cutler's e-mail to you,

5   you respond to Mr. Cutler after Cutler said it's critical that

6   ABB negotiate these separate from Fidelity, right?

7   A.      Yes.

8   Q.      And you say to Mr. Cutler -- why don't you read that?

9   A.      My response was, (quoted as read) "I don't know what

10  Dan wrote to you, but we have to be careful here.   We'll find

11  ourselves squeezing the balloon," quote, unquote.   "In other

12  words, they will give us the rebates and impose a record

13  keeping charge.   I'd rather have a discussion with Joe D. to

14  see what is the best arrangement."

15  Q.      So what you did is you shut that down, you took over

16  discussing with Joe D., who is a Fidelity employee, this

17  process of whether or not ABB would negotiate alliance rebates.

18  A.      I absolutely did not shut this down.   This was a word

19  of caution.   I wouldn't have stopped -- if Jack felt, if Jack

20  wanted to do this, if it was the right thing to do, if it was

21  in the best interests of participants, I had no reason to stop

22  him from doing it.

23          What I was cautioning him about was that there is a

24  revenue model.   And to the extent you start talking about

25  changing that revenue model, we have to just make absolutely

1  sure that -- and this is the squeezing of the balloon

2  comment -- that we aren't getting something over here and

3  paying it over there.  I don't want to take money out of my

4  left pocket and put it into my right pocket.  So this was just

5  a warning to be careful.  And go forward if you feel it's

6  necessary with your eyes wide open.

7             THE COURT:  Let me ask you a question.  What

8  difference does it make if it's all the same cost if it comes

9  from the right pocket or the left pocket?  What difference did

10 it make?

11            THE WITNESS:  To some extent, that's true.  I just

12 don't want it to be an increase at the end of the day.  You

13 see, then you have to do an analysis to say, okay, at the end

14 of the day, are we net better off, net worse off, or break

15 even.  It was just a word of caution to say, just make sure we

16 don't end up paying more than we have been.  Because you're

17 right.  I mean, the source of the funds is the participant.  I

18 just wanted to make sure it didn't go up.

19 BY MR. SCHLICHTER:

20 Q.     But you didn't know what it was, did you?

21 A.     I was not familiar with rebates, no, but Jack was.  And

22 here again, you know, I had responsibility for the relationship

23 with Fidelity, and Jack had an expertise.  I'm not going to sit

24 there -- I mean, if he was able to get the rebates and we saw

25 no changes anywhere else, my interpretation of that is a good

1   thing.  It's a good thing, lower costs.  I just wanted to make

2   sure that we were able to determine that we got the lower

3   costs.

4   Q.      So if Mr. Cutler is not analyzing these costs and

5   comparing them to a hard dollar record keeping fee that was

6   available, then he's not doing what you want him to do?

7   A.      I don't see anywhere in here where Jack is even

8   contemplating or thinking about a hard dollar record keeping

9   fee.  I'm sure he's looking at this saying, hey, I'm going to

10  try to get these rebates.  And if we get these rebates, good

11  for us, good for our participants.  I'm just saying tread

12  lightly, be careful, make sure that if you're successful in

13  doing this that we aren't just turning around and paying for it

14  somewhere else.  He's doing this not because he wants to break

15  even.  He's doing this because he wants to drive costs down.

16              I'm sorry, Your Honor.  To maybe get back to your

17  point about --

18              THE COURT:  Are you going to a new document?  I want

19  to try to take a break.

20              MR. SCHLICHTER:  Yes.

21              THE COURT:  Let's go ahead and take a 20-minute

22  break.  Court's in recess.

23              (A recess was taken from 2:03 p.m. to 2:25 p.m.)

24              THE COURT:  We will continue with the witness.

25              MR. SCHLICHTER:  Shall we proceed, Your Honor?

1          THE COURT:  Yes.

2   BY MR. SCHLICHTER:

3   Q.      Mr. Sackie, handing you, showing you what's been marked

4   as P331.  This is now an e-mail from, in the string from Mr.

5   Cutler.  Do you see that?

6   A.      That's not the hard copy I have.

7          THE COURT:  That's not the hard copy I have either.

8   I've got 326.  Is that what you've got?

9          THE WITNESS:  I have 326, yeah.

10          THE COURT:  Let's work off the screen.

11          THE WITNESS:  Okay.  Oh, I'm sorry.  This is the one

12   we were working with when we broke?

13   BY MR. SCHLICHTER:

14   Q.      I'm sorry.  That's my fault.  Here is the 326.  326,

15   which is now Mr. Cutler came back on this point to you and on

16   326, later that day, Mr. Cutler says to you he's very concerned

17   that we be, we being ABB, be a part of any discussion with a

18   provider regarding a rebate.  And he goes on -- he says that,

19   doesn't he?

20   A.      Yes, he does.

21   Q.      And you received that, right?

22   A.      Yes.

23   Q.      And he says he's more than a little bit upset with Dan.

24   Dan is Dan Isaacs of Fidelity, right?

25   A.      Yes.

1 Q.      That contrary to what Mr. Cutler has said he wanted to

2 do, Fidelity has already started discussions with State Street

3 and Reynolds without including ABB, especially since I even, I

4 stated I wanted to be involved in these discussions.

5           So what we have here is a situation where, despite

6 all of these urgings by Mr. Cutler that ABB be the ones

7 negotiating or talking about these rebates, Fidelity didn't

8 respond with the name of the person to talk to and did it on

9 its own, right?

10 A.      That's what it looks like.

11 Q.      That's what happened, isn't it?

12 A.      I don't recall what happened, but that's certainly what

13 is being described in this memo.

14 Q.      And then you respond to Mr. Cutler that we'll talk

15 about it on Friday.

16 A.      Right.

17 Q.      Now, ultimately what happened was, with all of this

18 discussion is that the Wellington Funds were mapped into the

19 Fidelity Freedom Funds, weren't they?

20 A.      If I could just back up for one second.

21 Q.      I'd like you to answer my question.

22 A.      Okay.

23 Q.      The Wellington Funds were mapped into Fidelity's

24 Freedom Funds, weren't they?

25 A.      Yes, they were.

1    Q.        And there was no negotiation of any rebates with

2    Fidelity or with any outside funds for rebates back to the

3    plan, was there?

4    A.        I don't recall how that ended up.

5    Q.        Now, so it's clear, you said the record keeping fees

6    are the responsibility of Mr. Cutler, right?  Other than hard

7    dollar?

8    A.        No.  What I said was it was Jack's area of expertise

9    when it came to evaluating expense ratios for similar mutual

10   funds, mutual funds within an asset class.

11   Q.        I'm talking about record keeping fees paid to expense

12   rate through revenue sharing.

13   A.        Revenue sharing through third parties?

14   Q.        Yes, revenue sharing through mutual funds, yes.  That

15   was the responsibility as I understood you of Mr. Cutler.  You

16   only knew about hard dollar fees.

17   A.        Again, when you say revenue sharing, I think in terms

18   of the, a non-Fidelity mutual fund agreeing to share a portion

19   of their expense ratio with Fidelity.  When you say revenue

20   sharing, that's what I think about.  That was not Jack's

21   responsibility.  That's something that occurred between the two

22   mutual fund companies.

23   Q.        Well, I'm asking you about record keeping fees.  You

24   agree, do you not, ABB has a duty to make sure that the fees

25   for the service of record keeping are no more than reasonable?

1   A.     Yes.  But let me -- again, record keeping fees.  I have

2   to clarify here because you're combining things and --

3   Q.     I'm not combining anything.  I'm asking about one

4   thing, record keeping fees, Mr. Sackie.

5   A.     Hard dollar fees or --

6   Q.     No, I'm asking about record keeping fees for the

7   service of record keeping, whether it's paid in hard dollar or

8   soft dollar or barter.  I'm talking about you, you just said

9   yes to my question about whether ABB has a duty to make sure

10  that record keeping fees are no more than reasonable.  You said

11  yes.

12  A.     Yes.

13  Q.     Okay.  Now, however they're paid, right?

14  A.     Yes.

15  Q.     Okay.  You said you know about hard dollar fees, but

16  you don't know anything about record keeping fees paid through

17  expense ratios or revenue sharing.

18  A.     I didn't say I didn't know anything about them.  I said

19  it was not my area of expertise to analyze them.

20  Q.     Okay.  That's Mr. Cutler's?

21  A.     That's correct.

22  Q.     And by the way, both you and Mr. Scarpa were in human

23  resources, and Mr. Scarpa ultimately took your position, so

24  Mr. Scarpa would be the same position as you since he's in the

25  human resources department too, right?

1    A.       I guess he would be the one to tell you that.

2    Q.       So it's Mr. Cutler's responsibility.  Let me show you

3    what Mr. Cutler says about this same subject.

4               (Plaintiffs' Deposition Clip No. 1 was played.)

5               MR. OPPENHEIMER:  Your Honor, may we have a page and

6    line number?

7               THE COURT:  Is that an exhibit?  Or is it part of

8    the --

9               MR. SCHLICHTER:  It's part of his deposition.

10              MR. ORTELERE:  Can we see the document he referred

11   to?

12              THE COURT:  Don't you have his deposition?

13              MR. SCHLICHTER:  291, 9 through 18.

14              COURTROOM DEPUTY:  I'm sorry.  Was that an exhibit

15   number?

16              MR. SCHLICHTER:  That's the page of his hard copy

17   deposition as opposed to the video.

18              THE COURT:  All right.  You may proceed.

19              (Plaintiffs' Deposition Clip No. 1 was played.)

20   BY MR. SCHLICHTER:

21   Q.       So we have Mr. Cutler saying he doesn't sign off on the

22   fees, that it's your department, the HR department.  Which is

23   it?  You say it's Mr. Cutler, and he says it's you when it

24   comes to the record keeping fees.

25   A.       Record keeping fees, when it comes to signing off on a

1   hard dollar record keeping fee, I sign off on that, and I think
2   that is the point Jack was making there.  I don't think there
3   is any sign-off necessary when it comes to expense ratios
4   because that's not a negotiable thing.  They are what they are.
5   The prospectus tells you fund by fund what those are.  And when
6   it comes to revenue sharing, the same thing.  That's an
7   agreement struck between Fidelity and the other mutual fund
8   company.  There's no sign-off at ABB necessary for that.
9   Q.      So the bottom line, then, as I understand your
10  testimony, Mr. Sackie, is that nobody at ABB signs off or cares
11  about what amount of record keeping fee services is paid
12  through revenue sharing?
13  A.      Yes, no one signs off on it.  But no, absolutely wrong,
14  we do care about what is being charged.
15  Q.      You care, but you don't care enough to determine what's
16  being charged by this asset-based record keeping service that
17  you say it's your duty as a fiduciary and ABB's duty as a
18  fiduciary to know and make sure is only reasonable?
19  A.      I would love for you or someone else to help me
20  understand what it was I could have done to impact the expense
21  ratio.  My understanding is there was nothing I could do.
22  Secondly, I did not tell people where to invest their money.
23  Q.      I'm not asking about investment.
24  A.      Well, that's what drives the fees we're talking about.
25  Q.      Well, Mr. Sackie, so in this structure, then, you're

1 telling us that ABB was helpless in terms of doing anything to

2 carry out its fiduciary duty to make sure that record keeping

3 fees were no more than reasonable; is that correct?

4 A.     Absolutely not.  We think the record keeping fees were

5 reasonable.  And why do we think they were reasonable?  We

6 think they were reasonable because the analysis that the

7 Pension and Thrift Management group did on an ongoing basis

8 documented the fact that these fees met very competitive

9 standards.  Again, we had fees on the very low end and we had

10 fees on the higher end.

11 Q.     Mr. Cutler said when it comes to evaluating fees

12 charged by service providers, including the record keepers --

13 and we can play it again if you'd like -- Mr. Cutler says

14 that's the job of HR, your department.  He didn't do it.

15 A.     He did say that, but I think you're taking his comment

16 out of context.  You might be --

17         Let me tell you what I think Jack was talking about.

18 I think Jack was talking about the hard dollar fee.  When he --

19 see, when we think about record keeping fee, we think about you

20 do an RFP.  They say, here is the record keeping fee.  This is

21 what we are going to charge you on a per participant basis.

22 Every single participant in the plan is going to pay, let's use

23 the number $10 per year.

24         If you were to ask Jack if he was responsible for

25 analyzing the expense ratios which ultimately became the source

1   of the fee for record keeping, not the record keeping fee, but

2   the fee for record keeping, I think he would have given you a

3   much different answer.

4   Q.     Mr. Cutler actually did give us the answer in his

5   deposition, Mr. Sackie, that he doesn't concern himself with

6   the revenue sharing paid for record keeping fees, and I assume

7   he'll testify to that here.

8           So, again, was there anyone who is determining the

9   reasonableness of the amount of record keeping fees at Fidelity

10  while you were there based on the way they're receiving those

11  fees?

12          MR. ORTELERE:   Objection, Your Honor, the question

13  makes an assumption about what Mr. Cutler will testify to.

14          THE COURT:   I'll overrule the objection.   He

15  eventually got to the question.   Has anybody?   That's the

16  question.

17  A.     And I'll answer that yes.   I monitored it from the hard

18  dollar fee perspective, and Jack Cutler or whoever his

19  predecessors were in the Pension and Thrift Management group

20  monitored it from the reasonableness, their analysis, their

21  ongoing analysis of the reasonableness of the expense ratio,

22  for not just the Fidelity funds, every single fund we offered

23  in the plan.

24  Q.     I didn't ask you about -- I asked you about record

25  keeping fees.

1    A.      The record keeping fees at $10 per person per

2   participant were very reasonable and ultimately became zero.

3    Q.      I think you've told us --

4            THE COURT:  I got the point a long time ago.  Go

5   ahead.

6            MR. SCHLICHTER:  Sorry, Your Honor.

7    Q.      Mr. Sackie -- I'm sorry.  This is Exhibit No. P323.

8   This is the last document regarding this.  And this document at

9   the top we see is from Fidelity, Mr. Cutts.  Now he's talking,

10  he's sent this to you and copied Mr. Cutler.  Now he's dealing

11  with you directly.

12   A.      Okay.

13   Q.      And he's now talking about the fees and says in about

14  the fifth paragraph, after we agree on the fund approach and

15  fee implications, I would propose we work with you to analyze

16  expenses and per participant charge.

17          So here what Mr. Cutts at Fidelity is saying is that

18  they and you will agree on the fund approach, right?

19   A.      I think that what this is saying is, yeah, they will

20  agree with what we ask them to do.  It's not like they have to

21  agree in order for this to happen.  They have to agree in order

22  for this to happen because they have to actually do the work.

23  What they're --

24   Q.      Analyze your expenses, he says, and adjust the per

25  participant charge appropriately so that you, ABB, are able to

1  cover all costs.  Do you see that?

2  A.      Yeah, I do.

3  Q.      The costs are Fidelity's for providing record keeping.

4  Is he talking about the non-qualified plan costs?

5  A.      Oh, no.  I mean, I don't know what comes -- is this

6  part of what we were -- I guess this is a follow-up to what we

7  were just looking at.  This is all related to PRISM and the

8  changes that were being proposed.

9  Q.      And after this e-mail, in fact, you and Fidelity did

10 agree on a fund approach and these 21 new funds were added to

11 the plan, right?

12 A.      I don't know what, the number of funds that were added

13 was, but funds were added.

14 Q.      I want to next direct your attention to the trust

15 agreement itself, Mr. Sackie.  That's P1.  This was entered

16 into on May 1st, this is the agreement that puts the -- and if

17 you look to -- first of all, in so far as this is concerned,

18 the trust agreement that was entered into was between ABB and

19 FMTC, Fidelity Management Trust Company, right?

20 A.      Yes.

21 Q.      They're trustee, and they are also record keeper,

22 correct?

23 A.      Correct.

24 Q.      Now, looking at Exhibit B of that document, that's a

25 schedule that was attached and includes --

1   A.      I'm sorry.   Schedule --

2   Q.      Schedule B.   Fee schedule.   Page number is P01, page 24

3   of that document.

4   A.      Okay.

5   Q.      And if you look at what it says there about

6   non-Fidelity funds, what it says is that 15 basis points on

7   assets invested in -- this is in '95.   We're going back in time

8   now.

9   A.      Uh-huh.

10  Q.      What Vanguard Wellington Fund, T. Rowe Price, and

11  others will be charged on non-Fidelity funds.   Do you see that?

12  A.      Yes.

13  Q.      Now, that establishes the amount because Fidelity gets

14  paid on asset-based record keeping fees, that establishes a

15  record keeping fee as to those funds that Fidelity will

16  receive, right?

17  A.      It's a fee that they'll receive, yes.

18  Q.      I believe there's also a $10 hard dollar charge on that

19  document.

20  A.      Yes.

21  Q.      Now, actually, there is one fund where there was a

22  negotiation to get some revenue sharing back to the plan as the

23  IPS required.   Do you recall that?

24          MR. ORTELERE:   Objection, Your Honor,

25  mischaracter --

1          THE COURT:  I'll sustain the objection.

2     Q.     Going back to this, at the very end of that it says

3   that the PIMCO Total Return Fund, which I believe had been in

4   the plan for quite a while, right?

5     A.     I'm sorry, are we still on page 24?

6     Q.     No, we're in schedule B-1.  It's schedule B, and

7   there's a schedule B-1.  The amended schedule is attached as

8   B-1, and that's page No. 4305.

9     A.     Okay.  I've got it.

10    Q.     CV4305.  And you'll see that on that amended

11  schedule --

12    A.     I'm sorry.  My CV4305 looks different than that.

13          MR. ORTELERE:  That's the docket number.

14    Q.     I'm sorry.  ABB 0077.

15    A.     Okay.

16    Q.     You see that there's been an amendment there that does

17  say that as to the PIMCO total return fund, the trustees agree

18  to rebate 10 basis points on such assets to the plan.  That is

19  one example of a rebate going back to the plan.

20    A.     Okay.

21    Q.     Do you see that?  So there's nothing preventing

22  rebates.  Not only is it in the IPS but, in fact, there is a

23  fund on which 10 basis points were rebated to the plan, right?

24    A.     That's what it says.

25    Q.     Now, a couple of months after the negotiation of the 15

1 basis points, there's another amendment to the plan.

2          This document is ABB 95.  It's an amendment to the

3 plan.  It's the tenth amendment.

4 A.     Yes.

5 Q.     Do you see it?

6 A.     Yes, I do.

7 Q.     Effective April of 2001, a short time, not much

8 longer -- well, this is some time later.  Actually, this is the

9 culmination of some other things that happened.  But effective

10 on that date, if you look at the annual participant fee, do you

11 see that?

12 A.     Yes.

13 Q.     That's when it went down to zero.  Okay.  But where you

14 see non-Fidelity mutual funds, you see that non-Fidelity mutual

15 fund vendors shall pay fees directly to Fidelity Investments,

16 FIIOC, or its affiliates equal to such percentage, generally 25

17 to 50 basis points, of plan assets invested in such

18 non-Fidelity mutual funds.  Do you see that?

19 A.     I do.

20 Q.     So you had an agreement with these funds to pay 15

21 basis points, and now the agreement is Fidelity is going to get

22 25 to 50 basis points out of these funds in revenue sharing,

23 correct?

24 A.     Correct.

25 Q.     So what that means is that the record keeping fees for

1 those funds will have gone up two thirds if it's 25 basis

2 points from the 15 that had been present before and up to more

3 than three times if it's 50 basis points.

4 A.     I think I read this document a little bit differently

5 because it seems to me that whereas the 15 basis points was an

6 additional charge before, it is now -- because it was paid by

7 the participants, if Fidelity was going to charge us, it is now

8 being paid by the mutual fund company, which is a savings to

9 the employee because it doesn't matter if it's 20, 30, or 40

10 basis points if the mutual fund company is paying for it.  It

11 all comes out of what's been deducted from the participants'

12 return anyway.  It's just a matter of how much they're willing

13 to, you know, share with Fidelity for what they determine to be

14 the work Fidelity is doing on their behalf.

15 Q.     Now, let's look at the asset size of this plan.  This

16 is ABB -- this is still Exhibit 1.  It's ABB 56.  And this is

17 '95.

18 A.     56?

19 Q.     56, yes.  By the way, it talks about Westinghouse

20 stock.  Westinghouse was what ABB became, right?

21 A.     No.

22 Q.     Or partially?

23 A.     Yes, ABB acquired a division of Westinghouse.

24 Q.     And you see that at, in '95, the plan size was current

25 plan assets of $589 million, right?

1  A.      Yes.

2  Q.      Half a billion dollars?

3          MR. ORTELERE:  Your Honor, I'm going to object.

4  This is so far before the class period, I don't see the

5  relevance.

6          MR. SCHLICHTER:  Well, the relevance, Your Honor, is

7  to show what happened to the plan size over the preceding --

8          THE COURT:  I'll overrule the objection.

9  BY MR. SCHLICHTER:

10  Q.      And 18,000 participants, right?

11  A.      Yes.

12  Q.      And also projected net cash flow, so the assumption was

13  it was going to grow 69 million.

14  A.      Yes.

15          THE COURT:  What page is that?

16          MR. SCHLICHTER:  That's page ABB 0056 of Exhibit No.

17  1, Your Honor.

18  Q.      All right.  589 million in plan size.

19  A.      Okay.

20  Q.      Now let's go to April 1st, the time you're adding these

21  funds.  This is ABB 96, same Exhibit, P-No. 1.  You'll see

22  there effective April 1 of 2001, speaking of the fees, current

23  assets of one billion, $1.421 billion, right?

24  A.      That's what it says, yes.

25  Q.      Almost tripled in size in six years, right?  With

1  actually just slightly fewer participants, 17,781, right?

2  A.      Right.

3  Q.      And so what you've got is asset-based record keeping

4  fees that start out at 15 basis points in '95 as we discussed,

5  then by 2001 ABB allows Fidelity with -- I'm talking about

6  non-Fidelity funds because you don't know what the revenue

7  sharing is in Fidelity funds, do you?

8  A.      Right.

9  Q.      You don't care either, do you?

10 A.      Not true.

11 Q.      Well, you don't care enough to find out.

12 A.      We cared a lot and we checked it for reasonableness on

13 an ongoing basis.

14          THE COURT:  Come on.  I'm tired of you arguing with

15 the witness.  He's never going to say that he didn't care.  I

16 don't expect him to ever say that.  Go ahead.

17 Q.      In any event, the basis points for revenue sharing with

18 outside funds, Fidelity, is now increased from 15 to 25 to 50

19 basis points, as we saw.

20 A.      Yes.

21 Q.      Which then thereby dramatically increased money it

22 receives for record keeping, right?

23 A.      Yes.  I'd like to point out that --

24 Q.      Just, if you would just answer my question, sir.  And

25 in addition --

1          THE WITNESS:  Your Honor, can I point out that --

2          THE COURT:  No, answer the question.  There's

3   cross-examination.  You have a lawyer here who is going to take

4   care of all of the cross.  Go ahead.

5          THE WITNESS:  Okay.

6   BY MR. SCHLICHTER:

7   Q.      And since we've seen that asset size has tripled, would

8   you agree, Mr. Sackie, that both the greater than 50 percent

9   increase in basis points of revenue sharing and the tripling of

10  asset size means that the record keeping fees would have

11  exploded compared to what they were in '95?

12  A.      The record keeping fees are higher and participants

13  must have done pretty well.

14  Q.      Well, the fact is that you also had some mergers and

15  acquisitions in that time, didn't you?

16  A.      That's the same number of participants, basically, so

17  the average account balance has grown significantly, which

18  means that the participants have done pretty well.

19  Q.      And the record keeping fees have exploded, would you

20  agree?

21  A.      They increased, that's for sure.

22  Q.      And what that means is that at that point in time you

23  have -- you've now, Fidelity has made all of this additional

24  increase and, in fact, has active proprietary, actively managed

25  mutual fund assets paying revenue sharing over 700 million in

1  the plan, right?

2   A.      That's what it says.

3   Q.      So would you say that Fidelity had a very dominant role

4  in the mutual fund lineup by 2001?

5   A.      They had half the assets in the plan, yes.

6   Q.      Now, do you know what a transfer agent fee is?

7   A.      I'm familiar with the term, but I can't recall what

8  that is.

9   Q.      Let me ask you this, going back to this document.

10  Would you agree that the same number of participants means that

11  Fidelity's record keeping services were being provided for no

12  greater volume of people than had been there before in 1995?

13   A.      The volume of services was much greater because there

14  were new technologies.  It was a much different program than --

15   Q.      Well, you didn't analyze the savings from technology,

16  did you?

17   A.      No, I didn't.

18   Q.      And as a matter of fact, do you know that when size

19  goes up, technology changes, enabling there to be efficiencies

20  that are not there with size?  Or do you not know?

21   A.      Can you repeat that?

22   Q.      Are you aware that there are record keeping

23  technologies such that as the number of participants goes up,

24  there's more efficiency in the terms of scale?

25   A.      I would say there's more efficiencies with greater

1  numbers, yeah.  It's the new technology that I was talking

2  about.  So it's not like they were doing the same for more,

3  they were doing more for more.

4  Q.      By the way, that reference on page 2 refers to three

5  plans.  What's the other plan?  You had the two PRISM Plans.

6  Talking about the non-qualified plans.

7  A.      When I look at the numbers, there were only two plans.

8  There was the PRISM Plan for salaried employees and the PRISM

9  Plan for union employees, hourly employees.

10 Q.      Would you agree, Mr. Sackie, that if you had $50,000 in

11 your 401(k) plan as an ABB employee and I had $5,000 in mine

12 that the record keeping cost doesn't, isn't greater for you

13 than for me?  Cost, not revenue.

14 A.      The record keeping cost isn't greater for the smaller

15 account than the larger account.  The larger account probably

16 experienced better returns.  Or put more money in.

17 Q.      Now, going back to the trust agreement, as well.  With

18 regard to page 3 of the trust agreement, or page 703, APP 703.

19 Section 4.

20 A.      I don't think I've found that page yet.  What was the

21 number again?

22 Q.      Page 3, Exhibit 1, ABB 00034

23 A.      I can't find it.

24 Q.      If you look at --

25         THE COURT:  It's right at the beginning.  If you

1    look here right at the beginning.

2          THE WITNESS:  Can you bear with me one more time,

3    can you give me that number?

4          THE COURT:  It's page 3.  In the right-hand, lower

5    right-hand corner you'll have ABB 00034.

6          THE WITNESS:  Thank you.

7    Q.      Do you have it?

8    A.      I do.

9    Q.      It says, available investment options.  Paragraph (b),

10   the named fiduciary shall direct the trustee as to what

11   investment options.  Little Roman, little ii is securities

12   issued by the investment companies not advised by Fidelity

13   Management and Research Company, non-Fidelity mutual funds, as

14   agreed to by the sponsor and the trustee.  Do you see that?

15   A.      Yes, I do.

16   Q.      So what that says is that Fidelity had to agree for

17   there to be securities issued by non-Fidelity funds in the

18   plan, right?

19   A.      They didn't have to agree, but they had to acknowledge

20   that, and they had to acknowledge that these funds were going

21   to be added to the plan.

22   Q.      Well, it doesn't say acknowledge, it says as agreed,

23   doesn't it, Mr. Sackie?

24   A.      Sure.  Here is what we want to put in.  Okay.  We

25   agree.

1  Q.      Okay.  And agree means the power to disagree, doesn't

2  it?

3  A.      No, it doesn't.  Well, it may include that.  I don't

4  know.  It never happened.  I never -- I can't think of any

5  single instance when that happened, and I can't think of a

6  document that would say they have that power.

7  Q.      The bottom of that subparagraph says, (quoted as read)

8  "The named fiduciary may add additional investment options with

9  the consent of the trustee and upon mutual amendment of the

10 trust agreement."  That requires Fidelity's consent, does it

11 not?

12 A.      It does, but, again --

13 Q.      I'm just asking you if that's what it requires.

14 A.      I interpreted it a little bit differently than you do.

15 Q.      You interpreted the requirement of consent not to be

16 consent?

17 A.      Sure.  They'll consent, but I don't read it in the

18 negative alternative like I think you may be.

19 Q.      Section 13 of that document, amendment or modification,

20 says this agreement may be amended or modified at any time and

21 from time to time only by an instrument executed by both the

22 sponsor and the trustee.

23         So Fidelity had the right to sign and the agreement

24 could only be amended if Fidelity signed at any time, correct?

25 A.      I'm sorry.  I just got to the page now.  Is this the

1   amendment or modification paragraph?

2   Q.      Yes.

3   A.      That's what it says.  Again, I interpret that to

4   mean --

5   Q.      I didn't ask for your interpretation, I just asked in

6   terms of what it says.

7   A.      That's what it says.

8   Q.      And in addition, Mr. Sackie, the next sentence says,

9   notwithstanding the foregoing to reflect increased operating

10  costs, the trustee, that's Fidelity, FMTC, the trustee may once

11  each calendar year amend Schedule B without the sponsor's

12  consent upon 75 days' notice.

13          So Fidelity has to agree to anything that ABB wants

14  to do to amend the contract, but Fidelity has a unilateral

15  right to increase its fees to offset operating costs without

16  even agreement of ABB, right?

17  A.      Again, that's -- that's one way to interpret, but it

18  never happened.

19  Q.      Fidelity never increased its fees?

20  A.      They never unilaterally increased fees.

21  Q.      And are you aware -- you're not aware of what remains

22  in the plan right now, I understand, in terms of this, right?

23  But if I told you that remains in the plan and the trust

24  agreement now, do you have any reason to disagree with that?

25  A.      If I read it literally, I would disagree with it, and I

1  would probably be surprised that it was in the plan.  But --

2  Q.     Now, Mr. Sackie, is there any reason why, that you know

3  of why ABB would agree to even create it, you say it never

4  happened, even creating a unilateral right on behalf of

5  Fidelity to increase its fees in this way?

6           MR. OPPENHEIMER:  Your Honor, I believe that

7  misstates the evidence and the document.

8           THE COURT:  Do you want to rephrase it?

9  BY MR. SCHLICHTER:

10  Q.     Okay.  Is there any reason you know of why ABB would

11  give Fidelity the unilateral right to increase its fees based

12  on its claim of operating costs increasing?

13           MR. OPPENHEIMER:  Misstates the document.

14           THE COURT:  Overruled.

15  A.     You throw in the word unilateral in there and that's, I

16  think, interpretive.  But I don't think it was ever ABB's

17  intent to allow Fidelity to unilaterally increase the fees.

18  Q.     Well --

19  A.     The record keeping fees.

20  Q.     I'm throwing the word unilaterally in.  I'm doing that

21  because ABB agrees to language that says without their consent,

22  meaning unilateral.  Do you have any reason, if ABB wasn't

23  going to do that, to understand why they put it in there?

24  A.     I don't know why that's in there.  I don't know why we

25  would agree to that.  And, again, I separate, you know,

1  sometimes trustee fees from record keeping fees.

2  Q.      All right.  Now, I want to hand you what -- or show you

3  P16, which is a December 29, 1997, letter from Fidelity.  This

4  is a letter addressed to you, Mr. Sackie.

5  A.      Uh-huh.

6  Q.      From Fidelity in which they say that they've now

7  launched this fund net, fund net program that we discussed a

8  little bit earlier.  Do you recall that?

9  A.      Yes.

10  Q.      And the fund net program, as we say, is a program that

11  ends up having other mutual funds, non-proprietary mutual funds

12  which are sharing revenue, which share revenue to Fidelity's

13  set limits of what they want, as far as you know, right?

14  A.      Yeah.

15  Q.      And if you take a look at the second page of that

16  document, the second page of that document, I believe, says --

17              THE COURT:  I'm sorry.  What document are you on?

18              MR. SCHLICHTER:  We're on APP O --

19              THE COURT:  You're still on 1?

20              MR. OPPENHEIMER:  Your Honor, P16.

21              THE COURT:  P16.  Here it is.

22  BY MR. SCHLICHTER:

23  Q.      Okay.  What that shows is, this is in the intermediary

24  period between the time that you started the plan with Fidelity

25  in '95 and the 2001 memo that we looked at before where

1  Fidelity's revenue sharing has increased from 30 to 50 basis

2  points, I believe it was, or 25 to 50 basis points. I believe

3  it was 30.

4          Here, this is a document effective in '98. Fidelity

5  will collect from our FundsNet partners a range of annual

6  administration fees, depending on the type of account,

7  effective January 1, '98. These funds that are mentioned there

8  will increase the amount of revenue sharing they're paying

9  Fidelity from 25 basis points to 35 basis points. That's what

10 happened, right?

11 A.      Yeah.

12 Q.      So in other words, Fidelity can unilaterally get

13 outside funds to increase the revenue sharing it is paid by

14 them without your involvement or approval?

15 A.      Correct.

16 Q.      And would you agree that when you have open-ended

17 asset-based record keeping fees, the result of that is to

18 increase Fidelity's fees and the amount participants pay for

19 record keeping services?

20 A.      It increases the Fidelity fees, but it does not

21 increase the charge to participants.

22 Q.      It increases the record keeping fees they're paying,

23 doesn't it?

24 A.      It just recharacterizes it from an expense ratio to a

25 record keeping fee.

1  Q.      Mr. Sackie, you said you have to make sure fees are
2  reasonable for the record keeping services provided.  It
3  increases the record keeping fees, doesn't it?
4  A.      There is no negative impact on the participant as a
5  result of this transaction.
6  Q.      Would you just answer my question?
7  A.      Ask it again, please.
8  Q.      It increases the record keeping fees, does it not?
9  A.      It increases the record keeping fee and decreases the
10 expense ratio or -- it increases the record keeping fee that
11 Fidelity is being paid by entities other than plan
12 participants.
13          THE COURT:  I think we're back to arguing.  He's not
14 going to say they're the same thing.  Go ahead.  It's wasting
15 time.
16          MR. SCHLICHTER:  I'm sorry.
17 BY MR. SCHLICHTER:
18 Q.      Let's talk about the issue of commingled funds.  And is
19 it fair to say, first of all, that you don't know much about
20 commingled funds but you know they were available and could and
21 should have been used according to the IPS?
22 A.      I don't know much about, I don't know anything about
23 commingled funds, and according to the investment, the IPS, it
24 said that they should be used.
25 Q.      And, in fact, one commingled fund was, one was used in

1    the plan after you had 21 options, correct?

2    A.      I don't recall if there were any commingled funds.

3    Q.      Okay.  Well, I believe even the attorneys have said

4    that, but if there was a commingled fund in the plan, would you

5    agree, then, that ABB saw no problem with having commingled

6    funds as it was required to have in the IPS?

7    A.      Correct.

8    Q.      And we've heard this talk about daily valuation.  Is it

9    correct, Mr. Sackie, that daily valuation was available for

10   separate accounts or commingled funds back in the late

11   nineties?

12   A.      I don't know.

13   Q.      We've also heard discussion about how the SEC oversight

14   of mutual funds is available.  Have you heard about some of the

15   abuses in the mutual fund industry in recent years?

16   A.      No.

17   Q.      You don't know anything about that?

18   A.      No.

19   Q.      In any event, since the IPS provided that the company

20   should be considering commingled funds in separate accounts,

21   obviously ABB didn't see any problem with putting those in,

22   despite lack of SEC oversight, right?

23   A.      My knowledge is ABB put them in.  I don't know any more

24   than that.

25   Q.      As a matter of fact, isn't it fair to say that when

1  you're an institutional investor with a billion dollar plus

2  plan and you can set up separate accounts, you can tailor them

3  however you want in terms of reporting, in terms of

4  communication, investment style, investment managers, and so

5  on; isn't that correct?

6  A.      There's a lot of customizing that can be done.   And

7  picking managers, yeah.

8  Q.      And you can tailor it to the employees.   We've heard

9  about the diversity of employees and retirement ages and so on.

10 You can tailor it to ABB's particular set of employees, which

11 you can't do with mutual funds, can you?

12 A.      I'm sorry.   I thought you were talking about PRISM.   We

13 tailored the program, you know, the options available in PRISM.

14 Q.      I'm talking about funds within PRISM.   In other words,

15 if you wanted to have certain investment managers, you pick

16 them up and set up a separate account.   You can do that.

17 A.      I'm not familiar with separate accounts.

18 Q.      In any event, you don't see anything that would be a

19 problem, do you, with having separate accounts or commingled

20 funds in terms of lack of control or regulation over whatever

21 the investment vehicle is.

22 A.      The document says they're permitted.   I don't know

23 enough about separate accounts to say one way or the other

24 about, anything about them.

25 Q.      Now, I'm going to hand you, or show you, rather, what's

1 been marked as P141. ABB 5290. This is a Fidelity record

2 keeping invoice that's sent to you, Mr. Sackie, in the year

3 2003, in January. Do you see that and agree with that?

4 A.    Yes.

5 Q.    If you turn to the second page of that document, which

6 is 5291, this is referring to the T. Rowe Price fund which did

7 not pay Fidelity revenue sharing but actually rebated it to the

8 plan, correct?

9 A.    That's what it looks like.

10 Q.    And yet, despite that fact and the fact that the plan

11 IPS requires that people get alliance rebates for the plan,

12 whoever it is in ABB, this is an invoice that is sent from this

13 outside mutual fund, T. Rowe Price, to the plan to pay what

14 they rebated to the, the amount that was rebated to the plan.

15         MR. ORTELERE:    Objection, Your Honor, compound

16 question, assumes facts that have not been established.

17 Q.    Let me rephrase it. It's a bill from T. Rowe Price to

18 the plan, right?

19 A.    This is a bill from Fidelity.

20 Q.    I'm sorry, from Fidelity to the plan. I'm sorry. I

21 said T. Rowe Price. It's concerning the T. Rowe Price plan.

22 It's a bill from Fidelity because Fidelity wasn't getting

23 revenue sharing from T. Rowe Price.

24 A.    I don't recall that specifically, but it looks like

25 they are billing us for it.

1    Q.      From the H account, it says at the bottom.   That's the

2    account, the plans' checking account, if you will, right?   Bill

3    Jeff City directly, it says.

4    A.      Yes.

5    Q.      So what we have here is a situation where T. Rowe Price

6    doesn't pay Fidelity the revenue sharing, they insist for

7    whatever reason they go to the plan and then Fidelity bills the

8    plan and you authorize the payment, right?

9    A.      I don't see my authorization to pay it, but I'm sure it

10   was paid.

11   Q.      Now, let's talk about the trust agreement and the

12   amendments that you were involved in.   I believe you were

13   involved in signing some on behalf of ABB; is that correct?

14   A.      I would have to see them first.

15   Q.      Okay.   All right.   You say you would have to see it,

16   but isn't it true that you signed most of those amendments to

17   the agreements?

18   A.      I have no idea how many amendments there were.   I'm

19   sure I signed some of them.   I see one right here.

20   Q.      Referring you to the 2004 amendment where section 4 was

21   amended, this is P1, page 104, ABB 00104.

22   A.      Okay.

23   Q.      We'll try to read through it.   Here section 4 is being

24   amended, the trust agreement we discussed before.   And if you

25   see that, once again, as of 2004, April of 2004, section 4 is

amended, but it says specifically the named fiduciary may

determine to offer as investment options only securities issued

by the investment companies advised by Fidelity and, ii,

securities issued by investment companies not advised by

Fidelity.

Okay. It makes a change in that provision, I

believe. And as to those that are not affiliated with the

trustee, it does allow that to occur, right?

A.    I did not sign this document. I'm not really familiar

with it.

Q.    Okay. Let me ask you this way to save time. Are you

familiar with anything that ever eliminated the requirement

that Fidelity consent to the addition of investment options in

the trust agreement?

A.    I'll answer that and say I don't remember it being in

there to begin with, and I'm not familiar with the change.

Q.    And you're not familiar with the fact that section 13

then didn't change either, requiring that Fidelity must sign

off to amend the document?

A.    I'm not familiar with that.

Q.    Would you agree that when the investment options are

specified in the trust agreement as they were that making the

requirement that Fidelity sign off to an amendment means that

Fidelity will have the ability to control deletions or

additions?

1  A.      No.   It means to me that Fidelity accepts the changes

2  we've asked to be made and it isn't seeking their agreement.

3  Well, they accepted the changes.   That's the way I interpret

4  that.

5  Q.      What is float?

6  A.      I'm only familiar with float on payroll situations, but

7  it's short-term invested money.

8  Q.      What is it for payroll?

9  A.      Well, you know, there is -- if you use a third party to

10 do payroll and the checks are mailed out on payday, let's talk

11 about a world without 100 percent direct deposit, there is a

12 time delay, if you will, between the date that the checking

13 account is funded and the check actually clears.

14 Q.      And did you get involved in managing the float in the

15 payroll account?

16 A.      I didn't get involved in managing it, but I remember

17 having a lot of discussion about it.

18 Q.      Okay.   And did you do anything, have any discussions

19 about it in the 401(k) plans?

20 A.      Never.

21 Q.      Who did?

22 A.      I don't know.

23 Q.      Did you ever inquire about it?

24 A.      I don't remember that.   I don't remember inquiring.   I

25 don't remember there being a need to inquire.   I didn't -- the

1    money was sent -- as I said before, the money was sent on

2    payday and invested.  I didn't think float was an issue.

3    Q.     Now, in the payroll account, you made sure that ABB

4    monitored the float, I think you said, to ensure the interest

5    rate was reasonable.  I want to ask you about a couple things

6    in that regard.

7             MR. ORTELERE:  Objection, Your Honor, I'm not sure

8    that was a question.

9             MR. SCHLICHTER:  I'm sorry, Your Honor, I'm trying

10   to get a document here.

11   BY MR. SCHLICHTER:

12   Q.     This is P270, page ABB-KEN 22344.  It's from Mr. Cutler

13   to you dated 3/10, 2004.  And this is discussing the DB plan,

14   is it not?

15   A.     No.  It's discussing the --

16   Q.     Payroll?

17   A.     I don't know what it's discussing.  Did you say DB

18   plan?

19   Q.     Yes, the benefit payment procedures.

20   A.     I don't know benefit payments from what plan.  I'm

21   trying to look for that.

22   Q.     Well, it's -- whatever -- it's a corporate plan, is it

23   not?  This isn't the PRISM Plans?

24   A.     I don't know that.  I don't know that.

25   Q.     Well, you know that the, you didn't concern yourself

1   with float in the 401(k) plans.  And if you take a look at this

2   document, Mr. Cutler is saying in the latter half of the second

3   paragraph, (quoted as read) "Additionally, knowing the daily

4   balance, I can compute the average daily balance and daily

5   average interest rate applied on these funds.  I can compare

6   this rate to the rate that Mellon credited to our pension trust

7   assets to insure that Fidelity's interest rate is reasonable."

8    A.     Sure.  Now that I get there I see that it's the pension

9   plans.

10          THE COURT:  I want clarification.  We're talking

11  about non-qualified pension plans, defined contribution pension

12  plans, defined benefit pension plans, what pension plans?

13          MR. SCHLICHTER:  This is the corporate pension plan

14  that, I believe it's the defined benefit plan.

15          THE COURT:  Okay.  That's what I'm trying to figure

16  out.  So when you call it the corporate plan, you're referring

17  to the defined benefit plan.

18          MR. SCHLICHTER:  Yes.  Actually I've been using that

19  term more broadly than that, Your Honor, to refer to plans

20  which the corporation funds and for which it has liability,

21  which would be the defined benefit plan.  But also the

22  non-qualified plans and payroll, as well as health and welfare.

23   BY MR. SCHLICHTER:

24   Q.     So is that, is it your understanding that that document

25  is, in fact, a document in which Mr. Cutler is trying to make

1  sure that Fidelity, Fidelity's interest rate is reasonable and

2  trying to capture the kind of float that can be captured from

3  that plan?

4  A.      Yes.

5  Q.      For ABB?

6  A.      Yes.

7          MR. SCHLICHTER:  Your Honor, could I request a brief

8  break before we finish?  I would expect -- are you going to

9  take an afternoon break?

10         THE COURT:  Well, I was planning on taking an

11  afternoon break at 4:00, and then we'll continue until 5:30, if

12  you have enough witnesses.

13         MR. ORTELERE:  Do keep in mind, Your Honor, that

14  I'll be calling Mr. Sackie on direct per the agreements with

15  the plaintiffs.  Plenty to do today.

16         MR. SCHLICHTER:  We do have that agreement, Your

17  Honor.  And we do want to move through these witnesses.  If

18  there's any way we could --

19         THE COURT:  Do you want to take a break now?

20         MR. SCHLICHTER:  Could we do that?

21         THE COURT:  Sure.  Court's in recess.  How long do

22  you want?

23         MR. SCHLICHTER:  Whatever you say, Your Honor.

24         THE COURT:  It's your time.

25         MR. SCHLICHTER:  Oh.  Ten minutes.

1          THE COURT:  All right.

2          (A recess was taken from 3:31 p.m. to 3:43 p.m.)

3          THE COURT:  We will continue.

4          MR. SCHLICHTER:  Thank you, Your Honor.

5    BY MR. SCHLICHTER:

6    Q.      Mr. Sackie, the fact that we talked about payroll and

7    we also talked about the defined benefit plan, it's fair to

8    say, is it not, the defined benefit plan that is the pension

9    plan for ABB employees, health and welfare plan, and payroll,

10   all involve corporate dollars and corporate funding?

11   A.      Corporate and employee, health and welfare, for

12   example, the cost of medical is shared between the employee and

13   the company.

14   Q.      All right.  But there's a corporate liability for the

15   pension plan and the health and welfare plan and for the

16   payroll, right?

17   A.      Like PRISM, company matching contribution.

18   Q.      I understand.  But once the matching contribution has

19   been made, then the money is the plan's and the participants'

20   in the plan rather than the company's liability or money or

21   assets, right?

22   A.      Right.

23   Q.      Okay.  In the corporate plans -- and I'm going to use

24   corporate plans so we're clear to refer to plans under your

25   jurisdiction that were corporate liabilities, that is, whether

1  the corporation ABB would benefit or it would work to its

2  detriment, depending upon what happened with fees and what

3  happened with the money.

4        So in those corporate plans, isn't it fair to say

5  that the float was handled the same way, it was negotiated for

6  in each of those plans?

7  A.    No.  I'll give you an example.  In the medical plan,

8  the payments were made by a third party.  This is somebody

9  incurred a claim, submitted a medical claim, the company we

10 hired to process those claims did that, they processed the

11 claim, and they made a payment, and we funded the checking

12 account from which those payments were made on a decks cleared

13 basis.

14 Q.    Did all of the corporate plans have a fixed expiration

15 date?

16 A.    Fixed expiration date?

17 Q.    In the contracts with service providers.

18 A.    I don't recall.

19 Q.    What about any kind of performance guarantees, did they

20 have performance guarantees?

21 A.    All of our contracts had performance guarantees.

22 Q.    All of your corporate contracts had performance

23 guarantees, right?

24 A.    Again, all of our relationships, all of our providers

25 had performance guarantees.

1   Q.      So you didn't have performance guarantees in the 401(k)

2   plans, did you?

3   A.      Not financial guarantees, no.

4   Q.      All right.  In other words, performance guarantees are

5   of the type that ABB will say with a service provider, you take

6   some of the risk of performance, and if you don't perform

7   according to specifications, you may pay a 20 percent penalty

8   or something like that?

9   A.      No, not at all.  We had very few performance -- we had

10  performance guarantees, but these were performance against

11  metrics or standards that we established for service delivery.

12  We didn't have any contracts that I can recall that had ongoing

13  performance guarantees in them.  When we negotiated some new

14  relationships, we put some performance guarantees around

15  implementation, but not ongoing.

16  Q.      In terms of fees to service providers in the corporate

17  plans, you didn't have any corporate plans that had open-ended

18  uncapped fees, did you?

19  A.      The fees --

20  Q.      Talking about asset-based fees.

21  A.      No, because there were no assets.

22  Q.      Well, in the DB plan, there are all kinds of assets,

23  aren't there?

24  A.      I wouldn't be able to -- that's outside my area of

25  expertise.  When it came to the DB or pension plan assets,

1  again, that was Pension and Thrift Management, and I don't

2  really know what kind of agreements they had with the fund

3  managers.

4  Q.    So it's clear insofar as the DB pension plan, you were

5  overseeing it, right?

6  A.    That's correct.

7  Q.    And then didn't you know what was in it?

8  A.    I was responsible for overseeing the administration of

9  the plan, the design of the plan, making sure the funding of

10 the plan happened, but -- I participated with the actuaries in

11 calculating funding requirements and things like that.  But

12 when it came to oversight responsibility for the assets in the

13 defined benefit plans, that was not my responsibility, that was

14 Pension and Thrift Management.

15 Q.    Did you know enough to know that there were only hard

16 dollar fees and no open-ended asset, uncapped asset-based fees

17 in the pension plan, the DB plan?

18 A.    You're talking about fees paid to whom?

19 Q.    Service providers.

20 A.    Like Fidelity?

21 Q.    Yes.

22 A.    I was familiar with that, yes.

23 Q.    And you didn't pay Fidelity with open-ended uncapped

24 asset-based service fees in the pension plan, did you?

25 A.    That's correct.

1   Q.      And you didn't have any Fidelity funds in the DB plan.

2   A.      I'm not aware of any.

3   Q.      In the role as a fiduciary for the people who were

4   picking the investment managers, if they felt in their hat as a

5   fiduciary to the 401(k) plan that these were such stellar

6   performers, these Fidelity funds, why wouldn't they put them in

7   the DB plan?

8   A.      There were a lot of other funds besides Fidelity funds

9   in the 401(k) plan, and I don't ever remember anyone calling

10  any of the mutual funds we offered stellar performers.  I think

11  there's a whole different philosophy in a 401(k) plan.  The

12  investment risk is the individual's, and in the defined benefit

13  plan, the investment risk lies with the company.

14  Q.      Exactly.  And when you had the company's responsibility

15  involved, you chose not to use any Fidelity funds, right?

16  A.      That's correct.

17  Q.      Did you ever say in a DB plan, Fidelity, don't even use

18  your mutual fund platform, just manage money for us.  Did you

19  ever have Fidelity manage anything for you in the DB plan?

20  A.      I'm -- not that I'm aware of.

21          MR. SCHLICHTER:  Your Honor, we will offer -- I

22  believe it's agreed to or will be agreed to, -- those plans in

23  evidence rather than go through them here.

24          THE COURT:  All right.

25          MR. ORTELERE:  I'm sorry, Your Honor, I'm not sure I

1 understood that.

2        MR. SCHLICHTER:  The DB plan and the health and

3 welfare, we'll offer those.  I believe they're stipulated to.

4        MR. ORTELERE:  I'm sorry, I didn't understand.

5        MR. SCHLICHTER:  The contracts.  The contracts in

6 those plans, the contracts --

7        THE COURT:  He'll just admit them and he won't go

8 through it here and read it to me.

9 BY MR. SCHLICHTER:

10 Q.      Now, I want to refer you next to Exhibit No. P1102.

11 And that's a June 4, 2002 e-mail.

12        Your e-mail is dated that day, that's -- I'm sorry.

13 1102, ABB 54119.  You sent an e-mail to Joanne Morlan.  Joanne

14 Morlan is the relationship manager at the time for Fidelity for

15 the ABB account, right?

16 A.      I don't think she was a relationship manager in 2003.

17 Q.      All right.  She's a Fidelity representative.  She's

18 going to testify when she was relationship manager.  But in any

19 event, in this time frame, Fidelity has now been expanding

20 corporate services, and you're about to add now payroll, for

21 Fidelity to handle your payroll to the services they're already

22 providing to ABB, correct?

23 A.      Yes.

24 Q.      Okay.  And you ask the question to Joanne Morlan with

25 Fidelity, (quoted as read) "After HR/Payroll goes live will we

1   see any reductions in our current Fidelity benefits

2   administrative fees," right?

3   A.      Yes.

4   Q.      (Quoted as read.)  "Anything you can provide that will

5   help us quantify savings would be appreciated and will help our

6   pitch."  That's what you said.

7   A.      Right.

8   Q.      And so what you're talking about is really sharpening

9   the pencil for the corporate plan, the payroll plan to help

10  make the case as to why it should be Fidelity doing that,

11  right?

12  A.      I'm not 100 percent sure of that.  You see, this is an

13  economies of scale kind of request.  We send data to Fidelity

14  on a regular basis, and as we expand the amount of

15  administrative service work that Fidelity does for us, we're

16  assuming that the data that we feed to them as opposed to there

17  being multiple feeds, now there will be a single feed, does

18  that streamlining create any economies of scale.

19          So, in other words, if there were three programs in

20  place and there were separate data feeds for all three programs

21  and now there was only going to be a single data feed and

22  actually maybe some of the feeds, and the other two were being

23  eliminated, where is the economies of scale because you're not

24  doing that work anymore.  That was the request.

25  Q.      All right.  And that's for the corporate, corporation's

1 benefit and for the benefit of ABB you said, we are looking for

2 every penny we can find to support a Fidelity recommendation,

3 right?

4 A.    We were trying to do everything we could to make the

5 HR/Payroll cost effective.

6 Q.    You were going to be sure you knew about every fee and

7 you got it negotiated down to benefit ABB to the penny, right?

8 A.    No.   No.   We were -- this is an open-ended question

9 just saying is there any economies of scale that we will

10 realize as a result of doing this.

11 Q.    Now, let's turn to Exhibit No. P242, which is a 3/22/04

12 document regarding another corporate expense, payroll.   This

13 document is to you dated that day, 3/22/04, regarding Fidelity

14 questions.   These are questions about payroll.   And in the

15 funding part, paragraph 1, you talk about the payroll float,

16 right?

17 A.    Alan Keller does.

18 Q.    He talks to you about the payroll.   And who is Alan

19 Keller?

20 A.    Alan Keller was the director of payroll and he reported

21 to me.

22 Q.    And insofar as float is concerned, Mr. Keller says in

23 that paragraph, (quoted as read) "Fidelity's standard service

24 requires gross payroll funding two days prior to settlement

25 date.   They commingle the funds and they receive the float to

1  offset the processing cost. We are negotiating with Fidelity

2  on the float. We want an equitable method to identify the

3  float and that ABB receives the float. This is especially

4  important due to fluctuation in interest rates over the term of

5  our contract."

6           So you worked hard, or ABB was working hard to

7  identify the amount of float involved and then to get the

8  benefit of it for itself from Fidelity, right?

9  A.     This is a situation where --

10  Q.     Excuse me, is that right? That's my question.

11  A.     We worked on that, yes.

12  Q.     Okay.

13  A.     And --

14  Q.     That's all I'm asking. You did that for the payroll

15  where that's going to go to the ABB corporate account, not to

16  any participants in the PRISM Plans, right?

17  A.     No, it's not going to come out of it because we didn't

18  have that situation prior to going to Fidelity.

19  Q.     Now, let's go to Exhibit No. P244. And this is also, I

20  believe, in that general time frame in June of '04, also I

21  believe an e-mail from you regarding float and the payroll,

22  right?

23  A.     I was not an employee at this time, but --

24  Q.     You were a consultant at this time.

25  A.     Yes.

1  Q.      So it's clear, you were an employee through which year

2  was it, '03?

3  A.      No, I was an employee until May 31st of '04.

4  Q.      Just before that date.

5  A.      But I do want to point out that from January 1st of '03

6  through May 31st of '04, I was in what's called a phased

7  retirement program, so I was phasing out.  So as the documents

8  and correspondence with me get closer and closer to June 1st or

9  May 31st of '04, it's more just -- I was less involved in the

10 day-to-day decision making.  It was just information.

11 Q.      So in this document, you said that, (quoted as read)

12 "In order to track our float separately, Fidelity will charge

13 us $15 per employee per year.  That would amount to $135,000.

14 Sounds to me like that will eventually become a better deal

15 than giving them the float.  In fact, if I can negotiate a rate

16 better than $15, it would be even better than giving them the

17 float.  Do you agree that I should agree to the $15 rate even

18 if I can't get a lower fee?"

19         So what's going on here is you're actually,

20 Mr. Sackie, doing the math with regard to the float to get the

21 best deal for ABB, right?

22 A.      No, I don't think I was doing the math.  I think Alan

23 presented me with the data and the math and I was reacting to

24 his analysis.

25 Q.      Okay.  Alan is doing the math, you're analyzing the

1  math, and the two of you are comparing a flat fee compared to

2  open-ended float, right?

3  A.      Yeah.   We did our own payroll prior to this, so this is

4  cost avoidance as opposed to, you know, a savings.  We're being

5  faced with a situation now where we're going to have float

6  whereas before we didn't have float because the payroll was

7  done internally.

8  Q.      So unlike what you did, ignoring the -- your not

9  getting involved in the asset-based record keeping costs and

10  comparing that to hard dollar fees, here you are comparing this

11  open-ended float income to a firm hard dollar fee and choosing

12  which is better.

13  A.      Of course I object to the use of the word ignore, but

14  we were working on the payroll float issue.

15  Q.      Now, let's go to P250.  This is later in the year,

16  October of 2004.  Now, this is from Alan Keller also to, who is

17  Daniel Johnson?

18  A.      I don't know who Daniel Johnson is.

19  Q.      But you were copied on this.

20  A.      I was copied on this.

21  Q.      Okay.  In this document, if you take a look at the

22  October 13th date, the question is now being asked about float

23  again.  (Quoted as read.)  "Why are the monthly fees assessed

24  against ABB's lost float?  The bank fees are based on

25  transactions, which is a Fidelity expense that should not

1  reduce ABB's lost float." You see that, right?

2  A.      Yes, I do.

3  Q.      And that's discussing float in what corporate plan or

4  context?

5  A.      Well, it's not a plan. It's the payroll.

6  Q.      Okay. It's payroll. Corporate liability. So here

7  you're saying that Fidelity should not get bank fees that are

8  charged to Fidelity out of a float account?

9  A.      That's what Alan is saying.

10 Q.      That's what Alan is saying?

11 A.      Yes.

12 Q.      And then in your response to Alan Keller, you say, if

13 the standard offering whereby Fidelity retains the, (quoted as

14 read) "If the standard offering whereby Fidelity retains the

15 float, Fidelity also absorbs the full amount of the bank fees."

16 A.      That's not a response from me.

17 Q.      I'm sorry. That's Andy. I'm sorry. (Quoted as read.)

18 "In accommodating the ABB need to return float, ABB also needs

19 to absorb a pro rata share of the bank fees."

20         So ABB's position in this discussion is that

21 Fidelity, not ABB, should pay the bank fees on the float

22 account, right?

23 A.      That's what it sounds like. I mean, this is four and a

24 half months after I retired. Alan is in direct discussions

25 with Fidelity on, in this case, the issue of float. Very

1  knowledgeable about the issue and working it hard with

2  Fidelity.

3  Q.      Are you aware, Mr. Sackie, that in the PRISM Plans for

4  the 401(k) participants, the Fidelity bank fees on the float

5  account are charged to the participants' account?

6  A.      I don't recall that.

7  Q.      If they are, that would be a different way of handling

8  it than you're handling the payroll, wouldn't it?

9  A.      If I knew more about it, I would be more comfortable

10  answering that question.

11  Q.      Exhibit P880 I'm going to refer to now.  880.  This is

12  a letter from Fidelity to you in January of 2002, and this is

13  discussing in general what topic?

14  A.      Let me just take one minute and -- this looks like a

15  memo from Fidelity summarizing a meeting we probably had --

16  well, I guess we had it on the 10th.

17          Around the end of the year or beginning of the new

18  calendar year, Fidelity wanted to come down and spend some time

19  just to find out what ABB was planning to do.  Within the

20  benefits function at ABB, we developed a strategic plan, it was

21  a multi-year strategic plan.  And Fidelity, being a critical

22  supplier or vendor of ours, we wanted to make sure that they

23  knew, No. 1, the kinds of things that we were planning for our

24  benefit programs over the next several years.  We also wanted

25  their input as to what they may be working on that we might be

1 able to incorporate into our plan. So this was a joint meeting

2 between ABB and Fidelity to discuss the ABB strategic plan.

3 Q.    Now, insofar as the 401(k) or PRISM Plans, Mr. Sackie,

4 the law requires and you operated on an, and you're saying ABB

5 operated on the principle that you've got to exclusively,

6 exclusively work for the benefit of the plan participants,

7 right?

8 A.    I wouldn't disagree with that.

9 Q.    All right. In the paragraph that starts, or the bullet

10 point that starts out streamlining and standardization, if you

11 take a look at that, that says you will look for ways to

12 consolidate available benefits, reduce the number of carriers,

13 and simplify ABB's approach to subsidizing plans. Do you see

14 that?

15 A.    I do.

16 Q.    So in this total ABB relationship, in this whole

17 strategy -- do you need some water?

18 A.    No, I'm good, thanks.

19 Q.    In this total strategy, Fidelity in this letter is

20 saying to you that ABB is subsidizing plans, isn't it?

21 A.    Yes, and I need to explain that to you because it's

22 not --

23 Q.    I'm sure you'll have an opportunity to explain through

24 your attorneys.

25 A.    That's a total misrepresentation of what this means.

1  Q.      I asked you whether it says that ABB is subsidizing

2  plans, and the answer, I believe you said, is yes, right?

3  A.      Without being able to define subsidy, I'm not going

4  to -- I'm going to say I don't know.

5  Q.      Do you know what the profit margins have been on the

6  health and welfare and DB and payroll?

7  A.      At Fidelity?

8  Q.      Yeah.

9  A.      No.

10  Q.      Do you know that Fidelity takes the position that it's

11  been losing money and continues to lose money in those plans?

12  A.      I have absolutely no idea.

13  Q.      Do you know anything about what the profit margin is on

14  the 401(k) PRISM Plans?

15  A.      All I know is what you presented this morning.  Before

16  that I knew nothing.

17  Q.      Before that you knew nothing because you never asked

18  and no one that you know of ever asked.

19  A.      That's correct.

20  Q.      Well, in that regard, let's take a look at Exhibit 918.

21  Going to page 11 -- APP 1175, which is the second to the last

22  page of that document first.  Try to get a date for the

23  context.  I believe the date there is January 2nd of '02.  Do

24  you see that, from Bob Mills?

25  A.      Yes.

1  Q.      This is in the same month as the prior letter that
2  we've just discussed where we're talking about ABB subsidizing
3  plans, right?  That letter that we just looked at was in
4  January of '02, as well.
5  A.      Okay.
6  Q.      Okay.  And that gives the context for the date, that
7  last part, and in that letter, who is Mr. Mills?
8  A.      I don't remember.
9  Q.      Okay.  In any event, it says, (quoted as read) "John
10 Sackie is a valued referenceable senior contact, who as ABB's
11 primary decision maker was instrumental in bringing this
12 multi-practice relationship to Fidelity, DC, DB, and H&W."  Do
13 you agree with that?
14 A.      Yes -- well, I don't know.  Was I instrumental in
15 bringing those businesses to them?  Yes.  I can't react to
16 their feeling that I was a valued customer.
17 Q.      You gave them references, didn't you?
18 A.      I made myself available as a reference if they wanted
19 me to be one.
20 Q.      And you --
21 A.      And I was a good, honest reference.
22 Q.      Okay.  Now, we've already heard over and over from ABB
23 in its pretrial papers and we've heard at other times that they
24 lose money on their corporate plans and we saw --
25         THE COURT:  Could I interrupt a minute?  I've lost

1 track of what this exhibit is.

2           MR. SCHLICHTER:  This is an e-mail string, Your

3 Honor, that has -- it's a Fidelity e-mail string, Your Honor,

4 that speaks to ultimately new non-qualified plan.

5           THE COURT:  Number?

6           MR. SCHLICHTER:  Oh, number?  It's P918.

7           THE COURT:  Got it.  Okay.  Thank you.  I just

8 misplaced it.

9  BY MR. SCHLICHTER:

10 Q.      So we've heard that, we've heard from ABB they're

11 losing money on the corporate plans.

12           MR. ORTELERE:  I think you're referring to Fidelity.

13 Q.      I'm sorry.  Fidelity is losing money on their corporate

14 plans.

15           MR. ORTELERE:  Again, I don't see how Mr. Sackie can

16 validate or authenticate an internal Fidelity e-mail and what's

17 happening within Fidelity.

18           MR. SCHLICHTER:  Well, I believe the document's

19 going to be in evidence or is in evidence, Your Honor.

20           MR. ORTELERE:  There are objections, Your Honor, for

21 this reason.  Certainly this witness can't authenticate it.

22           MR. SCHLICHTER:  You've said you're not raising an

23 authentication objection for e-mails.  For your e-mails.

24           MR. ORTELERE:  It's their e-mail.

25           MR. SCHLICHTER:  They're waiving authentication

1  witnesses.

2          MR. OPPENHEIMER:  Your Honor, the simple answer to

3  the objection is there are stated objections.  This is not one

4  of the exhibits that's on the joint list.  That's all.

5          THE COURT:  Okay.

6  BY MR. SCHLICHTER:

7  Q.      What we see here is there's a discussion of a new

8  non-qualified plan for some other executives or maybe the same

9  executives.  Do you recall that?

10          MR. ORTELERE:  Objection, Your Honor, we also have a

11  hearsay problem this witness can't remedy.

12  Q.      Let me ask you this.  Do you recall when you were a

13  consultant, Mr. Sackie, still at ABB at some point a new

14  non-qualified plan being added for executives?

15  A.      I don't think this is a new plan.  I think this is just

16  a change in record keeper, if I'm looking at the right

17  document.

18  Q.      All right.  This is a change in record keeper of the

19  non-qualified executives plan, right?

20  A.      That's correct.

21  Q.      If you turn to the second page, then, after they talk

22  about how, they're asking that, they use the word record

23  keeper.  And on the second page of that e-mail, it says we're

24  going to take on record keeping of an additional ABB

25  non-qualified plan in mid-2002.  That's why I said additional

1  because it says additional.

2         Then if you look to the third --

3  A.     I'm sorry.  That's on the second page, is that --

4  Q.     The last page, I'm sorry, the next page.  I'm sorry.  I

5  misspoke.

6  A.     Let me get there and read that.  Yeah, it's additional

7  because up until that point they hadn't been doing it.  It's

8  not new to ABB, but it's new to Fidelity.

9  Q.     All right.  In any event, if you look at that document

10 and you see the paragraph that begins about three paragraphs

11 down, ABB, do you see that paragraph?

12 A.     Yes.

13 Q.     Read that first sentence.

14 A.     (Quoted as read.)  "ABB is a three service (DC, DB, and

15 H&W) client with a very healthy 54 percent DC margin.  Waiving

16 the corporate action and ongoing record keeping expense has

17 only a minus one percent impact on margin."

18 Q.     So you can see that Fidelity considered the ABB

19 account, despite the fact that everything in the corporate side

20 lost money, to be a very healthy 54 percent profit margin,

21 according to this, right?

22 A.     It says the DC profit margin was 54 percent.

23 Q.     And then the ultimate response from this, in this

24 e-mail is, (quoted as read) "I would be in favor of waiving

25 these fees based on the information below.  I just want to be

1    sure Cindy communicates what the fees are and that we are
2    waiving them so we get some credit from the client."
3              The client is ABB, right?
4    A.       Okay.  Yes.
5    Q.       So this is an example of waiving fees, which means
6    something else is subsidizing those waived fees, right?
7              MR. OPPENHEIMER:  Foundation, Your Honor.
8              THE COURT:  Sustained.
9    Q.       Have you seen any -- you said you know about fees for
10   record keeping services to some extent.  Have you seen anybody
11   who does them for free if they're not getting something else
12   for it?
13   A.       No.  I haven't seen any.
14   Q.       And, in fact, Fidelity did take over that second --
15   again, you were still there, you were still a consultant,
16   Fidelity did take over that second or that non-qualified,
17   changed the record keeping and the record keeper, in fact, did
18   not do the record keeping services to that non-qualified plan,
19   correct?
20   A.       I don't recall.
21   Q.       But you don't recall ever a non-qualified plan paying
22   record keeping services, do you?
23   A.       I don't recall paying them or not paying them, to be
24   honest with you.
25   Q.       So what we have is a situation, is it fair to say,

1  Mr. Sackie, that over the period of time after Fidelity got its

2  foot in the door, so to speak, in '95 with the record keeping

3  of the 401(k) plans, that Fidelity consistently increased

4  involvement in corporate plans of ABB, the DB plan, the health

5  and welfare plan, the payroll processing over the period of the

6  following years?

7  A.       That's correct.

8  Q.       And despite doing all of that and despite increased

9  revenue from those plans, Fidelity says they've lost money on

10 those corporate plans consistently, six years of losses.

11 That's what they say.

12 A.       I'm not aware of that.

13 Q.       You're quite aware, though, that they made quite a bit

14 of money on the 401(k) plan, aren't you?

15 A.       I'm only aware of that in the last few hours since you

16 put that slide up this morning.

17              MR. SCHLICHTER:  That's all I have, Mr. Sackie.

18              THE COURT:  Have you all worked out who is going

19 first?

20              MR. OPPENHEIMER:  We have, Your Honor.

21              COURTROOM DEPUTY:  Excuse me, plaintiff, were you

22 going to move your exhibits?

23              THE COURT:  Are you going to move to admit them?

24              MR. SCHLICHTER:  We move to admit them now.

25              COURTROOM DEPUTY:  Have you got a list?

1          MR. SCHLICHTER:  Yes, we do.  I'll get it, get it to

2   you.  Would you like to address it at a later time, Your Honor?

3          THE COURT:  I don't care when we address it, but

4   until somebody actually admits an exhibit, it's not in the

5   record from my perspective, even though you've shown it to me

6   and the number is in the transcript, because it sounds like we

7   still have objections.

8          MR. OPPENHEIMER:  Your Honor, we do have the one

9   exhibit, which was 918, has standing objections.  We still have

10  the unresolved objection on 918, P918 for hearsay and P1358 for

11  relevance and hearsay.

12         THE COURT:  I'm sorry.  P1358?

13         MR. OPPENHEIMER:  Yes, Your Honor.  And that was the

14  study by Economic Systems supplied to DOL by, about which there

15  was some colloquy about whether it was actually a DOL study or

16  not.  And the other exhibit, P918 is the one we just looked at

17  which is a long e-mail chain that Mr. Sackie was not a party to

18  but he was asked some questions.  It may just be it was being

19  used to attempt to refresh or as a reference and is not being

20  used for any other purpose, at which point there's no point in

21  addressing it.

22         THE COURT:  Is 918 an e-mail?  You're objecting to

23  it on grounds of --

24         MR. OPPENHEIMER:  There's no authenticity objection,

25  but we object to hearsay.

1          THE COURT:  Let's deal with that first.  Aren't

2     these party opponents?  Isn't this, aren't these your clients

3     talking?

4          MR. OPPENHEIMER:  Your Honor, I believe we have

5     references in here to -- and I apologize if I have the wrong

6     exhibit.  Let me just check.

7          THE COURT:  I'm dealing with P918.  Are you talking

8     about hearsay within hearsay?

9          MR. OPPENHEIMER:  Yes, because I believe it's

10    statements made to individuals at Fidelity.  Let me -- I

11    apologize if I've misremembered this.  Your Honor, there is a

12    reference to a statement made to Mr. -- actually, it's not

13    clear who it's made to in the first series at the bottom of the

14    second page, that would be APP 01175.  It says John -- and that

15    may be Mr. Sackie in context, I'm not sure -- asked us to take

16    over their exec plan.  That would be, I think, embedded at the

17    second level, Your Honor.

18         THE COURT:  So you're objecting to that sentence?

19         MR. OPPENHEIMER:  Yes, he wasn't asked about that.

20         THE COURT:  You have no objection to anything else

21    in it?

22         MR. OPPENHEIMER:  I believe that's it, Your Honor.

23         THE COURT:  Okay.

24         MR. ORTELERE:  I will only add to the extent the

25    court characterizes the document as an admission on the part of

Fidelity --

THE COURT:  I didn't hear any objection or any argument it wasn't.

MR. ORTELERE:  If it is an admission, it's not an admission as against ABB.

THE COURT:  Right.  Okay.  Any response?

MR. SCHLICHTER:  Yes, Your Honor.  I believe it is an admission as to Fidelity because they're admitting damaging facts.  It's their statement.  It's authentic.

And insofar as the argument that it's not an admission against ABB, this theory of the case is that these two parties are jointly operating together to serve their mutual interests.

THE COURT:  How does that affect the hearsay?  I'm just asking.  I don't know the answer.

MR. SCHLICHTER:  It's also against the interests of ABB in that it is recognition of Mr. Sackie functioning to benefit them.  Mr. Sackie has also agreed that he did, he was a reference.  He's also agreed that he did provide -- he didn't disagree with the profit margin.  He didn't agree or disagree. So it's an admission insofar as this joint effort on the part of these two against both their interests.  And in addition, they have the joint defense agreement, Your Honor, which I think bears upon this, as well.

THE COURT:  I've never heard that before.

1    MR. SCHLICHTER: Well, I think their interests are

2 so intertwined, Your Honor, is the point that it's very

3 difficult to separate out. This document would be an admission

4 against Fidelity's interests and not against ABB's interests.

5    But in any event, if the court doesn't agree, it

6 would be, have to be admitted for the limited purpose of an

7 admission against Fidelity's interests and would come in with

8 that limited understanding. And if you didn't think it was

9 applicable to ABB, you would have to in your mind --

10    THE COURT: Certainly evidence as to what Fidelity

11 views as its relationship with ABB and these people, isn't it?

12    MR. ORTELERE: I don't speak for Fidelity, but as to

13 ABB, there's no indicia of reliability related to the document

14 such that the hearsay should come in against us.

15    THE COURT: Why should I not think that this is

16 authentic? It's an e-mail.

17    MR. ORTELERE: I'm sorry. What I mean is the

18 different predicates to the hearsay exceptions --

19    THE COURT: Do you think they're lying about what

20 John Sackie said?

21    MR. ORTELERE: No, Your Honor. Again, it's not our

22 statement, that's all I'm saying. And I don't think Mr. Sackie

23 has said that that's his statement to them.

24    MR. SCHLICHTER: In any event, Your Honor, it would

25 come in under the catch-all otherwise trustworthy provision of

1 the federal rules.

2     THE COURT:  Yeah, why not that one?

3     MR. OPPENHEIMER:  Your Honor, part of the problem

4 here is none of us were involved in this chain, of course, it

5 was a long time ago.  But I don't read it -- one person's view,

6 but I don't read the reference that I was referring to as an

7 indication that the author of the statement had the

8 conversation.  That's part of the problem.  If you look at the

9 e-mail at the bottom of this, I guess it's the third page, Your

10 Honor, that would be APP 01175.

11     THE COURT:  Right.  John asked us to take over their

12 exec account.  That's the sentence you're objecting to.  And

13 you're objecting to everything.

14     MR. ORTELERE:  We're just saying that it's not

15 admissible as against ABB.

16     THE COURT:  Let's finish with you first.

17     MR. OPPENHEIMER:  But just to finish my thought, if

18 you then look to the last page, which is the first sequence in

19 the e-mail, frankly the way it reads to me is that Mr. Mills is

20 drawing an inference from something that Miss Kuppens sent him.

21 And anyway, in context, that's what it looks like and,

22 therefore, it truly is hearsay.  This does not appear to be a

23 reported statement made to Mr. Mills at all.

24     THE COURT:  Okay.  Well, I'm going to take that

25 under advisement.  We'll deal with that before tomorrow

morning.

As to everything else, though, there's no objection to any of the other exhibits except for this 1358, the Economic Systems?

MR. ORTELERE:  No objections from ABB, Your Honor, as to the other documents.

THE COURT:  Your only objection is to 918; is that correct?

MR. ORTELERE:  Although I realize I overlooked the DOL.

THE COURT:  Are you objecting to 1358 too?

MR. ORTELERE:  Yes, I join Fidelity's objection.

THE COURT:  What's your objection?  Are you claiming it's not an authentic document?

MR. OPPENHEIMER:  No.

THE COURT:  What's the objection?

MR. OPPENHEIMER:  Actually, I guess the -- I suppose the most pragmatic issue from Your Honor's comments, I am highly confident that it's being understood in context.  And consequently, if it's not being offered for the truth, and perhaps it isn't, we would withdraw our objection.

MR. SCHLICHTER:  It is offered for the truth, Your Honor.  And it's available on the DOL website under the government exception for certification.  It's the equivalent of a certification of a print copy of a government document.

1    It is offered for what it is, and it also separately

2  goes to the industry knowledge and industry standards.  In this

3  company they have the standard of a prudent financial expert

4  that is applied to them as a fiduciary.  So it's quite

5  trustworthy as it's a U.S. government record by the agency that

6  oversees 401(k) plans.

7    MR. OPPENHEIMER:  Your Honor, I have a suggestion

8  because I don't believe there's any further testimony that the

9  witness could give that would enhance this discussion in any

10  event.  But I do believe that there are portions of the

11  document which are not included in this exhibit which reflect

12  on its status as to whether or not it's a government report or

13  not.  I believe our understanding is it isn't.

14    Perhaps if we could just discuss with Mr. Schlichter

15  this evening the total document, maybe we can reach an

16  accommodation.  I believe the document in its whole form and

17  its complete form contains within itself descriptive terms

18  which would cause it not to be a government document.  If we're

19  wrong about that -- that's my memory, but I don't have it here,

20  then perhaps --

21    THE COURT:  What I'm hearing is you'll try to work

22  it out, and otherwise you'll let me know tomorrow morning if

23  there's not an agreement on that.

24    MR. OPPENHEIMER:  Yes, Your Honor.

25    THE COURT:  Then if there's not an agreement I'll

1  resolve it.  Okay?  As to 918 I've already taken that under

2  advisement.  Okay.  Cross-examination.

3            MR. ORTELERE:  Well, Your Honor, Brian Ortelere for

4  ABB again, and we're taking Mr. Sackie in direct, on direct as

5  part of our case in chief by agreement with plaintiffs'

6  counsel.

7                              - - -

8                       CROSS-EXAMINATION

9   By Mr. Ortelere:

10  Q.       Now, Mr. Sackie, you discussed with Mr. Schlichter some

11  of your employment history, but let's you take -- let's take

12  you back to around 2000.  Were you working for ABB at that

13  point in time?

14  A.       Yes.

15  Q.       And do you recall, sir, what was your title at that

16  point in time?

17  A.       Vice-president, HR services, human resources services.

18  Q.       Can you describe generally, Mr. Sackie, your

19  responsibilities?

20  A.       I was, had overall responsibility for ABB's benefit

21  plans, the ABB payroll, and the ABB HR Information Systems

22  group.

23  Q.       I think it would be useful if you explain to the judge

24  what that refers to, HR Information Systems.

25  A.       Sure.  The human resources, HR Information System is --

1          THE COURT:  I want to make sure I understand.  You

2   had overall responsibility for ABB's benefit plans?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Go ahead.

5   A.        The HR Information Systems, that was a group -- there

6   is a system, it's a database, it's the repository of all of the

7   ABB employee and retiree data.  New hires are entered into that

8   system.  Changes made, addresses, salary, made during someone's

9   employment are entered into that system.  Separations from

10  employment are entered into that system.  And I managed the

11  group, or I had overall responsibility for the group that had

12  responsibility for that system, maintaining that system.

13  Q.        Now, sir, you've testified that you had responsibility

14  for the varied ABB benefits plans, correct?

15  A.        That's correct.

16  Q.        Now, can you describe for the court the role you played

17  with respect to selecting service providers for these plans?

18  A.        Again, I had overall responsibility and direct

19  involvement in negotiations.  We drove this by internal task

20  force and consultants, and I kind of had overall responsibility

21  for making sure the process worked.

22  Q.        Well, what steps did you take to ensure that quality

23  service providers were selected?

24  A.        Every arrangement or every relationship that we entered

25  into, we developed a series of service delivery metrics, if you

1  will, measurements to ensure that the level of services being

2  provided to our employees were of the highest quality and

3  maintained at that level.

4  Q.      Now, can you explain the role of consultants in

5  selecting service providers?

6  A.      Sure.   You know, consultants, there are a number of

7  nationally known HR consulting companies who are involved with

8  the benefits industry on a daily basis.   So we would hire a

9  consultant to help us conduct a request for proposal or RFP

10 process.

11 Q.      Let's back up a bit, sir, what I'll call before 1995

12 and the selection of Fidelity.   Now, before 1995, can you

13 generally describe what your job title was?

14 A.      Director of employee benefits.

15 Q.      Now, again, before 1995, can you describe for the court

16 how the PRISM Plan came to be?

17 A.      Yes.   Prior to 1990 -- as of 1990, ABB acquired

18 Combustion Engineering and a large division of Westinghouse

19 called Power Transmission and Distribution.   And following the

20 acquisition and the merger of these companies, we felt it was

21 important for us to develop single plans for which, or in which

22 all new ABB employees would participate.   PRISM is the plan

23 that came out of an elaborate study to determine what type of

24 plan should be made available to the, again, new employees of

25 ABB.

1  Q.      Now, the three separate plans you described, could you

2  describe how they were in turn administered?

3  A.      Okay, yeah.  The original ABB defined contribution plan

4  was administered by Mercer.  The Power T&D plan was

5  administered --

6          THE COURT:  Don't use -- what does that mean?

7          THE WITNESS:  Mercer is a large national HR

8  consulting firm.

9          THE COURT:  I know what Mercer is.  What's the

10 acronym that you just used at the end?

11 BY MR. ORTELERE:

12 Q.      T&D.

13 A.      I'm sorry.  Power Transmission and Distribution, that

14 plan was administered by Towers Perrin, and the Combustion

15 Engineering plan was administered internally.

16         THE COURT:  Are you referring to the different

17 companies that were consolidated or that were taken over by ABB

18 and their plans?

19         THE WITNESS:  That's correct.

20         THE COURT:  Okay.  I understand.  Go ahead.

21 BY MR. ORTELERE:

22 Q.      Now, please explain, sir, what you did to consolidate

23 those three plans.

24 A.      We created a task force made up of HR folks from each

25 of the previous separate entities, the three companies I just

1   mentioned.   And we hired a consultant to facilitate discussions

2   amongst us about the existing plans and what kind of a plan we

3   wanted to migrate to.   We also talked about or developed a

4   request for proposal, an RFP that we would use to go to the

5   marketplace to find a record keeper, if you will, for the new

6   plan.

7   Q.        And for that new consolidated plan, who or what was the

8   record keeper?

9   A.        We selected Hewitt Associates.

10  Q.        Now, can you generally explain what services did you

11  want or did Hewitt provide in that capacity as record keeper?

12  A.        As record keeper, Hewitt was the company that would

13  accumulate participant data.   As participants enrolled, as

14  participants made elections in regard to how much they were

15  going to invest, where they were going to invest it, Hewitt was

16  responsible for accumulating that information and creating

17  individual records for every single participant in the plan.

18  They produced statements on a regular basis, and they also did

19  plan communications.

20  Q.        Well, maybe you could explain further, what do you mean

21  in this context by communications?

22  A.        Well, newsletters that were distributed to employees,

23  and statements.   The statement would summarize the individual's

24  activity quarterly.   So it would start with the balance as of

25  the first day of the quarter, summarize all of the activity

1    that had transpired during the quarter, employee contributions,

2    company contributions, earnings, withdrawals, and at the -- it

3    would track that all the way through and show you an ending

4    balance at the end of that quarter.

5    Q.       By the way, Mr. Sackie, I think you've heard it said

6    today that ABB is a large plan.  What is your view on that?

7    A.       ABB is a large plan.  And as a large plan, we require

8    customization, as opposed to a small plan where you would

9    approach someone like Hewitt and they would have prepackaged

10   programs that they would make available to you with little, if

11   any, customizing capability.

12   Q.       Now, can you describe how ABB initially selected Hewitt

13   as the PRISM record keeper?

14   A.       Again, we went through the RFP process working with the

15   consultant and people from the HR organization throughout ABB.

16   The RFP or the request for proposal was a series of questions

17   about capabilities, deliverables, references.  And it was

18   distributed to various record keepers.  They submitted their

19   responses, the consultant consolidated the responses and took

20   us through a process of evaluating the responses from the

21   companies we sent the proposals, the request for proposals to.

22   Q.       Can you please explain how the flexibility to select

23   investment options informed the decision making process at that

24   point in time?

25   A.       ABB always, our philosophy was always to have

1  independence when it came to selecting the investment options

2  that were going to be available in our plan.

3          In the effort we went through when we ended up with

4  Hewitt, one of the companies that submitted a proposal was

5  Fidelity.  And one of Fidelity's requirements at the time was

6  that we use Fidelity funds exclusively.  That was not

7  acceptable and immediately knocked Fidelity out of the bidding,

8  and we moved on without them.  We moved on in the discovery

9  process and evaluation process without Fidelity.

10  Q.      Would you please describe ABB's level of satisfaction

11  with Hewitt as record keeper?

12  A.      From a processing standpoint day in and day out, Hewitt

13  was a very good record keeper.  If there was -- the

14  dissatisfaction we had with Hewitt was fees.  They were

15  extremely expensive and even more expensive than what their

16  proposal said they would be.

17  Q.      Can you describe the problem you encountered with bills

18  that were considered out of scope?

19  A.      Yeah, it was kind of interesting, but every month we

20  would get a bill from Hewitt, and there was always an entry on

21  the bill, out of scope charges.  And didn't really know what

22  that meant.

23          So in discussions I had with the folks from Hewitt,

24  I discovered that it was charges for high level consultants

25  within Hewitt who had to get involved in the administration of

1   the account.   And for that, they charged us at these senior

2   consultants' hourly rates.

3   Q.      I'm sorry, sir, please continue.

4   A.      We just found that very hard to digest.

5   Q.      Can you please describe any problems with Hewitt

6   related to communications?

7   A.      The quality of the communications from Hewitt were, was

8   very good, but here again, the cost of their communications,

9   when you compare the actual cost of the communications as they

10  developed them versus the price that was included in the RFP,

11  there was quite a difference, and we paid dearly for a very

12  good but very, very expensive communications program.

13  Q.      Sir, let's now turn to the selection of Fidelity in

14  1995.

15  A.      Okay.

16  Q.      Can you describe the factors or considerations that

17  precipitated the replacement of Hewitt?

18  A.      Yeah, we started to have some conversations with Hewitt

19  about what was changing in the industry.   Things like daily

20  valuation as opposed to monthly or quarterly valuation.

21  Q.      Maybe you could take a moment, Mr. Sackie, and explain

22  daily valuation as opposed to monthly or quarterly valuation.

23  A.      Daily valuation means that every participant's account

24  is updated every night for any activity that took place during

25  the day, including earnings.   This is why it's so important to

1    work with these outside mutual funds.

2              It also meant that on a daily basis, a participant

3    could effect a transaction.  If they wanted to get out of one

4    fund and into another fund, they could do that as of the close

5    of business every single business day.  In a monthly valuation

6    process, the participant only has that option, that is, the

7    option to say I want to reinvest from this fund to this fund

8    once a month and on the last day of the month.

9    Q.    And how was this a problem as it related to Hewitt at

10   the time?

11   A.    Hewitt wasn't quite there yet.

12   Q.    Can you describe for the court the RFP process that

13   ensued?

14   A.    In 1995?

15   Q.    Yes, sir.

16   A.    Again, we hired a consultant and we gathered the HR

17   folks from ABB again and said, okay, here is what we want to

18   do.  We're thinking about going to daily valuation where we

19   want to implement a call center.  In other words, we want to

20   enable employees to have the ability to call the record keeper

21   directly as opposed to having everything go through our HR

22   organization.

23             That was a middle step that, because of changes in

24   the industry, became no value-added procedure, or process in

25   the step.  So the daily processing, call center technology,

1  voice response technology, all of these things, and we working
2  with the Pension Thrift Management group, there was an
3  identification of some gaps, if you will, in the lineup of
4  investment options.  It was too limited and we wanted to
5  consider adding new asset classes to the funds lineup.  So
6  there were administrative issues, and there were investment
7  fund issues.
8  Q.      The investment flexibility consideration that you
9  mentioned a moment ago, please explain the relationship on that
10  issue to the big process.
11  A.      The need for free rein, if you will, in selecting.  It
12  was absolutely critical.  We would not have considered any bid
13  where we were constrained at all insofar as the investment
14  options that we would add to the plan.  And all of the bidders
15  were able to do that.
16  Q.      And who or what, in fact, submitted responses or bids
17  in response to the RFP?
18  A.      Hewitt, Fidelity, Vanguard, and T. Rowe Price.
19  Q.      And who did ABB ultimately select as the result of that
20  process?
21  A.      We selected Fidelity.
22  Q.      Can you describe any changes to the investment lineup
23  at that point in time?
24  A.      I don't remember exactly what the changes were, but
25  we -- do you mean the changes we made or the process we went

1  through to --

2  Q.      Generally, what happened to the lineup?  Did it change?

3  A.      The lineup changed.  We added new funds to the PRISM

4  Plan.

5  Q.      Brian, DA964?

6          COURTROOM DEPUTY:  That noise is someone's phone may

7  be too close to a speaker.  What is this exhibit number?

8          MR. ORTELERE:  That is DA964.  And let me -- I will

9  rattle off, there's a cluster of documents, Your Honor, that

10  were prepared about the same time but they've been marked

11  separately.  JD0226, JD0227, JD0228, DA962, JD229, JD230.

12          THE COURT:  You're going too fast for us to keep any

13  record if that's your intent.

14          COURTROOM DEPUTY:  JD230?

15          MR. ORTELERE:  JD230, followed by JD231.

16  BY MR. ORTELERE:

17  Q.      Sir, why don't you take a look at, and it's on the

18  screen, the first page of DA964 which bears a Bates stamp

19  number 43839.  Are you with me?

20  A.      Yes.

21  Q.      Why don't you just glance at the remaining documents

22  that you've been provided and perhaps you could explain for the

23  court, what is this cluster of materials?

24          THE COURT:  I have two copies of DA962 and no copies

25  of JD230 and 231.

1          MR. ORTELERE:  Sorry, Your Honor.

2    Q.      Without further ado, Mr. Sackie, and you've had an

3    opportunity to look at these documents, correct?

4    A.      Yes.

5    Q.      Let's look at the, again, the first page of DA964.

6    It's on the screen.

7    A.      Uh-huh.

8    Q.      Is that your signature?

9    A.      Yes, it is.

10   Q.      Okay.  Now, can you describe for the judge what these

11   documents are?

12   A.      The cover letter is an invitation to our benefit

13   representatives to attend a training session at our facility in

14   Windsor, Connecticut, in order to learn about the changes that

15   we were making to the PRISM Plan, and that's the new record

16   keeper, new funds lineup, and plan improvements.

17   Q.      And what is the attachment to the first page?

18   A.      The attachment is issue 1 of the -- it's a PRISM

19   updates, transition updates.  We had a program, a

20   communications plan to provide periodic updates as we moved

21   through the process of transitioning to the new record keeper,

22   the new procedures, and the new funds lineup.  This is the

23   first of eight communications or updates.

24   Q.      To be absolutely clear, Mr. Sackie, who was the

25   intended audience of this group of documents?

1  A.      It's the benefit representatives.  And the benefit

2  representatives are those HR people at each of the ABB

3  facilities that was responsible prior to this for administering

4  the ABB benefits program.

5  Q.      Now, returning to the cover memo, I'll call it the

6  first page of DA964, can you describe for the court those

7  individuals who contributed to the preparation of these memos?

8  A.      Sure.  Larry Morgenthal and Eric Wood who at the time

9  represented the Pension and Thrift Management group, and Rose

10 da Silva and myself.

11 Q.      Sir, what was your role in preparing these materials?

12 A.      I didn't write these, the material, I did have the

13 responsibility to review them and okay them before they got

14 distributed.

15 Q.      The right-hand column.  Mr. Sackie, can you describe

16 for the court the reasons, and now we're back in 1995, for the

17 selection of Fidelity as record keeper?

18 A.      Well, first of all, Fidelity was a leader in the 401(k)

19 record keeping business.  They were a technology leader, as

20 well.  And when we visited the call center, we got a very, very

21 good look at how it operated.  We actually listened in to phone

22 calls that were coming in from other companies they were doing,

23 from the employees with other companies they were doing record

24 keeping for.

25          We also looked at their back room operations, the

1    group that if a call came in and had to be handled, it couldn't
2    be handled on the phone, had to be handled in the operations
3    group, we watched how that process worked.

4    Q.    Sir, focusing on that right-hand column on the page
5    43841, there's two, two reasons are described for the selection
6    of Fidelity.  Could you explain that for the judge?  Why don't
7    you start with that first paragraph.

8    A.    The first paragraph?

9    Q.    I'm sorry.  The third paragraph from the top, which
10   begins with the word first.

11   A.    I'm sorry.  Yeah, we touched on this a little bit
12   before.  Hewitt was a record keeper and only a record keeper.
13   Fidelity, as well as T. Rowe Price and Vanguard, were not only
14   401(k) record keepers, they were mutual fund companies who ran
15   investment options or mutual funds.  So the immediate advantage
16   for Fidelity, Vanguard, and T. Rowe Price was two sources of
17   income versus Hewitt's single source of income.  So it made
18   Hewitt, made it difficult for Hewitt to be competitive
19   price-wise.

20   Q.    How did these considerations help participants, or how
21   did these factors improve participants', or decrease record
22   keeping fees?

23   A.    Since the participants were paying the record keeping
24   fees, paying lower record keeping fees meant participants would
25   pay less.

1    Q.       Sir, who was the -- was Fidelity the low bidder?

2    A.       Fidelity was not the low bidder, but we weren't looking

3    for the low bidder, we were looking for the best.  And Fidelity

4    also wasn't the high bidder.  And, again, we weren't

5    necessarily looking to, looking for the low bidder, we were

6    looking for the best company and we were very comfortable, the

7    entire group that was involved in this process, very

8    comfortable with the selection of Fidelity for PRISM.

9    Q.       And, again, what was your understanding of Fidelity's

10   experience in the field?

11   A.       Fidelity's experience was excellent.  I mean, they had

12   been in it for a long time, references were checked out very,

13   very well.  And our site visit was outstanding.

14   Q.       And what is your understanding based on your experience

15   regarding Fidelity's reputation?

16   A.       Highly regarded in the industry as leader in 401(k)

17   plan administration.

18   Q.       Now, sir, could you contrast how participant

19   communications were handled when Hewitt was the record keeper

20   as they were to be handled when Fidelity took over?

21   A.       Significant difference.  We had an even more robust

22   communication program when we moved to Fidelity, partially

23   because there was so much more that the plan had to offer and

24   so much more capability, if you will.  Fidelity's systems were

25   so robust that we had access to data that we didn't have

1  before.

2          One of the other things and very important thing is

3  there was no additional charge.  The -- all of the

4  communications provided by Fidelity was included in the fees we

5  agreed to pay upfront, in contrast to Hewitt where the

6  communications was billed over and above the record keeping

7  fee.

8  Q.      Brian, could you pull up JD228, please?

9          Now, before Fidelity came on board, what was the

10  role of these benefits representatives, the recipients of these

11  transition updates?

12  A.      The benefit reps were responsible for getting people

13  enrolled in a plan, processing changes people wanted to make,

14  change the level of contribution, change the investment options

15  I want to put my money into.  So they were intimately involved

16  in the day-to-day administration of the plan, initiating loans

17  and things.

18  Q.      Now, looking at the right-hand column at the top

19  there -- yes, thank you, Brian.  What did you say to the

20  benefits representatives at that point in time, March 22, 1995,

21  about their changing responsibilities?

22  A.      We were telling them here that they were no longer, no

23  longer did they have to be involved or worry about PRISM

24  administration.  They could involve themselves with more

25  valuated HR functions.

1  Q.      DA964, Brian.  43841 on the left, the italicized
2  language on the bullet point.

3          Now, Mr. Sackie, what did you say to the benefits
4  representatives at that point in time regarding fees, given the
5  changes that were coming to PRISM?

6  A.      We told it the way it was.  We were going to be able to
7  do all of this, which was much more than we had been doing, and
8  reduce our administrative fees at the same time.

9  Q.      Sir, I'd like to turn now to the monitoring of services
10  and fees related to PRISM.  But I think first we should address
11  your experience in such matters.  At the time of your
12  retirement, sir, how much experience did you have in the
13  benefits industry?

14  A.      Over thirty years.

15  Q.      And would you describe for the court your level of
16  familiarity with the 401(k) industry borne of that experience?

17  A.      Very familiar.

18  Q.      Could you further describe, please, how did you gain
19  that knowledge, what were your sources of information?

20  A.      I was a member of an organization called Council on
21  Employee Benefits, CEB, and this was an association that had,
22  whose membership included probably the top 100, 150 companies
23  in the country.  They would meet on a semi-annual basis, and
24  the purpose of those meetings was information sharing.
25  Consultants would be invited to present the latest and

1  greatest; plan sponsors, that being companies like ABB and my

2  counterparts, would be invited to present to the group on the

3  kinds of things that they were focusing on and the exciting

4  things that they were doing in the benefits world.

5  Q.    What, if anything, did you present on at these

6  conferences?

7  A.    I presented -- I can't remember exactly what I

8  presented.

9  Q.    But you had given --

10  A.    I did make presentations, but I can't recall exactly.

11  Q.    Fair enough.  This was some time ago, isn't it, sir?

12  A.    Yes, it is.

13  Q.    Now, further to the knowledge you acquired during your

14  thirty years in the business, what role did consulting firms

15  play?

16  A.    Again, consultants played a big role.  We had contact

17  on a regular basis with the big players, the nationally known,

18  the Hewitts, the Mercers, the Towers Perrins, the Watson

19  Wyatts, and we did a lot of work with Watson Wyatt, so we were

20  in contact with them constantly.

21      But the consultants were always very interested in

22  making sure that we, their potential clients for projects, had

23  a good handle on what was out there, what was new, what was

24  going on in the marketplace.  So there was a lot of discussion

25  with them.

1   Q.      And can you describe for the court any publications you

2   read to learn about benefits matters?

3   A.      Sure.   We subscribed to Pension and Investments,

4   Employee Benefit News.

5   Q.      And please describe what you learned on the job.

6   A.      I learned a lot.   I lived with benefits administration.

7   I lived with benefit plan design.   I worked for a company that

8   was very dynamic.   It was a huge change when ABB acquired

9   Combustion Engineering, the company I worked for before ABB,

10  and this large division of Westinghouse.   And I had a lot of

11  interactions with a lot of people in the industry directly

12  related to my job.

13  Q.      Would you describe whether you attended Fidelity

14  conferences?

15  A.      I attended conferences for all of our major benefit

16  administration providers.   Fidelity, of course, being one of

17  them.   And Fidelity had an annual what they called large plan

18  sponsor conference.   And I attended that.   I was also on

19  Fidelity's advisory committee.

20  Q.      What would you learn at these Fidelity conferences?

21  A.      Well, here again, it's another opportunity because

22  Fidelity being as big as they were in this business had a lot

23  of clients.   And these -- again, these are the large clients.

24  And this was an opportunity for us, again, to hear from

25  Fidelity what their focus was, what they were looking at as the

1  way they were going to grow and expand services and provide new

2  technologies to service the 401(k) market.  Again, it also gave

3  us an opportunity to hear from other companies, specifically

4  about their 401(k) plans and what they were doing, as well.

5       On a more informal basis outside of the presentation

6  format, dinners, breaks, things of that nature, it was an

7  opportunity for me and my colleagues to just talk amongst

8  ourselves about what we were doing.

9  Q.      Now, you mentioned consultants as sources of knowledge

10 related to benefits.  Can you -- which consultant firms are you

11 referring to in that regard?

12 A.      We worked with Watson Wyatt, Towers Perrin, Mercer, and

13 to some extent Hewitt.

14 Q.      And what are the reputations of those providers?

15 A.      They were all very well known, very highly regarded

16 large national HR consulting firms.

17 Q.      What kind of information would these consultants

18 provide you?

19 A.      They -- besides sharing with us what their initiatives

20 were, they would also be able to give us a sense of the

21 marketplace, services being provided, cost of services being

22 provided.

23 Q.      DA21.  Mr. Sackie, what is DA21?

24 A.      This is a Fidelity service review.

25 Q.      Maybe you could further describe, what is a Fidelity

1  service review?

2  A.    Well, as I mentioned before, we had established

3  objectives and goals as far as delivering service to our

4  employees.   The call center.   Let me just -- excuse me.

5  Q.    Mr. Sackie, can I get you a lozenge?

6  A.    I just need to get this tickle out of my throat.   I'll

7  be fine.

8  Q.    We apologize, again, Your Honor, Mr. Sackie has been

9  ill.

10  A.    This is the opportunity we took on a quarterly basis

11  the sit down and say, okay, how did the call center, how did

12  the operations group, that's the group in the back room that

13  actually processes transactions, how did all of these

14  departments perform against the predetermined metrics or

15  measurements that we put in place that helped us measure the

16  quality of service.

17  Q.    And, again, how often did you receive these, compile

18  these reports?

19  A.    This was quarterly.

20  Q.    Why don't we turn to the page 1153.   Mr. Sackie, would

21  you explain what is depicted there?   Have you found the page?

22  I'm sorry.

23  A.    I have.   This is a summary of the performance of the

24  call center.

25  Q.    What does that mean?

1   A.      This particular one is how, what percent of the phone

2   calls coming into the service center were called within or

3   answered within 20 seconds.  Our goal was to have 90 percent of

4   the calls handled within that, or not handled, but answered

5   within that 20 seconds.

6   Q.      And turning to the next page, what is depicted there,

7   and perhaps relative to the prior page?  Maybe I'll try it this

8   way, John.  What's the date period under scrutiny?

9   A.      I was going to say, I think we're looking at -- yeah,

10  on the first one, we're looking at the third quarter of 2001.

11  On the --

12  Q.      And, again, what is under consideration here?

13  A.      This is the percentage of incoming phone calls answered

14  within 20 seconds.

15  Q.      Maybe -- please turn to page 1157.

16  A.      Okay.

17  Q.      Could you explain what metric is being considered or

18  depicted there?

19  A.      This gets to the lengths of time it took, an issue that

20  could not be handled on the phone and had to be handed off to

21  the back room of the operations group, how long did it take

22  them to actually resolve the issue and get back to the

23  participant.

24  Q.      It might be helpful, Mr. Sackie, to describe an example

25  of an issue in this context.

1    A.        I'm trying to think -- someone -- someone would call

2    up.  I can't think of one off the top of my head, but --

3    Q.        How about this.  What issues might arise regarding a

4    participant loan?

5    A.        Yeah, a loan is something that would not be able to be

6    handled on the telephone, a withdrawal would not be able to be

7    handled on the telephone.  So those kinds of requests would go

8    to the back room and they would both fall into this particular

9    performance standard.

10   Q.        DA22.  Sir, what is DA22?

11   A.        It's another Fidelity service review.  Again, another

12   summary of the quarterly performance against the service

13   standards that we had in place.

14   Q.        1252, Brian.  Mr. Sackie, please turn to page 1252.

15   A.        Okay.  Okay.

16   Q.        Generally speaking, what does this graph depict?

17   A.        Very similar to one of the previous graphs we looked

18   at, this is the measurement of the days to resolve issues that

19   were handed off from the call center to the back room and for a

20   different time period and it measures the number of days it

21   took to resolve the issue.

22   Q.        Now, do you see the words ABB stretch goal?

23   A.        Yes.

24   Q.        What does that mean?

25   A.        You know, the industry standard for this particular

1   metric is five days.

2   Q.      Let me pause for a second.   And where is that depicted

3   on the chart, the graph?

4   A.      Well, if you look on the left-hand side, the scale of 0

5   to 6, you'll see the 5 with the dotted line that goes across.

6   Q.      Again, what is that?

7   A.      That is the guarantee, if you will, that was the agreed

8   upon goal between ABB and Fidelity.

9   Q.      Okay.   And then how does that compare to the stretch

10  goal?

11  A.      Over time, when we looked at the performance, we're

12  saying, like, this is almost ridiculous, you consistently

13  exceed that five days by such a large margin.   In a joint

14  interest for a process of continuous improvement, why don't we

15  drop that objective to three days and drive the process to make

16  sure that we meet or exceed that three-day goal.

17          This is a really good example of why we do this.

18  You can see in one month there, although the goal was better

19  than the five-day stated objective, it exceeded what had been

20  established as the stretch goal.

21          But what's so good about the fact that, No. 1, we

22  measure this stuff and, No. 2, we meet to review this stuff, it

23  enables us to sit down and have a conversation about what

24  caused this change in service delivery and immediately put

25  action plans in place to get it back to where it's supposed to

1  be.  So we looked at it, we reviewed it, we measured it, we

2  reviewed it, we developed action plans to correct any problems

3  that came up.

4  Q.      So over time, how did these standards or metrics

5  change?

6  A.      We always pressed Fidelity to become more aggressive

7  and, you know, we didn't assign financial penalties for failure

8  to meet the goals.  These were just good relational things,

9  measures for us to do and to get a vendor like this to be way

10 more aggressive in what they're willing to commit to us on than

11 the marketplace is saying is an acceptable performance level.

12 Q.      Let me pause you for a second.  Based on the foregoing,

13 how did ABB's service standards compare to those of other plan

14 sponsors?

15 A.      In almost every case, our standards and actual

16 performance by the third parties exceeded -- our standards were

17 more aggressive than industry standard and our performance met

18 those more aggressive goals.  Fidelity was -- it wasn't just

19 Fidelity, we did this with United Healthcare, we did this with

20 other companies.  This was something we took very, very

21 seriously.

22         Fidelity happened to be one that continually met

23 very aggressive goals.  We were so proud of this stuff that we

24 used to hang this on the walls of the halls in our department

25 so that when people walked through, the participants in the

1   PRISM Plan, the participants in the medical plan could see that

2   we were focusing on the level of service that was being

3   provided to them and everyone like them around the company.

4           So we were very proud of all of this.  And we worked

5   very hard to get it to where it was and keep it there.

6   Q.      Now, in your experience, how did Fidelity compare to

7   other record keepers in terms of service and technology

8   innovations?

9   A.      Leading edge.  It's very, very clear that Fidelity, not

10  only are they committed to quality service, but their

11  commitment to advanced technology, I don't think they matched

12  any industry, whether it's call center, voice response, web

13  access, all of that.

14  Q.      Sir, still looking at --

15  A.      Which by the way, I just wanted to say, fit perfectly

16  into a growing ABB desire for employee self-service.  So here

17  we are basically 24/7 via the web able to access data, enact

18  transactions, without having to talk to anyone.

19  Q.      Still looking at DA22.  Can you turn, please, to page

20  1269.  Why don't you take a moment to take a look at that,

21  Mr. Sackie.

22  A.      Okay.  Get to it.  Okay.  Yeah.

23  Q.      Would you describe for the court what's being surveyed

24  there and what ABB did with that sort of information?

25  A.      This is a really good example of having a robust

1  database and being able to collect participant data.  When you
2  look at this, one of the things that we wanted to know about is
3  how many -- look across the bottom, you can see even at that
4  point, there was a fair number of investment options available
5  to people.  And we tried to encourage people to diversify their
6  investment.  So what we would do is we would actually go in and
7  look to see how many of our participants were actually putting
8  100 percent of their money into only one fund.
9     Q.      And why is that a concern?
10    A.      That's a concern to us because we're afraid people
11 don't understand the advantages of diversifying their
12 investment.  And it fit into our communication program which,
13 besides having a regular ongoing robust communication program,
14 we did targeted communications.  When we saw a chart like this,
15 we would immediately go out and tell people who are in the
16 income fund and tell people who are putting all of their money
17 into Fidelity Magellan that, what the advantages of
18 diversification were.  They didn't realize that they weren't
19 the only ones getting the memo or the newsletter, but it was
20 simply an effort on our part to help them understand the
21 advantages of having a diversified investment portfolio and do
22 everything we could to try to encourage them to at least think
23 about it.
24    Q.      Would you describe whether ABB discussed service issues
25 and matters with Fidelity outside or at times other than these

1  quarterly meetings?

2  A.        Oh, yeah.

3  Q.        Quarterly reviews, excuse me.

4  A.        Oh, yeah.  You know, especially if a service issue was

5  brought to our attention.  If there was a particular problem at

6  a location, whether it was a data problem or a service center

7  problem, we would jump into action immediately.  We did this

8  because we really didn't want these issues to become apparent

9  to us because participants were having the problem.  We always

10  tried to address it before it became a serious problem.  But

11  sometimes there were serious problems and we had to jump on

12  them and we did.  We weren't shy about getting problems fixed.

13         MR. ORTELERE:  Your Honor, I have one more document

14  and then our outline heads in a whole new direction.  Perhaps

15  it makes sense that we talk about the document and then --

16         THE COURT:  Sounds good because you have four

17  minutes left.  Go ahead.

18         MR. ORTELERE:  DA1805, Your Honor.  I believe this

19  letter is already in evidence.

20         MR. HAYNE:  As P880.

21         MR. ORTELERE:  I won't move for the admission of

22  another copy.

23         THE COURT:  Go ahead with the document.  We're going

24  to straighten out the admission of exhibits later.

25         MR. HAYNE:  May I give the witness a copy of this

1  exhibit?

2          THE COURT:  Sure.

3          THE WITNESS:  We looked at this earlier, right?

4          MR. HAYNE:  Yes.

5  BY MR. ORTELERE:

6  Q.      Now, I know you saw this document earlier this

7  afternoon, Mr. Sackie.  Who is this letter from?

8  A.      I think it was Cindy Kuppens.  Let me check that, yes,

9  Cindy Kuppens.

10 Q.      Who was the recipient?

11 A.      The recipient was me.

12 Q.      We've talked about some portions of the document, but

13 if you would, please turn to the second page and the third

14 paragraph.  And what is Ms. Kuppens saying to you about a prior

15 discussion that you had?

16 A.      Yeah, I mean, this is Cindy acknowledging and moving

17 into action mode to address slippages in the quality of

18 service.

19 Q.      Now, in the second line, those quality problems are

20 more specifically identified as what?

21 A.      Errors.

22 Q.      Thank you.  And reading a little further in that

23 sentence, is there another?

24 A.      And insufficient internal resources.

25 Q.      In the fourth line, what does Miss Kuppens covenant

1  there to ABB?

2  A.       (Quoted as read.)  "All of us who work with ABB care

3  very, very much about the quality of our work.  We want to hear

4  from you, we want to hear your concerns and will work with ABB

5  and with each other to" --

6  Q.       I don't think we're in the same place, Mr. Sackie.

7  That paragraph --

8  A.       Did you say fourth sentence of fourth paragraph?

9  Q.       Fourth line in that paragraph that begins with over the

10  past year.  Are we at the same place?  Are we in the same

11  paragraph?

12  A.       I'm at the first sentence in the third paragraph, over

13  the past year.

14  Q.       If you were to count down from there three lines, the

15  word on the left is issue.  Are you with me?

16  A.       Yes, I am.

17  Q.       Okay.  In that line, what does Ms. Kuppens say that

18  Fidelity is going to do?

19  A.       We want to raise the issue now so that we refocus our

20  efforts to ensure excellent service.

21  Q.       Why don't we just very briefly and perhaps, mercifully,

22  the next paragraph what is described there, beginning you also

23  noted.

24  A.       Yeah.  Is the turnover on the ABB team at Fidelity.

25  And, you know, a loss of continuity and knowledge, and that's

1    an issue for us because although we understand that people get
2    promoted and turnover is normal, they have to manage it so that
3    they have people in the queue ready to fill in and be up to
4    speed immediately.
5    Q.    Generally speaking, Mr. Sackie, how does this letter
6    reflect or illustrate ABB's efforts to ensure quality service
7    from Fidelity?
8    A.    No. 1, I think it shows very clearly that we cared
9    about it.  I think it shows very clearly that we focused on it,
10   we were passionate about it, and we had Fidelity's undivided
11   attention because if people want to accuse me of being a good
12   reference, it's because of this kind of stuff right here.
13   They're not perfect, but they know how to jump on it.
14          MR. ORTELERE:  Your Honor, I have no more questions
15   for today.
16          THE COURT:  We'll go ahead and take a break.  We'll
17   reconvene at 9 o'clock tomorrow morning.  I'd like for you to
18   come in at 8:45.  I'd like the parties to talk tonight about
19   the exhibits and see if you can put together a list of what's
20   agreed to based upon what we have done today.  If there are
21   things that you cannot agree to, you will identify them and
22   we'll try to resolve them first thing in the morning.  But I
23   need you to at 8:45 meet with my courtroom deputy so that we
24   have an accurate list as to what has been admitted today.
25   Court's in recess.

1          MR. SCHLICHTER:  One logistical question, if I may.

2  Do you want us to work through how we're doing the time or are

3  you keeping --

4          THE COURT:  I assume you're doing terribly on time.

5          MR. SCHLICHTER:  Well, that's another issue, but

6  just in terms of accurate recording of the time.

7          THE COURT:  My courtroom deputy is the final word on

8  the reporting of time.

9          MR. SCHLICHTER:  So is it agreeable --

10         THE COURT:  You can ask her what the time is at the

11  end of each day.

12         MR. SCHLICHTER:  Okay.  Thank you very much.

13         THE COURT:  Anything else you want to talk about

14  before we reconvene tomorrow?  Court's in recess.

15         (Trial recessed for the evening at 5:31 p.m.)

16                          - - -

17                          - - -

18                       CERTIFICATE

19         I certify that the foregoing VOLUME I (PAGES 1-277)

20  is a correct transcript from the record of proceedings in the

21  above-entitled matter.

22

23  FEBRUARY 24, 2010

24                         /s/_____
                           Kathleen M. Wirt, RDR, CRR
25                         U.S. Court Reporter