# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

RONALD TUSSEY, ET AL.,      )
                              )
          Plaintiffs,      )
                              )
      vs.                 )    Case No. 2:06-CV-04305-NKL
                              )
ABB, INC., ET AL.,          )
                              )
         Defendants.     )

## ORDER

Plaintiffs bring their claims on behalf of a class of present and former ABB, Inc., employees who are participants in two retirement plans offered by ABB, Inc. The first is the Personal Retirement Investment and Savings Management Plan and the second is the Personal Retirement Investment and Savings Management Plan for Represented Employees of ABB, Inc. (collectively, "PRISM Plan" or "PRISM Plans"). Both are 401(k) defined contribution plans regulated by the Employee Retirement Income Security Act ("ERISA").

Plaintiffs' complaint names the following defendants: ABB, Inc., John W. Cutler, Jr., Pension Review Committee of ABB, Inc., Pension & Thrift Management Group of ABB, Inc., Employee Benefits Committee of ABB, Inc. (collectively "ABB"), Fidelity Management Trust Company ("Fidelity Trust"), and Fidelity Management & Research Company ("Fidelity Research") (collectively "Fidelity" unless otherwise noted).

Plaintiffs seek to recover damages and injunctive relief for breaches by the Defendants

1

of their ERISA fiduciary duties to the PRISM Plans.

## I.  Summary

Defendant ABB, Inc., is a major manufacturer of power and automation equipment. ABB, Inc., provides retirement benefits to its employees.  Some ABB employees participate in a defined benefit plan, receiving a guaranteed pension upon retirement, the amount of which is dependent on their years of service and annual salaries.  Most employees, including the Plaintiffs and their class members, participate in one of two PRISM Plans sponsored by ABB, Inc., which are defined contribution plans under section 401(k) of the Internal Revenue Code.[1]  Their retirement benefits depend on the performance of the investments that they choose.  For certain highly compensated individuals, ABB, Inc., provides additional retirement benefits of non-qualified deferred compensation plans and non-qualified defined benefit plans.

ABB, Inc., gives a 50% match to contributions made by participants up to six percent of their annual salaries. Participants can direct their contributions to be invested in any of the investment options pre-selected by ABB to be on the Plan's investment platform.  The PRISM Plan was used by ABB to attract and retain employees.

---

[1] ABB, Inc., offers two PRISM Plans–one to its unionized employees and one to its non-union employees–which offer nearly identical benefits and are managed by the same individuals. In this Order, the Court will refer simply to "the PRISM Plan" or "Plan" when referencing both Plans unless the Court is discussing a material difference between the Plans. In that case, the plan for non-union employees will be referred to as "the Main PRISM Plan" and the plan for union employees will be referred to as the "the Union PRISM Plan."

The Employee Benefits Committee of ABB, Inc., is a three-member committee appointed by ABB's board of directors to oversee all of ABB's employee benefits programs. It is the named administrator of the Plan. The Pension Review Committee of ABB, Inc., is a named fiduciary of the Plan and is responsible for selecting and monitoring the Plan's investment options. The Pension & Thrift Management Group of ABB, Inc., acts as the staff of the Pension Review Committee. John W. Cutler, Jr., has been the Director of the Pension & Thrift Management Group since 1999. Mr. Cutler and these ABB entities are all named defendants in this action.

The Plan includes mutual funds offered by Fidelity Investments ("Fidelity mutual funds"). Defendant Fidelity Research is the investment adviser to the Fidelity mutual funds which are offered by the Plan. Fidelity Research also invests the balances of bank accounts, which hold Plan contributions in overnight securities. Fidelity Trust is the recordkeeper for the Plans. As the recordkeeper, Fidelity Trust provides educational information, bookkeeping, and other services to PRISM Plan participants.

During its relationship with the PRISM Plans, Fidelity Trust has been paid two different ways for its services. Originally, Fidelity Trust was selected by a competitive bid process and was paid a per-participant, hard-dollar fee. Over time, Fidelity Trust was primarily paid with "revenue sharing."

The revenue sharing came from some of the investment companies whose products were selected by ABB to be on the PRISM platform. Those investment companies gave Fidelity Trust a certain percentage of the income they received from PRISM participants who

3

selected their company's investment option. Fidelity Trust also derived revenue sharing from an internal allocation within the interrelated Fidelity companies. For example, Fidelity's Magellan Fund, was one of the mutual funds placed on the PRISM platform by ABB. When PRISM participants invested in Magellan, a set number of basis points (i.e., a percentage) was transferred internally from Fidelity Research, which managed the Magellan Fund, to Fidelity Trust. This has been described by Fidelity and others as internal revenue sharing.

When revenue sharing was used to pay Fidelity Trust, its fee grew as the assets of the Plan which provided revenue sharing grew, even if Fidelity Trust provided no additional services to the Plan. Likewise, if the Plan's assets in those investments declined, the amount paid for the services could decline. However, when there was a concern by Fidelity that revenue sharing would decline, Fidelity asked for hard-dollars to make up the difference. In addition, pursuant to its recordkeeping contract, Fidelity had the right to amend its compensation agreement for Plan services.

Fidelity's relationship with ABB was not limited to the PRISM Plans. Shortly after becoming the recordkeeper for the PRISM Plans, Fidelity began providing total benefit outsourcing services to ABB. These corporate services, as opposed to Plan services, included doing the payroll for all ABB employees, the recordkeeping for ABB's health insurance and welfare plans, ABB's defined benefit retirement plan and other retirement vehicles for highly compensated employees ("ABB corporate services"). Fidelity took over recordkeeping for the PRISM Plan in 1995; the defined benefit plan in 1997; health and welfare plans in 1999 and 2000; and payroll in 2004. Fidelity lost money on these corporate

4

services that it provided to ABB, but it made a substantial profit as the recordkeeper of the PRISM Plans.

Having tried this matter over a four-week period, and having reviewed voluminous records and testimony, the Court finds that the ABB Defendants and Fidelity Defendants breached some fiduciary duties that they owed to the PRISM Plans. Specifically, the Court finds: (1) ABB Defendants violated their fiduciary duties to the Plan when they failed to monitor recordkeeping costs, failed to negotiate rebates for the Plan from either Fidelity or other investment companies chosen to be on the PRISM platform, selected more expensive share classes for the PRISM Plan's investment platform when less expensive share classes were available, and removed the Vanguard Wellington Fund and replaced it with Fidelity's Freedom Funds; (2) ABB, Inc., and the Employee Benefits Committee violated their fiduciary duties to the Plan when they agreed to pay to Fidelity an amount that exceeded market costs for Plan services in order to subsidize the corporate services provided to ABB by Fidelity, such as ABB's payroll and recordkeeping for ABB's health and welfare plan and its defined benefit plan; (3) Fidelity Trust breached its fiduciary duties to the Plan when it failed to distribute float income solely for the interest of the Plan; and (4) Fidelity Research violated its fiduciary duties when it transferred float income to the Plan's investment options instead of the Plan.

As to each of these breaches, the Court finds that the Plan must be compensated for its losses and any ill-gotten gains by Defendants when they used Plan assets for their own benefit. However, the Court rejects Plaintiffs' global damages theory which is based on the

5

assumption that ABB's breaches infected all of its investment decisions for the Plans and the assumption that damages should thus be measured by the performance of ABB's defined benefit plans. While the Court is suspicious that the relationship between ABB and Fidelity Trust infected more than the specific instances identified in this order, the Court cannot rely on suspicion and therefore rejects Plaintiffs' global damage theory. Instead, relying on *Martin v. Feilen*, 965 F.2d 660 (1992), the Court has determined "the specific damages that resulted from each of the transactions in which ERISA fiduciary duties were breached." *Id.* at 672.

## II. ERISA

Congress primarily intended ERISA to be a consumer protection bill. Frank Cummings, *ERISA: The Reasonable Expectation Bill*, 65 Tax Notes 880, 881 (1994). Congress desired employees to have "enhanced protection for their benefits." *Metro Life Ins. Co. v. Glenn*, 554 U.S. 105, 114 (2008) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996)). To accomplish these goals Congress makes an ERISA fiduciary liable for failing to comply with the strict trust standards codified by ERISA.

> Borrowing from trust law, ERISA imposes high standards of fiduciary duty upon those responsible for administering an ERISA plan and investing and disposing of its assets. The ERISA fiduciary is subject to a strict standard of care . . . .

*Martin v. Feilen*, 965 F.2d 660, 660(8th Cir. 1992).

### A. Who is a Fiduciary?

A fiduciary with respect to an ERISA plan is any person

6

... to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 405(c)(1)(B) of this title.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Subsection (iii) focuses on persons who *have* discretionary authority or discretionary responsibility to administer an ERISA plan. The first clause of subsection (i) covers persons who *exercise* discretionary authority or discretionary control respecting <u>management</u> of the plan. This clause ensures that persons with no authority to <u>administer</u> the plan but do so anyway will be treated as a fiduciary. *See* Peter J. Wiedenbeck, *ERISA: Principles of Employee Benefit Law* 112 (2010) ("ERISA's functional definition of fiduciary extends . . . also to those who wield power de facto.").

The second clause of subsection (i) "also makes a person a fiduciary if he . . . "exercises any authority or control respecting <u>management or disposition of assets</u>." (Emphasis added). Thus, persons are ERISA fiduciaries if they exercise control over plan assets, whether they are authorized to do so or not and whether they have any discretion or not. *See, e.g.*, *Coldesina v. Estate of Simper*, 407 F.3d 1126, 1133 (10th Cir. 2005); *Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006); *Briscoe v. Fine*, 444 F.3d 478, 491 (6th Cir. 2006). Also, the Labor Department, when determining fiduciary status under section 1002(21)(A), relies only on the existence of "authority and control over plans assets," and not whether discretion is afforded to a directed plan trustees. Labor Dep't Field Assistance

7

Bulletin 2004-03 (Dec. 17, 2004), *available at* http://www.dol.gov/ebsa/regs/fab_2004-3.html.

However, some courts, including the Eighth Circuit, have made sweeping statements that might suggest that discretion is a prerequisite to fiduciary status. "'Discretion' is the 'benchmark for fiduciary status under ERISA' pursuant to the explicit wording of ERISA § 3(21)(A)." *Johnston v. Paul Revere Life Ins. Co.*, 241 F.3d 623, 632 (8th Cir. 2001) (quoting *Maniace v. Commerce Bank of Kansas City*, 40 F.3d 264, 267 (8th Cir. 1994)). "At all events, ERISA makes the existence of discretion a sine qua non of fiduciary duty." *Pohl v. Nat'l Benefits Consultants, Inc.,* 956 F.2d 126, 129 (7th Cir. 1992). *See also* Wiedenbeck, *supra*, at 113 & n.14 (citing Patricia Wick Hatamyar, *See No Evil? The Role of the Directed Trustee Under ERISA*, 64 Tenn. L. Rev. 1, 41-52 (1996) (cases cited and discussed therein)). The Court expects that the Eighth Circuit will not interpret the second clause of ERISA § 3(21)(A)(i) to require discretion when confronted with this specific statutory construction problem. Given the language of ERISA § 3(21)(A)(i) and common sense, a person who handles the assets of a plan with no authority to do so should not be in a better position than one who has discretion to handle the assets. Nonetheless, for purposes of this order only, the Court assumes discretion is a prerequisite to fiduciary status.

Even if discretionary action is necessary, ERISA's definition of fiduciary is clear in requiring only "discretionary authority *or* discretionary control." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (emphasis added). Thus, an individual who may lack authority, but who exercises discretionary control, is a fiduciary according to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Indeed, "[c]onduct alone may in an appropriate circumstance impose

8

fiduciary obligations." *Wiedenbeck*, *supra*, at 112 (quoting Explanation of H.R. 12906, 120 *Cong. Rec.* 3983 (1974), *reprinted in* 2 *Subcomm. on Labor of the S. Comm. on Labor and Public Welfare, 94th Cong., Legislative History of the Employee Retirement Income Security Act of 1974*, at 3293, 3309 (Comm. Print 1976)).

In addition, a fiduciary's status is limited to situations related to "management of the plan," "management or disposition of [plan] assets," or "administration." ERISA § 3(21)(A)(i), (iii). Thus, individuals who serve multiple roles with respect to a plan will be held to be a fiduciary only for conduct related to "management of the plan," "management or disposition of (plan) assets," or "administration." Put another way, "[f]iduciary status under § 1002(21)(A) is not an all-or-nothing concept. A court must ask whether a person is a fiduciary with respect to the particular activity in question." *Kerns v. Benefit Trust Life Ins. Co.*, 992 F.2d 214 (8th Cir. 1993) (citation omitted). For example, when a plan sponsor–the employer–adopts or amends an employee benefit plan, it is not acting as a fiduciary because "amending . . . a plan cannot be an act of plan management or administration." *Lockheed Corp. v. Spink*, 517 U.S. 882, 890-91 (1996) (citation omitted). In that situation, it is often said that the plan sponsor wore the "hat" of a non-fiduciary. Only when one wears the "hat" of a fiduciary do ERISA's fiduciary requirements attach.

Many individuals wear fiduciary "hats." Even when a plan document states that certain individuals must take direction from a fiduciary, these limited-role fiduciaries, or "directed trustees," cannot escape fiduciary liability by claiming that they were directed to commit misconduct when they "know[] or should know that a direction from a named

9

fiduciary is not made in accordance with the terms of the plan or is contrary to ERISA[.]" Labor Dep't Field Assistance Bulletin 2004-03 (Dec. 17, 2004). Rather, "the directed trustee may not, consistent with its fiduciary responsibilities, follow the direction." *Id. See also Maniace*, 40 F.3d 264 (finding that appellants "failed to establish that [the directed trustee's] conduct at the [fiduciary's] direction was not 'in accordance with the terms of the plan' or was 'contrary to' provisions of ERISA" before concluding that the directed trustee did not breach its fiduciary duties).

The Labor Department's bulletin reflects ERISA's treatment of co-fiduciaries to the same plan, which holds one fiduciary liable for the misconduct of another fiduciary:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(1) [29 U.S.C. § 1104(a)(1) (duties of loyalty and prudence)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

ERISA § 405(a), 29 USC § 1105(a). This rule applies to directed trustees. Labor Dep't Field Assistance Bulletin 2004-03 (Dec. 17, 2004) ("[I]f a directed trustee has knowledge of a fiduciary breach, the directed trustee may be liable as a co-fiduciary unless the directed trustee takes reasonable steps to remedy the breach.").

## B. Fiduciary Duties and Prohibited Transactions

All fiduciaries must abide by ERISA's duties of prudence and loyalty. The duty of loyalty requires a fiduciary to:

10

> discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>> (A) for the exclusive purpose of:
>>> (i) providing benefits to participants and their beneficiaries; and
>>> (ii) defraying reasonable expenses of administering the plan.

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). Although ERISA contemplates that fiduciaries may wear multiple "hats," it nonetheless "require[s] . . . that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions." *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000). Thus, as long as decisions are made in the best interest of the plan and its participants and beneficiaries, incidental benefits to the plan sponsor or the fiduciary are not inconsistent with the duty of loyalty. *See e.g.*, *Morse v. Stanley*, 732 F.2d 1139, 1146 (2d Cir. 1984); *Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 140 (6th Cir. 1993).

The duty of prudence dictates that a fiduciary must discharge its duties:

> with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). The Eighth Circuit has held that "[t]he . . . prudent person standard is an objective standard . . . that focuses on the fiduciary's conduct preceding the challenged decision." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (citing *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994)). "In evaluating whether a fiduciary has acted prudently, we therefore focus on the process by

11

which it makes its decisions rather than the results of those decisions." *Id.* (citing *Roth*, 16

F.3d at 917-18; *Schaefer v. Ark. Med. Soc'y*, 853 F.2d 1487, 1492 (8th Cir. 1988) (fiduciaries

must "investigate all decisions that will affect the pension plan")).

ERISA also explicitly prohibits certain transactions:

(a) Transaction between plan and party in interest.
Except as provided in section 408 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect–

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

. . . .

(b) Transactions between plan and fiduciary
A fiduciary with respect to a plan shall not--

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its

12

participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

ERISA § 406, 29 U.S.C. § 1106.

The "parties in interest" with whom plan fiduciaries are prohibited from transacting

under ERISA section 406 include:

fiduciaries, plan employees, employers whose employees are covered by ERISA plans, service providers, employee organizations whose members are covered by a plan, and owners of fifty percent or more of stock in these employer and employee organizations . . . [,] employees, officers, and directors, as well as shareholders, partners, and joint venturers owning ten percent or more of entities that are themselves parties in interest.

*Reich v. Stangl*, 73 F.3d 1027 (10th Cir. 1996) (citing ERISA § 2(14)(A)-(I), 29 U.S.C. §

1002(14)(A)-(I)).

### C.     Liability for Fiduciary Misconduct

ERISA Section 409 outlines the liability incurred for breach of fiduciary obligations:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. . . .

ERISA § 409(a), 29 U.S.C. § 1109(a).

In the Eighth Circuit, a breach of fiduciary duty claim under ERISA § 404, 29 U.S.C.

§ 1104 (breach of prudence or loyalty) involves a three-step analysis. "ERISA plaintiffs bear

13

the burden of proving a breach of fiduciary duty and a prima facie case of loss to the plan. Once the plaintiff has satisfied these burdens, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused [by] the breach of duty." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994) (citing *Martin*, 965 F.2d at 671).

For claims based on violations of ERISA's prohibited transaction rules, the plaintiff need not demonstrate loss in order to recover. Prohibited transactions "are conclusively presumed to be undertaken to promote a conflicting interest, and even if no loss ensues, participants can insist that the fiduciary disgorge any profits made through the use of plan assets." *Wiedenbeck*, *supra*, at 132.

### D.      Statute of Limitations

ERISA's statute of limitations states:

No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of–

    (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

    (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation . . . .

ERISA § 413, 29 U.S.C. § 1113.

Based on the evidence, the Court finds that Plaintiffs' claims may not be based on breaches that occurred prior to December 29, 2000. The Court applies the six-year

limitation from the "date of the last action which constituted a part of the breach or violation." The Court does not find that ABB concealed its fiduciary breaches. Plaintiffs' challenge concerning the absence of separate accounts and co-mingled funds on the Plan's investment platform may fall under a different limitations period; however, as the Court finds that there is no merit to this claim, the Court does not address what specific limitations period applies to that claim.

The Court, however, will consider evidence of a conflicted relationship outside the statutory period as appropriate. *Batra v. Investors Research Corp.*, 144 F.R.D. 97, 98-99 (W.D. Mo. 1992).

### III. Did ABB Breach Its Fiduciary Duty by Failing to Monitor Recordkeeping Costs and Failing to Negotiate Rebates for the Plan?

The Court finds that ABB breached its fiduciary duty to the Plans because it did not monitor recordkeeping costs and failed to comply with the Prism Plan's Investment Policy Statement that states: "at all times, [Alliance], rebates will be used to offset or reduce the cost of providing administrative services to plan participants."

#### A. Findings of Fact

Fidelity Trust performed the PRISM Plan's recordkeeping services from 1995 to the time of trial and was compensated with monies obtained through "revenue sharing." Revenue sharing, which is also referred to as "alliance rebates," is a set percentage paid by an investment company which has been selected to offer its investment product to retirement plan participants. For example, the "XYZ" corporation hires a recordkeeper to administer

15

its defined contribution retirement plan.  The "XYZ" corporation also selects the "LMN" mutual fund to be one of the investments in which the "XYZ" employees can invest.  Instead of paying a recordkeeper with a hard-dollar, per-participant fee, the "XYZ" corporation permits the recordkeeper to negotiate with the "LMN" mutual fund for a percent of the revenue which the "LMN" mutual fund makes from plan participants choosing that mutual fund.  Sometimes, the recordkeeper is paid with a combination of revenue sharing and hard-dollar, per-participant fees.

When it started doing recordkeeping for the PRISM plans, Fidelity Trust was paid with a hard-dollar, per-participant fee.  By April 2001, Fidelity Trust was solely compensated for its services to the Main PRISM Plan through revenue sharing, and was compensated for its services to the Union PRISM Plan through revenue sharing and an $8 per-participant fee.  Fidelity Trust obtained its revenue sharing through agreements it makes with the individual investment companies, which were selected to be on the PRISM platform. Many of the investments on the PRISM Plan's investment platform maintained revenue sharing arrangements with Fidelity Trust.  All of the PRISM Plan's investments that provided revenue sharing, except for one, paid Fidelity Trust directly.  ABB's arrangement with T. Rowe Price, which was the exception, required that T. Rowe Price submit revenue sharing payments to the Plan; Fidelity Trust then billed the Plan for these amounts.

The revenue sharing income received by Fidelity Trust from PRISM Plan assets paid for record keeping and other administrative expenses of the Plans, such as trustee services and custodial services.  This is an acceptable practice in the investment industry.

16

Revenue sharing is not an expense explicitly reported in an investment's prospectus, nor was it disclosed as such to Plan participants. However, each investment on the Plan platform had an expense ratio and that expense ratio is listed in an investment's prospectus. The expense ratio affects the net asset value ("NAV") of the investment. The NAV is the "price" of one share of an investment option. Because an investment's expenses are paid from the assets of the investment, it is the investors who pay for the investment's expenses. As revenue sharing is one such expense, the investors pay for revenue sharing. In this manner, PRISM Plan participants pay the revenue sharing costs associated with each investment option on the Plan's platform in which they have invested if that investment shares revenue with Fidelity Trust.

In the investment industry, revenue sharing arrangements with recordkeepers are common; in part, because plan recordkeepers do some of the work that would otherwise be done by the investment company. For example, the investment company need not keep track of the holdings of each participant in a plan. Rather, the investment can report its daily NAV to Fidelity Trust, and Fidelity Trust will apply that information to each participant's account.

While ABB selects the investments offered on the PRISM Plan's platform, participants retain the autonomy to choose from any of the investments offered on the platform. However, ABB encourages diversification. Over several years, ABB has tracked its participants' investment habits. For example, it is aware that most rollover contributions from the defined benefit plan are invested in the ABB Income Fund. It is also aware of the

17

number of participants and their account balances who purchase only one type of fund and never diversify. [Tr. 272:1-8]. Because ABB was aware of trends in how Plan participants invested their accounts, it knew that there was little chance that the Plan's asset allocations among the platform's investment options would shift dramatically in a short amount of time.

### 1. ABB's Failure to Monitor Recordkeeping Fees

In 2001 and thereafter (during the relevant statute of limitations period), ABB never calculated the dollar amount of the recordkeeping fees the Plan paid to Fidelity Trust via revenue sharing arrangements, nor did it consider how the Plan's size could be leveraged to reduce recordkeeping costs. In fact, it did not obtain a benchmark cost of Fidelity's services prior to choosing revenue sharing as the Plan's method for compensating Fidelity Trust. It did not even do so in 2005, when an outside consulting firm, Mercer, told ABB that it was overpaying for recordkeeping and that it appeared the Prism Plan's were subsidizing the corporate service provided to ABB by Fidelity. Thereafter, ABB failed to even determine the accuracy of Mercer's information or to investigate how linkage might be affecting the interest of Plan participants. Nor did ABB tell Fidelity that there could be no linkage between the Plan and ABB's corporate services. It did not even investigate whether Fidelity was giving ABB a very favorable price for the work Fidelity did for ABB's corporate services, such as payroll and recordkeeping for ABB's defined benefit plans; nor did it investigate the market price for comparable recordkeeping fees. This is particularly egregious because Fidelity, at the same time, suggested to ABB that Fidelity viewed its delivery of corporate services and Plan services to be interconnected. *See* subsection V, *supra*.

18

Furthermore, ABB had good information about how the investing habits of Plan participants might affect the availability of revenue sharing, so it had a reasonable basis for conducting such an investigation.

The Court is also unconvinced that ABB monitored the reasonableness of Fidelity Trust recordkeeping fees by monitoring the reasonableness of the expense ratio of the retail investments chosen for the PRISM platform. First, the expense ratio does not show how much revenue is flowing from the investment company to the recordkeeper. Second, it does not show what the competitive market is for recordkeeping fees for comparable funds. Most importantly, in this case, it fails to take into account the size of the retirement plan and the competitive benefit that an investment company acquires when it is selected to be on a retirement plan platform. Participant choices are generally limited to those investments on the platform, substantially increasing the visibility of these investments and limiting competition from other funds.

While there are legitimate reasons for limiting choices, the reality is that being put on a platform is a valuable benefit and gives a large plan, the opportunity to negotiate for rebates in exchange for that benefit. For example, a PRISM Plan participant is not an ordinary retail investor because her assets are part of the Plan, which as of 2000, maintained over $1.4 billion in assets. There is consumer strength associated with significant assets. Indeed, as later discussed, the PRISM Investment Policy Statement clearly states that revenue sharing should be used to offset or reduce recordkeeping costs. Thus, in accordance with the IPS, ABB was required to leverage the PRISM Plan's size and assets to reduce

19

recordkeeping costs. In other words, ABB must use its "purchasing power" to negotiate for rebates from Fidelity Trust, either in the form of basis points or hard-dollar amounts, if the amount of revenue sharing generated exceeded market value for Fidelity Trust's services. A fair negotiation for such rebates cannot occur without determining the amount of income generated by Fidelity Trust from revenue sharing, knowing the market costs for comparable services and affirmatively evaluating the quality provided by Fidelity Trust, and evaluating the costs and benefits of risk sharing. ABB did none of this and did not even ask Fidelity Trust for a rebate or even discuss the issue with them.

The Court specifically finds that the ABB fiduciaries were not concerned about the cost of recordkeeping unless it increased ABB expenses or caused the PRISM Plans to be less attractive to its employees as a result of hard-dollar, per-participant fees being charged. The latter was a concern to ABB corporate because the Plans were used by ABB to attract and maintain high quality employees, so it was to ABB's benefit that opaque revenue sharing be used rather than hard dollar fees which were clearly visible to the participants.

Nor is the Court persuaded that ABB chose to compensate Fidelity Trust with revenue sharing to achieve "progressivity." A plan may choose revenue sharing as its model for compensating its recordkeeper. "Progressivity" is defined similarly to the term's usage in the field of income tax. A larger income is taxed at a higher percentage rate: those who have more pay more, not just in dollar amount, but in a progressively higher proportion. In the context of defined contribution plans, plan participants with bigger accounts pay more for the cost of administering the plan.

20

However, ABB engaged in no process for evaluating whether their revenue sharing model actually implemented "progressivity," so that individuals with greater assets in the Plan paid more for Plan recordkeeping services. Further, there is no connection between the type of investment selected by an ABB Plan participant and the amount of funds that participant maintains in the Plan. In other words, there is no evidence that a participant with high assets in the Plan tended to select investments that had higher revenue sharing; or that a participant's account appreciated in value primarily due to higher returns from funds with higher revenue sharing. Indeed, the evidence shows that participants could obtain a high rate of return even when investing in only passively managed options, which pay little to no revenue sharing. In fact, it appears that participants who chose funds with no revenue sharing paid little or nothing for recordkeeping even when their asset balances were very high.

Arguably, ABB's "progressivity" could also be defined simply by fund choice, e.g., participants who choose actively managed funds (with higher revenue sharing) should pay more than participants who choose index funds (with little to no revenue sharing) regardless of the amount of assets they maintain in the Plan. Even if this were the case, the Court has been presented with no evidence why such "progressivity" is in the best interest of all Plan participants. For example, the Court finds no evidence that recordkeeping for an account with assets that are invested in actively managed mutual funds is more costly than recordkeeping for an account with assets that are invested in passive funds or index funds.

The Court also finds that the Plans overpaid for the recordkeeping services provided

21

by Fidelity Trust. In 2001 and after, the revenue sharing generated for Fidelity by the Plan's assets far exceeded the market value for recordkeeping and other administrative services provided by Fidelity Trust. The Plan, on average, paid the following per-participant: $108 in 2001, $ 65 in 2002; $106 in 2003; $122 in 2004, $100 in 2005, $93 in 2006, and $180 in 2007. A reasonable per head fee for such services to the Plan would have been $60 in 2001, $65 in 2002, $70 in 2003, $68 in 2004, $63 in 2005, $60 in 2006, $44 in 2007. These figures come from Albert J. Otto's expert testimony.

In determining that these figures are credible, the Court found persuasive the rate paid in 2008 by the Texa$aver Plan, the employee retirement system for employees of the State of Texas. The Texa$aver Plan offers 401(k) and 457 plans, which are deferred compensation retirement savings vehicles, just as is the PRISM Plan. Although the Texa$aver Plan is not an ERISA plan, the Court finds that the recordkeeping and administrative services rendered to the Texa$aver Plan are comparable to the services rendered by Fidelity Trust to the PRISM Plan. Additionally, the Texa$aver Plan maintains over $1 billion in Plan assets, which is smaller than the asset size of the PRISM Plan. Because administration and recordkeeping fees are generally lower for larger plans, the Court finds that the Texa$aver fees are a conservative comparator.

The recordkeeping and administrative services fees for the Texa$aver Plan were a $4 annual participant fee and an asset-based fee directly assessed to the Texas participants at 20 basis points of their account balances per year. The asset-based fee could not exceed $20 per month per-participant. As of June 2008, the average account balance for a Texa$aver Plan

22

participant was slightly under $20,000.  Thus, for a participant who had an average account balance of $20,000, recordkeeping and administrative services cost $52 per year.

Moreover, Fidelity Trust's own documents show that the revenue it generates per PRISM Plan participant far exceeds the trend of revenue earned by Fidelity Trust from other plans.  *See, e.g.*, [Ex. P1093, at FID-ABB-P 0053689 (showing that as compared to other plans serviced by Fidelity Trust, a Plan with the same number of participants as the PRISM Plans would generate $70 per-participant in revenue for Fidelity Trust)].  Because revenue earned by Fidelity Trust is equivalent to the cost for the services paid by the Plan, the graph in Exhibit P1093 shows that before the removal of the Fidelity Magellan Fund in 2005, the Plan paid approximately $130 per-participant for recordkeeping services, far exceeding Fidelity Trust's own trend line of $70.  The Court notes that some trial testimony appeared to suggest that this chart compares the cost to ABB for all of Fidelity Trust's services–both recordkeeping and other administrative services–to the recordkeeping only costs of other defined contribution plans serviced by Fidelity Trust.  However, the Court does not agree with this characterization.  Rather, it finds that the chart compares the costs to the Plan that are associated with recordkeeping to the recordkeeping costs of other plans serviced by Fidelity Trust, as indicated by the chart's x-axis.

Indeed, Fidelity Trust's own trend line of $70 corresponds to the findings of Mercer, an outside consulting firm ABB hired to assist it in the Plan's 2005 fee negotiations with

23

Fidelity Trust. Mercer issued a report in November 2005 ("Mercer Report"),[2] which indicated that based on Mercer's research, a recordkeeping only fee of $70 per-participant "is consistent with our experience but generally includes some of the basic services that [Fidelity] suggest come at an additional cost." [Ex. P38, at APP 00373]. Thus, according to Mercer, $70 is a market rate for services that include recordkeeping and some administration.

Accordingly, the Court finds that the reasonable recordkeeping fee estimates used in Mr. Otto's calculations are appropriate. Thus, the Court finds that the Plan overpaid for Fidelity Trust's recordkeeping and administrative services as a result of the use of revenue sharing without any rebates to the Plan.

In making this determination, the Court specifically rejects the argument that ABB prudently used revenue sharing to pay Fidelity Trust because revenue sharing arrangements permit risk sharing between Fidelity and the Plan. Theoretically, revenue sharing can result in "risk sharing." For example, regardless of market fluctuations or changes to the investment habits of a Plan participant, revenue sharing arrangements theoretically permit the Plan to pay a pre-determined percentage of its assets in a particular investment option every year for recordkeeping. If the Plan were to pay a flat annual fee for recordkeeping, that set dollar amount could represent proportionately more of the Plan's assets when account

---

[2] The Court finds that the content of the Mercer Report is sufficiently reliable and can be appropriately considered for the purposes of comparing benchmark market prices for Plan services. The Court also finds the deposition testimony of former Mercer employee, Kathy Labonte, provided nearly three years after the Mercer Report, regarding the reasonableness of Fidelity Trust's fees, to be not only contradicted by the Mercer Report itself, but also to be neither reliable nor credible.

24

balances have gone down, whereas it could represent proportionately less of the Plan's assets when account balances are up. However, even when the Plan pays its recordkeeper through revenue sharing, nothing prevents a recordkeeper from demanding more flat fees or per head fees to replace revenue sharing lost by a decline in assets of the Plan. Indeed, The Trust Agreement between Fidelity Trust and ABB states: "[T]o reflect increased operating costs, the Trustee [Fidelity Trust] may once each calendar year amend Schedule "B" without the Sponsor's [ABB] consent upon seventy-five days (75) written notice to the Sponsor." [Ex. P1, at ABB00047]. Schedule "B" of the Trust Agreement outlines how the Plan compensates Fidelity Trust for its services. Further, on the occasion when revenue sharing did decline because a Fidelity fund was removed from the investment platform, Fidelity requested a hard-dollar fee and eventually negotiated for a revenue neutral provision in its agreement with the Plan.

In contrast, ABB never determined how much revenue sharing was collected by Fidelity and, therefore, did not and was never in a position to ask for a rebate when Fidelity revenue sharing exceeded the value of the recordkeeping services provided. In fact, after there was an explicit agreement for "revenue neutrality" between Fidelity and ABB, there is no evidence that ABB tracked when Fidelity's revenue exceeded the agreed amount, but there is ample evidence that Fidelity did keep track of any decrease in its revenue sharing. Therefore, while revenue sharing is intended to shift the risk to the recordkeeper, it did not operate this way for the PRISM Plans because ABB as a fiduciary did not protect the Plan.

## 2. ABB's Failure to Comply With IPS

The Pension Review Committee–a named fiduciary–adopted the PRISM Plan's Investment Policy Statement ("IPS"), which provides the Committee with guidelines concerning investment management decisions such as selecting, deselecting, and monitoring investment offerings in the Plan. The IPS requires that at "<u>all times, [Alliance] rebates will be used to offset or reduce the cost of providing administrative services to plan participants.</u>" (Emphasis added). [Ex. P887, at APP 01164]. ABB did not use alliance rebates/revenue sharing to offset or reduce the cost of the Plan's administrative services. Instead, ABB permitted Fidelity to take the revenue sharing to cover recordkeeping costs but this did not lower administrative costs. As explained above, it resulted in above-market costs.

## 3. ABB Fiduciaries

ABB, Inc., is the Plan sponsor and oversees administration of the Plan. All contracts or agreements approved by the Employee Benefits Committee and the Pension Review Committee are required to be signed by an officer of ABB, Inc. The Employee Benefits Committee is a named fiduciary with respect to the administration of the Plan. It is responsible for, among other things, determining the compensation of Fidelity Trust. [Ex. DA1061, at ABB-KEN-0048285]. The members of the Employee Benefits Committee are appointed by ABB, Inc.'s board of directors. [Ex. DA1061, at ABB-KEN-00048274]. The Pension Review Committee is a named fiduciary to the Plan, and maintains the Pension and Thrift Management Group as its staff. The Pension Review Committee is responsible for selecting and monitoring the Plan's investment options. The members of the Committee are

26

appointed by the President of ABB, Inc., in consultation with the board of directors of the company.

The Director of the Pension and Thrift Management Group is John Cutler, who exercises discretion over the investment and administration of PRISM Plan assets. As Mr. Cutler serves the Pension and Thrift Management Group and is an employee of the Pension Review Committee, both the Group and the Committee also likewise exercise discretion over the Plan.

The decision to compensate Fidelity Trust for recordkeeping services using revenue sharing involved discretionary authority by all ABB Defendants: Mr. Cutler, as director of the Pension and Thrift Management Group and staff to the Pension Review Committee, reviewed the reasonableness of the arrangement by examining expense ratios; the Employee Benefits Committee was required to administer the Plan and determine an appropriate recordkeeping compensatory scheme for the Plan; and ABB, Inc., approved the Plan's contract with Fidelity Trust.

### B.  Conclusions of Law

All ABB Defendants ("ABB") are fiduciaries to the Plan with respect to the administration of the recordkeeping for the Plan, including cost of administration.

The IPS is a governing plan document within the meaning of ERISA section 404(a)(1)(D). *See* Interpretive Bulletin Relating to Written Statements of Investment Policy, Including Proxy Voting Policy or Guidelines, 29 C.F.R. § 2509.94-2 (1994) ("Statements of

27

investment policy issued by a named fiduciary authorized to appoint investment managers would be part of the 'documents and instruments governing the plan' within the meaning of ERISA § 404(a)(1)(D).").  The duty of prudence requires that fiduciaries discharge their duties in accordance with governing plan documents.  ERISA § 404(a)(1)(D).

The IPS requires that revenue sharing be used to "offset or reduce the cost of providing administrative services to plan participants."  ABB failed to comply with IPS because it made no meaningful effort to monitor the revenue sharing and determine whether it was being used to reduce Plan recordkeeping costs.  This is particularly so because the prudent man standard in the Eighth Circuit focuses on a fiduciary's decision-making process.  *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009).

To assess the prudence of a revenue sharing arrangement ABB had to determine the market rate for the recordkeeping services provided to the Plan.  Without such a baseline, it would be impossible to determine whether a revenue sharing arrangement would add to the value of the PRISM Plan, given its particular assets and allocation of those assets.  Also, such a baseline was necessary for ABB to evaluate whether Fidelity Trust is justified when seeking additional hard-dollar fees to replace lost revenue from declining Plan assets in investment options that provided revenue sharing, including internal revenue sharing.

While ABB's choice to use revenue sharing to pay for record keeping expenses is not uncommon among plan sponsors, ABB failed to assess the prudence of its choice in the context of the PRISM Plans.  For example, ABB didn't even know the amount of revenue

28

sharing income the PRISM Plan's assets generated for Fidelity Trust. Without looking at the revenue sharing in context, ABB could not determine whether revenue sharing was the best way to pay Fidelity or whether it could use its purchasing power due to its large size to find a more competitive rate for recordkeeping services.

As noted, the amount of income generated by revenue sharing is also a function of participant choice–if participants chose to invest in investments that do not engage in revenue sharing with Fidelity Trust, Fidelity Trust would receive no income. While the purchasing habits of participants may potentially be fickle enough to deprive Fidelity Trust of income, ABB had sufficient knowledge of how Plan participants have traditionally allocated their investment dollars. Thus, ABB could have performed a meaningful analysis to determine if revenue sharing was a prudent method of compensating for Plan recordkeeping services.

It is true that revenue sharing is commonly used in the industry to pay for recordkeeping fees. In addition, a common method for determining the reasonableness of those fees is to examine the expense ratios of various investments. While both of these statements may be true as to what is commonly used in the industry, the Court finds that such inquiries are not sufficient as to the PRISM Plan because of the IPS. The IPS specifically requires that revenue sharing be used to *offset* or *reduce* the cost of providing administrative services to Plan participants. Thus, ABB may not choose revenue sharing as an appropriate method for compensating the Plan's recordkeeper simply because many others in the industry use that method of compensation. Rather, ABB may deliberately choose revenue sharing as

29

its method of recordkeeping if it will *offset* or *reduce* the cost of providing administrative services as compared to other methods of compensation, such as hard-dollar, per-participant fees.

In sum, as fiduciaries, the ABB Defendants are required to act prudently in discharging their duties. ERISA § 404(a)(1)(B). While revenue sharing is accepted industry-wide as a method of paying for plan recordkeeping services, the prudence of choosing that option must be evaluated according to the circumstances of each plan. Here, the process by which ABB determined to use revenue sharing as the Plan's payment model was imprudent. First, ABB did not select revenue sharing to achieve progressivity. Second, because it failed to calculate how many dollars would be or had been generated by revenue sharing for Fidelity Trust, ABB could not analyze how revenue sharing would benefit the Plan; nor was it in a position to negotiate revenue sharing (alliance rebates) with Fidelity Trust by leveraging the Plan's size to offset or reduce recordkeeping costs. As the IPS is a governing Plan document within the meaning of ERISA section 404(a)(1)(D), ABB breached its fiduciary duties when it failed to comply with this provision of the IPS.

To be clear, the Court is not stating that revenue sharing is an imprudent method for compensating a plan's recordkeeper, or that evaluating expense ratios may not, in some circumstances, comport with a prudent process for selecting a plan's investment line-up. However, if a plan sponsor opts for revenue sharing as its method of paying for recordkeeping services, it must not only comply with its governing plan documents, it must

30

also have gone through a deliberative process for determining why such a choice is in the Plan's and participants' best interest. Such an inquiry involves more than a raw assessment of the reasonableness of expense ratios; particularly, given the inherent difficulty of identifying how expense ratios are broken down between administration and investment services and the fact that the expense ratio doesn't show whether there is a revenue sharing agreement with the recordkeeper or for how much. Nor does it show what the market value is for recordkeeping services.

Fidelity is not liable for ABB's fiduciary breaches described here. Fidelity did not affect nor was it aware of the decision-making process employed by ABB when choosing to compensate Fidelity Trust through revenue sharing. Although the Trust Agreement permits Fidelity Trust to subsequently alter its compensation once per calendar year to reflect increased operating costs, Fidelity Trust did not have discretionary authority to change its compensation for any other reasons. Although Fidelity Trust could re-negotiate with individual investment companies the percentage it received in revenue sharing from them, such negotiations were not specific to the PRISM Plan. Thus, Fidelity Trust did not act in a fiduciary capacity during such renegotiations. *See DeLuca v. Blue Cross Blue Shield of Mich.*, No. 08-1085 (6th Cir. Dec. 8, 2010). Moreover, it is ABB's decision to use revenue sharing as its method of compensating Fidelity Trust without any meaningful investigation that the Court faults, and there is no evidence that Fidelity Trust was aware or should have been aware of this deficiency.

31

## IV. ABB's Selection and De-selection of Investments

Although Plaintiffs argue that all of ABB's decisions concerning the selection and de-selection of investments on the PRISM Plan's platform was improperly influenced by conflicts of interest, the Court finds that the evidence only shows such conflict in two specific situations. They are: 1) the de-selection of the Vanguard Wellington Fund and the selection of the Fidelity Freedom Funds, and 2) the decision to select or to keep more costly classes of investments on the Plan's investment platform when less expensive classes of those same investments were available. While the Court is suspicious that the relationship between ABB and Fidelity Trust infected more than the specific instances identified, the Court cannot rely on suspicion and therefore rejects the idea that all decisions related to the investment options on the Plan's platform were tainted.

### A. The Mapping of Vanguard Wellington Funds to Fidelity Freedom Funds

#### 1. Findings of Fact

"Mapping" is the transfer of assets from one investment option on a retirement platform to another investment option.

The Vanguard Wellington Fund is an actively managed balanced mutual fund, which invests in both stocks and bonds. It is a well known fund that has a seventy-year track record. [Tr. 1816:3-4]. Except for one "bad" year between 1996 to 2000, the performance of the Fund remained "stellar" and "consistent" during that period. [Tr. 1816:1-4]. Even including the one year of poor performance, by the end of 2000 the Fund's annual performance

32

exceeded Morningstar's benchmark by 4 percent, or 400 basis points.

The Fidelity Freedom Funds is a "lifestyle" fund (also referred to as a "lifecycle" fund or "target-dated" fund) composed of Fidelity retail funds. It has been referred to as a "fund-of-funds." [Tr. 1143:3-4 (testimony of Mr. Cutler)]. The Freedom Funds remove the asset allocation decision from the hands of the investor. The fund determines how conservative, neutral, or aggressive an investor can afford based on his or her age. Historically, the number of retail funds contained in the Freedom Funds has ranged between the high teens to the mid-twenties. This number of funds is considered on the high end compared to other similar target funds.

It is the job of Mr. Cutler and his staff at the Pension Thrift Management Group to recommend to the Pension Review Committee the funds that are going to be added to or deleted from the PRISM Plan. The Committee's process for de-selection of a fund involves the following: examining a three to five-year period, determining if there are five years of underperformance, and if so, place the fund onto a "watch list," and then remove the fund within six months.

At a Committee meeting on May 23, 2000, Mr. Cutler proposed that the plan implement an "investment policy statement." At the meeting, Mr. Cutler summarized the key elements of an investment policy and the PRISM Plan investment management process. Mr. Cutler's proposed IPS was unanimously approved by the Committee. The IPS is intended to be a prescriptive document that provides a roadmap for the Committee to follow in

33

selecting, deselecting, and monitoring investment offerings in the plan. The Committee's method of de-selecting funds is included in the IPS.

Also at the May 2000 meeting, Mr. Cutler summarized a tiered investment strategy that he and Mr. John Sackie, head of employee benefits at ABB, Inc., were recommending as part of the PRISM Plan's IPS. One of the tiers of this investment strategy was directed at participants unwilling or unable to make a personal asset allocation decision. For these participants, the IPS indicated that the Plan "will offer several 'managed allocation' funds designed to offer the participant a professionally managed, well diversified fund or funds appropriate for the participants' investment goals." [Ex. P20, at ABB-KEN 02735 (November draft); Tr. 992:11-19]. The IPS also details how a new fund is selected. The IPS requires a large winnowing process.

At the same meeting, Mr. Cutler recommended that the Committee remove the Vanguard Wellington Fund due to "deteriorating performance," and because "participants would be empowered to create their own balanced fund using either actively or passively managed core fund offerings." [Ex. P447, at APP 00696]. At the meeting, Mr. Cutler did not provide any information to the Committee regarding the three to five-year performance history of the Wellington Fund. Mr. Cutler did not know what the return for the Vanguard Wellington Fund was between 1996 and 2000. No calculations were performed regarding the performance of the Wellington Fund that would have led to its removal consistent with the IPS. He also did not recommend that the Wellington Fund go on a watch list. Mr. Cutler

34

also suggested to the Pension Review Committee that as a result of implementing the IPS, which now required a "managed allocation" investment option as part of the Plan's new investment strategy, that the Committee add a "lifestyle" fund in accord with the IPS's investment strategy. [Ex. P447, at APP 00696 to APP 00697]. Mr. Cutler provided information to the Committee about the increasing use of lifestyle funds by Plan sponsors and Plan participants and that these types of funds are primarily designed for novice investors. At this meeting, he did not suggest that any particular lifestyle fund be adopted.

In 2000, there were not many lifecycle funds, or target-dated funds, in the market. However, the Group only considered three funds: Fidelity Freedom Funds and target-dated funds by T. Rowe Price and BGI. An exception was made by Mr. Cutler and the Pension Thrift Management Group to consider the Fidelity Freedom Funds, which were in existence for fewer than five years by 2000. The Group eliminated from consideration the BGI fund because it employed a "static allocation approach," whereas the Group wanted a fund that employed a "dynamic approach." [Tr. 1164:16-19; Exhibit DA940]. This left only the T. Rowe Price fund and the Fidelity Freedom Funds. The Court finds that Mr. Cutler and the Pension and Thrift Management Group did not employ a "winnowing process." Indeed, it could not do so as it only considered three funds, one of which was automatically rejected without any discussion of the merits of the option, e.g., rate of return, management expertise, etc., because it employed a "static" approach. Choosing a fund option between the remaining two funds does not employ a "winnowing process," And the Court believes the Freedom

35

Funds were chosen instead because of ABB's relationship with Fidelity.

In May 2000, Mr. Cutler received information from T. Rowe Price regarding its "lifestyle" funds. At the time of the decision to add a target-dated fund, T. Rowe Price had one fund in the PRISM Plan's fund line-up. T. Rowe Price had a long-standing agreement with the Plan to allow revenue sharing to be paid back to the Plan, unlike Fidelity's practice.

In September 2000, Mr. Cutler and Mr. Sackie met with Jeffrey Cutts of Fidelity to discuss "pricing implications" of recordkeeping fees. [Ex. P324]. Prior to this time, the Plan paid Fidelity Trust with both revenue sharing and a $10 hard-dollar fee per-participant. Later, on September 20, 2000, Mr. Cutts informed both Mr. Cutler and Mr. Sackie of three different proposals regarding Fidelity's hard-dollar recordkeeping charges: (1) they would reduce the recordkeeping fees for both PRISM Plans to zero if Wellington assets were mapped and defaulted to the Freedom Funds and the Plan kept Fidelity's index funds in the fund line-up; (2) if the Wellington Funds were mapped to the Freedom Funds but Fidelity's index funds were not retained in the Plan's investment platform, recordkeeping fees would go from $10 to zero for employees in the Main PRISM Plan, and $10 to $8 for each employee in the Union PRISM Plan; (3) if Fidelity's index funds were not retained nor were Wellington assets mapped into the Freedom Funds, the recordkeeping fee for the main PRISM Plan would be $4 annually per employee, and $27 annually per employee for the Union PRISM Plan. Mr. Cutts, in making this proposal, intended to provide financial incentives to ABB, Inc., so that more assets in the Plan were with Fidelity investment

options.

When receiving this information, ABB had not yet decided what fund would be added after the removal of the Wellington Fund. At that time, pursuant to a collective bargaining agreement with the employee union, ABB, Inc. paid the difference between the hard-dollar fees charged to the Union PRISM Plan and the Main PRISM Plan. Thus, it was in ABB, Inc.'s interest to maintain low hard-dollar costs for the Union PRISM Plan because any difference in fees between the Main and Union Plans was paid for by ABB, Inc., not by participants in the Union PRISM Plan. More importantly, because ABB, Inc. used the Plan as a labor recruitment and retention tool, it was in its own best interests to have participation in the Plan appear to cost the employee as little as possible. Thus, ABB had a corporate incentive to negotiate for little or no hard-dollar fees for the Main PRISM Plan. Because the revenue sharing concept is an opaque method of paying recordkeeping, ABB Defendants knew that it would be difficult for employees to understand that the employees were in fact paying for the administration of the Plan.

On November 14, 2000, the Committee voted to add the Freedom Funds after Mr. Cutler stated that the Pension Thrift Management Group's research focused on dynamic funds, and "reviewed with the Committee the funds which [the Group] considered for this assignment and then presented a recommendation to the Committee that they select the Fidelity Freedom Funds as managed allocation funds selection for the PRISM plans." [Exhibit JD 168, at ABB-KEN 03654]. The Court finds that the Group's research was scant

37

and the "review" by the Committee was cursory. Any consideration by the Pension and Thrift Management Group of additional target-dated funds other than those offered by BGI, T. Rowe Price, and Fidelity, was superficial and minimal. The Group decided to recommend to the Committee that the Fidelity Funds be included in the PRISM Plan investment platform without sufficient analysis supporting that decision, as compared to other available choices. Indeed, the only reason provided to the Court as to why the Group preferred the Fidelity Freedom Funds over other target-dated investment options was the Freedom Funds' "glide path"–the changes to allocation over time as a participant nears retirement. However, such allocation changes are not unique to Freedom Funds, but rather is a characteristic embodied by lifestyle funds generally.

It is the responsibility of ABB, Inc.'s Human Resources Department to "sign off" on or consent to hard-dollar recordkeeping fees. There is no "signing off" requirement when recordkeeping fees are paid through revenue sharing. Mr. Cutler was aware that Fidelity's recordkeeping charge would change depending on the decision of the Pension Review Committee to select or deselect various funds to and from the fund line-up. He was also aware that any changes to the hard-dollar recordkeeping fees that would result from the Committee's changes would need the approval of the Human Resources Department.

Because of the failure of Mr. Cutler and the Group to employ a winnowing process in selecting the Freedom Funds and their failure to examine the performance history of the Wellington Fund prior to suggesting its removal to the Committee, the Court finds that Mr.

Cutler did not solely consider the merits of the Freedom Funds or the Wellington Fund when recommending that they be added or removed. Rather, the Court finds that Mr. Cutler considered other factors, such as the effect of the fund selected on recordkeeping fees, and what changes to the fee structure were in ABB, Inc.'s best interest. In sum, Mr. Cutler's recommendation to add the Freedom Funds to the Plan's investment platform and remove the Wellington Fund despite its excellent performance record was motivated in part by his desire to decrease the fees that ABB was paying and to maintain the appearance that the employees were not paying for the administration of the Prism Plan.

After the Pension Review Committee decided to add the Fidelity Freedom Funds to the fund line-up, the assets from the Vanguard Wellington Fund were mapped into the Freedom Funds, effectively eliminating the Wellington Fund from the fund line-up and introducing the Fidelity Freedom Fund into the line-up. The assets of participants who did not elect to transfer their assets from Wellington into another fund were mapped to the Fidelity Freedom Funds on an age-appropriate basis.

Mr. Cutler's trial testimony indicates that the Committee decided to map the Vanguard Wellington Fund to the Fidelity Freedom Funds because the Wellington Fund was a "balanced fund" and the Freedom Funds was also a "balanced fund," i.e., both funds invested in both stocks and bonds. [Tr. 1063:17-25, 1064:1-8]. However, the Court does not find this explanation credible. When Mr. Cutler first recommended to the Committee in May 2000 that the Vanguard Wellington Fund should be removed, he explained that removal

Case 2:06-cv-04305-NKL   Document 623   Filed 03/31/12   Page 39 of 81

would allow participants to "be empowered to create their own balanced fund using either actively or passively managed core fund offerings." [Ex. P447, at APP 00696]. Yet, mapping the Wellington Fund to the Freedom Funds–which effectively replaces the Wellington Fund with the Freedom Funds–is contrary to Mr. Cutler's original stated purpose for removing of the Wellington Fund. Indeed, the Freedom Funds were designed to remove decision-making from the participant instead of "empowering" participants to "create" their own balanced fund. The Court also notes that the Wellington Fund had competitive expense ratios [Tr. 171] and provided only 15 basis points in revenue sharing as compared to the 35 basis points provided by Freedom Funds. [Ex. P1, at ABB00055 (Schedule B)]. Additionally, the Plan's platform maintained other actively and passively managed balanced funds, which Mr. Cutler had referenced in May 2000 when he recommended the removal of the Wellington Fund. Thus, even if the Committee in fact viewed both the Wellington Fund and the Freedom Funds as comparable because they were both balanced funds, Mr. Cutler and the Group failed to compare differences in expense ratios or revenue sharing percentages between the Wellington Fund and the Freedom Funds or other balanced funds on the Plan platform, which affect an investment's return. Thus, they failed to make a prudent determination as to which investment would have been most appropriate for mapping the Wellington Fund's assets. This demonstrates another example of the cursory analysis used by Mr. Cutler, the Group, and the Committee, when making these particular decisions to alter the line-up of options on the Plan's investment platform.

40

The inconsistency between Mr. Cutler's reasons for removing the Wellington Fund and the decision to map the Wellington Fund to the Freedom Funds, coupled with the large discrepancy in the expenses of both funds, underscore the Court's finding that Mr. Cutler's recommendations were motivated in part by his desire to decrease the fees that ABB, Inc., paid. Indeed, the Vanguard Wellington Fund with its low fees, and long-standing consistent performance history, made it a very attractive fund to maintain on the Plan's investment platform. The Court believes that the Wellington Fund's removal was not due to any failure of its merits, but because the Freedom Funds that replaced it generated more in revenue sharing for Fidelity Trust.

Also in November 2000, the Pension Review Committee decided to give the index funds to BGI. BGI Index Funds are not a mutual fund. Effectively, the Pension Review Committee's decisions adopted Fidelity's second proposal. All of the changes made to the Plan's investment platform were finalized when the Trust Agreement was revised in 2001. That ABB did not choose the option proposed by Fidelity that would result in the greatest reduction in hard-dollar recordkeeping fees does not diminish the fact that Mr. Cutler was influenced by Fidelity's proposal to reduce hard-dollar recordkeeping fees if the Wellington Fund was mapped into Fidelity Freedom Funds.

After the Wellington Funds were mapped into the Fidelity Freedom funds, thereby changing the hard-dollar fees charged, ABB did no "mathematical calculation" of what the Plan now paid Fidelity in recordkeeping fees. Revenue sharing was paid to Fidelity Trust

41

based on each of the retail funds that comprised the Freedom Funds.  Fidelity charged an additional fee for deciding how to allocate additional funds coming into the Freedom Funds. Mr. Cutler was not aware of this fee until September 2005 when he learned of it through another plan sponsor.  Fidelity removed the fee in September 2005. As of December 31, 2006, the revenue sharing associated with the Freedom Funds was estimated by Fidelity to be 35 basis points.  Thus, from 2001 to September 2005, the Court concludes that Fidelity received an additional 35 basis points as a result of the Freedom Funds being selected by ABB to be on the PRISM platforms.

Mr. Cutler was aware that target-dated index funds were available in the marketplace, and that in August 2005 he felt that "low cost index funds would appear to be a better way for participants to get the same general asset allocation [as the Freedom Funds] at lower cost and better performance."  At this time, he was concerned with the poor performance of the Freedom Funds.  [Tr. 904:23-25; Ex. P1086, at APP 01258].  In September 2005, the Freedom Funds were placed on a watch list.  By March 2006, the Freedom Funds had earned their way off the watch list.  Even so, Mr. Cutler was aware that there existed other target-dated funds that were less costly than the Freedom Funds and provided better returns, yet did not suggest that they replace the Freedom Funds.  This contrasts sharply with Mr. Cutler's recommendation to remove the Wellington Funds for "poor performance" despite consistent outstanding performance, but for one year, between 1995  to 2000.  Additionally, between 2000 and 2008, the Wellington Funds outperformed the Freedom Funds.  Such behavior

42

underscores the Court's finding that Mr. Cutler did not recommend the removal of the Wellington Fund and the addition of the Freedom Funds solely based on the merits of the investments and the requirements of the IPS. Notably, the Committee could not have carefully examined the merits of the Freedom Funds due to the superficial research and lack of "winnowing" by the Group.

The Pension Review Committee is a named fiduciary with regard to the investment of Plan assets. The Pension and Thrift Management Group, as staff of the Committee, was delegated discretionary authority by the Committee to make preliminary decisions such as (1) creating its own benchmark standards for fund performance, and (2) recommending fund selections to the Committee based on its own research and analysis. Mr. Cutler was the Director of the Group and communicated the Group's proposals to the Committee. Changes to the Plan's investment line-up must be approved by the Employee Benefits Committee and ABB, Inc.

### 2. Conclusions of Law

The IPS is a governing plan document within the meaning of ERISA. The duty of prudence requires that fiduciaries comply with the IPS. ERISA § 404(a)(1)(D).

All ABB Defendants are fiduciaries to the Plan, within the meaning of ERISA, as to the selection and de-selection of funds on the Plan's investment platform.

The Pension and Thrift Management Group violated the IPS and the duty of prudence when it failed to employ a "winnowing process" in selecting a managed allocation fund for

the Plan's investment line-up. As Mr. Cutler explained to the Pension Review Committee meeting in November 2000, the IPS requires that a managed allocation target-dated fund be added to the Plan's investment platform for those participants who either lacked the time, skill, or inclination to adequately research investment options. However, because the Group did not employ a winnowing process, it failed to act as a gatekeeper for the Plan in allowing only well considered investment options onto the investment platform. Moreover, the Fidelity Freedom Funds were specifically geared towards Plan participants who arguably relied the most heavily on the care and expertise of the Group and Committee. Yet, the Freedom Funds were not chosen to be in the Plan's investment platform solely for their merit. Indeed, they routinely underperformed. Thus, the Group and the Committee violated their duty of prudence (1) when they failed to follow the IPS when it considered only two viable options for a managed allocation fund, and (2) failed to engage in a deliberative assessment of the merits when determining which investment option to choose.

Mr. Cutler's recommendation to the Pension Review Committee that the Vanguard Wellington Fund be removed due to "deteriorating performance" and the Committee's removal of the fund from the PRISM Plan fund line-up are breaches of the IPS and therefore breaches of ERISA's duty of prudence. The IPS specifically outlines the Committee's process for de-selection of a fund. The process requires an examination of the fund's performance over a three to five-year period, determining if there are five years of underperformance, and if so, placement of the fund onto a "watch list." Neither the Pension

44

and Thrift Management Group nor the Committee complied with this process. Indeed, Mr. Cutler did not know what the return for the Vanguard Wellington Fund was between 1996 and 2000, which is the five-year period prior to its removal. Further, no calculations were performed regarding the Wellington Fund's performance in the years preceding its removal, and the fund was not placed on a "watch list" as required by the IPS. Had the required de-selection process been performed by the Group and the Committee, the results would have shown that but for one year of poor performance, the Fund remained "stellar" and "consistent" between 1996 and 2000. Such results, according to the IPS, would have either eliminated the Wellington Fund from being considered for de-selection, or at the most, placed it on a "watch list." The performance of the Fund by the end of 2000 would have removed the Fund from the "watch list" as the Fund annually outperformed Morningstar's benchmark by 400 basis points by the end of 2000.

Thus, according to the standards set forth in the IPS, removal of the Wellington Fund at the recommendation to the Committee by Mr. Cutler, the head of the Group, was imprudent. Moreover, the lack of research and analysis supporting the decision to remove the Fund corroborates the imprudence of the Committee's decision notwithstanding the provisions of the IPS. A modicum of inquiry into the Wellington Fund's past performance would have revealed that it was a consistent, strong-performing fund over its seventy-year existence, including the five-year interval immediately prior to Mr. Cutler's recommendation that it should be removed for "deteriorating performance." Mr. Cutler's recommendation

45

that the Wellington Fund be removed for poor performance was a blatant violation of the IPS and illustrates a careless, imprudent decision-making process.

Mr. Cutler, as the head of the Pension and Thrift Management Group, is a fiduciary to the Plan. He exercises discretionary control in carrying out the duties delegated to the Group by the IPS. Mr. Cutler also violated his duty of loyalty to the Plan by deciding to recommend the (1) de-selection of the well performing Vanguard Wellington Fund, and (2) inclusion of the Fidelity Freedom Funds despite minimal research and comparison with other similar target-dated funds in the market, because Mr. Cutler based his recommendations, in part, on the benefits to ABB, Inc., that would inure. Mr. Cutler knew that his recommendations would generate more revenue sharing for Fidelity Trust and reduce the Plan's hard-dollar cost, thereby making it easier for ABB, Inc., to use the Plan as a labor recruitment tool. That Mr. Cutler was unaware of all of the Freedom Funds' fees, in addition to those associated with revenue sharing, underscores how the merits of the Freedom Funds and the Wellington Funds did not solely drive Mr. Cutler's recommendation.. Additionally, Mr. Cutler's decision effectively altered the responsibility for paying recordkeeping fees by compelling the Plan to bear the full recordkeeping and administrative costs, when ABB, Inc., previously paid more of such costs as a benefit to its union employees.

Because the decision to map the Wellington Fund to the Freedom Funds was not made in the best interest of the Plan, the benefits reaped by ABB, Inc., are not merely "incidental."

46

They are inconsistent with Mr. Cutler's duty of loyalty. The Wellington Fund was removed and mapped to the Freedom Funds so that ABB, Inc., could reduce its out-of-pocket costs for recordkeeping fees, and at the same time influence employee retention and recruitment, by offering a low cost or "free" retirement plan. Mr. Cutler was also influenced by the close relationship which ABB had with Fidelity, including the use of Fidelity to perform corporate services for ABB.

ABB, Inc., is a "party in interest" as that term is used in ERISA section 406, which prohibits fiduciaries from "caus[ing] the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." ERISA §§ 2(14); 406(a)(1)(D). Thus, Mr. Cutler's recommendations to the Committee and the Committee's decision to adopt those recommendations caused the Plan to engage in a transaction with Fidelity Trust whereby ABB, Inc., would have reduced fees for the Union PRISM Plan. Thus, Mr. Cutler committed a prohibited transaction under ERISA. Mr. Cutler is head of the Group and a staff member of the Committee. Thus, Mr. Cutler's violations are also violations by the Group, the Committee, the Employee Benefits Committee, and ABB, Inc., as co-fiduciaries.

Mr. Sackie was fully aware in advance of the benefits that ABB, Inc., would receive if the Committee decided to map the Wellington Fund into the Freedom Funds. Because all changes to hard-dollar record keeping fees must be "signed off" by Mr. Sackie, Mr. Sackie

47

had to approve the change in recordkeeping fees caused by the mapping. Thus, Mr. Sackie was fully aware of the Committee's decision to map the Wellington Fund into the Freedom Funds and that ABB would benefit from reduced recordkeeping fees. By signing off on the recordkeeping fee change, Mr. Sackie caused the Plan to engage in a transaction that he knew or should have known to constitute a benefit to ABB, Inc.. Thus, Mr. Sackie committed a prohibited transaction in violation of ERISA Section 406. As Mr. Sackie was the employee in charge of all of the benefit plans at ABB, Inc., including the PRISM Plans, and because Mr. Cutler was aware of Mr. Sackie's action and benefits therefrom to ABB, all ABB Defendants are liable for Mr. Sackie's commission of a prohibited transaction in violation of ERISA Section 406. *See* ERISA § 405(a), 29 U.S.C. § 1105(a) (co-fiduciary liability).

The Court now turns to the question of whether Fidelity Trust committed a prohibited transaction as a result of ABB's conduct. Section 406 of ERISA states: "A fiduciary with respect to a plan shall not . . . in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." ERISA § 406(b)(2). Fidelity Trust serves as the Plan trustee and recordkeeper. In this capacity, it acts as a "directed trustee" of the trust that holds Plan assets and provides various administrative services to the Plan. As a "directed trustee," Fidelity Trust wears the "hat" of a fiduciary only when carrying out its delegated duties as the Plan trustee and recordkeeper.

Mr. Cutts of Fidelity Trust did not act under the direction of the Trust Agreement

when he communicated with Mr. Sackie and Mr. Cutler regarding a reduction in recordkeeping fees depending on the PRISM Plans' fund line-up. Thus, Fidelity Trust did not wear the fiduciary "hat" in this instance; Mr. Cutts simply represented Fidelity Trust's own interests in his discussions with Mr. Sackie and Mr. Cutler. These interests were to increase Fidelity Trust's compensation for the recordkeeping and administrative services to the Plan. To achieve these interests, Fidelity Trust viewed each of the three compensation schemes presented by Mr. Cutts as equally desirable. There is no evidence that Mr. Cutts or Fidelity Trust was aware that ABB, Inc., intended to pay for any hard-dollar recordkeeping fees, and therefore, they were unaware that some options would effectively transfer recordkeeping fees from ABB, Inc., to the Plan. Thus, the Court finds that Fidelity Trust did not commit a prohibited transaction nor is it liable as a co-fiduciary because it was unaware that ABB's decision was motivated by its own self-interests.

Plaintiffs argue that Fidelity Trust was a fiduciary to the Plan as to the selection of new funds for the Plan's investment platform because the Trust Agreement gave it the power to "veto" new fund additions. According to Plaintiffs, because of this "veto" power, Fidelity Trust is liable as a co-fiduciary for ABB's breaches. First, the Court finds that because Fidelity Trust lacked any knowledge that ABB selected the Freedom Funds to replace the Wellington Fund for self-serving purposes, Fidelity Trust cannot be held liable under ERISA Section 405(a)(1) and (3), which require knowing that a co-fiduciary committed a breach. Second, any possible fiduciary duties that may arise from Fidelity Trust's "veto" power are

limited to Fidelity Trust's role as the Plan's trustee and recordkeeper, such as determining whether adding a particular fund may hinder its recordkeeping duties. By the plain language of the Trust Agreement, Fidelity Trust has no responsibility for reviewing the merits of fund choices made by the Pension Review Committee. Thus, Fidelity Trust had no responsibility to prevent the addition of the Freedom Funds to the Plan's investment line-up. For these reasons, the Court finds that Fidelity Trust cannot be held liable for ABB's breaches under ERISA Section 405(a)(2).

ABB's imprudent decision to remove the Vanguard Wellington Fund and add the Fidelity Freedom Funds to the Plan's investment platform occurred during the applicable statute of limitations. ABB's final decision to add and remove funds, was made in 2001. The Court rejects ABB's argument that the decisions to remove Wellington and add the Freedom Funds were made prior to December 29, 2000, and thus was prior to the applicable limitations period. Defendants point to no evidence, nor has the Court found any upon its review, that any decisions made in November 2000 were not subject to change. Indeed, according to ABB's "New Investment Options Executive Summary –Timeline of Events," [Ex. J7, at ABB-KEN 03659], the process of adding new Fidelity and outside funds to the PRISM Plan was not initiated until approximately February 15, 2001, and the mapping of Vanguard Wellington Fund assets to the Freedom funds did not occur until March 30, 2001. Because these actions concern the administration of Plan assets, they are actions pursuant to fiduciary duties.

50

In *Larson v. Northrop Corp.*, 21 F.3d 1164 (D.C. Cir. 1994), the court found that any actions taken after a plan sponsor's acquisition of a group annuity contract to pay benefits due under a pension plan that it had terminated were not fiduciary in nature. Notably, though not squarely at issue, the court did not state that the plan sponsor's "decision" to purchase the group annuity contract was its final fiduciary act, but rather, it was the acquisition of the insurance policy that constituted the final fiduciary act. This aligns with the Court's reasoning here that it was not the decision by the Pension Review Committee that constituted the final fiduciary act relevant to both the mapping of the Wellington Funds to the Freedom Funds and the new $0 hard-dollar recordkeeping scheme. That decision was always subject to reconsideration. Rather, the final fiduciary acts were the execution of the mapping and the execution of the Trust Agreement amendments. These acts did not take place until 2001, which is within the six-year limitations period.

The cases cited by Defendants primarily identify actions that are not fiduciary acts. For example, the Supreme Court found in *Hughes* that a plan sponsor's amendment of a plan was not the "administration" of the plan, because an amendment is not a fiduciary act, but the administration of the plan is a fiduciary act. "In general, an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999). On the other hand, ABB's selection and mapping decisions were administrative, making

51

distinguishable *Hughes* and *Lockheed Co. v. Spink*, 517 U.S. 882, 890 (1996) (adoption of plan amendments not a fiduciary act).

Also, the case before the Court is distinguishable from *Librizzi v. Children's Memorial Medical Center*, 134 F.3d 1302 (7th Cir. 1998). There, the Seventh Circuit was concerned with the three-year limitations period which began on the date an employee first learns of the fiduciary's breach, a different portion of ERISA's statute of limitations than is at issue here. Further, the *Librizzi* court's comment that "[a]n adverse decision whose effect is deferred gives rise to a claim when the decision is made, not when the effect is felt," was intended to address the plaintiff's argument that a fiduciary breach does not occur until "the [fiduciary] fails to correct its error." *Id.* at 1306. Failure to correct a breach is not at issue here. Additionally, Defendants, do not explain why the Court should construe the *Librizzi* statement more broadly than its original intent.

For the foregoing reasons, the Court finds that the date of the last fiduciary *action* of ABB occurred after December 29, 2000, and therefore falls within the applicable statute of limitations.

The Court also finds that Plaintiffs may recover for any decision by ABB that is premised on the imprudent decision to map the Wellington Fund to the Freedom Funds. This conclusion directly applies to Plaintiffs' claim that ABB selected more costly share classes, in violation of the IPS, which is discussed below.

    **B.**    **ABB's Selection of Classes of Investments That Had Higher Expenses When Other Share Classes with Lower Expenses Were Available**

## 1. Findings of Fact

The Court hereby incorporates all of the findings of fact related to ABB's fiduciary breaches when it mapped the Vanguard Wellington Fund into the Fidelity Freedom Funds and when it used a deficient process for determining how revenue sharing would benefit the PRISM Plans.

Following the mapping of the Vanguard Wellington Funds to the Fidelity Freedom Funds, the PRISM Plan Trust Agreement between Fidelity Trust and ABB was amended, effective April 1, 2001, to reflect the changes to both the fund line-up and the new compensation agreement with Fidelity Trust. The revised Trust Agreement added a fee change policy to minimize future recordkeeping fee negotiations between ABB and Fidelity Trust each time changes were made to the composition of the Plan. The fee change policy states: "Fees will be subject to revision if these Plan characteristics change significantly (+/- 10%) by either falling below or exceeding current or projected levels," which consisted of "current plan assets of $1.421.0 million, current participation of 17,781 participants, . . . total Fidelity actively managed Mutual Fund assets of $712.0 million" and other criteria. [Ex. JD257]. Although the term "revenue neutral" was not used by Fidelity Trust or ABB until several years later, that term accurately describes the above referenced amendment to the Trust Agreement: the agreed upon model for paying Fidelity Trust's recordkeeping costs would be subject to change should the fund line-up or other Plan characteristics alter the revenue sharing paid to Fidelity.

In 2005, ABB removed the Fidelity Magellan Fund from the Plan's investment

platform. When selecting the class of shares for various investments already on the Plan platform or to be put on the PRISM Plan's platform to replace the Magellan Fund, ABB chose share classes that provided more basis points for revenue sharing over share classes that provided less in revenue sharing in order to remain "revenue neutral." [Tr. 1093]. ABB did so to prevent the imposition of a per-participant hard-dollar fee for recordkeeping. Specifically, the Court finds that after the Fidelity Magellan Fund was removed from the Plan fund line-up, ABB selected share classes with higher expenses than other available share classes for the following investment options: PIMCO Total Return Fund, Selected American Fund, Strong Opportunity Fund, Franklin Small-Mid Cap Fund, Managers Special Equity Fund, and the Pacific Small Cap Fund. In sum, ABB selected these particular investments because of the investments' effect on ABB's method of compensation to Fidelity Trust. ABB did not select one investment over another solely because of a difference in their merit or value to the participants.

### 2. Conclusions of Law

Section 5 of the PRISM states: "When a selected mutual fund offers ABB a choice of share classes, ABB will select that share class that provides Plan participants with the lowest cost of participation." The Court interprets this to mean that ABB will choose the share class that has the lowest expense ratio; i.e., the cost of participating in the specific investment selected, normally expressed as an expense ratio. ABB argues that such a reading is incorrect and that the "lowest cost to participation" must take into consideration how the choice of the investment option might affect the revenue neutral requirement of the Trust

54

Agreement with Fidelity Trust. According to ABB, choosing a share class with the lower expense ratio might cause Fidelity Trust to impose a per-participant hard-dollar charge on all participants, thereby increasing costs of participating in the Plan. ABB appears to be concerned that payment for recordkeeping would then shift from participants who chose to invest in investments that generate revenue sharing, to all participants. The Court is not persuaded by ABB's argument for three reasons: 1) The more logical interpretation is that the share with the lowest expense ratio should be chosen. If, unexpectedly, the IPS was intended to relate to recordkeeping expenses in addition to the expense ratio, one would expect it to say so; 2) as the Court previously found, ABB never considered progressivity when deciding how to compensate Fidelity Trust; and 3) according to testimony, the hard-dollar fees would not have shifted to all participants because ABB, Inc., intended to pay all hard-dollar recordkeeping fees that resulted from new negotiations with Fidelity Trust. Further, ABB fails to explain how it is prudent to require participants who chose managed funds, those that produce revenue sharing, to pay for the recordkeeping expenses of the participants who chose more conservative investments that did not produce revenue sharing.

Moreover, on its face, a revenue neutral agreement would simply maintain the status quo for Fidelity Trust's compensation and is not violative of ERISA or the IPS. As previously discussed by the Court, however, ABB's process for arriving at their chosen compensation model was deficient, because among other reasons, it failed to determine the amount of income revenue sharing generated for Fidelity Trust and failed to negotiate with

55

Fidelity Trust for rebates. Without knowing the amount of revenue sharing generated by the Plan, ABB could not determine whether an agreement to maintain that level of income for Fidelity Trust was in the Plan's best interest. Because (1) ABB's compensation scheme for recordkeeping services was not arrived at prudently; and (2) the revenue neutral provision was added to the Trust Agreement as a result of ABB's prohibited transaction when it mapped the Wellington Funds to the Freedom Funds, the decision to maintain that scheme instead of selecting share classes with lower expenses, was imprudent.

To be clear, the use of revenue sharing to pay recordkeeping fees is not, standing alone, imprudent. However, the PRISM IPS specifically requires use of a share class that has the least expenses. ABB's decision to use classes of shares with greater expense ratios violates the IPS, a governing Plan document, and therefore violates ERISA's duty of prudence. Moreover, ABB's decision was premised on achieving revenue neutrality with a standard that was a result of prohibited transactions and using revenue sharing that was not prudently determined to be a reasonable method to compensate Fidelity Trust. Thus, the Court finds that ABB's decision to choose share classes with more expenses in order to maintain neutral revenue sharing income for Fidelity Trust violates ERISA's duty of prudence.

There is no evidence in the record that the Fidelity Defendants are liable for this breach by ABB.

## V.     Subsidization of ABB Corporate Administrative Services with Excessive Revenue Sharing Generated by PRISM Plan Assets

## A.  Findings of Fact

As previously found, the fee change policy in the Trust Agreement states: "Fees will be subject to revision if these Plan characteristics change significantly (+/- 10%) by either falling below or exceeding current or projected levels,"  which consisted of "current plan assets of $1,421.0 million, current participation of 17,781 participants, . . . total Fidelity actively managed Mutual Fund assets of $712.0 million" and other criteria.  [Ex. JD257].

In 2004, ABB notified Fidelity Trust of its plan to remove the Fidelity Magellan Funds, which held about $243 million in Plan assets.  In response, Fidelity Trust informed ABB that removal of the fund would result in an $11 hard-dollar per-participant recordkeeping fee to maintain revenue neutrality.  This triggered a ten to eleven-month long negotiation between ABB and Fidelity Trust over a new recordkeeping compensation arrangement.  At the end of the negotiations, Fidelity Trust agreed to keep hard-dollar per-participant fee for the Main PRISM Plan at $0 and for the Union Prism Plan at $8.  However, during the course of the negotiation, Fidelity Trust conveyed to ABB the revenue and cost information as to all of its services to ABB, including recordkeeping for the defined benefit plan, non-qualified deferred compensation plan, health benefits, and payroll, i.e., ABB corporate services.  ABB also obtained an evaluation of Fidelity Trust's fees from Mercer, an outside consulting firm it had hired to assist it in its negotiations with Fidelity Trust. Mercer issued a report in November 2005 ("Mercer Report"), which indicated that based on Mercer's research, ABB overpaid for Plan recordkeeping services and that the Plan's

recordkeeping payments via revenue sharing appeared to be subsidizing services for ABB corporate plans. At this time, Joanne Morlan of Fidelity Brokerage managed Fidelity Trust's relationship with ABB and negotiated the recordkeeping charge on behalf of Fidelity Trust. In an e-mail dated May 12, 2005, Ms. Morlan communicated to Mike Scarpa of ABB that Fidelity Trust offered services for ABB's health and welfare plan at below market cost. She did so as part of her negotiations with ABB concerning the $11 per-participant fee. Additionally, Ms. Morlan reminded ABB that it did not charge fees for its administration of ABB's non-qualified plans, but rather, Fidelity "absorbed" these fees. These explanations were proffered to explain that these services for ABB corporate plans could continue only if revenue generated by recordkeeping the PRISM Plans remained constant even after Fidelity's Magellan Fund was removed from the PRISM platform.

From Ms. Morlan's communications, as early as May 2005, Mr. Scarpa at ABB was put on notice that Fidelity Trust viewed the amount of the PRISM Plan's fees to be the reason why no fees were assessed to ABB for administering its non-qualified plans. Mr. Scarpa did not inform anyone at ABB of the notice he received either from Ms. Morlan or Mercer about the subsidization of ABB corporate services by the PRISM Plan.

Despite receiving this notice, Mr. Scarpa failed to contact Fidelity Trust to voice any concern about Ms. Morlan's representations that Plan recordkeeping fees subsidized the low costs of ABB corporate plan services. Rather, Mr. Scarpa only contacted Mercer to share his concern. After Mercer submitted a report that opined that the Plan was subsidizing ABB

58

corporate services, Mr. Scarpa did nothing to either obtain clarification or address the problem.

The Court specifically finds that Mr. Scarpa failed to make a good faith effort to prevent the subsidization of administration costs of ABB corporate services due to the revenue sharing generated by PRISM Plan assets. He consistently communicated with Ms. Morlan throughout the negotiations, yet raised no concern directly with her or any other Fidelity Trust representative. His failure to contact anyone at Fidelity Trust is indicative of the purposeful blind eye he turned to the subsidization of ABB corporate services with PRISM funds so that ABB, Inc., could continue to receive discounted services for itself. This is so even though no $11 participant charge was ultimately imposed by Fidelity.

Given the disturbing implications of cross subsidization, any prudent, loyal fiduciary, in Mr. Scarpa's position, would take immediate action to investigate. Thus, the Court does not believe that Mr. Scarpa thought that subsidization had ceased. Additionally, at no time did anyone at ABB calculate how much revenue was generated for Fidelity Trust from revenue sharing. Without even a rough estimate, Mr. Scarpa could not reasonably draw the conclusion that subsidization ceased. Relatedly, based upon the Court's review of the record, there is no evidence that ABB, Inc., incurred large increases in costs to its corporate plans that would suggest an elimination of subsidies. Rather, in 2006, Fidelity Trust continued to sustain either minimal profitability or large losses on the services it provided to ABB, Inc., as compared to the high profitability from the PRISM Plan. [Ex. FD131, at FID-ABB-P

0023963].

Indeed, Mr. Scarpa, during the same period, negotiated with Fidelity to make the contractual period for the ABC corporate plans the same as for the PRISM Plan. This ensured that the contracts for each would be renegotiated at the same time so that Fidelity's business relationship with ABB and the Plan would be considered together, thereby facilitating continued subsidization of ABB corporate services. The Court specifically finds that thereafter Mr. Scarpa's decisions and actions when negotiating a recordkeeping fee on behalf of the Plan were motivated by the discounts ABB, Inc., received for its corporate services, instead of solely in the Plan's interest. The Court does not believe Mr. Scarpa's testimony to the contrary.

Although Mr. Scarpa reported directly to Jeff Halsey, a member of the Pension Review Committee, from mid-2004 through 2006, the Court finds that there is no evidence that Mr. Scarpa communicated any information regarding Plan subsidization to Mr. Halsey or any member of the Pension Review Committee or the Pension and Thrift Management Group.

**B.      Conclusions of Law**

Prior to receiving any notice that the revenue sharing generated by the Plan may be subsidizing the administration of ABB corporate services, the Court finds that ABB's receipt of free services is not violative of any of its fiduciary duties. Again, while the Court is suspicious, there is not sufficient evidence to conclude that ABB actually knew that Fidelity

was providing ABB corporate services at a discount because the PRISM Plans were so lucrative. However, once Mr. Scarpa became aware that the PRISM recordkeeping fees appeared to be subsidizing ABB's corporate programs, he had a fiduciary obligation to investigate and prevent any future subsidy. He failed to take any step to do so. Instead, ABB selected investments to ensure revenue neutrality for Fidelity Trust and ABB continued to pay above market for recordkeeping fees and Fidelity continued to lose money on some ABB corporate services and make profits on the Prism Plan business.

In addition, Mr. Scarpa actively sought for the contract renewal dates of all PRISM and ABB corporate plans to be the same. Because of Mr. Scarpa's inaction and lack of good faith, ABB, Inc., and the Employee Benefits Committee perpetuated the use of PRISM Plan revenue sharing to subsidize discounts for ABB corporate services, which is a non-Plan purpose, in violation of ERISA's duty of loyalty. Because there is no evidence in the record that Mr. Cutler, the Pension and Thrift Management Group, and the Pension Review Committee were aware of Mr. Scarpa's knowledge, inaction, and lack of good faith, they are not liable for this breach.

Because Joanne Morlan was not acting as a fiduciary when she negotiated the recordkeeping fees for the Prism Plans, nor was Fidelity acting in a fiduciary capacity when it negotiated the corporate services it would provide, and because there is no evidence that Fidelity was contemporaneously aware of the statement in the Mercer report about subsidization, the Court cannot say that Fidelity knew or had reason to know that Scarpa was

61

violating his fiduciary duty to the Plan.  Therefore the Court does not find the Fidelity Defendants liable for ABB's breach.

## VI.    ABB's Use of Separate Accounts and Co-mingled Funds

Plaintiffs argue that ABB violated its duty of prudence when it failed to offer on the PRISM Plan's investment platform more separate accounts or co-mingled funds.  Such funds mirror the current retail mutual funds offered on the platform but would do so at a lower cost to participants. The Court rejects this claim.

### A.    Findings of Fact

One of the investment objectives stated in the IPS is "to use readily available mutual funds and institutional co-mingled funds."  [Ex. P887].  The IPS also requires that: "To the extent possible, ABB will use the purchasing power afforded by the size of Plan assets to reduce the cost to participants of providing the Plan's investment options."  [Ex. P887]. There is no provision in the IPS that forbids, per se, the use of retail mutual funds on the Plan's investment platform.

A separate account is an individual investment account where assets are managed for the benefit of one client.  The PRISM Plan's investment platform has one separate account–the ABB Income Fund.  The assets of the Income Fund are composed only of assets from Plan participants and other ABB funds; i.e., institutional funds. ABB maintains a specific fund manager to invest these assets and otherwise monitor the Income Fund's performance.  Separate accounts are not themselves subject to direct regulation; however,

62

their investment managers, if registered, are subject to regulation under the Investment Advisor's Act. A co-mingled fund has characteristics similar to both a mutual fund and a separate account because only institutional funds are invested, yet those funds can come from various institutions. The Plan's platform has four institutional co-mingled funds, which are the BGI index funds. Separate accounts and co-mingled funds generally have lower expenses than retail mutual funds.

Separate accounts and institutional co-mingled funds are not the same type of investment vehicle. Although the PRISM Plan's IPS does explicitly require that co-mingled funds be used, it does not require the use of separate funds.

The ABB Income Fund is a low-volatility, low-risk income fund that maintained the same returns as the monthly interest credit rate. ABB considered offering other separate accounts as investment options for Plan participants, but decided against it. Because separate accounts require a large amount of assets to be maintained, ABB reasoned that the Plan would be forced to reduce the number, and hence, diversity, of investment options on the Plan's investment platform. Also, because one-third of the Plan's assets were already invested in the ABB Income Fund, ABB did not want to encourage Plan participants to contribute even more of their retirement funds to investment options that lacked SEC oversight.

ABB also decided against adding separate accounts or more institutional co-mingled funds because they hindered the ability of participants to exercise immediate control over

their assets. Separate accounts and co-mingled funds may report their NAV only monthly. This would hinder a participant from making knowledgeable sales and purchases on a daily or weekly basis that does not coincide with the issuance of the investment's NAV. Further, participants would be unable to follow the market fluctuations of their investment on any basis other than when the NAV is issued.

### B. Conclusions of Law

The Court finds that ABB was not imprudent to limit the number of co-mingled and separate accounts on the PRISM platform. ABB's decision was arrived at in a prudent fashion, and does not violate the IPS. ABB followed the guidelines in the IPS and offered "readily available" mutual funds and co-mingled accounts. The IPS does not require that separate accounts be offered. The IPS does not require that ABB create separate accounts or seek out only co-mingled funds as other investment options. In addition, ABB underwent a deliberate decision-making process when deciding against offering additional separate accounts and institutional co-mingled funds on the Plan's investment platform. While separate funds might be more cost effective, it was not imprudent for ABB to also weigh SEC oversight and the method of reporting asset valuation. While this choice may not be the best choice for the Plan, ABB, as a fiduciary, is not required to make the best choice.

Plaintiffs argue that ABB already maintains investment managers to manage all of the separate accounts on the defined benefit plan's investment platform, and so offering those separate accounts as investment options would not be burdensome. Plaintiffs appear to ask

64

for the opportunity to invest their funds in the same manner that the assets in ABB's defined benefit plan are invested because the defined benefit plan consistently has higher returns. However, the IPS does not require the PRISM Plans to offer the same types of investment options as are offered in ABB's defined benefit plan. Also, there is no prudential standard that requires a company's defined benefit plan to permit access to its investment platform by participants in the company's defined contribution plan. Indeed, while both types of plans provide retirement benefits, the key distinction between a defined contribution plan and a defined benefit plan is participant choice–as to how much is invested, when, and in which investment options. Thus, participant choice is not only a key component of the PRISM Plan's IPS, but underlies the purpose of all defined contribution plans.

It is widely acknowledged in industry and academic circles that defined benefit plans typically outperform defined contribution plans. Even a few basis points a year can significantly impact the amount of retirement funds at the end of a participant's tenure at ABB. However, that does not compel ABB to offer the same investment vehicles in the PRISM Plan as in its defined benefit plan. The IPS requires that "To the extent possible, ABB will use the purchasing power afforded by the size of Plan assets to reduce the cost to participants of providing the Plan's investment options." [Ex. P887], but this guideline only requires leveraging the Plan's assets "to the extent possible." ABB had considered the use of other separate accounts and institutional co-mingled funds, but concluded that they were contrary to the purpose of offering a defined contribution plan in the form of a 401(k), where

65

participant choice and control is paramount. In addition, that choice was not tainted by self-interest, nor was it a violation of the IPS.

## VII. Float

### A. Findings of Fact

Both ABB, Inc., and participants contribute funds to the Plan. ABB's contributions first go into the Fidelity Participant Recordkeeping System depository account ("Depository Account"). This account is held at Deutsche Bank and is registered to Fidelity Investments Institution Operations Company ("Fidelity Operations") for the benefit of the investment options in which Plan participants may choose to invest. On any given day, once funds are received from ABB, it goes through a dedicated transfer process that was established by Fidelity Operations, which is an agent of Fidelity Trust. The Trust Agreement authorizes Fidelity Operations, as an agent or affiliate to Fidelity Trust, to perform Fidelity Trust's duties under the Agreement. Thus, the Court finds that it was in this capacity that Fidelity Operations had discretionary control over Plan assets, and transferred them according to the following process: 1) Contributions are transferred into the Depository Account. 2) Each day at 1 o'clock and 4 o'clock in the afternoon, the contributions are transferred to the consolidated repurchase agreement account ("REPO Account"). The REPO Account is held at Deutsche Bank. It pools funds from other Fidelity accounts, not only the Depository Account. 3) Any contributions made by ABB after 4 o'clock are held in the Depository Account overnight. 4) Once funds are transferred to the REPO Account, they are transferred

66

to the FICASH Program ("FICASH"). FICASH is not an account, but a process that invests in secured overnight vehicles. Fidelity Research manages FICASH. Fidelity Research is a subsidiary of FMR LLC, which is the overall parent company of Fidelity. 5) The following day, the principal in FICASH is returned to the REPO Account. 6) The funds are then returned to the Depository Account. 7) Finally, the funds are moved into the investment options.

Contributions from participants go through a similar process, which is as follows: 1) participants' contributions are first transferred into a regional bank account. 2) The following day, these contributions are transferred into the Depository Account. 3) Later that day, the funds are moved into one of three investment concentration accounts and then reflected in the books of the individual investment options.

When disbursements of PRISM Plan assets are triggered, they are received by participants after the following process: 1) The day after disbursements are triggered, funds move from their respective investment concentration account into a redemption bank account. The redemption bank account is held at Deutsche Bank, and is registered to Fidelity Operations for the benefit of the investment options. 2) Later that same day, the IRS is paid. 3) Also, later that day, remaining funds are transferred to the REPO Account. 4) Once funds are transferred to the REPO Account, they are transferred to FICASH. 5) The following day, after remaining with FICASH overnight, the principal of those funds initially transferred to the FICASH are transferred back to the redemption bank account. 6) Depending on state tax

67

remittance schedules, state taxes are then paid. 7) Either on or after the same day that the redemption account receives funds back from the FICASH program, participants may receive electronic disbursements from the redemption bank account. 8) If participants do not receive an electronic disbursement, the redemption bank account transfers funds to a disbursement bank account. The disbursement bank account is held at Deutsche Bank. The disbursement bank account then issues a check to participants. Participants receive funds after they deposit their checks.

The process for exchanging funds from, for example, "Investment Option A" to "Investment Option B" is as follows: 1) The day after a trade is placed, funds move to the Depository Account from the corresponding investment concentration account to Investment Option A; 2) Funds then move from the Depository Account to the corresponding investment concentration account to Investment Option B. In each of the contribution, disbursement, and exchange processes, participants purchase and sell investment options at the per share net asset value ("NAV") on the trade date, i.e., the date of their purchase or sale request.

Interest is earned when funds lie in the various accounts, exclusive of the REPO Account. Income is earned when funds in FICASH are invested in overnight secured vehicles. Because only contribution principal is transferred back to the Depository Account following an overnight, interest is also earned on the income that remains in FICASH. Both the income and interest earned on the contribution principal are included in the term "float income" or "float."

Case 2:06-cv-04305-NKL   Document 623   Filed 03/31/12   Page 68 of 81

All of the accounts in the process incur bank expenses. Expenses incurred by the REPO Account are paid by "other accounts," and is not at issue. Interest earned in the remaining accounts are credited against any bank expenses incurred. For example, the Depository Account is first credited with any interest earned by the account. Remaining expenses are paid with float earned in FICASH. Because maintaining these accounts are integral to the services rendered by Fidelity Trust, float income is being used to pay Fidelity Trust's operating expenses for recordkeeping and administering the Plan. This means that Fidelity Trust is earning more income than the Trust Agreement provides: the Agreement specifies that Fidelity Trust would be paid through revenue sharing.

Any remaining float is then distributed pro rata among individual investment options that choose to receive it, and thus goes to the benefit of all shareholders of the investment option; i.e., interest generated by Plan assets are not disbursed solely to Plan participants and beneficiaries. The decision that float income would ultimately be distributed to investment options was made by Fidelity Operations as it chose to register the bank accounts on behalf of the investment options.

### B. Conclusions of Law

There is no dispute that contributions to the Plan from ABB, Inc., and the participants are Plan assets. Thus, the moment ABB transfers participant contributions into the regional bank accounts, or its own contributions into the Depository Account, those contributions are thereby segregated from ABB's general assets and become Plan assets. The process by

which the NAVs, or share prices, are assigned to these contributions does not impact their status as Plan assets because no actual exchange of Plan assets for investment shares occur until after Plan Assets are moved in and out of various bank accounts and invested in overnight securities.

Fidelity Research manages Plan assets when contributions remain overnight in FICASH. Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ." 29 U.S.C. § 1002(21)(A). The definition does not depend on payment or nonpayment of a fee to such a person. 29 C.F.R. § 2510.3-101(a)(2) ("[A]ny person who exercises authority or control respecting the management or disposition of such underlying [plan] assets, and any person who provides investment advice with respect to such assets for a fee . . . is a fiduciary of the investing plan."). Thus, although Fidelity Research was not paid any fee for running FICASH, it is a fiduciary to the Plan to the extent it manages Plan assets in FICASH as it exercises discretionary authority and control when it invests Plan assets in various overnight securities.

"[W]hen a plan invests in another entity, the plan's assets include its investment." 29 C.F.R. § 2510.3-101(a)(2). Float income, which consists of interest earned from Plan assets in the various bank accounts and the returns from investing Plan Assets in overnight securities through FICASH, are Plan assets. *See George v. Kraft Foods Global, Inc.*, No. 10-

70

1469, slip op. at 31 (7th Cir. Apr. 11, 2011). Fidelity Research, the manager of FICASH,

transferred Plan assets to an entity that was neither a Plan participant or beneficiary: it

transferred float to the Depository Account, which is an account registered to Fidelity

Operations for the benefit of investment options. Fidelity Trust, through Fidelity Operations,

its agent or affiliate for the purposes of rendering services to the Plan pursuant to the Trust

Agreement, exercised its discretion to transfer and distribute float in this manner.

Additionally, Fidelity Trust used float income for its own benefit when it used interest earned

from Plan assets to pay for bank expenses that should have been borne by Fidelity.

　　　"[A] fiduciary shall discharge his duties with respect to a plan solely in the interest

of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing

benefits to participants and their beneficiaries and . . . defraying reasonable expenses of

administering the plan . . . ." 29 U.S.C. § 1104. "[T]he assets of a plan . . . shall be held for

the exclusive purposes of providing benefits to participants in the plan and their beneficiaries

and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). The

Eighth Circuit acknowledges that "[t]he legislative history [of ERISA] made it clear that the

legislation imposed strict fiduciary obligations on those having discretion or responsibility

for the management or disposition of pension . . . plan assets." *Boyle v. Anderson*, 68 F.3d

1093, 1102 (8th Cir. 1995). Thus, Fidelity Trust is also a fiduciary to the plan because it

exercised discretionary authority and control to distribute float income through its agent,

Fidelity Operations. Because Plan assets were distributed to investment options neither "for

the exclusive purpose of . . . providing benefits to participants and their beneficiaries," nor to defray administration costs for the Plan's benefit, Fidelity Research and Fidelity Trust breached their fiduciary duties of loyalty to the Plan.

There is no evidence that any of the ABB Defendants were or should have been aware of Fidelity Trust's and Fidelity Research's unlawful distribution of float income. Thus, they are not liable for Fidelity's breaches.

## VIII. Relief

For the foregoing reasons, the Court finds: (1) none of the Defendants violated their fiduciary obligations by the limited use of separate accounts and co-mingled funds on the PRISM Plan's investment platform; (2) ABB Defendants violated their fiduciary duties to the Plan when they failed to monitor recordkeeping costs and negotiate rebates from Fidelity Trust, and selected classes of particular investments to be on the PRISM Plan's investment platform that had higher expenses when other share classes with lower expenses of those same investments were available; (3) ABB Defendants violated their fiduciary duty when they removed the Wellington Fund and replaced it with Fidelity Freedom Funds; (4) ABB, Inc., and the Employee Benefits Committee violated their fiduciary duties to the Plan when they agreed to pay to Fidelity an amount that exceeded market costs for Plan services in order to subsidize ABB's corporate services; (5) Fidelity Trust breached its fiduciary duties to the Plan when it failed to distribute float income solely for the interest of the Plan; and (6) Fidelity Research violated its fiduciary duties when it transferred float income to the Plan's

Case 2:06-cv-04305-NKL   Document 623   Filed 03/31/12   Page 72 of 81

investment options instead of the Plan.

ERISA Section 409 provides the extent of Defendants' liability for these breaches:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. . . .

ERISA § 409, 29 U.S.C. § 1109. Thus, personal liability for fiduciary breaches are limited to "damages ('to make good to [the] plan any losses to the plan resulting from each such breach'), for restitution ('to restore to [the] plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary'), and for 'such other equitable or remedial relief as the court may deem appropriate,' including removal of the fiduciary." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 252 (1993).

While the actions of Defendants may have resulted in breaches of multiple fiduciary duties and the commission of prohibited transactions under ERISA, the Court finds that "equitable or remedial" relief does not entail, for example, compounding the amount of Plan losses by the number of violative actions that compose a transaction. Such relief would no longer be "equitable" in character, and is not available under ERISA. Indeed, the Court's duty is to "determine the specific damages that resulted from each of the *transactions* in which ERISA fiduciary duties were breached." *Martin v. Feilen*, 965 F.2d 660, 672 (8th Cir. 1992) (emphasis added). As discussed below, this precludes the Court from adopting the global theory of damages advocated by Plaintiffs.

73

### A.    ABB's Failure to Monitor Recordkeeping Costs and Negotiate for Rebates

The Court finds that Plaintiffs have established a prima facie case of loss to the Plans due to ABB's failure to monitor recordkeeping costs and negotiate rebates from Fidelity Trust.. The Court also finds that ABB has not met its burden to show that the loss established by Plaintiffs was not caused by its breaches of fiduciary duty. Indeed, the evidence shows that the Plan overpaid for recordkeeping services such that it subsidized the cost of Fidelity's services to ABB's corporate plans.

The Court additionally finds that Plaintiffs' method of calculating the extent of their loss is appropriate. Plaintiffs rely primarily on the expert testimony of Albert J. Otto, who first determined a per capita "upper limit" as to what "should be paid for record keeping and administration in 2003" for a plan of similar size to the PRISM Plans. [Tr. 1329]. He then applied this figure to determine the extent that the Plan overpaid for services, and compounded that amount through 2007 assuming an annual rate of return equal to that of the S&P 500 for each respective year. Although Mr. Otto did not account for the breadth of services provided by Fidelity Trust to the Plan when he calculated his "upper limit" figure, the Court finds that the figure reflects the market value of Fidelity Trust's services. As previously discussed, *supra* Part III.A, the Court bases its finding on the average per head amount paid by the Texa$aver Plan, Fidelity's internal records, and the Mercer Report, which all show that expected revenue sharing income from a plan of PRISM's size are reasonably near Mr. Otto's figure. The Court additionally finds that using the S&P 500 to calculate a

rate of return is a fair estimate of what the Plan could have earned had participants not overpaid for recordkeeping services. "The measure of such damages need not be exact–'it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *Martin*, 965 F.2d at 672 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). Accordingly, the Court finds that the Plan suffered losses of $13.4 million as a result of ABB's failure to monitor recordkeeping costs and to negotiate for rebates. All ABB Defendants are held jointly and severally liable for this amount.

### B.  Mapping of the Vanguard Wellington Fund to the Fidelity Freedom Funds

The Court finds that Plaintiffs have established a prima facie case of loss to the Plans due to Defendants' fiduciary breaches associated with the mapping of the Vanguard Wellington Fund to the Fidelity Freedom Funds. Indeed, the Wellington Fund consistently outperformed the Freedom Funds from 2000 to 2008. Had the Wellington Fund not been removed in violation of the IPS and its assets mapped to the Freedom Funds, participants who invested in the Wellington Fund would have achieved the higher returns associated with the Wellington Fund as opposed to the Freedom Funds. The Court also finds that for the purposes of determining loss, it is a reasonable inference that participants who invested in the Freedom Funds would have invested in the Wellington Fund had it not been removed from the Plan's investment platform. The Court also finds that Defendants have not met their burden to show that the loss established by Plaintiffs was not caused by their breaches of

fiduciary duty.

The Court finds credible the testimony of Dr. Steve Pomerantz, who concluded that due to the mapping, the Plan suffered losses of $21.8 million. Defendants do not present any argument to the contrary. All ABB Defendants are held jointly and severally liable for this amount.

### C.   ABB's Selection of Classes of Investments That Had Higher Expenses When Other Share Classes with Lower Expenses Were Available

The Court finds that Plaintiffs have established a prima facie case of loss to the Plans due to ABB's fiduciary breaches associated with the selection of more costly classes of investments that had higher expenses when other share classes were available that had lower expense ratios. The evidence shows that participants who invested in the class of share chosen by ABB would have received a greater return on their investment had they purchased the class of shares with lower expense ratios. The Court also finds that ABB has not met its burden to show that the loss established by Plaintiffs was not caused by its deliberate decision to include more expensive share classes on the Plan's investment platform to perpetuate "revenue neutral" revenue sharing.

The Court finds credible the testimony of Mr. Otto, who identified six different funds where classes of shares with greater expenses were selected by ABB. These share classes had higher expense ratios than other classes of shares. Thus, the Court finds that Plaintiffs suffered loss due to the excess paid by participants due to higher expense ratios. But for the higher expense ratios, participants who purchased these six funds would have retained more

76

assets in a given fund, which would then have been compounded by annual market returns for that fund.

However, the loss from this fiduciary breach by ABB is directly related to ABB's revenue neutrality agreement with Fidelity, and the Court has already awarded damages to compensate the Plans for the excess recordkeeping expenses paid to Fidelity. Because choosing more expensive shares are but another example of how ABB breached its fiduciary duty to the Plans by protecting the recordkeeping fees of Fidelity at the expense of Plan participants, it would be double counting to award additional damages for these losses. Therefore, the Court assumes that these losses are adequately reflected in the damages awarded to the Plan for excess recordkeeping fees.

### D. Subsidization of ABB Corporate Services with Excessive Revenue Sharing Generated by PRISM Plan Assets

The Court finds that Plaintiffs have established a prima facie case of loss to the Plans due to Defendants' fiduciary breaches associated with subsidization of ABB corporate services. Indeed, the evidence shows that the Plan paid excessive fees via revenue sharing such that ABB's costs for obtaining corporate services from Fidelity Trust were subsidized by the excess. The Court also finds that Defendants have not met their burden to show that the loss established by Plaintiffs was not caused by their breaches of fiduciary duty.

Such subsidization unjustly enriched ABB as ABB did not have to pay the market rate it would otherwise have had to pay for services that were provided by Fidelity Trust for ABB corporate plans. However, the Court finds that these damages did not begin to accrue until

May 12, 2005, the date that Mr. Scarpa was informed by Ms. Morlan that Fidelity Trust viewed PRISM Plan recordkeeping payments as subsidizing the costs of ABB corporate plan services, and the Court has no evidence to show what the damages would be after that date.

Further, because the Court has rejected the Plaintiffs' global damages theory, the logical measure of damages for this subsidization is reasonably calculated to be the excess recordkeeping fees that the PRISM Plan had to pay. It was this excess profit that made it logical for Fidelity to give ABB corporate benefits at a discounted rate from this subsidization. While the benefit to ABB might be slightly more or less than the loss to the Plan as a result of ABB's fiduciary breaches related to recordkeeping, it is a fair estimate. This is particularly so because the Court does not have a plausible alternative method for calculating the benefit ABB received after May 12, 2005, as a result of Fidelity charging ABB discounted fees for its corporate services. Therefore, the Court finds that this benefit is fairly accounted for by the damages already assessed against ABB for violating its fiduciary duty to monitor the recordkeeping fees paid by the Plan.

### E.     Float

The Court finds that Plaintiffs have established a prima facie case of loss to the Plans due to Fidelity Defendants' fiduciary breaches associated with failing to distribute float income solely for the interest of the Plan. The Court also finds that Fidelity Defendants have not met their burden to show that the loss established by Plaintiffs was not caused by their breaches of fiduciary duty.

The Court finds credible the testimony of Mr. Otto, who concluded that the total amount of float income generated by PRISM Plan assets, which Plaintiffs were deprived of, was $1,294,388. The Court also finds that the S&P 500 index fairly factors in the earnings that participants were deprived of because of the mismanagement of float. Had the Plan retained float income, its administrative expenses would have been defrayed by such amount and therefore participants would have retained more of their assets in their accounts, which would've earned market returns. Accordingly, the Court finds that the Plan suffered total losses of $1.7 million for Fidelity breaches concerning float. The Court finds that all Fidelity Defendants are held jointly and severally liable for this amount.

### F. Injunctive Relief

The Court finds that ABB's actions are not so egregious as to mandate the issuance of an injunction barring ABB from serving as fiduciary to the Plan or any ERISA plan. However, the Court orders that within 18 months from the date of this Order, ABB utilizes a competitive bidding process, including a request for proposal, to select a new recordkeeper. Fidelity Trust is permitted to take part in this process.

The Court also orders that ABB shall monitor recordkeeping costs in accordance with their duty of prudence, loyalty, and in accord with Plan documents. ABB shall negotiate for a reasonable, market price for the services provided by its recordkeeper. If ABB uses revenue sharing to pay for recordkeeping, it shall determine the dollar amount it is compensating its recordkeeper, and leverage its size to negotiate for rebates. So long as it serves as a fiduciary to the Plan, ABB shall not use a PRISM recordkeeper to provide any

corporate services to ABB. For investments on the Plan's investment platform, ABB shall choose the share class of investments that has the lowest expense ratio. Finally, ABB shall manage the PRISM Plans for the exclusive benefit of the Plan its participants and beneficiaries.

The Court further orders that Fidelity Trust shall not transfer float income to any entity other than the Plan, its participants, or its beneficiaries unless expressly permitted to do so by the terms of its agreements with the PRISM Plans.

The Court finds that any further injunctive relief requested by Plaintiffs is unnecessary.

## VII.  Attorney's Fees

ERISA Section 503(g) provides: "In any action under this title . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  The Court hereby orders that the parties brief the issue of attorney's fees and costs in light of the five factors identified in *Lawrence v. Westerhaus*, 749 F.2d 494 (8th Cir. 1984), and any other relevant considerations.  *See Martin v. Arkansas Blue Cross & Blue Shield*, 299 F.3d 966, 972 (8th Cir. 2002).  The parties should prepare a schedule for resolving this issue and submit it to the Court.

## VIII.  Conclusion

For the reasons stated above, the Court rules as follows:

ABB Defendants violated their fiduciary duties to the Plan and its participants when they failed to monitor recordkeeping costs and negotiate for rebates from Fidelity Trust, and

80

selected classes of particular investments to be on the PRISM Plan's investment platform that had higher expenses when other share classes with lower expenses of those same investments were available, and removed the Vanguard Wellington Fund, and replacing it with the Fidelity Freedom Funds. ABB, Inc. also violated its fiduciary duties to the Plan when it continued to pay to Fidelity an amount that exceeded market costs for Plan services in order to subsidize ABB's corporate services. Fidelity Trust breached its fiduciary duties by failing to distribute float income solely for the interest of the Plan. Fidelity Research violated its fiduciary duties when it transferred float income to the Plan's investment options instead of the Plan.

ABB Defendants are jointly and severally liable for $ 13.4 million lost by the Plan due to ABB's failure to monitor recordkeeping fees and negotiate for rebates, and $21.8 million lost by the Plan due to the mapping of the Vanguard Wellington Fund to the Fidelity Freedom Funds. Fidelity Defendants are jointly and severally liable for compensating the Plan $1.7 million for lost float income.

The parties are ordered to submit a schedule for resolving the issue of attorney fees and any other remaining issues.

.                                        s/ NANETTE K. LAUGHREY
                                          NANETTE K. LAUGHREY
                                          United States District Judge

Dated:    March 31, 2012
Jefferson City, Missouri

81