IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| RONALD TUSSEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:06-cv-04305-NKL |
| | ) | |
| ABB INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## ORDER

The Eighth Circuit remanded this case for application of the *Firestone* abuse of discretion standard to the Defendants' decision to remove the Vanguard Wellington Fund from the PRISM Plan and transfer its assets to the Fidelity Freedom Funds. *Tussey v. ABB*, 746 F.3d 327, 335, 338-39 (8th Cir. 2014); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). Having reviewed the trial record and applied the abuse of discretion standard, the Court finds that the Defendants did abuse their discretion. Nonetheless, Plaintiffs have failed to prove damages consistent with the method of damage calculation suggested by the Eighth Circuit. Therefore, judgment is entered in favor of the ABB Defendants on this remaining claim.

## I.     Record on Remand

Both parties have asked to expand the record on remand. The ABB Defendants have opposed Plaintiffs' request and Plaintiffs have opposed ABB's request. The Court has rejected each party's request for expansion because this matter was not remanded by the

Case 2:06-cv-04305-NKL   Document 771   Filed 07/09/15   Page 1 of 24

Eighth Circuit for a new trial; it was remanded for further consideration. The Eighth Circuit directed the Court to apply the abuse of discretion standard to the Wellington/Freedom Funds dispute and to reconsider the proper method for determining damages, if any. There is nothing in the Eighth Circuit directive that suggests the Court should expand the record. *See Molasky v. C.I.R.*, 997 F.2d 1241, 1242-43 (8th Cir. 1993); *Poletti v. C.I.R.*, 351 F.2d 345, 348 (8th Cir. 1965).

In addition, the procedural history and conduct of the parties does not support expanding the record at this late date. Both parties conducted extensive discovery and filed voluminous substantive motions with the Court leading up to trial in January 2010. Both parties had the opportunity to fully develop the record during a four week long trial. For eighteen months following trial, the parties continued to file supplemental authority with the Court. During this time, no one argued that *Firestone* deference was the applicable standard of review, although all parties had an opportunity to do so and to develop the record to address *Firestone*. Any evidence relevant to *Firestone* deference should have been presented during the original trial. *See Schoenholtz v. Doniger*, 112 F.R.D. 110, 113 (S.D.N.Y. 1986) ("'[The] Court should not utilize its discretion to grant such relief unless the interests of justice require it, nor should any party be afforded such relief where it has not carried its burden of establishing that its failure to produce the evidence which it now seeks to offer was not the result of its own lack of diligence.'"). While ABB raised *Firestone* on appeal, it did not argue to the Eighth Circuit that it needed to develop the record on this issue or that it had been deprived of the right to develop the record. It is now too late to bring in additional expert testimony to opine about ABB's conduct.

2

Plaintiffs seek to expand the record to include new methods for calculating damages, all of which could have been presented at trial. Plaintiffs strategically chose different methods for calculating damages at trial, all of which have been found to be speculative. It does not promote the principle of finality to permit a party to develop a new strategy on remand or to conduct additional discovery to address concerns raised by prior rulings of the courts.

Fairness, of course, is always a powerful consideration. In the interest of fairness, the Court did permit the parties to "conduct limited discovery exclusively related to the damages calculation suggested by the 8th Circuit." [Doc. 755]. However, neither party has presented evidence consistent with such a calculation, nor asked for additional discovery to do so.

Under these circumstances, the Court cannot say that any issue of fairness outweighs respect for finality. Therefore, the Court will review the record developed during trial and reviewed by the Eighth Circuit, to determine whether the ABB Defendants abused their discretion, and if so, the proper measure of damages.

## II.   Findings of Fact[1]

The named Plaintiffs and class members are present or former participants in the PRISM Plan,[2] which is a defined contribution pension plan regulated by the Employee

---

[1] All facts previously found by the Court [Doc. 623] are incorporated by reference even if not expressly stated here. The Court primarily restates facts that are relevant to the Wellington/Freedom Funds dispute. To the extent any fact lacked clarity in its prior order [Doc. 623], the Court has attempted to provide clarification. The Court has not included any facts concerning the Defendants' right to exercise discretion because the Eighth Circuit has concluded that *Firestone* applies. The Court has also not included additional facts concerning the fiduciary status of all Defendants because that issue was previously decided and not challenged on appeal.

Case 2:06-cv-04305-NKL   Document 771   Filed 07/09/15   Page 3 of 24

Retirement Income Security Act of 1974 ("ERISA"). Defendant ABB Inc. is the sponsor of the PRISM Plan. Defendant Employee Benefits Committee of ABB Inc. ("EBC") is a three-member committee appointed by ABB's board of directors to oversee ABB's employee benefits programs. It is the named Plan Administrator. Defendant Pension Review Committee of ABB Inc. ("PRC") has authority to control and manage the investment of the assets of the PRISM Plan. Defendant Pension & Thrift Management Group of ABB Inc. ("PTM") acts as the staff of the PRC. Defendant John W. Cutler, Jr. ("Cutler") was Director of the PTM.

At all times relevant to this lawsuit, Fidelity Trust was the PRISM Plan's trustee and record keeper. Fidelity Trust was paid for these services through a combination of revenue sharing and hard dollar fees. Prior to April 2001, participants in the Main PRISM Plan paid a $10 hard dollar fee and participants in the Union PRISM Plan were charged a $33 fee, of which ABB was required to pay the difference. The rest of Fidelity Trust's fees came from revenue sharing paid by investment companies who were chosen to be on the PRISM platform.

When revenue sharing was used to pay Fidelity Trust, its fee grew as the assets of the Plan grew, even if Fidelity Trust provided no additional services to the Plan. Likewise, if the Plan's assets declined, the amount paid to Fidelity Trust could decline. However,

---

[2] ABB, Inc. offers two PRISM Plans – one to its unionized employees and one to its non-union employees – which offer nearly identical benefits and are managed by the same individuals. In this Order, the Court will refer simply to "the PRISM Plan" or "Plan" when referencing both Plans unless the Court is discussing a material difference between the Plans. In that case, the plan for non-union employees will be referred to as "the Main PRISM Plan" and the plan for union employees will be referred to as the "the Union PRISM Plan."

Case 2:06-cv-04305-NKL   Document 771   Filed 07/09/15   Page 4 of 24

when Fidelity was concerned that revenue sharing would decline, it asked for hard-dollars to make up the difference. To avoid paying hard-dollar fees, ABB defendants worked to increase revenue sharing for Fidelity Trust.

Fidelity's relationship with ABB was not limited to the PRISM Plan. Shortly after becoming the record keeper for the PRISM Plan, Fidelity began providing total benefit outsourcing services to ABB. These corporate services included doing the payroll for all ABB employees, the recordkeeping for ABB's health insurance and welfare plans, and management of ABB's defined benefit retirement plan and other retirement vehicles for highly compensated employees ("ABB corporate services"). Fidelity lost money on the corporate services that it provided to ABB, but it made a substantial profit on the work it did for the PRISM Plan because the PRISM Plan was paying above market rate for its record keeping services.[3] Therefore, it was in ABB's interest to maintain the status quo of its mutually beneficial relationship with the Fidelity Trust for its corporate services and the PRISM Plan record keeping.

At a PRC meeting on May 23, 2000, Cutler and John Sackie, head of employee benefits for ABB, proposed an "investment policy statement" ("IPS") for the PRISM Plan. Cutler obtained a written opinion letter from the Plan's outside counsel confirming that ABB had to comply with the IPS "and that a failure to follow the [IPS] would be a breach

---

[3] The Plan, on average, paid the following per-participant: $108 in 2001, $ 65 in 2002; $106 in 2003; $122 in 2004, $100 in 2005, $93 in 2006, and $180 in 2007. A reasonable per head fee for such services to the Plan would have been $60 in 2001, $65 in 2002, $70 in 2003, $68 in 2004, $63 in 2005, $60 in 2006, $44 in 2007.

of fiduciary duty." [Ex. P328 at p. 4 (ABB-KEN 42749); Tr. 957-58]. The IPS was eventually approved unanimously by the PRC.[4]

The IPS had a three tiered investment strategy. Tier 1 was designed for participants unwilling or unable to make personal asset allocation decisions. [Ex. P20 at p. 2 (ABB-KEN 2735)]. To accommodate these participants, the IPS provided that "the Plans will offer several 'managed allocation' funds designed to offer the participant a professionally managed, well diversified fund or funds appropriate for the participants' investment goals." *Id.* Tiers 2 and 3 offered participants various passively and actively managed fund options. *Id.* at 2-3.

Because only a few investments were offered to PRISM Plan participants, the IPS had a roadmap for the PRC to follow in selecting, deselecting, and monitoring PRISM Plan investments. The PRC provided that before removing a fund, the PRC would examine the fund's performance for a three to five-year period, determine if there were five years of under-performance, and if so, place the fund onto a "watch list," and then remove the fund within six months, if necessary. The IPS also stated that if there was a change at one of the funds on the PRISM platform "that might cause PTM to loose [*sic*] confidence in a fund manager's ability to continue to add value for the plan participants," the PTM could report this change to the PRC which could subsequently remove the fund from the Plan. [Ex. P20 at p. 4 (ABB-KEN 2737)]. The IPS also required that new funds be selected through a winnowing process. [Ex. P20 at p. 3 (ABB-KEN 2736); *see also* Tr. 1068-80].

---

[4] There is a continuing dispute about whether the IPS is a Plan document. However, the fact that the ABB Defendants were notified that they were required to follow the IPS is relevant to their subsequent conduct, regardless of whether the IPS is a Plan document or not.

Case 2:06-cv-04305-NKL   Document 771   Filed 07/09/15   Page 6 of 24

As of 2000, the PRISM Plan included one income fund and eight mutual funds including the Vanguard Wellington Fund. The Wellington Fund is an actively managed balanced mutual fund, which invests in both stocks and bonds. It is a well-known fund that has a seventy-year track record. [Tr. 1815-16]. Except for one "weak" year, between 1996 and 2000 the performance of the Fund remained "stellar" and "consistent." *Id*. Even including the one year of poor performance, by the end of 2000 the Fund's annual performance exceeded Morningstar's benchmark by 4 percent, or 400 basis points.

Despite the performance of the Wellington Fund, Mr. Cutler recommended at the May 23, 2000 meeting that the PRC remove the Wellington Fund due to "deteriorating performance," and because "participants would be empowered to create their own balanced fund using either actively or passively managed core fund offerings." [Ex. P447 at p. 3 (ABB-KEN 50874)].[5] Mr. Cutler did not explain what he meant by "deteriorating performance" and there was no discussion at the meeting about Wellington's performance other than Mr. Cutler's perfunctory statement. The record of the May 2000 meeting does not show that the PRC took any action concerning the Wellington Fund.

At the same meeting that the Wellington Fund was discussed, Mr. Cutler suggested the PRC should add a "lifestyle" fund to the Plan. [Ex. P447 at p. 3-4 (ABB-KEN 50874-75)]. "Lifestyle" or "lifecycle" or "target-date" funds are designed to provide participants more aggressive investment strategies when they are younger and more conservative

_____

[5] At the meeting, Mr. Cutler did not provide any information regarding the three to five-year performance history of the Wellington Fund. Mr. Cutler did not know what the return for the Vanguard Wellington Fund was between 1996 and 2000. Mr. Cutler did not recommend that the Wellington Fund go on a watch list. Mr. Cutler did not discuss why he did not take these factors into account, although they are contained in the IPS. Nor did Mr. Cutler discuss the fees charged by the Wellington Fund.

7

investment portfolios as retirement grows near, without requiring participants to make these investment changes and decisions themselves. Mr. Cutler provided information to the PRC about the increasing use of lifestyle funds by retirement plan sponsors and retirement plan participants and informed the PRC that these types of funds are primarily designed for novice investors. He said that a lifestyle fund would satisfy the Tier 1 "managed allocation" investment option required by the IPS (Tier 1 was for participants who were unwilling or unable to make personal asset allocation decisions). The Wellington Fund was also a managed allocation fund, the oldest allocation fund in the United States.

In 2000, there were not many lifestyle funds on the market. The written record shows the Pension and Thrift Management Group only considered three lifestyle funds to add to the PRISM Plan: Fidelity Freedom Funds and target-dated funds by T. Rowe Price and BGI. An exception was made by Mr. Cutler and the Pension and Thrift Management Group to consider the Fidelity Freedom Funds, which had been in existence for fewer than five years by 2000. [Ex. P20 at p. 4 (ABB-KEN 02737); Tr. 895-96]. Eventually, the Fidelity Freedom Funds were chosen to be on the PRISM Platform.[6]

Contemporaneous with the adoption of the IPS, the discussion of lifestyle funds, and the recommendation to remove the Wellington Fund, John Cutler and John Sackie were negotiating with Fidelity Trust for changes to the hard dollar recordkeeping fees charged to

---

[6] The Pension and Thrift Management Group eliminated the BGI fund from consideration because it employed a "static allocation approach," and the Group wanted a fund that employed a "dynamic approach." [Tr. 1164]. This left only the T. Rowe Price fund and the Fidelity Freedom Funds for the PRC to consider. At the time of the decision to add a target-dated fund, T. Rowe Price had one fund in the PRISM Plan's fund line-up. T. Rowe Price had a long-standing agreement with the PRISM Plan to allow revenue sharing to be paid to the Plan, rather than to Fidelity Trust.

8

the PRISM Plan. [Doc. 623 at p. 32-43; Ex. P324, P447, P460, J7]. In September 2000, Mr. Cutler and Mr. Sackie met with Jeffrey Cutts of Fidelity to discuss "pricing implications" of recordkeeping fees. [Ex. P324]. On September 20, 2000, Mr. Cutts presented Mr. Cutler and Mr. Sackie three different proposals for changes in Fidelity's hard-dollar recordkeeping fees, depending on whether the money from the Vanguard Wellington Fund was "mapped" into the Freedom Funds. "Mapping" is the transfer of assets from one investment option on a retirement platform to another investment option. Fidelity proposed to ABB that (1) it would reduce the recordkeeping fees for both PRISM Plans to zero if Wellington assets were mapped and defaulted to the Freedom Funds and the Plan kept Fidelity's index funds in the Fidelity fund line-up; (2) if the Wellington Fund was mapped to the Freedom Funds but Fidelity's index funds were not retained in the Plan's investment platform, recordkeeping fees would go from $10 to zero for employees in the Main PRISM Plan, and $33 to $8 for each employee in the Union PRISM Plan; (3) if Fidelity's index funds were not retained nor were Wellington assets mapped into the Freedom Funds, the recordkeeping fee for the Main PRISM Plan would be $4 annually per employee, and $27 annually per employee for the Union PRISM Plan.

At the time of this discussion, PRISM participants had approximately $120,000,000 invested in the Wellington Fund which was a substantial part of the PRISM Plan's assets. The fees for the Wellington Fund were lower than the fees for the Fidelity Freedom Funds and the Wellington Fund contributed less revenue sharing to Fidelity Trust than would the

9

Fidelity Freedom Funds.  [Stipulation 2, Ex. 5; Ex. P1 at p. 27 (ABB 55); Ex. P301 at p. 2 (ABB-KEN 37651)].[7]

ABB tracked its participants' investment habits and the number of participants who purchase only one type of fund and never diversify their retirement savings.  [Ex. DA21 at p. 21-29, 50-57 (ABB-KEN 1163-74, 1193-1203); Ex. DA22 at  p. 21-37, 52-63 (ABB-KEN 1259-75, 1290-1301); Ex. DA1799 at p. 21-22 (FID-ABB-P 24489-90); Ex. J84 at p. 10-27 (FID-ABB-P 7276-93); Tr. 271-72; Doc. 623 at p. 17-18].  Based on its analysis of participant investment activity, ABB knew that Plan participants would not dramatically shift their asset allocations in a short amount of time.  [Ex. DA21 at p. 21-29, 50-57 (ABB-KEN 1163-74, 1193-1203); Ex. DA22 at p. 21-32, 52-63 (ABB-KEN 1259-70, 1290-1301); Ex. DA111 at p. 15 (ABB-KEN 3697); Ex. J84 at p. 10-27 (FID-ABB-P 7276-93); Ex. P333 at p. 2 (ABB-KEN 43127); Doc. 623 at p. 18].   The PTM, Cutler, and the PRC specifically recognized that "Fund asset allocation remained relatively constant over time." [Ex. DA111 at p. 33 (ABB-KEN 3715)].

At trial, Cutler testified that the Wellington Fund was removed because it was a "balanced fund" and the Fidelity Freedom Funds also were "balanced funds," suggesting there was only room for one balanced fund.[8]  [Tr. 1063-64].  That is not what he said,

_____

[7] The Wellington Fund had an expense ratio of 36 basis points, which was low and competitive relative to actively-managed mutual funds offered in the Plan. [Stipulation 2, Ex. 4; Tr. 171].  In contrast, the Fidelity Freedom Funds had higher expense ratios ranging from 68 basis points to 88 basis points.  [Stipulation 2, Ex. 4].  In addition, while the Wellington Fund apparently paid Fidelity Management Trust Company 15 basis points in revenue sharing, the Fidelity Freedom Funds paid 35 basis points in revenue sharing.  [Ex. P1 at p. 27 (ABB 55); Ex. P301 at p. 2 (ABB- KEN 37651); Doc. 623 at p. 40].

[8] This suggestion is inconsistent with the IPS which provided for "several allocated funds" in Tier 1.  The IPS clearly contemplated more than one allocated fund.

however, at the PRC's May 23, 2000 meeting. At that meeting, Cutler said that removal of the Wellington Fund would "empower" participants to create their own balanced fund from the Plan's other investments. [Ex. P447 at p. 3 (ABB-KEN 50874); Doc. 623 at p. 39-40]. Thus, replacing the Wellington Fund with the Freedom Funds was contrary to Cutler's original stated purpose of "empowering" participants to create their own balanced fund. [*Id.*; Ex. JD45 at p. 51 (ABB-KEN 16596)].

The PRC had exclusive authority to direct the Plan trustee regarding the investment of Plan assets, [Ex. P1 at p. 6 (ABB 34); Ex. P431 at p. 10, 14 (ABB-KEN 49958, 49962); Ex. P432 at p. 13, 18 (ABB-KEN 50029, 50034)], but the record of the May 2000 meeting does not show that the PRC adopted Cutler's recommendation to remove the Wellington Fund. In fact, there is no record of the PRC ever deciding to remove the Wellington Fund as a Plan investment option. Instead, on March 30, 2001, the Trust Agreement was amended, with John Sackie[9] signing on behalf of ABB, to remove Wellington as an investment option and to add the Fidelity Freedom Funds. [Ex. P1 at p. 59-61 (ABB 88-89)]. ABB instructed Fidelity to "liquidate all participant balances held in the Vanguard Wellington Fund" and to invest "the proceeds in the appropriate Freedom Fund." The Plan itself was amended in May 2002, retroactive to January 2002, to remove the Wellington Fund as an investment option and to add the Freedom Funds. [Ex. JD41]. Therefore, the removal of the Wellington Fund occurred at the same time its assets were mapped into the Fidelity Freedom Funds.

---

[9] Mr. Sackie was head of benefits for ABB and had a strong interest in maintaining a mutually beneficial relationship with Fidelity Trust which was providing ABB corporate services.

The Trust Agreement was amended at the same time as the Freedom Funds replaced the Wellington Fund to limit future negotiations regarding Plan recordkeeping fees and maintain revenue neutrality to Fidelity that secured the continued receipt of its profitable recordkeeping fees.  [Ex. P1 at p. 68 (ABB 96); *see also* Ex. P190 at p. 10 (ABB-KEN 5569) (referencing revenue neutrality); Doc. 623 at p. 53].

The Court believes that the ABB Defendants knew that removing the Wellington Fund and mapping its assets to the Freedom Funds would result in persistent increased revenues to Fidelity, which ultimately would benefit ABB.  Absent the mapping, this benefit would not occur because the Fidelity Freedom Funds would have no assets in the PRISM Plan until participants began to select it as an investment.  Its assets would only grow gradually.  Therefore, to achieve a steady and immediate stream of revenue sharing to benefit Fidelity and ABB,  the assets of the Wellington Fund had to be defaulted immediately into the Fidelity Freedom Funds, to provide a benefit to Fidelity Trust and its sister corporations – not only by increased revenue sharing but also by adding another Fidelity investment to the PRISM platform.

The record is clear that ABB understood how it and Fidelity were benefited by revenue sharing.  At one point, Fidelity contacted managers of proposed non-Fidelity funds to get revenue sharing.  Cutler objected to Fidelity interfering with ABB's efforts to obtain revenue sharing rebates for the Plan, noting, "I am particularly interested in negotiating with fund providers re rebates" and "it is CRITICAL that ABB negotiate these separate from Fidelity."  [Ex. P331].  Sackie, the head of employee benefits at ABB, however, intervened, noting, "we have to be careful here."  *Id.*  "We'll find ourselves 'squeezing the

balloon'. In other words they will give us the rebates and impose a recordkeeping charge. I'd rather have the discussion with Joe D. [of Fidelity] to see what is the best arrangement." *Id.* There is no record of further attempts to secure rebates for the PRISM Plan.

Sackie, as head of benefits for ABB, was involved in the removal of the Wellington Fund and the mapping of its assets to the Fidelity Freedom Funds. He also retained Fidelity to provide corporate services for ABB. Obviously, ABB was pleased with its corporate arrangement with Fidelity because it kept adding corporate services steadily after Fidelity Trust became the record keeper for the PRISM Plan. Fidelity took over recordkeeping for the PRISM Plan in 1995; ABB's defined benefit plan in 1997; ABB's health and welfare plans in 1999 and 2000; and ABB's payroll in 2004. Fidelity lost money on the corporate services it provided to ABB, but it made a substantial profit on the work it did for the PRISM Plan.

Avoiding a fixed-fee recordkeeping charge was particularly important to Sackie because he was responsible for "signing off" on any such fees in the Plan. [Tr. 187-88]. Although Sackie "was not familiar with rebates" and Cutler had "expertise" in that area, Sackie "had responsibility for the relationship with Fidelity." [Tr. 181]. Fidelity described Sackie as "ABB's primary decision maker [who] was instrumental in bringing this multipractice relationship to Fidelity (DC, DB & H&W)" and "a valued (referenceable) senior contact[.]" [Ex. P918 at p. 3 (FID-ABB-P 36404); Tr. 233]. Sackie's "best arrangement" was to have the Plan remove the Wellington Fund and forcibly transfer all participant investments in that Fund into the Freedom Funds. [Ex. P331; Ex. P460 at p. 3 (ABB-KEN-50927); Ex. P1 at p. 59-61 (ABB 87-89); Doc. 623 at p. 50-51].

13

ABB argues that because it chose the second option which did not give Fidelity as much as the third option, it was not motivated to benefit Fidelity or itself. But ABB's decision not to elect the most beneficial outcome does not show its mapping of the Wellington assets had nothing to do with Fidelity's proposal or ABB's self-interest. The second option largely achieved ABB's objective which was to eliminate most hard dollar fees.

Based on this circumstantial evidence, the Court finds it more likely than not that ABB decided to remove the Wellington Fund and map its assets into the Fidelity Freedom Funds to benefit ABB. The Court cannot say this was its sole motivation. Lifestyle funds were coming into vogue at this time and the Wellington Fund had a short period when it did not perform as well as it had previously. However, given the procedural irregularities including the strong performance of the Wellington Fund during the time period specifically identified in the IPS, ABB's inconsistent explanations for removing the Wellington Fund and mapping its assets to Fidelity Freedom Funds, the fact that ABB took a substantial part of the PRISM Plan's assets and put them in an investment that was so new that ABB needed to make an exception to the IPS, and Fidelity's explicit offer to give ABB a better deal if the Wellington assets were mapped into the Fidelity Freedom Funds, the Court is confident that ABB was conflicted when it chose to take the Wellington Fund assets and put them into the Fidelity Freedom Funds. The Court finds that there are too many coincidences to make the beneficial outcome for ABB serendipitous, particularly considering the powerful draw of self-interest when transactions are occurring out of sight and are unlikely to ever be discovered.

Finally, as a result of the mapping of the assets of the Wellington Fund into the Freedom Funds, the PRISM Plan sustained a loss because the Wellington Fund consistently outperformed the Freedom Funds after the mapping occurred until the six year statute of limitation ran.[10]

## III.   Conclusions of Law

### A.   Liability

The Eighth Circuit has held that the *Firestone* abuse of discretion standard applies to Plaintiffs' claim that the ABB Defendants violated ERISA when they eliminated the Vanguard Wellington Fund and mapped its assets to the Fidelity Freedom Funds.

> Like most circuits to address the issue, we see no compelling reason to limit *Firestone* deference to benefit claims. "'Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion.'" Firestone, 489 U.S. at 111, 109 S.Ct. 948 (quoting *Restatement (Second) of Trusts* § 187 (1959) (alterations omitted)). "This deferential standard reflects our general hesitancy to interfere with the administration of a benefits plan." *Layes v. Mead Corp.*, 132 F.3d 1246, 1250 (8th Cir. 1998). Given the grant of discretion in this case, the district court should have reviewed the Plan administrator's determinations under the Plan for an abuse of discretion.

---

[10] For clarification, the Court is not finding that ABB breached any fiduciary duty by choosing a fund which did not perform as well as the Wellington Fund. The relative performance of the Freedom Funds and the Wellington Fund is only relevant to determine whether a loss was sustained by the Plan when ABB intentionally sought to benefit itself by mapping the Wellington Fund to the Freedom Funds. ABB's actions would be a breach of the duty of loyalty even if the Freedom Funds did better than the Wellington Fund over the same time period. The difference is that there would be no cause of action because under ERISA, unlike trust law, there must be a loss before there is a breach of the duty of loyalty. Daniel Fischel and John Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule*, 55 U. CHI. L. REV. 1105 (Fall 1988).

*Tussey*, 746 F.3d at 335.[11]

    *Firestone* requires a court to weigh any conflict of interest by a plan administrator with all other factors to determine whether there has been an abuse of discretion. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 116-17 (2008). "[A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 117. "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits. See Herzel & Colling, The Chinese Wall and Conflict of Interest in Banks, 34 Bus. Law 73, 114 (1978) (recommending interdepartmental information walls to reduce bank conflicts); Brief for Blue Cross and Blue Shield Association as *Amicus Curiae* 15 (suggesting that insurers have incentives to reward claims processors for their accuracy); cf. generally J. Mashaw, Bureaucratic Justice (1983) (discussing internal controls as a sound method of producing administrative accuracy)." *Id.* at 117-18. Finally, the Supreme Court warned "against creating formulas that will "falsif[y] the actual process of judging" or serve as "instrument[s] of futile

---

[11] The Court assumes that the *Firestone* abuse of discretion standard applies to violations of a fiduciary's breach of the duty of loyalty pursuant to 29 U.S.C. § 1106. The Court has already found, without consideration of *Firestone* that the Defendants breached their fiduciary duty of loyalty when they mapped the Wellington Fund into the Freedom Funds.

casuistry." *Id.* (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 489 (1951)). The Court added that there "are no talismanic words that can avoid the process of judgment." *Glenn*, 554 U.S. at 119. Finally, ERISA represents a "'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004). "*Firestone* deference preserves this 'careful balancing' and protects the statute's interests in efficiency, predictability, and uniformity." *Conkright v. Frommert*, 559 U.S. 506, 507 (2010).

The Eighth Circuit has said that the abuse of discretion standard means "we will uphold [a fiduciary's] decision to deny benefits if it is reasonable." *Maune v. Int'l Bhd. of Elec. Workers, Local No. 1 Health & Welfare Fund*, 83 F.3d 959, 963 (8th Cir. 1996). "We measure reasonableness by whether substantial evidence exists to support the decision, meaning more than a scintilla but less than a preponderance." *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008) (internal quotation marks omitted). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir. 2004) (internal quotation marks omitted). "If substantial evidence supports the decision, it should not be disturbed even if a different, reasonable interpretation could have been made." *Id.* However, the Eighth Circuit recognizes that a conflict of interest must also be considered when applying *Firestone* review. "Where a fiduciary both evaluates claims for benefits and pays benefits claims, the court still applies the deferential abuse-of-discretion standard, but the fiduciary's conflict of interest is one

factor to be considered in the review.  *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 115-18, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)."  *Hampton v. Reliance Standard Life Ins. Co.*, 769 F.3d 597, 601(8th Cir. 2014).

Based on the standards established by the Supreme Court and the Eighth Circuit, the Court finds that the ABB Defendants did abuse their discretion when they removed the Wellington Fund and mapped its assets into the Fidelity Freedom Funds.  To be clear, a non-conflicted fiduciary could have chosen the Freedom Funds.  While all target funds carry high fees,[12] target funds were becoming popular in 2000 and there were not many target funds to choose from.  Because they were new and growing in popularity, it would not be unreasonable for a fiduciary to make an exception to the rule that a sustained track record was needed to at least put the investment on the platform.  But the removal of the Wellington Fund from the PRISM platform and the mapping of its assets to the Freedom Funds was an abuse of discretion because it was motivated in large part to benefit Fidelity Trust and ABB, not the Plan participants.

First, ABB has provided only one justification for its decision to map the Wellington Fund into the Freedom Funds and it is inconsistent with the justification Mr. Cutler gave for removing the Wellington Fund at the PRC's initial meeting in May 2000.  Mr. Cutler indicated at trial that the assets of the Wellington Fund were mapped to the Fidelity Freedom Funds because the Wellington Fund was a "balanced fund" and the Freedom Funds were also "balanced funds," meaning that both funds invested jointly in stocks and

---

[12] Target funds, which have been described as funds of funds, have high fees because the target fund itself charges fees and all the funds in the target fund charge fees as well. For several years, Fidelity charged an additional fee to the PRISM Plan each time new funds became part of the Freedom Funds.

Case 2:06-cv-04305-NKL   Document 771   Filed 07/09/15   Page 18 of 24

bonds. [Tr. 1063-64]. However, when Mr. Cutler first recommended the Wellington Fund's removal, he explained that removal would allow participants to "be empowered to create their own balanced fund using either actively or passively managed core fund offerings." [Ex. P447, at p. 3 (APP 696)]. Mapping the Wellington Fund to the Freedom Funds, which effectively replaced the Wellington Fund with the Freedom Funds, was contrary to Mr. Cutler's original stated purpose for removing the Wellington Fund. The Freedom Funds were designed to remove decision-making from the participant instead of "empowering" participants to "create" their own balanced fund.

Moreover, the Freedom Funds and the Wellington Fund were not comparable as to costs. While the Wellington Fund had competitive expense ratios [Tr. 171] and provided only 15 basis points in revenue sharing, the Freedom Funds charged 35 basis points. [Ex. P1, at p. 27 (ABB 55)]. This factor was not even considered by Mr. Cutler or Mr. Sackie.

Further, the Wellington Fund made up a substantial part of the PRISM Plan assets. At the time, approximately $120,000,000 was invested in the Wellington Fund; participants liked the fund. Yet in an effort to "give the participants more freedom," their money was put in a fund they did not choose and one that was so new to the marketplace that an exception had to be made to put it on the PRISM platform. Even with the elimination of the Wellington Fund,[13] there were other investments that the Wellington assets could have been defaulted to, but there is no record of them even being discussed. The only

---

[13] The removal of the Wellington Fund was done at the same time that its funds were transferred into the Freedom Funds. There is no record of the PRC approving these actions. Instead, on March 30, 2001, Mr. Sackie signed the document removing the Wellington Fund and transferring the assets to the Freedom Funds. It was not until 2002 that the Plan's Trust Agreement was signed to reflect this action by Mr. Sackie.

justification for the mapping to the Freedom Funds was the great similarity between the Wellington Fund and the Freedom Funds, *i.e.* they were both allocated funds designed to average risks – the very reason given for eliminating the Wellington Fund in the first place. Cherry picking information is not substantial evidence considering the record as a whole.

ABB argues that it was not responsible for the money going to the Freedom Funds because Plan participants had the right to invest their Wellington assets in any other Plan option. But ABB was aware that Plan participants did not generally make changes themselves and ABB's decision to default the Wellington Fund into the Freedom Funds resulted in most of the assets of the Wellington Fund ending up in the Fidelity Freedom Funds, consistent with ABB's understanding of participant decision making.

But even if there is substantial evidence to support ABB's decision, ABB's conflict of interest under these circumstances makes the removal of the Wellington Fund and the mapping of its assets to the Fidelity Freedom Funds an abuse of discretion. ABB actually had a discussion with Fidelity Trust about how Fidelity Trust would respond depending on what happened to the Wellington assets. They openly stated that if Fidelity got the Wellington assets, they would reduce the hard dollar fees that had to be paid for record keeping.[14] This is not an incidental consequence.

Further, during this time period, ABB had a very beneficial agreement with Fidelity to provide corporate services to ABB. Mr. Sackie, head of all benefits for ABB, was the point person that negotiated with Fidelity. He was a sophisticated businessman and could be expected to understand the market value of those corporate services and that at least one

---

[14] Fidelity did not offer to reduce its fees. It merely offered to reduce "hard dollar fees."

of the services was being provided without charge. ABB was obviously pleased with its corporate arrangement with Fidelity because it kept adding corporate services steadily after Fidelity Trust became the record keeper for the PRISM Plan. Fidelity took over recordkeeping for the PRISM Plan in 1995; ABB's defined benefit plan in 1997; ABB's health and welfare plans in 1999 and 2000; and ABB's payroll in 2004. Fidelity lost money on the corporate services it provided to ABB, but it made a substantial profit on the work it did for the PRISM Plan.

Finally, it would not have been difficult to construct a Chinese wall to avoid intentional or inadvertent cross subsidization or conflicted interests. Mr. Sackie did not have to serve as the point person for all services provided by Fidelity, both corporate and fiduciary. The administration of the PRISM Plan could have been separated, in fact not just in form, from the process for selecting stocks for the PRISM platform. There is no evidence of internal controls to prevent this conflict of interest or to "penalize for inaccurate decision making." While ERISA embodies a careful balance between fair treatment of the plan participants and the creation of retirement plans, it is not an onerous burden for a fiduciary to get a record keeper for the plan that is not also working on the fiduciary's personal business.

While it is difficult for plan participants to discover cross-subsidization because they lack access to meaningful information, ABB had ready access to that information. Yet when the Mercer Report directly warned of cross-subsidization, there is no record of a concerned response by ABB. To fairly administer the PRISM Plan, ABB did not need to use the assets of the Plan to achieve income neutrality for Fidelity.

Given all these factors, the Court finds that ABB abused its discretion when it removed the Wellington Fund and mapped its assets into the Fidelity Freedom Funds. It is more likely than not that but for its conflict of interest, ABB would not have made the same decisions.

The PRISM Plan also lost money as a result of ABB's abuse of discretion.[15] This is the one instance where the Court has found ABB chose a specific stock for the PRISM Plan to maintain revenue neutrality for Fidelity. Otherwise, the Court has only found a breach of the duty of prudence by failing to negotiate for lower fees and failing to get more revenue sharing returned to the PRISM Plan. *See* Doc. 623, p. 15-31, 56-61.

## IV.    Damages

As to the issue of damages, the Eighth Circuit has ruled that

> On remand, the district court should reevaluate its method of calculating the damage award, if any, for the participants' investment selection and mapping claims. *See Peabody v. Davis*, 636 F.3d 368, 373 (7th Cir. 2011) (clarifying in an ERISA case that "[t]he method of calculating damages is reviewed de novo; the calculations pursuant to the method are reviewed for clear error"). First, the district court awarded the amount that participants who had invested in the Wellington Fund presumably would have had if (1) ABB had not replaced the Wellington Fund with the Freedom Funds, and (2) the participants remained invested in the Wellington Fund for the entire period at issue. In light of the IPS requirement to add a managed allocation fund, it seems the participants' mapping damages, if any, would be more accurately measured by comparing the difference between the performance of the Freedom Funds and the minimum return of the subset of managed allocation funds the ABB fiduciaries could have chosen without breaching their fiduciary obligations.

---

[15] To have a successful breach of fiduciary duty claim, Plaintiffs must be able to prove both breach of fiduciary duty and a prima facie loss to the plan. *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994). Once Plaintiffs make this showing, "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by the breach of duty." *Id.* (quotation omitted).

*Tussey*, 746 F.3d at 339.

Plaintiffs argue that this method for calculating damages is wrong, citing precedent that suggests that the proper measure of damages would be the prudent alternative that provides the largest damages unless the breaching fiduciary sustains their burden of proof to establish that a lower yielding award is justified. *See Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1244 (2d Cir. 1989) ("the District Court should presume that, but for the breach, the funds would have been invested in the most profitable of the alternative and the errant fiduciary bears the burden of proving that the fund would have earned less than this amount."); *see also Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these."); *see Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir. 1995) (citing *Bierwirth* with approval). But even if the Court assumes that the performance of the alternative target fund that had the highest rate of return would be the proper measure of damages, Plaintiffs have presented no evidence of what that figure would be. Given that the Eighth Circuit has suggested a measure of damages, the Court finds that measure persuasive and Plaintiffs have failed to present evidence of the only measure of damages that the Eighth Circuit has tacitly approved. Therefore, Plaintiffs have failed to satisfy their burden of proof on the issue of damages. If the Court has misread the Eighth Circuit, its decision is subject to de novo review and can be corrected on appeal.

**V.      Conclusion**

For the reasons set forth above, the Court finds that Defendants abused their discretion; however, as Plaintiffs have failed to prove damages consistent with the Eighth Circuit's proposed calculation, judgment is in entered in favor of the ABB Defendants on the remaining claim.  Within thirty days of the date of this order, Plaintiffs may submit a new request for attorneys' fees consistent with the Eighth Circuit's opinion.


<u>/s/ Nanette K. Laughrey</u>
NANETTE K. LAUGHREY
United States District Judge

Dated:  <u>July 9, 2015</u>
Jefferson City, Missouri